# EXHIBIT J

In the Matter Of:

HAYSE vs CITY OF MELVINDALE, ET AL.

SERGEANT MATTHEW FURMAN

March 13, 2018

*Prepared for you by*



**USLEGAL SUPPORT**

The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 1–4

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   CHAD HAYSE,
          Plaintiff,
 6   -vs-                      Case No.: 17-cv-13294
     CITY OF MELVINDALE, a political  Hon. Linda V. Parker
 7   Subdivision of the State;   Mag. Elizabeth A. Stafford
     MELVINDALE CITY COUNCIL, a
 8   legislative body of the City of
     Melvindale; NICOLE BARNES,
 9   WHEELER MARSEE, MICHELLE SAID
     LAND, DAVE CYBULSKI, CARL
10   LOUVET, and STEVEN DENSMORE,
     individuals, sued in their
11   official and personal capacities,
          Defendants.
12   --------------------------------/
13   DEPONENT:    SERGEANT MATTHEW FURMAN
14   DATE:        Tuesday, March 13, 2018
15   TIME:        10:23 a.m.
16   LOCATION:    Deborah Gordon Law
17                33 Bloomfield Hills Parkway, Suite 220
18                Bloomfield Hills, Michigan
19
20   REPORTER:    John J. Slatin, RPR, CSR-5180
21                Certified Shorthand Reporter
22
23                (Appearances listed on page 2)
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3       DEBORAH L. GORDON (P27058)
 4       ELIZABETH MARZOTTO TAYLOR (P82061)
 5       Deborah Gordon Law
 6       33 Bloomfield Hills Parkway, Suite 220
 7       Bloomfield Hills, Michigan  48304
 8       (248) 258-2500
 9       dgordon@deborahgordonlaw.com
10       emarzottotaylor@deborahgordonlaw.com
11           Appearing on behalf of the Plaintiff.
12
13       GREGORY M. MEIHN (P38939)
14       MATTHEW WISE (P76794)
15       Foley & Mansfield, PLLP
16       130 E. Nine Mile Road
17       Ferndale, Michigan  48220
18       (248) 721-8183
19       gmeihn@foleymansfield.com
20       mwise@foleymansfield.com
21           Appearing on behalf of the Defendants.
22
23           (Appearances continued on page 3)
24
25
```

**Page 3**

```
 1   APPEARANCES (Continued):
 2
 3       LAWRENCE J. COOGAN (P42433)
 4       4146 Oakwood Boulevard
 5       Melvindale, Michigan  48122
 6       (313) 381-0044
 7       lawrencejcooganlaw@yahoo.com
 8           Appearing as co-counsel on behalf of
 9           the Defendants.
10
11       ALSO PRESENT:  Chad Hayse
12                      Richard Ortiz
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   TABLE OF CONTENTS
 2
 3   WITNESS                              PAGE
 4
 5   SERGEANT MATTHEW FURMAN
 6
 7       Examination by Ms. Gordon          5
 8       Examination by Mr. Coogan        296
 9       Re-Examination by Ms. Marzotto Taylor  324
10       Re-Examination by Mr. Coogan     333
11       Re-Examination by Ms. Marzotto Taylor  336
12
13   EXHIBITS:                       IDENTIFIED
14
15           (None offered)
16
17
18
19
20
21
22
23
24
25
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 5–8

Page 5

```
1                    Tuesday, March 13, 2018
2                    Bloomfield Hills, Michigan
3                    10:23 a.m.
4                    *  *  *
5             (Parties present as indicated.
6              Mr. Wise is not present.)
7                    *  *  *
8             SERGEANT MATTHEW FURMAN,
9       having been first duly sworn, was examined and testified
10      as follows:
11                      EXAMINATION
12  BY MS. GORDON:
13  Q.   Officer Furman, please state your full name and address
14       for the record.
15  A.   First name is Matthew, M-a-t-t-h-e-w.  Last name is
16       Furman, F-u-r-m-a-n.
17            Home address is 15207 Cicotte, that's
18       C-i-c-o-t-t-e, Avenue, Allen Park, Michigan.  ZIP code,
19       48101.
20  Q.   What is your date of birth?
21  A.   04-18-1985.
22  Q.   So, that makes you how old today?
23  A.   32.
24  Q.   Okay.  Are you married?
25  A.   No.
```

Page 6

```
1   Q.   Have you been married?
2   A.   No.
3   Q.   What is your educational background?
4   A.   Well, I went to Catholic school through eighth grade.  I
5        went to public high school.  I --
6   Q.   What public high school did you go to?
7   A.   Lincoln Consolidated High School.
8   Q.   What city is that in?
9   A.   Ypsilanti Township.
10  Q.   Okay.  And did you go there beginning in ninth grade?
11  A.   Yes.
12  Q.   So, ninth through twelfth?
13  A.   That's correct.
14  Q.   And what year did you graduate?
15  A.   2003.
16  Q.   Okay.  Any post high school education?
17  A.   Yes.
18  Q.   Okay.  What is it?
19  A.   Went to Washtenaw Community College.
20  Q.   When did you begin there?
21  A.   2003.
22  Q.   Okay.  And how long were you -- were you enrolled
23       full-time?  Part-time?
24  A.   Part-time.
25  Q.   Okay.  What -- and what happened with that?
```

Page 7

```
1   Q.        Did you obtain a degree or --
2   A.   I did.
3   Q.   -- some hours or what?
4   A.   I did.  I obtained an associate's degree.
5   Q.   And when was that?
6   A.   I believe 2008.
7   Q.   Okay.  And is there something the associate's degree is
8        in?
9   A.   Yes.
10  Q.   What is that?
11  A.   Criminal justice.
12  Q.   Okay.  And you obtained that in '08?
13  A.   (Nods head.)
14  Q.   That's --
15  A.   Correct.
16  Q.   -- a "yes" for the record?
17  A.   Yes.
18  Q.   Okay.  Any other educational background?
19  A.   Yes.
20  Q.   What is it?
21  A.   I went to Eastern Michigan University, obtained my
22       bachelor's degree in criminology.
23  Q.   When was that?
24  A.   I believe, 2011, I graduated.
25  Q.   When did you begin?
```

Page 8

```
1   A.   Roughly '08.
2   Q.   Okay.  Any other educational background?
3   A.   Just work-related training through the department.
4   Q.   What have you reviewed to get ready to give your
5        deposition today?
6   A.   Just my mental notes, you might say.
7   Q.   Okay.  Well, what documents did you review?
8   A.   I had read over -- it's called the -- the transcripts,
9        part of it --
10  Q.   Of?
11  A.   -- from Mr. Hayse's hearing.
12  Q.   Okay.
13  A.   Just basically my part where I testified.
14  Q.   Okay.  What else?
15  A.   I believe that's it offhand.
16  Q.   How about some of the dep testimony in this case?
17  A.   No, ma'am.
18  Q.   How about any of the documents sent to you with regard
19       to discipline or orders?
20  A.   No.
21  Q.   Are you sure about that?
22  A.   Yes.
23  Q.   And did you have the transcript from the Hayse hearing?
24  A.   I conducted a FOIA some time ago and obtained a copy.
25  Q.   Okay.  And roughly when was that?
```

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 9–12

**Page 9**

1  A.  I don't know, to be exact.
2  Q.  Well, so how long after the hearing?  Let's do it that
3      way.
4  A.  I don't know, to be exact.
5  Q.  Why did you FOIA the material?
6  A.  Well, I was interested to see what was in it.
7  Q.  Why?
8  A.  Well, I suppose human nature would be curiosity.
9  Q.  Well, what were you curious about?
10 A.  What was in the -- what was said during the meeting.
11 Q.  But -- I mean, so you had to pay for these documents?
12 A.  That's correct.
13 Q.  What did you receive through your FOIA request?
14 A.  A copy of the transcript.
15 Q.  Is that all you asked for, or did you ask for the
16     hearing file?
17 A.  I believe that was -- that was -- all I received was
18     that and the audio from it as well.
19 Q.  And did you listen to the audio?
20 A.  I did.
21 Q.  So, you wanted to know how -- what had happened at the
22     hearing where Chief Hayse lost his job?
23         MR. MEIHN:  I'll object.  That's not his testimony,
24     and it's not a question.
25         But go ahead.  Answer it if you can, please.

**Page 10**

1  A.  I was just curious to see what you said.
2  BY MS. GORDON:
3  Q.  I know, but there's a reason you were curious.  What was
4      it?
5  A.  I was just curious.  I like to know what was said.
6  Q.  Okay.  You were not having a hearing yourself.  You were
7      one of many witnesses, and you sought out the
8      transcript.
9         Why was that?
10        Did you like have a grudge against the chief?  Did
11     you want to see if he was treated fairly?  What was your
12     thinking?
13 A.  I was not present for the hearing aside from when I
14     actually gave testimony.  The rest of the time, myself
15     and all other witnesses were sequestered.  So, I was
16     not, at that time, able to hear anything else that
17     occurred, and I was curious as to what else occurred
18     other than the section of the time that I was in the
19     room.
20 Q.  You were in favor of Chief Hayse being removed; correct?
21 A.  I was in favor of there being a hearing to determine
22     whether he should.
23 Q.  I didn't ask you that.
24 A.  I had no vote and input, ma'am.
25 Q.  I didn't ask you that either.  And you know what?  I

**Page 11**

1      already knew that.
2         You were in favor of Chief Hayse being removed; is
3      that correct?
4  A.  Absolutely.  I think he should have been removed much
5      earlier in his career due to his unethical and
6      incompetent behavior.
7  Q.  Okay.  Did you ever put in writing to anybody that he
8      had unethical behavior?
9  A.  No.  I filed verbal complaints with my direct
10     supervisor --
11 Q.  Okay.  Well, I didn't ask you --
12 A.  -- which was Lieutenant Welch.
13 Q.  You know what?  I didn't ask you about verbal
14     complaints.
15 A.  Okay.  Well, I'm just expounding on my answer.
16 Q.  I know.
17 A.  Okay.  So, you're going to --
18 Q.  So -- hang on.
19        You never put anything in writing to anybody, the
20     Public Safety Commission, the mayor, legal counsel, the
21     attorney general's office, the Michigan State Police,
22     that the chief was incompetent.
23        I think you've said -- I'm correct on that; right?
24 A.  Oh, extremely so, yes.
25 Q.  I'm extremely correct?

**Page 12**

1  A.  You're extremely -- you're correct that I said Mr. Hayse
2      is incompetent.  I would say he was extremely
3      incompetent.
4  Q.  Okay.  You've got to listen --
5         THE REPORTER:  I'm sorry.  "Would" or "would not
6      say he was extremely --"
7  BY MS. GORDON:
8  Q.  You know what, Officer --
9  A.  He was extremely incompetent.
10 Q.  You've got to listen to my questions.
11 A.  Well, then don't interrupt me when I give the answer.
12 Q.  Okay.  This is not the Mark Furman Show -- Matthew
13     Furman Show.  You're just here --
14 A.  Okay.  I don't know if that was a dig at Mark Fuhrman
15     and the OJ situation, but my name is Matthew, and I'd
16     appreciate if -- if you wouldn't --
17 Q.  Yeah.  I -- you know what?
18 A.  -- refer me first to Mark Fuhrman.
19 Q.  Don't tell me what I'm going to do in this dep.  I'll
20     call you what I want, and if I make a mistake, I
21     apologize in advance.
22 A.  Wow.
23        MR. MEIHN:  Counsel, you will not call him what you
24     want.  You will treat him with respect, and he --
25        MS. GORDON:  I get the name mixed up, and I'm

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

**Page 13**

1 treating him with respect.
2     MR. MEIHN:  No, I understand you did.  And I'm not
3 blaming you on that.  And you need to treat him with
4 respect --
5     MS. GORDON:  I am.
6     MR. MEIHN:  -- and he needs to do the same thing
7 back to you.
8     MS. GORDON:  Okay.  Read the last question, John.
9 BY MS. GORDON:
10 Q.  You have to listen to the questions, Officer, or you're
11   going to be here a really long time, otherwise.
12     You shrug your shoulders.
13     Are you getting paid for today?
14     MR. MEIHN:  Counsel, please.
15     MS. GORDON:  I'm making a record, Counsel.
16     MR. MEIHN:  You are.
17 BY MS. GORDON:
18 Q.  You just shrugged your shoulders.
19     Are you getting paid for your time here today?
20 A.  **Yes, ma'am, I am.**
21 Q.  Okay.  What is your pay today?
22     Are you on an hourly basis?
23 A.  **That's correct.**
24 Q.  How much do you get paid an hour?
25 A.  **I'm not sure of my exact wage.**

**Page 14**

1 Q.  Well, give me a rough idea.
2 A.  **Roughly $44.**
3 Q.  How much do you make a year?
4 A.  **It varies by how much overtime I work.**
5     **My base wages, I believe, are 61.**
6     MR. MEIHN:  Are you going to go back and have him
7 read that last question, or are we --
8     MS. GORDON:  Of course.
9     Do you remember the question, John?
10     THE REPORTER:  One second, please.
11     MS. GORDON:  It was about whether -- what he put in
12 writing, and I listed a bunch of entities.  And then his
13 answer was "extremely" -- "extremely so."
14     MR. MEIHN:  Please, Deb.  You're testifying.  His
15 answer will reflect on the record.
16     MS. GORDON:  Okay.  That wasn't on the record.  I
17 was telling my court reporter where to look.
18     Go ahead, John.
19     THE REPORTER:  One second, please.
20     MR. MEIHN:  Can we please -- also, Mr. Reporter,
21 would you please let us know when and when you are not
22 on the record so that I know that?
23     MS. GORDON:  Okay.  You can watch his hands.
24     Go ahead.
25     MR. MEIHN:  No.  Well, let's act like people.

**Page 15**

1     MS. GORDON:  I -- we're not acting like people.  We
2 are people.
3     Got it?
4     THE REPORTER:  One second, please.
5     MR. MEIHN:  Mr. Court Reporter, when we're off the
6 record, I would appreciate you letting me know, and I
7 would appreciate you letting me know when we go back on
8 the record so that I can fulfill my duties.  And if
9 you're not willing to do that, you need to let me know
10 right now.
11     MS. GORDON:  Okay.  John, don't answer any
12 questions here.
13     MR. MEIHN:  All right.
14     MS. GORDON:  You're off.
15     MR. MEIHN:  We're going to take a break.  We'll
16 come back in 10 minutes, and when you want to conduct
17 this within --
18     MS. GORDON:  Stay on the record.
19     MR. MEIHN:  -- the rules of professional ethics and
20 in the oath of office you took as an attorney, Deb, then
21 we'll come back, but this is going into an argument that
22 has no basis.  I've asked a simple question.
23     MS. GORDON:  You're now arguing.
24     MR. MEIHN:  I'm not arguing now.  I've had enough
25 of the abuse.

**Page 16**

1     MS. GORDON:  Yeah.  You're arguing with my court
2 reporter.
3     MR. MEIHN:  No.  You just instructed your court
4 reporter not to tell me anything, when he's off or on,
5 and I'm asked him to follow the rules and do that.
6     MS. GORDON:  No, I --
7     MR. MEIHN:  I'll be back in 5 minutes, and we'll
8 see how we can pick up.
9     MS. GORDON:  I -- I instruct -- keep going, John.
10 I instructed him that he did not have to answer
11 your question.
12     MR. MEIHN:  Understood.
13     THE REPORTER:  So, we're off?
14     (Short recess at 10:33 a.m.)
15         *   *   *
16     (Record resumed at 10:39 a.m.)
17     (Record repeated by the reporter.)
18 BY MS. GORDON:
19 Q.  Okay.  That's your answer, but I'll ask the same
20   question with regard to unethical behavior.
21     You've never put anything in writing to the Public
22 Safety Commission, to the mayor, to the counsel, to city
23 council, to the Michigan State Police, to the attorney
24 general's office about the chief of police being
25 unethical.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 17–20

<table>
</table>

**Page 17**

1  Am I correct on that?
2  A.  No.
3  Q.  What -- what did you do in that regard?
4  What did you put in writing about the chief being
5  unethical?
6  A.  After Mr. Hayse was terminated, I did send letters to
7  the attorney general, Michigan State Police, MCOLES, the
8  FBI --
9  MR. MEIHN:  Slow down for a minute.  Just each one
10  so that -- go ahead, please.
11  A.  -- in regards to his behavior.
12  BY MS. GORDON:
13  Q.  And what did you say in those letters?
14  A.  I don't recall exactly.  I don't have them.
15  Q.  Well, what was the gist of them?
16  A.  I'm not going to guess at something that's not in front
17  of me.
18  Q.  Okay.  Well --
19  (Outside interruption; discussion
20  held off the record.)
21  BY MS. GORDON:
22  Q.  Okay.  And did you get a response to those letters?
23  A.  I got a response from MCOLES.
24  Q.  What did they say?
25  A.  That they would have the copy of the letter on file, I

**Page 18**

1  believe.
2  Q.  Well, did you get a response from anybody else?
3  A.  No.
4  Q.  Okay.  So, what was the unethical behavior you were
5  concerned about?
6  A.  Well, in the course of my duties, Mr. Hayse had given me
7  instructions which were in violation of the United
8  States Constitution and the Michigan Constitution.
9  Q.  Okay.  Well, go ahead.
10  Did you finish?
11  A.  No.
12  Q.  Okay.  What were they?
13  A.  Well, he wanted me to conduct my traffic stops and the
14  way I enforce the law based upon people's age, race and
15  gender.  And --
16  Q.  That's -- that was the unethical conduct or is there
17  more to it?
18  A.  That's -- that's part of it.
19  Q.  Okay.  And that's against the Constitution?
20  A.  Absolutely.
21  Q.  What's in the U.S. Constitution about race, age and
22  gender?
23  A.  Nothing.
24  Q.  Well, you said it was unconstitutional.
25  What were you -- you said he had asked you to

**Page 19**

1  engage in unconstitutional behavior.
2  A.  It is unconstitutional and illegal to base my actions on
3  a traffic stop based upon anyone's age, race or gender.
4  Q.  You think that's unconstitutional?
5  A.  Absolutely.
6  Q.  What part of the Constitution says that?  And what
7  Constitution are you talking about?
8  A.  The United States and the Michigan Constitution.
9  Q.  Well, those don't have anything in there about not
10  stopping somebody because of race or gender.
11  A.  Okay.
12  Q.  You are just guessing, or do you have some legal opinion
13  on that?
14  A.  I'll -- I'll refrain from answering that question.
15  Q.  You don't know?
16  A.  It's illegal.  I know that.  That's Police Academy 101.
17  It's illegal.
18  Q.  Well, you're the one that said "Constitution," not me.
19  So, I just wonder what you're referring to.
20  What makes -- what makes --
21  A.  Well, we're all equal under the Constitution.
22  Q.  Okay.  You don't know what you're -- you're not a
23  lawyer.
24  A.  Okay.  You're right.  I'm not.
25  Q.  And you apparently don't know what you're talking about.

**Page 20**

1  A.  Okay.
2  Q.  So, we're all equal.
3  Fine.
4  What else is unethical behavior that you've
5  reported or -- strike that -- been concerned about?
6  A.  I was ordered to write citations or tickets when the
7  tickets should not have been issued.
8  Q.  What are you referring to?
9  A.  An incident we had known as "Snowgate."  Mr. Hayse
10  ordered the desk sergeant to order myself and another
11  officer to immediately begin issuing parking citations
12  during a snow emergency.  However, there was no criteria
13  to meet those conditions.
14  Q.  I'm sorry.  What do you mean by "no criteria"?
15  A.  Well, in Melvindale, we have an ordinance, and if there
16  are 4 inches or more of snow on the ground and your
17  vehicle is not moved off the street so that the City may
18  plow, the City has the ordinance where we can issue
19  citations, tickets, for parking during snow emergency on
20  public roadway.  But the requirement is 4 inches of snow
21  or more.
22  At the time Mr. Hayse ordered us to write those
23  tickets, there was just a dusting of snow, not even
24  perhaps a half inch, and we were not supposed to write
25  those tickets.  However, he said it was -- the mayor

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 21

1     ordered them be written, and he ordered the sergeant to
2     order us to do so.  That created quite a -- quite a
3     ruckus.
4   Q.   Okay.  What was unethical about that?
5   A.   Well, the -- there was no justification to issue the
6     tickets, and we issued dozens of them.
7   Q.   Well, what does the word "unethical" mean to you?
8   A.   There was no legal justification to write those tickets.
9   Q.   That makes it unethical?
10   A.   Yes.
11   Q.   Okay.  And what year was this?
12   A.   I believe it was 2015.
13   Q.   Okay.  And how many cars were ticketed or whatever you
14     were doing?
15   A.   I don't recall an exact number.
16   Q.   Did you ticket any?
17   A.   Yes.
18   Q.   Even though it was unethical?
19   A.   It was direct orders.
20   Q.   Okay.  So, you did it?
21   A.   Correct.
22   Q.   Okay.  Did you put that in writing at the time, that you
23     had been ordered to do something that was unethical?
24   A.   An investigation was done.  I was --
25   Q.   Okay.  Did you put anything in writing?

Page 22

1        MR. MEIHN:  Please answer her question.
2   A.   No.
3        MR. MEIHN:  Sorry, Deb.
4        MS. GORDON:  Thank you.
5   BY MS. GORDON:
6   Q.   Anything else that the chief did that was unethical that
7     you have not covered here today?
8        You've mentioned two things.
9   A.   Well, a lot of it was in regards to the towing contract.
10   Q.   Okay.  I just want a list from you of what you're saying
11     is unethical that caused you to -- well, strike that.
12     Whatever you're saying is unethical.
13        What's the other unethical things; if any?
14   A.   Well, I think the chief became inappropriately involved
15     with the bidding process when the tow companies were
16     competing for the police towing contract.
17   Q.   Okay.  Was that unethical?
18   A.   I don't know.
19   Q.   Okay.
20   A.   It was concerning.
21   Q.   Okay.  I -- we're on -- we're on unethical now.
22        So, what else was unethical; if anything?
23   A.   I don't recall offhand.
24        Actually, I do recall something.
25   Q.   Go ahead.

Page 23

1   A.   I overheard Chad Hayse and former Lieutenant Mike Welch,
2     who was at one time suspended for perjury -- I overheard
3     them coming up with a plan to file a false police report
4     against Sergeant Easton.  At that time, Lieutenant Welch
5     stated he would do whatever it takes to make sure Easton
6     never becomes a lieutenant.  I was across the room from
7     them, and I was told not to say anything.
8   Q.   Okay.  And what did you do about -- what year was that?
9   A.   I'm not sure.
10   Q.   What did you do about that?
11   A.   I would -- I would think somewhere in the area of 2014.
12   Q.   Okay.  And what did you do about that?
13   A.   I didn't do anything.  I didn't want any problems.  I
14     don't know what was going on between Chief Hayse,
15     Lieutenant Welch and Sergeant Easton, and I didn't want
16     to be involved, and I didn't want any issues brought
17     upon myself.
18   Q.   So, somebody didn't want Easton -- Welch didn't want
19     Easton to become a lieutenant?
20   A.   Neither Welch nor Hayse.  They were very vocal about
21     that.
22   Q.   Okay.  And what was unethical about that?
23   A.   Well, they literally stood there, talking about what
24     they could come up with for a false report against
25     him --

Page 24

1   Q.   And what did they say?
2   A.   -- and coming up with ideas.
3        I believe it was tossed around that, you know,
4     maybe we could sell he's selling drugs, skipping work,
5     sleeping with people on the job, picking up hookers,
6     just trying to come up with ideas.
7   Q.   So, certainly, you must have put that in writing if you
8     heard somebody conspiring like that to break the law?
9     You must have gone to somebody?
10   A.   I was -- I was ordered by -- by Mr. Hayse to keep my
11     mouth shut.
12   Q.   Okay.  When did he order you to do that?
13   A.   Right after they had the -- him and Lieutenant Welch had
14     the conversation.  I was standing across the room by
15     our -- our trays --
16   Q.   Okay.  Well, you --
17   A.   -- the mail trays.
18   Q.   -- know how to write --
19        THE REPORTER:  Excuse me?  Sorry.  "-- standing
20     across the room --"
21   A.   By the mail trays, where the mail and stuff go.
22   BY MS. GORDON:
23   Q.   Well, you know how to write letters, obviously, because
24     you've written a bunch with regard to Chief Hayse.
25        So, you didn't write any letters, even though you

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 25–28

Page 25

1    were now being threatened and had supposedly observed
2    some conspiracy?
3  A. That's correct.
4  Q. You wrote -- you wrote no letters?  Okay.
5  A. I -- I was in fear of retaliation from Mr. Hayse and
6     Mr. Welch.
7  Q. What was your opinion of Lieutenant Easton at that time?
8  A. Are you referring to Sergeant Easton?
9  Q. Yes.
10 A. Somewhere between neutral and not really caring for him.
11    But he was my supervisor.  I showed him respect and did
12    my job in accordance with the law.
13        (Discussion held off the record.)
14 BY MS. GORDON:
15 Q. Have you ever had any problems, yourself, on Easton --
16    with Easton?
17 A. Yes.
18        (Discussion held off the record.)
19 BY MS. GORDON:
20 Q. And what are those?
21    What are the problems you've had with Easton?
22 A. I don't recall offhand.  I have not had any problems
23    with him in at least a couple years.  But I did have
24    issue with him in the past.
25 Q. You felt that Easton violated rules continually; is that

Page 26

1    correct?
2  A. I don't recall.  I'd have to see my original letter of
3     complaint --
4  Q. And you --
5  A. -- which I was instructed to write by Lieutenant Welch.
6  Q. And you felt that Easton wanted Goch & Sons to become
7     the towing service because he could get alcohol,
8     vacations and trips from them, and he could not get them
9     from Gene's; is that true?
10 A. I don't recall at this time.
11 Q. Does that sound familiar to you?
12 A. I don't remember what my issues were.
13 Q. Okay.  Well, I'll read you from Bates stamp 933.
14 A. May I see that document, ma'am?
15 Q. Yeah.  I'm going to read it to you and then I'm going to
16    hand it to you.
17 A. Okay.  I'd rather not comment until I've read the entire
18    document.
19 Q. That's fine.
20        "Sergeant Easton makes it clear he does
21    not like the fact that Gene's Towing makes
22    money from performing towing services for MED-
23    -- MEPD because the owner of Gene's Towing,
24    Paul Ott, refuses to buy Sergeant Easton things
25    he has asked for, including lunch, food, gift

Page 27

1    cards, alcohol, vacations and trips, games, and
2    concert tickets."
3    Do you remember saying that?
4  A. Lieutenant Welch had advised me of those things.  That's
5     correct.
6  Q. Okay.  You said:
7        "Sergeant Easton has often made reference
8     to wanting Goch & Sons to become the towing
9     service for MEPD because he knows they will
10    'take care of him' --"
11    put that in quotes --
12       "-- and provide him with the gifts and
13    things he wants."
14    Do you remember saying that?
15 A. I don't recall.
16 Q. (Reading.)
17       "Sergeant Easton has told me I should want
18    Goch & Sons to become our towing company
19    because they will take care of me as well."
20    Do you remember being told that?
21 A. No.
22 Q. Do you remember being told that -- strike that.
23    Do you remember expressing to Sergeant Easton that
24    you take satisfaction in simply doing your job, and you
25    don't want gifts and rewards?

Page 28

1  A. I have expressed that to everyone.  I'm sure I've
2     expressed that to him as well.
3  Q. You've expressed that to everyone?
4  A. I -- yeah, I take great pride in my job.  That's why I
5     became a police officer.
6  Q. Because you didn't want to take gifts?
7  A. Because I take pride in my job in upholding the law.
8  Q. Did you say that Sergeant Easton has made a habit of
9     punishing you when you impound a vehicle?
10 A. I don't recall.
11 Q. And you -- and -- and -- or do anything that will create
12    work for him?
13 A. Again, I'd -- I'd rather not comment until I see the
14    letter.
15 Q. Okay.  I'm just asking if you recall this.
16 A. No.  I mean, this was years ago.
17 Q. It's 2015, but okay.
18 A. Well, that's three years ago.
19 Q. I'm going to hand you Bates stamp 933 through 935.
20 A. Okay.
21        MS. GORDON:  Greg, can I talk to you for a second
22    while he's reading that?
23        MR. MEIHN:  Sure.  Yep.
24        (Short recess at 10:53 a.m.)
25              *  *  *

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 29–32

Page 29

1    (Record resumed at 10:56 a.m.)
2  BY MS. GORDON:
3  Q.  Done with the letter?
4  A.  Yes, ma'am.
5  Q.  Okay.  On a different topic, before I take your answers.
6    MS. GORDON:  You're running a tape here today,
7  John?  An audio tape?
8    THE REPORTER:  I am.
9    MS. GORDON:  I'm going to ask you to save that;
10  okay?  And I just served counsel with a Notice for Video
11  Deposition.  He's objecting to it, so we're going to go
12  forward today anyway on the audio.
13    MR. MEIHN:  And, John, would you just make sure
14  when you get done, I get a copy of the audio, too,
15  please?
16    THE REPORTER:  Can we go off the record for a
17  second?
18    MR. MEIHN:  Oh, absolutely.
19    (Discussion held off the record.)
20  BY MS. GORDON:
21  Q.  All right.  So, you've now looked at Bates stamp 933
22  through 936.
23    Does this refresh your recollection that on 1-6-15,
24  you wrote to Lieutenant Welch about Easton?
25    (Discussion held off the record.)

Page 30

1    MR. MEIHN:  Well, tell her that and just explain it
2  to her.
3  A.  This is 933, -34, -35.  I don't have a -36.
4  BY MS. GORDON:
5  Q.  I'm sorry.  It's through 935.
6  A.  Okay.
7  Q.  And you say the following things -- well, strike that.
8    Is this your letter?
9  A.  Yes, ma'am.
10  Q.  And you sent this to Welch?
11  A.  Yes.
12  Q.  And everything in it is correct and accurate?
13  A.  Yes.
14  Q.  Okay.  Okay.  Thank you.
15    MR. MEIHN:  I don't want you to get out of your
16  line.
17  BY MS. GORDON:
18  Q.  You have a -- a license to carry a concealed weapon; is
19  that correct?
20  A.  Yes.
21  Q.  Are you carrying a weapon today?
22  A.  No.
23  Q.  You were hired by Melvindale P.D. in 2012?
24  A.  Yes.
25  Q.  What were you doing immediately prior to that job?

Page 31

1  A.  I actually had my own firewood and lawn care business,
2    doing odd jobs, as I job-hunted.
3  Q.  Was there a name of the company?
4  A.  Matt's Firewood.
5  Q.  Okay.  And when did that begin?  When did you start
6    doing that?
7  A.  I don't recall the exact date.
8  Q.  Give me a rough idea.
9  A.  I'm really not -- I -- I don't want to guess at it.  I
10    don't recall.
11  Q.  Okay.  Well, how long were you doing that business?
12  A.  A couple years, just here and there as time allowed and
13    I could find trees.
14  Q.  So, what were your jobs prior to going to Melvindale
15    Police Department?
16  A.  I worked for the University of Michigan for five years
17    at the Ross School of Business.  I was the night shift
18    manager up there in the Computing Services Department.
19  Q.  What did you do?
20  A.  Repaired computers, repaired printers, maintained the
21    student computer labs.
22  Q.  What was your title?
23  A.  Support services staff, I believe.
24  Q.  And why did you leave that job?
25  A.  I wanted to finish my bachelor's degree and attend

Page 32

1    police academy, and I couldn't do both while working.
2  Q.  So, support services staff.
3    And did students or faculty bring computers to you,
4    or what -- what is it you were working on?
5  A.  We had -- I worked at the business school and throughout
6    the complex.  We had Xerox machines, commercial
7    printers, and I would maintain those, repair them, fill
8    them up with paper and toner.
9  Q.  Okay.  This is printers and --
10  A.  Printers.  I did printers and I did computers.
11  Q.  All right.  What did you do on computers?
12  A.  Software updates, software installation, cleaned them.
13    Everything got very dusty there for some reason.  Just
14    general maintenance.  And if there's anything more in
15    depth, then we had other personnel who would do more
16    advanced things with the computers.
17  Q.  What was your hourly rate?
18  A.  I don't recall offhand.  I'm guessing it was $11ish an
19    hour.  It was not very career-oriented job.
20  Q.  Did you do it full-time?
21  A.  Yeah.  I worked -- I think my first maybe half a year
22    there was part-time, and then after that it was
23    full-time for 40 hours a week for the remainder of the
24    five years.
25  Q.  Did you work anywhere else during that five years, or

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 33

1       was that the only place of employment you had?
2  A.  I tried working a security job for a very short time,
3       but between that, school and U of M, I just couldn't do
4       it.  So, I quit there after about three months.  Other
5       than that, I believe it was just U of M.
6  Q.  Any other regular full-time jobs you held prior to going
7       to Melvindale Police Department?
8  A.  I worked at McDonald's for several years back in high
9       school.  I worked in a couple -- I grew up out in the
10      country, so I worked on a couple local farms.  I helped
11      my uncle on the family farm quite a bit.
12  Q.  Was it -- did you get paid for that?
13  A.  With my uncle it was more or less volunteer, but the
14      other farm jobs was paid.
15  Q.  What city was that in?
16  A.  Well, I grew up in Willis.
17  Q.  Where is Willis?
18  A.  Ypsilanti, Milan, Belleville, Sumpter area.
19  Q.  Okay.  Okay.
20  A.  And my uncle's farm is in Saline.  So, I would go out
21      there and help and visit with everybody.
22  Q.  Have you listed all of your full-time employment for me
23      now, or are there some other jobs that you have had
24      held?
25  A.  Let me think for a second.

Page 34

1       I believe that's everything, ma'am.
2  Q.  Did you request a complete copy of your personnel file
3      from the City of Melvindale on August 31, 2017?
4  A.  Yes, ma'am.
5  Q.  Why was that?
6  A.  Well, I wanted to know what was in it.
7  Q.  For what reason?
8       You had already been there five years and had not
9      previously requested the file.
10      Why did you request it then?
11  A.  Well, I had, on several occasions while Mr. Hayse was
12      chief, requested to see my file.  He would never let me
13      see it.  He told me I could see it when I was gone, when
14      he got rid of me, when I quit.
15  Q.  Did you request it in writing from him at any time?
16  A.  I requested in writing once and verbally several other
17      times.
18  Q.  Okay.  So, you filed a written request for your file on
19      August 31, 2017; correct?
20  A.  That's correct.
21  Q.  Okay.  And what was the purpose of that?
22  A.  To see what was in my file.  I had never been allowed to
23      see it.
24  Q.  And had you asked the Public Safety Commission to see
25      your file at any time?

Page 35

1  A.  No, ma'am.  I went to Mr. Hayse.  He had them in his
2      office, I believe.
3  Q.  Okay.  And you're aware, I suppose, that the police
4      department reports to the Public Safety Commission?
5  A.  That's correct.
6  Q.  And the Public Safety Commission manages and runs the
7      police department?
8  A.  That's correct.
9  Q.  Prior to being hired at the Melvindale P.D., you had
10      had --
11  A.  Excuse me.
12  Q.  -- a bench warrant out for you at one point; is that
13      correct?
14  A.  That is correct.
15  Q.  What was that for?
16  A.  I got a seat belt ticket, and I did not pay the seat
17      belt ticket.  I got it while parallel parking.  I didn't
18      have the money to pay it, put it in a stack of paperwork
19      and forgot about it.
20  Q.  And what happened after the bench warrant was issued?
21  A.  Well, I had resolved it, got my -- took care of it, paid
22      the ticket, got my license reinstated and everything
23      squared away as quickly as possible.
24  Q.  So, your license had been suspended?
25  A.  That's correct.

Page 36

1  Q.  And when was that?
2  A.  I don't remember.  I'm guessing 2007, maybe.  I don't
3      recall offhand.
4  Q.  Okay.  So, you were driving without a license for a
5      period of time?
6  A.  That is correct.
7  Q.  You were driving on a suspended?
8  A.  For a couple weeks.  I didn't realize it.  Yes.
9  Q.  And how did you receive the bench warrant?
10  A.  I got pulled over.
11  Q.  And what city was that?
12  A.  Standard traffic stop.
13       I believe it was Sumpter Township.
14  Q.  Okay.  And what happened after you got pulled over?
15      Were you arrested?
16  A.  Yes.
17  Q.  At the scene?
18  A.  Yes.
19  Q.  Okay.  And what happened after you were arrested?  Where
20      were you taken; if anywhere?
21  A.  To the Sumpter Township Police Department.
22  Q.  Okay.  And did you remain there for more than a couple
23      hours?
24  A.  No.  I posted bond and -- or my parents came and posted
25      bond and took me home.

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 37–40

Page 37

1   Q.   Okay.
2   A.   And then I went and resolved everything right away.
3   Q.   Was your car impounded at that time when you were
4        arrested?
5   A.   Yes.
6   Q.   And how much did it cost you to get -- to pay for the
7        tow and to get your car out?
8   A.   I don't recall.  I recall it being very expensive,
9        particularly on my budget at that point.
10  Q.   Were you --
11  A.   I'm guessing it was --
12  Q.   Go ahead.
13  A.   I'm guessing it was several hundred dollars.
14  Q.   Did you get arrested in 2003 for solicitation of a
15       prostitute?
16  A.   Yes.
17  Q.   Okay.  And --
18  A.   That was all dismissed in court.
19  Q.   Okay.  And on what basis was it dismissed as you
20       understood it at the time?
21       Go ahead.
22       (Discussion held off the record.)
23  A.   I don't -- I'm not sure.
24  BY MS. GORDON:
25  Q.   Where were you arrested for that?

Page 38

1   A.   Detroit.
2   Q.   Where were you in Detroit at the time you were arrested?
3   A.   Somewhere near 94 and Michigan Avenue.
4   Q.   Okay.  And were you with a vehicle or not with a
5        vehicle?
6   A.   With a vehicle.
7   Q.   Okay.  And you were arrested by a City of Detroit police
8        officer?
9   A.   Yes.
10  Q.   And were you with a prostitute at the time you were
11       arrested?
12  A.   No.
13  Q.   Was there another person there?
14  A.   No.
15  Q.   Okay.  And was your car impounded?
16  A.   Yes.
17  Q.   Okay.  And how much did it cost you to get the car out
18       then?
19  A.   I don't recall.
20  Q.   Okay.  So, what's the next thing that happened after you
21       were -- this was an arrest?
22  A.   Technically.
23       I was immediately released.  But, yeah, same -- out
24       of the car and --
25  Q.   Okay.  All right.  So, what's the next thing that

Page 39

1        happened on the way to getting it resolved?
2   A.   I went to court several times.
3   Q.   Did you have counsel?
4   A.   No.
5   Q.   Okay.
6   A.   Well, I mean, there was a public defender there.
7   Q.   Okay.  So, you had -- you did have representation?
8   A.   Well, I did, yes.
9   Q.   Okay.
10  A.   Yeah.
11  Q.   And what -- did you end up working out some kind of an
12       arrangement where it would be dismissed?
13  A.   I showed up to court, and then I had to go back a couple
14       times.  Once we went to court and the judge didn't show
15       up, so everybody got sent home.  Then I ended up -- the
16       next time I went to court, they just ended up dismissing
17       it.
18  Q.   And what was the reason they dismissed it as you
19       understood that?
20  A.   I -- I don't know.  They just told me it was dismissed
21       and I could leave.
22  Q.   Did the police officer not show up?
23  A.   I believe she was there, but I'm not sure.  You're
24       talking years ago now.
25  Q.   And you've had moving violations; is that correct?

Page 40

1   A.   Had a seat belt ticket.  That's what caused the
2        suspended license.
3   Q.   What else?
4   A.   Had a couple speeding tickets.
5   Q.   What cities were those in?
6   A.   I don't recall.  I believe Saline, but I'm not sure.
7   Q.   Okay.  What else?
8   A.   I believe that's it.
9   Q.   Didn't you get a
10       failure-to-stop-at-a-safe-assured-distance ticket?
11  A.   Correct.
12  Q.   In Pittsfield Township?
13  A.   Correct.  Somebody made a -- a short stop in front of
14       me.  I slammed on my brakes and, unfortunately, I just
15       bumped them.  The driver actually apologized to me for
16       making the stop short, but his wife called the police,
17       so I received a ticket.
18  Q.   Okay.  And what other moving violations have you had?
19  A.   I don't recall.
20  Q.   What other arrests have you had?
21  A.   None.
22  Q.   Have any lawsuits ever been filed against you?
23  A.   Yes.
24  Q.   Okay.  What lawsuits have been filed against you?
25  A.   Well, somebody is suing me now for, I guess, excessive

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 41

1     force or -- I'm not sure exactly what the grounds are.
2 Q.   Use -- use of excessive force, assault and battery,
3     something to that effect?
4 A.   Correct.
5 Q.   Is that in federal court?
6 A.   Correct.
7 Q.   Okay.  And have you given a deposition in that case?
8 A.   No, I don't believe I have.
9     Well, I take that back.  I believe I have.
10 Q.   Okay.  And where did you go to give your deposition?
11 A.   I believe it was at the Melvindale Police Department, in
12     our conference room.
13 Q.   And roughly how long ago was that?
14     Well, it had to be fairly recently; right?
15 A.   I believe it was last year.  Early last year maybe.
16 Q.   Early 2017?
17 A.   I'm not positive.
18 Q.   Okay.  Who deposed you?
19 A.   Her lawyer.
20     I don't know his name.
21 Q.   Her lawyer.
22     What is the Plaintiff's name?
23 A.   Henderson.
24 Q.   And what does -- what were -- what are the circumstances
25     there she alleges occurred?

Page 42

1 A.   Well, she alleges she was TASERed ten times, which is
2     factually incorrect.  We have video and audio.
3 Q.   Okay.  And when did this occur?
4 A.   I don't recall the date.
5 Q.   What year?
6 A.   I don't recall for certain.
7 Q.   Is it H-e-n-d-e-r-s-o-n?  Is that --
8 A.   I believe.
9 Q.   What's her first name?
10 A.   I don't remember.
11 Q.   And are you a named defendant?
12 A.   Yes.
13 Q.   And who else is a defendant?
14 A.   Chad Hayse.
15 Q.   Who else?
16 A.   City of Melvindale.
17 Q.   Anybody else?
18 A.   Not to my knowledge.
19 Q.   Okay.  And did you have counsel at your deposition?
20 A.   Yes.  The City's -- Bob Siebert.
21 Q.   Robert Siebert?
22 A.   Yes.  I believe he was --
23 Q.   Okay.  What other times have you been involved in
24     lawsuits where you were a party?
25 A.   I think that's the only time I've ever been sued.

Page 43

1 Q.   Is there a lawsuit going on right now against you?
2 A.   That -- that is the one.
3 Q.   Okay.
4 A.   The Henderson.
5     (Discussion held off the record.)
6 BY MS. GORDON:
7 Q.   By the way, with regard to the Henderson case, am I
8     correct that the chief and the City have been dismissed
9     from the case?
10 A.   I'm not sure, ma'am.
11     MS. GORDON:  Hang on one second.
12 BY MS. GORDON:
13 Q.   Has a Robert McClintock filed a lawsuit against you?
14 A.   Not to my knowledge.
15 Q.   Well, he did.  You may not have been served --
16 A.   I --
17 Q.   -- but you were sued.
18 A.   I have not been served.  I have no knowledge of that.
19 Q.   Okay.  Has anybody taken out or attempted to take out a
20     Personal Protection Order with regard to you?
21 A.   Not to my knowledge.
22 Q.   Have you attempted to take out a Personal Protection
23     Order against anybody?
24 A.   No.
25 Q.   What policies and procedures govern your employment at

Page 44

1     the Melvindale Police Department?
2     All of them that we have --
3 A.   What are they?  Give me a list of what exists that you
4     know of.
5     Let's start with this.  I'll give you an easy one.
6     There's a Collective Bargaining Agreement; is that
7     correct?
8 A.   Yes.
9 Q.   Are you covered by that?
10 A.   Yes.
11 Q.   You're a union member?
12 A.   Yes.
13 Q.   What's the name of the union?
14 A.   Well, the unit I'm now would be the Melvindale Police
15     Supervisors Union.  That's their official name.
16 Q.   Are you now -- are you now a sergeant?
17 A.   That is correct, ma'am.
18 Q.   When did you become a sergeant?
19 A.   January 11th, 2018.
20 Q.   Okay.  What other policy -- well, the Bargaining
21     Agreement is not obviously a policy or procedure, but
22     it's a document that governs your employment.
23     What other documents contain rules and regulations,
24     policies and procedures of the Melvindale Police
25     Department that you're aware of?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 45

1  A.  I guess that would be the document, the Melvindale
2      Police Department Policies and Procedures.
3  Q.  Is there one document called that?
4  A.  It's typically a large binder with -- titled something
5      along those lines that contain all of our policies.
6          A lot of them are now being moved to the Internet,
7      online.
8  Q.  Is there anything that exists other than the binder
9      you're talking about that you're saying is referred to
10     as the policies and procedures?  Is there anything else
11     that exists?
12  A.  I -- I guess I don't understand the question.
13  Q.  Are there any other policies -- policy books, rule
14     books, guidelines?
15         You told me there is a binder that's got policies
16     and procedures in it.
17         Is there anything else that exists at the
18     Melvindale P.D. other than the binder that you're aware
19     of that sets forth rules of employment?
20  A.  Well, on the Internet, we have a website we use called
21     Police 1 Academy.  A lot of our policies, if they're
22     being updated, are placed on that website.  So, when we
23     log in, we have a list of all the policies as the chief
24     comes out with them.
25  Q.  What is Police 1 Academy?  Is that a Melvindale

Page 46

1      document?
2  A.  I guess I don't know how to answer that.
3          Police 1 Academy is a website, and any department
4      can subscribe and use their services.  So, there's all
5      kinds of training videos on there, and then you can list
6      assignments and things to read.  And part of that, you
7      can put your department policies on there.
8  Q.  Okay.  So, that's not created by Melvindale?  That's --
9      you have access to it?  Many --
10  A.  Well, Police 1 Academy is not created by Melvindale.
11  Q.  Okay.  So, I want to know what's created by the City of
12     Melvindale with regard to their policies and procedures
13     that you are aware of other than the binder.
14  A.  The binder.  I mean, generally anything that comes out
15     or gets updated goes in the binder.
16  Q.  Are you -- has that same binder with -- as it's updated
17     been at the department since you got there in 2012?
18  A.  Yes.
19  Q.  Okay.  Who is in charge of adding new policies or
20     procedures to it, as you understand it?
21  A.  As I understand it, the chief of police.
22  Q.  When is the last time it was updated from what you can
23     remember?
24  A.  We just had some new policies -- revised policies come
25     out about a week or two ago.

Page 47

1  Q.  What were those about?
2  A.  Most of it relates to the City of Dearborn.  They're
3      going to be taking over our police dispatch.  So, it's
4      basically all the information on their radio codes and
5      how they talk over the radio versus how we talk.
6          So, we have to basically learn how they do things
7      now.
8  Q.  Okay.  So, that's what was updated in the policies and
9      procedures?
10  A.  Correct.  There -- there were other stuff, but I don't
11     recall.  That was the main -- that was the main focus,
12     was the Dearborn radio transmission procedures.
13         MR. MEIHN:  Can you please stop yawning?
14         MR. COOGAN:  Yeah, I'll stop now.
15         MR. MEIHN:  Sorry.
16  BY MS. GORDON:
17  Q.  Do you have any members of the city council with whom
18     you are friends?
19  A.  No.
20  Q.  Nobody?
21  A.  I get along with everyone on the council, but nobody I
22     would consider a friend.
23  Q.  You don't consider Nicole Barnes a friend?
24  A.  No.  She's an acquaintance.  We get along, which is --
25  Q.  Haven't you gone out socially with her?

Page 48

1  A.  After Mr. Hayse suspended me, I did have a -- I was
2      instructed by Mr. Hayse and Mr. Welch -- well, by
3      Mr. Welch, not Mr. Hayse.  Let me correct that -- not to
4      speak to any member of the council, the mayor, the city
5      attorney, Rich, or anyone else, but I was --
6  Q.  I'm sorry.  Who instructed you on that?
7  A.  Lieutenant Welch.  Mike Welch.
8  Q.  Is that in writing?
9  A.  No, he verbally told me that --
10  Q.  Okay.
11  A.  -- at the time of my suspension.
12         He refused to provide any reason for the
13     suspension.  I was just told not to talk to anybody and
14     go home and keep my mouth shut.
15         And after being at home for quite some time, and my
16     union and me being unable to find out any reason or any
17     documentation for my suspension, I did contact
18     Ms. Barnes to -- a council member to express my concern.
19     And at that point, I did have a meeting with her, but
20     that's the first time I ever met with her outside of
21     work or really talked with her in-depth.
22  Q.  Where was -- where did you meet?
23  A.  We met at a bar --
24  Q.  What was it called?
25  A.  -- restaurant.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 49

1        Give me a second.
2        Broadcast Booth.
3   Q.   And when was this?
4   A.   This was during the time I was suspended.
5   Q.   So, we would be talking April 2016 or -- or after that?
6   A.   I don't recall the exact dates.
7   Q.   Well, that's what I'm showing as your -- roughly the
8        time you were suspended.
9        MR. MEIHN:  I don't -- I don't have that document.
10  A.   I'm -- I'm not -- I'm not sure.
11  BY MS. GORDON:
12  Q.   Okay.  Well, let's assume for a minute it was April --
13  A.   Okay.
14  Q.   -- of 2016, and you --
15  A.   It was 2016.
16  Q.   You met -- would have met with Ms. Barnes, when?
17  A.   During my suspension.
18  Q.   And why did you select Ms. Barnes to meet with?
19  A.   Well, I met with her, and I met with also Carl Louvet.
20       It wasn't a matter of selecting her for any particular
21       reason.  I just wanted to talk to somebody from council
22       or somebodies from council.
23  Q.   Okay.  But why did you pick those two?
24  A.   They seemed to be two of the more established members of
25       the community, and they seemed to have been on council

Page 50

1        for a while, to my knowledge.
2   Q.   Had you ever had a personal conversation with Ms. Barnes
3        prior to you going with her to The Broadcast Booth to
4        discuss your suspension?
5   A.   Yes.
6   Q.   Okay.  And when would that have been?
7   A.   When I -- myself and the ordinance officer had gone to
8        her residence, and I think we placed an abandoned
9        vehicle sticker on a boat or a trailer or something in
10       her backyard that wasn't properly -- it was parked on
11       the grass or something.  And she was not very happy
12       about that.  She actually came down to the station and
13       discussed it with Mr. Hayse.  And she was not happy with
14       me or the ordinance officer.  She yelled at both of us.
15       And, later, she actually apologized for it, several
16       weeks later, and there was really no conversation after
17       that, that I can recall.
18  Q.   Well, that wasn't a personal conversation.  That was a
19       business conversation you had with her; correct?  You
20       were out there on business?
21  A.   Yeah, it was all -- I mean, everything that I've
22       discussed with her has been work-related.  But, yes,
23       that was --
24  Q.   But I -- I asked you about a personal conversation.
25  A.   Oh, I'm sorry.  I thought you meant personal

Page 51

1        interaction.
2   Q.   Have you ever had a personal conversation with her?
3        Something other than work?
4   A.   I mean, just hellos and stuff.  If I see her at the
5        Melvindale Street Fair or see her at -- you know, any
6        City event, I always say "hello" to everybody and try to
7        be social, but not really any conversation other than
8        "Hello" and "How are you?"
9   Q.   And how about Carl Louvet?  Have you had any person
10       conversations with him?
11  A.   Mr. Louvet?
12  Q.   Louvet.
13  A.   No.  Just City-related.
14  Q.   So, you've never had any personal conversations with
15       Barnes?
16  A.   Not that I can recall.
17  Q.   And you never had personal conversations with Louvet?
18  A.   Not that I can recall.
19  Q.   And you've been -- met once with Barnes at Broadcast
20       Booth to discuss a work matter which would have been
21       your suspension?
22  A.   That's correct.
23  Q.   And you met how many times with Louvet?
24  A.   We had a phone call.
25  Q.   Okay.  And what -- have you had any other phone calls

Page 52

1        with him about anything else?
2   A.   I believe that was the only time I ever spoke with him,
3        on the phone.
4   Q.   And have you talked to him again about your suspension?
5   A.   No.  It was -- there was no need to after I was
6        reinstated.
7   Q.   And did you talk to Barnes again about your suspension
8        or anything else that happened to you work-wise?
9   A.   I believe I did talk to her on the phone --
10  Q.   Okay.
11  A.   -- trying to get any kind of update or further
12       information in regards to my suspension and what was
13       going on or why I was suspended.
14  Q.   Do you have any council members -- do you text with any
15       of the council member?
16  A.   I have texted Barnes before.
17  Q.   Uh-huh.  And what -- what phone do you use for that?
18  A.   My personal cell phone.
19  Q.   And what is that phone?
20  A.   (Xxx) xxx-xxxx.
21  Q.   And who is your carrier?
22       MR. MEIHN:  Hang on.
23       Do you mind we just give that to you off the
24       record?  I'm --
25       MS. GORDON:  The carrier?

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 53–56

| | Page 53 |
|---|---|
| 1 | MR. MEIHN:  Yeah. |
| 2 | MS. GORDON:  No, that's fine. |
| 3 | MR. MEIHN:  Okay. |
| 4 | MS. GORDON:  Let's go off the record. |
| 5 | MR. MEIHN:  Off the record. |
| 6 | (Discussion held off the record.) |
| 7 | MR. MEIHN:  And could I also ask, because he's an |
| 8 | officer, can we agree on the phone number that he's put |
| 9 | on the record -- I'm a little behind.  I meant that. |
| 10 | Can we have that either stricken or have that removed in |
| 11 | some fashion? |
| 12 | MS. GORDON:  Sure.  Sure.  That's fine. |
| 13 | (Discussion held off the record.) |
| 14 | MR. MEIHN:  Okay.  We can go back on the record. |
| 15 | MS. GORDON:  All right.  So, we're going to redact |
| 16 | the phone number from the record. |
| 17 | BY MS. GORDON: |
| 18 | Q.  And how often do you text with Ms. Barnes? |
| 19 | A.  I can't even think of the last time I texted her. |
| 20 | Q.  Okay.  Well, was there a time when you were texting with |
| 21 | her? |
| 22 | A.  Around the time of the suspension. |
| 23 | There was one other time I recall speaking with |
| 24 | Ms. Barnes.  She approached me because I'm very heavily |
| 25 | in traffic enforcement, and she had asked me if I would |

| | Page 54 |
|---|---|
| 1 | be interested in being a traffic car if we were to |
| 2 | establish a position for a dedicated traffic enforcement |
| 3 | unit like most other cities have.  I did advise her I |
| 4 | would be interested in that. |
| 5 | Q.  When was that? |
| 6 | A.  I don't recall offhand.  Maybe 2015 or '16. |
| 7 | Q.  Okay.  Then -- |
| 8 | A.  It's been a long -- it's been a long time. |
| 9 | Q.  I'm going to revise this then. |
| 10 | Broadcast Booth, met with Ms. Barnes to discuss |
| 11 | your suspension, whenever that was.  I'm showing it was |
| 12 | around April 2016. |
| 13 | Another time you met with her to discuss the |
| 14 | traffic car? |
| 15 | A.  Yes. |
| 16 | As a matter of fact, that had been prior to my |
| 17 | suspension. |
| 18 | Q.  Okay.  And when is the last time -- and those are the |
| 19 | two times you've met with her, seen her, et cetera? |
| 20 | A.  I don't know that I met with her to discuss any kind of |
| 21 | traffic car.  I think we talked on the phone or text. |
| 22 | Q.  So, you've had one meeting with her? |
| 23 | A.  I believe it's just one meeting.  Correct.  That's all I |
| 24 | recall. |
| 25 | Q.  So, what kind of a phone do you have? |

| | Page 55 |
|---|---|
| 1 | A.  A cell phone. |
| 2 | Q.  I know.  What is it? |
| 3 | A.  This -- the one I have now is a Samsung. |
| 4 | Q.  When did you get that phone? |
| 5 | A.  I guessing about two or three months ago. |
| 6 | Q.  And what did you have previously? |
| 7 | A.  Another Samsung. |
| 8 | Q.  You've actually been out with Ms. Barnes several times, |
| 9 | haven't you, for social reasons? |
| 10 | I mean, you're not being honest when you say -- |
| 11 | A.  No. |
| 12 | Q.  -- you haven't been out with her socially; correct? |
| 13 | A.  I've never gone out with her specifically.  I've |
| 14 | encountered her at social -- |
| 15 | Q.  Okay.  You've been with her socially on several |
| 16 | occasions, just the two of you; correct?  At bars? |
| 17 | A.  I've encountered her at the City Christmas party. |
| 18 | Q.  Okay.  Did you hear my question? |
| 19 | MR. MEIHN:  You need to answer her question, |
| 20 | please. |
| 21 | A.  Okay.  I don't recall. |
| 22 | I recall one incident where I -- or get-together |
| 23 | with her. |
| 24 | BY MS. GORDON: |
| 25 | Q.  Uh-huh. |

| | Page 56 |
|---|---|
| 1 | You've been to her home, haven't you? |
| 2 | A.  I've been in her backyard with the ordinance officer. |
| 3 | Q.  No. |
| 4 | Since then, you've been in her home to talk -- |
| 5 | A.  No, ma'am. |
| 6 | Q.  -- as friends? |
| 7 | A.  That is incorrect. |
| 8 | Q.  Well, she -- she's testified under oath.  Are you aware |
| 9 | of that? |
| 10 | A.  Well, I'll -- I'll testify under oath I've never been |
| 11 | inside her home. |
| 12 | The only area in her home I've been to is her |
| 13 | backyard when the ordinance officer and I were there. |
| 14 | Q.  She says you've been friends -- |
| 15 | A.  Never been in her house. |
| 16 | Q.  Strike that. |
| 17 | She says you've been friends since you became a |
| 18 | police officer with the City in 2012. |
| 19 | Is that correct? |
| 20 | A.  No. |
| 21 | Q.  Okay. |
| 22 | A.  The first time we met, she didn't like me, because I |
| 23 | tagged the trailer in her yard. |
| 24 | Q.  Well -- well, then -- but she says right away you came |
| 25 | back and apologized, and you've been friends ever since, |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 57–60

| | | Page 57 |
|---|---|---|
| 1 | | and you see each other socially. |
| 2 | | Is she lying? |
| 3 | A. | I would not consider us friends. I would consider an |
| 4 | | acquaintance. |
| 5 | Q. | Okay. When did you go out to her house? |
| 6 | A. | The only time I've been to her house is with the |
| 7 | | ordinance officer. |
| 8 | Q. | When was that? |
| 9 | A. | I have no idea now. |
| 10 | Q. | Okay. Well, she says that ever since that date, you've |
| 11 | | been her friend. |
| 12 | | Is that false? |
| 13 | A. | I would -- |
| 14 | | MR. MEIHN: I'm going to object. He's answered |
| 15 | | that question already. |
| 16 | | But please do. |
| 17 | A. | I would not consider us friends and certainly not on |
| 18 | | that date, no. She was -- she was upset. |
| 19 | | BY MS. GORDON: |
| 20 | Q. | I'm not saying on that date. I'm saying after that |
| 21 | | fact. |
| 22 | | She says ever since then -- she says this: |
| 23 | | "Later on, he came back and apologized |
| 24 | | and ever since we've been friends." |
| 25 | | Do you disagree with that? |

| | | Page 58 |
|---|---|---|
| 1 | A. | Yes. I wouldn't consider us friends. |
| 2 | Q. | Okay. |
| 3 | A. | I consider us acquaintances. It's not somebody I'm |
| 4 | | watching -- inviting to watch a football game, but -- |
| 5 | Q. | And she said you also text with her. |
| 6 | | Is that correct or not? |
| 7 | A. | I have regarding the City issues. |
| 8 | Q. | Uh-huh. |
| 9 | A. | Mr. Hayse stuff, my suspension. |
| 10 | Q. | Well, I'm going to ask you to hang onto all of your |
| 11 | | texts with her. |
| 12 | A. | I don't have anything on this phone. I haven't texted |
| 13 | | her in months. |
| 14 | Q. | Okay. I'm just asking you to hang onto all your texts. |
| 15 | | You have a duty under the law to do so. |
| 16 | A. | Okay. |
| 17 | Q. | And she said you've been with her to the Oakwood Bar and |
| 18 | | Grill. |
| 19 | | Does that sound right? |
| 20 | A. | I don't recall. I believe it was Broadcast Booth. |
| 21 | | MR. MEIHN: Hey, Deb, in about 5, 10 minutes, can |
| 22 | | we take a break -- |
| 23 | | MS. GORDON: Uh-huh. |
| 24 | | MR. MEIHN: -- so I can just take a -- |
| 25 | | MS. GORDON: Sure. |

| | | Page 59 |
|---|---|---|
| 1 | | MR. MEIHN: -- some medicine. |
| 2 | | MS. GORDON: Sure. |
| 3 | | MR. MEIHN: Thanks. |
| 4 | | BY MS. GORDON: |
| 5 | Q. | When did you become a sergeant? |
| 6 | | MR. MEIHN: Asked and answered. |
| 7 | | But go ahead. |
| 8 | A. | January 11th, I was promoted. |
| 9 | | BY MS. GORDON: |
| 10 | Q. | And how was it you were promoted at that time? What was |
| 11 | | the reason for the promotion? |
| 12 | A. | Well, I had a -- when you say "how," do you mean the |
| 13 | | process of being -- being promoted? |
| 14 | Q. | No. What was the -- what was the reason for you being |
| 15 | | promoted? |
| 16 | A. | There was a vacant sergeant spot. |
| 17 | Q. | And what -- what happened so that you received the |
| 18 | | promotion? |
| 19 | A. | Well, I did a letter expressing interest in it so that |
| 20 | | myself and anyone else who expressed interest in the |
| 21 | | position could go for an oral board panel and then go |
| 22 | | for a written test. And I scored the highest on both |
| 23 | | the interview and the written exam. |
| 24 | Q. | Who was on the oral board panel? |
| 25 | A. | It was a retired Melvindale chief, Brophy. There was |

| | | Page 60 |
|---|---|---|
| 1 | | a -- |
| 2 | Q. | Do you remember his first name? |
| 3 | A. | What's that? |
| 4 | Q. | Do you remember Brophy's first name? |
| 5 | A. | James Brophy. |
| 6 | | There was somebody from Dearborn. I don't remember |
| 7 | | his name. And there was somebody from, I believe, |
| 8 | | Southgate Police Department, but I don't remember his |
| 9 | | name either. |
| 10 | | The -- I hadn't met either of the other two people |
| 11 | | before. |
| 12 | Q. | Have you ever had a psychiatric exam or a psychological |
| 13 | | exam for purposes of work? |
| 14 | A. | Yes. |
| 15 | Q. | When was that? |
| 16 | A. | That's part of the licensing process to become a police |
| 17 | | officer. |
| 18 | Q. | Okay. And when was that? |
| 19 | A. | I took one before police academy. We were required to |
| 20 | | take one, and that would have been 2010. And then I had |
| 21 | | to take one as part of the background application |
| 22 | | process for the Melvindale Police Department, and that |
| 23 | | would have been in 2012. |
| 24 | Q. | Have you seen the results of the test? Either test? |
| 25 | A. | No. |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 61–64

Page 61

1    I believe they send those right to the police,
2    right to the --
3  Q.  They do, but I wanted to know if you had been -- seen --
4    seen it or been apprised of the results.
5  A.  No.
6  Q.  Have you had any psychological treatment at any time in
7    your life?
8  A.  Mr. Hayse sent me for some visits to our department
9    shrink.
10  Q.  Who is your department shrink?
11  A.  Dr. Clark.
12  Q.  And how many visits did you have with Dr. Clark?
13  A.  One.
14  Q.  And what do you mean by "department shrink"?  What does
15    that mean?
16  A.  He's the guy we use for all of our background -- we go
17    through his office.
18  Q.  He's private, and the City uses him?  Is that the idea?
19    He doesn't work for the City?
20  A.  Correct.  I guess he'd be contracted or -- I guess.
21  Q.  So, you went to one -- one or more than one appointment
22    with him?
23  A.  Well, I went to one appointment with Dr. Clark before I
24    was hired at the police department, as part of the
25    background check, and then I was hired.  And then I

Page 62

1    went, to my knowledge, one other visit with Dr. Clark,
2    and then seven or eight visits with another doctor in
3    his office.
4  Q.  Who was that?
5  A.  Dr. Zambo.
6  Q.  And why were you going to those visits?
7  A.  Well, after the Snowgate incident, Mr. Hayse told me if
8    I was -- I got subpoenaed to testify at Mr. Coogan's
9    office as to what happened and why I wrote the tickets
10    and everything I knew regarding that incident.  The
11    other officer and the sergeant also got subpoenaed.
12  Q.  What do you mean by "subpoenaed"?
13    Subpoenaed to appear in front of who?
14  A.  The city attorney, Mr. Coogan.
15  Q.  You didn't actually receive a legal subpoena, did you?
16    This was just a request?
17  A.  I believe I did.  No, I was -- we were told we had to
18    go, so I believe it was an actual subpoena.
19  Q.  Was it a hearing?
20  A.  Yes.  I took a union representative with me, as did the
21    other officer.
22  Q.  Okay.  And then what happened then that caused you --
23    you were giving me the background to these additional
24    appointments.
25  A.  Yes.

Page 63

1    Mr. Hayse expressed to me he did not want me to go
2    down to speak with Mr. Coogan regarding the Snowgate
3    tickets incident, and I told him, "I have to go.  I'm
4    required to go."
5    And he says, "I don't care.  You're not going down
6    there."
7    But I did, and I testified truthfully as to what I
8    knew regarding the tickets, and that I was ordered to
9    write them and all that.
10    Mr. Hayse was very upset that I went down there.
11    He stopped me in the hallway and told me if I was going
12    to testify against him, I must be crazy.
13    So -- and he wanted me to go to the shrink.
14  Q.  So, then what happened?
15  A.  Then I went to the shrink.
16  Q.  So, he said -- he told you in a hallway, "You need to go
17    to a shrink," and you went?
18  A.  No.  He called me in there to his office, and I agreed
19    to go because I didn't want any additional issues.
20    He's known for being very retaliatory toward any
21    officers he has an issue with, so I didn't want --
22  Q.  So, let --
23  A.  I just kind of roll with the flow.
24  Q.  You -- you go with the flow?
25  A.  I tried, just to try and --

Page 64

1  Q.  Okay.  So, I want to understand how it is you ended up
2    at a psychologist's office.
3    Let's start with who it was.
4  A.  It was Dr. Clark and Dr. Zambo.
5  Q.  Okay.  Were you ordered to go there?
6  A.  Yes.
7  Q.  Okay.
8  A.  And I was ordered to go after hours and not pay for it.
9  Q.  Okay.  And is there a written order?
10  A.  I don't know.  I believe there was.
11  Q.  Okay.  And was this part of any discipline you received?
12  A.  Yes.  Mr. Hayse lumped it in with something else.  But
13    verbally I was told it was because I testified against
14    him, and I won't be doing that again.
15  Q.  So, you didn't report that to anybody either, that you
16    had been told you were being punished for testifying
17    against him?
18    You didn't go to anybody with that?
19  A.  No, because I didn't want to make it any worse.
20  Q.  Okay.
21  A.  I -- I don't think you understand the environment in
22    which we worked under.
23  Q.  Well, it doesn't really matter if I do or don't.  I'm
24    just trying to find out what you actually did as a -- a
25    grown man and a police officer who -- you're sitting

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 65–68

**Page 65**

1    here today, testifying under oath --
2    A.   Uh-huh.
3    Q.   -- were given fake orders and, according to you, told to
4    do things that were illegal.
5    A.   That's correct.
6    Q.   So, I'm just trying --
7            MR. MEIHN:  Deb, I -- I've got to object to the use
8    of the "fake orders" and --
9            MS. GORDON:  Well, he just agreed with me.  He said
10   that's true.
11           MR. MEIHN:  No --
12   BY MS. GORDON:
13   Q.   Is that what you're saying?  Fake orders?
14           MR. MEIHN:  He didn't -- he didn't agree with you.
15   He never testified they were fake orders.
16   A.   No.
17           MR. MEIHN:  He testified he was told to do so,
18   but --
19   BY MS. GORDON:
20   Q.   You were retaliated against seriously and, you felt,
21   illegally?
22   A.   Yes.  I felt very retaliated against.
23   Q.   All right.  Do -- do you ever go to the Public Safety
24   Commission?
25   A.   To the meetings?

**Page 66**

1    Q.   Yeah.
2    A.   I've been to them.  I've been to several.
3    Q.   Okay.  Do you know anybody on the Public Safety
4    Commission?
5    A.   I know who all the commissioners are.
6    Q.   Okay.  And let's go back now to how you ended up going
7    to seven or eight sessions.
8    A.   Uh-huh.
9    Q.   Was this in writing to you as an order?
10   A.   There was something in writing to go see Dr. Clark.
11   Q.   Okay.  That was a part of what?
12        Because you've mentioned him several different
13   times here now.
14        That was as part of discipline, or is that an
15   earlier occasion?
16   A.   Apparently part of discipline.
17   Q.   Okay.  And then what did the order say you had to do?
18   A.   I don't recall.  I'd have to see it.
19   Q.   All right.  So, after you saw Dr. Clark once --
20   A.   Uh-huh.
21   Q.   -- you were then apparently slotted into additional
22   appointments; is that correct?
23   A.   Dr. Clark essentially told me I was fine.  But Mr. Hayse
24   told me that he wasn't happy with Dr. Clark's diagnosis,
25   and then I was to see Dr. Zambo, and I saw him for, I

**Page 67**

1    believe, seven or eight visits.
2    Q.   Okay.
3    A.   Joseph Zambo.
4    Q.   And what year was that?
5    A.   I believe 2015.
6    Q.   Was this about your conduct at work that you were seeing
7    him?
8    A.   I wasn't -- don't know that I was given a definitive
9    reason.  I don't recall offhand.
10   Q.   Well, were you there for personal reasons, or were you
11   there because your employer --
12   A.   No, I didn't want to be there.
13   Q.   Hang on.
14        Or were you there because your employer wanted you
15   to go?
16   A.   Because my employer wanted me to go.
17   Q.   And your employer told you to go?
18   A.   Correct.
19   Q.   And was that because somebody thought you had an anger
20   issue, as you understood why you were there?
21           MR. MEIHN:  I'm going to object.  He's testified
22   that the reason he was sent there was because he
23   testified against Mr. Hayse, and Mr. Hayse said he "You're
24   not going to testify against me."
25   BY MS. GORDON:

**Page 68**

1    Q.   Go ahead.  I'll take an answer.
2            MR. MEIHN:  Go ahead.
3    A.   As far as I knew, I was there as retaliation.
4    BY MS. GORDON:
5    Q.   Well, I --
6    A.   So, I went, not wanting to make it any worse.
7            Did I want to be there?  No.
8    Q.   I didn't ask you that, and your attorney is now coaching
9    you.  But -- so, so be it with that.  But none of this
10   answers my question, which is, what did you understand
11   the reason was from anybody you saw at Clark's office or
12   from the order you were given that you needed to receive
13   psychological counseling?
14        For what reason, were you told you needed
15   psychological counseling?
16   A.   Dr. Clark gave me the impression he didn't really know
17   why I was there and told me I was fine when he approved
18   me for being -- hiring -- for being hired, and that I'm
19   fine at this time.
20   Q.   Okay.  He told you that verbally?
21   A.   Correct.
22   Q.   Did he put that in writing?
23   A.   I never was able to see any kind of written
24   documentation.
25   Q.   That --

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 69–72

Page 69

1  A.   That goes directly to the department.
2  Q.   So, you don't know what he said in writing?
3  A.   No.  That's correct.
4  Q.   So, did you say to him, "Well, I'm supposed to now see
5       somebody else," or "I'm supposed to continue
6       treatments"?
7  A.   No.  Mr. Hayse advised me I needed to continue
8       treatments.
9  Q.   Well, I know.  So, Clark, according to you was -- told
10      you you're fine.
11 A.   Uh-huh.
12          MR. MEIHN:  You've got to say "yes" or "no," sir.
13 A.   Yes.
14 BY MS. GORDON:
15 Q.   So, why did you continue to go to appointments?
16 A.   I thought it would make things at the department easier
17      if I just did what Mr. Hayse wanted.
18 Q.   Well, was -- was it in the order how many sessions you
19      had to go to?
20 A.   I --
21 Q.   Did he order you to go to a certain number of sessions?
22 A.   I don't believe there was a specific number listed, no.
23          I --
24 Q.   So, did -- did the Clark office set up how many
25      appointments you should get?

Page 70

1           I'm trying to figure out who forced you to go to
2       these seven appointments, if anybody, or if you just
3       went on your own.
4  A.   No.  If it was up to me, I would not have gone.
5  Q.   Well, so why were you going to more than the one
6       session?
7  A.   I was instructed to by Mr. Hayse.
8  Q.   Verbally or in writing?
9  A.   Verbally.
10 Q.   Okay.  So, you've got your boss telling you, "You need
11      to go -- as part of your discipline, you need to go get
12      evaluated."
13          And then he also told you, "You have to attend
14      seven sessions"?
15 A.   I don't believe he gave a number.  He just told me I'm
16      going to start seeing Dr. Zambo, and it was in the
17      evening so it would be after my regular shift, and then
18      I was -- never received any compensation for -- for
19      going either.
20 Q.   Okay.  You didn't grieve that?
21 A.   Again, I didn't want to make any more issues than
22      just -- it's easier to just lay low.
23 Q.   Well, you did grieve stuff -- a lot of stuff under Chief
24      Hayse; correct?
25 A.   I don't recall.  I'd have to see specifics.

Page 71

1  Q.   You don't recall how many grievances you filed about
2       discipline you got?
3  A.   After he was terminated, I did.  I went to the Safety
4       Commission with several issues.
5  Q.   No, you filed grievances while he was still there.
6           You don't recall that, back to 2016?
7  A.   No.
8  Q.   Okay.  So, you -- you attended these seven sessions.
9           And then how is it they ended?
10 A.   I got the impression the doctor thought I was just fine
11      and had told me I didn't need to come any more.
12 Q.   And who told you you were just fine?
13 A.   Dr. Zambo.
14 Q.   And, as you understood it, when you went to these
15      appointments, it's the City that is the recipient of the
16      documents and results, not you; correct?
17 A.   Correct.
18 Q.   That's the way I understand these relationships when
19      you're sent for job purposes.
20 A.   That's correct.  The candidate, or whoever is sent,
21      generally does not get a copy of anything.
22 Q.   Uh-huh.
23          MS. GORDON:  Okay.  You wanted to take a break,
24      Greg?
25          MR. MEIHN:  Yeah.  If you don't mind, please.

Page 72

1  A.   Yeah, I need to take a restroom break.
2           MS. GORDON:  Before -- before you do, do you guys
3       plan to take a lunch break or go through?
4           MR. MEIHN:  I don't plan on taking a lunch break to
5       help us get through.
6           I will tell you that around 1:30, 2:00 -- well,
7       let's do this off the record.
8           MS. GORDON:  Okay.
9               (Short recess at 11:42 a.m.)
10                    *   *   *
11              (Record resumed at 12:00 p.m.)
12 BY MS. GORDON:
13 Q.   Did you -- with regard to the sergeant promotion, do you
14      obtain recommendations from officers at the City?
15 A.   No.
16 Q.   When you were hired into the department, what was your
17      first job?
18 A.   Police officer.
19 Q.   And what were your duties?
20 A.   As a police officer?
21 Q.   Whatever your job duties were -- I don't know -- when
22      you were first hired in, which was 2012.
23 A.   Well, to uphold the law and --
24 Q.   Okay.  What -- what were your day-to-day functions?
25 A.   As a police officer, it completely varies by day.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 73

1  Q.  Well, just give me a list of all the various tasks.
2  A.  Traffic enforcement, assist with ordinance enforcement.
3  Q.  Hang on.
4      Traffic enforcement.
5      Does that mean you're in a patrol car?
6  A.  That's correct.
7  Q.  How many patrol cars are there at the City of Novi (sic)?
8  A.  I have no idea.
9  Q.  I've sued the City of Novi Police Department, as John
10     well knows.
11     MR. MEIHN:  Yes.
12 BY MS. GORDON:
13 Q.  At Melvindale, how many cars?
14 A.  We have seven patrols cars, three detective vehicles,
15     one undercover car, a motor carrier vehicle and an
16     ordinance truck.
17 Q.  Okay.
18 A.  We also have a bicycle.
19 Q.  Okay.  So, that's traffic enforcement.
20     And does that put you into a patrol car, that
21     particular task?
22 A.  As a police officer, if you're not a supervisor inside,
23     you're pretty much always in a patrol car.
24 Q.  Okay.  And how many officers -- how many shifts are
25     there at the department?

Page 74

1  A.  Three.
2  Q.  Okay.  And what shift did you -- have you worked the
3      same shift since you've been hired?
4  A.  No, ma'am.
5  Q.  What shift are you on now?
6  A.  At this time, afternoon shift.
7  Q.  Okay.  And when you started, what were you on?
8  A.  Well, when you first start, they rotate you.  You start
9      with days, afternoons, then mids, then back to days.
10 Q.  Okay.
11 A.  Then after that, I was on afternoons for, I would guess,
12     about a year.  And then I went to day shift for quite
13     some time, for several years.  And then I went back to
14     afternoons this -- when I got promoted.
15 Q.  Okay.  All right.  How many officers per shift?
16 A.  It varies by day, we have minimum manpower numbers.
17 Q.  So, what's the minimum manpower numbers?
18 A.  For day shift, two.  For afternoon and midnight shift,
19     three.
20 Q.  Okay.  So, when you first started out, you were assigned
21     to a patrol car on most days?
22 A.  The road patrol division.
23 Q.  Okay.  It's called the road patrol division?
24 A.  That's correct.
25 Q.  Does that report up to someone?

Page 75

1  A.  Well, there's supervisors within the division itself.
2  Q.  Right.  Okay.
3  A.  And we -- yeah.
4  Q.  All right.  So, it could be any sergeant or any
5      lieutenant with -- connected to the department, or is
6      there somebody dedicated to road patrol?
7  A.  It's -- so, your road patrol, you have your officers.
8      You have your corporals.  You have your sergeants.  And,
9      at the time, which you don't any more, you had
10     lieutenants on each shift.
11     So, you would follow the structure within your own
12     shift.
13 Q.  And is -- were those people dedicated to road patrol,
14     those lieutenants and sergeants?
15 A.  That's -- they're part of the road patrol division --
16 Q.  Okay.
17 A.  -- but they were not necessarily on the road themselves.
18 Q.  I understand.
19 A.  They may be assigned to the station duties.
20 Q.  Who are the command officers in the road patrol division
21     today?
22 A.  Myself, Sergeant Blunden and Sergeant Nick Martinez.
23     And then Lieutenant Robert Kennaley is in charge of the
24     road patrol division.  He's our administrative
25     lieutenant as well.

Page 76

1  Q.  Okay.  And as of 2016, who were the command officers?
2  A.  In 2016, if I recall correctly, Lieutenant Welch on day
3      shift, Lieutenant Don Meador on midnight shift.  And I
4      believe at that time -- not positive, but I believe it
5      was -- John Allen was the afternoon shift lieutenant.
6  Q.  Is your performance evaluated by the police department?
7  A.  Your first year on the job, it is, when you're on what
8      they call probation.  You're evaluated monthly.
9  Q.  Well, how about after that?
10 A.  Not -- we don't do any kind of actual performance
11     reviews, no.
12 Q.  Okay.  What is your performance -- how is your
13     performance evaluated; if you know?
14     In other words, what are you supposed to be doing
15     that's going to be viewed as a good job performance; if
16     you know?
17 A.  I -- I guess not being lazy and sitting around the
18     station.  But, I mean, beyond that, it's -- it kind of
19     varies.  We have certain officers who specialize in
20     certain things.
21 Q.  Formally or informally?
22 A.  Informally.
23 Q.  Who specializes in what?
24 A.  Well, for example, we have an officer who specializes in
25     dealing with apartment complexes and things of that

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 77—80

**Page 77**

1   nature. If we have problem people, he'll work with the
2   management to have them evicted. He also deals a lot
3   with the schools and community relations-type events,
4   and he's taken it upon himself to -- even though he's
5   part of the road patrol division, he really specializes
6   in those two fields.
7   Q.   Okay. All right. Do you report in to your sergeants at
8        the end of the day or the end of the shift?
9   A.   Yeah, at the end of the shift, everyone comes to the
10       station.
11  Q.   Have you ever done any detective work?
12  A.   Well, I've never been an actual -- assigned to the
13       detective bureau, no. However, I -- in the course of
14       being a police officer, I mean, you do detective-type
15       tasks, ask questions, investigate, record things, take
16       pictures, type reports. I request warrants, things of
17       that nature.
18  Q.   Okay. So, you said one of your job duties is traffic --
19       traffic enforcement.
20            What are your other job --
21  A.   That's correct.
22  Q.   -- duties?
23  A.   Well, your primary -- well, it's a little different now
24       that I'm a sergeant. I'm inside. But when I was on the
25       actual road, it varies.

**Page 78**

1            Your primary duty is to respond to any -- any
2        dispatched calls, and those can vary -- everything from
3        robberies, to missing property, to stolen cars, fights,
4        disorderlies, civil disputes. The entire spectrum. So,
5        anything you can think of, we've been to.
6   Q.   Is that what you've done while you've been at the police
7        department? Have you responded to dispatch calls?
8   A.   Correct.
9   Q.   Do you respond at the same rate that other officers do?
10  A.   Yeah. I mean, we all try and respond in a timely
11       manner.
12  Q.   What else are your duties?
13  A.   Periodically assisting the ordinance officers, if she
14       needs help with something; if you come across road
15       hazards, deal with that; you know, broke down cars,
16       things of that nature; patrol checks, check certain
17       areas, especially problem areas; just make sure there's
18       police presence known in the area; business stops. We
19       like to stop and, you know, visit with some of the
20       business owners and see if they have any tips or
21       information or -- just maintain good community
22       relations.
23  Q.   Okay. Do -- do you keep track of your moving violations
24       that you issue?
25  A.   I was for quite some time, yes.

**Page 79**

1   Q.   What period of time were you doing that for?
2   A.   Well, I mean, you could pull it up for any time at -- I
3        would check it basically monthly and see what I did.
4            You can go on the records management system we have
5        and type in the officer's name and whatever field of
6        time you want, and it will pull up how many citations
7        they wrote, how many people they arrested, how many
8        reports they wrote.
9   Q.   Okay.
10  A.   Things of that nature.
11  Q.   What's the name of that system?
12  A.   Record -- RMS, Records Management System. That -- that
13       is the name of it.
14  Q.   Any other duties that go with being a police officer in
15       your role, when you were, prior to becoming a sergeant?
16  A.   I -- just assisting with whatever is needed in the
17       community.
18            I mean, there's a lot of variation in this job.
19  Q.   What are the legal reasons you are allowed to tow or
20       remove a vehicle from the highway?
21  A.   Well, if it creates a danger to the motoring public, it
22       would be, whether it's broke down, such as a road hazard
23       and a car that's, you know, literally left in the middle
24       of a busy area or an intersection; if the driver is in
25       violation of the law, has a suspended license, no

**Page 80**

1        license; if the driver is being arrested for warrants,
2        along that nature; if the vehicle is not insured, it's
3        allowed to be removed from the roadway.
4   Q.   Where do you get the laws for this?
5            What are the laws you've referred to or rely on for
6        the reasons for towing for removal that you just cited
7        to me?
8   A.   City ordinance and the Michigan Motor Vehicle Code.
9   Q.   What does the City ordinance say about towing?
10  A.   I can't quote it offhand. I'd have to see a reference.
11  Q.   Okay. I'm looking at Section 18-92, "Removal of
12       Vehicles, City Authority."
13            Does that sound familiar to you?
14  A.   It sounds familiar, but I couldn't tell you exactly what
15       it reads.
16  Q.   Okay. It says:
17            "The City or its authorized agents may
18       remove or cause the removal of any vehicle under
19       the following enumerated circumstances: One,
20       when a vehicle upon a highway is so disabled as
21       to constitute an obstruction to traffic and the
22       person in charge of the vehicle is, by reason of
23       physical injury, incapacitated to such an extent
24       as to be unable to provide for its custody and
25       removal."

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 81–84

Page 81

```
1             What does that mean to you as a police officer?
2    A.  Can I take a look at that, please?
3    Q.  Sure.
4             It's Number 1.  I'll circle it.
5    A.  Okay.  What was the question again, ma'am?
6    Q.  What does that mean to you as a police officer,
7        Number 1?
8    A.  Well, the -- the vehicle presents a safety or traffic
9        hazard.  It can be removed from the roadway.  Or if the
10       driver is injured or intoxicated or for some reason
11       unable to safely operate the vehicle in a public
12       roadway, it may be removed from the roadway.
13   Q.  Okay.  I'll take that back.
14            Number 2 says:
15               "When the driver of such vehicle is taken
16            into custody by the police department and such
17            vehicle would thereby be left unattended."
18            What does that mean, Number 2?
19   A.  Well, if you're arresting somebody for -- if they've got
20       a warrant for their arrest, if they're intoxicated, or
21       other such factors that would involve arresting the
22       driver, you can't leave the vehicle in a roadway --
23   Q.  Okay.
24   A.  -- where it's going to be a traffic hazard or
25       obstruction.
```

Page 82

```
1    Q.  And what if somebody can come and pick up the vehicle?
2        Then it's obviously not necessary to tow?
3    A.  Well, it would vary.
4             I mean, if they can pick it up in a very reasonable
5        amount of time, but we don't have time or manpower to
6        sit there and babysit the vehicle while you're waiting
7        for somebody to come from a -- another location.  If the
8        vehicle is not insured, not properly plated, not
9        legal --
10   Q.  I'm not onto that.  I'm still onto Number 2.
11   A.  Well, I'm just giving you a thorough answer.
12            It would -- it would vary by --
13   Q.  So, if -- this says:
14               "When the driver of such vehicle is taken
15            into custody by the police department and such
16            vehicle is thereby left unattended."
17   A.  Uh-huh.
18   Q.  So, you cannot automatically take a vehicle when
19       somebody is arrested.  It has to be that the vehicle
20       will be left unattended.
21   A.  That's not correct.
22   Q.  Well, look at -- look at the language of your ordinance.
23       And it says "and."
24   A.  Okay.  That's --
25   Q.  So, take a look at that and --
```

Page 83

```
1    A.  I -- I see it, ma'am.
2             That's not correct.
3    Q.  The ordinance is incorrect?
4    A.  The ordinance doesn't cover all the factors under which
5        a vehicle can be impounded.
6    Q.  Okay.  That's one factor?  When you arrest somebody
7        "and" the vehicle will be leave -- left unattended; is
8        that incorrect?
9    A.  No, that is correct.  But --
10   Q.  Okay.  All I asked you is about Number 2.  Just -- let's
11       be clear for the record.
12   A.  Okay.
13   Q.  I'm --
14   A.  Can you read the question back again?
15   Q.  No, we're not going to read the question back.
16            MR. MEIHN:  She's -- she's doing a dep.  It's her
17       dep.  She'll ask you a question.
18   A.  Okay.
19            MR. MEIHN:  Go ahead.
20   BY MS. GORDON:
21   Q.  I'm reading Section 18-92 of the Melvindale Code of
22       Ordinances, "Removal of Vehicle, City Authority."
23   A.  Okay.
24   Q.  We already covered Number 1, when a vehicle is so
25       disabled, et cetera.
```

Page 84

```
1             Number 2 says:
2                "When the driver of such vehicle is taken
3             into custody by the police department --"
4             Okay.  You -- we both understand what "custody"
5        means.
6    A.  Yes.
7    Q.  It's an arrest; correct?
8    A.  Correct.
9    Q.  And then it says:
10               "-- and such vehicle would thereby be
11            left unattended."
12            Is that correct, Number 2, that under those
13       circumstance, you can tow a vehicle?
14   A.  Yes.  Under those circumstances, a vehicle may be
15       impounded.
16   Q.  Okay.  So, if you are arresting a driver, but there's,
17       let's say, a spouse in the car that can drive the
18       away, it's not necessary to impound it; correct?
19   A.  Not necessarily.
20   Q.  Okay.  And then Number 3 of the City ordinance says:
21               "When the removal is necessary in the
22            interest of public safety."
23            What does that mean?
24   A.  Correct.  Such as an uninsured vehicle, an intoxicated
25       person driving.  We've impounded a couple vehicles where
```

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 85–88

Page 85

```
1        you had -- I mean, literally the gas tank is just
2        leaking fuel all over the roadway and the person is
3        still driving, and it becomes a large safety hazard.
4   Q.   Okay.  Well, where do I find the list of "in the
5        interest of public safety"?
6             I mean, what -- what do you work on --
7   A.   In the Melvindale ordinances?
8             I -- I don't -- I don't know, ma'am.
9   Q.   Well, how about somewhere else?  If it's not in the
10       Melvindale ordinance, where is the guidance on when it's
11       determined that the removal is necessary in the interest
12       of public safety?
13            Is there some other place you would look, like a
14       state law or something?
15  A.   I -- I can't quote the exact case, but I believe we
16       looked something up one time, and the court has held
17       that you're able to tow a vehicle that is uninsured,
18       remove that from the roadway, and that is in the
19       interest of public safety.
20  Q.   Well, I didn't ask you about that.  I said, where do you
21       get your list of things that constitute being in the
22       interest of public safety?
23  A.   Michigan Motor Vehicle Code.
24  Q.   Okay.  Do you know what part of the Michigan Motor
25       Vehicle Code it is?
```

Page 86

```
1   A.   Not offhand, no, ma'am.
2   Q.   All right.  Under -- under those -- those -- the list of
3        the ordinances, are there any other legal guidelines,
4        laws, with regard to towing?
5             MR. MEIHN:  Other than what he's testified to?
6             MS. GORDON:  Yeah.
7             MR. MEIHN:  Okay.
8   BY MS. GORDON:
9   Q.   What does the Michigan Vehicle Code say about it?
10  A.   I can't quote anything offhand, ma'am.
11  Q.   Okay.  Well, I'm going to read you from MC -- Michigan
12       Vehicle Code 257.2553:
13            "A police officer may impound a vehicle
14            until a valid registration is obtained."
15            Are you familiar with that?
16  A.   Uh-huh.
17            THE REPORTER:  I'm sorry.  Is that "yes"?
18  BY MS. GORDON:
19  Q.   That's a "yes"?
20            THE REPORTER:  Is that "yes"?
21            MR. MEIHN:  "Yes," sir?
22  A.   Yes.  Yes.
23  BY MS. GORDON:
24  Q.   And that you may impound a -- I'm sorry.
25            "On the conviction of certain drunk
```

Page 87

```
1        driving offenses, the court may order as part
2        of the sentence the forfeiture of the vehicle."
3             Is that correct?
4   A.   That is correct in some circumstances, yes.
5   Q.   Do you know of any law that allows you to impound a
6        vehicle because the person is uninsured?
7   A.   Yes.  That is legal.
8   Q.   Under what law?  Is it -- do you --
9   A.   I would -- I would have to look that up.
10  Q.   Do you believe it's in a state statute?
11  A.   I do believe so.
12            I would have to do some research to find out.  I've
13       looked it up in the past, but --
14  Q.   Sitting here today, you don't know what the authority is
15       for that?
16  A.   Offhand, I -- I can't quote anything.
17  Q.   And why can a vehicle -- strike that.
18            Impound is always discretionary; correct?
19  A.   No.
20  Q.   What do you mean by "no"?
21            Why do you say "no"?
22  A.   Well, if you're arresting the driver and you're going to
23       leave the, you know, unoccupied vehicle just in the
24       middle of the road, I mean, there's -- there's really no
25       discretion to just leave it there.  You have to have
```

Page 88

```
1        so it doesn't present a -- a safety issue to the rest of
2        the motoring public.
3   Q.   Okay.  Well, if it's not in the middle of the road, if
4        it's pulled over on the -- in a parking lot, it can be
5        discretionary to impound the vehicle; is that correct?
6   A.   It depends on the circumstances.
7   Q.   So, that means it's discretionary; it depends on the
8        circumstances?
9   A.   Uh-huh.
10            THE REPORTER:  I'm sorry.  Is that "yes"?
11  BY MS. GORDON:
12  Q.   That's a "yes"?
13  A.   Yes.
14  Q.   So, other than a vehicle --
15  A.   In some situations, yes.
16  Q.   Other than a vehicle being in the middle of the road --
17       being left unattended in the middle of road, which is
18       obviously going to cause a significant traffic/safety
19       issue --
20  A.   Uh-huh.
21  Q.   -- is there any other time when you do not have
22       discretion with regard to whether you should impound a
23       vehicle?
24  A.   Yes.
25  Q.   What?
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 89

1  A.   Stolen cars, for example.  If we locate a stolen motor
2       vehicle somewhere in the city, be it on a roadway or --
3       or off a roadway or occupied or otherwise, we do have
4       the authority and the duty to impound that vehicle.
5  Q.   Is that a forfeiture?
6  A.   No.  I'm referring to like a recovered stolen car.  Say,
7       somebody had their vehicle stolen.  You find it ditched
8       on a side street --
9  Q.   I understand.
10 A.   -- or a backyard.
11 Q.   Okay.  What else?
12 A.   That wouldn't be a forfeiture.  It would just be an
13      impound.
14 Q.   Okay.  What else?
15 A.   We have a duty to remove vehicles from the roadway that
16      are uninsured and also present a danger to the motoring
17      public.
18 Q.   But that's a discretionary decision?
19 A.   I -- I would not view it as that, no.
20 Q.   Okay.  I'm not asking whether you view it.  I'm asking
21      you about the law.
22           So, what I'm seeing in the City ordinance is it
23      says "the City may remove."  It doesn't say "shall."
24 A.   Okay.
25 Q.   It says you may review -- remove vehicles under these

Page 90

1       circumstances.  That means that's discretionary.  You're
2       not required to.
3            I want to know if you know of any law that requires
4       you to impound a vehicle at the scene other than a
5       stolen vehicle, which you seem to think there's a law
6       that you must impound --
7  A.   Well, again --
8  Q.   You've got to let me finish.
9  A.   Sure.  Sorry.
10 Q.   -- or if -- if a vehicle is going to be left in the
11      middle of the road.
12           Do you know of any other legal requirement that a
13      vehicle be impounded?
14 A.   Well, the insurance law.
15 Q.   Okay.  Do you know of any --
16 A.   If you --
17 Q.   -- other law that requires you to impound a vehicle?
18 A.   Michigan Insurance Code, I would say, does, if you're
19      operating --
20 Q.   Are you guessing, or do you have something specific?
21 A.   No, it does.
22 Q.   What does it say about impound?
23 A.   Well, if you're operating a vehicle on -- you're
24      required to have insurance to operate a vehicle on a
25      public roadway.

Page 91

1  Q.   Okay.
2  A.   If you don't and I stop somebody who doesn't have that
3       insurance, then that vehicle has a duty to be removed
4       from the roadway, and I can't let an uninsured vehicle
5       drive further down the road.
6            (Discussion held off the record.)
7  BY MS. GORDON:
8  Q.   Okay.  The Michigan Insurance Code does not talk about
9       impounding vehicles and nor can the Michigan Insurance
10      Code require a police officer to impound a vehicle.
11           Do you agree with that?
12 A.   But it -- it also does not allow for those vehicles to
13      be on the roadway.
14 Q.   Okay.  Well, that's a different matter than whether the
15      government can impound your car.  So, I'm sticking with
16      you, as a police officer, being able to impound your car
17      and not the Michigan insurance industry doing what they
18      do.
19           I want to know what requires you to impound a car
20      as compared to using your discretion under the
21      circumstances.
22           Do you know of anything else other than the two
23      incidents you gave me?
24 A.   Well, I will again state insurance.
25 Q.   Okay.  Well, do you know that the Michigan Insurance

Page 92

1       Code --
2  A.   Also --
3  Q.   You've got to let me finish.
4  A.   Sure.
5  Q.   Can the Michigan Insurance Code require a Melvindale
6       police officer to impound a car?  Is that what you're
7       saying here today?
8            MR. MEIHN:  I'm going to object.  You're asking him
9       a legal question.
10           MS. GORDON:  Well, he -- he raised it, so --
11           MR. MEIHN:  If you -- if you can --
12           MS. GORDON:  -- you know, I'm asking him what he
13      knows.
14           Go ahead.
15           MR. MEIHN:  Let me finish my objection.
16           You're asking him a legal question.  You can -- he
17      can testify as to his understanding.
18 BY MS. GORDON:
19 Q.   Go ahead.
20           Do you think the Michigan Insurance Code requires
21      you to impound a vehicle?
22 A.   Yes.
23 Q.   Okay.  Do you have a portion of that code?
24 A.   Not in front of me.
25 Q.   Okay.  All right.  Other than Michigan Insurance Code,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**Page 93**

1     stolen vehicle and in the middle of the -- vehicle in
2     the middle of the street, any other time where you know
3     of that you are required to impound a vehicle?
4  A.  Unlicensed driver.
5  Q.  Okay.  Your city ordinance does not require you to
6     impound --
7  A.  Okay.
8  Q.  -- from an unlicensed driver; correct?
9         MR. MEIHN:  If you --
10  A.  Does the ordinance --
11         MR. MEIHN:  If you know the answer, answer it.  If
12     you don't, tell her.
13  A.  I don't know.
14  BY MS. GORDON:
15  Q.  Okay.  And your city ordinance does not allow you --
16     does not require you to impound a vehicle when the
17     driver does not have insurance; correct?
18  A.  I don't know.
19  Q.  Okay.  Well, do you know of any other city ordinance
20     other than Section 18-92, "Removal of Vehicles," which
21     directs you, as a police officer, with --
22  A.  I would have to --
23  Q.  -- with the laws?
24  A.  I'd have to research the city ordinance.
25         THE REPORTER:  Excuse me?

**Page 94**

1         MR. MEIHN:  You've got to let her finish the
2     questions, please, sir.
3  BY MS. GORDON:
4  Q.  Go ahead.
5  A.  I would have to research the city ordinance.
6  Q.  Nothing you can think of, sitting here today?
7  A.  I don't recall.
8  Q.  Do you -- when you are out in your vehicle, do you carry
9     with you a checklist for laws, traffic laws?
10  A.  I carry the Motor Vehicle Code.  I have the book in my
11     work bag.
12  Q.  Okay.
13  A.  I have a list of our most commonly used city traffic
14     ordinances.
15  Q.  Okay.
16  A.  As well as some other ordinances, such as animal-related
17     things and --
18  Q.  Okay.  So, you have the Michigan Motor Vehicle Code that
19     you carry with you.
20  A.  Uh-huh.
21  Q.  Is it a paperback or looseleaf, or what is it?
22  A.  It's a paperback book.
23  Q.  Okay.  And then you also have commonly used ordinances?
24  A.  Yes.
25  Q.  Okay.  Are these provided to you by the police

**Page 95**

1     department, or did you put this together yourself?
2  A.  The list of ordinances was provided by the police
3     department.
4  Q.  Okay.
5  A.  And I --
6  Q.  Anything else that you carry with you?
7  A.  As far as the book goes, I don't recall if they provided
8     it or if I had it on my own, because we had a copy from
9     police academy.  I don't know if that was mine or the
10     department's.
11  Q.  Okay.  But you said the Michigan Motor Vehicle Code and
12     Ordinances.
13         Anything else that you carry with you?
14  A.  Yes.  Michigan Compiled Law book.
15  Q.  What is the Michigan Compiled Law book?
16  A.  It's a publication, I believe, put out by state police
17     with a list of all of our basically misdemeanor and
18     felony offenses here in the State of Michigan.
19  Q.  Okay.  Anything else?
20  A.  As far as?
21  Q.  What you carry with you.
22         You've said there are certain things you carry in
23     your vehicle with you --
24  A.  True.
25  Q.  -- to use as a resource, I'm sure.

**Page 96**

1         So, anything --
2  A.  Right.
3         As far as resource material, that would -- that
4     would be about it.
5  Q.  Okay.  Do you carry a TASER in your vehicle?
6  A.  I carry it on my person.
7  Q.  Okay.
8  A.  All officers do.  It's assigned equipment.
9  Q.  What's the process at the City of Melvindale for filing
10     a citizen complaint?
11  A.  You simply come up and fill out a form and turn it in.
12  Q.  And then what happens?
13  A.  Then it gets passed on to -- well at this time, the
14     administrative lieutenant receives that complaint.
15  Q.  And who is that at this time?
16  A.  Lieutenant Kennaley.
17  Q.  And then what happens?
18  A.  Then it's up to that officer -- that lieutenant to
19     investigate the complaint.
20  Q.  Are you aware of any investigations into citizen
21     complaints that have been made since you've been at
22     Melvindale?
23  A.  In general?
24  Q.  Yeah.
25  A.  Yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 97–100

Page 97

1  Q.  What are you aware of?
2  A.  People complain all the time.
3  Q.  You do have citizen complaints coming --
4  A.  Are you talking about me or of any officers?
5  Q.  No, no.  Everybody.
6      So, you're saying citizen complaints come in all
7      the time?
8  A.  Well --
9  Q.  Often?
10 A.  At this point, no.  We've been very low on complaints
11     lately.  But in the past there have been more frequent.
12     Sometimes people come in the lobby and just verbally
13     complain.  We get that a lot.  Usually complain about,
14     you know, getting a ticket or a parking ticket or
15     something like that or what was --
16 Q.  I'm talking about written complaints.
17 A.  Very few, to my knowledge, at this point.
18 Q.  Okay.  Well, there -- you said --
19 A.  I'm just thinking -- I'm sorry.
20     To clarify, we get a lot of people in the lobby
21     just complaining about things.  But as far as actual
22     written citizen complaints, I mean, nobody runs them by
23     me.  But, I mean, on my shift we've had zero since I've
24     been sergeant.
25 Q.  So, what happens when a complaint comes in?  You said it

Page 98

1      goes to the administrative lieutenant?
2  A.  It does at this point.
3      I don't know what the old procedure was for that
4      before I was a sergeant.
5  Q.  And then what happens to it?
6  A.  The administrative lieutenant would investigate that
7      complaint.
8  Q.  And have you become aware of any investigations into
9      citizen complaints since you've been with the
10     department?
11 A.  I -- I mean, I can't recall anything exactly right
12     offhand, but --
13 Q.  Have there been any that you can recall?
14 A.  Yes.
15 Q.  What do you recall?
16 A.  Well, I know personally I've received complaints
17     regarding the traffic detail.  A lot of people just
18     complaining they thought they were -- vehicle was
19     impounded unfairly, and they really don't need to have a
20     license.  I've had sovereign citizens come and complain.
21     They don't think any laws apply to them at all within
22     the United States.  We get a fair number of those.
23 Q.  Are these in writing?
24     I'm asking about written complaints that you know
25     of that were investigated.

Page 99

1  A.  I don't know.  I know I had a sovereign citizen come
2      make a complaint about me that I had enforced laws upon
3      her, and they don't apply to her.
4  Q.  When was that?
5  A.  I'm guessing three or four years ago now.
6  Q.  Was it investigated?
7  A.  I -- I don't know.  I never heard any more about it.  I
8      was --
9  Q.  So, as far as you know, it was not investigated; you
10     were never asked about it?
11 A.  I -- no.
12 Q.  Okay.  And what about the impound one, you mentioned?
13 A.  Oh, I've had people complain that their vehicles were
14     impounded.
15 Q.  In writing?
16 A.  Yes.
17 Q.  Okay.  And how many of those citizen complaints have
18     come in?
19 A.  I'm not sure.
20 Q.  Okay.  Have those been investigated?
21 A.  I don't know.  I would assume so.
22 Q.  How many --
23     (Outside interruption.)
24 A.  Is that me?
25     (Discussion held off the record.)

Page 100

1  BY MS. GORDON:
2  Q.  How many citizens complaints do you think you've had?
3      (Discussion held off the record.)
4  BY MS. GORDON:
5  Q.  How many citizen complaints do you know of that have
6      been filed with regard to you?
7  A.  I don't have an exact number.
8  Q.  Well, give me a rough idea.
9  A.  I would guess several dozen over the years.  I'm very
10     proactive and a lot of people --
11 Q.  What do you mean by that?
12 A.  Well, when I'm at work, if, you know, I'm out there
13     working, I like to work.  I like to make traffic stops.
14     I like to -- to investigate things.  I certainly don't
15     mind, you know, arresting people if they need it.  But a
16     lot of people are unhappy to be arrested.  They're
17     unhappy to have their vehicle impounded.  They're
18     unhappy to get a ticket.  I've had people come in and
19     make parking ticket complaints, such as the Snowgate
20     issue.
21 Q.  I'm just asking about in writing.
22 A.  I -- I don't know, ma'am.  I don't have an exact number.
23 Q.  So, you think you had about several dozen, though?
24 A.  I would presume.
25 Q.  Have any of those been investigated?

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 101

```
 1  A.  I don't know.  That's above my pay grade.
 2  Q.  Well, have you ever been questioned as part of an
 3      investigation?
 4  A.  I've been asked to clarify -- yeah, to clarify certain
 5      situations.
 6  Q.  Okay.  These are kept on record, presumably, somewhere?
 7  A.  Presumably.
 8          (Discussion held off the record.)
 9  A.  Ma'am, I need to use the restroom shortly.
10          MS. GORDON:  Okay.  Go ahead.
11  A.  Okay.
12          MR. MEIHN:  We'll wait here for you.
13          (Short recess at 12:28 p.m.)
14                    *   *   *
15          (Record resumed at 12:31 p.m.)
16  BY MS. GORDON:
17  Q.  Sergeant, other than removing a vehicle upon the
18      highway, because it is disabled and is causing an
19      obstruction, other than that, does an arrest occur when
20      you are doing an impound?
21          Does impound go with an arrest, a violation of law,
22      where somebody is being arrested?
23          For example, no insurance, driving while suspended,
24      any of the other things you've said.
25  A.  It tends to vary.  I mean, some impounds are abandoned
```

Page 102

```
 1      vehicles or not occupied, so then in that case there's
 2      no arrest.
 3  Q.  Right.
 4  A.  If somebody is drunk driving, then there's pretty much
 5      always an arrest.  If somebody has warrants from
 6      Melvindale, then, you know, they're pretty much --
 7  Q.  There's arrest?
 8  A.  -- guaranteed arrest.  Depend -- I mean, if they have
 9      warrants for other places -- it depends where it's from.
10      A lot of times, if somebody has a Detroit warrant,
11      Detroit just doesn't come pick anything up.  They're too
12      busy.  But if they're Melvindale or, you know, something
13      right nearby, sometimes Dearborn, they'll pick up.
14  Q.  So, what you're telling me is, an impound, when --
15      when -- when the impound is occurring because of
16      wrongdoing by the driver, it goes with an arrest?
17  A.  It can.
18  Q.  Well, when -- I'm trying to figure out -- I know it can.
19      It sounds like it always does unless the vehicle is
20      disabled or abandoned.
21  A.  Well, it's officer's discretion whether to take that
22      person to jail or not in -- in most cases.
23  Q.  Well --
24  A.  I mean, if somebody has a suspended license, they can be
25      arrested and taken to jail.
```

Page 103

```
 1  Q.  But your -- your city ordinance says one of the three
 2      reasons for impound is "when the driver of such vehicle
 3      is taken into custody."
 4  A.  Uh-huh.
 5  Q.  So, that means an arrest, doesn't it?
 6  A.  I would --
 7  Q.  Taken into custody has to be an arrest?
 8  A.  Uh-huh.
 9          THE REPORTER:  I'm sorry.  Is that --
10  A.  Yes.
11  BY MS. GORDON:
12  Q.  Right?
13          And then your other -- other thing says when a
14      vehicle is so disabled, you can impound.  So --
15  A.  Right.  Accidents and --
16  Q.  I'm trying to find out from you, as a matter of law --
17  A.  Uh-huh.
18  Q.  -- in traffic enforcement, can you impound a vehicle
19      without taking a person into custody?
20  A.  Yes.
21  Q.  And what are the circumstances?
22  A.  Somebody driving without a license, unlicensed,
23      suspended, never acquired a driver's license.
24  Q.  Okay.  Hang on.
25          Is that illegal?
```

Page 104

```
 1  A.  Yes.
 2  Q.  Okay.  Why are you not taking the person into custody,
 3      then?
 4  A.  It's my discretion.
 5  Q.  Well, if the person is violating the law and you're
 6      going to impound the car, why are you not going to
 7      arrest them?
 8  A.  Removing the vehicle from the roadway eliminates the
 9      safety hazard to the other motoring public.  Whether
10      they go to jail or not, a lot of times you try and help
11      somebody out.  They -- you -- some people just literally
12      can't come up with any bond money, so they're going
13      to -- you know, we'll end up releasing them after a few
14      hours anyway.  Some people have kids with them, and you
15      don't want to separate the parent from the kid by
16      taking -- you know, what are you going to do with the
17      kids if you just take the parent to jail?
18          You get people who are, you know, just -- you give
19      them a break on that one way or another, if they're a
20      first-time offender, somebody you don't deal with often.
21          And then we have other people where, you know, this
22      is the third time you've been stopped for driving with a
23      license suspended and it's time to go to jail.
24  Q.  So, you think, by law, you can impound somebody's car
25      and take it away from the person, even though they have
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 105–108

**Page 105**

1     not been taken into custody?
2  A.  Yes, absolutely.
3  Q.  And they've committed a crime, though?
4  A.  Yes.
5  Q.  So, you can have somebody in front of you that's
6     committed a crime, but you do not arrest them?
7  A.  Correct.
8  Q.  And where is the rule for that?
9  A.  I can't quote the exact rule on that.
10  Q.  Is that in the Melvindale policies and procedures?
11  A.  It would be in accordance with the law.
12  Q.  What law?
13  A.  I can't quote offhand, ma'am.
14  Q.  Okay. Well, what other laws exist, that you know of in
15     your duties in Melvindale as a police officer, where
16     you -- somebody commits a crime and they're not
17     arrested?
18  A.  Can you ask the question again? I didn't --
19  A.  Yeah.
20  A.  -- follow that.
21  Q.  Give me other circumstances where you will be present
22     when somebody commits a crime and not arrest them.
23  A.  Well, for example, we run into people with warrants
24     sometimes, and rather than take them to jail, we'll let
25     them stay out of jail and use it as leverage. Like,

**Page 106**

1     "Listen, you need to cooperate and behave, or we're
2     going to take you to jail today."
3  Q.  That's because -- but there's already a warrant for the
4     person's arrest out?
5  A.  Right.
6  Q.  The crime was not committed on your -- in your presence;
7     correct?
8  A.  Correct. But I -- they can still be taken to jail.
9     It's the discretion of the officer.
10  Q.  Okay. So, the -- it's the discretion of the officer
11     whether to arrest somebody, but you say you don't have
12     discretion in impounding cars under certain
13     circumstances? It's mandatory?
14  A.  Correct.
15  Q.  Does that make any sense to you?
16  A.  Yes.
17  Q.  Okay. Under what law?
18  A.  Again, you've asked me that several times.
19     I can't quote the exact law.
20  Q.  Fair enough.
21  A.  Okay.
22  Q.  What percentage of times when you -- let's say in 2017,
23     what percentage of the time did you impound a car
24     without an arrest?
25  A.  Well, I don't know a percentage, ma'am.

**Page 107**

1  Q.  What percentage of the tows that occur in the City of
2     Melvindale, are you done -- have been done by you?
3  A.  I -- the majority of them.
4  Q.  Okay.
5  A.  I don't have actual -- an actual percentage, but I would
6     say the majority of them. I work a lot of traffic
7     enforcement detail overtime.
8     (Discussion held off the record.)
9  BY MS. GORDON:
10  Q.  Go ahead.
11     So, when you say "the majority," what does that
12     mean? Like 80 percent of the tows are you?
13  A.  I don't -- I don't have any exact statistics offhand.
14  Q.  Well, you've been given some information and data,
15     haven't you?
16  A.  Correct. But, I mean, I don't have it in front of me.
17  Q.  Okay. And what data do you have on that?
18  A.  Well, just from pulling my own statistics off the
19     computer system -- RMS at work.
20  Q.  Okay. So, the RMS shows the number of impounds?
21  A.  Yes. Correct.
22  Q.  Of you and the other officers?
23  A.  Correct. Every -- everyone in the department.
24  Q.  So, why is it that you have done the vast majority of
25     impounds?

**Page 108**

1  A.  I enjoy doing traffic detail. And we also have
2     basically unlimited -- if you want to work overtime, you
3     can work traffic detail, and police wages don't go very
4     far, so I work a lot of overtime.
5  Q.  So, you're saying you have unlimited overtime?
6  A.  Well, I shouldn't say "unlimited." You're capped as to
7     how many hours you can work in a day, but I mean --
8  Q.  How many is that?
9  A.  Well, we have a regular eight-hour shift. And if you
10     want, you can work up to four hours of overtime traffic
11     detail after your regular shift, but they don't want you
12     to work more than 12 hours in one shift for safety
13     reasons, if possible.
14  Q.  So, if there's -- if you stop somebody, and there's a
15     warrant out for the person's arrest, and it's a
16     Melvindale warrant, what do you do?
17  A.  It varies depending on circumstance, but most of the
18     time, if they have a Melvindale warrant, I like to bring
19     them in.
20     For example, yesterday, I stopped a car and the
21     front seat passenger had a Melvindale warrant -- two of
22     them, actually -- and I called another unit to assist
23     me, and we -- he transported her to the jail.
24  Q.  It -- the -- what would a possible reason be for not
25     taking somebody into custody if you see an active

Page 109

1       warrant for that person's arrest?
2 A. Like I said, earlier, a lot of times we keep it for
3       leverage if they're an actual local resident. Because
4       if you go to that person's house, you know, you've got
5       somebody, and you'll say, "Listen, you need to cooperate
6       or you're going to jail. You have this warrant that we
7       know about."
8 Q. Cooperate with what?
9          I don't know what you're talking about.
10          Cooperate with what?
11 A. Well, whatever the circumstance may be, be it a noise
12       complaint, blaring radio, you know, don't want to go
13       there three different times and ask them to turn it
14       down.
15 Q. So, do you then report back to the station that you did
16       stop somebody that had warrants out, but that you
17       decided not to arrest the person?
18 A. Well, I would document -- write a -- put this in the
19       report. I mean, I would document in the report, you
20       know, "Subject was advised of their warrants."
21 Q. What report?
22 A. Whatever the incident report may be.
23 Q. So, you're going to go back and write an incident
24       report, and you're going to say, "I stopped somebody and
25       he had a warrant out for his arrest. I did not arrest

Page 110

1       him, but I advised him" of something?
2 A. Yes. Yes.
3 Q. And what are you going to advise him of?
4 A. Advised him he has -- well, sometimes people don't know
5       they have a warrant, and they, you know, legitimately
6       don't realize they have it. So, you'll advise them,
7       "Hey, you have a warrant out of this court. This is
8       your bond. You need to get this take care of. You
9       know, if I see you driving again after today or we come
10       to your house again and you have this to take care
11       of" -- and a lot of times people then take care of it on
12       their own.
13 Q. Okay. Well, why do you impound the car, then? If
14       you're not arresting the guy, and -- and --
15 A. It --
16 Q. Why do you impound the car?
17 A. Well, it varies by circumstance. Like I said, if they
18       have no insurance.
19 Q. No. This is somebody that's got a warrant out for his
20       arrest for something else.
21          You stop him. He's got a warrant out for his
22       arrest.
23          Give me an example of somebody who has had a
24       warrant out for arrest that you've stopped.
25 A. Like I said, yesterday.

Page 111

1 Q. And what was his -- the warrant for?
2 A. Traffic stuff, driving while license suspended twice.
3       It was actually a female.
4 Q. Okay. So, why would you not arrest that person, or do
5       you?
6 A. I -- I did. She was -- that's the one I just gave an
7       example of. I called the initial unit to the scene.
8 Q. I got it.
9 A. She was transported to jail.
10 Q. I got it.
11          Okay. So, if it's somebody that you decide not to
12       arrest but you impound the car, you write that in your
13       police report every time?
14 A. I don't understand question. I mean --
15 Q. You said "sometimes" you impound --
16 A. Okay. I --
17          MR. MEIHN: Let her finish.
18 BY MS. GORDON:
19 Q. -- you impound the car --
20 A. Uh-huh.
21 Q. -- and you don't arrest, even though there's a warrant
22       out.
23 A. Yes.
24 Q. You said it's officer's discretion?
25 A. (Nods head.)

Page 112

1 Q. "Yes"?
2 A. But the --
3 Q. Hang on. "Yes"?
4 A. Okay. Sorry.
5 Q. You've got to say "yes."
6          You've nodded your head. You didn't say "yes."
7 A. Yes. Yes, ma'am. Sorry.
8 Q. Okay. So, how do you handle that in the report, that
9       you have now stopped somebody with an active warrant for
10       his arrest --
11 A. Uh-huh.
12 Q. -- and you've not arrested him?
13          Is there a record made of that?
14 A. Yes.
15 Q. And where is that record made?
16 A. In the report.
17 Q. Okay. And what -- do you put the reason you did not
18       arrest the person in the report?
19 A. Sometimes.
20          Say, for example, I pull somebody over and they
21       have warrants in Allen Park, which is the next city
22       over. And we contact Allen Park, and Allen Park will
23       say, "We're too busy. We -- our jail is full," or
24       whatever. "We can't pick up." And they decline to pick
25       the person up on their warrants.

FURMAN, SERGEANT MATTHEW
03/13/2018

**Page 113**

```
 1          So, then it would be documented in the report, you
 2    know, "Allen Park contacted by dispatch" --
 3    Q.  I'm not talking about that.  I'm talking about when you
 4    personally decide, for a Melvindale resident --
 5    A.  Okay.
 6    Q.  -- to take the car and not to arrest.
 7          How is that documented?
 8    A.  Well, the vehicle, if it's being taken, isn't being
 9    taken because they have a warrant.  It's being taken for
10    another reason discovered during the traffic stop.  Say,
11    the license is suspended, no insurance, stolen plate on
12    the car, improper plate, something of that nature.  But
13    it would be documented.  You know, LEIN showed the
14    person to have a suspended license.
15    Q.  Right.  So --
16    A.  They admitted to having no insurance.
17    Q.  I'm trying to find out how you would document this, that
18    you -- somebody has an active --
19    A.  It would --
20          THE REPORTER:  I'm sorry --
21    BY MS. GORDON:
22    Q.  Hang on.
23          Somebody has an active warrant for his arrest.  You
24    choose to impound the car --
25    A.  Uh-huh.
```

**Page 114**

```
 1    Q.  -- and not arrest.
 2          How do you handle that from a records end of this?
 3    A.  As I've stated several times, it would be documented in
 4    the report, "The subject was advised on their warrants."
 5    Q.  Okay.  And if I pull all your reports where you didn't
 6    arrest somebody, I'm going to see that?
 7    A.  It depends if they had a warrant.
 8    Q.  I know.
 9          For all the people that have warrants, I'm going to
10    see that every time on your reports?
11    A.  I can't say for sure, no.
12    Q.  Okay.
13          (Discussion held off the record.)
14    BY MS. GORDON:
15    Q.  I'm going to hand you Bates stamp 4290.
16    A.  Okay.
17    Q.  Your name is on that document.
18          Do you recognize that document?
19    A.  Yes.
20    Q.  Okay.  This is a tow tag?
21    A.  That's correct.
22    Q.  Okay.  So, here, we had a situation where you stopped
23    somebody, where the registered owner had Melvindale
24    Police Department warrants out.
25          Do you see that?
```

**Page 115**

```
 1    A.  Yes.
 2    Q.  Okay.  And you did not take the person into custody;
 3    correct?
 4    A.  That is correct.
 5    Q.  Okay.  But you did tow the car; correct?
 6    A.  That is correct.
 7    Q.  Why?
 8    A.  Because the subject had, according to this sheet, a
 9    suspended driver's license, no insurance on the
10    automobile.  Additionally, they had an expired plate,
11    although that's not grounds for an impound, but the
12    insurance and the suspended license is.
13          And I did put a -- I had advised the owner and gave
14    them a chance to get it taken care of on their own, and
15    I did let them know when they come into the police
16    department, you know, make sure --
17    Q.  Okay.
18    A.  -- these warrants are taken care of by then.
19    Q.  Okay.  You have to answer my question.
20          Why did you not arrest somebody who had outstanding
21    warrants?
22          MR. MEIHN:  He just answered that question.  Asked
23    and answered.
24          Go ahead, again.
25    A.  It's my discretion.  I chose not to.  I chose to give
```

**Page 116**

```
 1    that person a break by letting them go to court on their
 2    own and take care of the warrants.
 3    BY MS. GORDON:
 4    Q.  How much did this tow cost this person?
 5    A.  I have no idea, ma'am.
 6    Q.  And you, of course, know that the tows generate revenue
 7    for the City, don't you?
 8    A.  As a -- as a by-product of law enforcement, yes, revenue
 9    is created.
10    Q.  Well, it's not always a by-product.  You can certainly
11    enforce the law and not have the City generate revenue
12    from tows; correct?
13    A.  I -- it's above my pay grade.  I don't --
14    Q.  No, it's not.
15          When Gene's Towing was there, the City didn't make
16    any revenue from tows, did it, when you were working
17    there --
18    A.  Yes, actually they did.
19    Q.  What -- what did they make?
20    A.  Storage administration fees.
21    Q.  Okay.  For storage of the car, but not for the tow;
22    correct?
23    A.  I believe.  I'd have to look at the contract.  It was --
24    Q.  Well, you know very well what the revenue is.  You get
25    notices of it, don't you, that's being generated now
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 117–120

Page 117

```
1       that Goch & Sons is there?
2   A.  I don't.  I believe the city council --
3   Q.  Okay.
4   A.  -- gets a report.  I don't get any kind of paperwork or
5       report.
6   Q.  But you know well that, under Goch & Sons, it's -- the
7       City is -- it's public record -- is now generating
8       revenue; correct?
9           MR. MEIHN:  Objection to foundation.
10  BY MS. GORDON:
11  Q.  You know that, don't you?
12  A.  I would presume so.
13  Q.  Right.
14  A.  I don't have any numbers.
15  Q.  All right.  But in any event, the reason the City
16      generates revenue is because the City decides how much
17      will be charged for that tow, and the City and the
18      contractor decide how much will be given back to the
19      City; correct?
20  A.  That -- I don't know.
21  Q.  Okay.  So, when you say it's a by-product, it's a
22      by-product only if the City decides it's going to be a
23      by-product and the City is going to generate revenue
24      from tows; correct?
25  A.  My job is to enforce --
```

Page 118

```
1   Q.  I didn't ask you that.  Just -- if you know, you can
2       answer my question.
3   A.  I don't know.
4   Q.  Okay.  And do you issue a citation for a tow?  How is
5       that handled administratively by you?
6   A.  With the exception of a vehicle that is parked -- and
7       sometimes you can't track who the owner down is -- it's
8       just an unregistered, abandoned car, no plates, no
9       information on it.  If you can't determine who, for
10      sure, the owner of that vehicle is --
11  Q.  Okay.  This is --
12  A.  -- then I won't necessarily issue -- I'm trying to
13      answer you.
14          I won't necessarily issue a citation.
15          If there's a subject with the vehicle, a driver,
16      and it's being impounded, then practically every time,
17      that driver is issued a citation.
18  Q.  Okay.  And how much -- do you tell the person how much
19      the tow fee is?
20  A.  We give them a sheet with a handout -- a handout, we
21      provide to them.  It has the tow information --
22  Q.  Okay.
23  A.  -- the fax number and the requirements to get your
24      vehicle out of impound.
25  Q.  Does it show the cost?
```

Page 119

```
1   A.  Yes.  It has a breakdown of all the different costs.
2   Q.  Okay.  So, you carry that in your car as well?
3   A.  Correct.  When I impound somebody's vehicle, I give them
4       a copy of that.
5   Q.  Okay.  4290 was -- the tow date was 11-11-15.
6           I'll give you 4477.  The tow date is 7-8-15.
7           Okay.  The next day after this, somebody was
8       arrested; is that correct?  This driver?
9   A.  Yes.
10  Q.  Why was this car stopped?
11  A.  Well, without the report in front of me, I don't know,
12      but from what I gather from this, it was not stopped.
13      It was an abandoned car.
14  Q.  And how can you tell that?
15  A.  Well, there's no keys with the vehicle.  It has an
16      improper license plate.
17  Q.  Okay.
18  A.  Which means I probably -- I mean, I can't say.
19  Q.  Okay.
20  A.  Without seeing the report, I can't say with any clarity.
21  Q.  Okay.  Here is a tow tag from 4-29-15, Bates stamp 4870.
22          The bottom of this says:
23          "Registered owner has Melvindale Police
24      Department warrant."
25          That means there's a warrant for this person's
```

Page 120

```
1       arrest; is that correct?
2   A.  Correct.
3   Q.  And there was no arrest here by you; is that correct?
4   A.  It would seem that way.
5   Q.  Okay.
6   A.  However, I don't know if the owner was present with the
7       vehicle or if somebody else was driving at the time of
8       the stop, either of which would make a difference.  And
9       I would put a note on here because if the registered
10      owner wasn't present, I couldn't arrest them either way.
11  Q.  Here's a tow tag dated 11-13-16, Bates stamp 3656.  It
12      appears here that you did -- the registered owner had
13      a -- a warrant, and you did not arrest the person; is
14      that correct?
15  A.  Without seeing the report, I can't say for sure, but it
16      would appear that way.
17  Q.  Okay.  I'll take that back.
18  A.  I also can't say whether they were with the vehicle at
19      the time or if somebody else was driving.
20  Q.  Here's a tow tag, 11-22-16.  "Registered owner has
21      Melvindale Police Department warrants."
22          It appears that you did not arrest that person; is
23      that correct?
24  A.  And, again, I don't know if the person was present with
25      the vehicle at the time of the arrest to be arrested.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 121–124

Page 121

1   Q.   Okay.
2   A.   And, again, without seeing the report, I am very
3        hesitant to make more of a comment.
4            MR. MEIHN:  Could you keep those, what you're going
5        through, for me?
6   BY MS. GORDON:
7   Q.   Here's a tow tag dated 12-8-16.  It's Bates stamp 3787.
8        It appears that this registered owner had warrants from
9        Melvindale, Dearborn, Redford Township, and you did not
10       arrest the person.
11           Do you see that?
12  A.   Okay.
13  Q.   You advised the person to resolve the warrants; is that
14       correct?  And you impounded the car?
15  A.   That's correct.
16  Q.   Okay.
17           MR. COOGAN:  Keep it.
18           (Discussion held off the record.)
19  BY MS. GORDON:
20  Q.   Did you ever believe that Goch & Sons Towing was
21       corrupt?
22  A.   No.
23           I mean, I was told they were by Chad Hayse and Mike
24       Welch, but I never had any contact with them or any
25       firsthand knowledge.

Page 122

1   Q.   Were you friends with the son of the owner of Gene's
2        Towing?
3   A.   Yes.
4   Q.   What was his name?
5   A.   His name is Paul.
6   Q.   You discussed with him Goch & Sons Towing being corrupt;
7        is that correct?
8   A.   I have no recollection offhand, but I'm sure we
9        discussed the towing contract.
10  Q.   Right.
11  A.   I told him what I had heard.
12  Q.   And what had you heard about Goch & Sons?
13  A.   Mike Welch told me that Mike Goch is a convicted felon.
14       Bad guy, steals cars, all sorts of allegations.
15  Q.   Who told you that?  Welch?
16  A.   Mike Welch.
17           Chad Hayse said the same thing.
18  Q.   And you passed that along; is that correct?  I think you
19       talked to Welch about it; is that right?
20  A.   I don't recall at this point.
21  Q.   And did you tell --
22  A.   It was several years ago.
23  Q.   -- Gene -- Gene's son -- I think his name is Paul --
24       that that's what you had heard?
25  A.   Yeah.  Well, there's no actual Gene.  It's just Paul.

Page 123

1   Q.   Fair enough.
2   A.   Paul Senior and Paul Junior.
3            MR. MEIHN:  Now answer her questions.
4   A.   What -- what was the question, ma'am?  Sorry.
5   BY MS. GORDON:
6   Q.   Did you discuss that with him, tell him that that's what
7        Welch was saying?
8   A.   I'm sure I did, but I don't have a recollection of --
9        recollection of an exact conversation.
10  Q.   Who do you know today from Goch & Sons?
11  A.   Well, pretty much everybody at this point.
12  Q.   Give me a list.
13  A.   Well, there's Mike Goch.  He's the owner.  There's his
14       son, Jared Goch.  One of the main drivers who kind of is
15       assigned to the Melvindale area is Sean Briscoe, S-e-a-n
16       B-r-i-s-c-o-e.
17           And then a lot of guys, I just know by their first
18       name or nicknames.  There's Big Jared.  I don't know his
19       last name.  He's just a really big guy named Jared.
20  Q.   Do you know the administrator?
21  A.   The administrator?
22  Q.   Yeah.  The female who is the administrator, the spouse
23       of Mike Goch?
24  A.   I don't really know her personally.
25  Q.   Or the girlfriend.

Page 124

1   A.   I know who she is.  Well, there's -- Darlene is his
2        ex-wife.  She's a dispatcher.
3   Q.   I think it's a girlfriend.
4   A.   Oh, Kate.
5   Q.   Katie.
6   A.   Yes, I know her.
7   Q.   How do you know her?
8   A.   Through the tow truck company.
9   Q.   And what's your interaction with her?
10           She's not out driving a tow truck as far as I
11       understand it.
12  A.   No, but I've seen her at City functions, and, you know,
13       I get along well with her and Mike when I see them
14       places and --
15  Q.   Have you socialized with them?
16  A.   Yes.
17  Q.   Where have you socialized with them?
18  A.   Well, prior to the contract, no, I never met him, but,
19       yes, I've socialized with him since.
20  Q.   Okay.
21  A.   I've seen him at the Melvindale City Christmas party.  I
22       have been on his boat once.
23  Q.   Where is his boat anchored?
24  A.   Gibraltar.
25  Q.   And what kind of a boat is it?

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 125–128

Page 125

1  A.  I don't know much about boats.  It's a motor boat.
2  Q.  Okay.
3  A.  A decent-sized boat.  I --
4  Q.  Okay.  What else, socializing with him?
5  A.  Went out to eat with him a couple times.
6  Q.  Where did you go?
7  A.  I don't recall offhand where we ate.  I don't know.
8  Q.  Okay.  Who -- did you -- did -- he pick -- picked up the
9      bill as I understand it; is that correct?
10 A.  No.  I pay my own food.
11 Q.  You got a separate bill?
12 A.  Correct.
13 Q.  Did you put it on a credit card?
14 A.  I usually carry cash.
15 Q.  Okay.
16 A.  I may have put it on a card.  I don't know.
17 Q.  Where have you -- where else have you been with him?
18 A.  Out to eat.  I've been to his residence, which is where
19     his boat is.  I was on his boat one time.
20 Q.  And at his residence another time?
21 A.  No.  It was the same -- well, yeah.
22 Q.  A different time?
23 A.  Correct.
24 Q.  What was that for?
25 A.  They invited me over for dinner.

Page 126

1  Q.  Who is "they"?
2  A.  Mike and Kate.
3  Q.  Okay.  Anybody else there?
4  A.  Yes.
5  Q.  Who else?
6  A.  Kate has two kids.  They were there.
7  Q.  Okay.  Who else?
8  A.  Her father was there.
9  Q.  Who else?
10 A.  I think when I went for dinner, that was it.  Just their
11     family unit and then me.
12 Q.  Any gifts you've received from them of any kind?
13 A.  No, ma'am.
14 Q.  Tickets?
15 A.  Nope.
16         (Discussion held off the record.)
17 BY MS. GORDON:
18 Q.  You make Goch & Sons a lot of money, don't you?
19 A.  I don't know the finances, ma'am.
20 Q.  But you know you make them a significant amount of
21     money; right?
22 A.  I -- I don't know how much they make.
23 Q.  In fact --
24 A.  I have nothing to do with the contract, the pricing,
25     anything.

Page 127

1  Q.  Well, in fact, the vast majority of the money they
2      receive -- let me see that -- that they receive based on
3      their contract with the City of Melvindale comes from
4      your -- your tows; correct?  As far as you understand
5      it, you did the majority of the tows?
6  A.  Well, statistically.
7  Q.  Sure.
8  A.  I mean, I tow most of our impounds, so I would say yes.
9          MR. MEIHN:  Are you insinuating he's an employee of
10     Goch & Sons?  Is that what you're trying to indicate?
11         MS. GORDON:  No.
12         MR. MEIHN:  Okay.
13         MS. GORDON:  He's --
14         MR. MEIHN:  I didn't know if you were tying that
15     in.
16         MS. GORDON:  He's an employee of the City of
17     Melvindale.
18         MR. MEIHN:  Got it.
19 BY MS. GORDON:
20 Q.  Did Goch & Sons offer to or actually purchase some
21     equipment for a patrol car?
22 A.  I have no idea, ma'am.
23         (Discussion held off the record.)
24 BY MS. GORDON:
25 Q.  What car -- do you typically drive a designated car?

Page 128

1  A.  No, we don't have assigned cars.
2  Q.  Did you discuss with Ms. Barnes a designated car for
3      certain traffic patrol duties?
4  A.  Yes.
5  Q.  What would that have been?
6  A.  When Ms. Barnes approached me to see if I would be
7      interested in a traffic unit, I did advise that we --
8      all of our police cars are pretty much fully marked.
9      So, they're not exactly the most low-key, and we would
10     need an actual traffic car.
11         We had a traffic car, but it was not in use.  We
12     had a Ford Mustang, but there was no computer and the
13     radar didn't work.  There was no printer.  So, that
14     would need -- either need to be made back into service
15     for a traffic car or something else acquired if the City
16     didn't want to keep that particular car.
17 Q.  So, Ms. Barnes suggested it would be in the City's best
18     interests to have such a vehicle; is that correct?
19 A.  I don't recall the exact -- what she said exactly.
20 Q.  Was there the purchase of a new computer for the --
21     there's a Mustang patrol car.  Am I correct on that?
22 A.  There was at the time.  There's not anymore.  The City
23     actually got rid of it.  No one ever used it, and we
24     traded it in for credit towards a new car at the Ford
25     dealer.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 129–132

Page 129

1  Q.  And what was the new car?
2  A.  A Ford Explorer.
3  Q.  And what do you drive?
4  A.  A Ford Explorer.
5      All the patrols cars are Ford Explorers.
6  Q.  So, I have towing data from the City, and you've always
7      done the majority of the towing since you've been with
8      the City?
9  A.  Yes, from -- from day one.
10 Q.  Right.
11     But your numbers went up -- the number of tows went
12     up.  From the first six months of 2015, there were 368
13     tows under Gene's.
14 A.  Of what year?
15 Q.  '15.
16 A.  Okay.
17 Q.  The second half of 2015, there were 1,137 tows in the
18     second half of the year.
19     I would say that looks like it's almost four times
20     the number of tows.
21     Why was that?
22 A.  Well, I'm not sure exactly.  I mean, I imagine I was --
23 Q.  Well, you were out there doing them.  I mean, your name
24     is attached to the vast majority of them.
25     What happened with you to change your number of

Page 130

1      tows in a six-month period from 368 to 1,137?
2  A.  Well, for a period of time, I was actually doing a lot
3      of ordinance stuff with the ordinance officers we had at
4      the time.  So, rather than be towing cars, I was doing a
5      lot more stuff in the neighborhoods with them.  We had
6      two part-time ordinance officers.
7      So, that took a lot of my focus off traffic aside
8      from, you know, overtime or abandoned cars, things of
9      that nature.
10 Q.  When did you work with the ordinance officers?
11 A.  I don't remember the exact date.  They were fired kind
12     of without warning by Mr. Hayse one day, without warning
13     or documentation.
14 Q.  I'm not sure what your point is.
15 A.  But --
16 Q.  Did that cause you to do some ordinance work?
17 A.  Yes.  He actually left us without any ordinance officers
18     for quite some time, which caused quite the ruckus in
19     the City.
20 Q.  Okay.  I'm going to go back to my question.
21     Why did your towing numbers go from 368, in the
22     first half of 2015, to 1,137 in the second half?
23     MR. MEIHN:  And I'm just going to place an
24     objection to foundation, that there's no evidence to
25     establish that those numbers are correct.  So, could you

Page 131

1      at least --
2      MS. GORDON:  Well, you've given me the documents.
3      MR. MEIHN:  Well, I -- I don't know that he knows
4      those numbers to be correct, but --
5      MS. GORDON:  Okay.  Well --
6      MR. MEIHN:  -- subject to that, if you can answer
7      the question --
8  BY MS. GORDON:
9  Q.  Go ahead.
10 A.  Well, I -- I don't know those numbers to be correct, but
11     I also don't know exactly what percentage or what
12     portion of those are my impounds.
13     Excuse me.
14     But I know a lot of it is related to me working
15     overtime.
16 Q.  So, you just decided --
17 A.  I worked as intensive on overtime.
18 Q.  You -- so, if I pull your overtime records, I will see
19     more overtime --
20 A.  I would suspect so, yes.
21 Q.  And why did you start working more overtime?
22 A.  Well, because we're one of the lowest paid police
23     departments in Southeast Michigan, so --
24 Q.  But that's always been true.
25     Why did you start working more --

Page 132

1  A.  Well, I've always worked a lot of overtime, but --
2  Q.  Okay.  Then I'm going to go --
3  A.  -- maybe I worked more at that period.
4      THE REPORTER:  Excuse me?
5      (Discussion held off the record.)
6      THE REPORTER:  Sorry.
7      MR. MEIHN:  What you need to do, sir, is you need
8      to let her finish the question.
9  A.  Okay.
10     MR. MEIHN:  And then you answer; okay?
11 A.  Okay.  Sorry.
12     MR. MEIHN:  Don't talk over her.
13 BY MS. GORDON:
14 Q.  Okay.  I'm going to go back to my question.
15 A.  Okay.
16 Q.  I mean, I can see from the data about this difference in
17     towing numbers.  I'm trying to find out if you know why.
18 A.  No, ma'am.
19 Q.  You've said -- you don't know why?
20 A.  No.
21 Q.  And if I pull the records, which I've already done, and
22     I can show that the vast majority of the 1,137 tows were
23     yours, what would be the reason for your number of tows
24     to go up?
25     Do you have anything to offer me as a reason for

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 133–136

Page 133

1    that?
2  A.  No. I've always been a proactive officer with a high
3      number of impounds.
4  Q.  Well, that's fine, except for you went from 368 to
5      1,137.
6        MR. MEIHN: And I'm going to object. There's no
7      foundation that that number of 368 in comparison to this
8      1,000 is a proper comparison, because the 1,000 is
9      everybody in the department, and the 360 may be his.
10       MS. GORDON: It's not. All -- virtually all his
11     with a few others.
12 A.  There was also, around the time -- oh.
13 BY MS. GORDON:
14 Q.  I'm listening.
15       Go ahead.
16 A.  Go ahead? Okay.
17       Around the time that the contract was out for bid,
18     Mr. Hayse and Mr. Welch was -- were telling everyone not
19     to tow any cars either, and they didn't want Goch to get
20     the contract. So, they had us kind of doing a
21     slowdown --
22 Q.  Okay. Well, did you slow down?
23 A.  -- to send a message to the City.
24 Q.  Did they send an order out to that?
25 A.  They did.

Page 134

1  Q.  So, you intentionally slowed down --
2  A.  I did slow down for a period. Correct.
3  Q.  All right. Well, what about your numbers in 2014?
4        MR. MEIHN: Object to foundation.
5  A.  I don't know what my numbers were in 2014.
6        (Discussion held off the record.)
7  BY MS. GORDON:
8  Q.  What are the reasons you are allowed by law to stop a
9      vehicle?
10 A.  I mean, there's many reasons.
11 Q.  What are they?
12 A.  Well, expired plate, improper plate. If you have
13     probable cause to believe the registered owner is behind
14     the wheel and that subject has an improper -- or expired
15     or suspended driver's license. Somebody has --
16 Q.  Probable -- I'm sorry. Hang on.
17       You have reason to believe the registered owner of
18     the vehicle is behind the wheel?
19 A.  Correct.
20 Q.  Okay.
21 A.  And that person has a suspended or expired or cancelled
22     driver's license.
23 Q.  And how would you know that?
24 A.  You run their license plate and pop up that information.
25 Q.  So, you run plates for anybody that you see on the road?

Page 135

1  A.  I run plates all the time. Correct.
2  Q.  Okay. What else?
3  A.  Well, if you have a stolen car or -- like yesterday, I
4      had a stolen license plate. I had a vehicle yesterday
5      with an improper license plate. That means it was taken
6      from one vehicle and put on another one.
7  Q.  What else?
8  A.  Equipment violations, such as brake lights out, smashed
9      windshields, obstructed vision, somebody driving -- a
10     lot of people will drive on a completely flat tire where
11     just -- the tire is gone, just the wheel. You can stop
12     them and advise them, "You need to leave the roadway."
13 Q.  How many plates do you run a day?
14 A.  Oh, it -- it varies. I mean, as a sergeant, I'm indoors
15     most of the time. So, if I'm on regular shift, none.
16 Q.  When you were -- before you were a sergeant.
17 A.  It just depends how busy we were, how I felt.
18 Q.  Give me a range.
19 A.  It could be several dozen. It could be a few dozen.
20 Q.  Where do I find a record of how many --
21 A.  It could be a couple.
22 Q.  -- license plates you run?
23 A.  I have no idea. You'd have to contact our chief.
24 Q.  That all goes through the LEIN system?
25 A.  I believe so, yes.

Page 136

1  Q.  You keep close number of -- track of the number of cars
2      you tow a year; is that correct?
3  A.  I usually check a couple times a year to see, I mean, my
4      stats, how many arrests I've made, just kind of how many
5      reports I've taken.
6        (Discussion held off the record.)
7  A.  I haven't in quite some time now, but --
8  BY MS. GORDON:
9  Q.  Do you remember your stating at the Chad Hayse hearing
10     that, for 2016, you towed roughly 776 cars?
11 A.  I recall giving a number.
12       I don't recall exactly if that was it, but it may
13     have been.
14 Q.  And do you remember saying at the hearing on October
15     26th, 2017, that for 2015, you towed 860 cars?
16 A.  What hearing in 2017?
17 Q.  The Chad Hayse hearing.
18 A.  Wasn't that 2016?
19 Q.  Yes. August 29th. This must be the date of the -- the
20     transcript was typed up.
21       August 29, 2016.
22       So, you stated on August 29, 2016 that, for the
23     year before, you towed 776 cars. That would be for
24     2015. And then for 2014, you towed four hundred and --
25     860 for '14, and for '13, 460.

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 137–140

Page 137

1    Does that sound right to you?
2        MR. MEIHN:  I'm just going to object.  The
3    transcript speaks for itself.
4        But if you have a memory, sir, please.
5    BY MS. GORDON:
6    Q.  Do you remember testifying to that?
7    A.  I remember speaking.  I don't remember the exact
8        numbers I gave.
9    Q.  Did those --
10   A.  But those sound approximately correct.
11   Q.  Okay.  So, then, per your testimony at the trial, for
12       2016, you towed 776 cars; for 2015, you towed 860; for
13       2014, according to you, you -- you towed 460.
14       So, that is -- '14, '15, and '16 are significantly
15       less than the cars you towed after June of 2015;
16       correct?
17   A.  Well, if --
18       MR. MEIHN:  Counsel, I have to object.  I'm
19   confused now.
20   A.  Yeah.
21       MR. MEIHN:  You -- you gave numbers for '14, '15,
22   and '16, and then you're asking that that -- those
23   numbers are substantially less as of June of 2015?
24       MS. GORDON:  You know what?  That's fine.  The
25   numbers will speak for themselves.  I'll come back to

Page 138

1    this if I want to.
2        MR. MEIHN:  Thank you.
3    BY MS. GORDON:
4    Q.  But I'm just confirming that this is your testimony with
5        regard to your prior towing numbers.
6    A.  I'd have to see the transcript.
7        MR. MEIHN:  But she's asking you to confirm --
8    A.  But I --
9        MR. MEIHN:  -- that your testimony in the
10   transcript was accurate.
11   A.  Yes, at the -- yes.  I looked up the numbers on our
12       computer system before I went in there.
13       MR. MEIHN:  Okay.
14   BY MS. GORDON:
15   Q.  And in 2017, then, how many cars did you tow?
16   A.  I don't know.
17   Q.  Was it more than the 860 in 2015?
18   A.  I -- I don't know offhand, ma'am.
19       (Discussion held off the record.)
20       MS. GORDON:  Okay.  I'm going to need to take about
21   a 5-minute break.
22       What time is your person coming, Greg?
23       MR. MEIHN:  1:30.
24       MR. COOGAN:  You don't want to grab lunch there,
25   Mr. Furman, and --

Page 139

1        MS. GORDON:  He wants to get out of here, I think
2    he said.
3    A.  Well, I can go either way.  It's up to you guys.  It
4        doesn't matter.
5        MR. MEIHN:  Well, let me find -- well, we'd at
6    least do this last part of it.
7        How long do you think you'll need to grill him?
8        MS. GORDON:  I've got another probably hour and a
9    half.
10       MR. MEIHN:  Why don't we -- why don't we do this?
11   Why don't we just come back at 1:45?  That's 30 minutes.
12       MS. GORDON:  Half an hour?
13       MR. MEIHN:  Yeah.  And that will give me a
14   chance --
15       MS. GORDON:  And that will give you a chance to
16   switch --
17       MR. MEIHN:  Yeah.
18       MS. GORDON:  Okay.
19       MR. MEIHN:  Cool.  Thank you.
20       MS. GORDON:  See you then.  Uh-huh.  Surely.
21       (Deposition recessed at 1:14 p.m.)
22           *   *   *
23
24
25

Page 140

1                    Tuesday, March 13, 2018
2                    Bloomfield Hills, Michigan
3                    2:08 p.m.
4            *   *   *
5        (Deposition resumed pursuant to
6        its recess; parties present, same
7        as before.  Mr. Meihn is not present
8        after the break.  Mr. Wise is now
9        present.)
10
11       SERGEANT MATTHEW FURMAN,
12   after having been previously duly sworn, was examined
13   and testified further as follows:
14       EXAMINATION (Continued)
15   BY MS. GORDON:
16   Q.  Sergeant, what shift are you working now?
17   A.  Afternoons, ma'am.
18   Q.  Who is your lieutenant?
19   A.  The administrative lieutenant is in charge of all three
20       sergeants.  That's Lieutenant Kennaley, K-e-n-n-a-l-e-y.
21   Q.  What data do you -- strike that.
22       How many road patrol officers report to you on any
23   given day?
24   A.  It varies by the day of the week, but a minimum of
25       three.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 141–144

Page 141

| | |
|---|---|
| 1 Q. | What's -- |
| 2 A. | And sometimes we'll have four. |
| 3 Q. | What's -- four is the maximum? |
| 4 A. | I believe five is the maximum, but that's rarely met. |
| 5 Q. | Okay.  What data do you get from the City or the police |
| 6 | department, as a sergeant, with regard to the numbers |
| 7 | you were talking about earlier vis-à-vis traffic? |
| 8 A. | They don't provide us with anything. |
| 9 Q. | And -- and police activity? |
| 10 A. | They don't provide the sergeants with any materials. |
| 11 Q. | It's on -- all online? |
| 12 A. | And if you want to go on the -- the Records Management |
| 13 | System -- |
| 14 Q. | Right. |
| 15 A. | It's really the RMS. |
| 16 | If you want to go on there on your own and pull it |
| 17 | up, you can. |
| 18 Q. | Do you for the people that report to you? |
| 19 A. | No. |
| 20 Q. | You don't look to see what they're doing during the day? |
| 21 A. | No, ma'am. |
| 22 Q. | Okay.  So, you don't -- you don't know if they're just |
| 23 | driving around and not making stops? |
| 24 A. | Well, I'll dispatch them on calls.  I'll check their |
| 25 | security while they're on a call.  If they're on |

Page 142

| | |
|---|---|
| 1 | something for an extended period of time, I'll make sure |
| 2 | to do a radio check and make sure they're okay. |
| 3 Q. | How many dispatchers are there typically in a shift? |
| 4 A. | It can verify from -- vary from, you know, one or two to |
| 5 | twenty. |
| 6 Q. | So, you don't know whether one officer is writing ten |
| 7 | tickets a day for moving violations and the other is |
| 8 | writing none? |
| 9 A. | Correct.  No, I don't track that stuff. |
| 10 Q. | Does anybody at the City for -- |
| 11 A. | I don't -- |
| 12 Q. | -- to see productivity of the officers? |
| 13 A. | I don't know, ma'am.  I don't. |
| 14 Q. | Okay.  When you pull a car -- if you're -- when you |
| 15 | were -- prior to being a sergeant and you were out on |
| 16 | road patrol, and you decided to run somebody's license |
| 17 | just for the heck of it -- |
| 18 A. | License plate or driver's license? |
| 19 Q. | License plate. |
| 20 A. | Okay. |
| 21 Q. | You're driving behind them, and you run plates.  You |
| 22 | don't know how many plates you ran a day.  We'll see if |
| 23 | there's a way we can find that out. |
| 24 A. | Sure. |
| 25 Q. | But you're running plates throughout the day; correct? |

Page 143

| | |
|---|---|
| 1 A. | Yes. |
| 2 Q. | Because you're looking to see if you can find somebody |
| 3 | who has a violation where you can stop them? |
| 4 A. | Looking for anything, but yes. |
| 5 Q. | Okay.  Do other officers run plates throughout the day, |
| 6 | or are they looking for some kind of illegal activity |
| 7 | from what you know? |
| 8 A. | Yes. |
| 9 Q. | "Yes," what? |
| 10 A. | To my knowledge, everybody runs plates.  I mean, |
| 11 | that's -- |
| 12 Q. | All day long? |
| 13 A. | I don't know what they do on their -- when they're out |
| 14 | there, but guys initiate traffic stops and a lot of it |
| 15 | is plate-related. |
| 16 Q. | Well, a lot of it is a moving violation that they |
| 17 | observe, and then they pull somebody over? |
| 18 A. | That's correct.  There's a variety of things. |
| 19 Q. | Do you assign people to certain locations, dangerous |
| 20 | intersections and the like? |
| 21 A. | If we get complaints by residents.  We have a list of |
| 22 | like high-target areas.  Like there's certain Stop signs |
| 23 | in the neighborhoods that are often ran or -- |
| 24 Q. | I just wanted to know if you assign people. |
| 25 | Do you ever assign people to certain locations to |

Page 144

| | |
|---|---|
| 1 | sit and watch? |
| 2 A. | Myself, no. |
| 3 Q. | Okay.  So, in 20- -- you became a sergeant this year; is |
| 4 | that correct? |
| 5 A. | That is correct, ma'am. |
| 6 Q. | What are the tow numbers this year since you've become a |
| 7 | sergeant? |
| 8 A. | I have no idea.  I don't track that. |
| 9 Q. | Well, you used to track your tow numbers? |
| 10 A. | Correct. |
| 11 Q. | So, do you know whether or not the tows are down? |
| 12 A. | I don't know.  I don't track them.  I don't track those |
| 13 | people on my shift. |
| 14 Q. | I didn't ask you whether you tracked them.  I just |
| 15 | wanted to know whether you knew. |
| 16 A. | Okay.  I have no idea, ma'am, to clarify. |
| 17 Q. | Do you go to the Public Safety Commission meetings now |
| 18 | that you're a sergeant? |
| 19 A. | I have not been since I have been a sergeant, no. |
| 20 Q. | How long does it take for a traffic stop where you have |
| 21 | already run somebody's license and seen that they're |
| 22 | driving on a suspended to pull them over and call a tow |
| 23 | truck?  How long does that typically take? |
| 24 A. | Well, I generally pull them over immediately or as -- as |
| 25 | conditions allow.  I mean, if we're right at an |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 145–148

**Page 145**

```
 1       intersection, obviously, I would wait until we're safely
 2       on the other side of that, if possible, or something of
 3       that nature.  I mean --
 4   Q.  I just wanted to know the length of time, not where you
 5       pull them over.
 6            How long does it take between the time you run the
 7       plate --
 8   A.  Uh-huh.
 9   Q.  -- and you -- and the tow truck arrives?
10   A.  I don't know.
11   Q.  Well, you must know.  You do it all day long.  You did
12       do it all day long.
13   A.  I --
14   Q.  What's a rough estimate?
15   A.  I don't keep tracks of their response times.  I mean,
16       they're --
17   Q.  I know you don't keep track --
18   A.  They're fairly quick.
19   Q.  -- but you have a pretty good idea of how long it takes
20       you to make a stop and get a tow truck.
21   A.  Usually within a few minutes of me calling.
22   Q.  And when do you call?
23   A.  After I've made the determination to impound the
24       vehicle.
25   Q.  Okay.  And how do you make that?
```

**Page 146**

```
 1            You've now run the plate.  You see the person is
 2       driving on a suspended.
 3   A.  Uh-huh.
 4   Q.  You've now identified the driver by his or her driver's
 5       license.
 6            What -- is there anything more to do before you
 7       call the tow truck?
 8   A.  Well, I see if there's any other violations at that
 9       time, check the insurance, plate status, things of that
10       nature.
11   Q.  So, you ask for the insurance and the license,
12       registration?
13   A.  Correct.
14   Q.  What else?
15   A.  That's it as far as determining whether to impound.
16   Q.  So, by the time you pull the car over to the side of the
17       road, between that time and the time you call the tow
18       truck, what is it?  About 10 minutes?
19   A.  I don't know exact times, but I mean it's -- I would say
20       roughly.  It could vary in either direction.
21   Q.  Of course.
22   A.  Sometimes it takes a while to verify insurance coverage
23       with an insurance company over the phone, and it might
24       take an extra 10 minutes on the phone just with them.
25   Q.  Okay.  But roughly about 10 minutes?
```

**Page 147**

```
 1   A.  I would -- I would assume, yes.
 2   Q.  Okay.  And then do you wait there for the tow truck to
 3       come?
 4   A.  Oh, yes.  Always.
 5   Q.  What happens to the passengers when the tow truck
 6       arrives?
 7   A.  Well, a lot of times, people have already been picked up
 8       by their ride if they're from nearby.  Otherwise,
 9       they're offered a ride to a nearby location of their
10       choice or any location of their choice in Melvindale.
11   Q.  You take anybody and give them a ride, or who takes
12       them?
13   A.  If somebody is violent, then no.  I've had people
14       threaten my life, things of that nature.  They don't get
15       a ride.  But --
16   Q.  Is it your practice to give every single other person a
17       ride?
18   A.  Offer them a ride.  Whether they take it or not is up to
19       them.  I have a lot of people --
20   Q.  And do you make records of offering rides?
21   A.  I do.
22   Q.  And where do you make the record?
23   A.  I make those at the bottom of my report for every stop.
24   Q.  Okay.  And assuming somebody doesn't want a ride but
25       they're -- they're waiting there, what happens to the
```

**Page 148**

```
 1       person?  They go by the side of the road?
 2   A.  Well, they're free to go.  I can't -- I can't detain
 3       them until their ride arrives.
 4   Q.  Okay.
 5   A.  I recommend, if they don't want a ride, that they can
 6       wait inside a local business or restaurant, or I offer
 7       to give them a ride to places like that.  But a lot of
 8       people don't want to ride in a patrol car or they don't
 9       want a ride.  It's --
10   Q.  I get it.  I get it.
11   A.  Okay.
12   Q.  I just wanted to know whether you offered them a ride.
13       I know why they wouldn't want it.
14            So, on any given day, during the time you were busy
15       with tows, it looks to me like potentially you could
16       have up to seven or eight tows a day.
17            Does that sound right?
18   A.  Correct.  Yes.
19   Q.  How long does it take to arrest somebody?
20            What's the process if you stop somebody and arrest
21       him or her?
22   A.  Oh, it varies.  I mean, if they're cooperative,
23       uncooperative, how long it takes to pull their
24       paperwork.
25   Q.  Well, let's go through the steps.
```

Page 149

| 1 | | You pull -- pull somebody over because they're |
| 2 | | driving on a suspended license. |
| 3 | A. | Okay. |
| 4 | Q. | Because you've now run their plate. |
| 5 | | So, you've decided to arrest them, hypothetically. |
| 6 | | What do you do? |
| 7 | A. | Well, impound the vehicle -- issue the citation, impound |
| 8 | | the vehicle, secure them in the rear of my patrol car. |
| 9 | | Once the tow truck itself is cleared from the scene -- |
| 10 | Q. | Hang on. You're going a little too fast. |
| 11 | A. | Okay. I'm sorry. |
| 12 | Q. | Do you read the person their rights there? |
| 13 | A. | No. |
| 14 | Q. | Do you handcuff them? |
| 15 | A. | Yes. |
| 16 | Q. | Okay. Do you search the car? |
| 17 | A. | Yes. |
| 18 | Q. | Okay. What do you do with occupants in the car? |
| 19 | A. | Well, it depends on what the situation is. I mean, it |
| 20 | | kind of varies. |
| 21 | Q. | What's the range? |
| 22 | A. | You have people, passengers, who are uncooperative, |
| 23 | | don't want a ride. Because, otherwise, we can call |
| 24 | | another officer for a ride or transport, things like |
| 25 | | that. |

Page 150

| 1 | Q. | Okay. What's the amount of time, if you're going to |
| 2 | | effectuate an arrest, and what happens to the people? |
| 3 | | Do you drive them to the -- to the police station? |
| 4 | A. | The person who is being arrested? |
| 5 | Q. | Yes. |
| 6 | A. | Yes. |
| 7 | Q. | Okay. |
| 8 | A. | They go to the police station. |
| 9 | Q. | Okay. So, how long does it take to effectuate an arrest |
| 10 | | by the time you decide to make the arrest? Do you have |
| 11 | | to make a phone call or call in LEIN or call the station |
| 12 | | before you make an arrest? |
| 13 | A. | If you're verifying the warrant, you would have to run |
| 14 | | things through LEIN, perhaps, or contact another agency. |
| 15 | Q. | All right. Well, hang on a second. Let me do it this |
| 16 | | way, then. |
| 17 | | You're at the car. You've already determined |
| 18 | | there's a -- a warrant for an arrest because you see it |
| 19 | | pop up on LEIN. You now stop the person. You've |
| 20 | | hypothetically decided to arrest the person. |
| 21 | | When you walk up to the car, do you say, "Get out |
| 22 | | of the car"? |
| 23 | A. | I've already determined I'm going to arrest them at this |
| 24 | | point? |
| 25 | Q. | Yes. |

Page 151

| 1 | A. | Then, yes, I'd have them exit the vehicle. |
| 2 | Q. | Do you ask for the license first? |
| 3 | A. | Well, I would have established that to -- to confirm |
| 4 | | their identity prior to making an arrest, yes. |
| 5 | Q. | Okay. So, now you have them step out of the car. |
| 6 | A. | Yes. |
| 7 | Q. | What's the next thing you do? |
| 8 | A. | They're handcuffed. |
| 9 | Q. | Are they patted down? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. So, are they patted down -- handcuffed and then |
| 12 | | patted down? |
| 13 | A. | Correct. |
| 14 | Q. | Okay. Then what's the next thing that happens? |
| 15 | A. | Or sometimes vice versa. |
| 16 | Q. | And what's the next thing that happens? |
| 17 | A. | They're walked to the back of my patrol car. |
| 18 | Q. | Okay. And then you drive them back where? |
| 19 | A. | To the Melvindale Police Department. |
| 20 | Q. | Okay. Now, up until the time you head back to the |
| 21 | | Melvindale Police Department, have you made a call to |
| 22 | | the desk? |
| 23 | A. | It depends -- |
| 24 | Q. | Contacted the desk? |
| 25 | A. | Okay. Let's go back a step. |

Page 152

| 1 | | This is for a warrant arrest? No other issues? |
| 2 | Q. | Right. |
| 3 | A. | Okay. Well, I would remain right there on the stop |
| 4 | | until the warrant was confirmed. And if somebody is |
| 5 | | unable to pick up, then the person would be released, |
| 6 | | possibly, unless they had other issues as well. |
| 7 | Q. | So, you -- so, you do call the desk if it's a warrant |
| 8 | | arrest? |
| 9 | A. | Yes. |
| 10 | Q. | Okay. And -- |
| 11 | A. | Or I've actually called other departments myself to -- |
| 12 | | from my cell phone. |
| 13 | Q. | Okay. And -- |
| 14 | A. | I would call Lincoln Park or Allen Park. |
| 15 | Q. | And why are you calling the desk? |
| 16 | A. | To have them verify a warrant. |
| 17 | Q. | And how do they do that? |
| 18 | A. | They would send a LEIN message to the other agency. |
| 19 | Q. | Okay. You can't do that from your car? |
| 20 | A. | No. |
| 21 | Q. | Okay. So, the concept here is, you know there's a |
| 22 | | warrant out but you have to have the warrant verified? |
| 23 | A. | Depending who it was for, yes. Or -- |
| 24 | Q. | Okay. And what if it's a Melvindale warrant? |
| 25 | A. | -- not even necessarily -- well, verify but also verify |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 153–156

Page 153

1   whether that agency is able or willing to pick up.
2   Q.  Well, what if it's Melvindale?  Do you call to see if
3       they're willing to pick up, or are you the pick-up?
4   A.  I would be the pick-up.
5   Q.  So, with regard to Melvindale, what do you do?
6   A.  Well, if I decide that I'm arresting them on the
7       warrant, then I would transport them to the police
8       station.
9   Q.  Do you --
10  A.  Book them.
11  Q.  Do you call the desk if it's a Melvindale --
12  A.  I would notify the desk.
13  Q.  -- arrest warrant?
14          THE REPORTER:  Excuse me.  One at a time, please.
15  BY MS. GORDON:
16  Q.  Okay.  So, you do call the desk if you're going to make
17      an arrest?
18  A.  Not necessarily call.  I could also send a message from
19      my computer to the terminal.
20  Q.  Okay.  Do you have to get any confirmation on any
21      information?
22  A.  Generally not.
23  Q.  Okay.  And if you're calling another jurisdiction, what
24      information are you giving the person?
25  A.  Whether that person is basically sane, sober, if they

Page 154

1   have any funds on them to post bond, if they have any
2   medical issues or if they're injured at that time or
3   things of that nature.  Conditions of the person.
4   Q.  And if you're in a -- what do you need to have somebody
5       do a LEIN check?  What information do you need to give
6       the other person?
7   A.  Full name, date of birth, gender.
8   Q.  Okay.  And then with that, they can run the LEIN and let
9       you know what -- what's popped up?
10  A.  Correct.
11  Q.  And up until the time you became a sergeant, roughly how
12      many times in any given week did you actually contact
13      another -- a department and say, "Do you want to come
14      pick this person up?"
15  A.  It verified -- or -- excuse me -- it varied.
16  Q.  From what to what?
17  A.  From nothing to -- to a couple here or there.
18          A lot of agencies around here where people have
19      warrants are known for not picking up.  I mean, they --
20  Q.  Yeah, you said that.
21  A.  You -- every single time you call them, they --
22  Q.  You said that.  You said --
23  A.  -- they just don't come out.
24  Q.  You said Detroit doesn't.
25  A.  Detroit, Highland Park, Hamtramck.  Just a lot of places

Page 155

1   won't come out.
2   Q.  Well, do you -- if -- if you're calling somebody that
3       does come out, you have to stand there and wait, I
4       assume?
5   A.  No, not necessarily.  A lot of times we'll meet up at a
6       halfway point around --
7   Q.  Okay.
8   A.  -- one of the cities -- if it's Dearborn, if they decide
9       to come out, we can meet them on the border of our
10      cities.
11  Q.  So, you have to -- you have to drive the person arrested
12      somewhere?
13  A.  Yeah.  Yeah.  Just a short drive to wherever.
14  Q.  So, the very fastest and quickest thing for you, if time
15      was the only issue, would be to stop the car, have it
16      towed and go on your way?
17          That saves you time?
18  A.  The quickest thing would be to issue a citation and send
19      them on their way because towing adds a lot of paperwork
20      and time.
21  Q.  Okay.  Well, the second most quick thing is to call the
22      tow truck?
23  A.  Correct.
24  Q.  Do you stop people when you -- strike that.
25          When you run a license plate, can you see if

Page 156

1   somebody is an illegal alien?
2   A.  Generally it doesn't pop up unless there's a message
3       that they're on like the terrorist watch list or
4       something like that.  Even that doesn't mean they're an
5       illegal alien.
6           But through investigation, you can generally
7       determine whether they are or not.
8   Q.  Through what investigation?
9   A.  Well, a lot of times somebody who is here illegally will
10      have had a license to start, and they won't have a
11      license at this point, and it will be expired for many
12      years.
13          And so you make contact with them regarding their
14      expired license and, through the course of conversation,
15      you know, questioning, find out, you know, if the person
16      is an illegal alien.
17  Q.  I'll hand you Bates stamp 3675.
18  A.  Okay.
19          It's difficult to read this one.
20          Okay.
21  Q.  What -- what's this about?  What does -- do you say on
22      the side "illegal alien"?
23  A.  Correct.  The subject was an illegal alien, never
24      acquired a driver's license and had no insurance in the
25      automobile.

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 157–160

Page 157

1   Q.   And you picked that up from what?
2   A.   Investigation at the scene.
3   Q.   Are there any times during 2017 that you stopped
4        somebody for driving on a suspended license and did not
5        tow the car?
6   A.   Possibly, but none that I can recall.
7             I -- I generally don't like to do that.  Unless
8        somebody has a severe medical issue or some extenuating
9        circumstance -- they're en route to the hospital or some
10       life-threatening something, I generally would prefer not
11       to let the car go.
12  Q.   You've testified previously that you don't want to be
13       complicit in allowing people to violate the law;
14       correct?
15  A.   That is correct.
16  Q.   But you're complicit when you fail to actually
17       effectuate a court order, an arrest warrant; correct?
18  A.   No.
19  Q.   Well, you're ignoring an arrest warrant when you're an
20       officer of the law standing there who is authorized to
21       arrest somebody whom the court has ordered be arrested?
22  A.   Well, again, part of that is --
23  Q.   Is that correct?  Is that correct?
24  A.   No.
25  Q.   What's incorrect about what I said?

Page 158

1   A.   A lot of times, I have no control over whether that
2        person can be picked up on their warrant.  If the other
3        agency won't pick them up, there's nothing I can do
4        about it.
5   Q.   I'm talking about Melvindale.
6   A.   That's my discretion.
7   Q.   Okay.  I didn't ask you that.
8             I asked you whether you've previously testified
9        that you don't want to be complicit in people being
10       allowed to break the law.  You said "yes."
11  A.   Uh-huh.
12  Q.   So, then I said, but when there's a court-ordered arrest
13       warrant and you decide to let the person go and not
14       arrest him, you're complicit in -- in not following what
15       the court has directed; agree?
16             MR. WISE:  Just object to form and foundation.
17             Go ahead.
18  BY MS. GORDON:
19  Q.   Agree?
20             You've used your discretion to not comply with the
21       court-ordered arrest warrant; correct?
22  A.   Correct.
23  Q.   Okay.  Okay.  Now, you have been counseled many times
24       since you've been with Melvindale P.D. about being --
25       these are not the City's words.  These are my words.

Page 159

1        I'm paraphrasing --
2   A.   Okay.
3   Q.   -- about needing to broaden your scope of patrol duties
4        and not just towing; correct?
5   A.   I'd like to see that documentation.  I don't recall it.
6   Q.   I'm not asking you about documentation.
7   A.   Okay.  Well, I don't recall.
8   Q.   Look, you're an officer that's now a sergeant.  I want
9        to know if you recall ever being counseled about
10       broadening your patrol activities.
11            That's just a "yes" or a "no" answer.  Either you
12       recall it or you don't.
13  A.   No.
14  Q.   Okay.  Have you been counseled about your failure to use
15       appropriate discretion in towing activities?
16  A.   I have been spoken to about it, and it was somebody's
17       opinion --
18  Q.   Well, obviously.
19  A.   -- but it was still my discretion.
20  Q.   Okay.  Have you been -- but you've been talked to by
21       higher level officers that you are abusing discretion;
22       correct?
23  A.   I had a lieutenant verbalize that -- or give me his
24       opinion on that, but I disagree with it.
25  Q.   Well, who has the last word?  You or the commanding

Page 160

1        officer?
2   A.   Well, in this case, I would say me.  That commanding
3        officer was suspended by the City for perjury, admitted
4        to lying under oath during a public hearing for
5        Mr. Hayse.  So, I really don't put any credibility in
6        anything that officer says.
7   Q.   Okay.  Well --
8   A.   He lied numerous other times on the job.
9   Q.   So, then you -- so, the fact that he was a command
10       officer over you, you just discounted that on your own
11       and decided not to follow his directives?
12            MR. WISE:  Object to form.
13  BY MS. GORDON:
14  Q.   Do I have that right?
15            MR. WISE:  Go ahead.
16  A.   No.  I decided --
17  BY MS. GORDON:
18  Q.   You just -- you just decided, I don't want to believe
19       this guy and I don't like him, so I'm just not going to
20       listen?
21  A.   I decided to use my discretion --
22  Q.   And not listen to him?
23  A.   -- in -- in as allowed by law to enforce the law equally.
24  Q.   Okay.  Well, actually, your city procedures manuals say,
25       over and over again, that you're in a paramilitary

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018
Pages 161–164

| Page 161 |
| --- |

1    operation --
2  A.  Uh-huh.
3  Q.  -- and you report up the chain of command; correct?
4  A.  That is correct.
5  Q.  And your lieutenant's discretion trumps your discretion;
6    correct?
7  A.  The lieutenant has no authority to take my discretion
8    away on a traffic stop.
9  Q.  Well, if he tells you not to make a traffic stop, you
10    have to listen to what he says, don't you?
11  A.  No.  It would be a -- it would be an illegal order.
12  Q.  Well, that assumes he's asking you to do something
13    illegal.
14        If he tells you to do something that's not illegal
15    and you don't do it, that's a sanctionable offense --
16    it's a possible discipline; correct?
17  A.  Could you repeat the question?
18        MS. GORDON:  Read it back, John.
19        THE REPORTER:  Yes.
20        (Record repeated by the reporter.)
21  A.  Correct.
22  BY MS. GORDON:
23  Q.  Okay.  I'm going to go back to what you just said about
24    Welch.  You've said it twice today, something about
25    committing perjury.

| Page 162 |
| --- |

1  A.  Uh-huh.  Correct.
2  Q.  What are you talking about?
3        Do you know what perjury is?
4  A.  Yes.
5  Q.  What's the definition?
6  A.  Lying under oath.
7  Q.  Okay.  Where was he under oath when he lied?
8  A.  He was under oath at Mr. Hayse's hearing.
9  Q.  Okay.  What did he say?
10  A.  I don't have the transcripts in front of me.
11  Q.  Well, you've sat here today, sir, and said many times --
12  A.  Correct.
13  Q.  -- this man committed perjury.  So --
14  A.  And he admitted to committing perjury and was
15    disciplined by the City of Melvindale --
16  Q.  Okay.
17  A.  -- for same.
18  Q.  You know, I'm asking the question, and I know you've got
19    your story you want to tell, but I'm not interested in
20    it.
21  A.  It's documented, ma'am.
22  Q.  Whether it's documented or not, it's something that's
23    your story at the moment.
24  A.  Okay.
25  Q.  You've accused a man here today, multiple times, of

| Page 163 |
| --- |

1    committing perjury.
2        I want to know what the perjury was about.
3  A.  He lied to cover for Mr. Hayse.
4  Q.  What did he say?
5  A.  Well, I don't have the transcript in front of me.
6  Q.  What do you remember?
7  A.  If you make those available to me, I'd be glad to read
8    his --
9  Q.  So, you're saying he committed perjury, but you don't
10    know what it is?
11  A.  If -- if you'll provide me with the transcript --
12  Q.  No.
13  A.  -- I'd be happy to read that for you.
14  Q.  Look -- look, you used the word "perjury."
15  A.  Okay.  That's correct.
16  Q.  Hang -- you know what?  You can't interrupt me.  I'm now
17    asking you a question, so please wait until I'm done.
18        You've accused a man of committing perjury.
19  A.  Uh-huh.
20  Q.  You did it without refreshing your memory about what he
21    had said.
22        Why did you commit -- why did you say he committed
23    perjury?  What did he purger himself with regard to?
24        MR. WISE:  Object to form.  Foundation.
25        Go ahead.  You can answer.

| Page 164 |
| --- |

1  A.  Okay.  Without the transcript in front of me, I'm going
2    to decline to answer because I don't want to misquote
3    his statements.
4  BY MS. GORDON:
5  Q.  Well, what -- what was the topic about?
6  A.  Mr. Hayse and his behavior while chief.
7  Q.  Well, what was it?  What was the perjury?
8  A.  Again, without the transcript in front of --
9  Q.  You don't know?
10  A.  If you'd like to make that available to me, I'd be happy
11    to read it.
12  Q.  I don't want to make it available to you.
13  A.  Okay.
14  Q.  You're the one using the word "perjury."
15  A.  Okay.
16  Q.  So, I want to see if you can back up your use of the
17    word "perjury."
18        I guess you cannot.
19        You don't -- you don't have any idea what he said
20    that's perjury from what --
21  A.  Okay.  Well, you're welcome to go pull his personnel
22    file and speak to the Safety Commission.
23  Q.  Don't direct me what to do.
24  A.  Okay.
25  Q.  I will -- I'm --

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 165

1      MR. WISE:  Is there a question -- is there a
2  question on the table?
3      MS. GORDON:  Well, why don't you ask him?
4      MR. WISE:  I'm not asking the questions right now.
5      MS. GORDON:  Why don't you ask him if there's a
6  question on the table since he's just recommending I go
7  pull stuff.
8      MR. WISE:  Well, if you've got a question for him,
9  go ahead.
10     MS. GORDON:  I will.
11     MR. WISE:  Thank you.
12 BY MS. GORDON:
13 Q.  We're going to get to that in a second.
14     I am just confirming that you cannot articulate
15  here today what the perjury is that you've said several
16  times.
17 A.  I'll declining to articulate without the transcripts in
18  front of me.
19 Q.  You don't know without --
20 A.  I'm declining, and I'm not going to say it again.  I'm
21  declining.
22 Q.  Okay.  You know, I'm going to end the dep in about 2
23  seconds --
24 A.  Okay.
25 Q.  -- when you tell me you're "not going to say it again."

Page 166

1      MS. GORDON:  Counsel, would you please direct your
2  witness?
3      Before you got here today, when Greg was here, he
4  got him under control and it was a much more calm
5  atmosphere.  And since he's gone, he's now telling me
6  what he's going to answer and not answer.
7      MR. WISE:  Well --
8      MS. GORDON:  So, I will end the dep and go get a
9  court order to stop him from telling counsel what he's
10  going to answer or not unless you're going to do it.
11     Would you read back his last answer, John?
12     THE REPORTER:  One second, please.
13     (Record repeated by the reporter.)
14 BY MS. GORDON:
15 Q.  Correct?
16 A.  No.
17 Q.  "No," what?  You cannot?
18 A.  Cannot what?
19 Q.  Okay.  You cannot identify the perjury.  Do I have that
20  right?  You --
21     MR. WISE:  Object to form.  Foundation.  He said he
22  can't tell you without the transcript.  He's not going
23  to speculate on the transcript.
24     MS. GORDON:  That's fine.
25     MR. WISE:  Show him the transcript if you --

Page 167

1      MS. GORDON:  That's fine.  I just want to know --
2      MR. WISE:  If he says, "I don't know," he says he
3  doesn't know.
4  BY MS. GORDON:
5  Q.  You -- you are unable on your own to articulate any
6  perjury here today?
7  A.  Correct.
8  Q.  Okay.  All right.  Now, after the so-called "perjury,"
9  what happened to Lieutenant Welch?
10 A.  Well, a hearing --
11 Q.  Is he -- is he at the police department today?
12 A.  No.
13 Q.  Where is he?
14 A.  He retired.
15 Q.  Okay.  And when did he retire?  As --
16 A.  I don't know the exact date of retirement.
17 Q.  As I understand, he's still on the payroll.
18     Do you believe that to be so or you don't know?
19 A.  I don't know.
20 Q.  Okay.  And when did he retire?
21 A.  I last saw him, I believe, at the end of last year, the
22  beginning of this year, in person.
23 Q.  Okay.  And when was he -- he was disciplined, you're
24  saying, or there were some charges that didn't --
25 A.  That's correct.  I believe he was suspended for 30 days

Page 168

1  without paying after a hearing regarding his testimony.
2  Q.  And when was that?
3  A.  2016, I believe.  It was after Mr. Hayse's hearing.
4  Q.  And then he came back after that?
5  A.  Correct.
6  Q.  And he came back as a lieutenant?
7  A.  Correct.
8  Q.  So, he continued on as a lieutenant with the City of
9  Melvindale?
10 A.  Correct.
11 Q.  Okay.  And do you know -- did you -- do you have any
12  personal knowledge of what he was disciplined for?
13 A.  Well, he lied during the hearing.
14 Q.  I asked whether you knew what he was disciplined for.
15 A.  No.
16 Q.  And who disciplined him; if you know?
17 A.  Public Safety Commission.
18 Q.  What is the role of the Public Safety Commission with
19  the police department, as you understand it?
20 A.  Oversee the police department.
21 Q.  Have you -- were you sent to diversity training by Chief
22  Hayse?
23 A.  Yes.
24 Q.  And that training -- training had to -- and that was
25  because you had been racially profiling people?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 169–172

Page 169

1  A.  I --
2  Q.  That's what he said; is that correct?
3  A.  No.
4       As a matter of fact, I was ordered to racially
5     profile by Mr. Hayse.
6  Q.  Okay. Well, we'll get to that, and you've got your
7     little story, which is false, but I realize that's your
8     mantra.
9       But, in any event, I'm going to ask you a different
10    question.
11      You were sent to diversity training because Chief
12    Hayse was concerned you were racially profiling people?
13      Do you recall that?
14  A.  I recall going to diversity training.
15  Q.  And do you remember why you went to diversity training?
16  A.  Along with, I believe, another officer, but --
17  Q.  Do you remember why you went?
18  A.  No.
19  Q.  Do you remember the chief expressing concern that you
20    were racially profiling people at some point?
21  A.  No.
22  Q.  Don't you have a story you tell freely about having had
23    a black friend once when you were a child?
24  A.  I had numerous black friends. I still do today. I
25    could line them up in here for you.

Page 170

1      And, yes, I did --
2  Q.  Well, why don't you --
3  A.  I did have --
4  Q.  Well, why don't you just give me the names of your black
5    friends, then, instead of lining them up in here?
6      What are their names?
7  A.  Okay. I'm going to decline to provide them at this
8     time.
9  Q.  You can't decline that, sir. You're under --
10  A.  Okay.
11      MR. WISE: So, what's the relevance of this?
12      MS. GORDON: This is a discovery dep.
13      MR. WISE: I understand that.
14  A.  All right. Well, I can log into Facebook here and
15     provide you with all their names.
16  BY MS. GORDON:
17  Q.  Well, if they're your friends, you shouldn't have to log
18    into Facebook.
19      So, just give me the names of the people --
20  A.  Okay.
21  Q.  -- you recall.
22  A.  I'm drawing a little bit of a blank at this time under
23    the pressure.
24  Q.  Okay. You're drawing a blank under pressure?
25  A.  Correct.

Page 171

1  Q.  A sergeant? Okay.
2      So, you had black friend or friends, and you told
3    people you became racially biased because your black
4    friend stole from you; correct? You've used that story?
5  A.  I told him we stopped being friends when he stole my
6     watch.
7  Q.  And you --
8  A.  It's not because he was black. It was because he stole
9     my watch.
10  Q.  And -- and how old were you at this time?
11  A.  I don't know. Early teens, mid teens.
12  Q.  Okay. So, you've continued to tell that story since
13    you've been at the Melvindale P.D.; correct?
14  A.  I believe I told that story once, and it was during a
15     discussion of somebody having a friend stab them in the
16     back. I remember telling that story.
17  Q.  Well, you've said around the station that you're
18    racially biased.
19  A.  No. That's actually completely incorrect.
20  Q.  You've used the "N" word, haven't you?
21  A.  No, I have not.
22  Q.  You have used the "N" word several times --
23  A.  That's absolutely false.
24  Q.  -- in the last ten years; is that correct?
25  A.  No. That's incorrect.

Page 172

1  Q.  And haven't you been counseled to be more careful --
2    strike that -- more equitable about where you patrol
3    because it's widely known that you like to patrol on
4    Schaefer Road; is that correct?
5  A.  Schaefer Highway is our busiest traffic area, so I do
6     like to patrol there because it's -- it's the most
7     traffic coming through.
8  Q.  Well, it's also -- how -- how many miles is Schaefer
9    Road in Melvindale?
10  A.  I would guess about -- I mean from border to border, a
11     mile and a half, 2 miles maybe.
12  Q.  And if I pull the race on every person you towed in
13    2017, what percent of your tows are African Americans?
14  A.  I have no idea, ma'am.
15  Q.  Is it --
16  A.  I don't -- I don't do my job based upon age, race or
17     gender, even when directed to do so by Mr. Hayse.
18  Q.  Okay. Well, do you know what? Then you should be able
19    to have a pretty good idea of how many African Americans
20    you've towed as compared to white people.
21  A.  I tow whoever breaks the law, ma'am, in accordance with
22     my --
23  Q.  Okay. Well, that may or may not be --
24  A.  -- duties.
25      THE REPORTER: I'm sorry. Excuse me.

**Page 173**

1  BY MS. GORDON:
2  Q.  But you've already told me you exercise your discretion
3      during the day.  And I want to know, am I correct that
4      you -- a significant percentage of the people you tow
5      are black?
6  A.  I don't know what percentage.
7  Q.  Okay.  So, you spend a lot of time patrolling Schaefer
8      Road?
9  A.  I did.
10 Q.  Up until the time you became a sergeant?
11 A.  Up until the time that I-75 shut down, and a lot of
12     construction was happening in that area, and it really
13     interfered with traffic flow.
14 Q.  When was that?
15 A.  Last year, I think, they shut down.  It's still under
16     construction.
17 Q.  Do you remember a citizen complaint coming in with
18     regard to you in roughly 2013 where you refused to give
19     a woman a ride after you had her car towed.  She was a
20     large individual, and you told her she could use the
21     walk?
22 A.  Yes.  Because she --
23 Q.  Do -- do you remember in 2013, '14 you got into a
24     physical altercation, a fight with a passenger in a car
25     that you towed?

**Page 174**

1  A.  Could you repeat the question?
2  Q.  Yeah.
3          Do you remember that in roughly 2013, '14 time
4      frame, you got into a physical altercation with a
5      passenger of a car that you towed?
6  A.  Yes.
7          Well, I don't remember which event.
8  Q.  And you had -- and you had to put out -- I'm sorry?
9  A.  I don't -- which specific event are you referring to?
10 Q.  There's been several times you've gotten into fights; is
11     that correct?
12 A.  Yes.  People come -- become combative on traffic stops.
13 Q.  And how many times have you had to call for backup when
14     you've towed somebody?
15 A.  Numerous times.  I couldn't name you a number.
16 Q.  And with regard to the one I'm thinking of where you got
17     into a physical altercation and Chief Hayse responded to
18     your call for help, you were later counseled by your
19     lieutenant on escalating the situation unnecessarily.
20     Do you recall that?
21 A.  No.
22 Q.  Are you denying it, or you just don't recall?
23 A.  I don't recall that.
24          I'm not even positive which incident we're
25     referring to, but I don't recall that.

**Page 175**

1  Q.  And you've already talked about being ordered to get a
2      psychological evaluation.
3          That was because of your demeanor during towing and
4      all the complaints that had come into the department
5      about your overly aggressive behavior, at least in part;
6      is that correct?
7  A.  I don't know why.  I was not provided with a direct
8      reason that I can recall.
9  Q.  Well, you certainly must have asked, "Why am I being
10     sent to get a psychological exam," didn't you?
11         MR. WISE:  Just object to foundation.  Calls for
12     speculation.
13         Go ahead.
14 A.  Mr. Hayse told me he was sending me because I testified
15     against him after the Snowgate incident.
16 BY MS. GORDON:
17 Q.  Okay.  Well, that's funny because I just asked you a
18     minute ago why you were sent to see a psychologist and
19     you said, "I don't know.  I wasn't told."
20         And then I said, "Well, you certainly must have
21     asked."
22         And now you suddenly remember with that --
23 A.  No, I --
24 Q.  Hang on.
25         You now suddenly remember that, oh, really, I

**Page 176**

1  forgot I had that story over there that I was -- it was
2  all just retaliation?
3          Did -- is that what the chief told you?  It was
4  retaliation?
5  A.  I was very retaliated against.  I was retaliated against
6  for -- for the last couple years of Mr. Hayse's career.
7  Q.  Yeah.  Well, we're going to get into that in a second
8  what you did.
9          And I guess you think retaliation is people trying
10 to rein in your behavior, is the way I read the
11 documents.
12 A.  Okay.
13 Q.  In any event, did the psychologist discuss with you your
14 anger issue?  Was that something that you discussed in
15 the six or seven sessions?
16 A.  No.
17 Q.  That never came up?
18 A.  No.
19          I don't believe I have an anger issue, and I
20 don't --
21 Q.  I didn't ask you if you had an anger issue, nor is your
22 opinion worth anything to me about whether you have an
23 anger issue.
24          MR. WISE:  Stop.
25 BY MS. GORDON:

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018                                                              Pages 177–180

Page 177

1   Q.  So, I'm asking you whether that is something that came
2       up with --
3   A.  I don't recall.
4   Q.  -- the psychologist?
5           Okay.  Were you talked to about -- with the
6       psychologist about whether -- how -- how you conducted
7       yourself on the job with citizens?
8   A.  I don't recall.
9   Q.  Were you talked to about your personal life with the
10      psychologist?
11  A.  I don't recall.
12  Q.  So, you don't recall anything that the psychologist
13      wanted to talk to you about in those six or seven
14      sessions?  Not a single thing?
15  A.  I really don't recall.
16  Q.  Not one thing?
17  A.  Don't recall.
18  Q.  Did you pay any attention while you were in there, or
19      did you just blow it off because you didn't care?
20  A.  I don't recall.
21  Q.  You don't care if you blew it -- you don't recall if you
22      blew it off.  Okay.
23          That works.
24          Just being honest, I guess, over there, aren't you?
25          MR. WISE:  Object to the argumentative comments.

Page 178

1       They're unnecessary.  You can ask him questions and move
2       along, please.
3           MS. GORDON:  Okay.
4   BY MS. GORDON:
5   Q.  And when you were sent to the psychologist, didn't the
6       city psychologist recommend that you be given tools to
7       help you develop discretion on the job and tried to
8       assist you with that?
9   A.  I don't recall.
10  Q.  In 2016, did you receive a citizen complaint from an
11      ex-girlfriend of yours that you had stopped her for a
12      traffic violation, confiscated her license?
13  A.  Not to my knowledge.
14  Q.  You're not aware that there was a complaint made?
15  A.  No, ma'am.
16  Q.  Who did you stop that was an ex-girlfriend?
17  A.  That's a good question.
18          I have no idea.
19  Q.  Who was your ex-girlfriend in 2015?
20  A.  Well, I don't know.
21  Q.  Did you have a girlfriend in 2014-15?
22  A.  I did have a girlfriend --
23  Q.  What was her name?
24  A.  -- but never made a traffic stop.
25  Q.  What was her name?

Page 179

1   A.  Alexandra Hamric.
2   Q.  And how long did you --
3   A.  I dated her for --
4   Q.  How long did you go out with her?
5   A.  About two years.
6   Q.  And when was the last time you talked to her?
7   A.  Couple years ago.
8   Q.  What city does she live in?
9   A.  I don't know at this point.
10  Q.  When -- where did she live when you were dating her?
11  A.  Canton.
12          But I never made any traffic stop involving her.
13  Q.  Did you ever confiscate her driver's license?
14  A.  No.
15  Q.  Did you ever take the license of any other female that
16      you had gone out with?
17  A.  No.
18  Q.  Are you sure about that?
19  A.  As far as -- I've never pulled over anybody I've gone
20      out with.
21          (Discussion held off the record.)
22  BY MS. GORDON:
23  Q.  What is your -- strike that.
24          (Discussion held off the record.)
25  BY MS. GORDON:

Page 180

1   Q.  Are you aware that time an ex-girlfriend named Alex
2       contacted Chief Furman(sic) in writing?
3           MR. COOGAN:  "Chief Furman"?
4   A.  Yeah.  I like the ring of that.
5           There's no -- there's no Chief Furman.
6   BY MS. GORDON:
7   Q.  Good point.
8           Chief Hayse.
9   A.  No.
10          I haven't had contact with Alex in a very long
11      time.
12  Q.  Okay.  What's your relationship with Sergeant Easton
13      like today?
14  A.  It's fairly neutral.  We're not on the same shift.  I
15      don't really see him.
16  Q.  Well, you've known him a long time, ever since you've
17      been with the department, haven't you?
18  A.  Of course, yes.
19  Q.  So, do you have a good relationship with him?
20  A.  I'd say it's mediocre.
21  Q.  Okay.  What are the -- what's -- what causes it to be
22      mediocre as compared to positive or -- or negative?
23  A.  Well, for one thing, we're on different shifts, so I
24      don't really see him very often.
25          For another thing, he's got a lot of issues in his

FURMAN, SERGEANT MATTHEW
03/13/2018
Pages 181–184

Page 181

1  own personal life going on, and I'd rather stay out
2  of --
3  Q.  Okay.
4  A.  -- out of his business and away from him at this time.
5  Q.  Do you respect him as a police officer?
6  A.  He's all right.
7  Q.  Okay.  He does his job well as far as you know?
8  A.  I don't know.  I'm not his supervisor.  He's not on my
9  shift.
10 Q.  I said "as far as you know."
11     From what you've heard --
12 A.  I -- I --
13 Q.  -- and learned or seen?
14 A.  I can't say.
15     He was my supervisor for quite some time.
16 Q.  Okay.  How long?
17 A.  I'm not sure of an exact time.  I would guess about
18 three years.
19 Q.  And what years would those have been?
20     When did that end?
21     Let's do it that way.
22 A.  It would have been -- I would -- I'm guessing here, but
23 I'm thinking '16, '15, '14.
24 Q.  Okay.  And how did you get along --
25 A.  Maybe '13, but I don't -- I think I was on a different

Page 182

1  shift during '13.
2  Q.  So, you've had a chance to see him in action.
3     Was he okay as a supervisor?  Did you have some
4  respect for him in that regard?
5  A.  We had some issues at times.  As you recall from that
6  letter you provided earlier, one of your exhibits, we
7  did have some -- some personality clash and -- and work
8  issues.
9     But we got along okay the last several years.
10 Q.  What were -- what was the personality clash?
11 A.  He was a little more -- I like to go out there and work
12 and do stuff, and he didn't necessarily like that.  His
13 opinion was that if a police agent -- if a town is safe,
14 the police department is not going to have to be out
15 there doing a lot.  They can kind of kick back and
16 relax.  And my thing was, get out there and work hard
17 and have a lot of police presence and that would keep
18 things safer.
19 Q.  Well, did he tell you not to do that?
20     I mean, how did this become a problem?
21 A.  He -- he -- he wasn't real satisfied with --
22 Q.  You working?
23 A.  -- being very proactive, yeah.
24 Q.  Well, what did he say?  I mean, why do you say --
25 A.  He -- he encouraged me to kind of be a little more

Page 183

1  relaxed and spend more time at the station and do more
2  business stops and things like that as opposed to being
3  out there arresting people or bringing people to jail or
4  towing cars or writing tickets.  He had a little more
5  different mentality as far as that goes.
6  Q.  I'll hand you Bates stamp 931 and 932.
7  A.  Okay.
8  Q.  You were reporting to Sergeant Easton August 2014?
9  A.  Yes.
10     Well, he was my -- Lieutenant Welch was a shift
11 supervisor, I believe, at that time, and Lieutenant --
12 or Sergeant Easton was his second in command.
13 Q.  Okay.  So, you are, at this point, a corporal, and you
14 take it upon yourself to go to Welch with a laundry list
15 of nasty comments about Easton; correct?
16 A.  I wouldn't say "nasty."  I would say certainly not
17 flattering, but --
18 Q.  Why did you do this?
19 A.  Lieutenant Welch didn't -- Mr. Hayse did not like
20 Sergeant Easton, and they knew that I had -- Lieutenant
21 Welch knew I had some issues with him and encouraged me
22 to write them down.  And I told them, I said, "I don't
23 want to be involved in this."  And I --
24     And he told me, "Well, just put on there in bold,
25 you know, what I put here:

Page 184

1     "I'd prefer --"
2  Q.  I'm sorry --
3  A.  (Reading.)
4     "-- that Sergeant Easton did not know that
5     I wrote this IDCF --"
6  Interdepartment communication --
7     "-- for fear of retaliation."
8  Q.  What -- what did you not want to be involved in?  I mean
9  you saying, "I don't want to be involved," what are you
10 talking about?
11 A.  Making a complaint against another officer or -- or
12 raising --
13 Q.  And Welch told you to make a complaint against Easton?
14 A.  He told me he wanted me to write it down -- write a
15 letter to him as -- as my supervisor.
16 Q.  Okay.  And did that make sense to you?
17 A.  Yeah.  I mean, I expressed that I don't want to be
18 involved, and I don't want to, but he said I need to,
19 and I did.  And that's this letter.
20 Q.  Okay.  So, what was the purpose, as you understood it,
21 of Welch asking you to write this down?
22 A.  It sounded like he was going to have to have some sort
23 of meeting or counseling with Sergeant Easton to address
24 some of his work-related behavior and --
25 Q.  Did that ever happen; if you know?

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 185–188

Page 185

1  A.  I have no idea.  I was told to write the letter.  I was
2      told that he wouldn't see it, and then I did.  And I
3      didn't hear anything about it, and it's above my rank
4      and pay grade to be involved in any discipline of a
5      supervisor.  We're in different unions as well -- or at
6      that time we were in different unions.
7  Q.  Okay.  Let's look at the first bullet point.
8               "Sergeant Easton often disappears for long
9          periods of time, hours, and is often difficult
10         to reach over the radio.  Often, nobody knows
11         where he is, but his patrol vehicle will be
12         parked in a residential area and unoccupied."
13         Had you ever reported that before to anybody?
14  A.  I believe I made verbal comments to Mr. Welch regarding
15      that.
16  Q.  By the way, is Easton still with the department?
17  A.  He is.
18  Q.  What's his rank today?
19  A.  He's an officer.
20  Q.  What is he?
21  A.  A police officer.
22  Q.  Is he a sergeant still?
23  A.  No.  No.  He's an officer -- okay.
24         So, our rank goes officer, corporal, sergeant,
25      lieutenant.

Page 186

1          He's officer, which is the -- the lowest rank, just
2      patrol officer.
3  Q.  And he used to be a sergeant?
4  A.  Yes.
5  Q.  Okay.  Second bullet point:
6               "When Sergeant Easton is requested to
7          assist another officer, it often takes him a
8          long time to get there."
9          Were you referring to anything in particular?
10  A.  Not that I recall.  I think it was just kind of a
11      general pattern of behavior at that time.
12  Q.  Go to the second page.
13               "Sergeant Easton is --"
14      last bullet.
15               "Sergeant Easton is vocal about his dislike
16         of Gene's Towing because they do not send him
17         free lunches, alcohol, et cetera."
18         What was that referring to?
19  A.  Sergeant Easton did not like the owner of Gene's Towing.
20      There was -- on one occasion he asked the owner of
21      Gene's Towing to buy him lunch --
22         (Discussion held off the record.)
23  A.  -- to drop off lunch and the owner declined, and they
24      got into some sort of argument.
25  BY MS. GORDON:

Page 187

1  Q.  And, apparently, Easton told you he thought that Goch &
2      Son was going to buy him free lunches and alcohol.
3         Did he tell you that?
4  A.  He implied it.  I don't think he came out and said it,
5      but he said they would be a lot better to him and that
6      they -- they would take care of him, I think was the
7      word.  But I don't recall exactly.
8  Q.  Who is Alexandra Carrier?
9  A.  That's Alex.  That's her new name.  She's married now.
10  Q.  Ah.  Her name was Alexandra Hammer (ph)?
11  A.  Hamric.
12  Q.  Thank you.
13  A.  Yes.
14  Q.  Can you spell that?
15  A.  H-a-m-r-i-c.
16  Q.  Okay.  I'm going to change the question that I asked you
17      earlier about whether you ever stopped her and
18      confiscated her license.
19  A.  Okay.  Because I -- I never did.
20  Q.  Fair enough.  I was -- think I was mistaken.
21  A.  Okay.
22  Q.  You told her, though, that you had stopped -- that you
23      had confiscated a woman's driver's license because it
24      was suspended, and then you met that woman at a hotel
25      and sold it back to her for money.

Page 188

1  A.  No.
2  Q.  You told Alexandra that, didn't you?
3  A.  No, ma'am.
4  Q.  Is Alexandra a liar?
5  A.  Well, that's -- there's a reason we're not together.
6  Q.  Oh, okay.
7  A.  But --
8  Q.  And did you also tell Alexandra -- strike that.
9         Did you contact Alexandra at some point when you
10      were at a hotel with a girlfriend --
11  A.  No.
12  Q.  -- and discussed this with her?
13  A.  No.
14         We had an argument one time because she thought I
15      was seeing an ex, which I met for lunch.  That
16      relationship ended on a sour note.
17  Q.  Why --
18  A.  Which is all for the best, so --
19         THE REPORTER:  "-- all--"
20  A.  Which was for the best that it ended.
21         THE REPORTER:  I'm sorry.
22  A.  So --
23  BY MS. GORDON:
24  Q.  What is -- Alexandra said about you, "It honestly blows
25      my mind that he is trying to play good cop.  He's as

FURMAN, SERGEANT MATTHEW
03/13/2018                                                                Pages 189–192

Page 189

1    crooked and racist as they come."
2          Did you ever discuss that with her that she thought
3    you were a racist?
4  A.  No.
5  Q.  I mean, is she lying when she says you're a racist?
6          MR. WISE:  Object to foundation.
7  BY MS. GORDON:
8  Q.  When she says you're "as racist as they come," is that
9    something she's lying about?
10         MR. WISE:  Foundation.
11 A.  Yes.
12 BY MS. GORDON:
13 Q.  You dated her for two years?
14 A.  Correct.
15         (Discussion held off the record.)
16 BY MS. GORDON:
17 Q.  Am I correct that on April 26th, you were suspended for
18   towing activity that occurred in April of 2016?
19 A.  I'd have to see the documentation.  I don't recall what
20   the dates are and things.
21 Q.  Well, do you recall that you were disciplined for that?
22 A.  Yes.
23 Q.  Did a Cecilia Wielichowski come into the station and
24   make a complaint about you and how you treated her
25   during the traffic stop and impound?

Page 190

1  A.  She did.
2  Q.  And you put her in an arm bar; is that correct?  And
3    removed her from the vehicle?
4  A.  After doing everything I could to get her to voluntarily
5    leave the vehicle and she refused, yes, she was
6    physically extracted from the vehicle.
7  Q.  What's an arm bar?
8  A.  It's carrying somebody's arms so you have control of
9    their body, removing them from the vehicle.
10 Q.  Well, it's a technique, isn't it?
11 A.  It is.  It's a police technique.
12 Q.  What -- what -- how do you --
13 A.  It's for compliance control.
14 Q.  So, what do you do?
15 A.  You grab them by the arm and the wrist and you maintain
16   control of their body.
17 Q.  And she was in the car at that time?
18 A.  Correct.  And then she came out of the car.
19 Q.  So, you leaned into her window?
20 A.  No, ma'am.  I opened the door, if I recall correctly.
21 Q.  And then -- and then what did you do?
22         Then what did you do?
23 A.  Placed her in handcuffs, detained her, secured her in
24   the rear of my patrol car.
25 Q.  Okay.  I want to know what the arm bar looks like.

Page 191

1    What's the technique?
2  A.  Grab by the wrist, by the arm --
3  Q.  Wait a minute.
4          You're standing outside the car.  She's seated?
5  A.  Correct.
6  Q.  What do you do?
7  A.  Reach in, get a hold of her arm and wrist and extract
8    her from the vehicle --
9  Q.  Well, what's the bar --
10 A.  -- physically -- physically pull her out.
11 Q.  What's the bar part?
12 A.  Basically their arm becomes like a bar so you have like
13   movement of the body.
14 Q.  Do you use two arms for that?
15 A.  Yes.
16 Q.  Is it painful?
17 A.  It doesn't feel good, but -- I mean, if you resist, it
18   becomes a higher level of pain.
19 Q.  And how old was Cecilia Wielichowski at the time?
20 A.  I don't know.
21 Q.  You didn't get her age?
22 A.  Well, I got it at the time, but I don't remember today.
23 Q.  Uh-huh.  And did she have children with her?
24 A.  Yes.
25 Q.  And -- two little children?

Page 192

1  A.  Yes.
2  Q.  Where were they in the car?
3  A.  In the rear seat --
4  Q.  Okay.  So, why don't you tell me --
5  A.  -- if I remember correctly.
6  Q.  -- what happened during the stop.
7          Why did you pull her car over?
8  A.  Well, she had a warrant for her arrest.  She had no
9    insurance.  She also had a cover over the license plate,
10   which is illegal in the state of Michigan.
11 Q.  What kind of a cover?
12 A.  Like a yellowed plastic cover that goes over the --
13 Q.  So, it was a cover that had yellowed?
14 A.  Yes.
15 Q.  It was originally a clear cover?
16 A.  Yes, which is also not allowed.
17 Q.  Did you run her plate before you stopped her?
18 A.  Yes.
19 Q.  So, you were able to see the number well enough to run
20   the plate?
21 A.  I believe so.
22 Q.  Okay.  So, you ran the plate.
23 A.  Correct.
24 Q.  And you stopped her for what reason?
25 A.  For the plate and then wanted to speak with her about

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 193–196

**Page 193**

1      her warrant.
2 Q. What was the warrant for?
3 A. I don't recall at this point.
4 Q. And why did you want to speak with her about it?
5 A. Make sure she's aware of it and see if she's going to do
6      anything about it and address that with her.
7 Q. Okay. So, you pulled her over.
8 A. We advise a lot of people on their warrants.
9 Q. You pulled her over.
10      What road?
11 A. Schaefer Highway.
12 Q. Okay. And what's the next thing that happened after you
13      pulled her over?
14 A. I made contact with her, advised her the reason for the
15      stop, obtained her driver's license. She informed me
16      she had no insurance or came -- I don't remember the
17      exact circumstance, but it was determined she had no
18      insurance.
19 Q. And what's the next thing that happened?
20 A. Well, I advised her the vehicle was going to be
21      impounded. She was welcome to call for a ride. She
22      did, or she was on the phone. She became very
23      argumentative.
24 Q. What do you mean?
25 A. Well, she said she -- I don't recall exactly without my

**Page 194**

1      report in front of me, but I remember she did not want
2      the vehicle to be impounded.
3          (Discussion held off the record.)
4 BY MS. GORDON:
5 Q. Go ahead. I'm listening.
6      You --
7 A. I don't recall the exact events.
8 Q. You tell her, "I'm impounding your car."
9      And did she at that point get on the phone to make
10      a call?
11 A. Yes. She was allowed to use the phone. We always allow
12      people to use the phone if they have one, which --
13 Q. You allow them to?
14      She wasn't under arrest, was she?
15 A. Well, we advise them they're welcome to use their phone
16      and call for a ride.
17 Q. Okay.
18 A. Make sure they don't think they're not allowed to,
19      basically.
20 Q. Okay. So, I want to know -- you tell her you're
21      impounding her car. She gets on the phone.
22      What's the next thing that happens?
23      When did the "argumentative" occur?
24 A. I don't recall the exact conversation we had. But I did
25      end up calling for another unit because she was being

**Page 195**

1      problematic.
2 Q. Well, what -- how was she being problematic?
3 A. She refused to exit the vehicle when she was asked to.
4 Q. Okay. Why? Did she tell you why she refused to exit
5      the vehicle?
6 A. She just said, "It's not being impounded," if I recall
7      correctly. I don't -- without my report in front of me,
8      I can't tell you exactly.
9 Q. Well, her ride -- you said she called for a ride. Was
10      there a ride on the way?
11 A. To my knowledge.
12 Q. Okay. Did she want to wait for a ride?
13 A. But I -- I don't know.
14 Q. Hang on.
15 A. Well, actually, I take that back.
16      I don't know if there was a ride on the way.
17 Q. Okay.
18 A. But I called an additional car because I -- I think I
19      advised her we would transport her to the station and
20      she could wait there and she's going save --
21 Q. Why couldn't you stand there and let her -- why couldn't
22      you let her sit in the car until the -- in February
23      until --
24 A. Because she --
25 Q. Excuse me.

**Page 196**

1 A. I'm sorry.
2 Q. Until her ride arrived?
3 A. Because that vehicle has been impounded. I have to
4      conduct an inventory search yet and do my paperwork, and
5      there's no reason she can't sit in the rear of my patrol
6      car which is also safe, warm and secure, and then be
7      transported to a safe location.
8 Q. So, you were going to sit in that location anyway. You
9      were willing to leave your car in that location anyway?
10 A. Until the tow truck had cleared. And then she would be
11      transported back to the police department, but if the --
12 Q. Right.
13      So, why couldn't she --
14 A. If the patrol -- if the tow truck came to the vehicle,
15      and she's still in it, now we're tying up the tow
16      truck's time, we're tying up everybody else's time.
17      We're extending the length of the traffic stop.
18 Q. What's --
19 A. And we're sitting on the roadway which creates a
20      traffic hazard.
21 Q. When is the last time you saw her that day?
22 A. When is the last time I saw her that day?
23 Q. Yeah.
24      What was she doing? Where was she?
25 A. I believe she was at the department lobby.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 197–200

---

**Page 197**

1   Q.   Okay.  And you had driven her there?
2   A.   No.  The officer I called to assist, which was Corporal
3        Hinojosa, drove her to that location if I recall
4        correctly.
5   Q.   And what did you do?
6   A.   I stayed with the vehicle, did the inventory search and
7        waited for --
8   Q.   And then what did you do?
9   A.   I waited for the tow truck to arrive and did my
10       paperwork.
11  Q.   And then where did you go?
12  A.   I don't recall after that.
13  Q.   Well, did you go back to the station?
14  A.   At some point.
15  Q.   Well, was she in the lobby when you got there?
16  A.   I believe she was.  She was transported to --
17  Q.   Are you guessing?
18  A.   Yes.
19            No.  I believe she was -- she was transported to
20       the lobby as far as I know, but --
21  Q.   Did you arrest her?
22  A.   No.
23  Q.   Well, did you see her at the station or not?
24  A.   I don't recall.  I believe so.
25  Q.   Well, how long did it take you to get back to that

---

**Page 198**

1        station?
2   A.   I don't know.
3   Q.   So, I'm going to go -- I want to know what caused the
4        argumentative part of the conversation.
5   A.   I don't know.
6   Q.   Do you remember?
7   A.   I don't know.
8            Well, being advised her vehicle is being impounded.
9        She also was very unhappy to receive a ticket.
10  Q.   Well, everybody is, I assume; correct?  You must be used
11       to that.
12  A.   Well, for the most part, yeah, no one is really happy to
13       get a ticket.
14  Q.   I'm sure you weren't happy when you got your tickets,
15       were you?
16  A.   Absolutely not, but --
17  Q.   But what?
18  A.   It's part of life.  I was compliant.  I certainly
19       wouldn't give an officer a hard time.
20  Q.   Well, she didn't give you a hard time other than she
21       didn't apparently want to get immediately out of the car
22       with small children in the back.
23            (Discussion held off the record.)
24            MR. COOGAN:  Object to form.
25  BY MS. GORDON:

---

**Page 199**

1   Q.   What else did she do that noncompliant?
2            MR. WISE:  Go ahead.
3            MS. GORDON:  Okay.  Larry, you know what?  He -- he
4        can handle this dep.  You've got a habit of --
5            MR. COOGAN:  You know what?
6            MS. GORDON:  -- telling other lawyers what to do.
7            MR. COOGAN:  I don't need to listen to what you say
8        right now.  Your opinion means nothing to me.
9            MS. GORDON:  Okay.
10           MR. COOGAN:  I can talk to my co-counsel just like
11       you talk to your co-counsel.  I don't comment --
12           MS. GORDON:  You're telling --
13           MR. COOGAN:  -- when you talk to your co-counsel.
14           MS. GORDON:  Fair enough.
15           MR. COOGAN:  Don't counsel me.
16           MS. GORDON:  It's a good point.
17           MR. COOGAN:  Thank you.
18           MS. GORDON:  That's a good point.
19           MR. COOGAN:  I'm just fair.
20           MS. GORDON:  I just have to -- you know, you're
21       always --
22           MR. COOGAN:  I'm sorry if I -- I'm sorry --
23           MS. GORDON:  You're always in the ear of other
24       lawyers because you would rather be doing the dep, and I
25       get that.

---

**Page 200**

1            MR. COOGAN:  I would.
2            MS. GORDON:  So, instead, that's your Plan B.
3            MR. COOGAN:  I thought I was whispering but
4        sometimes I'm little louder than I thought.
5            MS. GORDON:  All right.
6            MR. WISE:  I have bad hearing.
7   BY MS. GORDON:
8   Q.   Okay.  So, when -- we'll get the report, and you'll tell
9        me what the argumentative part is.
10           So, after the arm bar, what happened?
11  A.   I don't recall.  I'll wait for the report.
12  Q.   After you pull -- after you pulled her out of the
13       vehicle, then what happened?
14  A.   I'll wait to reference the report.
15  Q.   And you forced her over the hood of the car; is that
16       correct?
17  A.   I don't recall.
18  Q.   You don't recall this?
19  A.   No, ma'am.
20  Q.   You were disciplined for it, sir.
21  A.   It was several years ago, and the discipline was
22       overturned by the Public Safety Commission, who found
23       Mr. Hayse to be in error and my --
24  Q.   Well, not because -- not because you --
25  A.   -- vacation days were reinstated.

---

Page 201

1        THE REPORTER:  Excuse me?
2  BY MS. GORDON:
3  Q.  Not because you didn't do this.  It wasn't overturned
4      because you didn't do this.  It was overturned on a
5      technicality that he didn't give you notice in advance;
6      right?
7        MR. WISE:  Object to form.  Argumentative.
8  A.  Not to my knowledge, no.
9  BY MS. GORDON:
10 Q.  Well, what is your reason that this was overturned?
11     Because everybody is lying about you; the citizen, the
12     lieutenant, the chief?
13        Do you know why this was overturned?
14 A.  The Safety Commission overturned it when I explained the
15     situation.
16 Q.  Why?
17        I know.  Why?
18 A.  They found he shouldn't have taken those days from me.
19 Q.  That's because he didn't fill out the form.
20        Are you aware of that?
21 A.  That's because I was doing my job in accordance with the
22     way it should have been done.
23 Q.  Well, was that on the record with the Public Safety
24     Commission?
25 A.  I don't know.  I was not recording the meeting.

Page 202

1        So, we have no -- you have no record that you know
2      of, of your discipline being overturned because you
3      didn't actually --
4  A.  It --
5  Q.  You've got to let me finish.
6        -- you didn't actually conduct yourself in an
7      inappropriate way?
8        Do you have any written record --
9  A.  There is a record --
10 Q.  -- of why this was overturned?
11 A.  -- on file that it was overturned by the Safety
12     Commission.  It's in their minutes, but I do not have a
13     copy.
14 Q.  Why did you not arrest, Ms. Wielichowski?
15 A.  She had two children with her.
16 Q.  Okay.  But you -- didn't you say that there was a
17     warrant out for her arrest?
18 A.  There was.
19 Q.  And didn't you say that she was not complying with you?
20 A.  Correct.
21 Q.  And she -- did you learn she came in and made a citizens
22     complaint?
23 A.  Yes.
24 Q.  Did anybody investigate it?
25 A.  Yes.

Page 203

1  Q.  Who?
2  A.  Mike Welch.
3  Q.  Welch stated in his memo to Hayse about this that Welch
4      asked you, "If you see a need to go hands-on with a
5      subject and use physical force, the person was not
6      placed under arrest, why?"
7        Do you remember him asking you that?
8  A.  Vaguely.
9  Q.  Why did you not arrest her if you took it to the point
10     where you actually had to use your hands to pull her out
11     of the car?
12        Do you recall whether you had an explanation for
13     that?
14 A.  I would have liked to, but she had her two children with
15     her, so we made the -- I made the decision not to.
16 Q.  Okay.  Well, according to Welch, you had no explanation
17     for your actions when he asked you.
18        Do you recall that?
19 A.  No.
20 Q.  I'll hand you Bates stamp 938 and 939.
21        Second paragraph on the second page.
22        "I asked Furman why --"
23 A.  Let me read the entire document here.
24        Okay.
25        (Discussion held off the record.)

Page 204

1  A.  Okay.
2  BY MS. GORDON:
3  Q.  Okay.  Go to the second paragraph on the second page.
4        "I asked Furman why, if he saw the need to
5      go hands-on with the subject and use physical
6      force that person was not placed under arrest.
7      He had no explanation."
8        Is that correct?
9  A.  No.  I typed a written explanation in regards to the
10     incident to --
11 Q.  Well, that was after this conversation.  I'm talking --
12 A.  Okay.
13 Q.  -- talking about what he's got on this page.
14 A.  I don't recall.
15        Nor do I put any credibility in anything Mike Welch
16     writes or says.
17 Q.  Oh, I know.  You don't like to put credibility in -- to
18     anybody that apparently has criticized you.  That's kind
19     of your go-to.  When they criticize --
20        MR. WISE:  Any question?
21 BY MS. GORDON:
22 Q.  -- the person has no credibility.
23        MR. WISE:  You're not going to sit here and argue
24     with him, as you've been doing since I got here.
25 BY MS. GORDON:

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

**Page 205**

1   Q.   Okay.  This memo also says:
2           "I have spoken to Corporal Furman
3        repeatedly over using discretion, and it appears
4        to fall on deaf ears.  Other supervisors and
5        officers tell me they have talked to him to no
6        avail."
7        Does that refresh your recollection that you were
8        talked to on multiple occasions about your inability to
9        use discretion?
10  A.   I don't recall.
11  Q.   The last paragraph says:
12          "There's a serious problem here with lack
13       of discretion and common sense.  I believe my
14       efforts to coach and counsel Furman on his
15       behavior are largely ignored.  I feel that,
16       while he is working, I cannot trust him to do
17       the right thing.  Every encounter with a
18       citizen has a different set of circumstances
19       and many options for an officer to take.
20       Furman seems to only take the path that suits
21       him."
22       Do you see that?
23  A.   I see that.
24  Q.   Did you see that at the time?
25  A.   No.  I did not see a copy of this memo, I don't think.

**Page 206**

1   Q.   When did you -- when did you first see that memo?
2   A.   I don't know.
3   Q.   Did you cite -- give Wielichowski a citation with regard
4        to her license plate?
5   A.   I don't recall.  I know I gave her a citation, but I
6        don't recall.
7   Q.   Wielichowski told you that -- that she had somebody on
8        the way already to come and get her; is that correct?
9   A.   I don't recall for certain.
10  Q.   That's what your answer says, your report.
11  A.   Okay.  Can I see that?
12  Q.   No, not yet.
13  A.   Okay.
14  Q.   Where -- do you recall what city she lived in?
15  A.   No.
16              (Discussion held off the record.)
17  BY MS. GORDON:
18  Q.   Where will I find her address on your report?
19       Anywhere?
20  A.   Yes, it would be on there.
21       MR. COOGAN:  If I can help, it should be up at the
22       top, the first page.
23       Help streamline things here.
24       It should be on the first page, address of the
25       defendant.

**Page 207**

1        MS. GORDON:  This is an Incident Investigation
2   Report.
3        MR. COOGAN:  Yeah.  It should be on the first page,
4   list the individual.
5        Unless it was redacted or something for some
6   reason.
7        MS. GORDON:  Wasn't redacted.
8        MR. COOGAN:  I looked at about 700 a week.
9        MS. GORDON:  Okay.  Taylor.  This is a different
10  page.
11  BY MS. GORDON:
12  Q.   She lived at 15519 Pond Village in Taylor, Michigan.
13  A.   Okay.
14  Q.   Is that -- how far is that from Melvindale and Schaefer
15       Highway?
16  A.   I'm not exactly sure where in Taylor that is, but I'm
17       guessing at least a good 15 minutes, maybe 20 minutes.
18  Q.   So, she told you she had someone on the way, and you
19       were not willing for her ride to get there, so you
20       pulled her out of the vehicle; correct?
21  A.   I don't like to sit on the roadway.  It would be better
22       to get everything off the roadway and get them to a safe
23       place to wait, be it the station lobby, a restaurant or
24       a location of their choice.
25  Q.   Okay.  She could have turned around a corner onto a side

**Page 208**

1        street, couldn't she?
2   A.   No, ma'am.  Once that vehicle has no insurance, it's not
3        supposed to be on the roadway and I can't let her drive
4        any further.
5   Q.   You -- you knew she had no insurance by the time you
6        pulled her over; correct?
7   A.   Not for -- I hadn't confirmed that with her yet.
8             When you run a license plate, Secretary of State
9        will show if there's any insurance on file for the
10       vehicle or not.
11  Q.   What's an "SOS"?  Secretary of State?
12  A.   Secretary of State, like where you go for your license
13       plate.
14  Q.   Well, is that what you get when you run her plate, the
15       Secretary of State?
16  A.   Among other things.  That is one of the things that
17       comes up.
18  Q.   So, you would have gotten that when you ran her plate,
19       before you pulled her over?
20  A.   Yes.
21  Q.   But in your report, you don't say that.  In your report
22       you say you ran -- ran her license plate after you
23       initiated the stop.
24  A.   Okay.
25  Q.   So, that's not honest, is it?

FURMAN, SERGEANT MATTHEW
03/13/2018                                                                                    Pages 209–212

| Page 209 | Page 211 |
|---|---|
| 1   A.   Like I said, I don't recall.  But if I -- you asked if I | 1         MR. WISE:  Appreciate it. |
| 2       run the plate, will it come back.  Yes, when we run -- | 2       I appreciate it. |
| 3   Q.   No, I didn't. | 3         (Short recess at 3:16 p.m.) |
| 4   A.   Okay. | 4           *   *   * |
| 5   Q.   I wanted to know whether you ran the plate before you | 5         (Record resumed at 3:28 p.m.) |
| 6       stopped her and knew she didn't have insurance, and you | 6   BY MS. GORDON: |
| 7       said yes. | 7   Q.   Your form for incident and investigation report includes |
| 8   A.   Okay.  Well, I don't recall.  Again, I haven't been | 8       date of birth and age; correct? |
| 9       allowed to see my -- my report there to refresh my | 9   A.   Correct. |
| 10      memory. | 10   Q.   It includes race; is that correct? |
| 11   Q.   Were her children in safety seats? | 11   A.   Correct. |
| 12   A.   I don't recall. | 12   Q.   It includes sex; is that correct? |
| 13   Q.   Isn't it a violation to have -- not to have children | 13   A.   Well, gender. |
| 14      under a certain age in a child seat? | 14   Q.   It says "sex." |
| 15   A.   Yes. | 15   A.   Oh, okay.  Then "sex." |
| 16   Q.   Okay.  So, how could you transport children in your car? | 16   Q.   Same thing as gender; correct? |
| 17      You don't have children seats in there, do you? | 17   A.   Correct. |
| 18   A.   No.  There's no children seats in our patrol cars. | 18   Q.   And it includes that for anybody involved in the event, |
| 19   Q.   So, you can't transport a one- and a three-year-old | 19      whether it's a victim or a defendant; correct? |
| 20      safely in your car obviously. | 20   A.   Anyone who would have access to the report and anyone |
| 21   A.   Well, we have -- we have seat belts in our patrol cars. | 21      who would be listed in it. |
| 22   Q.   Adult seat belts? | 22   Q.   Is this discriminatory under the Constitution, as you |
| 23   A.   Correct. | 23      described to me earlier today -- |
| 24   Q.   You're not aware that those are not used for babies and | 24   A.   No. |
| 25      toddlers and children? | 25   Q.   -- at the beginning of your dep? |

| Page 210 | Page 212 |
|---|---|
| 1   A.   They can be used to -- if -- to position in a child | 1   A.   Having that information on the report? |
| 2      seat. | 2   Q.   Yeah. |
| 3   Q.   Do you know what the law is in the state of Michigan on | 3   A.   No, because it's not used to base anything that the |
| 4      transporting a baby or a toddler in a vehicle? | 4      report concerns. |
| 5   A.   Must be in a safety seat. | 5   Q.   How about you -- do you often identify people to the |
| 6   Q.   Okay.  So, it would be illegal for you to transport a | 6      department by race and gender? |
| 7      child not in a safety seat; correct? | 7   A.   If you're giving, say, a BOL, look for somebody, robbery |
| 8   A.   I'm not sure if there's an exemption for police vehicles | 8      suspect, white female, long blonde hair, red shirt, |
| 9      or not. | 9      then -- |
| 10   Q.   Well, maybe -- maybe -- I'm sure there's not, but maybe | 10   Q.   Other than that, no? |
| 11      the mother just didn't want her children not to be in a | 11   A.   Can you repeat the question again? |
| 12      safety seat. | 12   Q.   Yeah. |
| 13      Did that cross your mind? | 13      Do you identify people by race or gender when |
| 14   A.   Well, she couldn't have cared that much.  She's riding | 14      you're talking to the department? |
| 15      around in an uninsured vehicle. | 15   A.   To describe a person in a report. |
| 16   Q.   Okay.  Very interesting.  Very interesting comment from | 16   Q.   For what -- for what purpose? |
| 17      you. | 17   A.   Descriptive purposes. |
| 18   A.   Thank you. | 18   Q.   But for what -- why would you want to describe a person? |
| 19        MR. WISE:  Deb, can we take just a quick break so I | 19      If it was going to be somebody you were going to be |
| 20      can use the restroom?  I'll be right back. | 20      looking for or needed to identify? |
| 21        MS. GORDON:  Okay. | 21   A.   Correct. |
| 22        MR. WISE:  Just -- literally like -- just like 2 | 22   Q.   In this report, you wrote back about this Wielichowski |
| 23      minutes. | 23      stuff.  You identified the person who picked up |
| 24        MS. GORDON:  Sure.  Sure. | 24      Wielichowski as a black male. |
| 25   A.   I've got to go, too. | 25      Do you recall that? |

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 213–216

Page 213

```
1   A.   I'd have to see the report.
2   Q.   Why would you -- why would you need to talk about the
3        race of the person that was picking her up?
4   A.   Because if somebody says, "Well, she was never picked
5        up, never had a ride," I could say, "Well, that's not
6        true. Somebody watching this description picked her up,
7        so she was, indeed, picked up."
8   Q.   I notice that you note in your description that
9        Ms. Wielichowski was able-bodied.
10            What was the purpose of that, when you're -- in
11       your response? You wanted to let your lieutenant know
12       that, in getting her out of the car and taking her, you
13       know, wherever you were going to take her, she was an --
14       she was an able-bodied person apparently.
15            Is that correct?
16  A.   Yes. That would be to indicate that she had no physical
17       ailment preventing her from leaving the vehicle on her
18       own accord or cooperating with my orders to exit the
19       vehicle. She wasn't handicapped. She wasn't missing
20       any limbs, things of that nature.
21  Q.   Well, that's not why you say it, actually. You're
22       describing that was one of the reasons you made the
23       decision to impound her vehicle, that you had assessed
24       that she was able-bodied.
25            Do you recall that?
```

Page 214

```
1   A.   I'd have to see the report. I don't recall offhand.
2   Q.   And you described her as a female -- as an able-bodied
3        female.
4            Do you recall that as for a reason as to why you
5        decided to impound?
6   A.   I'd have to see the report. I don't recall.
7   Q.   So, you did transport Wielichowski and her infant
8        children in your car back to the station?
9   A.   I don't recall for certain, but I do not believe I did.
10       I believe Officer Hinojosa transported her. But I'm not
11       positive. I'd have to see my report for reference.
12  Q.   Well, in your response to Welch, you said:
13            "I was able to safely transport
14            Wielichowski and her passengers to White
15            Castle in Melvindale."
16       I guess I misspoke. You took her to the White
17       Castle.
18            Does that refresh your memory?
19  A.   I -- I don't recall. I'd have to review the report.
20  Q.   Okay. Let's assume for a second you transported her and
21       her children to the White Castle.
22  A.   Okay.
23  Q.   You did so without putting them in child seats, clearly;
24       right?
25  A.   I would presume so.
```

Page 215

```
1   Q.   You say in this document:
2            "If I had allowed Wielichowski to drive
3            the vehicle and it was involved in an accident,
4            I could potentially be held liable for damages."
5   A.   Correct.
6   Q.   Where did you come up with that?
7   A.   Well, to me it's the same as if I pull over somebody who
8        is drunk and I don't do my job to get them off the road,
9        and I say, "Well, just get home safe," and then they run
10       somebody over half a mile down the road. Guess who
11       that's falling back on? Not only that driver, but it's
12       coming back to me because I had a legal obligation to
13       remove that driver.
14  Q.   Oh, I didn't know there was that cause of action in
15       Michigan.
16  A.   Well, I have a duty as a police officer.
17  Q.   I didn't say you had a duty or didn't have a duty.
18            I'm asking you why you're telling me that if the
19       vehicle was involved in an accident you could be
20       potentially liable for damages in that the vehicle
21       didn't have insurance?
22  A.   Well --
23  Q.   Has anybody given you that as a legal opinion?
24  A.   Yes. I called --
25  Q.   Who?
```

Page 216

```
1   A.   -- a lawyer --
2   Q.   Who?
3   A.   -- and actually asked that -- I don't recall now.
4   Q.   Who?
5   A.   It was several years ago.
6            Plus, I mean, there's evidence today lawyers are
7        willing to take just about any case, whether they have
8        merit or not.
9   Q.   Well, that's not your job to figure out who has merit
10       and who doesn't. Your job is to not misstate the law,
11       such as, "if I had allowed Wielichowski to drive the
12       vehicle, I could potentially be held liable -- liable
13       for damages."
14            So, either you're making something up, or you just
15       want everybody to feel sorry for you, or you're right.
16       So, I'm just trying to figure out which one of these it
17       is --
18            MR. WISE: Is there a question here --
19  BY MS. GORDON:
20  Q.   -- and whether you're correct.
21            MR. WISE: -- anywhere?
22            I saw him. I saw Larry give you --
23            MR. WISE: No, this is --
24            MS. GORDON: Okay.
25            MR. WISE: I mean, you've been talking for a while
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 217–220

Page 217

1    now --
2            MS. GORDON:  Okay.
3            MR. WISE:  -- and you've asked him the same thing
4    about three times.
5    BY MS. GORDON:
6    Q.   You go on to say:
7            "If Wielichowski was allowed to leave the
8        scene and was then involved in an accident, she
9        would have no insurance policy to cover damages
10       for  herself, her children or vehicle, or any
11       incident parties, bicycle -- bicyclists."
12       Did you think you could be sued by all of them?
13   A.   I don't know.  We're a sue-happy society.
14   Q.   So, you base your actions on the fact that we're a
15       sue-happy society and not the law?
16   A.   I base my actions upon doing my job --
17   Q.   Well, you're --
18   A.   -- in accordance with the law.
19   Q.   Sir, this is your reasons for the impound, which you say
20       is doing your job and following the law, and you're
21       giving us one of the reasons you impounded her, that you
22       personally don't want to be sued.
23   A.   That's correct.  I don't want to open myself or the
24       department up to liability.
25   Q.   Okay.  But if there's an arrest warrant out for

Page 218

1    somebody, you let them go, even though they may then go
2    run somebody over in their car or shoot and kill
3    somebody.  It doesn't bother you that there's an arrest
4    warrant out, and you didn't pick the person up.  You're
5    willing to take that risk; right?
6            MR. WISE:  Foundation.  Assumes facts not in
7    evidence.
8            Go ahead.
9    BY MS. GORDON:
10   Q.   You're willing to take -- you're willing to let
11       somebody, who there's actually a court order to
12       arrest --
13   A.   That's a mischaracterization.
14   Q.   -- leave the scene.  Okay.
15   A.   Because it depends on the severity of the warrant.  If
16       it's a serious warrant, a violence warrant, something
17       like that, they're going in.  If it's a traffic warrant
18       or an unpaid parking ticket or a handicapped -- you
19       know, some sort of parking or driving offense, those are
20       the kind of warrants.  An ordinance.
21   Q.   What if it's a speeding ticket?
22   A.   If it's a speeding ticket, that's my discretion.
23   Q.   You don't recall that you let a felony assault drive off
24       into the sunset on a warrant?
25            I'll be happy to show it to you.

Page 219

1    A.   I'd like to see that, please.
2    Q.   Well, you will.
3    A.   Okay.  Let's take a look.
4            I know I had felony assaults where I had called
5        Detroit and they wouldn't pick up.
6    Q.   If you're worried about not being sued, why would you
7        put toddlers in the rear seat of your car where they
8        could be killed in an accident?
9    A.   Transport them to a safe location.
10   Q.   Well, your car wasn't a safe location for toddlers via
11       the State of Michigan law.
12           So, you were apparently willing to take that risk;
13       right?
14   A.   It's a better risk than leaving people on the side of
15       the road.
16   Q.   Well, she wanted to wait for her ride; remember?
17           Do you take into account the weather when you
18       decide whether to impound a vehicle or not?
19   A.   Whether to impound it?  No.
20   Q.   You don't take that into account?
21   A.   How does the weather affect the law?
22   Q.   I'm asking you.  I just wanted to know whether, before
23       you impound a car, you take into account the weather.
24   A.   No.  The weather has no -- no basis in the law and vice
25       versa.

Page 220

1    Q.   Well, that's not what you say in your -- your report.
2        You give, as one of the reasons you impounded the
3        vehicle, you say:
4            "I made the decision to impound
5        Wielichowski's vehicle for several reasons."
6        Reason 9 is:
7            "They would not be left exposed to the
8        elements except for a very short time.  It was
9        daylight, sunny and warm with no rain."
10   A.   Uh-huh.
11   Q.   So, obviously, you did think weather was a factor, and
12       you included it in one of the reasons that you were
13       impounding the vehicle; correct?
14   A.   That's -- that's taken out of context.  What that --
15   Q.   Okay.
16   A.   -- was to indicate is the fact that Ms. Wielichowski and
17       her children, from the time they walked to her
18       vehicle -- or from her vehicle to my patrol car weren't
19       going to be in any inclement weather.  So, I mean, that
20       way it shows that she had no objection to that.  It's
21       not like we're out in a hail storm.
22   Q.   Well, I'm sorry.  You're the one that put it under the
23       list of things of:
24            "I made the decision to impound
25        Wielichowski's vehicle for several reasons."

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 221–224

Page 221

1    "Number 9:  It was daylight, sunny and warm.
2    No rain."
3        You don't say it's because she could walk safely to
4    your car, but fine.  It says what it says.
5        You were subsequently disciplined by Chief Hayse,
6    suspended for three days.  And the explanation is that
7    you gave a verbal warning about a license plate cover on
8    the vehicle, yet you were able to run the license plate
9    prior to stopping the vehicle.
10       You've already covered that with me here today;
11   right?
12 A.  Correct.
13 Q.  You never gave her a ticket for the license plate cover.
14   You were, earlier --
15 A.  I'm a nice guy.  I give a lot of warnings.
16 Q.  Yeah.  As long as you can get that impound and take care
17   of your buddies over at Goch, good and good.
18       MR. WISE:  Object.  Argumentative.  Come on.
19       MS. GORDON:  His comment wasn't?
20 BY MS. GORDON:
21 Q.  By the way, you said you've got a buddy named Briscoe at
22   Goch?
23 A.  Yes.  He impounds vehicles for them.
24 Q.  You have --
25 A.  He's in charge of the Melvindale sector.

Page 222

1  Q.  You have his cell phone number, don't you?
2  A.  Yes.
3  Q.  And you contact him directly, don't you?
4  A.  Yes.
5  Q.  You don't go through whatever the towing number --
6  A.  He's assigned to be in Melvindale, so he stays in
7    Melvindale so it's easier to call him than to call their
8    dispatch and go through the prompts.
9  Q.  So, you and he have a thing worked out.  He stays close
10   to where you're going to be because he knows he's going
11   to get tows --
12 A.  He's --
13 Q.  -- and he's going to be able to make money; correct?
14       MR. WISE:  Object to form.  Foundation.  Assumes
15   facts not in evidence.
16       Go ahead.
17 BY MS. GORDON:
18 Q.  When is the last time you saw Briscoe?
19 A.  Mr. Briscoe is assigned to the Melvindale area whether
20   I'm working or not.
21 Q.  When -- when is the last time you saw him?
22 A.  Two days ago on a traffic stop.
23 Q.  Okay.  You're still making traffic stops?
24 A.  Yes.  On overtime.
25 Q.  How much money did you make all together last year at

Page 223

1    the City?
2        You gave me your base, but what did you get when
3    you include overtime?
4  A.  I don't have the exact figure offhand, but I believe it
5    was somewhere around $86.
6  Q.  So, you do your sergeant work on your normal schedule
7    and then you work overtime and do tows; correct?
8  A.  Well, we have different forms of overtime.  If there's
9    no other shift overtime available or supervisor overtime
10   available, then, yes, I do have the option of going out
11   and either doing traffic enforcement, or if you want to
12   come in at night when it's late, drunk driver
13   enforcement.
14 Q.  So, you saw him two days ago on a tow?
15 A.  Yes.
16 Q.  When is the last time you socialized with him?
17 A.  I'm not sure offhand.
18 Q.  Well, give me a rough idea.
19 A.  Socialize -- I mean, I talk with him when I see him.
20 Q.  Okay.  When is the last time you guys had a coffee or a
21   beer or whatever else you have?
22 A.  Went to his birthday party last year, I think, for maybe
23   20 minutes.  I had to work at 4:00 a.m. the next day, so
24   I just stopped up and bought him a beer and wished him a
25   good night.

Page 224

1  Q.  Was that the last time you saw him or not?
2  A.  Oh, no, I've seen him since then.  I mean I see him
3    frequently when I --
4  Q.  Socialized with him since then?
5  A.  That's probably the last time I -- well, no.  I'm sorry.
6        The Christmas party this year.
7  Q.  What was the Christmas party?
8  A.  It's to celebrate Christmas.
9  Q.  I know.  But a lot of people have parties.
10       Whose party was it?
11 A.  Goch & Sons.
12 Q.  And you knew exactly what I meant.  That was just being
13   a smart aleck.  But that's fine.  That's who you are.
14       So, where was the Christmas party at Goch & Sons?
15 A.  I believe it was at The Broadcast Booth in Allen Park.
16 Q.  Uh-huh.
17       And who all was invited?
18 A.  Well, I assume all the Goch employees.  I was invited.
19   I'm not sure who else was there.
20       I stopped up for a brief period after I went to our
21   City Christmas party on the same night.
22 Q.  Did you see anybody else from the City of Melvindale at
23   the Goch party?
24 A.  I believe the chief was there, but I'm not sure.
25 Q.  Did you -- is there an open bar at the Goch party?

Page 225

1  A.  I think they give you tokens or coupons.
2  Q.  I'm sorry?
3  A.  They give like tokens or whatever for all their
4      employees, but I didn't get any.  I bought my own beer
5      when I was there.
6  Q.  Oh, I'm sure you did.
7      And what's the name of the place?
8  A.  Broadcast Booth.
9  Q.  What was the date of the party?
10 A.  I don't know.
11 Q.  December?
12 A.  I presume.
13 Q.  2017?
14 A.  Yes.
15 Q.  Okay.  I'm going to hand you Bates stamp 4267.  This is
16     dated 7-8-15.
17     This is a tow tag.
18     (Discussion held off the record.)
19 BY MS. GORDON:
20 Q.  You say on the bottom:
21     "Subject reported to have purchased vehicle,
22     has parole absconder felony warrant."
23 A.  Uh-huh.
24 Q.  See that?  You didn't arrest him, did you?
25 A.  He wasn't there.  That's why I put that note on there.

Page 226

1  Q.  Did you go to the house and find out -- strike that.
2      What do you mean by "subject"?
3  A.  Subject, person.
4  Q.  Who?  Who is the subject in this?
5  A.  Whoever was reported to have bought the vehicle.
6  Q.  Okay.  Well, in the other documents, you've said
7      "vehicle owner."
8      What is the "subject" here?
9  A.  They're -- it's the same meaning, different terms.
10 Q.  Okay.  What does this mean?
11     "Subject reported to have purchased --"
12     What does that mean?
13 A.  Well, without my report, I don't have reference to it.
14     Do you have the report available for me?
15 Q.  No, not right now.
16 A.  Okay.
17 Q.  But what is -- is it your -- is that your writing on the
18     bottom?
19 A.  Yes, it is.
20 Q.  Okay.  Well, what does it mean when you say:
21     "Subject reported to have purchased
22     vehicle"?
23 A.  That means the person driving that vehicle, who was not
24     the subject, reported to me that somebody else owned the
25     vehicle, and whoever that person was apparently had a

Page 227

1      warrant.
2      So, I put it on there in case that person came to
3      the police department to redeem their vehicle.  The
4      officer at the desk would have notification, and we
5      could place that subject under arrest.
6  Q.  This says, "Verify ownership."
7      What did you mean by that?
8  A.  Well, the vehicle had no insurance, an improper plate,
9      and apparently it was cloudy as to actually who owned
10     it.  And so I put:
11     "Subject reported to --"
12 Q.  And who was the --
13 A.  (Reading.)
14     "-- have purchased the vehicle."
15     Because we weren't clear on that.
16 Q.  Okay.  So, we'll get the report and we'll see if this is
17     accurate.
18 A.  Okay.
19 Q.  Do you write reports on the vehicles you impound?
20 A.  Every single impound comes with a report.
21 Q.  Other than a tow tag?
22 A.  What?
23 Q.  Other than filling out the tow tag, do you write a
24     separate police department report?
25 A.  Yes.  I just stated that.

Page 228

1  Q.  Okay.  In your discipline of -- of April 25th, 2016, it
2      is stated you forcibly removed her, referring to the
3      same woman we've been talking about, using a transport
4      wrist lock and secured both of her wrists behind her
5      back.
6      Is that true?
7  A.  Correct.
8  Q.  It says:
9      "While forcing her over the hood of the
10     vehicle."
11     Is that true?
12 A.  I'd have to review my report.
13 Q.  Did you place the driver under arrest?
14     I guess when you -- once you handcuff somebody,
15     they're under arrest; is that correct?
16 A.  You can also handcuff to detain for officer safety.
17 Q.  Okay.  Well, was this person under arrest?
18 A.  I don't recall.
19 Q.  Well, how would I know?
20 A.  You'd have to check the report.  I don't have it in
21     front of me.
22 Q.  Okay.  I'm going to hand you your report and you're
23     going to tell me whether you detained her or you
24     arrested her.
25     This is Bates stamp 1457 through 1465.

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 229–232

Page 229

```
 1              (Discussion held off the record.)
 2   A.   Okay.
 3   BY MS. GORDON:
 4   Q.   Was she arrested?
 5   A.   Well, I don't recall.
 6   Q.   Well, you wanted your report so you could answer my
 7        question.
 8   A.   Uh-huh.
 9   Q.   You now have your report.
10             What's the answer?
11   A.   Well --
12   Q.   It doesn't say in your report?
13   A.   It doesn't clarify whether she's detained or arrested.
14   Q.   Oh, okay.
15             Well, if you handcuff somebody, is that, under the
16        law, considered an arrest?
17   A.   Or it can be a detainment.
18   Q.   I didn't know you could detain somebody with handcuffs.
19             What -- what law are you relying on for that?
20   A.   We do that frequently, oftentimes, until we've
21        identified somebody if they have no identification or if
22        somebody's violent, if there's weapons at a scene.
23        There's a lot of situations we will handcuff everybody,
24        make sure everything is secured, nobody is any danger,
25        and then go from there.
```

Page 230

```
 1   Q.   Anyway, you were disciplined for -- I'm sorry.  That's
 2        not right.
 3             Okay.  This discipline to you states you placed the
 4        driver under arrest.
 5             Did you write back and say:
 6             "That's incorrect.  I did not place her
 7             under arrest"?
 8   A.   No.
 9   Q.   And then it also states you failed to report the arrest
10        to your supervisor.
11             So, I'll stop right there.
12             Are you required to report to the desk arrests that
13        you made?
14   A.   The entire incident was documented in the police report.
15   Q.   I didn't ask you that.
16             I said, are you required to report arrests at the
17        time they occur to your supervisor?
18   A.   I'm not sure.
19   Q.   Your report states you did not process the prisoner but
20        instead released her with a citation for no insurance.
21             Is that correct?
22   A.   Yes.
23   Q.   The chief states:
24             "In my opinion, it was not necessary to
25             remove the woman from the vehicle instead of
```

Page 231

```
 1        allowing her to complete her telephone call."
 2             Did you write anything responding to that
 3        particular item?
 4   A.   I don't recall.
 5   Q.   Are you aware that Ms. Wielichowski later came to the
 6        police station and complained to Lieutenant Welch that
 7        you had assaulted her in front of her children?
 8   A.   Yes.
 9   Q.   And that she stated she did not want to remove her
10        children from the vehicle because the traffic stop was
11        conducted on Schaefer, and that she was forced out of
12        the vehicle and onto the ground and then over the hood
13        of the vehicle she was driving.
14             Are you aware that that's what she said?
15   A.   I don't recall her exact wording.
16   Q.   The chief cites a case called "People versus Gonzales,"
17        356 Mich 247, saying -- it states that an arrest is the
18        taking, seizing, or detaining of another person by
19        either touching or putting hands on that person, or by
20        any act that indicates an intention to take him or her
21        into custody.
22             Do you disagree with that?
23   A.   No.
24   Q.   Then the chief says you arrested the driver and failed
25        to follow the listed rules and regulations of the
```

Page 232

```
 1   Melvindale Police Department as adopted by the Public
 2   Safety Commission.
 3             "Number 4:  Handcuffs the prisoner.
 4             Number 5:  Search the prisoner.
 5             Number 6:  Transport prisoner to police
 6             station."
 7             The next section:
 8             "Processing prisoner."
 9             Section 8, "Detention of Prisoner."
10             You didn't do any of that, did you?
11   A.   No, because she had her kids with her.
12   Q.   So, you used your discretion there?
13   A.   Yes.
14   Q.   Because she had her kids with her?
15   A.   Correct.
16   Q.   Because of the age of the children; correct?
17   A.   Because they were children.
18   Q.   Right.
19             So, you used your assessment of the age of the
20        children to decide not to take arrest action?
21   A.   Correct.
22   Q.   Okay.  I'll hand you Bates stamp 1447.  This is the item
23        you're referring to where you see -- say the chief is
24        discriminating against people and treating them
25        differently.
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 233

1       Is that the document you're referring to?
2   A.  That is a document referring to that.  Correct.
3   Q.  Okay.  So, you're saying it's incorrect to call into the
4       station the driver gender and age?  Is that what you're
5       saying?
6   A.  Yes, absolutely.
7   Q.  Okay.  Is there some law, that says you cannot call in
8       the gender and age, that you know of?
9   A.  There's no law that makes exemptions based upon
10      someone's gender or age.
11  Q.  I didn't ask you about exceptions.
12      I asked you whether there's any law that says you
13      cannot call in to a police desk the gender and age of
14      the person being stopped.
15      That has been stopped.
16      Do you know of any such law?
17  A.  This refers to when I request a tow truck, I have to
18      provide that information and then the desk officer would
19      determine whether that was allowed to be impounded or
20      not.
21  Q.  Right.
22      So, I wanted to know whether there's any law that
23      you know of that says a person -- it's illegal to call
24      in the gender and age of a person who is now in some
25      kind of custody or detention?

Page 234

1   A.  I don't know what that is offhand.
2   Q.  You don't know what what is?
3   A.  What -- what a law would be offhand.
4   Q.  Okay.  And, in fact, you, yourself, have -- just a
5       moment ago -- told me that you took into account the age
6       of the children when you made a decision not to arrest
7       Ms. Wielichowski; correct?
8   A.  It wasn't the age of the children.  It was the fact that
9       she had children with her, and we wouldn't have anything
10      else to do with them while she was in jail.
11  Q.  Okay.  So, that -- so, that would be the age of people,
12      just like here, the driver gender and age, and their
13      ages -- the occupants of -- the number of occupants and
14      their -- their ages; correct?
15      That's the same thing.
16  A.  Well, I wouldn't base my actions of -- of the age on
17      the driver, the gender of the driver or any other
18      criteria.
19  Q.  Okay.
20  A.  They're the person violating the law.
21  Q.  It's not that they're just -- I guess you would -- I'll
22      ask you this:  Did you grasp the point here, it's not
23      the driver who is being treated differently because of
24      gender or race; it's you, sir.
25  A.  Uh --

Page 235

1   Q.  You don't -- don't interrupt me.
2       It's you.  It's because you failed to use
3       discretion and you put people in harm's way, and
4       sometimes they're old and sometimes they're very young
5       and sometimes they're frail, and you had been counseled
6       about it.
7       So, it's not that anybody wants to harm a driver by
8       making a decision.  They want you to be checked because
9       you're out of control.
10  A.  I --
11  Q.  Did you ever look at this that way?
12  A.  I --
13      MR. WISE:  Object to form.  Foundation.
14      I mean, do you -- we can swear you in over there at
15      this point.
16  BY MS. GORDON:
17  Q.  Did you look at this that way?  Did you not grasp that
18      that was the point of this memo?
19  A.  Absolutely not.  And I --
20  Q.  Okay.  Well, who did you --
21  A.  -- disagree 100 percent.
22      THE REPORTER:  Excuse me?
23  BY MS. GORDON:
24  Q.  Who did you understand was going to be discriminated
25      against --

Page 236

1       THE REPORTER:  I'm sorry.  Your answer?
2   A.  Absolutely not.  I disagree 100 percent.
3   BY MS. GORDON:
4   Q.  Oh, I'm sure you do.
5       Okay.  Well, I want to know then, since you can't
6       discriminate, who was -- who would be discriminated here
7       in your world?
8       Since it doesn't say that you can't tow people that
9       are black or white or young or old, who was being
10      discriminated against in your theory that you and the
11      City have cooked up as some kind of a weird rationale in
12      this case?
13  A.  Well, I think a lot of people are being discriminated
14      against.
15  Q.  Like who?
16  A.  Well, in one example, I was going to tow a car, and I
17      sent the vehicle information in to dispatch, requested a
18      tow truck, and I provided the gender and the age.  And
19      the sergeant who was then on desk then requested the
20      race of the driver.  I informed him the driver was
21      black, and he then advised me he would send a tow truck.
22  Q.  Okay.  Well, this memo doesn't -- was -- who were
23      you talking to?
24  A.  Sergeant Detrich.
25  Q.  Okay.  Well, this has nothing to do with my client

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 237

| | |
|---|---|
| 1 | because race isn't on here, is it? |
| 2 A. | The sergeants were under verbal and written orders from |
| 3 | Mr. Hayse to not only -- to only send me a tow truck if |
| 4 | the criteria was met. |
| 5 Q. | Okay. Well, race isn't on here, so -- |
| 6 A. | It was verbally -- |
| 7 Q. | Hang on. |
| 8 A. | -- advised to me -- |
| 9 Q. | Oh, I'm sure. I'm sure it was. |
| 10 A. | -- numerous times. |
| 11 | I was -- yeah. |
| 12 Q. | Really? |
| 13 | I'm looking at 1447, which is the order you're |
| 14 | hanging your hat on here. |
| 15 | So, you would have called -- you would have called |
| 16 | a tow truck on anybody; correct? |
| 17 | You didn't want to have to call in the African |
| 18 | American guy? You would have called the tow truck on |
| 19 | him right away; right? |
| 20 A. | I would have called a tow truck for any vehicle that |
| 21 | needed to be impounded in accordance with the law. |
| 22 Q. | Okay. And how old was guy at issue? |
| 23 A. | Well, I can't recall now. I write thousands of tickets. |
| 24 | I impound hundreds of cars. |
| 25 Q. | Okay. |

Page 238

| | |
|---|---|
| 1 A. | The age of a man from a specific event, I have no idea. |
| 2 Q. | Listen. |
| 3 | Are there any black officers at the Melvindale |
| 4 | P.D.? |
| 5 A. | No. |
| 6 Q. | Have there ever been? |
| 7 A. | I have no idea. |
| 8 Q. | Uh-huh. |
| 9 A. | I've been there for six years. |
| 10 Q. | What's the percentage -- what's the percentage of the |
| 11 | African American community in the City of Melvindale? |
| 12 A. | I don't know. |
| 13 Q. | You're -- you're a patrol officer there and you don't |
| 14 | have any feel for the -- |
| 15 A. | I don't have exact percentages. |
| 16 Q. | You've got to let me finish. |
| 17 | You don't have any feel for the demographics of |
| 18 | your community? |
| 19 A. | Percentage-wise. You asked me for a percentage. |
| 20 | I do not have a percentage for you. |
| 21 Q. | Do you have a rough idea? |
| 22 A. | I'm not going to guess or speculate, and I do not have a |
| 23 | percentage for you. |
| 24 Q. | So, black and Hispanic, it appears, is about 30 percent |
| 25 | of your community. |

Page 239

| | |
|---|---|
| 1 | Does that sound right to you? |
| 2 | MR. WISE: Foundation. |
| 3 | Go ahead. |
| 4 A. | I'm not sure. |
| 5 BY MS. GORDON: |
| 6 Q. | You're not sure about that? You're not sure if that |
| 7 | sounds right? |
| 8 A. | I -- again, I don't have percentages, ma'am. |
| 9 Q. | I didn't ask you. I said, you know, 30 percent is about |
| 10 | a third. You're on those highways and byways every day, |
| 11 | dealing with drivers. |
| 12 A. | Uh-huh. |
| 13 Q. | Does that sound about right to you? |
| 14 | MR. WISE: Asked and answered. Foundation. |
| 15 | Go ahead. |
| 16 A. | I don't know. |
| 17 BY MS. GORDON: |
| 18 Q. | Okay. A man named Richard Crosslin filed a complaint |
| 19 | against you with regard to excessive force; is that |
| 20 | correct? In July of 2016? |
| 21 A. | I don't recall offhand. I'd have to see a copy of that. |
| 22 Q. | Do you get a lot of excessive force charges filed |
| 23 | against you? |
| 24 A. | Well, I write thousands of tickets. I make hundreds of |
| 25 | arrests, impound thousands of cars and I -- |

Page 240

| | |
|---|---|
| 1 Q. | I didn't ask you that. |
| 2 A. | I'd say my complaint ratio is very, very low. |
| 3 Q. | I just asked you, what's your complaint ratio? |
| 4 | (Discussion held off the record.) |
| 5 BY MS. GORDON: |
| 6 Q. | What do you mean your "complaint ratio"? |
| 7 | What's a complaint ratio? |
| 8 A. | Well, let's say I impound 100 cars, and I get one |
| 9 | complaint. I guess that would be 1 percent complaint. |
| 10 | I -- |
| 11 Q. | Well, does somebody keep those -- that data somewhere in |
| 12 | the City? |
| 13 A. | I don't know. |
| 14 Q. | Well, why did you use the term "complaint ratio"? |
| 15 | What did you mean by that? |
| 16 A. | Well, you're asking me if I get a lot of complaints, and |
| 17 | I'm thinking, compared to the amount of work I do, I |
| 18 | don't know. I imagine it would be very, very low in |
| 19 | comparison to my work activities. |
| 20 Q. | Okay. So, there is no such thing called a "complaint |
| 21 | ratio"? |
| 22 A. | I have no idea if it's a technical term. |
| 23 Q. | Okay. And you work the same number of hours that |
| 24 | everybody else works around there, don't you? |
| 25 A. | No. |

FURMAN, SERGEANT MATTHEW
03/13/2018                                                          Pages 241–244

Page 241

1   Q.   You work more hours?
2   A.   I do work more hours.
3            I think I work a lot more hours than a lot of
4        people.
5   Q.   You have a good time out there, huh?
6   A.   I enjoy my job.
7   Q.   I see.
8   A.   If I didn't, I would have become a fireman or something
9        else.
10  Q.   I see.
11  A.   But I chose to become a police officer because I believe
12       in -- in what I do for a living --
13  Q.   Uh-huh.
14  A.   -- which is upholding the law and having standards so
15       society doesn't fall apart.
16  Q.   I see.
17           Well, those standards don't include arresting
18       people that have court orders out for them, but okay.
19           (Discussion held off the record.)
20  BY MS. GORDON:
21  Q.   Okay.  Richard Crosslin, G-r-o-s-s-l-i-n(sic), you've
22       put a response in writing to the excessive force
23       complaint.
24           Would you have been asked to do that, do you think,
25       or you just wanted to do it?

Page 242

1            (Discussion held off the record.)
2   BY MS. GORDON:
3   Q.   Would you have done that on your own or no?
4   A.   I don't recall, ma'am.  I don't recall the circumstances
5        or the name offhand.
6   Q.   Do you remember that Brandon Nolin raised concerns about
7        you abusing a prisoner, an arrestee?
8   A.   I have -- I did not receive a complaint or any copy of
9        any paperwork in regards to that.
10  Q.   Do you know Brandon Nolin?
11  A.   I do.  We work together.
12           He's actually extremely good friends with
13       Mr. Hayse.  He just got back from vacation out of state
14       together.  They were having dinner together the other
15       night.
16  Q.   You know, I really appreciate you giving me your two
17       cents' worth on why, once again, you've done nothing
18       wrong, and this is all a setup, but I would just
19       appreciate if you would answer my question.
20  A.   I believe I just did.
21  Q.   No, you didn't.
22           MR. WISE:  Well, in fairness, we'd appreciate
23       not so much commentary between his answers that
24       you've -- essentially testifying and not asking him
25       questions.  So, I mean --

Page 243

1            MS. GORDON:  Well, you know what?  So be it.
2            MR. WISE:  I mean, if you want to -- you know --
3            MS. GORDON:  So be it.
4   BY MS. GORDON:
5   Q.   How do you know Brandon Nolin?
6   A.   We work together.
7   Q.   Okay.  And how long have you worked together?
8   A.   Six years.  He started about two weeks after I did.
9   Q.   Is he a good police officer?
10  A.   I don't know.  He spent very little time on the road
11       patrol before Mr. Hayse gave him a spot in the detective
12       bureau that's generally reserved for a much more senior
13       officer.
14  Q.   So, you don't approve of him?  He's other person you
15       don't approve of?
16  A.   I didn't say that.  I said I don't know if he's a good
17       officer.  He doesn't work -- doesn't really work the
18       road.
19  Q.   Well, no, no, no.  You just said he shouldn't have been
20       given the spot he was given by the chief because there's
21       so many other more qualified people, didn't you?
22           (Discussion held off the record.)
23           MR. WISE:  Objection.
24           MS. GORDON:  Larry, you've got to stop talking out
25       loud.

Page 244

1   BY MS. GORDON:
2   Q.   Go ahead.
3            Isn't that what you just said?
4            MS. GORDON:  Would you read back --
5   A.   That's not what I -- that's not what I stated.
6   BY MS. GORDON:
7   Q.   All right.  Let's hang on.
8            MS. GORDON:  Would you read back the record, John?
9   A.   You asked me a question and you interrupt me when I
10       answer you.
11           MS. GORDON:  Let's listen to your answer.
12           THE REPORTER:  One second, please.
13           (Record repeated by the reporter.)
14  BY MS. GORDON:
15  Q.   Uh-huh.
16  A.   Uh-huh.
17  Q.   So, you didn't approve of that.  You thought a more
18       senior officer should have gotten that spot; is that
19       right?
20  A.   I didn't state that.  You asked if I thought he was a
21       good officer.  I said I don't know.  I've worked with
22       him very little on the road because he hasn't been on
23       the road.
24  Q.   Yeah.  And then you gratuitously added that he got a
25       spot in the detective something --

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 245–248

Page 245

1   A.   Would you like me to give partial answers or full
2        answers when you ask me a question?
3   Q.   Now, you're interrupting me.
4   A.   Oh.
5   Q.   Yeah.
6   A.   You do that to me frequently, it seems.
7            MR. WISE:  Stop.  Stop.  Just --
8   BY MS. GORDON:
9   Q.   Okay.  So, now you gratuitously added that he got a spot
10       that should have been given to somebody else.
11           So, you're being critical, obviously, of Brandon
12       Nolin's skill set, and you're also being critical of
13       Chief Hayse for giving him the spot in that answer;
14       correct?
15           And the question was simply, "How do you know him?"
16       And yet you decided to, once again, let me know how much
17       you don't approve of certain people in the department;
18       correct?
19           MR. WISE:  Object to form.  Mischaracterizes the
20       testimony.
21           Go ahead.
22   A.   I don't believe it was that question.  There was that
23       question and you followed up with another question which
24       I responded to.
25   BY MS. GORDON:

Page 246

1   Q.   Uh-huh.  No.
2   A.   There were two questions there.
3   Q.   Nope.  All I wanted to know was how you knew him.
4   A.   You asked me that --
5   Q.   And you --
6   A.   -- and then you asked me another question, which was
7        what I think of his job performance or time on the
8        patrol, whatever it was.  There were two questions
9        asked.
10  Q.   Okay.  What is Brandon Nolin's job today?
11  A.   He is a corporal.  He's assigned to midnight shift.
12       And, as far as I know, he's going to be going into a
13       undercover unit shortly.
14  Q.   And what about then Chief Allen?  What did you think
15       about him when he was a lieutenant?
16  A.   I like him.  He does a good job.  He's fair, honest --
17  Q.   Okay.
18  A.   -- for the most part, as far as I know.  Hardworking,
19       very effective police chief.
20  Q.   So, after your incident with this particular prisoner,
21       Welch and Allen went to the location where you were.  It
22       was a backyard, and there was a suspect face down with
23       no shirt and handcuffed behind his back.  There was a
24       pile of puke next to the suspect.
25           You told Nolin the puke is from the suspect.

Page 247

1        Also on the scene was Hinojosa.
2        Allen and Nolin then observed you walk the suspect
3   approximately two or three houses down to where your
4   patrol car was parked in the street.  You opened the
5   rear passenger side door and pushed the suspect towards
6   the car from approximately 3 feet away from the vehicle.
7        Nolin observed and heard the suspect's head hit
8   what appeared to be the door frame of the patrol car.
9   Nolin was going to remove you from the situation;
10  however, the incident was over and the suspect got into
11  the car.
12       Then, after that occurred, Allen asked Nolin, "Did
13  you observe the suspect's head hit the car?"
14       Nolin said, "Yes," and he observed -- notified
15  Allen of what he observed.
16       Does any of that sound familiar to you?
17  A.   I don't -- was not privy to their conversations.
18  Q.   I didn't ask you that.
19       I said does any of this sound familiar?
20  A.   I have my perspective on it.  I was there.
21  Q.   Does the -- so, the incident does sound familiar?
22  A.   Well, I believe you said Welch went to the location
23       earlier on.
24           I don't think Welch was at that location at all.  I
25       think he was in the station the entire time of the

Page 248

1   incident.
2   Q.   Okay.  I wanted to know whether this incident sounded
3        familiar.
4   A.   Yes.  The suspect --
5   Q.   If I said Welch was there, I was wrong.  It would have
6        been Nolin and Allen.  I misspoke if I said Welch.
7   A.   Okay.  You did.
8            The suspect pulled away from me.  I was parked a
9        good distance down the street from them.  And, yes, he
10       struck his head on the vehicle.
11  Q.   And did you throw him into the car from 3 feet away?
12  A.   He was pulling away from me.  I had a hard time getting
13       him in the vehicle to begin with.  He had just led us on
14       a foot pursuit, bicycle pursuit.  He had beaten assaulted
15       by residents prior to my arrival there.  As a matter of
16       fact, I probably saved the guy's life when I went in the
17       backyard as a resident had picked up a brick and began
18       screaming he was going to killing him.
19  Q.   I'm sure you did.
20  A.   So --
21  Q.   Because everything you do, whether it's arrest somebody
22       or not arrest them, you're all in and it's all great.
23           (Discussion held off the record.)
24  A.   I do my best, ma'am.
25  BY MS. GORDON:

Page 249

1  Q.  Maybe.
2      Okay.
3  A.  It is good to be appreciated.  Thank you.
4      MR. COOGAN:  I'm sorry.
5      Can we -- can I have just a minute -- we have just
6  a minute?
7      MS. GORDON:  No.  We just took a minute.
8      I'd like to finish the dep, Larry.  If you want to
9  step out, we don't need you.  Go.  Go with the wind.
10  A.  I have to pee.  I'm going to use the restroom.
11      MS. GORDON:  We just peed, men.
12  A.  I have high metabolism.
13      MS. GORDON:  Well, the men are running out to pee
14  continually.
15      (Discussion held off the record.)
16      MS. GORDON:  Can I just finish this dep?  Give me a
17  few more --
18      MR. WISE:  How much do you have?
19      Just a minute --
20      MS. GORDON:  All right.  The problem is --
21      MR. WISE:  If you have more than a like half
22  hour --
23      MS. GORDON:  -- the last time -- the last time you
24  said you wanted to step out and use the men's room, you
25  said --

Page 250

1      MR. WISE:  I'm not even going to leave.
2      MS. GORDON:  Fair enough.
3      You said "2 minutes."
4      I think 20 minutes went by before you three got
5  back in, four.
6      MR. WISE:  I don't know if that's fair, but --
7      MS. GORDON:  You four.
8  A.  Yeah.
9      MS. GORDON:  Okay.  Do we --
10      MR. WISE:  Well, you said we don't need these two
11  anyway, so don't worry about it.
12      MS. GORDON:  Can we really just make this really
13  fast.  I'd like to finish this.
14      MR. WISE:  Absolutely.  Absolutely.
15      (Short recess at 4:10 p.m.)
16         *  *  *
17      (Record resumed at 4:13 p.m.)
18      MS. GORDON:  Okay.  Back on the record.
19  BY MS. GORDON:
20  Q.  We were talking about this incident involving Lieutenant
21  Allen that Officer Nolin put into writing, and
22  apparently you do recall it, and we were talking about
23  whether you threw this guy into the car from 3 feet
24  away, and I don't recall what you said on that.
25  A.  Yeah.

Page 251

1      As a matter of fact, in clarifying this incident,
2  apparently Michigan State Police had done a complete
3  investigation and exonerated me, as I was advised by
4  now-Chief Allen.  No charges to be filed, and they found
5  I had no wrongdoing.
6  Q.  Can you answer my question?
7  A.  You were asking --
8  Q.  Did you throw him into the car from 3 feet away?
9  A.  No.  He struggled with me, and I had to force him into
10  the car.  Now, he was not happy to be arrested.  He had
11  just led us on at least a half-an-hour pursuit.
12  Q.  So, Nolin and Allen were wrong when they said you threw
13  him into the car -- they saw you throw him into the car
14  from 3 feet away?
15  A.  They were not standing 3 feet away from me.  They were
16  standing down the block.
17  Q.  I didn't say they were.
18  A.  I don't know what their vantage point appeared, but from
19  actually physically struggling with him, I know what
20  happened.
21  Q.  How did the man's head get injured?
22  A.  He was bouncing around and struck it on the vehicle
23  after I opened the door.
24  Q.  No.
25      Okay.  Wait a minute.

Page 252

1      His head was struck on the outside of the vehicle
2  before he got in.
3      How did that happen?
4  A.  No, that's not correct.  The door was open and he struck
5  it as he was getting in the vehicle on the -- I guess
6  the header, like the part over the door when the door is
7  open.
8  Q.  So, on his own, he just managed to strike his head
9  without you shoving him --
10  A.  I was trying --
11  Q.  Hang on.
12      Without you shoving him into the door, he just, on
13  his own, managed to injure his head and -- and get a cut
14  that need to be photographed?
15  A.  Well, he was --
16  Q.  Is that your testimony?  That was just his own doing?
17      MR. WISE:  Form.  Foundation.
18      Go ahead.
19  A.  The subject was high on drugs at the time, just led us
20  on pursuit --
21  BY MS. GORDON:
22  Q.  You know what?
23  A.  -- all amped up, and he was struggling with me
24  physically.  As I tried to get him in the vehicle, he
25  was bouncing around trying not to go in the vehicle, and

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 253–256

Page 253

1    he injured himself in the process.  Unfortunately, that
2    does happen.
3         Again, Michigan State Police did investigate that
4    and determined no charges to be filed --
5  Q.  Did you see the --
6  A.  -- and completely exonerated me.
7  Q.  Did you see the investigation report?
8  A.  No.  I was advised by Lieutenant Allen.
9  Q.  When was that?  When were you advised by Lieutenant
10   Allen?
11 A.  Last year.  He was chief at the time.  Chief or interim
12   chief.
13        (Discussion held off the record.)
14 BY MS. GORDON:
15 Q.  Did -- were you ever investigated by the Michigan State
16   Police?
17 A.  Yes.
18 Q.  Did you give a statement to the Michigan State Police?
19 A.  No.
20 Q.  Well, then, what do you mean you were investigated?  How
21   do you know you were investigated if you weren't asked
22   to give a statement?
23 A.  Well, Mr. Hayse had advised that it was both an internal
24   and external investigation being conducted.  I had never
25   seen a copy of either one.  Michigan State Police, from

Page 254

1    what I was told by other officers, came out and
2    interview them at the police station, interviewed
3    residents in the area, et cetera.
4         And then per Chief Allen, they found me exonerated
5    and that no charges would be filed.
6  Q.  Okay.  Well, who --
7  A.  But I have never seen a copy of anything, and I -- I've
8    requested one and never been provided with that.
9         (Discussion held off the record.)
10 BY MS. GORDON:
11 Q.  Okay.  So, you don't know this, but you've now been sued
12   by Mr. McClintock.
13 A.  Yes, I've never seen that.
14 Q.  Okay.
15 A.  Well, I know -- today apparently.  But, no, I had no
16   knowledge of that.
17 Q.  You -- yeah.  You know -- you've learned about it today?
18 A.  I never -- I've never been served, no.
19 Q.  Okay.  I just wanted to know who the police officers
20   were that the Michigan State Police came out and
21   interviewed about this.
22        You mentioned that some police officers were
23   interviewed.
24        Who were they?
25 A.  Correct.  That's what I was told.

Page 255

1  Q.  Who -- who would have been interviewed as far as you
2    understood it?
3  A.  Lieutenant Welch, Mr. Hayse, Mr. Nolin.
4  Q.  Are you guessing, or is this what you were told?
5  A.  These are what I was told --
6  Q.  Okay.  Go ahead.
7  A.  -- by another officer.
8  Q.  Go ahead.
9  A.  But I don't know.  I was not in the station at the time,
10   but apparently they were there, and I had no -- no
11   interaction with them.
12        MS. GORDON:  Excuse me.
13        (Discussion held off the record.)
14 BY MS. GORDON:
15 Q.  Who are your good friends in the department, other
16   officers?
17 A.  I try to stay on a more acquaintance level than friend
18   level at work.  I don't like to mix my personal and
19   professional life.  But I get along pretty well with
20   most guys there.
21 Q.  I mean, do you have somebody that you consider a friend
22   that you do stuff with?
23 A.  There's been officers I've been out with in the past,
24   out to the bar or out to -- well, City Christmas party
25   or things like that, but not -- not really.  Most of my

Page 256

1    friends are not police officers or they're police
2    officers for other cities.
3  Q.  So, there's nobody in the Melvindale P.D. that you would
4    say is a friend?
5  A.  I'm on friendly terms with a lot of people, Facebook
6    friends.
7  Q.  I -- I don't -- okay.  That's --
8  A.  As far as a good friend, I mean, some guys I get along
9    with very well and consider friends.
10 Q.  Who are those?
11 A.  Well, probably Officer Browning, Officer Brna.  Officer
12   Cooper and I get along very well.  Officer Gall and I.
13   Officer Blunden and I.  Officer Kennaley and I.
14 Q.  When did you talk to Larry Coogan from the City about --
15   about Chad Hayse?
16 A.  Well, I believe the first time was probably during the
17   Snowgate incident, when I was required to go down there
18   and speak with Mr. Coogan.
19 Q.  And who was present for that?  The two of you?
20 A.  My POAM lawyer -- or attorney.
21 Q.  Okay.  And what did you talk about there?
22 A.  Representative.  I'm not sure exactly what he does.
23        Well, they questioned about the -- the snow
24   emergency tickets, how much snow was on the ground, who
25   ordered to write -- who ordered you to write them.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 257–260

1   Everything -- basically everything we knew about the
2   Snowgate incident.
3   Q.   Okay.  And what did --
4   A.   That was really my first --
5   Q.   -- you talk to Mr. Coogan about?
6   A.   Well, I just answered his questions in regards to that
7        stuff.
8   Q.   Okay.  So, what is the next time you would have talked
9        to him about the chief?
10  A.   Well, I see him at -- at court --
11  Q.   At -- the chief.
12  A.   The chief.
13            Probably when I was suspended.
14  Q.   Okay.  And what was that discussion about?
15            You felt it was unfair?  Something to that effect?
16        Improper?
17  A.   Well, there was no reason -- there was no reason to ever
18        provide it to me or my union in regards to the
19        suspension.
20  Q.   So, you talked to him directly about that?
21  A.   I did end up talking to Mr. Coogan and -- and --
22  Q.   To his office or --
23  A.   Well, I first spoke with Councilwoman Barnes, and I then
24        spoke with Carl Louvet, another councilman.  I don't
25        remember if I went to Mr. Coogan's office or if I called

1        him or --
2   Q.   Okay.
3   A.   I don't recall.
4   Q.   Okay.  But this was after the suspension or not?
5   A.   During the suspension.  So, I suspended, and the time I
6        was off --
7   Q.   Okay.
8   A.   -- is when I started reaching out to the City.
9   Q.   Okay.  And what did you tell Mr. Coogan?
10  A.   That I was suspended and had no idea why.
11  Q.   And what did he say?
12  A.   He also had no idea why and was unable to find out for
13        me.
14  Q.   Okay.  Well, did you tell him about the whole back story
15        to the write-up?
16            In other words, what was put in writing?
17  A.   I received nothing in writing.  I didn't sign anything.
18        There were actually no protocols for our disciplinary
19        procedure followed.
20  Q.   Well, your -- you do have a suspension in writing --
21        it's -- it's -- it's a two-page document -- laying out
22        the reasons you were suspended.
23  A.   I -- I didn't receive anything.  I received nothing from
24        Mr. Hayse, and I signed nothing --
25  Q.   Go ahead.  I'm listening.

1            And you signed nothing?
2   A.   At the time that I was suspended, no.  It was --
3   Q.   No, not -- not -- I'm not asking whether you signed
4        something.  I'm just asking you whether you received the
5        document with regard to the suspension.
6   A.   Are you referring to the day I was suspended?
7   Q.   Yeah.
8   A.   Yeah, I received nothing.  I was called in -- Mr. Hayse
9        was in the building.  He left, and moments after he left
10        Lieutenant Welch called me in to Hayse's office and told
11        me that, per Hayse, I was suspended effective
12        immediately.
13  Q.   Okay.  But my --
14  A.   And he was unable to tell me why.
15  Q.   When you talked to Larry Coogan, he's like, "I don't
16        know either."
17            Did you say to him, "Well, the back story is that I
18        impounded a car and that there was a citizen complaint,
19        and that I had been warned before and --" did you tell
20        him any of that?
21            MR. WISE:  Just object to form.
22            Go ahead.
23  A.   I don't recall our conversation.  I was just trying to
24        find out why I was suspended because nobody knew.
25  BY MS. GORDON:

1   Q.   Okay.
2   A.   And I was suspended indefinitely.
3   Q.   You were suspended indefinitely?
4   A.   Yes.
5   Q.   And how long did the suspension end up being?
6   A.   Between paid and unpaid, it was approximately five
7        weeks.
8   Q.   And how much was unpaid?
9   A.   I don't recall exactly.  About the last third of it, I'm
10        guessing, but I'm not sure.
11  Q.   So, how much actual unpaid time off did you get?
12  A.   I don't recall.
13  Q.   Which year is this, the suspension that you're talking
14        about?  What was the event?
15  A.   2016.
16            I don't know what the event was.  I was just
17        suspended with no cause provided.
18  Q.   Okay.  Well, you said you didn't get anything in
19        writing.
20            I'm going to hand you Bates stamp 1440.
21  A.   Are we referring to the same incident?
22  Q.   I don't know.  You didn't identify what the incident was
23        you went to Mr. Coogan about.  You said, "I contacted
24        him and said, 'I don't know why I was suspended.'"
25  A.   Okay.  We're talking about two different incidents.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 261

1  Q.  Okay.  Why don't you tell me -- all right.
2       So, I've just handed you Bates stamp 1440.  This is
3  a suspension dated April 25, which is a page-and-a-half
4  document, correct, giving you the reasons?
5  A.  Correct.  Let me --
6  Q.  Okay.
7  A.  Let me take a read here.
8  Q.  All right.
9       MR. COOGAN:  Are we off the record?
10      MS. GORDON:  No, we're not off the record.  We're
11  on the record.
12  A.  And I believe this letter is not correct.  I believe
13  this was changed -- this was changed from a three-day
14  suspension to he took three of my vacation days away
15  instead.
16  BY MS. GORDON:
17  Q.  I think that's right.
18      But in any event, this document was produced to me
19  by the City.
20  A.  Okay.
21  Q.  But I take your point.  I don't think you lost any time.
22  You might have lost vacation days on the document dated
23  April 25th, 2016.
24  A.  I --
25  Q.  Now, why don't you tell me what you called Mr. Coogan

Page 262

1  about then if this is not a suspension.
2  A.  This -- this was not what I called Mr. Coogan about.
3  Q.  Okay.  So, what did you --
4  A.  We're talking about different issues.
5  Q.  Okay.  Well, you go ahead and fill me in then.
6  A.  Okay.
7  Q.  What -- what did you call him about?
8      I'll take that back.  We're on a different
9  incident.
10  A.  Okay.  Because that's -- that's -- yeah.
11  Q.  Yeah.
12  A.  Okay.
13  Q.  Go ahead.
14  A.  All right.  So, when I called Mr. Coogan, along with
15  Councilwoman Barnes and -- Councilwoman Barnes and
16  Councilman Louvet, that was in regards to when I was
17  suspended in 2016.
18  Q.  For what?
19  A.  I don't know.  That reason was never provided to me.
20  There was no documentation.  That was the issue.  There
21  was no reason for the suspension and no paperwork
22  completed or done, no chain of command followed.  And to
23  this day, there's no documentation as to why I was
24  suspended for five weeks.
25  Q.  Well, was it around an incident?

Page 263

1  A.  I was not given any information.
2  Q.  Okay.  So, you call Mr. Coogan.  He says, "I don't
3  know."  And what is -- then what happens with you and
4  Mr. Coogan?
5  A.  Well, I believe he contacted the -- I mean, I don't want
6  to speak for him, but I believe he contacted --
7  Q.  Well, just what you learned.  What you learned --
8  subsequently learned may have happened.
9  A.  Well, he ended up being in contact with my union
10  representative because we have our Local union, and then
11  we belong to Police Officers Association of Michigan,
12  which is a much bigger outfit, and they send a lawyer --
13  Q.  Right.
14  A.  -- and a representative out to talk to me to figure out
15  what the heck was going on.  They tried talking to
16  Mr. Hayse and didn't get any response or information,
17  and then they talked to Mr. Coogan.  And we were just
18  trying to figure out why I was suspended.
19  Q.  What's the next thing that happened?
20  A.  Well, I was suspended for about five weeks and lost a
21  lot of sleep, ate a lot of TUMS.  And then --
22  Q.  What month was that?
23  A.  I'm not positive.  It had been summertime.  I believe
24  June.
25  Q.  Okay.

Page 264

1  A.  But I -- I'm not positive.
2  Q.  Okay.  Go ahead.
3  A.  Well, then I remained suspended.  And then one day I was
4  advised that -- Chief Allen and my union president came
5  to my house and brought my gun and badge back and told
6  me that Chief Allen was the -- or Lieutenant Allen was
7  named the interim chief, and I would be back to work
8  tomorrow.
9  Q.  Okay.  And when did you next talk to Mr. Coogan?
10  A.  I received a subpoena for Mr. Hayse's --
11  Q.  Hearing?
12  A.  -- hearing.  I know that.  And --
13  Q.  And did you talk to Mr. Coogan?
14  A.  He had asked me some questions about what went on when
15  we were still trying to figure out, you know, why I was
16  suspended.  So, we had some interaction there.
17  Q.  And what did he ask you --
18  A.  I don't remember the exact dates or times.
19  Q.  -- about at that time?
20  A.  I don't recall.  Just why I was suspended and if I
21  received any documentation, if I signed anything, if I
22  was given any forms, if the union was there, anything.
23  Q.  On what other occasions -- oh.  So, then you talked to
24  Mr. Coogan to get ready for the hearing?
25  A.  He sent me a subpoena.

FURMAN, SERGEANT MATTHEW
03/13/2018
Pages 265–268

Page 265

1  Q.  Right.
2  A.  And --
3  Q.  And did you guys talk?
4  A.  Yeah.  He told me I would be sequestered and I couldn't
5      go to any of the meeting except when I was supposed to
6      testify.  He told me, just go in there and be honest and
7      tell the truth, and all the other officers are expected
8      to do the same, and the whole department is going to be
9      sequestered, and we all have to be there.  And that's
10     about it, I guess.
11 Q.  What other times have you talked to Mr. Coogan?
12 A.  I don't recall.  I mean, just it was a lot dates around
13     that same time during the suspension and issues there.
14 Q.  Have you talked to him about your deposition here today?
15 A.  Yes.
16 Q.  And when did you talk to him about that?
17 A.  Well, I wanted to see if somebody was coming with me, if
18     I was coming by myself.  I don't -- you know, I haven't
19     been through anything quite like this.  So --
20 Q.  Well, when did you talk to him about your dep?
21 A.  It was last Thursday, maybe.
22 Q.  Did you meet with him?
23 A.  Yes.
24 Q.  And for roughly how long?
25 A.  Maybe 45 minutes.

Page 266

1  Q.  What did he tell you you -- he wanted to know or that
2      you would be asked about?
3  A.  Just to dress professional, be honest and, you know,
4      just try and recall all the events as accurately as I
5      could.  I spent a lot of time thinking about it.
6  Q.  But that doesn't take 45 minutes.  That takes about as
7      long as you just said.
8  A.  Correct.
9  Q.  So, what else did he talk about?
10     He asked you about your testimony, obviously, and
11     went over some things; correct?
12 A.  Correct.
13 Q.  What did he go over with you about your testimony?
14 A.  Basically just, you know, kind of some general advice,
15     don't talk too fast, don't get -- you know, don't yell
16     or get frazzled or things of that nature.  You know, I
17     guess standard deposition advice.
18 Q.  I know, but what -- what did he ask you about your --
19     your testimony?
20     You guys obviously went over what you were going to
21     talk about.
22     What was that?  What were the questions about?
23 A.  I don't really recall any specific questions offhand.
24     MS. GORDON:  Okay.  I'm going to take a brief
25     break.  I don't think I'll have too much more, Matt.

Page 267

1      Let me just look at my notes.
2      (Short recess at 4:29 p.m.)
3      *  *  *
4      (Record resumed at 4:39 p.m.)
5  BY MS. GORDON:
6  Q.  Okay.  Sergeant, you were suspended, you said, on July
7      5th.
8  A.  Again, I'm not positive of the actual date.
9  Q.  Okay.  That's the date I'm showing.
10 A.  But rough.
11     Okay.
12 Q.  And you learned that the chief had gone to Michigan
13     State Police.  You've already seen that; correct?  Or
14     said that?
15 A.  I learned that while I was suspended.
16 Q.  Okay.  And what they had gone to the police about was
17     what we -- one of the things we've been talking about,
18     which was the Richard Crosslin complaint against you
19     with regard to excessive force, as far as you knew;
20     correct?
21     You just said there was an investigation --
22 A.  I --
23 Q.  -- you thought and some people were questioned.
24 A.  I thought you referred to a McClintock earlier.
25 Q.  Okay.  Well, was -- I could have gotten the name wrong,

Page 268

1      but this is an excessive force incident occurring on
2      7-4-2016.  You were writing to Furman -- you're
3      writing -- Furman is writing to Hayse about this on 7-5.
4  A.  Well, that was about the knife in the basement.
5  Q.  Right.
6      Which one went to the state police?
7  A.  I'm not sure, because I contacted Michigan State Police.
8      I did several FOIAs, and they told me no investigation
9      existed either way.  I did, I think, three FOIAs with
10     them, and they told me there was no investigation.
11 Q.  But you just testified a minute ago there was an
12     investigation?
13 A.  Mr. Hayse advised me there was an investigation and --
14 Q.  No, you said people told you at the station.
15 A.  Can I --
16 Q.  Yeah.  Go ahead.
17 A.  Apparently both of us are bad at interrupting each
18     other.  Okay.
19     Mr. Hayse apparently was telling people there was
20     an investigation.  And Sergeant -- then-Sergeant Easton
21     told me that Michigan State Police or people who said
22     they were Michigan State Police were at the station and
23     spoke with several officers.  But I never saw them
24     there.
25     And when I've done my FOIAs, I've received no

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 269–272

Page 269

1  paperwork from state police.  They tell me nothing
2  existed.
3  Q.  Okay.
4  A.  So, I have no copy of --
5  Q.  So, the chron- --
6  A.  -- anything from state police.
7  Q.  The chronology is that the alleged police misconduct
8  against Crosslin occurred on July 4th, according to you.
9  That's in your document.
10     You --
11 A.  Okay.  I'd have to look at it.  I don't --
12 Q.  I know.  And --
13 A.  I'm not good with dates after so many years.
14 Q.  -- and you're then suspended on the 5th.
15     So, you were suspended because of this Crosslin
16  incident, as you are aware; correct?
17 A.  I have no idea.  I was never given any documentation.
18     When you're suspended, they're supposed to provide
19  you with a reason for the suspension.  You're supposed
20  to sign something.  It's supposed to go through the
21  union.
22 Q.  I -- I've heard all this before, and I -- I hear your
23  point.
24 A.  So, I don't --
25 Q.  I'm not asking you what they're supposed to do.

Page 270

1  A.  Okay.
2  Q.  I just said --
3  A.  Well --
4  Q.  -- you knew you were suspended because of Richard
5  Crosslin --
6  A.  Absolutely false.
7  Q.  -- and the complaint.
8     Okay.  Well, you took it upon yourself on July 5th,
9  the very day you were suspended, to put in writing to
10  the chief your version of what happened with the Richard
11  Crosslin alleged police brutality claim, didn't you?
12 A.  I didn't take it upon myself.  I was instructed to
13  provide a letter.
14 Q.  By whom?
15 A.  I believe Lieutenant Welch.
16 Q.  Okay.  So, then, you did know there was an issue with
17  Crosslin.  If you were instructed to provide a letter on
18  the 5th, the very day you were suspended, you knew that
19  was being looked into; correct?
20 A.  Correct.
21     However, I wouldn't think that it would result in
22  any sort of suspension or discipline in that short of
23  period.  There was no investigation time.
24 Q.  Well, you were first put off with pay, correct, while an
25  investigation could be done?

Page 271

1  A.  Well, I still don't know why I was put off.
2  Q.  Excuse me.
3     You were originally put off with pay; is that
4  correct?
5  A.  I was suspended with pay.
6  Q.  Okay.  So, you were suspended with pay.  And this was
7  sent to the Michigan State Police, whether you know it
8  or you don't.
9     Somebody told you, "You better write a reply."
10  You're telling me your lieutenant told you that, and you
11  did write a reply, didn't you?
12 A.  Yes.
13 Q.  And I think it's Bates stamp 940 through 943.
14     So, it's almost four full pages by you.
15     Is that your document --
16 A.  Let me take a look at it here.
17 Q.  -- that you submitted to the chief?
18 A.  Yes.  Where I contend that absolutely no excessive force
19  was used against Crosslin by me or any other officer at
20  the scene.
21 Q.  And you went on in several pages to describe what
22  happened at the events; correct?
23 A.  Correct.  I'm just reading that now.
24 Q.  And then on the 11th --
25 A.  Wait.  Hang on.  I'm still reading.

Page 272

1     (Discussion held off the record.)
2  BY MS. GORDON:
3  Q.  You don't need to read the whole thing.  I just wanted
4  to know if that was your document.
5  A.  Well, I just want to -- I just want to make sure --
6  Q.  I'm not going to ask any --
7  A.  -- the entire --
8     MR. WISE:  If she's not going to ask you any
9  questions about it --
10 A.  Okay.
11     MR. WISE:  -- then don't worry about it.
12 BY MS. GORDON:
13 Q.  Yeah.  I'm not going to ask you --
14 A.  Okay.
15 Q.  I just wanted to confirm that that was the day that --
16     MR. WISE:  But did you write it?
17 BY MS. GORDON:
18 Q.  That was your --
19 A.  Yes, I wrote it.  Correct.
20 Q.  Okay.  So --
21 A.  And apparently it was on --
22 Q.  So, you --
23 A.  -- July 5th.
24 Q.  And you're referencing --
25     THE REPORTER:  I'm sorry.  "It was on --"

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 273–276

Page 273

1  A.  July 5th.
2  BY MS. GORDON:
3  Q.  Right.
4       And you're referencing the incident from the 4th,
5       right, in the first sentence there?
6  A.  Yes.
7  Q.  Okay.  So, you're suspended with pay.
8       And then on July 11th, Brandon Nolin writes his
9       e-mail about possible police misconduct with regard to
10      this McClintock where -- we talked about it a minute
11      ago -- and -- Allen and Nolin were there.  That's dated
12      July 11th; correct?
13 A.  That's the incident with -- the state police were --
14      reportedly investigated and I was exonerated.  Correct.
15 Q.  Well, I don't know if this is the incident.  I think
16      they went actually on Crosslin.
17      But whatever, you're telling me you're exonerated.
18      I'm just saying this is the date of the event with
19      McClintock --
20 A.  Did you say the 11th?
21 Q.  No.  July -- I might have.  It's July 1.
22 A.  Okay.
23 Q.  And it looks like --
24 A.  If you say the 11th, I wouldn't have been there.
25 Q.  And I did get an e-mail from -- strike that.

Page 274

1       There was a return e-mail from the Michigan State
2       Police on July 11th about this Brandon Nolin complaint.
3  A.  Okay.
4  Q.  I'll hand you Bates stamp 928 and you can look and see.
5  A.  All right.
6  Q.  That, right there, is the original from Brandon Nolin.
7       And then up above here is somebody is communicating with
8       the Michigan State police about something that I'm
9       unclear on.
10      See that?
11 A.  Okay.
12 Q.  All right.
13 A.  And the ticket --
14 Q.  Okay.  So, at that point, that's when you're suspended
15      without pay, when now this Brandon Nolin thing comes in;
16      correct?  Was it around the 11th you were suspended
17      without pay?
18 A.  I thought we determined it was the 5th.
19      Oh, without pay?
20 Q.  No, without pay.
21 A.  I don't know the exact date.  I thought it was later in
22      the month, maybe the 24th, 26th.
23 Q.  Okay.  I think -- maybe -- maybe you're right.  I think
24      the record will speak for itself on that.
25      (Discussion held off the record.)

Page 275

1  BY MS. GORDON:
2  Q.  Were you aware that Chad Hayse was involved with Larry
3       Coogan via e-mail and other means with regard to the
4       McClintock alleged police brutality?
5  A.  No.  I'm not privy to their conversations.
6  Q.  And that Coogan was provided with information of an
7       interview between McClintock and Lieutenant Allen and
8       Detective Nolin?
9  A.  No.
10 Q.  So, when you talked to Coogan and he said, "I don't know
11      what this is about," did he ever circle back to you and
12      say, "I've been in touch with the chief, and he's
13      providing me information about a Michigan State Police
14      investigation"?
15 A.  I was advised there was some sort of investigation going
16      on, but Mr. Coogan advised me that he tried to contact
17      Michigan State Police and they told him there's no
18      investigation, which is the same thing they told me when
19      I did my three FOIAs.
20 Q.  Okay.  Did they -- did Coogan tell you that he received
21      a copy of an interview done by Lieutenant Allen and
22      Detective Nolin of Mr. McClintock?
23 A.  I don't recall that.
24 Q.  Did you ever see the interview of McClintock where he
25      accuses you of police brutality?

Page 276

1  A.  No.
2       He was so high, I don't know how he could accuse me
3       of anything.
4  Q.  Was he drug tested at the scene or thereafter?
5  A.  I don't recall.
6       I know we found crack cocaine on his person.  He
7       admitted to being high.  He was throwing up and
8       exhibited all the signs of being highly intoxicated.
9       I believe he also had alcohol in his system.
10 Q.  So, when -- you -- did you continue to talk to Larry
11      Coogan about the fact that you were out on suspension?
12 A.  I stayed in contact with him, trying to find out why.
13      But I don't remember exact exchanges.
14 Q.  Were you aware that Chad Hayse provided Larry Coogan
15      with the phone number and contact from the Michigan
16      State Police on August 1, 2016?
17 A.  No.
18 Q.  He never told you that?
19 A.  I don't --
20 Q.  Coogan never said, "I received contact info from the
21      Michigan State Police"?
22 A.  I believe Mr. Coogan told me he contacted Michigan State
23      Police, and they said there was no investigation.
24 Q.  I heard you say that.
25 A.  Right.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 277–280

**Page 277**

1  Q.   That --
2  A.   Beyond that, I don't recall.
3  Q.   I -- I had a totally different question, which is
4       whether he ever told you --
5  A.   Okay.  My apologies.
6  Q.   -- whether he ever told you that Chad Hayse contacted
7       him and gave him the contact info for Sunshine Ponzetti
8       from the Michigan State Police?
9  A.   That, I don't recall.
10            I -- I have never heard the name Sunshine Ponzetti,
11       to my recollection, prior to now.
12  Q.   And did Coogan ever tell you that Hayse put together a
13       packet on you for Coogan's review --
14  A.   I --
15  Q.   -- and that -- in July?
16  A.   No, I don't recall being told that.
17  Q.   I've got an e-mail from Chad Hayse to Larry Coogan,
18       28 July 2016 stating:
19            "I have the packet available.  Are you
20            available to meet this afternoon between
21            2:00 p.m. and 3:30?"
22            You weren't aware of that?
23  A.   You said that was an e-mail?
24  Q.   Yeah.
25  A.   Yeah.

**Page 278**

1            No, I -- they didn't cc --
2  Q.   Did Coogan ever --
3  A.   -- cc me on anything.
4  Q.   I mean, I know you're in touch with Coogan.  So, did he
5       ever say, "Hey, Furman's got a packet.  I'm going to get
6       it, and I'm -- we're going to take a look and see what
7       Furman says you've done wrong"?
8            Did Coogan ever let you know that?
9  A.   I think you mis-worded that.  You probably meant Hayse,
10       not Furman, but --
11  Q.   I'm sorry.  You're right.  I did.
12            Did Hayse ever let you know?
13  A.   No, Hayse never let me know he --
14  Q.   Did -- did Coogan ever let you know that Hayse had a
15       packet for him and he was going to get more info?
16  A.   Not that I recall, no.  I never received any
17       clarification as to why I was suspended.
18  Q.   Were you aware that Chad Hayse wrote Larry Coogan on
19       Monday, July 5th, saying:
20            "I'll be back in the office on Thursday
21            and will provide the information.  There are
22            two separate matters concerning Corporal Furman,
23            and I assume you want the requested information
24            for both cases."
25            You were not aware of that?

**Page 279**

1  A.   I -- not that I -- I don't recall.
2  Q.   Coogan never told you that?
3  A.   I don't recall.
4  Q.   Did you talk to Coogan throughout the entire time you
5       were on leave?
6  A.   I don't recall.  I believe it was more of a sporadic
7       thing, check for updates or see if, you know, I needed
8       to sell my house or what.
9  Q.   Were you aware that Chad Hayse contacted the city
10       council and Larry Coogan on July 28 to advise them that
11       you were being suspended with pay after receiving the
12       last police officer statement?
13  A.   You said July 28th?
14  Q.   Yeah.
15  A.   I was already suspended with pay at that point.
16  Q.   Without pay on July 28th.
17            Were you aware that there was a written
18       communication between Chad Hayse to the council and
19       Coogan saying that it was being changed to without pay?
20  A.   I don't recall that.
21  Q.   And that it was based upon a statement in speaking with
22       the last police officer witness?
23  A.   I don't recall that.
24            I know somewhere right around that time, Chief
25       Hayse sent Detective Nolin to my house to try and talk

**Page 280**

1  me into resigning and making it easy for Mr. Hayse, and
2  I told him I would not.
3  Q.   Here, I'll hand -- I'll hand you Bates stamp 6027.
4       You were not aware -- I know you didn't get this.
5       You were not aware of this?
6  A.   I'm not on there.
7  Q.   I know you're not.  I said I know you didn't get it.
8       Did you ever become aware of it?
9  A.   I got a letter from -- it was not this -- not an e-mail.
10       I got an actual paper letter saying my suspension was
11       being -- I'm paraphrasing here.  I don't remember the
12       wording, but being changed to unpaid.
13  Q.   And who was that from?
14  A.   Mr. Hayse.
15            I believe that's at the same time that he had Nolin
16       try and talk me into resigning.
17  Q.   Did Nolin tell you that he was asked to ask you to
18       resign?
19  A.   Yes.
20  Q.   Well, where -- where did you talk to Nolin?
21  A.   We met in the commuter lot -- parking lot.
22  Q.   In what?
23  A.   Like a commuter lot, like a state -- one of those
24       state-operated parking lots where you --
25  Q.   Where?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

**U. S. LEGAL SUPPORT**
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 281–284

Page 281

1   A.   In Melvindale, right on our border.
2   Q.   Hmm.
3   A.   Because I live in Allen Park, which is the next city
4        over.  So, I met him there.  And I believe he
5        hand-delivered that letter to me and then told me I
6        should -- you know, Hayse wants me to resign.
7            MS. GORDON:  Okay.  Counsel, we don't have that
8        letter.  It's never been printed out.  I wanted to state
9        that for the record.
10           MR. COOGAN:  What -- I was taking notes.  What --
11           MS. GORDON:  Yeah.  The sergeant is telling us
12       about a letter he received that was hand-delivered to
13       him with regard to his suspension the day he met with --
14       with Officer Nolin.
15           MR. WISE:  Do you have that somewhere?
16   A.   Not here.  I --
17           MR. WISE:  Well, obviously.
18   A.   I figured Hayse would have a copy.
19   BY MS. GORDON:
20   Q.   Well, Hayse doesn't have access to his City stuff.
21       That's the thing.  We don't have access to it.  The City
22       does.
23   A.   Okay.
24   Q.   But you would have it, I assume?
25   A.   I believe I have a copy of that at home.

Page 282

1   Q.   Okay.  All right.
2   A.   I'll double-check as soon as I get home today.
3            MR. WISE:  Thank you.
4   BY MS. GORDON:
5   Q.   Okay.  What do you recall testifying in front of the
6        city council about --
7            (Discussion held off the record.)
8   BY MS. GORDON:
9   Q.   -- with regard to Hayse?
10           What were the topics?
11   A.   On the dates of his hearing --
12   Q.   Right.
13   A.   -- in August of 2016?
14   Q.   Correct.
15   A.   Okay.  I --
16   Q.   You said -- you said you looked it over --
17   A.   Right.
18   Q.   -- in prep for today.
19   A.   Right.
20   Q.   So, what do you recall your topics being?
21   A.   Well, most of it regarded police impound.
22   Q.   Yeah.  I see that.
23           You were asked questions about the number of tows
24       you had done --
25   A.   Correct.

Page 283

1   Q.   -- and why you towed and why you didn't arrest and
2        things like that.
3            And you explained your position on towing?
4   A.   Correct.
5   Q.   And you said, "I was told -- given orders basically by
6        the chief, 'Don't tow anything unless absolutely
7        necessary.'"
8   A.   By -- both by the chief and Mr. Welch.
9   Q.   Do you have any evidence of that other -- other than
10       your testimony?
11   A.   Well, they said it in front of other officers, and other
12       officers testified to the same thing, including
13       Lieutenant Kennaley, I believe, Sergeant Easton.
14   Q.   Okay.  But I'm just asking you, do you have any evidence
15       with regard to what was said to you other than your
16       testimony?
17   A.   No.  Just my testimony, ma'am.
18   Q.   Did you text with the chief at all?  Text message?
19   A.   Maybe a happy birthday one year or something.  I mean,
20       I --
21   Q.   He had your cell phone number and could text and vice
22       versa if -- if needed?
23   A.   Yeah.
24           Pretty much everybody at work has everybody's
25       number.  You've got to get hold of somebody and --

Page 284

1   Q.   Was it Welch that told you Mike Goch has bribed the
2        mayor, bribed the council and bribed the city attorney?
3   A.   Both Hayse and Welch said that repeatedly.
4   Q.   When did Hayse say that?  Can you give me some dates?
5   A.   During -- specific dates, no, but during the time that
6        the contract was -- was out for bid, and they -- Goch
7        placed a bid and Gene's placed a bid as well.
8   Q.   Well, do you remember the circumstances?  Where -- were
9        you in -- I mean, you were already -- the chief was
10       already not your favorite person in 2015; correct?
11   A.   Correct.  Yeah.  He had treated me very poorly for --
12   Q.   So, you're telling me --
13   A.   -- quite some time.
14   Q.   -- he came out to you and said --
15   A.   No, he came out to everybody.
16   Q.   I'm -- let me finish my question.
17   A.   Sure.
18   Q.   "Mike Goch has bribed the mayor," was that in front of
19       a group or where was that?
20   A.   Yes.
21   Q.   Did anybody say, "Well, what's the bribe?"
22   A.   He just said they were being bribed.
23           And it was not just the mayor.  It was also the
24       city attorney; the city council; Rich Ortiz, our
25       financial CEO.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Page 285

```
 1   Q.   Okay.  So, did -- did you speak up and say, "What are
 2        you talking about?"
 3   A.   No.  I just basically kind of listened to them.
 4   Q.   Did you go report that to the city attorney or anybody
 5        else?
 6   A.   No.  I didn't really talk to Mr. Coogan very much at
 7        that time other than at court for, you know, regular
 8        court stuff, tickets --
 9   Q.   Well, you interacted with him pretty regularly; correct?
10        On court stuff, at least, if nothing else.
11   A.   In -- in court.
12   Q.   Yeah.
13   A.   But there's no -- you know, that's basically just to
14        discuss court and then go back to City --
15   Q.   And you never went, obviously, to the Public Safety
16        Commission or anybody else; right?
17   A.   No, not at that time.
18        I was trying not to make any waves.
19   Q.   Was there -- had you heard any allegedly negative
20        comments the chief had made about the -- the mayor?
21   A.   Oh, numerous, numerous times.
22   Q.   When did you first hear that?
23   A.   Essentially my entire career.
24   Q.   Who did you hear it from?
25   A.   The chief.  A lot of times he would come back from city
```

Page 286

```
 1        council meetings which -- they're held in the other side
 2        of our building.  Half of our building is City Hall and
 3        half is the police department, and he would come back
 4        and just be ranting and raving about -- you know, he
 5        called the mayor a "cunt" and a "bitch" and a "whore."
 6        He would say she was uneducated.
 7   Q.   You didn't -- you didn't --
 8   A.   He said we shouldn't have a female mayor.
 9   Q.   You didn't testify to that.  You weren't asked to
10        testify to any of that, were you?
11   A.   I believe that was -- there were -- I was asked if I
12        heard or made disparaging comments.  I believe that came
13        up, but I had expressed that to city council as well.
14   Q.   When?
15   A.   During my suspension.
16   Q.   In what format did you express it to city council?
17   A.   Mr. Louvet, over the phone; Ms. Barnes, in person.
18   Q.   Okay.  But at the time these comments were said, you
19        never did anything about them, did you?
20   A.   No.  I didn't want to draw attention to myself.
21   Q.   But you didn't mind drawing attention to yourself later,
22        shortly thereafter, when you were on suspension.  You
23        were happy to do it.
24   A.   I wasn't happy to do.  I'm not happy with the whole
25        situation.  None of it should have ever --
```

Page 287

```
 1   Q.   Okay.
 2   A.   -- got to this point.
 3   Q.   So, you stood by -- you, the guy who has been in here
 4        telling me you're all about the law and you want to be
 5        sure things are done right, society shouldn't fall
 6        apart, you never made known to anybody that the police
 7        chief said Larry Coogan was taking bribes, the mayor was
 8        taking bribes, the mayor was a -- the "B" word, the "C"
 9        word.  You just stood idly by and allowed all that to
10        happen right in your very own police department,
11        according to you.
12        I guess that's your testimony; right?
13   A.   Along with --
14        MR. WISE:  Object to form.
15        Go ahead.
16   BY MS. GORDON:
17   Q.   Correct?
18   A.   Along with numerous other officers --
19   Q.   Exactly --
20   A.   -- who didn't want to feel Mr. Hayse's wrath.
21   Q.   Well, you could have complained anonymously.  You didn't
22        do that either, did you?  Since there were a whole bunch
23        of you that heard this when he just came back and
24        ranted, it could have been any --
25        MR. WISE:  Form.
```

Page 288

```
 1   BY MS. GORDON:
 2   Q.   It could have been anybody -- it could have been anybody
 3        that heard these comments.  It wouldn't necessarily have
 4        been you; correct?
 5   A.   Well, I don't -- I don't believe in -- well, yeah.
 6   Q.   You don't believe in anonymous complaints?
 7   A.   (Shakes head.)
 8   Q.   You don't believe --
 9        THE REPORTER:  I'm sorry --
10   BY MS. GORDON:
11   Q.   -- in complaints with your name on them either, do you?
12        You said --
13        MS. GORDON:  He said "no" to the, "You don't
14        believe in anonymous complaints."
15   BY MS. GORDON:
16   Q.   You said "no"?
17   A.   I don't -- I don't like anonymous complaints.  I feel if
18        you're going to write a complaint, put your name on it.
19   Q.   Exactly.
20        So, here you did neither.  You just allowed --
21   A.   I was scared and intimidated by Mr. Hayse.
22   Q.   Oh, I'm sure you were.  I'm sure you were so scared and
23        intimidated --
24   A.   Well, I didn't want to lose my house, my truck, my car.
25        I need my lights on and my water; right?
```

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 289–292

Page 289

1  Q.  So, so much for enforcing the law and being sure that
2      society doesn't crumble apart; right?
3          MR. WISE:  Object to -- objection.  Form.
4      Argumentative.
5  BY MS. GORDON:
6  Q.  That -- that only applies --
7          MR. WISE:  Is there even a question?
8          MS. GORDON:  Yeah.
9  BY MS. GORDON:
10 Q.  That only applies in certain circumstances, I guess, and
11     when it's within your own department and you've got a
12     police chief that you think is just seriously wrong, you
13     don't do anything about it.
14         But the record is already what it is.  So --
15         (Discussion held off the record.)
16 A.  Yeah, that's for sure.
17 BY MS. GORDON:
18 Q.  Do you know how long Chad Hayse was with the City of
19     Melvindale altogether?
20 A.  No, I do not.
21 Q.  Do you know that it's over 20 years?
22 A.  I know it's about 20 years or over 20 years.  I don't --
23 Q.  Do you know what his educational background is?
24 A.  Well, I know he had some sort of degree from a
25     university that was not accredited and doesn't exist.

Page 290

1  Q.  Well, do you know what other universities he has degrees
2      from?
3  A.  No, ma'am.
4  Q.  You know really very little about what he's accomplished
5      during the time he was with the City; correct?
6  A.  I -- I care very little about what Mr. Hayse does
7      outside of work or his educational background.
8  Q.  I see that.  You really don't care much about your own
9      point of view, but that's fine.
10         How is it you got selected to talk to Larry Jackson
11     in August of 2016, as you understand it, or -- how
12     many -- how many people are at the police department?
13     How many officers?
14 A.  Including the chief, I think we're at about 22, 23.
15 Q.  Okay.  How is it you got --
16 A.  I'm not sure.
17 Q.  -- selected, you and a couple of other people?
18 A.  I don't know.  I was called -- contacted by Mr. Jackson.
19 Q.  Nobody told you why you were selected?
20         He didn't tell you that?
21 A.  Well, Mr. Jackson told me he contacted me because a lot
22     of the issue was regarding Mr. Hayse, and he was
23     supposed to find out basically why there was less tows
24     being made and things like that.
25 Q.  Okay.

Page 291

1  A.  He was hired by the City to do an outside independent
2      investigation.
3  Q.  Wanted to find out why tows were down or off or
4      something like that?
5  A.  Yes.
6  Q.  And that -- this is while you're on leave?  Were you on
7      leave at this time?
8  A.  I don't -- I -- I can't say for certain.  I don't know
9      if it was before or during.
10 Q.  Okay.  So, that's what you talked to him about?
11 A.  Yes.
12 Q.  Okay.
13 A.  That, the general atmosphere at the department.
14         (Discussion held off the record.)
15 BY MS. GORDON:
16 Q.  Did you talk to Jackson about anything else?
17 A.  I don't -- I don't recall.  I've never, you know, spoke
18     with him since then, and I don't have a copy of the
19     investigation.
20 Q.  Did you get a copy?
21 A.  No.
22 Q.  You never received a copy of his results?
23 A.  No.
24 Q.  Okay.  What social media sites do you post on today?
25 A.  All I have is a Facebook and an e-mail.  I don't have

Page 292

1      really anything else.
2  Q.  What do you post on, though?  Do you post --
3  A.  Oh, I have an Instagram.
4  Q.  Do you post on any of the Melvindale sites?
5  A.  I just received administrative rights to post on our
6      Melvindale Police Department official web page, if
7      there's updates or information from the community.  For
8      example, I had to post something in regards to a -- an
9      emergency siren -- tornado siren a couple weeks ago.
10 Q.  What about "It Takes a Village"?
11 A.  I did used to look at that website, yes.
12 Q.  You've posted on it, haven't you?
13 A.  I do believe so, yes.
14 Q.  Do you still visit it periodically?
15 A.  No.  It's --
16 Q.  Why?
17 A.  There's a lot of goofballs on there, and I've seen
18     myself bashed enough times on there by people
19     complaining about getting their car towed or this or
20     that, I -- that I don't even want to look at this
21     any more.
22 Q.  Uh-huh.
23         You were against the combination of the dispatch
24     center -- is that correct -- with Dearborn?
25 A.  Initially, yes.  I was strongly against it for a couple

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 293–296

Page 293

1     reasons, but yes.
2  Q.  What were they?
3  A.  Well, it was going to switch us from our computer
4     system -- we use a computer system that's the same
5     computer system as our neighboring Downriver
6     communities, particularly Allen Park and Lincoln Park,
7     River Rouge, Ecorse, Southgate, and if we have an
8     emergency or something, that's our primary backup.
9         Being taken off of that computer system and put
10    onto another system with Dearborn and no longer on the
11    Melvindale system made me initially very uncomfortable
12    because these are the guys I see, guys I talk to, that's
13    my backup.  If something is wrong, I know these guys.  I
14    can send them a message.  I can see where everybody is
15    at on the maps, and it kind of took that away.
16 Q.  Okay.
17 A.  So, that -- that was really my -- that was my big
18    concern about it.
19 Q.  I noticed one of your posts says, in addition to what
20    you just said:
21        "I'm a police officer.  Our dispatch center
22        features state-of-the-art dispatch and police
23        radio equipment."
24 A.  That's correct.  We actually have the top-of-the line
25    stuff in Melvindale.  We've got the best radios, best

Page 294

1     computers, best 911, phone.  I mean, all of our
2     equipment is up-to-date.  It's not like we're -- I mean,
3     we're kind of a low budget city, but we have very, very
4     adequate equipment.
5  Q.  Okay.  You also say:
6         "It is, in fact, superior to what Dearborn
7         currently has."
8  A.  At the time, that's correct.  It was.
9  Q.  Okay.
10 A.  Not now.  It would be the same.
11        But at the time, yes, our equipment was superior to
12    Dearborn's.
13 Q.  Did there come a time when you changed your mind
14    about that?
15 A.  After I started finding out some of the resources that
16    Dearborn really had to offer, just how big they are,
17    their manpower, what kind of equipment they have and
18    just -- I mean, if there's an emergency and we need
19    backup, I mean, even with, you know, small communities
20    like Allen Park, Lincoln Park, River Rouge, Ecorse,
21    being able to send units for -- for reinforcements for
22    backup, all combined, I mean, Dearborn could still send
23    and do a lot more.
24        So, I mean, once I really started to learn about
25    Dearborn and get a lot more details, I kind of -- kind

Page 295

1     of changed my opinion quite a bit.
2  Q.  As I understand it, most of the department sort of
3     viewed it the way you did.  They -- they like the setup.
4     They like your equipment.  They like the neighboring
5     city connection.
6  A.  Yes.
7  Q.  Would that be your understanding?
8  A.  Yes.
9  Q.  And change was eventually apparently coming your way,
10    and people have kind of adapted to that?
11 A.  Yeah.  I -- I think a lot of guys kind of formed the
12    same opinion, particularly with the jail.  I mean,
13    the -- the way the jail is going to be, it's really
14    going to work out really swell for us.  Instead of
15    having -- running our own jail, we'll be able to take
16    them to Dearborn, and they have a lot more -- we can
17    just drop them off there and be like this -- "Hey, this
18    guy is arrested because he has this and this," and then
19    Dearborn does all the processing, all the booking.  They
20    do the housing.  They -- right now we have to send
21    officers to go pick up food every time somebody is in
22    there so we can feed them, keep the log books,
23    everything.
24        It's really going to simplify things quite a bit,
25    especially for a department with -- with small manpower.

Page 296

1         So, the jail thing is big sell.  Everybody is
2     really quite in --
3  Q.  Okay.
4  A.  -- favor on that.
5  Q.  Am I correct that nobody from the City ever contacted
6     you about your posts on social media about this issue of
7     dispatch or any of the other things you -- you posted?
8  A.  Mr. Hayse at the time encouraged me to speak out against
9     it, and I'm pretty sure we were all -- I mean, with a
10    couple exceptions, I think -- I think the whole
11    department was pretty against it at the time.
12 Q.  But nobody ever told you you shouldn't be posting;
13    correct?
14 A.  Not to my knowledge or recollection, no.
15        (Discussion held off the record.)
16        MS. GORDON:  Okay.  I have no more questions for
17    you.  You're done.
18                    *   *   *
19               EXAMINATION
20 BY MR. COOGAN:
21 Q.  Okay.  I'd like -- earlier you were questioned,
22    Mr. Furman, you never told --
23        MS. GORDON:  Hang on a second.  Let's put on the
24    record, are you representing Mr. Furman here today?
25        MR. COOGAN:  I am right now, yes.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 297–300

Page 297

1    MS. GORDON:  Okay.
2    MR. COOGAN:  I'm asking some questions, and I'll
3  hopefully move through it fairly quickly.
4    MS. GORDON:  And how many questions do you have?
5  How long do you have?
6    MR. COOGAN:  I don't know.  I'd say 20 minutes or
7  less, I'm hoping.
8    MS. GORDON:  Okay.  I'm going to take -- I didn't
9  know that.  So, if you don't mind, I'm just going to
10  take a very quick break.
11    MR. COOGAN:  Oh, sure.  Sure.
12    (Short recess at 5:08 p.m.)
13                *  *  *
14    (Record resumed at 5:13 p.m.)
15    (Ms. Gordon is not present after the break.)
16  BY MR. COOGAN:
17  Q.  Earlier you were asked by opposing counsel if you
18      discussed -- your failure to address or discuss these
19      issues with everybody; is that true?
20  A.  Can you repeat the question?
21  Q.  The issues surrounding Hayse, you were afraid to discuss
22      those?
23  A.  Yes.
24  Q.  But you had an opportunity to talk to Larry Jackson; is
25      that correct?

Page 298

1  A.  That's correct.
2  Q.  And did you discuss it with him?
3  A.  I did.
4  Q.  And did you agree to waive the position of being
5      anonymous when you talked to Mr. Jackson?
6  A.  I did.  I felt there had been enough silence on the
7      issues at this point and it was -- enough was enough,
8      and I needed to step forward, and if that meant having
9      my name out there, then so be it.
10  Q.  So, when you talked to Mr. Jackson, if you can recall,
11      what did you talk to Mr. Jackson about regarding
12      Mr. Hayse and Mr. Welch?
13  A.  Well, a lot of it was just their general behavior around
14      the department, the things they would say about --
15  Q.  Such as what?
16  A.  Well, about yourself.  They would say you were corrupt,
17      on the take.  Welch called you the worst attorney he's
18      ever met.  You probably never even really graduated law
19      school.  You only got the job because your dad was
20      mayor, you know, things of that nature.
21        He said the -- the current mayor -- well, Mayor
22      Striz at the time -- it's Bazman now -- she's been
23      remarried.  But he called her a -- a "cunt," a "whore,"
24      a "bitch," a "slut," made fun of her education.  He said
25      there's -- we should never have a female mayor or

Page 299

1      politicians.  Said that she was incompetent.
2  Q.  And you told all this --
3  A.  He called her "retarded."
4  Q.  -- to Mr. Jackson; is that correct?
5  A.  That's correct.  I did share that information with
6      Mr. Jackson.
7        Mr. Welch made pretty much the same exact comments.
8      They made very similar comments against the --
9      Mr. Ortiz, our city administrator.  They called him
10      "corrupt," "on the take."
11        They kept saying that they all went to high school
12      together.  And, you know, various people had accused the
13      mayor of sleeping with Mike Goch from the tow company.
14      They said they were cheating on their spouses with each
15      other.
16  Q.  All right.
17  A.  They called -- they called Mike Goch a "felon."  Never
18      provided any proof of same, but they said Mike Goch was
19      a "felon," "all his guys were felons, criminals."  He
20      said Mike Goch would steal cars and run chop shops and
21      just all kinds of -- you know, fairly extreme
22      accusations.
23  Q.  And you reported all this to Mr. Jackson?
24  A.  That's correct.
25        And same thing -- he said the same kind of comments

Page 300

1      about pretty much every city council member.  I remember
2      him calling Councilman Densmore a "sellout" and a "piece
3      of shit."
4  Q.  Okay.
5        THE WITNESS:  Are you good with --
6        THE REPORTER:  Yes.
7  BY MR. COOGAN:
8  Q.  Did Mr. Welch or Mr. Hayse ever -- both or either one
9      ever express their dislike for Mike Goch then?
10  A.  Oh, yes.  Numerous times.
11  Q.  What were the examples of what they would say, other
12      than what you've already alluded to?  Is there anything
13      else or not?
14  A.  Well, before Mr. Goch was awarded the contract, they
15      were telling all the officers that, "If he gets the
16      contract, we're not towing any cars.  Don't make that
17      fucking Mike Goch any money."  Things of that nature.
18        I was ordered that if he gets the contract not to
19      tow anything.
20        Once Mr. Goch was awarded the contract, I continued
21      to tow vehicles.  That upset Mr. Hayse and Mr. Welch
22      extremely so, to the point Welch actually accused me of
23      "sucking Mike Goch's dick."  That was the exact words he
24      used.  Told me I'm "busy sucking Mike Goch's dick."
25  Q.  Any other comments, or is that pretty much --

Page 301

1   A.  That's -- that's the gist of it.
2   Q.  All right.  Now --
3   A.  He accused everyone of being on the take and taking
4       bribes.  That's the only reason he got the contract.
5   Q.  Now, were officers in the department fearful of negative
6       treatment?
7   A.  Oh, absolutely, myself among them.
8   Q.  And what sort of negative treatment would be
9       experienced?
10  A.  Well, if Mr. Hayse didn't like you, I mean, his -- he
11      was pretty extreme.  For example, one of the officers
12      got a flat tire one time, and he wanted to suspend the
13      officer until he sent him to driving school for a flat
14      tire.  But, you know, you just encounter in driving -- I
15      mean, just ridiculous things.  Mr. Hayse has a bad
16      temper.  Does a lot of yelling and screaming.
17  Q.  Did this affect the morale in the department?
18  A.  Oh, yes.  Morale was almost nonexistent, absolutely
19      horrible.
20  Q.  Was he creating a hostile work environment in your
21      opinion?
22  A.  Extremely hostile.  I -- I couldn't wait to get off work
23      and go home every day.
24          And I went from a job where I looked forward to
25      going in to a job where I didn't want to be there, and I

Page 302

1       was ready to -- to job hunt and go somewhere else.
2   Q.  Was it safe to say that -- redirect your attention to --
3       to Gene's Towing.
4           Did you tow cars when you worked for the City and
5       Gene's was the tow company?
6   A.  Yes.
7   Q.  And did you tow --
8   A.  I did very large amount.
9   Q.  All right.
10  A.  Thousands, I guess, or --
11  Q.  Do you know -- are you familiar with what the rate was
12      of pay for Gene's Towing; if you know?
13  A.  Yes.
14          When I started there and Gene's Towing was towing
15      cars, they received $64 per tow.
16  Q.  And how do you know that?
17  A.  Because that's what was collected at the window.
18          We had a system where if somebody came to get their
19      vehicle from the impound, they didn't go to Gene's.
20      They came to the police station and paid in cash only at
21      the front desk.
22  Q.  Did you ever look at the contract?
23  A.  No.  I've never seen the contract.
24  Q.  Did there come a time when the fee structure for Gene's
25      changed, if you're aware of it?

Page 303

1   A.  Yes.
2           Mr. Hayse and Mr. Welch had a discussion, and they
3       decided to increase the fee per impounded vehicle from
4       $64 to $100 per automobile.
5   Q.  Do you know when that took place?
6   A.  Oh, I would guess about a year, year and a half into me
7       being there.
8   Q.  And you started in 2012?
9   A.  That's correct.  May 9th of 2012.
10  Q.  So, sometime in the middle of --
11  A.  I would say in '13.
12          That's a guess.  I'm not sure on it.  I don't
13      recall an actual date.
14          But they did raise it to $100 per car, and it was
15      still a cash only policy.
16  Q.  And who collected those funds?
17  A.  Whoever was at the front desk.  But, ultimately, Mike
18      Welch was responsible for everything, which I always
19      found curious because, per our department policy and
20      structure, it's my understanding the detective bureau is
21      supposed to run the impound auctions, do all the impound
22      paperwork, all that.
23          But for some reason, Mr. Welch, who was not in the
24      detective bureau, Mr. Hayse placed him in charge of all
25      of the auctions and the money and all that instead of

Page 304

1       having Lieutenant Bajorek, who should have been in
2       charge, do it.
3   Q.  Did Mr. Welch and Mr. Hayse have a name for auction day?
4   A.  They used to joke around and laugh and call auction day
5       their payday.
6   Q.  Did you find that odd?
7   A.  Knowing the two of them, no.
8           But, yes, it was very odd.
9   Q.  What did that mean to you?
10  A.  Well, to me, that meant they were -- they were skimming
11      from the auctions.
12  Q.  Okay.  You don't have any proof of that, do you?
13  A.  No, no.  That's just -- that was my impression.
14      Everything was done with cash only, and a lot of the
15      TR-52s and paperwork did not get filled out correctly.
16      There were no sale prices put on, no amounts put on.
17  Q.  Who was in charge of the TR-52s?
18  A.  Lieutenant Welch.
19  Q.  And what are TR-52s?
20  A.  TR-52 is basically a title release.  So, say, I impound
21      somebody's car, and that vehicle stays at the police
22      department x-amount of days.
23          Well, after it's there so long, we notify Secretary
24      of State that the vehicle has been abandoned, and then
25      they send a TR-52, which is basically -- TR is title

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 305–308

Page 305

1   release. They send this form to the police department,
2   and it turns over ownership of the vehicle to the police
3   department. They also send a notification to the owner
4   of that vehicle, and from the time they send it out, I
5   believe -- and I'm not certain because I don't do
6   that -- but I believe they have -- the owner has 20 days
7   to come redeem it, and if they don't, then the police
8   department can sell it at auction.
9        And on the back of that TR-52, the officer who
10  sells it is supposed to put the date, the sale amount,
11  the buyer's information, the date of sale, all that, and
12  Lieutenant Welch and Mr. Hayse would never complete the
13  information on there.
14  Q.  Well, why is that important?
15  A.  Well, it maintains accurate records and -- for what
16  things sold for and to -- to who purchased it. That way
17  if something comes up later, you know, we can say, "Oh,
18  yeah. We sold it to Mr. Smith for $600 on such-and-such
19  date, and he lives over here."
20  Q.  Do you have -- have you ever seen a TR-52 that took
21  place during the Gene's Towing era?
22  A.  Yes. As a matter of fact, Secretary of State sent
23  people back on numerous occasion with their blank forms
24  that were signed with no other information on them, and
25  the people have come to the station. Mr. Welch would

Page 306

1   tell them, "Just put whatever you want on there. Put
2   100 bucks." "Put -- put --" you know, "Don't pay so
3   many taxes," stuff like that.
4   Q.  Would Chief Hayse witness -- did he ever witness that
5   too?
6   A.  Yes. He assisted Lieutenant Welch with the auctions.
7   He was present at pretty much, I believe, every single
8   auction.
9   Q.  Were they upset when the City changed tow companies?
10  A.  Extremely, extremely upset.
11  Q.  Do you know why that would have been?
12  A.  Well, the way the old tow company worked, when they
13  impounded a vehicle, they received first $64 and then
14  later apparently $100 per vehicle. So, the old tow
15  company, the only statistics they kept were how many
16  vehicles were sold.
17       So, say we had an auction and 50 vehicles were
18  sold. The old tow company, Gene's, would know that,
19  okay, we sold $50. I get $100 tow fee per car, "Five
20  grand, please." It was that simple.
21       Well, when -- so, they didn't keep any records.
22  They didn't keep any paperwork. They didn't have to do
23  anything in terms of accounting other than knowing how
24  many cars were actually sold. That was all they cared
25  about.

Page 307

1   Well, Goch had a completely different structure
2   that he wanted to do for the auctions. And what that
3   was, was to have -- he would have his tow fee and then
4   he would administer the auctions, do a lot more
5   advertising, get more people there, put up signage and
6   all that. So, we would have a lot bigger crowds.
7        And then he would take a percentage of the auction.
8   I don't know what the percentage is. I -- I think it's
9   10 percent, but I could be completely wrong.
10       But then what that did was allow Mr. Goch to --
11  Mr. Goch would then have to keep track of all the actual
12  sales figures for things, what things actually sold for,
13  and I got the impression that Mr. Hayse and Mr. Welch
14  did not want any accurate records kept. They were very
15  adamant about Goch not being involved in the auction
16  process.
17       And, actually, after Goch & Sons received the
18  contract, Mr. Hayse and Mr. Welch refused to allow Goch
19  to administer the auctions like he was supposed to, per
20  his contract, and they refused to allow him to -- to
21  participate in the -- the auction process.
22       And there was -- as I was later told by Mr. Goch,
23  he kept track of what things sold for at the auctions
24  and then Hayse and Welch would tell you you're wrong,
25  and that they -- everything was -- they were saying sold

Page 308

1   for a lot less than it did.
2        So, there was a lot of discrepancy, and it got to
3   the point where Mr. Goch would have two or three
4   employees in plain clothes come to the auctions, writing
5   down what everything sold for. They would compare.
6   They would all have the same thing, and Mr. Hayse and
7   Mr. Welch would say, "Oh, no, this only sold for this,"
8   or "This sold for this."
9        So, there was a lot of discrepancy in the amount of
10  what the vehicles sold for versus what Mr. Hayse and
11  Mr. Welch were reporting they sold for. And was -- I
12  just had to -- you know, some thought that maybe that
13  had some reason to do with not wanting to change tow
14  companies.
15  Q.  Do you really care who tows the vehicles for you?
16  A.  Absolutely not. It made no difference. I -- I liked
17  the guys at Gene's. They did a good job. I like the
18  guys at Goch. They do a good job. If John's Towing
19  come in tomorrow or Deborah Gordon Towing, that would be
20  fine, too, as long as they do a thorough job.
21       (Discussion held off the record.)
22  BY MR. COOGAN:
23  Q.  Do you know who Gasper Fiore is?
24  A.  Yes.
25  Q.  And how do you know him?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 309–312

Page 309

1   A.   Well, Gasper Fiore is actually the owner of Gene's
2        Towing.  Paul -- Paul Ott is kind of a figure head at
3        Gene's Towing.
4             Gasper has been all over the news for various
5        corruption-related scandals throughout Southeast
6        Michigan, Macomb County.  It seems like a lot of bribery
7        and a lot of different towing and -- and garbage
8        sanitation.
9             MS. MARZOTTO TAYLOR:  So, is this like relevant to
10       anything?
11            MR. COOGAN:  I'm -- I'm getting there.
12  BY MR. COOGAN:
13  Q.   Have you ever seen him in the police station?
14  A.   Yes.  On at least two occasions that I know of.
15  Q.   And -- and have you ever seen him talk to former-Chief
16       Hayse?
17  A.   I saw him go to Mr. Hayse's door.  Mr. Hayse opened the
18       door and Mr. -- Gasper went inside, but I didn't see
19       them actually talk or what they did in there, but I saw
20       him enter Mr. Hayse's office.
21  Q.   Would it surprise you to know that Mr. Hayse testified
22       at a previous deposition that he didn't know who Gasper
23       Fiore was?
24  A.   That would surprise me because he did know who he was,
25       and I saw him go in his office.

Page 310

1             And I also saw Mr. --
2   Q.   So, would he be lying to say he didn't know who that
3        gentleman was?
4   A.   Yes.  I mean, unless they went in the office and had no
5        conversation and then Mr. Fiore left, but --
6   Q.   Okay.
7   A.   He was also at a hearing that the City held for the
8        contract when it was going out to bid.
9   Q.   Was Mr. Hayse there at that -- at that hearing as well?
10  A.   Yes.
11  Q.   Were you ever written up over this alleged incident that
12       took place sometime in July?
13  A.   Yes.
14            Well --
15  Q.   I'm referring to --
16  A.   I'm sorry.  I need to -- I need clarification on
17       which incident.
18  Q.   I'm specifically talking about the instance where you
19       were suspended in early July -- July 5th or 8th,
20       whenever it was you were suspended.
21            Were you ever written up for that?
22  A.   No.  There was no documentation for my suspension.
23       There was no write-up.  I didn't sign anything.
24  Q.   Were you told prior to being sent home what the reasons
25       were?

Page 311

1   A.   No.  Mr. Welch told me -- Mr. Hayse had been in the
2        building all morning, and I had saw Mr. Hayse 5 minutes
3        earlier, and then he -- he walked out of the building.
4        Excuse me.
5             Mr. Hayse -- or -- I'm sorry -- Mr. Welch called me
6        into Mr. Hayse's office, and he told me that, per Chief
7        Hayse, I was being suspended.  I believe Mr. -- Chief --
8        current-Chief Allen was there as well.  Neither one of
9        them knew why I was being suspended.  They just said it
10       was per Hayse.
11  Q.   You were subsequently -- and that was with pay, the
12       original suspension; is that correct?
13  A.   That's correct, sir.
14  Q.   And the subsequent suspension on the 28th of July was
15       without pay; is that correct?
16  A.   That's correct, sir.
17  Q.   And were you told on that day what you were being
18       suspended for?
19  A.   No.  I just -- Nolin told me to resign and make things
20       easy on Hayse, and I told him I wouldn't do that.
21       Beyond that, I wasn't given no actual reason for the
22       suspension and no further information.
23  Q.   Should employees have to guess as to why they're being
24       disciplined?
25  A.   Absolutely not.  We have a very clear policy.

Page 312

1   Q.   And what is that policy; if you know?
2   A.   That policy is -- and I'm paraphrasing here -- but if
3        you're being disciplined, you have the right to know
4        why.  Your union needs to be informed why.  You have
5        grievance procedures.  There's policy and procedure to
6        follow.  The Safety Commission should be advised.  The
7        city attorney should certainly be advised.
8   Q.   Okay.
9   A.   In my opinion, the city administrator, mayor and city
10       council should also have knowledge of what's going on in
11       the department.
12  Q.   So, were you denied due process?
13  A.   Yes, absolutely.
14  Q.   Never had a hearing?
15  A.   I was denied -- denied all process.
16  Q.   Never had a hearing?
17  A.   Never had a hearing.
18  Q.   Never notified what you were charged with?
19  A.   Correct.  Never notified, no hearing.
20  Q.   Did you have a union rep come in with you and talk with
21       you?
22  A.   Yes.
23            Well --
24  Q.   Were you afforded a hearing with the union rep?
25  A.   Let me take -- let me rephrase -- let me redact that

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 313–316

Page 313

1    statement.
2  Q.  That's a yes-or-no question.
3        Were you afforded a hearing?
4  A.  No.
5  Q.  And you never were informed of what the charges were?
6  A.  No.
7        I met with a union representative after I was
8    suspended.
9        But prior to my suspension or regarding the
10   suspension, no.
11 Q.  All right.  Is there a difference between an arrest and
12   a tow?
13 A.  Yes.
14 Q.  What -- what's the difference?
15       Because there seemed to be some confusion earlier
16   when you were asked questions like that.
17 A.  Well, a tow would be the impounding of a subject vehicle
18   and Hayse would be an arrest of a subject person.
19 Q.  So, they're completely separate and distinct?
20 A.  Yes.
21 Q.  Do you have to --
22 A.  You may have your car towed, but you may not be
23   arrested, or you may be arrested and your car may not be
24   towed.  They don't necessarily go hand in hand.
25 Q.  I see.

Page 314

1        Now, there was a memo that was alluded to earlier
2    that was posted by the chief and specifically dated
3    April 26th, 2016, the memo that was posted at the desk;
4    is that correct?
5  A.  Correct.
6  Q.  What is your belief the purpose of that memo was, if you
7    have one?
8  A.  Well, I believe that was part of Mr. Hayse's racism and
9    discriminatory policies.  I had been told on numerous
10   occasions by Mr. Hayse that I was not to tow white
11   females.  I was told I should have given
12   Ms. Wielichowski a -- given her a -- let her go with a
13   warning because she was a white female, and he said
14   something along the lines of, "I told you before, no
15   white females."
16       He encouraged me to tow the automobiles of blacks,
17   Hispanics.  I was told I can tow people my skin tone and
18   darker.  He made references -- and I'm not black or
19   black heritage, but he would call me "our token black
20   officer," "token nigger," things of that nature.
21       Mr. Hayse and Mr. Welch were -- were very overtly
22   racist.
23 Q.  What do you mean by that?
24 A.  Well, Mr. Hayse didn't -- he used the "N" word on
25   numerous occasions.  He didn't like black people.  He

Page 315

1    didn't like Arabic people, I think, even more.  He would
2    refer to them -- him and Welch both refer to them as
3    "chip pop bro."
4        THE REPORTER:  I'm sorry.  "-- refer to them as --"
5  A.  "Chip pop bro."
6  BY MR. COOGAN:
7  Q.  Any other acronyms he had for other people?
8  A.  I remember one time, after Goch & Sons was awarded the
9    contract, I was going to stay after and do traffic
10   detail and Hayse made a comment that, "Oh, so you can
11   make more money for Mike Goch."
12       And I said, "No, so I can have a better check when
13   I'm, you know, working more hours."
14       And he called me "a cheap Jew fuck," and a couple
15   days later, he called me "a kike."  And I'm not.  I'm
16   Catholic.  I'm not Jewish at all.
17 Q.  Was that common practice for Mr. Hayse?
18 A.  Oh, yes.  He insulted everybody.
19 Q.  Was there ever a quota for tows or tickets in the
20   department?
21 A.  No.  After Goch & Sons was awarded the contract there
22   was Mr. Hayse giving basically a towing ban -- don't tow
23   anything.  That way we can send a message and have Goch
24   & -- or Gene's Towing back in here after Goch & Sons was
25   awarded the contract.

Page 316

1  Q.  If there was to be a quota, who would institute a quota?
2  A.  Oh, the chief of police.
3  Q.  Is it legal to have quotas?
4  A.  Absolutely not.
5  Q.  Did anybody ever express a quota to you?
6  A.  No.  I never heard a thing about a quota.
7  Q.  Why do you typically -- earlier there were some tow tags
8    that were presented out here.
9  A.  You're correct.
10 Q.  All the ones that were presented here today, was there a
11   reason set forth on them as to why you towed those
12   vehicles?
13 A.  Yes.
14       And Ms. Gordon seemed to want to overlook that.
15       But on every one of those tow tags, it was
16   indicated whether a vehicle -- whether the driver was
17   suspended, had no insurance, an improper plate.  I
18   believe one of the vehicles was unregistered and
19   ownership unconfirmed.  I mean, every vehicle was towed
20   for a legal, sound reason, as is every vehicle I
21   impound.  I've never impounded a vehicle I didn't have
22   legal grounds to do so.
23 Q.  Do you feel you were ordered to racially profile people?
24 A.  Yes.
25 Q.  By who?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 317–320

| | Page 317 |
|---|---|
| 1 | A. Mr. Hayse, Mr. Welch. |
| 2 | Q. How did that take place? |
| 3 | How was that communicated to you? |
| 4 | A. Verbally. On numerous occasions verbally. |
| 5 | Q. Is gender a factor that should be considered whether or |
| 6 | not to tow a vehicle? |
| 7 | A. Absolutely not. |
| 8 | Q. Is age a factor that should be considered whether or not |
| 9 | to tow a vehicle? |
| 10 | A. Absolutely not. |
| 11 | Q. Are any of those appropriate considerations for writing |
| 12 | tickets? |
| 13 | A. Absolutely not. |
| 14 | Q. Is race appropriate factor to tow a vehicle? |
| 15 | A. Most definitely not. |
| 16 | Q. Is race appropriate factor to write a ticket? |
| 17 | A. Absolutely not. |
| 18 | Q. Were you ever instructed to reduce tows? |
| 19 | A. Yes. |
| 20 | Q. By who? |
| 21 | A. Mr. Hayse and Mr. Welch. |
| 22 | Q. And how were you instructed there? |
| 23 | A. Repeatedly, verbally. Through verbal directives. We |
| 24 | were told not to tow a single vehicle unless absolutely |
| 25 | necessary. And, you know, it was defined. "Absolutely |

| | Page 318 |
|---|---|
| 1 | necessary" means, you know, if you have a car accident |
| 2 | and everything is disabled. Well, then, obviously, |
| 3 | we -- we don't have a choice. We have to get it off the |
| 4 | roadway. Or a stolen car. |
| 5 | But, otherwise, I was told to give everybody a |
| 6 | ticket and let them drive off, or don't do anything at |
| 7 | all, and let the City get the message that we need to go |
| 8 | back to -- to Gene's Towing and then force the City to |
| 9 | do so. |
| 10 | Q. Was towing at the discretion of -- or tickets -- excuse |
| 11 | me -- tickets at the discretion of officers? |
| 12 | A. 100 percent. |
| 13 | Q. All right. Now, you also know the people who own Gene's |
| 14 | Towing; is that correct? |
| 15 | A. Yes. |
| 16 | Q. You socialize with Paul Ott? |
| 17 | A. I do. |
| 18 | MS. MARZOTTO TAYLOR: We've already covered this. |
| 19 | BY MR. COOGAN: |
| 20 | Q. Okay. And when you -- how do you socialize with him? |
| 21 | A. Well, more so Paul Ott -- his son and I became very good |
| 22 | friends. His son is a tow truck driver for the company, |
| 23 | and we ended up befriending each other because he would |
| 24 | see me on so many towing scenes and we discovered just |
| 25 | through conversation -- and we've got a lot of the same |

| | Page 319 |
|---|---|
| 1 | hobbies and interests, such as classic cars, |
| 2 | parachuting, World War II re-enacting, various things we |
| 3 | do together. So, we have a lot of hobbies in common. |
| 4 | You know, we get together to eat and drink and just |
| 5 | became really good friends. |
| 6 | Q. Are you still friends with him? |
| 7 | A. Yes. Yes, I am. |
| 8 | Q. Now, earlier, it was said that you were told to go see |
| 9 | Dr. Clark and then subsequently Dr. Zambo; is that |
| 10 | correct? |
| 11 | A. Correct. |
| 12 | Q. And who ordered you to see Dr. Zambo? |
| 13 | A. Mr. Hayse. |
| 14 | Q. Dr. Clark never ordered you to see Dr. Zambo? |
| 15 | A. Not to my knowledge, no. I never received any paperwork |
| 16 | from Dr. Clark at all. |
| 17 | Q. Did you receive paperwork from Dr. Zambo? |
| 18 | A. No. |
| 19 | Q. So, you never -- did you go at your own direction, or |
| 20 | were you formally told to go see this doctor? |
| 21 | A. Well, I was told to go -- |
| 22 | MS. MARZOTTO TAYLOR: This was covered multiple |
| 23 | times today already. |
| 24 | A. I was actually sent there to go, and I did not receive |
| 25 | any pay. I was forced to go after hours on my own time, |

| | Page 320 |
|---|---|
| 1 | and Mr. Hayse told me I would not be getting paid for |
| 2 | it. |
| 3 | BY MR. COOGAN: |
| 4 | Q. And did you ever see a report or anything from anybody? |
| 5 | A. No. |
| 6 | MS. MARZOTTO TAYLOR: He was just asked that. |
| 7 | MR. COOGAN: But, Counsel, you asked it. If I'm |
| 8 | doing some follow-up questions, I'm permitted to do so. |
| 9 | MS. MARZOTTO TAYLOR: Repeatedly? |
| 10 | MR. COOGAN: I don't think we're here to debate |
| 11 | whether or not you asked the question. Now we're -- I'm |
| 12 | asking the questions now. |
| 13 | MS. MARZOTTO TAYLOR: No, you literally just asked |
| 14 | him that same question like a minute ago. It's -- time |
| 15 | is running on. |
| 16 | A. I think Ms. Gordon asked me the same question about 30 |
| 17 | times a piece, so -- |
| 18 | BY MR. COOGAN: |
| 19 | Q. Okay. Do you know anything about -- you sustained some |
| 20 | damage one time for some clothing; is that correct? |
| 21 | A. That's correct. I was actually dragged down the road. |
| 22 | I had a guy take off on me on a traffic stop. I got |
| 23 | snagged on the car, and I got dragged about 300 feet and |
| 24 | almost killed. In the process, my uniform and a lot of |
| 25 | my leather gear, boots and things of that nature, were |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 321–324

Page 321

1  damaged during the incident.  That became an issue
2  because Mr. Hayse told me if I was stupid enough to get
3  dragged by a car, I could pay for my own replacement
4  gear.
5  Q.  Now, did the court ever reimburse you for those costs?
6  A.  That was a separate incident that the court reimbursed
7  on something.
8        For this stuff, Mr. Hayse refused, and I had to buy
9  stuff out of pocket.  Even though our contract with the
10  City says that if a uniform or apparel or any
11  work-required gear is damaged on duty, the -- it's the
12  City's responsibility and their cost to replace it for
13  us.
14        There was another incident in which I got -- was
15  assaulted on a traffic stop and my cell phone ended up
16  getting smashed in the process.  I had to pay a $100
17  deductible with Verizon to have a replacement phone sent
18  to me.  And I did request restitution from the court --
19  Q.  Did you receive restitution from the court?
20  A.  I did.  I received a check for $100 from the court that
21  they collected from the defendant.
22  Q.  And what happened to that check?
23  A.  Mr. Hayse made me sign it.  I explained to him what it
24  was for.  He said it's mine now, and he took it away
25  from me.

Page 322

1  Q.  So, the $100 reimbursement check you received from the
2  court to replace your phone was taken by Mr. Hayse; is
3  that correct?
4  A.  That's -- that's correct.
5  Q.  Do you consider that to be ethical?
6  A.  No.  I consider it to be theft.
7  Q.  Do you know anything about Mr. Hayse's boat?
8  A.  Well, I know he had a boat parked for a couple years --
9        MS. MARZOTTO TAYLOR:  So, I'm going to --
10  A.  -- in the police evidence garage --
11        MS. MARZOTTO TAYLOR:  -- to place an objection as
12  to relevance.
13        THE REPORTER:  Excuse me.  I'm sorry.
14        MS. MARZOTTO TAYLOR:  I'm going to place an
15  objection as to relevance.
16        MR. COOGAN:  Well, earlier you asked a question
17  regarding ethics, and I'm doing a follow-up regarding
18  ethics.
19        MS. MARZOTTO TAYLOR:  Okay.
20        MR. COOGAN:  That's my response.
21  BY MR. COOGAN:
22  Q.  So, please answer the question.
23  A.  Mr. Hayse had a boat that he personally owned, and he
24  stored it in our police evidence garage.
25  Q.  Wait.  Wait.

Page 323

1  He stored it in the Melvindale Police evidence
2  garage?
3  A.  Correct.  Where police evidence should be stored and
4  sensitive items are stored.
5  Q.  How do you know that?
6  A.  I saw it in there on numerous occasions when I had to,
7  in the course of my duties, go to the evidence garage.
8  Q.  Anything else --
9  A.  I also saw --
10  Q.  Go ahead.
11        Anything else unethical you observed?
12  A.  Yes.  There was a time when Mr. Hayse was doing some
13  renovation at a house he owned, I believe an investment
14  property in Lincoln Park, and he showed up at work with
15  a trailer full of debris and yard waste and things of
16  that nature.  He had me come down to the impound lot,
17  open it up and then proceed to unload his trailer in the
18  city dump pile.
19  Q.  Was this while you were on-duty police officer?
20  A.  I was on duty in uniform.  I actually got filthy
21  unloading all the debris from his trailer and --
22  Q.  Do you typically unload debris from trailers from other
23  police officers?
24  A.  No.
25        As a matter of fact, we're not even supposed to be

Page 324

1  dumping stuff down there.  That's the City's cost to
2  have to get rid of the waste down there.  So, he just
3  added to it.
4  Q.  Any other unethical issues that you observed from the
5  police -- excuse me -- police chief -- former police
6  chief?
7  A.  Mostly just regarding the towing contract, various
8  things he said about people, the way he treated certain
9  officers.  I believe I mentioned earlier about his --
10  the false report that he and Welch colluded upon against
11  then-Sergeant Easton.
12        (Discussion held off the record.)
13        MR. COOGAN:  I have nothing else.
14        MS. MARZOTTO TAYLOR:  Okay.  I need to go grab a
15  couple documents.  So, I'm just going to be right back.
16        MR. COOGAN:  Sure.
17        (Short recess at 5:39 p.m.)
18              *   *   *
19        (Record resumed at 5:42 p.m.)
20        MS. MARZOTTO TAYLOR:  Okay.  Back on.
21        THE REPORTER:  All set.
22        MS. MARZOTTO TAYLOR:  Great.
23              *   *   *
24              RE-EXAMINATION
25  BY MS. MARZOTTO TAYLOR:

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 325–328

Page 325

1  Q.  Okay.  So, when answering Mr. Coogan's questions just
2      now, you said that you've never towed a vehicle without
3      a lawful reason.
4          I'm --
5  A.  Not to my knowledge, no.
6  Q.  Okay.  Great.
7          So, I'm going to show you Bates stamp 3406.
8  A.  Okay.
9  Q.  And as you can see here, this is -- document is a
10     Melvindale Police Department tow tag.  The tow tag
11     prominently states "Released, no charges.  Towed in
12     error."
13 A.  Okay.
14 Q.  So --
15 A.  Well, let me clarify what that likely means here.
16     I mean, without having the actual --
17 Q.  So, actually, I -- I didn't ask you to clarify.
18     So, is it -- so, do you see that this document
19     states that this car was towed in error?
20 A.  Yes.  Based upon error is information from Secretary of
21     State.
22 Q.  So --
23 A.  Based upon error is information from Secretary of State,
24     which I'm legally allowed to rely upon as --
25 Q.  Okay.  All right.

Page 326

1  A.  -- truthful and accurate information.
2  Q.  So, in any event, you did, in fact, tow this car without
3      a lawful reason?
4  A.  No.  Because I had every reason to believe it was a
5      lawful reason and based upon the information provided by
6      Secretary of State.  The error was theirs, not mine.
7  Q.  Do you have any proof of that other than your testimony?
8  A.  You're welcome to contact Secretary of State.
9  Q.  Okay.  I might just do that.
10 A.  We didn't -- we didn't know you were bringing that up
11     today, or I would have came more prepared.
12 Q.  Okay.  I'll take back that.
13 A.  Thank you.
14     THE WITNESS:  Do you -- do you need this for
15     reference?  Report number --
16     MR. COOGAN:  Yeah.  I will follow up on that.
17     (Discussion held off the record.)
18 BY MS. MARZOTTO TAYLOR:
19 Q.  Okay.  Similarly, Bates stamp number 3366 says that this
20     car was also released.
21     I assume, based on your documentation, you know --
22 A.  It says "released."  I mean, it's no longer here.
23 Q.  So -- again -- okay.  So, you're going to have to let me
24     like finish asking my question.
25     So, I'm going to assume -- and you can correct me

Page 327

1      if I'm wrong -- that the car says that it was released.
2      And I assume, based on your documentation that you put
3      on Bates stamp 3406 that that was also because this car
4      was towed in error.
5          Is that accurate or inaccurate?
6  A.  I would guess that is inaccurate.
7  Q.  Okay.  So, why do you say that that's inaccurate?
8  A.  It doesn't say it was released in error or anything
9      else.  It just says "Released."
10     Sometimes we'll make notes on there, "Released," or
11     "In LEIN" or "Out of LEIN," "Remove from RMS."
12 Q.  Okay.
13 A.  Just notes for us in-house --
14 Q.  So --
15 A.  -- so we don't mix it up with paperwork.
16 Q.  If I wanted to, you know, double-check this information
17     to make sure that you did, in fact, have a lawful reason
18     to tow this car, how would you suggest that I do that?
19 A.  Well, you'd probably want to get yourself a copy of the
20     report.
21     You should know that as an attorney.
22     THE REPORTER:  I'm sorry -- I apologize.
23 BY MS. MARZOTTO TAYLOR:
24 Q.  So, you're here to -- you're here to answer my
25     questions, Mr. Furman.

Page 328

1  A.  Oh.  Thanks, Hon.
2  Q.  So --
3  A.  You need to obtain a copy of the police report.
4  Q.  Great.
5      So, I will be doing that.  Thank you so much.
6      Okay.
7      MR. WISE:  Can I have that?
8      (Discussion held off the record.)
9      MR. WISE:  Thank you.
10 BY MS. MARZOTTO TAYLOR:
11 Q.  Okay.  So, what is your role in personnel in HR between
12     the years 2012 and 2016?
13     (Discussion held off the record.)
14     MR. WISE:  I mean, I'm just going to object because
15     it wasn't covered on direct.  It wasn't covered in
16     follow-up --
17     MS. MARZOTTO TAYLOR:  So, you asked some -- so --
18     MR. WISE:  Where are you going?
19     MS. MARZOTTO TAYLOR:  So, you asked him questions
20     and Mr. Furman gave an answer about some disciplinary
21     decisions that were handed down.  So, I want to know
22     what his role was in, you know, providing discipline in
23     the department.
24 A.  I didn't have a role in providing discipline in the
25     department.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 329–332

Page 329

BY MS. MARZOTTO TAYLOR:

1
2  Q.  Okay. So, basically, then, you have no other evidence
3      other than, you know, what you heard kind of via --
4  A.  Firsthand from the officer?
5  Q.  -- the grapevine, you know, that this disciplinary
6      action was -- was given and what the reasons were for
7      it?
8          You weren't a part of giving that disciplinary
9      action, were you?
10 A.  I was a member of the same union as that officer. So, I
11     heard it from the union --
12 Q.  So --
13 A.  And I also heard it firsthand from that officer.
14 Q.  So, all the union members are all privy to one another's
15     personnel information, including disciplinary actions?
16 A.  No. But somebody on the union board, like myself, the
17     union treasurer, would be.
18 Q.  The union treasurer is privy to all disciplinary actions
19     that are handed down to all their police officers?
20 A.  We're a union representative. Correct.
21 Q.  So --
22 A.  That means you're treasurer, and you're also that
23     person's representative for any union matters.
24 Q.  Okay. So --
25 A.  We're a very small union, so we multitask.

Page 330

1  Q.  Okay. And what was your role in negotiating the towing
2      contracts? The City's towing contracts?
3  A.  I have no role in negotiating the City's towing
4      contract.
5  Q.  Excellent.
6          Let's see here.
7          Okay. So, I'm going to turn to the policy review.
8      Actually, not yet.
9          I'm going to instead -- to -- I'll direct your
10     attention to the April 26th memorandum that was issued
11     to you by Chad Hayse.
12         So, earlier you said that you were ordered to -- to
13     tow and to enforce the traffic code based on race.
14 A.  Correct.
15 Q.  And I believe that your answer was, you know, somehow in
16     reference to this document.
17         Can you tell me where it says "race" on that
18     document?
19 A.  Mr. Hayse and Mr. Welch made that verbally clear on a
20     regular basis.
21 Q.  Okay. So, that's not what I asked you. So, try to just
22     listen.
23         Can you show me on that where on that document it
24     says "race"?
25 A.  It doesn't say. He left that off.

Page 331

1  Q.  Great.
2          Okay. Now I will turn your attention to the policy
3      review.
4          Okay. So, you went through with Mr. Coogan a
5      lengthy list of things that you told Mr. Jackson --
6  A.  Uh-huh.
7  Q.  -- that were going -- that were allegedly going on in
8      the police department at that time.
9          Let's see here.
10         Is there any reason that you know of that
11     Mr. Jackson would not have included all of the
12     allegations that you brought up to him in his policy
13     review?
14 A.  I don't --
15         MR. WISE: Object to foundation.
16         Go ahead.
17 A.  I don't know what his scope of his report was or what --
18     I gave him everything I knew.
19 BY MS. MARZOTTO TAYLOR:
20 Q.  You just testified as to what you told him.
21 A.  Correct. But I don't know what he was paring down from
22     that to put in writing. I have no idea. And I have not
23     got a copy of his report.
24 Q.  Okay. You've never read the Policy Review?
25 A.  The Policy Review of what?

Page 332

1  Q.  It's the title of the -- of the report that Mr. Jackson
2      wrote with regards to your department. It's called
3      "Policy Review."
4          You never read Mr. Jackson's report after it was
5      completed?
6  A.  I read it for the first time about a week ago.
7  Q.  Okay.
8  A.  But prior to that, no, I had never seen it, didn't know
9      anything about it, how many pages, nothing.
10 Q.  Okay. So, other than what Mr. Jackson wrote up when he
11     was done with his investigation, do you have any other
12     proof as to what you told him that was going on in the
13     department?
14         Did you write any written statements or provide him
15     any documents with evidence, you know, to substantiate
16     your allegations or anything like that?
17 A.  I had sent him, I believe, two e-mails.
18 Q.  And what are -- what were those e-mails?
19 A.  Regarding Mr. Hayse and Mr. Welch's behavior and the
20     towing contract.
21 Q.  Specifically what?
22 A.  Well, I -- I don't have specifics at this point. I
23     mean, everything I discussed was discussed both there,
24     and then he called me as a follow-up to the e-mail and
25     we talked on the phone.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

FURMAN, SERGEANT MATTHEW
03/13/2018

Pages 333–336

Page 333

1  Q.  Did he -- did you give him a written statement of any
2      kind?
3  A.  I mean e-mail is writing, but as far as a handwritten
4      statement, no, not to my knowledge.
5  Q.  Okay.  And he didn't send you a summary of your
6      conversation for you to approve or anything like that?
7  A.  No.
8  Q.  Okay.  Great.
9           Okay.  And you also, in response to Mr. Coogan,
10     said that you were ordered to racially profile --
11 A.  Yes.
12 Q.  -- by Chief Hayse and Lieutenant Welch.
13 A.  Correct.
14 Q.  Other than your testimony here today, do you have any
15     proof of that?
16 A.  Written proof, no.
17 Q.  Anything given to you in writing?
18 A.  No.
19          MS. MARZOTTO TAYLOR:  Okay.  All right.  No further
20     questions.
21          MR. COOGAN:  Oh, I just -- thank you.  I just have
22     one question, or maybe -- maybe several.
23                      *   *   *
24              RE-EXAMINATION
25 BY MR. COOGAN:

Page 334

1  Q.  How do you know from this document from Secretary of
2      State, it is -- SOS, how do you know it was the
3      Secretary of State here?
4  A.  Because Secretary of State, when I ran it, showed no tax
5      paid, which meant it's not eligible for license plates,
6      which means it's not eligible to be driven on a public
7      roadway.  And when I ran the VIN on that vehicle, that's
8      what would have came up.
9  Q.  So, you --
10 A.  That's why it was impounded.
11 Q.  Okay.  So, you're telling me the Secretary of State
12     computer occasionally has a mistake?
13 A.  That's correct.  Secretary of State does make occasions.
14     However, as a police officer, I have to rely upon the
15     information Secretary of State and LEIN provides me, and
16     that's what they provided at the time the vehicle was
17     impounded.
18 Q.  So --
19 A.  And this would have probably been a parked car because
20     it shows there was no key.  So --
21 Q.  Okay.  How many times has that happened to you, a
22     Secretary of State error?
23 A.  It's rare, but it does happen.  I mean, they're --
24     they're mostly accurate, but they -- they can be, at
25     times, inaccurate.

Page 335

1  Q.  Do you know the reason for this vehicle being towed?
2           It says "Released."
3           Do you -- do you know why that vehicle was towed?
4           The other --
5  A.  It looks like it had invalid insurance or no insurance.
6      The --
7           MS. MARZOTTO TAYLOR:  Well, the document speaks for
8      itself.
9  A.  Yeah.
10          But I don't know without looking at the report.
11 BY MR. COOGAN:
12 Q.  And officers have discretion on occasion to release cars
13     if they want; is that correct?
14 A.  Correct.
15 Q.  And who -- who has the authority to do that?
16 A.  Are you talking about at the traffic stop or at the
17     station?
18 Q.  At the station.
19 A.  Whoever is on desk.
20          As a matter of fact, Lieutenant Welch used to
21     release vehicles or not charge for things after Goch &
22     Sons got the tow contract, and he would say it's the --
23     they can -- he's not going to make any more money than
24     he needs to.
25          MS. MARZOTTO TAYLOR:  All right.

Page 336

1           MR. COOGAN:  All right.  I have nothing else.
2           MS. MARZOTTO TAYLOR:  Okay.
3           MR. COOGAN:  I have nothing else.
4           These are your exhibits here, too.
5           MS. MARZOTTO TAYLOR:  Thank you.
6           MR. COOGAN:  You're welcome.
7                      *   *   *
8                RE-EXAMINATION
9  BY MS. MARZOTTO TAYLOR:
10 Q.  Do you have the capability to double-check the Secretary
11     of State information?
12 A.  No.  They -- all their updated information is kept -- I
13     mean, when you run a plate or run a VIN, that's what
14     comes back.  That's supposed to be the absolute most
15     current, most up-to-date information --
16 Q.  Okay.
17 A.  -- available.
18 Q.  So, how did you find out that there was a mistake?
19 A.  I don't even know if there was a mistake.  It just says
20     it was "Released."
21          Well, all -- all vehicles who don't go to auction
22     are released.  The vehicle either goes to auction or
23     it's released.  It's -- so, I don't know if that was
24     released at no charge or an error.
25 Q.  So, I'm going to bring your attention back to this

FURMAN, SERGEANT MATTHEW
03/13/2018

**Page 337**

1      document right here --
2 A.   Okay. I'm sorry. I thought you were still referring to
3      this one, which says "Released."
4 Q.   -- 3406.
5 A.   Okay.
6 Q.   This says "Towed in error."
7 A.   Okay. So, my assumption with that would be somebody had
8      the vehicle towed, went to Secretary of State, clarified
9      their stuff, and came back with a letter from Secretary
10      of State. Because that's generally the only way we
11      would waive the fees is if they had documentation from
12      Secretary of State basically saying, "Dear Melvindale
13      Police, we at Secretary of State made an error. We
14      apologize. Please turn this vehicle over. Its legal,"
15      or whatever.
16 Q.   Okay. But you can't check that out on your end?
17 A.   No. I mean, us checking is when we run it. They had to
18      go to the Secretary of State and then Secretary of State
19      would have had to --
20 Q.   Okay.
21 A.   -- somehow in their internal system --
22 Q.   Okay.
23 A.   -- determine there was an error made.
24 Q.   And it says here on this document that you towed this
25      car?

**Page 338**

1 A.   Yes. Very clearly.
2      MS. MARZOTTO TAYLOR: Okay. All right. Nothing
3      further.
4      MR. COOGAN: We're off the record.
5      (Deposition concluded at 5:53 p.m.)
6          *   *   *

**Page 339**

1   STATE OF MICHIGAN )
2   COUNTY OF OAKLAND )
3        CERTIFICATE OF NOTARY PUBLIC
4      I do hereby certify that the witness, whose
5 attached testimony was taken in the above matter, was
6 first duly sworn to tell the truth; the testimony
7 contained herein was reduced to writing in the presence
8 of the witness by means of stenography; afterwards
9 transcribed; and is a true and complete transcript of
10 the testimony given.
11      I further certify that I am not connected by blood
12 or marriage with any of the parties; their attorneys or
13 agents; and that I am not interested, directly or
14 indirectly, in the matter of controversy.
15      In witness whereof, I have hereunto set my hand
16 this day at Highland, Michigan, County of Oakland, State
17 of Michigan on Thursday, March 15, 2018.
18
19
20
21      John J. Slatin, RPR, CSR-5180
22      Certified Shorthand Reporter
23      Notary Public, Oakland County, Michigan
24      My commission expires: July 25, 2023
25

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy