# EXHIBIT L

# In the Matter Of:

# HAYSE vs CITY OF MELVINDALE, ET AL.

## DETECTIVE CORPORAL BRANDON NOLIN

### April 20, 2018

*Prepared for you by*



**The Power of Commitment™**

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5   CHAD HAYSE,
            Plaintiff,
 6   -vs-                        Case No.: 17-cv-13294
     CITY OF MELVINDALE, a political  Hon. Linda V. Parker
 7   Subdivision of the State;    Mag. Elizabeth A. Stafford
     MELVINDALE CITY COUNCIL, a
 8   legislative body of the City of
     Melvindale; NICOLE BARNES,
 9   WHEELER MARSEE, MICHELLE SAID
     LAND, DAVE CYBULSKI, CARL
10   LOUVET, and STEVEN DENSMORE,
     individuals, sued in their
11   official and personal capacities,
            Defendants.
12   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/
13   DEPONENT:    DETECTIVE CORPORAL BRANDON NOLIN
14   DATE:        Friday, April 20, 2018
15   TIME:        10:09 a.m.
16   LOCATION:    Deborah Gordon Law
17                33 Bloomfield Hills Parkway, Suite 220
18                Bloomfield Hills, Michigan
19
20   REPORTER:    John J. Slatin, RPR, CSR-5180
21                Certified Shorthand Reporter
22
23          (Appearances listed on page 2)
24
25
```

**Page 3**

```
 1                   TABLE OF CONTENTS
 2
 3   WITNESS                                  PAGE
 4
 5   DETECTIVE CORPORAL BRANDON NOLIN
 6
 7      Examination by Ms. Gordon             4
 8      Examination by Ms. Balian            105
 9      Re-Examination by Ms. Gordon         167
10
11   EXHIBITS:                           IDENTIFIED
12
13          (None offered)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1   APPEARANCES:
 2
 3       DEBORAH L. GORDON (P27058)
 4       ELIZABETH MARZOTTO TAYLOR (P82061)
 5       Deborah Gordon Law
 6       33 Bloomfield Hills Parkway, Suite 220
 7       Bloomfield Hills, Michigan  48304
 8       (248) 258-2500
 9       dgordon@deborahgordonlaw.com
10       emarzottotaylor@deborahgordonlaw.com
11          Appearing on behalf of the Plaintiff.
12
13       MELINDA BALIAN (P55744)
14       Foley & Mansfield, PLLP
15       130 E. Nine Mile Road
16       Ferndale, Michigan  48220
17       (248) 721-8183
18       mbalian@foleymansfield.com
19          Appearing on behalf of the Defendants.
20
21       ALSO PRESENT:  Chad Hayse
22
23
24
25
```

**Page 4**

```
 1                          Friday, April 20, 2018
 2                          Bloomfield Hills, Michigan
 3                          10:09 a.m.
 4                      *   *   *
 5          (Parties present as indicated.
 6           Mr. Hayse is not present.)
 7                      *   *   *
 8          DETECTIVE CORPORAL BRANDON NOLIN,
 9   having been first duly sworn, was examined and testified
10   as follows:
11                      EXAMINATION
12   BY MS. GORDON:
13   Q.  Hi, Detective Nolin.  I'm Deborah Gordon.  I represent
14       Chad Hayse.  We just met this morning.
15   A.  Yes.
16   Q.  If you don't understand my questions, if you want me to
17       repeat or rephrase, just let me know; okay?
18   A.  Okay.
19   Q.  How long have you been with Melvindale?
20   A.  It will be six years next month.
21   Q.  Okay.  And when you hired in, what was your title or
22       role?
23   A.  Road patrol officer.
24   Q.  Okay.  And at some point you became a detective?
25   A.  Yes, ma'am.
```

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                        Pages 5–8

Page 5

1   Q.   And when was that?
2   A.   That was February of 2014.
3   Q.   Okay.  And what are you doing today?
4        What are your job duties?
5   A.   Today, I'm currently assigned to the Michigan State
6        Police in an undercover role for a narcotics team.
7   Q.   Okay.  And that's some kind of a special assignment, I
8        assume?
9   A.   Yes.
10  Q.   And when did you begin that assignment?
11  A.   The 26th of last month was my first day.
12  Q.   Okay.  And as of that time, what was your role at
13       Melvindale?
14  A.   Prior to --
15  Q.   To leaving for your special assignment.
16  A.   I was a corporal on the midnight shift.
17  Q.   Okay.  And what were you doing?
18       Were you on road patrol?
19  A.   Road patrol, yes.
20  Q.   Okay.  And do you act as a detective?
21  A.   I do now.
22       I didn't then.
23  Q.   I see.
24       Okay.  When did you get the title of detective?
25  A.   The first time?

Page 6

1   Q.   Yeah.
2   A.   That was in 2014.
3   Q.   Okay.
4   A.   I came out of the detective bureau.  I was -- in January
5        of 2017 and went to the midnight shift as a corporal.
6   Q.   Okay.  When did you come out of the academy?
7   A.   That would have been December of 2011, I believe.
8   Q.   And what was your first job?
9   A.   My first police job?
10  Q.   Yes.
11  A.   Was Melvindale.
12  Q.   Okay.  And what's your educational background?
13  A.   I have an associate's degree in criminal justice from
14       Oakland Community College.
15  Q.   Give me a brief overview of your duties as a detective.
16  A.   As a detective, our duties -- or my duties were to
17       follow up on cases that had reports that had already
18       been taken by the road patrol officers, handle the
19       prisoners that were in custody to make sure that they
20       got arraigned and handle interviews of potential
21       suspects or witnesses, things of that nature.
22  Q.   Okay.  And you're currently doing some road patrol work?
23  A.   No, not on the -- not on the special assignment.
24  Q.   Okay.  I'm sorry.  But prior to the special assignment,
25       you were doing some road patrol?

Page 7

1   A.   Yes.
2   Q.   Okay.  And what were your duties on road patrol?
3   A.   Road patrol was to respond for calls for service,
4        enforce the traffic laws, make sure we were visible for
5        the public so they knew that we were out there, trying
6        to keep them safe.
7   Q.   Okay.  And do all road patrol officers have essentially the
8        same duties?
9   A.   For the most part, yes.
10  Q.   Okay.  And who -- as far as you know, who is responsible
11       for disciplining command officers at the Melvindale
12       Police Department?  Is that --
13  A.   Currently?
14  Q.   Is that the Public Safety Commission?
15  A.   I believe so.
16  Q.   Okay.  And nonsupervisory officers, what's the procedure
17       for discipline?
18  A.   That would go through the supervisors, up through to the
19       chief.
20       So, our sergeants to our lieutenants and then to
21       the chief's office.
22  Q.   Okay.  With regard to towing in the City of Melvindale,
23       what is the purpose of towing as part of your job
24       duties; if any?
25  A.   Certain vehicles -- there's certain laws that state --

Page 8

1        that make a vehicle roadworthy, whether it has to have
2        insurance, it has to have proper plates on it.  The
3        driver has to have a valid license.
4        So, if the vehicle is in violation of those things
5        or if it -- if it isn't safe for it to be on the road,
6        if the brakes aren't working, if it's nighttime and the
7        headlights aren't working, things of that nature, the
8        officer has discretion on whether or not to tow that
9        vehicle.
10       Also, if it's used in the commission of a crime, if
11       there are narcotics found in the vehicle or on any
12       person within the vehicle, unregistered firearms, stolen
13       firearms, if there's just stolen product from a B & E in
14       the vehicle, again, the vehicle would be impounded.
15  Q.   Okay.  So, is the impound the second step after a
16       traffic stop for some other reason?
17       How does that work?
18  A.   What -- I'm not sure I understand.
19  Q.   Okay.  So, you say -- for example, your last example was
20       if there's some criminal activity, you find some illegal
21       substance in the car, somebody is driving without a
22       license.
23       You learn that after you've made a stop?
24  A.   Yes.
25  Q.   Okay.  So, would you typically make a stop for some

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                    Pages 9–12

Page 9

1    traffic violation purpose and then --
2  A.   Usually, yes.  That's how it would work.
3  Q.   Okay.  And then the next step would be that, in part of
4       your investigation on the scene, you might learn
5       something that would cause you to think I may have to
6       impound this vehicle?
7  A.   Correct.
8  Q.   Okay.  Do you know whether or not officers look for cars
9       to tow and stop cars for the purpose of towing instead
10      of for some other purpose?
11 A.   Yes.
12 Q.   What do you know in that regard?
13 A.   We have a specific officer who seems to take pride in
14      towing vehicles.  It's a goal of his.
15 Q.   Okay.  And that's Matthew Furman?
16 A.   Yes.
17 Q.   And so -- I mean, I've deposed him, and what I've
18      learned is that he does run license plates before he
19      pulls somebody over.
20 A.   Yes.
21          Most officers will -- well, some officers will do
22      that.
23          Just in the course of road patrol duties, you can
24      run --
25 Q.   Right.

Page 10

1  A.   -- any license plate on the roadway just to make sure
2       that it's valid, to make sure that the driver doesn't
3       have warrants, to make sure that -- that the driver's
4       license is valid for the driver of the vehicle.
5           However, it's not common practice to do that in --
6       in a sense of trying to find something wrong.  You're
7       just doing that to make sure everything is correct.
8           It's the practice of Officer Furman that he does
9       that with every car that he can find that he believes
10      he's going to be able to impound.
11 Q.   Okay.  And he has said that he may tow as many as ten
12      vehicles a day.
13          I don't know if it's more or less, but he used that
14      as a possibility.
15          Does that sound like a high number of vehicles, for
16      a shift, to tow?
17 A.   Yes.  That's -- our busiest shift, as far as traffic,
18      would be our afternoon shift, which is 4:00 to midnight.
19      That's when the most traffic would be on the roadway for
20      our officers to interact with.  And ten would be heavy
21      for that entire shift to tow, which is three or four
22      officers on the road.
23 Q.   Have you impounded vehicles?
24 A.   Yes.
25 Q.   Tell me what your procedure is.

Page 11

1           Just give me a hypothetical example or something
2       you can think of from the time you spot a vehicle and
3       begin to think about making a stop.
4  A.   If I'm stopping a vehicle, it is for either absolute
5       safety reasons, meaning the vehicle is swerving or has
6       something defective that --
7               (Discussion held off the record.)
8  A.   Maybe they may not even --
9               MS. GORDON:  Excuse me one second, Detective.
10 A.   I'm sorry.
11              (Discussion held off the record.)
12              MS. BALIAN:  Can I -- are those the documents I
13      provided today?
14              MS. GORDON:  Yeah.
15              MS. BALIAN:  I just want to make a record that they
16      were provided to you.
17              MS. GORDON:  Okay.  Very good.
18 A.   So, if I see something, a traffic violation or something
19      that needs to be addressed for safety reasons, I'll stop
20      the vehicle and conduct a traffic stop.  And throughout
21      the investigation of the traffic stop, if they're --
22      again, like I said, if there's something criminal, if I
23      believe that there's narcotics in the vehicle, if the
24      driver has been drinking, I'll continue my investigation
25      further.  And if it comes to the point where I'm going

Page 12

1       to impound the vehicle, I will ask for another officer
2       to the scene, for safety reasons -- people generally
3       don't like it when you're taking their vehicle -- before
4       I ever let the driver know that I'm going to be taking
5       it, as well as I'll let dispatch know to call for a tow
6       truck.
7           And then once the scene is safe, whether I'm
8       arresting the occupants, driver, passengers, whatever,
9       or sometimes I -- they're not arrested at the scene.
10      They're released from the scene.
11          Once it's safe for me to do so, I will search the
12      vehicle as far as an inventory search to make sure
13      that -- to note any items of value on the vehicle and
14      any damage currently with the vehicle, and report that
15      on our tow sheets.
16 BY MS. GORDON:
17 Q.   Okay.  And then do you -- if you are taking -- if there
18      is an arrest, is it that you already have another
19      officer there and that individual can take the citizen
20      to the police station, or how does that work?
21 A.   Some -- some officers do that.  I prefer not to do that
22      only because -- this is just personal preference.
23 Q.   Uh-huh.
24 A.   I don't want myself tied up and a second officer tied up
25      staying with the vehicle in case our third officer gets

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 13

1    a two-man call and needs backup.  I don't want all of
2    this backup being tied up because of my stop.
3         So, personal preference, I'll have the arrested in
4    my car and wait for the tow myself.  And once the
5    vehicle clears, then I will take the arrested in to the
6    station.
7  Q.  And then what do you do once you get to the station?  Is
8    there paperwork and so on?
9  A.  Yes.
10       You book the prisoner.  I always search the
11    prisoner twice.  Again, just personal preference.  I
12    search them before I put them in my car and then I
13    search them again at the station while they're still in
14    handcuffs.  It's just a safety personal preference.
15       However, once they're in the booking area, you book
16    them in, get their paperwork set up, get them in a cell.
17       We have a board up in the -- what used to be the
18    dispatch area, where we write the names of the
19    prisoners.
20       However, all that has actually just changed as of
21    about a week or so ago because now we're housing at
22    Dearborn P.D.  So, I'm not 100 percent how that's
23    working since I'm not there.  But that was the procedure
24    while I was there.
25  Q.  And so, of the impounds that you effectuate, roughly

Page 14

1    what percent end up with the driver being arrested?
2         MS. BALIAN:  Objection.  Lack of foundation.
3         You can answer if you know.
4  A.  I -- of my own personal.
5  BY MS. GORDON:
6  Q.  Yes.
7  A.  It would be hard to say.  Each -- I take each incident
8    separate from the next.
9       So -- it would be hard to say.
10  Q.  Okay.  What's the policy at the department if you stop
11    somebody and there's a warrant out for his arrest?
12  A.  It depends on what the warrant is for and which
13    department.
14  Q.  Okay.
15  A.  However, the general policy, if it's not a Melvindale
16    warrant, if it's not our own warrant, is to advise
17    dispatch that there is -- that you have made contact
18    with person -- you know, Person A and that there's a
19    warrant for their arrest.  And dispatch will contact
20    that department to see if they want to hold them and
21    arrest -- have us arrest them for them to pick up.
22       If they do, then -- then we can arrange it where
23    we'll hold at our station.  We can arrange it where we
24    will meet that department on the road.  Sometimes if
25    it's close, as in Lincoln Park or Allen Park, we have

Page 15

1    dropped off right at their station.  Or, if the
2    department says that they don't want to hold them for
3    that -- sometimes they're less serious warrants, some --
4    I mean literally just for a littering ticket.  So, if
5    it's for something of a less serious nature, the
6    department won't want to pick up.  So, we'll just advise
7    them that they have a warrant that they need to take
8    care of, but release the person from the scene.
9  Q.  Okay.  If it's a more serious warrant than something
10    like a littering, is it standard procedure to let the
11    other departments know and give them the opportunity to
12    decide whether they want to try to obtain the person?
13  A.  If it's a felony warrant, they have to pick up.
14  Q.  Okay.
15  A.  So, we still advise them that we have Person A in
16    custody; that they have a felony warrant with you.  And
17    we will try to work out details, again, on whether to
18    house at our place and let them pick up from there or to
19    meet on the road, how they want to work that.  But that
20    person would be arrested.
21       (Mr. Hayse enters the room.)
22  BY MS. GORDON:
23  Q.  And what about if it's a Melvindale citizen and there's
24    a felony warrant?  How is that handled?
25  A.  That would be -- they would be arrested once that is

Page 16

1    learned.
2       And then we would just contact our own dispatch and
3    let them know that we have Person A under arrest for a
4    Melvindale felony warrant and bring them into the
5    station and go through the booking process that I
6    described earlier.
7  Q.  And as I understand it, that's a requirement --
8  A.  Yes.
9  Q.  -- if you're picking somebody up from Melvindale and
10    there is a warrant to bring the person in?
11  A.  Yes.
12  Q.  Okay.  You said you called dispatch.
13       Do you always call dispatch when you're engaged in
14    an impound activity?
15  A.  Yes.
16  Q.  And what's the purpose?
17  A.  For a few reasons.
18       One, that lets dispatch know you're going to be
19    tied up for a little while, as far as not being able to
20    assist with calls.
21       Also, dispatch is the one who would contact the
22    towing company to let them know to send a tow truck to
23    the stop, as well as -- previously, up until about two
24    months ago, the dispatcher or supervisor was who
25    dispatched us.  So, our supervisor would be the one who

Page 17

1    would enter the vehicle into LEIN as impounded.
2    Q.  I see.  Okay.
3            Are you aware that Matthew Furman uses his cell
4        phone to directly call a Goch driver --
5    A.  Yes.
6    Q.  -- on his cell?  Scott(sic) Briscoe would be one
7        person --
8    A.  Yes.
9            MS. GORDON:  Do I have the name right?
10           MS. MARZOTTO TAYLOR:  Uh-huh.
11   BY MS. GORDON:
12   Q.  -- on his phone.
13           Does that strike you as unusual?
14   A.  For Mr. -- for Officer Furman, no, he's done that for
15       quite some time.
16   Q.  For police activity?
17   A.  But for -- for our department, yes, I believe he's the
18       only officer who does that.
19   Q.  So, what, as you understand how this whole thing works,
20       would be the point of doing that?
21   A.  It speeds up the process for Officer Furman, and I
22       believe it's so he can tow -- tow more cars, in all
23       honesty.
24   Q.  Right.
25           And what do you understand the reason is he wants

Page 18

1    to tow so many cars that he wants to take steps like
2    calling a tow driver directly on his own cell?
3            What would be the point, from a Melvindale Police
4    Department point of view, of speeding that process up so
5    much?
6            What would be the upside to the department?
7            MS. BALIAN:  Objection.  Lack of foundation.
8    BY MS. GORDON:
9    Q.  Go ahead.  We make these objections, and you go ahead.
10           MS. BALIAN:  You can still answer.
11   A.  Oh, sorry.
12           The upside to the department would be it generates
13   revenue for the department.
14   BY MS. GORDON:
15   Q.  And how about to Officer Furman?
16   A.  As I said earlier, he seems to take pride in it.  Since
17   around our one-year mark or so, maybe a little after
18   that -- we hired in roughly about four days apart from
19   each other.
20           So, around our one-year mark, or roughly in that
21   area, he made it a goal of his to tow cars.  He would
22   tell -- almost as if to be bragging to officers in the
23   locker room, "I towed 12 cars today."  "I towed 20 cars
24   last week."
25           He actually had told many officers, including

Page 19

1    myself, that he had a goal to tow 1,000 cars within a
2    calendar year.
3    Q.  So, what did you make of that, as a police officer?
4    A.  I didn't think it was appropriate.  I don't -- as a
5        fellow officer, I don't understand the purpose of it.  I
6        don't feel that that's really what a police officer is
7        supposed to be doing.
8    Q.  Tell me what a police officer is supposed to be doing
9        that's out on road patrol.
10   A.  Serving the public.  That's our -- everybody knows, when
11       you get into this line of work, you are a public
12       servant.  That's what the job is for.
13           And I don't believe the way that Officer Furman
14       polices is serving the public most of the time.  I think
15       most of the time he's serving his own agenda, his own
16       pride.
17   Q.  Okay.  When he's tied up with all these tows that he's
18       doing all day, does it mean he's not doing other things
19       that the other officers on the shift may be doing?
20   A.  Yes.
21   Q.  Can you describe that a little bit?
22   A.  Well, as I explained earlier, specifically with myself,
23       why I would wait with the prisoner in my car and wait
24       for the tow truck myself, that's so the other cars -- I
25       could have two cars free.

Page 20

1            Well, on day shift, our minimum required for the
2    road is only two officers on the road, which happens
3    most of the time.  Therefore, it would just be Officer
4    Furman and one other officer on the road.
5            When he is tied up with these tows, which take up
6    most of his day, because that's what he chooses to do,
7    the other officer is the one taking all the calls for
8    service, sometimes having to place -- well, not placing
9    the call on hold, but telling the caller, "Okay.  We'll
10   get there as soon as we can," because our one officer is
11   out on a call and Officer Furman was towing a car.
12           Sometimes we would have to send the detectives out
13   to handle the call, which is not the norm.  Sometimes,
14   including -- I was working when Chief Allen had to
15   handle a call for service, as the chief, because the
16   detective bureau was busy.  Our one officer was on a
17   call, and Officer Furman was towing a car.
18   Q.  So, why didn't -- I mean, what's your understanding of
19       why, for example, Chief Allen doesn't say, "You can't do
20       this.  We need you out there backing people up.  We need
21       you taking calls.  We need you doing traffic patrol"?
22   A.  I'm not 100 percent sure why Chief Allen -- that would
23       be a question more for him.
24   Q.  Right.
25   A.  However, I know that it has been stressed to Officer

Page 21

1   Furman from friends, from coworkers, from supervisors
2   that they would like him to do that.  However, he stays
3   within his legal rights as an officer, and it makes it
4   difficult for a supervisor to tell him not to do that.
5   Q.   I see.
6        What do you mean by "legal rights"?  Contractual
7   rights or what?
8   A.   As an officer, you're given certain authority, and he
9   stays within that authority as far as what the law
10  allows him to do as an officer --
11  Q.   Okay.
12  A.   -- by towing these cars.  So --
13  Q.   You used the word earlier "discretion" when you were
14  describing decision-making with regard to calling for a
15  tow --
16  A.   Yes.
17  Q.   -- and doing an impound.
18       Explain to me what "discretion" means in that
19  regard.
20  A.   In regards to the towing?
21  Q.   Yes.
22       What are the factors that you would be thinking of?
23  A.   I take in -- as I said, I take each traffic stop
24  separate from the one before, separate from the one
25  after it.  So, I take into account the age of the -- of

Page 22

1   the person in the vehicle, or the driver, if you will.
2   I take into account the situation, who all is in the
3   car, as far as, are there children in the car?  Is there
4   elderly in the car?  Is there someone sick in the car?
5   Sometimes -- are they on their way to or from a
6   hospital?
7        I also -- I ask every driver if they have a reason
8   for whatever it was I stopped them for, if they're
9   speeding but their mom just got real sick and the
10  hospital said to get up here.  That's -- I take into
11  account all of that, as well as what it was they -- I
12  actually stopped them for.
13       If I stopped them just because their taillight was
14  out, and then I found out later that their license was
15  suspended versus I stopped them because they -- you
16  know, they almost hit three cars, I take into account
17  all of that, as well as road conditions.  I take into
18  account time of day, just about everything really.  I
19  try to encompass all that as I would want somebody to do
20  for me.
21  Q.   Do you -- from what you've observed and what you're
22  aware of, do most of the officers in Melvindale use
23  discretion in the way you've just described?
24  A.   Yes.  From the ones that I've seen, most of them do.
25  Q.   Obviously, you must know who Michael Goch is, by this

Page 23

1   time?
2   A.   Yes.
3   Q.   Okay.  And, obviously, we all know that he has the
4   towing contract for Melvindale.
5        Prior to him obtaining the towing contract, did you
6   see him around the police station?
7   A.   Yes.
8   Q.   In what regard?
9   A.   He would come up to the station and introduce himself to
10  everyone as Mike Goch, the owner of Goch & Sons Towing.
11       He spent most of his time on the city hall side.
12  Our station is in the same building as our city hall,
13  but basically on opposite sides of the building.  He
14  seemed to spend most of his time over there; however,
15  every time that I seen him in the building prior to the
16  contract, he would come over to the police department
17  side and introduce himself to anybody that was in the
18  station.
19  Q.   Okay.  And what was -- as far as you know, who was he
20  visiting on the city side?
21  A.   I don't know for sure.
22  Q.   Obviously, it would be helpful to him to have good
23  relationships, I assume, with officials in the City.
24       Would that be your understanding?
25       MS. BALIAN:  Objection.  Calls for speculation.

Page 24

1   BY MS. GORDON:
2   Q.   You can go ahead and answer.
3   A.   Yes.
4        It was -- we knew that -- the officers at the
5   department, myself included, knew at that time that Goch
6   & Sons had got into -- that they were bidding for our
7   towing contract and trying to outbid the current towing
8   company that we were using, which was Gene's.  And it
9   was assumed at that point that he was there trying to
10  help his chances of gaining our -- the City's business.
11  Q.   Did you ever become aware that Goch gave gifts or
12  donations to the police department?
13       We've heard some of that during other depositions
14  in this case.
15  A.   Yes.
16       (Outside interruption.)
17  A.   I'm sorry.  That's my work phone.
18  BY MS. GORDON:
19  Q.   If you need to take a call, just let us know.
20  A.   No.  It was just a text message.  I may need to respond
21  here in a second, though.
22  Q.   Okay.
23  A.   But, yes, Goch & Sons, specifically from Mike Goch, had
24  brought food to the department on multiple occasions,
25  including -- I know of one specific incident, and I

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                    Pages 25—28

Page 25

```
1         don't remember the date or time frame in which it
2         happened, where he provided food for a party at Officer
3         Easton's house for the police officers of Melvindale.
4    Q.   Okay.  Did you become aware that Officer Furman
5         developed a personal relationship with Mike Goch?
6              He's testified to that here.
7    A.   Yes.
8    Q.   And how did you become aware of that, and what did you
9         become aware of?
10            MS. BALIAN:  Did you say Officer Easton has
11        testified to that?
12            MS. GORDON:  No.  Furman had.
13   A.   Officer Furman told me himself that he had -- would have
14        a -- multiple conversations with Mr. Goch.  He never
15        used the word "friendship," but it was -- it seemed like
16        a friendship in the way he described it as how often
17        they would talk, how often they would speak on the
18        phone, and the type of conversations that they would
19        have were not of a professional nature.  They would talk
20        about restoring old vehicles and things of that nature.
21                   (Outside interruption.)
22   A.   I'm sorry.
23   BY MS. GORDON:
24   Q.   That's okay.
25                   (Discussion held off the record.)
```

Page 26

```
1    BY MS. GORDON:
2    Q.   Did Furman ever discuss with you that he socialized with
3         Goch, went to his home, on his boat?
4    A.   He did tell me that he's been to his house.
5              I did not know that he had been on his boat;
6         however, he did tell me that he's been to his house,
7         that he had been to social events with Mike Goch.
8    Q.   Obviously, Furman undoubtedly generates a lot of revenue
9         for Goch.
10             Would you agree with that?
11   A.   Absolutely.
12   Q.   Were you aware that Furman had personal relationships
13        with the tow drivers, the wrecker drivers?
14   A.   I know that he has -- I believe it's Sean Briscoe.
15   Q.   Right.
16   A.   I know he has his personal cell phone number, and I know
17        that they speak often.  But I -- I'm unaware of the
18        other drivers.  I know he knows them all by first name,
19        but I wasn't sure if that was just through how many cars
20        he towed or whether it was a more personal nature.
21   Q.   Speaking of Briscoe, were you aware that Briscoe has
22        purchased cars at auctions?
23   A.   I knew of one.
24   Q.   Okay.  And did he purchase that for himself or for
25        Furman or for somebody else?
```

Page 27

```
1    A.   He bought it for Officer Furman.
2    Q.   Can you explain how -- what the system is there or what
3         that refers to?
4    A.   I was -- at that time, I was assisting Lieutenant Welch
5         with running the auctions and making sure everybody paid
6         and writing down the correct dollar amounts and things
7         of that nature.  And at the one specific auction that
8         I'm talking about, Mr. Briscoe was bidding.  And I asked
9         him specifically who the car was for, and he told me he
10        was bidding for Officer Furman.  And, actually, he did
11        purchase a car that day for Officer Furman.
12   Q.   So, why wouldn't Furman have purchased it himself as you
13        understand the process and the system?
14   A.   I don't know.  I believe it was because it -- to me, it
15        looks inappropriate that an officer who impounds so many
16        vehicles would then turn around and purchase those
17        vehicles to sell for profit.  Which Officer Furman has
18        told me -- because Officer Furman has bought numerous
19        vehicles from our auction, and he has told myself and
20        other officers that that's what he does with them.  He
21        fixes them up and sells them for a profit.
22   Q.   Have you ever heard that he damages vehicles himself --
23   A.   No.
24   Q.   -- to get a lower price -- to pay a lower price?
25   A.   Yeah.  No, I haven't heard that.
```

Page 28

```
1         You haven't heard that.
2              Is there a limit on the number of cars a police
3         officer can buy from his city auction?
4    A.   Not that I'm aware of.
5    Q.   Okay.  Do you know roughly -- have any feel for how many
6         cars in a month or year Furman purchases?
7    A.   I don't know.
8              I know that it's been multiple, as he would tell
9         us.
10   Q.   Sure.
11   A.   "I bought two cars at that last action and sold them,"
12        and things of that nature; however, I don't know an
13        exact number.
14   Q.   And do you know how he sells them or where he sells
15        them?
16   A.   I believe he lists them online, on probably like a
17        Craigslist, I'm assuming.  But I believe he lists them
18        online and sells them that way.
19   Q.   Okay.  Did you become aware that the city council and
20        some city officials, maybe the city administrator, were
21        very concerned with the amount of revenue generated from
22        towing?
23   A.   Yes.
24   Q.   Okay.  And what did you learn in that regard?
25   A.   The entire department knew that it was going on, that
```

Page 29

1   the city officials were going to and did hire an outside
2   investigator and pay him or her to investigate why our
3   towing numbers had dropped, meaning the number of
4   impounds.
5   Q.   Okay.  So, before we get into that, that the numbers had
6        dropped, I don't know what paperwork you have -- you
7        see, but in this case, a lot of paperwork has been
8        generated about revenue from tows.
9   A.   Okay.
10  Q.   And we can certainly see that the city council is -- has
11       raised many questions about -- or concerns about keeping
12       that revenue up.
13  A.   Right.
14  Q.   And has that -- is that something you've become aware
15       of?
16  A.   Yes.  They -- they stressed at meetings numerous
17       times -- they never specified that it was the revenue.
18       They stressed numerous times that they needed and were
19       curious about the numbers of tows and that they wanted
20       them to remain high, and they wanted to know why they
21       had dropped.  Again, they never specified revenue at the
22       meetings that I was a part of.
23  Q.   Were you aware that there was a drop when Furman -- I
24       think -- these are my words, not anybody's official
25       words -- when Furman got irritated because he was told

Page 30

1        to call dispatch or something to that effect?
2   A.   Yes.
3   Q.   Do you remember that?
4   A.   Yes.
5            Throughout our time at the department, Officer
6        Furman has gotten upset, I believe, about three times,
7        whether it be with administration, whether it be with
8        the City, but he got angry at something.  And his way of
9        handling it, I guess -- and he was verbal about this --
10       was that he was not going to tow cars for a while.
11           And during that low, in which the City was going to
12       pay and did pay the outside investigator, was the first
13       time that that happened where Officer Furman had become
14       upset with something to do with -- I'm not sure whether
15       it was administration or the City, and, therefore, he
16       decided not to tow cars for a while.
17              (Discussion held off the record.)
18  BY MS. GORDON:
19  Q.   Okay.  Just because what?  He was kind of -- this my
20       word, not his or anybody else's.  He was kind of in a
21       snit?
22  A.   Yes, he -- yeah, he was --
23  Q.   He was mad?
24  A.   He was upset.
25  Q.   So, at that point, the tows would have dropped?

Page 31

1   A.   Absolutely.
2   Q.   Because for any day he's off the road, you're losing a
3        significant number of tows, most all your tows?
4   A.   Yes.  He -- I don't have an exact number, but I would
5        bet it was safe to say that he tows 60 to 70 percent of
6        the vehicles, if not more, for the entire department.
7   Q.   Okay.  And then -- so, how long would this -- from what
8        you observed would he go then with just deciding he
9        wasn't going to do that?
10  A.   It depended on each time that he was upset.  That first
11       time, I believe, lasted a few weeks -- two or three
12       weeks -- where he just didn't tow any cars.  Which, in
13       that amount of time for him, would -- would be a
14       significant amount of cars if not -- if it didn't last
15       longer than that.
16  Q.   So, there was this Lawrence Jackson report, which I'm
17       going to ask you about in a little while, but I don't
18       know if you're aware of this, but he was hired by the
19       City to look into why tows were down.
20            Did you become aware of that?
21  A.   I didn't know the name.
22  Q.   Okay.
23  A.   But I did know that they hired someone to look into it,
24       yes.
25  Q.   And I'll hand you a copy shortly, but I do note that in

Page 32

1   this document, on Bates 1276, produced by the City,
2   Jackson, in this report, states on 4-26-16:
3            "Corporal Furman was given special written
4        instructions by Chief Chad Hayse --"
5   and I'll hand that to you in a minute.
6            And then he says:
7            "Corporal Furman took this to mean his
8        performance was being closely monitored and
9        evaluated.  He said that caused him to alter
10       his normal job performance.  He restricted
11       his towing to abandoned or unoccupied areas."
12           So, is that the kind of thing you're talking about?
13  A.   Actually, now that you say that, I remember that
14       specifically, that he -- Officer Furman told myself,
15       again, and almost every officer there that that's what
16       he was going to do was only tow unoccupied vehicles.
17       Because he was getting -- Officer Furman was getting
18       numerous citizen complaints when towing vehicles at that
19       time, and -- which was causing him to end up having to
20       speak with our -- with supervisors.  And so he -- he was
21       mad about it.  He took it personal and, therefore, said
22       he wasn't going to tow any cars other than the
23       unoccupied vehicles.
24  Q.   So, Chad Hayse, of course, was -- with regard to this
25       particular discipline -- I'm going to hand this to you.

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 33—36

Page 33

1    I don't know if you've ever seen it before.  It's been
2    produced by the City.  It's Bates stamp 1442.
3        So, this apparently -- this memo was given after
4    Lieutenant Welch and Chief Hayse had talked to Furman
5    and then issued this memo.  So, just take a look and
6    read that.
7  A.   Okay.
8  Q.   Have you seen this document before?
9        MS. BALIAN:  What's the Bates stamp?
10 A.   I'm sorry?
11       MS. BALIAN:  I just want to see the Bates stamp.
12 A.   Okay.
13       MS. BALIAN:  Defendant --
14 A.   Yes.  I have seen this before.
15 BY MS. GORDON:
16 Q.   Okay.  And do you have any understanding of why this
17    would have been issued from your knowledge of the
18    circumstances?
19 A.   Yes.
20       MS. BALIAN:  Objection.  Lack of foundation.
21 BY MS. GORDON:
22 Q.   Go ahead.
23 A.   From having worked with Officer Furman, be it just on
24    the same shift, on -- or a -- more specifically while he
25    was out working traffic, at this time, it appeared,

Page 34

1    especially through all of the citizen complaints,
2    through my observations and other officers' observations
3    that he seemed to lack the ability to use discretion.
4        His -- as I stated earlier, his focus was strictly
5    on finding a reason to tow the car and towing it and
6    impounding it.  And although be it within -- within the
7    law, what he was doing, didn't necessarily make it
8    right.
9        So, myself included, as Officer Furman and I were
10    friends at this time, numerous officers tried talking to
11    him and giving advice and basically examples on things
12    he should or shouldn't be doing and telling him that
13    just because you can tow a car doesn't mean you have to.
14    There's other factors that you should consider, which
15    are the factors -- a lot of them which are listed in
16    this memo here.
17       And as that -- as he ignored myself and other
18    officers at the patrol level, then things worked up to
19    where sergeants started speaking with Officer Furman.
20    He ignored that, where it made it up to lieutenants.
21    Lieutenants tried speaking to him.
22       And this was all just a person-to-person, nothing
23    in an official order or anything of that.  Just trying
24    to keep him from getting these complaints and getting
25    himself in any trouble.

Page 35

1        And that -- he continued his behavior, if you will,
2    and that -- his habit of towing the vehicles, and that
3    worked its way up to Chief Hayse to where Chief Hayse
4    put this out in order to still keep him from getting
5    these complaints, getting himself in trouble.  And as
6    the chief of police, he had to address the amount of
7    complaints Officer Furman was getting.
8        So, this was put out in order to try to keep those
9    complaints from coming in.
10       And this really offended Officer Furman when this
11    came out.
12 Q.   Uh-huh.  And then he had the slowdown apparently --
13 A.   Yes.
14 Q.   -- after that.
15       And then Chief Hayse was severely criticized a la
16    the Larry Jackson report --
17 A.   Yes.
18 Q.   -- because he had -- apparently, according to
19    Mr. Jackson, it was Chad Hayse's fault that the towing
20    was down.
21 A.   Correct.
22 Q.   Did you become aware of that?
23 A.   Yes.
24 Q.   Okay.  So, look at the content of this April 26th, 2016
25    memo to Corporal Furman from Chief Hayse.

Page 36

1        The City has taken the position in this case that
2    Chad Hayse was -- let's see.  How did they put it --
3    some of them say "he's violating the Constitution."
4    Others say "he's engaging in civil rights violations"
5    because he's asking Furman to please relay to dispatch
6    gender, age, number of occupants and so on.
7        What is your takeaway on the use of the words
8    "gender," "age," and "occupants" in here, as a police
9    officer?
10 A.   I -- as I stated earlier, those are things that I
11    consider with every stop, whether it be for towing, for
12    arrest, for -- even for citation.  Even for as low as a
13    ticket, I consider all these factors.  And I believe,
14    from my own observations, that most of the officers at
15    our department also consider these factors.
16       I don't believe that those factors come into play
17    for Officer Furman hardly ever, if at all.
18 Q.   So, since my client has been excoriated for putting the
19    words "gender" and "age" in here, could you explain -- I
20    mean it seems obvious to me, and -- I don't know -- that
21    doesn't matter, but just for the record -- how gender
22    and age play a role in your work?
23 A.   If -- an example would be if it's a 16-year-old who has
24    had their license two weeks and they -- they didn't use
25    their turn signal while changing lanes, and they're

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 37

1  driving their mother's vehicle without insurance on it.
2  And I stop them for not using their turn signal, and I
3  come up and get their information and realize she's
4  had -- he or she has had their license two weeks, and
5  then realize that her mom doesn't have insurance on the
6  vehicle, I'm not going to fault her for that. That's
7  just my personal way of handling it. She's 16. She's
8  just now learning about car insurance. I'm sure if she
9  has a job, it's not paying well enough to afford putting
10  car insurance on her mother's car, which she, I'm sure,
11  only drives maybe on the weekends, things of that
12  nature. So, that's where age would come into play.
13       Also if it's an elderly person -- the whole point
14  of the way that I was taught in my academy -- the whole
15  point of a traffic citation is to gain compliance with
16  whatever law -- traffic law they broke.
17       If a person is 80 years old and was lost and
18  happened to maybe, you know, swerve over a lane while
19  they were trying to find where they were going, I don't
20  believe that that person maybe needs a citation.
21  They've had a clean driving record for 50, 60 years.
22  They may not need a citation to gain compliance with the
23  law. Maybe they were just lost and I can actually help
24  them out and give them directions and let them know
25  where they're at without having to give them a ticket

Page 38

1       or, furthermore, impounding their vehicle.
2       That -- that would be where it comes into play in
3  my opinion.
4  Q.  And with regard to taking a vehicle away from somebody
5       that has children in the car or somebody that's elderly
6       or maybe a female that's, you know, more frail, or
7       something -- osteoporosis, who knows -- how does that
8       affect your decision to actually tow a car?
9  A.  Majorly, including with where the stop happened, where
10  they live, the weather. I'm not going to have a mother
11  who is driving on a suspended license, who has got two
12  kids in car seats in the back, put out on January 1st in
13  that kind of weather just because her license is
14  suspended.
15       No. I'm going to instruct her not to drive the
16  vehicle, wait in her vehicle and get somebody there with
17  a valid license to drive her away from there, and I
18  would probably give her a ticket. But, again, all of
19  the factors would come into play, why I stopped her
20  originally, what her driving record is, all of that.
21       However, I would -- for something as far as just a
22  ticket, I would not be taking her vehicle for that
23  because I -- if somebody did that to my mom, I would be
24  so irate, it would -- you know, I -- again, is it legal
25  for me to take her vehicle? Yes. She broke the law.

Page 39

1  But just because it's legal doesn't mean it's right in
2  certain instances, and I wouldn't -- in fact, most of
3  our officers wouldn't do that.
4  Q.  We have some documents that would indicate that Officer
5       Furman did not effectuate arrests for individuals who he
6       stopped and towed their vehicle when it was a felony
7       arrest.
8  A.  I know of one specific incident where that happened,
9       yes.
10  Q.  What do you know of in that regard?
11  A.  I don't know the name of the individual; however,
12       Officer Furman stopped the vehicle, did a -- conducted a
13       traffic stop and, through his time with the traffic
14       stop, learned that the individual driving had a felony
15       warrant -- valid warrant for their arrest. Didn't
16       notify dispatch of the warrant, didn't notify any other
17       officers of that warrant, and did have a legal reason to
18       impound the vehicle for whatever traffic violations had
19       happened.
20       So, he impounded the vehicle, wrote that person a
21  ticket and let them leave from the scene. And at the
22  time, the sergeant on the desk, when he went to -- he
23  has to -- they call -- it's name candidating. He has to
24  verify all the names are correct because an officer can
25  manually type in the names on the ticket.

Page 40

1       So, the supervisor has to verify that the names are
2  spelled correctly; that the correct person is getting
3  the citation.
4       When the sergeant was doing that, at the end of the
5  shift, observed that the person that Officer Furman gave
6  that ticket to had a felony warrant and questioned
7  Officer Furman on it, and Officer Furman actually got
8  into a verbal argument with the sergeant to where they
9  had to -- the sergeant made him go outside because he
10  was kind of challenging his authority in front of the
11  shift, the other officers.
12  Q.  Did Furman have any rationale for why he wouldn't
13       effectuate an arrest?
14  A.  He blamed the equipment. He said that, because the
15       computer took too long, he didn't want to wait for that.
16       And he used some choice words about the equipment and
17       then said that that was why.
18  Q.  Have you observed that Furman has an anger problem?
19  A.  Yes.
20  Q.  What have you observed?
21  A.  I believe, from my observations and speaking with
22       Officer Furman throughout his career, he seems to take
23       each traffic stop personally, and that every person that
24       he stops he feels automatically should respect him
25       because he's an officer.

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 41

1    And although I agree to a certain extent, there is
2  some respect that should come with the job, you -- if
3  you take each incident personally of that -- in that
4  way, you will become angry because there's people who
5  are having a bad day already before you stop them.
6  Obviously, nobody enjoys getting a ticket.  So, then
7  you're making their day worse.
8  Q.  It's intimidating?
9  A.  Yes.
10    And also some people just flat out don't like the
11  police and don't respect the police.  But it's our job
12  to still show them respect.  That's sometimes easier
13  said than done, and I agree with that, but you still
14  have to try.
15    And he has gotten -- he seems to talk down to the
16  people that he stops, as -- in a demeaning manner.  He
17  also has -- he's gotten numerous complaints from
18  citizens that I've witnessed the complaints come in for
19  his tone of voice, his choice of words on the stop,
20  as -- and, lastly, I have observed him, in my opinion,
21  go way over the line in that he had a suspect in
22  handcuffs already who wasn't resisting, was just walking
23  to the patrol vehicle with Officer Furman, and Officer
24  Furman pushed his head into the patrol vehicle, actually
25  splitting his head open.

Page 42

1  Q.  Yeah.  And I think Officer -- Lieutenant Allen witnessed
2      that event?
3  A.  Yes.
4      Myself, Lieutenant Allen and Corporal Hinojosa were
5  witnesses to that event.
6  Q.  Okay.  So -- was this in -- I don't remember the dates,
7      but, again, the City has produced documents on this
8      incident.  And it appears that it was in July of 2016.
9  A.  That sounds right.
10  Q.  So, who was present when those events occurred?
11  A.  Myself, Lieutenant Allen, Officer Hinojosa all observed
12      it.
13      Sergeant Slaughter was in the area, but I don't
14  believe he actually observed that part happen.
15  Q.  So, what happened after you observed this?
16  A.  Officer Furman transported the suspect back to the
17      department.  I returned to the department with
18      Lieutenant Allen.  And immediately upon return to the
19      department, I had to leave with another detective.  I
20      believe we were serving subpoenas.  I don't remember
21      exactly what we were doing.  However on our return,
22      Lieutenant Allen called me into his office and asked me
23      if I observed what happened with Officer Furman and the
24      suspect at that time, and I informed him that I did.
25      And he told me that I needed to inform Chief Hayse that

Page 43

1  I observed it.
2      Chief Hayse requested a letter from me on what I
3  observed.  I -- I typed a very brief memo to Chief Hayse
4  as to what I observed.  And then I'm not sure how much
5  longer later, I was informed that Chief Hayse had turned
6  that investigation over to the Michigan State Police.
7  And the -- a female state trooper, along with two male
8  FBI agents were at the department and interviewed
9  myself, Lieutenant Allen, Corporal Hinojosa, and I
10  believe they also introduced Sergeant Slaughter.  And
11  I'm not sure if they interviewed Officer Furman or not
12  in regards to that incident.
13  Q.  What's the next thing that happened?  Were you there
14      when they came into the department?
15  A.  I don't think I saw them come in, but I was there that
16      day, yes.
17  Q.  Okay.  All right.  And you saw them talk to the people
18      you've just mentioned?
19  A.  I wasn't in the room when they spoke --
20  Q.  Right.
21  A.  -- with them.  That was in the chief's conference room.
22      But, yes, I was -- I observed them go in there to speak
23      with them, yes.
24  Q.  I have an e-mail exchange between you and Sunshine
25      Ponzetti from the Michigan State Police.

Page 44

1  A.  That sounds right, yes.
2  Q.  Does that sound like the person you saw?
3  A.  Yes.
4  Q.  So, I can hand you that.
5      Do you remember sending her an e-mail, and did she
6  ask you for information?
7  A.  Yes.  She --
8  Q.  I'll hand this to you, if you don't mind.  This is Hayse
9      Bates stamp 928, 929, 930.
10      MS. BALIAN:  Can I just see that for a minute?
11  A.  Yeah.
12      Yes.  When we spoke that day, she asked if I could
13  put it in writing for her in this e-mail, which is --
14  BY MS. GORDON:
15  Q.  This is your e-mail, and this is what you wrote down?
16  A.  Correct.
17  Q.  Okay.  And you sent this to her, it looks like, via
18      e-mail?
19  A.  Yes.
20  Q.  Okay.  Now, if you look on the e-mail on the top,
21      Officer Ponzetti is saying to somebody named Renee:
22      "I searched my e-mail and located this sent
23  e-mail from Brandon Nolin.  This e-mail, as you
24  can see, was forwarded to my FBI account as well
25  as S.A. Lobar's(ph)."

Page 45

1    Was Officer Ponzetti involved with the FBI?  Is
2    that how you understand this?
3  A.  She informed -- yes.
4  Q.  Yeah.
5  A.  When she interviewed me that day, she informed me
6    that -- I think she said it had something to do with
7    manpower -- I'm not sure on that.  But for some reason,
8    she had the FBI with her, and that she was working with
9    them with this investigation.
10 Q.  Well, it looks like she has an FBI account herself.  I
11   don't know if that makes any sense to you or not.
12 A.  She never stated that to me.
13 Q.  Why would the FBI be involved with this, from what you
14   can think of?
15 A.  I have no idea.
16 Q.  Have you ever heard of the FBI filling in with the MSP
17   for manpower purposes?
18 A.  Not prior or after this, no.
19 Q.  Okay.  So, when is the next time you talked to Officer
20   Ponzetti?
21 A.  I haven't since.
22 Q.  Okay.  Did anybody tell you what the upshot of this
23   investigation was?
24 A.  No.
25 Q.  Did you ever hear anything about whether there was going

Page 46

1    to be any action taken or whether there was a file that
2    was opened anywhere?
3  A.  They told us specifically that -- or at least I know
4    that they told me this, and the other officers confirmed
5    it to me that were interviewed, that during the
6    interview they told us once they left the department
7    that day, if we called them, if we even called them the
8    next day and said, "Hey, I want to talk to you about
9    that investigation," that they would inform us at that
10   time they didn't know what investigation we were talking
11   about; there was no such investigation.
12 Q.  So, what did you make of that?  What was your takeaway?
13 A.  I thought it was really weird.  I didn't understand
14   that.  I still don't understand it.  I don't know why
15   that would be that way.  I still don't.
16 Q.  So, before they left the station, they told you this?
17 A.  Yes, including -- which is how I -- why it came to be
18   that the other officers who were interviewed confirmed
19   this with me, because I asked them if they were told the
20   same thing because it struck me as extremely odd,
21   including asking Lieutenant Allen why that would be, and
22   he also stated he had no idea.  That's not something
23   that I've ever heard of happening.  I don't know why
24   that is like that.
25 Q.  Huh.

Page 47

1    So, no ideas on why the Michigan State Police would
2    say -- whoever you were talking to would say, "We're
3    going to say we don't even know what you're talking
4    about"?
5  A.  Yeah.  I found that extremely odd.  Especially -- even
6    if I called and said, "Oh, I forgot to tell you guys
7    this," that was -- that was just going to fall on deaf
8    ears apparently.  I don't know.  It was really weird.
9  Q.  Okay.  And have you heard anything about it since?
10 A.  I don't know the time frame, but I do know that the
11   individual -- I can't remember his name.
12 Q.  McClintock, I believe.
13 A.  Yes.  That sounds right.
14      He was returned to our department at a later date
15   for his court appearance.  He was under arrest for a
16   valid reason.
17 Q.  Right.
18 A.  So, he returned later for his court date, and I believe
19   we tried to -- our department -- not myself
20   specifically, but I believe our department tried to
21   contact MSP to inform them, "If you need to interview
22   this gentleman" -- because he did file a formal
23   complaint with our department as well, that if they
24   needed to contact him -- because he was believed to be
25   homeless at the time, so we weren't sure if the state

Page 48

1    police would be able to find him or locate him to speak
2    with him.
3      So, we reached out to contact Michigan State Police
4    to let them know that he was at our department, again,
5    if they wanted to come interview him in regards to the
6    incident, and they said, "We don't know what
7    investigation you're talking about.  We don't have
8    anything."
9  Q.  I believe McClintock has now filed a federal lawsuit.
10   I'm not 100 percent sure, but we did get a Complaint.
11      So, were you aware, then, that Chad Hayse came
12   under criticism for attempting to discipline Furman over
13   this event?
14 A.  It was never said outright that -- in the beginning that
15   that's what was happening.  However, towards the --
16   towards the end of the ordeal with Chief Hayes, it was
17   known -- and I was aware of it, that the City was
18   criticizing Chief Hayse for not filing proper paperwork
19   as far as his discipline with Officer Furman.
20 Q.  So, I'm going to hand you Plaintiff's Exhibit 5, marked
21   during Chief Hayse's deposition.
22      And now we've got Larry Coogan.  This is about the
23   same situation I've been talking to you about,
24   Detective, with regard to the McClintock situation and
25   investigation.  Take a look at that.

Page 49

1   A.   Okay.
2   Q.   Okay.  Do you recall that Furman was facing suspension
3        with or without pay around this time?
4             MS. BALIAN:  Objection.  Lack of foundation.
5   A.   Yes.  I, at the time, was on the union board for our
6        patrol union and also friends with Officer Furman.  I
7        was actually his representative from our union during
8        this incident.
9             So, the communications between Chief Hayse and
10       Officer Furman basically went through me.
11  BY MS. GORDON:
12  Q.   Okay.  So, what did you communicate to Furman that you
13       received from the chief in your role as a union
14       representative?
15  A.   Originally, the first disciplinary action that was taken
16       against Officer Furman with this was, he was being
17       suspended with pay.  That notice came from Lieutenant
18       Allen; however, I was present when that happened, that
19       he had to turn over his firearm and ID, pending the
20       further investigation into this matter by Chief Hayse.
21  Q.   The McClintock matter?
22  A.   Yes.
23  Q.   Okay.
24  A.   So, he was suspended with pay originally.
25            Once the investigation was concluded by Chief

Page 50

1        Hayse, he informed me -- and I believe gave a formal
2        letter -- it was enclosed in an envelope, so I didn't
3        read it, but I hand-delivered it to Officer Furman and
4        was verbally told by Chief Hayse, and I verbally told
5        Officer Furman that Chief Hayse was changing his
6        suspension to without pay, and that he was going to be
7        seeking his termination.
8   Q.   Okay.  Did you understand the reason he was seeking his
9        termination?
10  A.   Yes.
11  Q.   What was that?
12  A.   It was for misuse of force against Mr. McClintock
13       throughout -- along with the number of other
14       disciplinaries that Officer Furman had already received
15       throughout his career.
16  Q.   Okay.  And some of these issues you've talked about
17       today?
18  A.   Yes.
19  Q.   Some of the concerns.
20            So, you did hand Furman an envelope that contained
21       paperwork --
22  A.   Yes.
23  Q.   -- from the chief with regard to his now being placed on
24       an unpaid leave or suspension and with termination being
25       requested?

Page 51

1   A.   Yes.
2             At that time, Corporal Thompson was also with me.
3        He witnessed me handing him the notice, as well as was
4        present during the conversation, including -- I had
5        texted Officer Furman because he didn't -- he was --
6        which I understood.  He was kind of embarrassed to come
7        to the station.
8             So, he actually asked me to grab a few things out
9        of his personal locker for him and give him those, as
10       well, because -- at that time, I told him through text
11       already that -- what was happening as far as the
12       suspension becoming without pay and that Chief Hayse
13       would be seeking his termination.
14  Q.   What was Furman's reaction after what you told him that
15       you just described to us?
16  A.   At that point, he didn't have much of a reaction.  He --
17       he -- the initial shock didn't really seem to hit him at
18       that point.  I think maybe it hit him later when he got
19       home, or maybe he just didn't want to show it in front
20       of us, as when he was originally suspended with pay, he
21       broke down and was very emotional.  So, I think he was
22       trying to fight that when it changed to unpaid and the
23       termination was coming.
24            However, at the end of it, he was becoming more and
25       more upset -- at the end of that conversation, he was

Page 52

1        becoming more and more upset and angry about it, and
2        just kept saying he didn't understand why this was
3        happening, and basically kept -- and repeated it several
4        times, that "There's rapists and murderers out there,
5        yet I'm getting in trouble for this."
6             That was basically his stance on it.
7   Q.   Were you aware that Larry Coogan -- city attorney, I
8        guess, would be the title -- got involved in the matter
9        of the discipline of Matthew Furman?
10  A.   I was aware that Chief Hayse had attempted to contact
11       Mr. Coogan in order to see how the City wished Chief
12       Hayse to proceed with the termination.
13            It's my understanding that the chief can proceed
14       one of two ways, and he can either terminate an officer
15       outright under his own authority or have it go in front
16       of the Safety Commission as far as basically a trial
17       board.
18  Q.   Uh-huh.
19  A.   And he -- it was my understanding that Chief Hayse
20       attempted several times to contact Mr. Coogan in order
21       to see how Mr. Coogan and the City thought it would be
22       best to proceed with the termination of Officer Furman.
23            I was unaware of this communication here, though.
24  Q.   Yeah.
25            So, as you can see, Mr. Coogan is demanding that

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 53

1  Chief Hayse produce certain things.
2  A.  Right.
3  Q.  And then were you aware that shortly thereafter,
4  obviously, within weeks, Chief Hayse was -- a removal
5  action was begun against him, and that Furman was --
6  this Furman discipline was one of the key reasons?
7  Did you learn that?
8  A.  Yes.  I was at the meeting when they called for Chief
9  Hayse's original suspension.
10 Q.  Were you aware that he was charged with willful
11 misconduct in office by the improper issuance of
12 discipline upon Corporal Furman?
13 A.  I was not made aware of the specific reasonings for
14 their calling for his termination, no.
15 Q.  So, what would your opinion be on why the City of
16 Melvindale would go after Chief Hayse for his attempt to
17 discipline a police officer who apparently was engaged
18 in some activity that was of concern?
19 MS. BALIAN:  Objection.  Lack of foundation.
20 But if you know --
21 MS. GORDON:  I'm asking for an opinion.
22 A.  Yeah.
23 BY MS. GORDON:
24 Q.  You can offer your opinion.
25 A.  Yeah.  My opinion in this matter is that -- that Officer

Page 54

1  Furman generates a ton of revenue for the City, and the
2  City didn't really hide it that they held his tow
3  numbers in high regard; that that was a big issue for
4  them.
5  And I -- I mean, anybody that looked at our numbers
6  would see, if Officer Furman was terminated, they would
7  lose a lot of -- the City would lose a lot of revenue.
8  Our -- the rest of our officers just -- they don't tow
9  cars the way that he does.
10 And I believe that the City saw that they were
11 going to lose that when -- you know, if Officer Furman
12 was terminated.  So, I believe that that's why they
13 interjected.
14 Q.  They interjected and got rid of the chief and kept on
15 and protected Furman and ensured he didn't even get any
16 discipline; correct?
17 A.  Yeah.  I believe that it was -- at that point it was
18 either the chief or Furman.
19 I know from my own observations that Chief Hayse
20 had plenty of reason to terminate Officer Furman, as
21 well as other officers that observed his behavior
22 throughout his career.  And the City chose -- like I
23 said at that point, it was either Chief Hayse or officer
24 Furman because Chief Hayse had made his decision to
25 terminate Officer Furman.

Page 55

1  So, they had to either back the chief and terminate
2  Officer Furman or do what they did.
3  That being said, I know that since Chief Hayse was
4  terminated, the City actually went back and gave officer
5  Furman backpay for the time that he was suspended
6  without pay before they were able to terminate Chief
7  Hayse.  And I don't know if it's common practice or not,
8  but they did so without notifying his own union.  Nobody
9  in our union knew about it.  The only way we found out
10 about it was, we have a book that is kept in what used
11 to be the dispatch area, that keeps track of vacation
12 time, sick days, personal days, overtime, anything of
13 that nature, and the discipline that he received was
14 given -- was erased out of that book and given back to
15 him.
16 Q.  Right.  We have learned that.
17 And in addition he's received a promotion; correct?
18 A.  Since then, yes.
19 Q.  Is anybody -- well, anybody in command, that you're
20 aware of from your vantage point, monitoring his conduct
21 vis-à-vis towing and some of the other things we've
22 discussed here today, or is he pretty much just doing
23 whatever he wants to do?
24 A.  Now, he is a sergeant, so now he's in charge of whatever
25 shift he's assigned to, which, I believe, at this time

Page 56

1  is the afternoon shift.
2  So, after 4:30, he is the top-ranking officer at
3  the department when he's there.  The chief is gone, both
4  lieutenants are gone.  So, nobody really monitors him at
5  that point.
6  Q.  He said he goes out and tows sometimes after a shift is
7  over.
8  A.  Yes.
9  Q.  Have you observed that?
10 A.  Yes.
11 Q.  So, now that he's a sergeant, are the towing numbers --
12 is he still doing the tows?
13 A.  Since he's become a sergeant, I haven't been on the
14 afternoon shift, which would be -- or -- I was on the
15 midnight shift, or now in my assignment where I am, I
16 don't report to the department, so I don't know what his
17 numbers would be recently.
18 Q.  Fair enough.
19 You mentioned citizen complaints a couple of times.
20 Describe to me, from what you know as an officer at
21 this department, how citizen complaints are handled.
22 First of all, what's the way a person can make a
23 citizen complaint?
24 A.  A citizen can file a complaint by -- they come to the
25 front desk at the department.  There's an actual form

Page 57

1     that you can list of the date and time of the complaint.
2     You can list your own name as the complainant, and you
3     list the officer or officers' names that you want to
4     file the complaint against.  And then you just handwrite
5     what you believe the officer did that was inappropriate
6     or wrong, and -- in your own words.
7         It's a narrative portion.
8         Every one of those complaints that are handed in
9     are turned over to the chief of police.
10  Q.  Okay.  And then what happens as you understand it?
11  A.  It's my understanding that the chief investigates that
12     incident, whether it be speaking directly to the officer
13     that the complaint is against, whether it be speaking to
14     the other officers that were at the scene, or it could
15     possibly be just reviewing the body camera footage from
16     that incident.
17        There's numerous ways that a complaint can be
18     reviewed as -- by the chief.  As well as, sometimes the
19     chief -- before even asking any questions, the chief
20     just requests all officers that were involved to write a
21     narrative just to the chief as far as what their
22     recollection of that incident was.
23  Q.  Okay.  And are those kept?
24  A.  It's my understanding that they are, yes.
25  Q.  Okay.  And what about if somebody makes a phone call in

Page 58

1     to the station or makes a verbal complaint, either on
2     the phone or walks in and doesn't fill out the form?
3         What happens then; if you know?
4  A.  I believe it depends on -- kind of all circumstances
5     come into play, I believe, at that point, on whether
6     they believe that the complaint is credible, what the
7     complaint is, if the complaint is something that is
8     reviewable at that point.
9         Most -- if the complaints would be over the phone,
10     it would probably generally go right to the office of
11     the chief, so I wouldn't really hear most of those.
12     However, we do have some people who complain at the
13     front office window and don't want to fill out the form,
14     and those are still investigated to the best -- the
15     ability of -- usually at that point, a lieutenant will
16     handle that because it's harder to investigate those
17     with less detail, as far as what's in the complaint.
18  Q.  Okay.  I don't know if you're aware of this, but we've
19     gotten the data on the tows, and we see the number of
20     tows during the first six months under Gene's was 368.
21     This is in 2015.
22  A.  Okay.
23  Q.  And then Gene's contract ended, I think, in June, and
24     Goch took over, and then there were 1,137 tows in the
25     last six months.

Page 59

1         So, that's the data that's been produced to us by
2     the City.
3         So, you can see that, once Goch came in, the number
4     of tows went way, way up.
5  A.  Yes.
6  Q.  And is it your testimony here today -- I think this is
7     what you're saying -- that Furman is -- is there because
8     he's effectuating those tows?
9  A.  That's my --
10        MS. BALIAN:  Objection.  Lack of foundation.  Calls
11     for speculation.
12  BY MS. GORDON:
13  Q.  Go ahead.
14  A.  That's my belief.  I can't, 100 percent, say why the
15     City kept him, but it would appear to myself and other
16     officers as we've discussed it, that that is why Officer
17     Furman still is employed with the City of Melvindale.
18  Q.  Did you appear at a Public Safety Commission meeting at
19     one point and raise a question or a concern about towing
20     numbers?
21  A.  Yes.
22  Q.  Okay.  Can you tell us roughly when that would have
23     been, or exactly if you know?
24  A.  Honestly, it would have been, I believe, a day or two
25     before Chief Hayse's suspension.

Page 60

1  Q.  Okay.  And what did you say at the Public Safety
2     Commission meeting?
3  A.  That was the -- it wasn't -- it was their pre-meeting.
4     They hold a more closed pre-meeting to kind of discuss
5     what they're going to discuss in front of the public
6     basically, and that's where this took place.
7         And they were discussing hiring the outside
8     investigator to look into why the towing numbers were
9     down.  And the way that they were discussing it, I -- it
10     was as if they were almost arguing with Chief Hayse in
11     that he needed to push us officers to tow more cars.
12        And I raised my hand and waited to be called upon
13     to speak.  And when they called upon me, I informed
14     them -- at that time, I said, "You're wasting your money
15     if you're going to hire this investigator.  You can
16     speak to any officer at this department.  Speak to any
17     of us, and we will tell you, without a doubt, why the
18     towing numbers are down.  Furman is mad.  He's not
19     towing cars.  That's why the numbers are down."
20        Second of all, I told them that it sounded
21     dangerously like they wanted a quota as far as towing
22     cars the way that they were speaking about it.  And the
23     mayor -- Mayor Striz told me I was out of line and
24     couldn't talk any more, and I needed to sit down.
25  Q.  Okay.  And this was before the official meeting started?

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                                    Pages 61–64

Page 61

1  A.  The -- they hold -- I can't remember --
2  Q.  Workshop, I think --
3  A.  Yes, exactly.  Yep.  It was at the workshop.
4          So, the meeting, I believe, is either a day or two
5      days after.  That's how I know it was a day or two
6      before Chief Hayes was suspended, because I went to the
7      following -- the actual meeting.
8  Q.  And is that open to the public, that workshop?
9  A.  I don't believe so.
10 Q.  But some members of the police department were there?
11 A.  Yes.
12 Q.  Okay.  So, you were told to sit down and not talk about
13     this further, something to that effect?
14 A.  Yes.  She told me I was out of line, and I -- I've
15     never -- we never had a dialog.  It was just I was out
16     of line and needed to sit down and not talk any more.
17 Q.  Did you ever know of any racial profiling by Officer
18     Furman?
19 A.  Yes.
20 Q.  What did you know of in that regard?
21 A.  Early on in -- when he started getting into the tows --
22     like I said, I think that was around our year mark, once
23     the --
24 Q.  This is around your one-year mark?
25 A.  Correct.

Page 62

1  Q.  So, what year would this be?
2  A.  This would have been 2013.
3  Q.  Okay.
4  A.  Maybe early 2014, somewhere in that time frame.
5  Q.  Okay.
6  A.  That's when he got big into towing cars and looking for
7      reasons to tow cars and that nature.
8          It appeared to myself and numerous other officers
9      on the -- at the department that most of his impounds
10     were coming from African American drivers.  It just -- I
11     mean, by -- I'm confident, if you were able to pull the
12     ticket numbers in that time frame, that most of his
13     impounds and tickets were to African American drivers.
14 Q.  Did he talk about stopping African American drivers at
15     all?
16 A.  He never verbalized that, no.  I think he -- I think he
17     knew that that would -- would really --
18         MS. BALIAN:  Objection to what you think he knew.
19     Calls for speculation.
20 BY MS. GORDON:
21 Q.  You can go ahead and offer your opinion.
22 A.  Yeah.  I think that he knew that that would look
23     inappropriate.  So --
24 Q.  Okay.  But this was an observation that you and others
25     made?  Is that what you're saying?

Page 63

1  A.  Yes.  Yes.
2  Q.  Okay.  Did you ever hear him voice his opinion of
3      African American people?
4  A.  Yes.
5  Q.  What did you hear in that regard?
6  A.  Any time that officers would question his -- him being
7      racist or anything of that nature, him racial profiling,
8      anything of that nature, his response was always, "I had
9      a black friend once, and he stole from me."
10 Q.  And therefore what?
11 A.  That's just how he ended it.
12         So, it led anybody reasonably to believe he
13     didn't -- he didn't like black people.
14 Q.  And what we've learned so far is that -- I think from
15     him, actually, is that he spent a lot of time on
16     Schaefer Road.
17 A.  Correct.
18 Q.  Were you aware of that?
19 A.  Yes.  That's where most of his impounds come from, most
20     of his day is spent on Schaefer Road.
21 Q.  Okay.  And what is it about Schaefer Road?
22         I'm not as familiar with that part of Schaefer
23     where -- in Melvindale.
24         What's going on there?
25 A.  It borders -- Schaefer Road is our border with Detroit.

Page 64

1  Q.  Uh-huh.
2  A.  So, a lot of, I guess, towable cars are on Schaefer.
3      There's a lot of no insurance, a lot of -- especially
4      now, what he targets are defective equipment, mostly
5      cracked windshield, because he can stop for that.
6      Chances are, they're not going to have insurance and he
7      tows them.
8  Q.  So, when you say that's mostly what he's doing, why do
9      you say that?
10         Are you aware of what he's doing?
11 A.  Yes.  I mean, we can pull up the reports.  If you
12     impound a vehicle, you have to do a report on it.  So,
13     you can check the reports at any time as long as you
14     have access to the system, which, when you're on duty,
15     you can check the reports at any time, as far as the
16     reports from the previous day or weeks, whatever.
17         And also, once I became a corporal, I was actually
18     in charge of approving some of the reports, and that was
19     a majority of the reports that were turned in by Officer
20     Furman --
21 Q.  I see.
22 A.  -- were for defective equipment and no insurance to a
23     tow --
24 Q.  So, he was --
25 A.  -- for impound.

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                    Pages 65–68

Page 65

1  Q.   -- spending his day --
2       THE REPORTER:  Excuse me?
3  A.   To a tow and impound.
4  BY MS. GORDON:
5  Q.   So, he was spending his day, pulling over people with
6       cracked windows so he could then tow them because they
7       didn't have insurance?
8  A.   The majority of it, yes.
9            (Discussion held off the record.)
10 BY MS. GORDON:
11 Q.   You mentioned citizen complaints and Furman previously.
12      What do you know in that regard?  Anything in
13      particular that you recall?
14 A.   He received -- we actually, sadly, became kind of a joke
15      at the department between myself and other officers,
16      including -- Officer Furman is aware of this -- that we
17      said that you can basically copy and paste the narrative
18      of the citizen complaints and just change the
19      complainant and maybe location, date and time, that kind
20      of thing.  But most of his complaints were the same;
21      that he talked down to them; that he was just
22      inappropriate in his tone, as well as he would get abuse
23      of force once in a while.  And a lot also were racial
24      profiling, a lot of African American people were --
25      especially in the beginning, were coming in, stating

Page 66

1       that they believed that they were being stopped by him
2       because they were African American.
3  Q.   Okay.  Do you know whether any of those were
4       investigated?  Do you happen to --
5  A.   At that time, I was not privy to the investigation, so I
6       wasn't on the union board when those -- most of these
7       complaints were coming in.  However, I know that the --
8       like I said, that the complaint would have gone to Chief
9       Hayse, and I would believe that it was investigated.
10 Q.   Do you think Furman had more citizen complaints than the
11      other officers?
12 A.   I know that he did.
13      I -- actually, I take that back.
14      I do know that those incidents were investigated
15      because throughout his career, Officer Furman has been
16      disciplined based off those complaints and that he has
17      been sent to a couple different re-trainings and also
18      sent to a counselor as far as trying to help him, you
19      know, so that way these complaints would stop and he
20      could honestly be a better officer.
21 Q.   Become more effective?
22 A.   Yes.
23 Q.   Yeah.
24      You've mentioned one excessive force or abuse of
25      force, as you just said, complaint.

Page 67

1  Q.   Do you know of any others?  Anything about a woman
2       who he dragged out of the car?
3  A.   Yes.
4  Q.   Have you heard about that one?
5  A.   Yes.  Yes.
6  Q.   What was that about?
7  A.   That was a traffic stop.  I don't know the legality of
8       the stop.  However, he was impounding the vehicle, and
9       she was refusing to get out of the vehicle.  And so
10      Officer Furman forcefully pulled her out of the vehicle.
11      And I -- I know that he pushed her over the hood, I
12      believe, of the patrol car and actually dry stunned her
13      with his TASER, and then, once the vehicle was
14      impounded, let her go.
15      So, she filed a complaint, and I believe a lawsuit
16      as well.
17 Q.   Okay.  Did you ever hear him talk about that at all?
18 A.   I asked him about it on a personal note as, like I said,
19      we were friends.  It's -- it's -- any officer that I've
20      ever spoke to -- now, I've had family in law
21      enforcement.  I have many, many friends in law
22      enforcement, especially now with time on the job.  Any
23      time you have to put your hands on someone, you have --
24      at that point, if you have reason to put your hands on
25      someone and you do so, they are to go to jail.  That's

Page 68

1       just -- I've never -- this is the one and only time I've
2       ever heard of an officer forcefully putting his hands on
3       a suspect and they didn't go to jail -- or, you know,
4       God forbid, what if they have to go to the hospital.
5       But they're in custody anyway.
6       This is the only time I've ever heard of that.
7       So, I asked Furman why he -- what his thought
8       process was, why he did that, because I -- it makes
9       about as much sense to me as MSP's investigation or lack
10      thereof.  And he told me that he didn't want to come in
11      and book her because that took up his time, and he
12      wanted to get back to towing.
13 Q.   Okay.  I'm going to hand you this tow report from
14      Mr. Jackson.
15      Did Mr. Coogan have any reason, as far as you know
16      of, to be involved in why -- how many cars were being
17      towed, who was towing them, police discipline?
18      Did he have any role in that?
19      MS. BALIAN:  Objection.  Lack of foundation.
20 A.   Not that I'm aware of.  It's my understanding that
21      Mr. Coogan's role with the City is basically to advise
22      the City on legal matters and what the best course of
23      action would be for the City.  So, as far as
24      disciplining officers, I would believe his only role
25      would be to inform the City if they had legal reason to

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 69

1    do so.  Short of that, I don't know what else his role
2    would be.
3    BY MS. GORDON:
4  Q.  I had one follow-up to what you were saying a second
5    ago.  I'm just going to go back.
6        What family do you have in law enforcement?
7        You mentioned that.
8  A.  My father was an officer.  His father was an officer.
9    My dad's uncle was an officer.  And I believe he said
10   like -- which I never met, but he had like three cousins
11   that were officers.
12 Q.  Okay.  Are these local communities --
13 A.  Yes.
14 Q.  -- in Michigan?
15 A.  Yeah.
16       My dad was an officer in Auburn Hills.  My grandpa
17   was an officer with Pontiac P.D., and it would have been
18   my great uncle was actually the undersheriff of Oakland
19   County.
20 Q.  Okay.  All right.
21       So, do you have any idea of why Larry Coogan would
22   have been interviewed as part of the investigation into
23   why towing numbers were down?
24 A.  No.  I would think that that would be a waste of time.
25   He would have no knowledge of that, unless having spoke

Page 70

1    to Officer Furman.
2  Q.  All right.  So, when did you first hear there was going
3    to be this investigation by Lawrence A. Jackson?
4        Well, I guess you didn't know who it was.
5  A.  Around that time of that workshop.
6        That's actually why I was going.
7  Q.  Ah.
8  A.  I wanted to hear what was happening.  At that time, I
9    was on the union board.  So, I wanted to represent the
10   patrol union, and I -- so, that way I can inform the
11   other patrol officers what was going on.  We were all
12   kind of in the dark at that point.
13       And so we were -- I wanted to be able to inform the
14   other officers what was happening.
15 Q.  I see.
16       You were trying to obtain some information?
17 A.  Yes.
18 Q.  Okay.  So, you learned about this, how?
19       And by the way, the date of his -- his report was
20   submitted, if this helps you time-wise, is August 9,
21   2016.
22       So, what's the first thing you learned about that?
23 A.  About the conclusion of his investigation?
24 Q.  No.  About the fact that somebody was going to be coming
25   in, and that the police -- I assume the idea was that

Page 71

1    some of you officers might be questioned or talked to.
2  A.  It would have been -- that they were actually doing
3    that, I learned that at that workshop.  I'm not sure
4    what the exact date on that was, but that workshop.
5  Q.  Okay.  So, you've already made the point -- the rather
6    obvious point like, "You don't really need to do an
7    investigation.  We all already can see why the numbers
8    are down"?
9  A.  Right.  I informed the entire council that they could
10   speak to any officer at the department, top, highest
11   seniority, lowest seniority.  Everyone there knew why
12   the numbers were down.
13 Q.  Okay.
14 A.  Furman was very verbal, you know, about his -- him being
15   upset and his idea to stop towing for a while.
16 Q.  Right.  And, actually, that's right in the report.  I
17   mean, that's written down right in the report.
18 A.  Yeah.
19 Q.  Furman doesn't want to tow.  He's, you know, upset.
20 A.  Yeah.
21 Q.  So, what was your understanding of what was going to
22   happen with an "investigation"?
23       Because this says -- the document says that
24   Jackson's coming in to determine the reasons for the
25   fluctuation in towing activity by the Melvindale Police

Page 72

1    Department.
2        Did you understand that there were going to be
3    interviews?
4  A.  The City never told us anything.  We found -- the way we
5    found out that it had started and that he was going to
6    contact some of us is, he called -- somehow he got one
7    of our officer's personal cell phone numbers, which
8    really upset that officer.  So, that had to come from
9    the City, and called that officer on the phone and
10   was -- you know, stated "I'm So-and-So.  I'm
11   investigating the towing situation."
12       And we, as a union, decided that we would not speak
13   to him over the phone because we -- obviously, over the
14   phone, he could have been anybody.
15       You know, we just, as a union, decided that we
16   weren't going to speak on the matter with anybody.  We
17   told the City up front that the investigation was
18   pointless.
19 Q.  Who did you tell?  The Public Safety Commission?
20 A.  Yes.
21 Q.  Okay.  So, some people were interviewed.
22 A.  I know that he contacted at least two officers.  I don't
23   know -- I don't believe they actually gave him much
24   information, if any, but I don't know 100 percent for
25   that.  I wasn't there when those conversations took

Page 73

1    place. This is just what they told me after the fact.
2  Q.  So, here is what the report says:
3              "Four members of the patrol division were
4         asked to interview."
5        So, he picked four people to ask.
6  A.  Yes. I was told that he contacted a few.
7  Q.  And one declined.
8        So, there were three apparently that he talked to.
9  A.  Okay.
10  Q.  And Furman is one of them, according to this report.
11  A.  Okay.
12  Q.  He says:
13              "During these interviews all officers
14         requested anonymity in this report. To honor
15         their request, names of the interviewees are
16         not included here. The single exception is
17         Corporal Matthew Furman. Furman agreed to be
18         identified as he is central to many of the
19         issues in this report."
20        So, we know it's Furman, and then there's two
21    others.
22        Do you happen to know if Easton was one of them?
23  A.  He would have been in the supervisor's union, and I
24    don't know. Officer Easton and I don't speak whenever
25    it can be avoided.

Page 74

1  Q.  Why is that?
2  A.  Officer Easton hates me and has been trying to get me
3    fired for about three and half years.
4  Q.  Why is that as you understand?
5  A.  I don't know. I've actually asked around to the guys at
6    the department what his issue is with me.
7        The only explanation I was ever given was, when I
8    became a detective, it really upset Officer Easton -- or
9    at the time Sergeant Easton -- due to the fact that he
10    enjoys power and authority, and I didn't answer directly
11    to him any more. I had a sergeant and a lieutenant in
12    the detective bureau that I answered to directly, and I
13    was told that that upset him.
14        But that's the only answer I've ever been given.
15  Q.  Okay. And by the way, how -- how are you getting along
16    with Chief Allen?
17  A.  We're on -- we're good.
18  Q.  And how about Lieutenant Welch, when he was still there
19    and around?
20  A.  We were fine.
21  Q.  Okay. And how about Chief Hayes?
22  A.  We're friends.
23  Q.  Okay. What was the officers in the department, the
24    non-command staff's takeaway, from what you could
25    discern, of Furman?

Page 75

1  A.  He's hardworking. Nobody trusts him. Most officers
2    feel he shouldn't be a cop.
3  Q.  Okay. So, I'm going to hand you the document I referred
4    to early on, which is the policy review by Jackson.
5    It's Bates stamp 1273 through 1283.
6        I'm not going to ask you about all of it.
7  A.  Okay.
8        MS. GORDON: Melinda?
9        MS. BALIAN: Thank you.
10  BY MS. GORDON:
11  Q.  Have you seen this before?
12  A.  No.
13  Q.  Okay. Let's go to -- all right. I'm going to have you
14    read the first page.
15  A.  Okay.
16        All right.
17  Q.  Okay. So, you see here that Jackson is talking about
18    factors, and you can have external factors and you can
19    have internal factors within the control of the City.
20        What is your opinion on his point about there are
21    some things that are within the control of the City?
22        And by that, I mean with regard to your particular
23    department and towing.
24  A.  There are things that the police department could
25    control that would affect the numbers of tows, in

Page 76

1    that -- actually since this has happened -- this was
2    later than this, we have gone to a different patrol
3    system in the way we patrol the City. We've actually
4    broke it up into two zones, an A zone and a B zone.
5        Had this happened at this time, Corporal Furman's
6    supervisor could have put him off of Schaefer, which
7    would have -- he still would have found tows, I'm sure,
8    but I know it would have knocked the numbers down.
9        So, that -- it could have happened. However, like
10    I said at this time, this was not in place. This didn't
11    happen until roughly a year later.
12  Q.  Okay. If you go to the second page, and under
13    "Documents Reviewed" -- I'm sorry. Under "Interviews,"
14    it says four members were interviewed. It gives the
15    dates. It says Larry Coogan was interviewed. Mike Goch
16    was interviewed.
17        And then it says:
18              "During the interviews, all participants
19         agreed that Corporal Matt Furman produces the
20         largest amount of impounded vehicles. All three
21         attributed the drop in impounded vehicles as a
22         result of his absence on the road."
23        That's what you've been saying. Everybody -- that
24    was widely understood; correct?
25  A.  Right. Yes.

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 77

1  Q.  Okay.  Now go down to Point Number 1 under "Interview
2      Content," where it says:
3              "During these interviews, it quickly became
4          clear --"
5      and just for the record, let me stop myself.
6              This is Furman, I guess, and two other people he's
7      talking about, unless he's including Coogan.
8              "During these interviews, it quickly became
9          apparent that there was considerable personal
10         emotion and conflict associated with the
11         impound/towing issue.  All officers stated that
12         Chief Hayse and Lieutenant Welch hate Mike Goch
13         and his company.  All related experiences where
14         the chief and lieutenant ordered officers 'not to
15         make that fucking Goch more money.'  They
16         mentioned this was a typical comment whenever
17         Corporal Furman or others requested towing
18         services."
19             Do you have any information on the point made in
20     Number 1?
21  A.  I have never heard Chief Hayse or Lieutenant Welch state
22      that they hate Mike Goch nor did I ever hear Chief Hayse
23      or Lieutenant Welch make the following statement of "not
24      to make that fucking Goch any more money."
25              I will say that our entire department was happy

Page 78

1      with Gene's.  So, none of us, including Officer Furman,
2      wanted to switch over to Goch, including -- officers did
3      complain about Goch's company, never about Mike
4      personally, at least not in front of me.  The service
5      was much faster for Gene's, especially at the beginning,
6      which is probably normal, but it's also normal for
7      people to not like change.
8              So, the department didn't want the change.  We
9      wanted to keep Gene's.  And officers, including Officer
10     Furman and myself, felt that Goch -- I mean, it's true.
11     Goch charged a lot more money than Gene's would.  We
12     felt our citizens were being ripped off.  And, again,
13     that included Officer Furman.
14  Q.  Uh-huh.
15  A.  But I never heard those statements made that are in that
16      point.
17  Q.  Go to Number 2, if you would.
18              It's an attribution to some witnesses who did not
19      cite their source, and they're just theorizing that
20      Hayse and Welch were personal friends with the owner of
21      Gene's Towing and so on.
22              Do you know anything about Point Number 2 there?
23  A.  The only friends that I know that were between our
24      department and anybody a part of Gene's Towing was
25      Corporal Furman with the son of the owner of Gene's

Page 79

1      Towing.  They are very good friends.  They still hang
2      out and speak on a regular basis to this day.
3  Q.  What's his name; if you recall?
4  A.  I can look it up, if you would like --
5  Q.  That's okay.
6  A.  -- but I don't recall off the top of my head.
7  Q.  Okay.
8  A.  Oh, it's Paul, because it's the owner.  His name is
9      Paul, and it's Paul, Jr.
10  Q.  Okay.  Number four:
11             "Officers related a frequent stream of
12         invective into Goch and his company.  They
13         mentioned several times that Welch told them
14         that Goch is a crook."
15             I think you've already addressed this, but I'd like
16     you to specifically talk about that, whether you ever
17     heard that or not?
18  A.  Not that specific phrase, but I -- like I said, our
19      entire department, and then you can look at the numbers
20      and see that they charged much more than Gene's did.  We
21      all felt that -- and myself included that Goch was kind
22      of ripping off our citizens.  Having your car impounded
23      is bad enough, and then, to make it worse, a lot of --
24      especially since the switchover to Goch, a lot of people
25      had a hard time getting their car back out.  Usually --

Page 80

1      especially with Furman's tows was for no insurance.
2              Most of the time that that happened was because the
3      people couldn't afford insurance, which -- and, again,
4      it was legal for him to tow those cars, but then you
5      give them this astronomical towing fee and impound fee
6      that they can't afford because they just had to get
7      insurance on their car that they already couldn't afford
8      because they can't get it out without insurance, it just
9      seemed almost like you were double-dipping them at that
10     point.  And that was the opinion of most of the officers
11     at the department.
12  Q.  Look at Number 6, if you would, please, on the next
13     page.
14             "All interviewees related hearing Chief
15         Hayse and Mike Welch disparaging city
16         administrators, including the city council and
17         the city attorney, as being on the take."
18             Did you ever hear that?
19  A.  No.
20             Well, not from them.  I've heard, through this
21     investigation, that people are alleging that Chief Hayse
22     had said that.
23             So, I've heard of that allegation, but I've never
24     heard that come from Chief Hayse or Lieutenant Welch.
25  Q.  And how about the next part?

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                    Pages 81–84

Page 81

1          "They also witnessed them --"
2    that would be Welch and Hayse --
3               "-- calling the mayor a 'bitch,' 'whore,'
4       'slut,' 'cunt' in the presence of officers."
5          Have you ever heard anything about that?
6    A.  No.
7          I honestly believe that statement to be a lie.
8    I've never heard -- as I stated earlier that Chief Hayse
9    and I are friends.  I've never heard Chief Hayse use
10   that kind of language, ever, even just in a personal
11   setting.  And I've never heard Lieutenant Welch say that
12   about the mayor or anybody on the city council.
13   Q.  Did you know Welch was -- I'll say lost his job, but
14   maybe that's not exactly technically correct, because he
15   allegedly lied at the hearing about this?
16   A.  I was informed that they were going to fire him at
17   that -- his meeting or whatever, and that basically the
18   union was able to kind of argue back for him to only be
19   suspended for 30 days.
20   Q.  And did you -- were you aware it was because Larry
21   Coogan, and whoever else, decided that he had lied at
22   the hearing about this?
23   A.  Yes.  That's what I was told.
24   Q.  Did you ever have any officers tell you that they heard
25   Welch or Hayse use this kind of language?

Page 82

1    A.  No.
2    Q.  So, I guess the people that testified to this --
3    "testified," that's the wrong word.  There was no
4    testimony, I don't think.
5          But who has talked about this at this hearing was
6    Furman.  He said that he heard this language.
7          So, does that resonate with you with regard to his
8    credibility on that?
9    A.  As I stayed earlier, I believe that statement is just a
10   lie.
11         When this whole thing came to be, as I, again,
12   stated earlier, at that point, it was either Chief Hayse
13   who was going to lose his job or Officer Furman who was
14   going to lose his job.  So, I believe he was in a
15   self-preservation mode and was willing to do what needed
16   to be done, and he did that.
17   Q.  And then Easton also said something to that effect.
18         Do you know why he would be willing to say those
19   things at a hearing?
20   A.  Excuse me.
21         MS. BALIAN:  I'm going to place an objection as to
22   speculation.
23         But you can answer.
24   A.  It's been told to me that Officer Easton has taken and
25   filed formal complaints with the City against every

Page 83

1    chief that he has worked for at the City of Melvindale,
2    including now Chief Allen.
3          Officer Easton is a very vindictive person.  Every
4    officer there knows it.  Half the department has turned
5    in letters against him as far as his conduct as an
6    officer, whether it be on or off duty, mostly on, which
7    I believe would probably be worse.
8          So, I believe that Officer Easton did this because
9    he wanted to -- wanted the chief's position.
10         And has actually, from what I was told, been
11   recorded as saying so on one of our body cameras, that
12   he stated that when Chief Hayse was fired that he should
13   be chief, that Chief Allen didn't deserve the position,
14   that it should be Officer Easton that is the chief.
15         So, I believe his reason for doing this was he
16   thought that he could possibly become chief.
17   BY MS. GORDON:
18   Q.  What about Officer Kennaley?
19         He was the third person -- Furman, Easton,
20   Kennaley -- I believe that the record will reflect, that
21   backed up these so-called profanities used by Welch and
22   Hayse.
23         What do you know about Kennaley and a possible
24   motivation for him to say that?
25   A.  I wouldn't know his motivation.  Everybody at the

Page 84

1    department knows that I'm friends with Chief Hayse.  So,
2    since this -- since this entire incident happened, it's
3    not talked about much in front of me in that they know
4    that I support Chief Hayse.  So, I would have no idea
5    what Officer Kennaley's reason for that would have been.
6    Q.  How is it you're friends with Chief Hayse?
7          Did you meet when you joined the department?
8    A.  I had probably met him at shift change maybe a dozen
9    times prior to me becoming a detective.  Once I became a
10   detective, we worked the same hours, and it's a small
11   department.  So, just throughout working together, we
12   became friends in that way.
13   Q.  Okay.  And you thought he did a good job as a chief?
14   A.  Absolutely.
15   Q.  Okay.  What was the morale like there?
16         I've heard stuff about morale issues under Chief
17   Hayse.
18   A.  While he was chief?
19   Q.  Yeah.
20   A.  I loved working there, including -- specifically for me,
21   I became a detective very early in my career which then
22   allowed me to go to some more trainings and things of
23   that nature, which would have -- would look really
24   promising on a resumé.  And to be honest, our department
25   doesn't pay that great, and we don't have a pension.  I

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                          Pages 85–88

Page 85

1    had numerous people, including some of the command from
2    our department, stating that I should probably leave, go
3    to a department that would pay more money and definitely
4    give me a pension with having -- being able to put those
5    things on my resumé.
6          I never even applied any place else 99 percent due
7    to the morale at this department.  The guys -- almost
8    all the guys got along.  We would hang out together
9    outside of work.  It was relaxed, which suited me.  I
10   enjoyed it.
11 Q.  And what's happened since this whole situation with
12   Chief Hayse and him being taken down?
13 A.  Where we're at currently today, I would say we're
14   getting close to getting back to that.  Where we were at
15   when Chief Hayse was fired was horrible.
16         There was only two officers at the department that
17   were happy at the department, including Officer
18   Kennaley.  He was not happy with what happened.  The
19   only two officers that were happy were Sergeant Easton
20   and Officer Furman, including Sergeant Easton trying to
21   throw it in my face -- I think to bait me to get me in
22   trouble.  He kept telling me how great it was now
23   there -- I mean specifically to me, which, again,
24   everybody knew at that point that I was friends with
25   Chief Hayse.  Which I -- I had officer or chief -- at

Page 86

1    the time Chief Allen look into that because I wanted
2    that to stop.  I didn't want him throwing it in my face
3    that my friend was just fired.  It was inappropriate for
4    any workplace, which I had other officers hear him say,
5    but Sergeant Easton lied about it and said he didn't say
6    it, so the investigation was dropped at that point.
7          But all the officers were just kind of down.  They
8    stopped -- we honestly kind of just even stopped joking
9    around with each other because you were afraid what --
10   honestly what Sergeant Easton or what Officer Furman
11   would go and tell the City you said, whether you
12   actually said it or not.  So, you didn't even want to
13   really get close to any sort of boundary or anything of
14   that nature.
15         It was just very stiff.  Nobody enjoyed it,
16   including Chief Allen who got promoted to chief.  He
17   didn't like it.  In fact, I still don't think he's very
18   happy.  He's kind of -- like I said, he's just now kind
19   of smoothing out the waters and getting everything back
20   to normal, but --
21 Q.  On page 1277 of this report -- let me see what
22   paragraph.
23         It's the next page actually.  It's "Conclusion 2."
24         It's on the bottom, 1277.  It's under "Conclusion
25   2."

Page 87

1          "A vocal campaign of negative comments and
2    actions was reported by all officers."
3          Again, we're talking about three people.
4  A.  Okay.
5  Q.  (Reading.)
6          "Even Mr. Goch had heard some of the
7    stories regarding the rejection of his food
8    and flower donations.  This tension is
9    affecting the police department.  The question
10   is, how much?  The anger and verbal direction
11   from Chief Hayse and Lieutenant Welch are
12   communicated very effectively."
13         Do you know what that is in reference to?
14 A.  Numerous officers, including myself, not under any
15   direction by Chief Hayse or Lieutenant Welch, but under
16   our own power, if you will, would reject eating the food
17   that Mike Goch was bringing because it appeared
18   inappropriate.  It was as if he was trying to bribe us
19   into giving the contract to him for his towing company.
20         So, many officers, like I said, including myself,
21   didn't want to eat the food that he was bringing.
22   Again, it just seemed very inappropriate.
23         I was unaware of any flower donations, though.
24 Q.  There's been evidence in this -- I think it was a
25   Christmas poinsettia or something like that.

Page 88

1  A.  Okay.
2  Q.  There's been some testimony in this case that -- or some
3    evidence -- I'm not sure if it's testimony -- that
4    Furman has told people he has tapes of Chief Hayse -- I
5    think it's something like directing him to -- this would
6    be a paraphrase -- "stop African American drivers and
7    impound their cars," or something to that effect.
8  A.  It was me he told that to.
9  Q.  Oh, okay.  Go ahead.
10         What did he say?
11 A.  Whenever Chief Hayse's name is brought up in front of
12   Officer Furman, it immediately is followed by, "That guy
13   is an asshole," or "That guy is --" it's derogatory,
14   always from Officer Furman in regards to Chief Hayse.
15         And the last time that this came up was, say,
16   roughly a month ago, somewhere in that time frame.  And
17   I don't -- I don't remember the context of the
18   conversation as to why we were speaking of Chief Hayse,
19   but it was in front of Officer Furman, and he
20   immediately went to "Oh, F that guy.  He's just an
21   asshole."
22         And I immediately told Officer Furman to stop, and
23   that he knows I'm his friend.  When I was friends with
24   Officer Furman and he was getting in trouble at the
25   department, I didn't let the guys talk bad about him in

Page 89

1  front of me.  I'm not going to let Officer Furman talk
2  bad about Chief Hayse in front of me.  I just -- it's
3  not appropriate.  I don't want to hear it.  If you want
4  to go to your buddies and mouth Chief Hayse, then do it
5  outside of work.  It's just not appropriate.
6       And he said something along the lines of "If you
7  only knew."
8       So, I inquired.  I said, "What are you talking
9  about?"
10      And he said, "Chief Hayse --" well, he doesn't --
11  he goes, "Hayse -- I've got audio and visual recordings
12  of Hayse ordering me to target minorities."
13      And that's a quote from Officer Furman.  Those were
14  his exact words to me.
15      And I -- so, I asked him to let me see them or hear
16  them.  He said that he would.
17      And the next time I saw Officer Furman was
18  within -- in a week, anyway.  The next time I saw
19  him was, again, at work.  I asked him about the
20  recordings, and he stated that he couldn't show them to
21  me because his attorney told him not to.
22  Q.  Did he say who his attorney was?
23  A.  I didn't ask; he didn't say.
24  Q.  So, what did you make of that?  Did you think he was
25  lying?

Page 90

1  A.  I know he was lying.  Chief Hayse would never do that.
2  Q.  Okay.  All right.  Were you ever involved in auctions?
3  A.  Yes.
4  Q.  Okay.  When was that?
5  A.  It was towards the end of my being in the detective
6  bureau, so that was the end of 2016.  So, it was
7  probably the last maybe year that I -- maybe a little
8  longer than that, that I was in the detective bureau.
9       So, around about 2016 to 2017.
10  Q.  Okay.  And what was your role?
11  A.  I would assist Lieutenant Welch in getting the cars
12  ready for auction, meaning removing the license plates
13  and researching the vehicles just in case the officers
14  that impounded them missed anything, whether it be
15  narcotics, a gun, needles anything that -- illegal that
16  obviously we don't want in the vehicle that we're
17  selling.
18       And then, on the day of the auction, I would be
19  present at the auction, again with Lieutenant Welch.  I
20  would -- the way that they ran it varied from --
21  sometimes from auction to auction.  I would either help
22  collect the -- I don't -- not a donation but if -- a
23  deposit.  If you purchased a vehicle, you had to leave a
24  deposit with us before you left because sometimes we --
25  people would change their mind.  We didn't want that

Page 91

1  happening without at least being able to either resell
2  the car or getting something from it, because,
3  obviously, somebody else would have purchased the
4  vehicle.
5       So, I would either help with that or help in that I
6  would write down which car sold to which bidder, which
7  bidder number, and the price that it sold for.  And
8  then, back at the station, I would collect the money and
9  write out a receipt to the buyer for that.
10  Q.  So, this was while Goch & Sons was doing the towing?
11  A.  Correct.  It was only while Goch and Sons was there.
12  Q.  Am I correct that there has to be a police officer
13  present at the auction by law?
14  A.  I don't know about that.  That makes sense to me, but I
15  don't know about that for sure.
16  Q.  Was there always a Melvindale police officer present?
17  A.  Every auction that I was a part of, there was at least
18  three.
19  Q.  Okay.  And somebody from Goch was there as well?
20  A.  Correct.  Goch actually ran the auction.  Not Mike
21  himself, but the company ran the auction and that of
22  calling out prices and which car we were on and things
23  like that.
24  Q.  Who used to do that before Goch got the contract?  So --
25  A.  As far as who ran it?

Page 92

1  Q.  Yeah.
2  A.  I was told it was us.  I don't know specifically who,
3  but I was told it was the police department who would
4  run the auction before, when it was Gene's.
5  Q.  Did Goch do anything other than what you've just
6  described, which would be to describe the vehicle and
7  take bids?
8       Did they play any other role?
9  A.  Not that I can think of.
10      Well, they were the ones who would take everybody's
11  license and give them a bidder number.
12  Q.  Okay.
13  A.  So, they were in charge of that.  That's the way they
14  ran it during the auctions that I was a part of.
15      That way, basically, we held onto your license in
16  case you didn't give a deposit.  Again, it was just kind
17  of an insurance thing.
18  Q.  Okay.  And how many people typically attended these
19  auctions?
20  A.  That depended mostly on the weather.
21      For the nicer days, it may be 30 to 40 people.
22      In the winter months, maybe 20 to 30.
23  Q.  And how many auctions were there?  How often did they
24  occur?
25  A.  At that point we were doing one every other month.

Page 93

1  Q.  Okay.  And did that change?
2  A.  I think it has changed now, but I don't know --
3  Q.  Okay.
4  A.  -- for sure.
5  Q.  So, you were there, when you were in the detective
6      department, to fill out paperwork?
7  A.  For the auction?
8  Q.  Uh-huh.
9  A.  Excuse me.  Yes.
10         And then, again, once we returned to the station,
11     that's where we would collect the payments for the
12     vehicles and give them the paperwork and the keys and
13     all that.  That would actually happen back at the
14     station.
15         So, once back at the station, I actually was the
16     one who collected the money, for every auction that I
17     was a part of, and would fill out the receipts for the
18     payments.
19  Q.  Was the money in cash usually or not?
20  A.  The only people that we would take a payment other than
21     cash from was somebody that Lieutenant Welch and
22     Sergeant Slaughter had -- were comfortable that they had
23     been to many auctions.  It was usually salvage yards who
24     would purchase five, six, seven cars at each auction and
25     had been to multiple auctions, and that the checks had

Page 94

1      always cleared from.
2          But anybody who they didn't recognize, it was
3      always cash.
4  Q.  Furman testified that he believed Welch was either
5      embezzling money or skimming money.
6          Do you have a comment on that based on your working
7      on auctions with Welch?
8  A.  While I was working with him --
9  Q.  Yeah.
10  A.  -- it would have been impossible for him to do because
11     he never handled the money until it was completely over
12     with.  I would turn over the money to him at that point,
13     but there had already been receipts made and signed by
14     me.  So, the only way that that could have happened was
15     if somebody just add up those receipts.
16  Q.  And Furman purchased vehicles at these auctions --
17  A.  Yes.
18  Q.  -- from time to time?
19  A.  Yes.
20  Q.  Did he typically, from the auctions you were at,
21     purchase vehicles?
22  A.  The ones I was at, he was never there personally, but I
23     know, as I said earlier, that Mr. Briscoe purchased at
24     least one vehicle for Officer Furman at the auctions I
25     was at and --

Page 95

1  Q.  How about -- go ahead.
2  A.  But I do know from Officer Furman and I talking about it
3      that he's purchased multiple -- that Officer Furman has
4      purchased multiple vehicles from our auctions.
5  Q.  How about Goch?  Did he ever purchase vehicles, or his
6      son or family members?
7  A.  Yes.  I do know that vehicles were purchased for him.  I
8      don't -- I don't think -- in fact, I know that he never
9      bid on them while at the auctions I was at, but I was
10     told that the -- some of the vehicles were purchased for
11     people in his family.
12  Q.  Were you aware Furman would walk through the auto
13     impound lot a few days before the auction to sort of see
14     what was available?
15  A.  Yes.  I've personally seen him do that.  Sometimes he
16     would come down while Lieutenant Welch and I were
17     prepping the vehicles, like I said, taking the plates
18     off and re-searching them and that.  He would go down
19     there and see what was up for auction.
20  Q.  Did -- were you aware of a girlfriend of Matthew
21     Furman's ever purchasing a car for him or a friend?
22  A.  No, I wasn't aware of that.
23  Q.  Did you ever hear a citizen complaint being brought
24     against him with regard to taking the license of a
25     female he stopped?

Page 96

1  A.  Yes.
2  Q.  What did you hear of?
3  A.  I was told that a female that he was either seeing or
4      dating or whatever, what have you, that she filed a
5      complaint with the department, that Officer Furman
6      stopped her like for a traffic stop, and got her
7      driver's license through the course of that stop, and
8      then, at the end of the stop, told her that he was going
9      to hold onto her license, and she had to come to his
10     house to retrieve the license and that -- implying that
11     she had to have sex with him to get her license back.
12  Q.  How did you hear that?
13  A.  Through an officer at the department, but I don't
14     remember who it was that told me.
15  Q.  Did you have any reason to think it was not true?
16  A.  No.  I honestly hoped it wasn't true because, as I said,
17     earlier that officer and I -- Officer Furman and I were
18     friends, and it makes us as officers look bad and
19     specifically makes our department look bad if something
20     like that did happen.
21         However, it is known, again, throughout the entire
22     department that Officer Furman is a bit of a womanizer;
23     that he would date many women and then sleep with a lot
24     of women, at least per his own words, you know.
25     Obviously, none of us would be there for that, but that

Page 97

1    would be from his own words that he would kind of, you
2    know, brag about the amount of -- because he was on like
3    a lot of social media or Internet dating sites and
4    things like that.
5          So, he would brag about the amount of women that he
6    would take home. So, it didn't seem out of the realm
7    for him.
8  Q. Did you ever hear him talk about a relationship with
9    Nicole Barnes from the City?
10 A. He never talked about it, and I -- and I heard others
11   talk about it including I -- we would kind of razz him
12   about it a little bit, and -- especially myself and
13   another officer when we -- we would hang out together
14   outside of work, we would again razz him about it.
15         He would always say, "Oh, we're just friends" and
16   kind of laugh about it, but I -- I was with him when
17   I -- and I've seen him text her outside of work reasons.
18 Q. Okay. I've got some questions for you about procedures
19   for verifying whether a driver has valid insurance --
20 A. Okay.
21 Q. -- when you make a stop.
22         So, walk me through that, if you would.
23 A. Okay. Well, you -- if I were to stop someone for a
24   traffic offense, I always ask them for their driver's
25   license, registration, and proof of insurance.

Page 98

1          If they hand me an expired insurance, I would
2    inform them, you know, this insurance is old. Do you
3    have the current one? Sometimes they would say, "Oh,
4    I" -- "Oh, I must have left it at home," or something of
5    that nature.
6          Usually, I would assume that they just don't have
7    insurance on the vehicle anymore, that they let it lapse
8    and -- especially, if it was a couple years old.
9    However, it was a couple years ago where it got put into
10   LEIN where LEIN would tell you whether a vehicle had
11   insurance or not, but we were informed that that wasn't
12   always 100 percent accurate. It would sometimes take a
13   couple days for that to be updated, so it may not be
14   accurate as far as LEIN was concerned.
15         So, we were told not to -- you couldn't use that
16   for validation for a stop, and you really shouldn't 100
17   percent base your reasoning off of that. You could use
18   it, you know, as a tool, more or less.
19         So, if it said "no insurance on the vehicle," you
20   could ask the driver or especially, obviously, if they
21   were the owner of the vehicle, "Hey, you know, I see
22   that" -- "LEIN is telling me that there's no insurance.
23   Do you actually have insurance on this vehicle or not?"
24         Sometimes the person would be honest at that point.
25   They probably felt they were caught in a lie, so they'd

Page 99

1    be honest. Or if you really wanted to push it further,
2    you could just call the company that they said that they
3    had insurance through and have them check the -- that
4    person's name, and that company would let you know
5    whether or not there was insurance through that person's
6    name and on what vehicle.
7  Q. Okay. So, the LEIN system carried Secretary of State --
8  A. Correct.
9  Q. -- info?
10 A. Yep.
11 Q. And that's the info you're saying would not necessarily
12   be completely up-to-date or accurate, reliable?
13 A. Exactly.
14         And we were made -- when the information was --
15   came out that that was going to be put on the Secretary
16   of State, I guess, page, of LEIN, we were told right up
17   front that it was to be used more as a -- again, as a
18   tool than as a definite yes or no because it wasn't
19   always accurate, including -- I mean, officers would run
20   into that where it would say yes or no but you -- I mean
21   the driver could provide paperwork showing otherwise.
22 Q. All right. So, if you're going to tow -- I get that
23   there's a ticket -- or you'll tell me if this is right
24   or wrong.
25         Can you issue a citation for not carrying proof of

Page 100

1    insurance as compared to not having insurance?
2  A. Correct.
3  Q. Okay.
4  A. Which as a personal -- from my own experience, that's
5    more so what I would write. Again, generally the reason
6    for people not having insurance is they can't afford it.
7    I try to sympathize as much as I can. Some people, I
8    would still write the "no insurance" ticket to and
9    impound vehicle, sure, but that would again be compared
10   with all the circumstances at the time.
11         But, generally, if somebody didn't have insurance,
12   I would just write them a "no proof of insurance" ticket
13   as a personal way of handling it.
14 Q. Okay. So, you can get a citation for not carrying your
15   proof with you, even if you have insurance, and you can
16   also get a citation for literally not having insurance?
17 A. Correct.
18 Q. Okay. Now, can you tow a car if the person actually has
19   insurance but just didn't carry proof of it with them?
20 A. Legally, no.
21 Q. Okay. So, the tow goes directly to the fact you're
22   driving around out on these streets literally without
23   insurance?
24 A. Correct.
25 Q. Okay. So, if you're going to tow a car for no

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

---

1    insurance -- strike that.

2        If you're going to tow a car based on insurance, it

3    can't just be because there's no proof of insurance in

4    the car; it has to be because the person actually

5    doesn't have insurance?

6  A.  Correct.

7  Q.  Have you ever towed a car for somebody that did not have

8    any insurance?

9  A.  Yes.

10  Q.  Okay. Have you checked to see whether that's, in fact,

11    true, as compared to they just don't have the proof on

12    them, like the driver says, "No, I really do have

13    insurance. I just didn't stick it in my wallet"?

14  A.  The only times that that would happen would be where I

15    would use my discretion and that. I think I've done it

16    twice, and the person was very argumentative and rude to

17    me, immediately arguing why I stopped them, that I had

18    no reason to pull them over. And, therefore, I would

19    make my investigation more thorough, meaning I would

20    check on all the information that they were giving me.

21    And when they couldn't provide the proof of insurance,

22    but said, "Oh, I know I have it. It's with such and

23    such company," it may only have been once, but I think I

24    may have actually called twice. It's very few times

25    that I've done that, but I have, yes.

---

1        (Discussion held off the record.)

2  BY MS. GORDON:

3  Q.  I'm going to hand you Bates stamp 3406. That's a tow

4    ticket or tow tag inventory sheet filled out by Matthew

5    Furman.

6  A.  Okay.

7  Q.  Okay. And he's towing this vehicle. It says on the

8    bottom, "SOS shows no tax paid."

9    Do you know what that refers to?

10  A.  No. I've never -- I've never seen that before.

11  Q.  Okay. And then up on top, there's a box that says

12    "Towed in error. Release, no charges."

13  A.  Yeah. I would have to assume that that's because

14    Officer Furman wasn't supposed to tow this vehicle. I

15    don't know what that "shows no tax paid" means. I don't

16    know what that is.

17    So, I -- "not eligible for plates," I'm assuming,

18    is what that other part says, but I'm kind of guessing

19    at that.

20    But, yeah. I would assume the reason why we didn't

21    charge this person and it says "towed in error" is

22    because Officer Furman wasn't supposed to tow it. So,

23    technically it was towed illegally.

24  Q.  All right. Now, you stop somebody, hypothetically, and

25    the registered owner of the car has a warrant out for

---

1    his or her arrest.

2    What do you do?

3  A.  Is the registered owner the driver? Are they in the

4    vehicle?

5  Q.  I don't know. I'm going to hand you Bates stamp 4870.

6  A.  Okay.

7  Q.  That's a tow tag --

8  A.  Okay.

9  Q.  -- for a Furman tow.

10  A.  Oh, okay. Yeah, he does this.

11    What this is, is, we can only release the vehicle

12    to the registered owner. Even if you're the brother or

13    sister or mother of the registered owner, maybe I don't

14    want my brother driving my car, you know, so we can't

15    release it to anybody other than the registered owner.

16    So, when he does this, what this is, is, the

17    registered owner is not in the vehicle and he tows the

18    vehicle from the driver, sees that the registered owner

19    has a warrant with us, as it says "MEPD warrant,"

20    letting the -- whoever is going to be at the desk when

21    this vehicle is released know when that person comes in

22    that they have a warrant with us.

23  Q.  Okay.

24  A.  That's what he's doing there.

25  Q.  Okay.

---

1  A.  I believe he's the only one who does that, but --

2  Q.  So, here's one, Bates stamp 3491, no valid insurance.

3    The bottom says:

4        "Owner advised to take care of numerous

5        warrants."

6    What do you make of that; if anything?

7  A.  Well, based on the fact that he didn't write "MEPD

8    warrants" on here, I'm going to assume the warrants are

9    with other cities.

10    And Officer Furman must have let that person go on

11    those warrants but told them not to come get the car

12    until he took care of those warrants, which is honestly

13    irrelevant because just because you have a warrant with

14    another City doesn't mean you can't come get your car

15    out of impound with us or any department, for that

16    matter.

17  Q.  And then this he would write on here and then he just

18    wouldn't let the other cities know and possibly wait for

19    them to pick the guy up? That's what he said.

20    MS. BALIAN: Objection. Calls for facts not in

21    evidence. It doesn't say that.

22    MS. GORDON: That's what he testified to.

23    MS. BALIAN: Neither did he.

24    MS. GORDON: He said he didn't wait. He said

25    typically he --

---

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 105–108

Page 105

1   A.   Yes.
2          This -- that's what I would take away from this
3   form is that he didn't arrest the person on those
4   warrants from the stop.  And as -- in general, with
5   Officer Furman, the reasoning for that would have been
6   he didn't want to wait or do the booking process and
7   that takes up his time and didn't want to wait for that.
8   So, he would want to let the person leave from -- so he
9   could tow the car, and then go on and tow other
10  vehicles.
11  BY MS. GORDON:
12  Q.   Okay.  So, your -- you became aware that he was just not
13  calling in the warrants to the departments at issue?
14  A.   He has verbally told myself and numerous other officers
15  that when he is out there trying to tow cars which,
16  again, he's doing most of the time, that unless it was a
17  serious warrant, he wouldn't call any other department
18  other than ours.  Obviously, if it was a Melvindale
19  warrant, he would usually bring those in.
20         MS. GORDON:  Okay.  That's all I have for you.
21         MS. BALIAN:  Okay.  I have some questions.
22         MS. GORDON:  Thank you for your time.
23                    *   *   *
24                 EXAMINATION
25  BY MS. BALIAN:

Page 106

1   Q.   First, I'm going to ask you about this Defendant's Bates
2   stamp document 3491.
3          You testified that you would assume he told the
4   driver not to pick up the car until he takes care of the
5   warrants.
6   A.   Yes.
7   Q.   It doesn't say that anywhere on here that he told the
8   driver not to pick up the car until he takes care of the
9   warrants; right?
10  A.   No, it actually does.
11  Q.   It says:
12         "Owner advised to take care of numerous
13         warrants --"
14  A.   (Reading.)
15         "-- before attempting to redeem vehicle."
16         It actually says those exact words.
17  Q.   These are not MEPD warrants; correct?
18  A.   I would assume not.  I don't know that, but I would
19  assume not because generally you would write "MEPD
20  warrants" on there.  Correct.
21  Q.   Okay.  And you testified earlier that, unless they're
22  MEPD warrants, the drivers are advised of the warrants
23  and released; correct?
24  A.   No, I did not.
25  Q.   They're put in the system.

Page 107

1   A.   I did not testify to that.
2   Q.   That they're put in the system and, unless the
3   individual other agencies tell the officers to hold
4   them, then they are advised and released?
5   A.   Yes.  If the -- say the -- for example, if the person
6   has a warrant with Lincoln Park, if we contact Lincoln
7   Park and they don't want to pick them up, yes, we advise
8   and release on the warrant.
9   Q.   Okay.  So, what evidence do you have that Officer Furman
10  didn't contact these agencies?
11  A.   I didn't say that he didn't.
12  Q.   Okay.  Well, you made an assumption, you said, that
13  because he wanted to get to other towing that he didn't
14  contact them.
15         What evidence do you have?
16  A.   I said -- yes, in general, that would be his practice.
17  Q.   My question was, what evidence do you have that he
18  didn't contact the other agencies?
19  A.   On that specific incident, that would -- is his general
20  evidence.  That's the only evidence I have.
21  Q.   What evidence do you have -- listen to my question.
22  A.   That's it.
23  Q.   What evidence do you have that he didn't contact the
24  other agencies?
25         Do you have any evidence that he didn't?

Page 108

1   A.   His general practice.
2   Q.   Okay.  So, you don't have any personal knowledge that he
3   didn't contact the other agencies?
4   A.   Correct.
5   Q.   Okay.  So, on Bates stamp document 4870:
6          "Registered owner has MEPD warrant."
7   A.   Yes.
8   Q.   So, are you saying that the registered owner was not the
9   driver of the vehicle?
10  A.   That would be my assumption.
11  Q.   Okay.  So, he's letting whomever is running the desk
12  know that when the registered owner comes in, they've
13  got a warrant?
14  A.   Correct.
15  Q.   So, you were hired in 2011 --
16  A.   No, 2012.
17  Q.   2012.
18         What month?
19  A.   May.
20  Q.   And what are the various shifts that you've worked over
21  the years, if you can remember?
22  A.   I've worked day shift, afternoons, midnights, and the
23  detective bureau.
24  Q.   What shifts in what years have you worked with Officer
25  Furman?

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 109–112

1   A.   I've worked afternoons with Officer Furman. I --
2   Q.   Say -- let's start in 2012, because you were hired with
3       him in 2012; right?
4   A.   Correct.
5   Q.   Okay.
6   A.   We were roughly, I believe, like five days apart.
7   Q.   Okay. So, in 2012, what shifts did you work with him
8       then?
9   A.   I believe we worked afternoons together in 2012.
10   Q.   In what time period?
11   A.   It would have been maybe for about two months, from June
12      to August, somewhere in that time frame.
13   Q.   Okay. And in 2013, what time period did you work the
14      same shift with Officer Furman?
15   A.   I believe all of 2013, again on afternoons.
16   Q.   Okay.
17   A.   I believe.
18   Q.   Were you ever partners, or did you work separately?
19   A.   Our department you're almost never in a double car
20      because we're so small. So, it's almost always single
21      car.
22   Q.   Okay. So, you think you worked the same shift with
23      Officer Furman all of 2013?
24   A.   I believe so.
25   Q.   Okay. And what about 2014?

1       You said you became a detective in February of '14;
2      is that correct?
3   A.   Yes.
4   Q.   Through January of 2017?
5   A.   There was a few months that I was pulled out of the DB
6      in that time frame in there, but most of that I was a
7      detective, yes.
8   Q.   As a detective, do you still have different shifts or do
9      you have an assigned shift?
10   A.   As a detective, my assigned shift was 8:30 a.m. to
11      4:30 p.m.
12   Q.   Okay. And do you recall what shift Officer Furman had
13      at that time?
14   A.   For most of that time frame, he was on day shift, which
15      was 8:00 a.m. to 4:00 p.m.
16   Q.   Okay. And then you said you -- in January of 2017, you
17      went back out onto the road patrol?
18   A.   Correct.
19   Q.   Okay. And when you went back out on road patrol, what
20      shift were you?
21   A.   I was on midnights. Midnight to 8:00 a.m.
22   Q.   Midnight to 8:00 a.m.
23       And you remained on that shift until March 26th of
24      '18?
25   A.   Correct.

1   Q.   Okay. And explain your job now.
2       What are you doing?
3   A.   I'm assigned to the Michigan State Police in an
4      undercover drug unit.
5   Q.   Okay. And what are your responsibilities in that?
6   A.   Basically, the team's responsibility is to recover
7      narcotics off the streets. So, we have -- we work in
8      plain clothes and set up buys with drug dealers.
9   Q.   Are you working with other police departments? Do they
10      take some members of other police departments?
11   A.   Correct, yeah.
12   Q.   Okay. Yeah. I've heard of that.
13       All right. So, is there anybody else assigned from
14      the Melvindale Police Department to that?
15   A.   No.
16   Q.   Or is it just you?
17   A.   Just me.
18   Q.   Okay. And what is your shift?
19   A.   Typically it's 2:00 p.m. to midnight, but it kind of
20      varies depending on when we're needed, if the occasion
21      arises.
22   Q.   How often do you go into the Melvindale Police
23      Department?
24   A.   Since I've been on --
25   Q.   Since you've been in this new role.

1   A.   I've probably been there four or five times since then.
2   Q.   Okay. Do you just kind of go from your home out to the
3      field, or what do you do?
4   A.   We have an office that I report to, like I have -- we
5      have a state police trooper, or he's a sergeant. He's
6      basically who I report to every day that I'm working,
7      which is at our office. It's in Taylor.
8   Q.   Okay. Did you have to like apply for that new job with
9      the Michigan State Police?
10   A.   Yes.
11   Q.   Like how did that come about?
12   A.   Yes.
13       The, I guess, opening was posted at the department,
14      and any officer who was interested submitted a letter to
15      Chief Allen. And every officer who submitted a letter
16      was interviewed by the lieutenant and sergeant in charge
17      of that team, and they made a decision based on that
18      interview.
19       (Ms. Gordon leaves the room.)
20 BY MS. BALIAN:
21   Q.   Okay. Now, you've testified a couple times today that
22      you used to be friends with Officer Furman.
23   A.   Correct.
24   Q.   When did you stop being friends with Officer Furman?
25      What time period?

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 113—116

Page 113

1   A.   When this all happened.
2   Q.   When what all happened?
3   A.   When he testified, in my opinion, falsely against Chief
4        Hayse.
5   Q.   Okay.  So, in August of 2016?
6   A.   That sounds right.
7   Q.   Okay.  That was the removal hearing, August 29th and
8        August 30th.  Okay.
9             And you've also testified several times today that
10       you're friends with Chief Hayse.
11            Does that go outside, then, of when you worked with
12       Chief Hayse?  Would you get together with him socially?
13  A.   Are you asking before I started working here or
14       currently?
15  Q.   Sure.  When you worked under Chief Hayse.
16  A.   Yes.
17  Q.   Okay.  How would you get together?
18  A.   Go to sporting events, hang out at his house.
19  Q.   Okay.  When did that start?
20  A.   It was after I was in the detective bureau.  Probably --
21       I started in February.  I'm sure it was a few months
22       after that.  I'm guessing probably that summer.
23  Q.   February of '14?
24  A.   Yeah.  I'm guessing probably the summer of that year.
25  Q.   Okay.  What other officers hung out socially with Chief

Page 114

1        Hayse?
2   A.   Lieutenant Welch, Lieutenant Jones, Lieutenant Bajorek,
3        Lieutenant Meador.  I know some of the retired officers,
4        I've seen hang out socially with Chief Hayse, that
5        worked there, retired before I started.
6             Sergeant Martinez -- Detective Martinez, Officer
7        Lash.  I think that -- Officer Lane.
8   Q.   Okay.  And other than going to sporting events and going
9        to his home, what else did you do socially?
10  A.   We would get dinner, have a beer once in a while.
11  Q.   Where did you have a beer?
12            (Ms. Gordon enters the room.)
13  A.   Usually in Allen Park.
14  BY MS. BALIAN:
15  Q.   Is there a certain bar you would go to in Allen Park?
16  A.   Not specifically.
17  Q.   Okay.  So, what bars have you been to with Chief Hayse?
18  A.   Honestly, I don't remember the names of them because we
19       were usually only there -- this has only happened a few
20       times.  So --
21  Q.   Are you married?
22  A.   No.
23  Q.   Okay.  Do you have a girlfriend?
24  A.   No.
25  Q.   Okay.  Would Chief Hayse bring his wife ever to these

Page 115

1        social events that you would go to with him?
2   A.   Yeah.
3   Q.   Okay.  When is the last time you saw him, other than
4        today?
5   A.   Actually, I bumped into him at 24th District Court on
6        Tuesday, I think it was.
7   Q.   When is the last time you were with him at a planned
8        meeting?
9   A.   I think it's been -- I don't know -- a month or so.
10  Q.   What did you do?
11  A.   We met up, myself, Chief Hayse, his wife, and Lieutenant
12       Bajorek and his wife met up at -- I think it was the
13       Knights of Columbus in -- I think it's Lincoln Park.
14  Q.   For what?
15  A.   Catch up.  I haven't seen -- Lieutenant Bajorek is
16       retired, so I haven't seen him in a while.  And, as I
17       stated earlier, I know that Chief Hayse and Lieutenant
18       Bajorek are friends.  So, just catch up.
19  Q.   Did you talk to the chief at all about your deposition
20       today?
21            I'm talking about Chief Hayse, not Chief Allen.
22  A.   Nothing other than that my deposition was today.
23  Q.   Okay.  Did you talk to anybody, whether on the phone or
24       in person, from this office about your deposition today?
25  A.   Yes.

Page 116

1   Q.   Okay.  Who did you speak with?
2   A.   Both of those two women.
3   Q.   Okay.
4             MS. GORDON:  I think he spoke to Elizabeth, and
5        then me this morning.
6   A.   I thought I spoke to you the first time.
7             MS. GORDON:  Okay.  Sorry.  I'll leave you to the
8        testimony.
9   BY MS. BALIAN:
10  Q.   And what did you talk about?
11  A.   They asked me questions in regards to this whole
12       incident, the whole deposition.
13  Q.   About the subject matter you testified to here today?
14  A.   Correct.
15  Q.   And when did you speak with them?
16  A.   The first time was maybe a month or so ago, two months
17       ago, somewhere in that time frame.
18            And the last time was, I believe, earlier this
19       week, maybe late last week.
20  Q.   Okay.  Did you provide them any documents?
21  A.   No.
22  Q.   Okay.  Did they contact you on your cell phone or at the
23       police station?
24  A.   My cell phone.
25  Q.   How did they get your cell phone number?

Page 117

1   A.   I contacted Ms. Gordon the first time, actually, myself,
2        and I gave her my cell phone number then.
3   Q.   Okay.  You testified a lot today about Officer Furman
4        towing vehicles.
5             Do you have any personal knowledge that he has ever
6        illegally towed a vehicle?
7   A.   One specific incident, I was working at the time that it
8        happened, albeit I don't believe -- excuse me -- I don't
9        believe it was intentional on Officer Furman's part, but
10       he did tow a vehicle -- technically it was illegal for
11       him to tow it.
12            I don't remember the circumstances, but I remember
13       we kind of goofed on him about it for a little while at
14       the station, that the reason that he had towed it was --
15       he shouldn't have.
16  Q.   What were the circumstance?
17            You said you don't think it was intentional.
18            How did he -- what happened?
19  A.   He believed that he was towing it properly.  Like I
20       said, I don't remember exactly what it was, but he
21       did -- he believed he was towing it properly.  He didn't
22       receive any discipline for it.  Like I said, we all just
23       kind of goofed on him and the owner was contacted and we
24       released the vehicle to him, but --
25  Q.   So, let me ask you this:  Do you have any personal

Page 118

1        knowledge that he has ever intentionally illegally towed
2        a vehicle?
3   A.   No.
4   Q.   Okay.  Do you have any personal knowledge that he has
5        ever been directed by the Public Safety Commission to
6        increase his towing of vehicles?
7   A.   Yes.
8   Q.   What?
9   A.   Officer Furman told me that two members of the
10       council -- he wouldn't say who -- told him that he
11       needed to keep towing cars in order to -- actually, I
12       take that back.  Three members.  Two were from the
13       council and one was Rich Ortiz -- that he needed to keep
14       towing cars in order to make the City money because we
15       had a deficit.
16  Q.   Okay.  My question was the Public Safety Commission.
17  A.   Okay.  Well, excuse me then.
18  Q.   Okay.  So, the Public Safety Commission is a body --
19  A.   Yes.  He stated --
20  Q.   -- that has authority --
21  A.   Yes.
22  Q.   -- over the police department; right?
23  A.   Yes.
24  Q.   Okay.  So, can you answer that question?
25  A.   Yes.  He stated two members from that body informed him

Page 119

1        to continue to tow vehicles in order to make revenue for
2        the City --
3   Q.   Okay.  Who is on the Public Safety Commission?
4             MS. GORDON:  Wait a minute.  Did you finish your
5        answer?
6             I wasn't sure if you were --
7   A.   No.  I was -- because the City had a deficit.
8   BY MS. BALIAN:
9   Q.   Okay.  Who are the two members of the Public Safety
10       Commission?
11  A.   He wouldn't tell me.
12  Q.   Okay.  When did he tell you this?
13  A.   This would have been while we were still friends, so it
14       would have been in that time frame.  I don't remember
15       exactly when, though.
16  Q.   Okay.  Have you ever witnessed anybody -- have you ever
17       witnessed the Public Safety Commission give a directive
18       to Officer Furman to increase his tows?
19  A.   No.
20  Q.   Okay.  Do you have any personal knowledge that Officer
21       Furman was directed to increase his tows by city
22       council?
23            MS. GORDON:  Other than what he just testified to,
24       you mean, where he was told that that's what he was --
25            MS. BALIAN:  I'm talking about city council as a

Page 120

1        body.
2             MS. GORDON:  I know.  He just said he was told
3        that.
4             MS. BALIAN:  If you could repeat my question?
5             THE REPORTER:  One second, please.
6             (Record repeated by the reporter.)
7   BY MS. BALIAN:
8   Q.   Go ahead.
9   A.   Yes, from Officer Furman stating the council had
10       informed him to --
11  Q.   The council --
12            MS. GORDON:  Hang on.  You've got to let you --
13  A.   Members, excuse me.
14            MS. GORDON:  You've got to let him finish, though,
15       Melinda.
16  A.   Members from the council had told him to continue to tow
17       vehicles in order to generate revenue because the City
18       was in a deficit.
19  BY MS. BALIAN:
20  Q.   Okay.  And who were those members?
21  A.   He wouldn't tell me.
22  Q.   Did you ask him who they were?
23  A.   Yes.
24  Q.   Okay.  And when did he tell you this?
25  A.   Again, in that same time frame of when we were still

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                          Pages 121–124

Page 121

1    friends.
2  Q.  And you said Rich Ortiz also; right?
3  A.  Yes.
4  Q.  Told him this.
5       And when did Rich Ortiz tell him this?
6  A.  Same time frame.
7  Q.  So, he would give you Rich Ortiz's name, but he wouldn't
8       give you the other names?
9  A.  Correct.
10  Q.  Okay.  And when did he share this -- or where did he
11       share this information with you?
12  A.  At the department.
13  Q.  Was anybody else around?
14  A.  Probably, but I wouldn't remember who.  I wasn't paying
15       attention to that kind of thing.  I didn't think it was
16       relevant to anything.
17  Q.  So, this would have been when you were working
18       midnights?
19  A.  No.  While -- when --
20  Q.  Well, you said it was right before all this all went
21       down.
22  A.  I said it was while we were still friends.  I have been
23       working midnights for over a year.  That was well after
24       Chief Hayse had been terminated and Corporal Furman and
25       I were no longer friends.

Page 122

1  Q.  Oh, it was after Chief Hayse had been terminated?
2  A.  No.
3  Q.  I thought your testimony was --
4  A.  I -- oh, that I went to midnights?
5  Q.  It was during the time frame you were on road patrol --
6  A.  Correct.  I was -- road patrol is any day shift, noons
7       or midnights.
8  Q.  Well, let me get out my full question.
9       That it was when you were working road patrol,
10       after you returned to that from the detective bureau?
11  A.  No.  It was before that.
12  Q.  Okay.
13  A.  Chances are I was honestly probably still in the
14       detective bureau when this happened.  That's when --
15  Q.  "Chances are."
16       Do you know, or are you guessing?
17       MS. GORDON:  He's doing his best to answer, I
18       think.
19       Go ahead.
20  BY MS. BALIAN:
21  Q.  Do you know, or are you guessing?
22  A.  Well, I'm not guessing, but Corporal Furman and I
23       spent -- most of our time that we worked together was
24       while he was on day shift, that we were in the detective
25       bureau.

Page 123

1       So, I'm pretty sure that that would have been the
2       time frame.
3  Q.  How often were you in the department when you were
4       working in the detective bureau?
5  A.  Monday through Friday and including weekends if I was
6       called in.
7  Q.  But how often was your body actually in the department?
8  A.  That's -- I reported there every day in the morning.
9       Most of my work was done from within the department.
10       The detective bureau is a lot of paperwork, a lot
11       of phone calls, which most of that took place in the
12       department.
13  Q.  Did you have to be in court?
14  A.  Sometimes.
15  Q.  How often out of the week?
16       What percentage of your time would you say was in
17       court during the week?
18  A.  5 percent.
19  Q.  Does that include your testimony time, the time you had
20       to go to the prosecutor's office, everything like that?
21  A.  Yes.
22       Maybe, at the most, 10 percent.  We only had one
23       day a week that was set for court at the 24th District
24       Court, and if my cases weren't -- if it wasn't my case,
25       I wouldn't go.  So --

Page 124

1  Q.  Well, what about circuit court?
2  A.  Most of our cases pled before circuit court.  I believe
3       I've had to appear in circuit court four times, five
4       times in my six years.
5  Q.  You had testified about Furman using his cell phone to
6       contact -- I think it's Sean Briscoe; is that right?
7  A.  He has, yes.
8  Q.  Okay.  Do you have personal knowledge if he does that
9       every time he needs a tow?
10  A.  No, I don't.
11  Q.  Okay.  Did you ever ask him why he contacted Sean
12       Briscoe using his cell phone?
13  A.  Yes.
14  Q.  And the reason?
15  A.  He said it's faster.
16  Q.  You also testified that you had heard about a time that
17       Mike Goch provided food at a party that Easton had?
18  A.  Correct.
19  Q.  Is that correct?
20       Were you at that party?
21  A.  No.
22  Q.  So, you've heard this from somebody else?
23  A.  Yes.
24  Q.  And there was some testimony from you that you -- I
25       don't know whether somebody informed you or you heard

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                    Pages 125–128

Page 125

1   elsewhere -- that Furman was having somebody purchase
2   cars for him at the auction, and you learned of this
3   during the time that you worked at the auction; is that
4   correct?
5   A.  Correct.  Yes.
6   Q.  Okay.  And that was after Hayse was terminated; is that
7   correct?
8   A.  I believe this was before, but I'm not 100 percent on
9   that.
10  Q.  Well, what time did you work at the auction?
11  A.  I believe the year of 2016.
12  Q.  What time frame?
13  A.  That whole year.  I believe that was the time frame that
14  I helped with the auctions.
15  Q.  I believe your testimony was the end of 2016 through
16  2017.
17  A.  No.  I wasn't even in the detective bureau in 2017.
18  Q.  Okay.  So, you believe it was just throughout 2016?
19  A.  Correct.
20  Q.  Okay.  What paperwork can we look at to find out the
21  exact time frame of when you worked there?  What would
22  show that?
23  A.  The -- the receipts that I filled out.
24  Q.  Receipts of what?
25  A.  From the payments for the cars.

Page 126

1   Q.  Okay.  Did anybody report the supposed purchasing of
2   vehicles by Furman?
3   A.  What do you mean by "report" it?
4   Q.  Well, you said you believed it was wrong.  So, did
5   you --
6   A.  I did not say that.
7   Q.  Did you ever report it?
8   A.  I didn't say that I believed it was wrong.
9   Q.  Well, you did.  You said you believed it was wrong that
10  there was all this towing activity on his part and then
11  somebody was purchasing the cars at the auction.
12      So, did you ever report it?
13  A.  What I said was I believed it was inappropriate.
14      But, again, I don't understand your question as far
15  as reporting it.
16      What do you mean did I "report" it?
17  Q.  Okay.  So, you believe it was inappropriate?
18  A.  Yes.
19  Q.  Did you ever report it to Chief Hayse that you thought
20  this inappropriate activity was going on by Furman?
21  A.  No, I did not speak directly with Chief Hayse about it.
22  Q.  Did you report it to anybody else?
23  A.  Lieutenant Welch was aware that Mr. Briscoe was
24  purchasing cars, or at least the one that I was there
25  for.  Lieutenant Welch was aware that --

Page 127

1   Q.  Did you report it to anybody else?
2   A.  No.
3   Q.  Do you know if anybody else reported it?
4   A.  I have no idea.
5   Q.  Did Lawrence Jackson ask to speak with you?
6   A.  No.
7   Q.  And you had testified that you were present at a meeting
8   where they were talking about this.
9       What meeting was that?
10  A.  It was the workshop that the council was holding prior
11  to the meeting that Chief Hayse was suspended at.
12  Q.  What was the workshop about?
13  A.  The towing.  As far as I could tell, that was their main
14  concern.
15      Now, the -- as far as I know, they still hold the
16  same workshop.  Basically, they go over the agenda for
17  the following meeting, the meeting to follow, and
18  discuss briefly what is going to be discussed in the
19  open meeting in total of everything.
20  Q.  Do you know if actually this -- Lawrence Jackson, if
21  this issue was discussed in the open meeting at city
22  council?
23  A.  Yes.  I was there.
24  Q.  Okay.  So, it was brought up at the city council of
25  hiring this individual for the investigation?

Page 128

1   A.  Correct.
2   Q.  Okay.  Were you aware that the number of tickets issued
3   by the Melvindale police officers dropped by over 2,000
4   from 2014 to 2015?
5   A.  No.
6   Q.  Chief Hayse testified that, although he wasn't really
7   aware that that was the number, that that is a valid
8   concern.
9       Did -- was that ever raised to you when you were an
10  officer?
11  A.  Not that specific number.  As I said, I was unaware of
12  that number.
13      But, yes, Chief Hayse and even -- and still Chief
14  Allen, when our union, as the patrol union would meet,
15  the chief would meet with the union president and give
16  topics or things that he wanted addressed.  Sometimes it
17  would be making sure the station was cleaned or the cars
18  were cleaned, just whatever the chief felt needed to be
19  addressed but not maybe directly from the chief.  Just
20  things he wanted to be -- seen taken care of.
21      And sometimes it would be to make sure that we were
22  still enforcing the traffic laws as far as -- and making
23  sure that the City was being policed properly.
24  Q.  Are you saying that Chief Hayse addressed that with you?
25  A.  Not directly with me, but he -- yes, Chief Hayse did

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 129–132

Page 129

1    have our union president address it with our union.
2 Q.  You understand, I would assume, as an officer, you can't
3    discriminate against the public in the performance of
4    your duties; right?
5 A.  Yes.
6        MS. BALIAN:  Do you have the memo that was issued
7    to Furman?
8 A.  It should still be over here.
9        MS. BALIAN:  I don't have it.
10        MS. GORDON:  The discriminatory memo?
11        MS. BALIAN:  Those are your words, not mine, Deb.
12        MS. GORDON:  Well, actually, that's your client's
13    words, not mine.
14 BY MS. BALIAN:
15 Q.  Did Chief Hayse sit down and have a personal
16    conversation with you about this Bates stamp document
17    1442 before it was issued to Officer Furman?
18 A.  No.
19 Q.  What was your position in April of 2016?
20        Were you a detective?
21 A.  At the beginning of April, I was not.  By the end of
22    April, I was.  I had gone back to the road from January
23    of '16 to sometime in April of 2016.
24 Q.  So, you were at the scene when Robert McClintock was
25    arrested; correct?

Page 130

1 A.  Yes.
2 Q.  Okay.  And it's my understanding that you and Chief
3    Allen were standing in the backyard?
4 A.  When he was arrested or throughout the whole incident?
5 Q.  When he was arrested.
6 A.  Yes.
7 Q.  Okay.  And you saw Corporal Furman -- Corporal Furman at
8    that time -- put him in handcuffs; correct?
9 A.  Yes.
10 Q.  Okay.  And then you saw Corporal Furman pull him up and
11    start walking him out to the patrol car; correct?
12 A.  Yes.
13 Q.  Okay.  So, now I'm assuming that at the time you're
14    watching Furman walk him out to the car, McClintock is
15    in front of Furman.  So, you have McClintock and then
16    Furman, and then you're behind Furman; correct?
17 A.  No.
18 Q.  Where were you?
19 A.  I was behind, yes, but McClintock was not in front of
20    him.  He was next to him.
21 Q.  Okay.  And you're in the backyard.
22        Where is the home in relation to where you're
23    standing?
24 A.  What do you mean?  Where is --
25 Q.  You're in the backyard of the home?

Page 131

1 A.  Not when he's walking him to the car, no.
2 Q.  Okay.  Where were you?
3 A.  Standing in the driveway, up in front of the house, next
4    to Lieutenant Allen.
5 Q.  And in front of the house where?
6 A.  In the driveway.
7 Q.  Where in the driveway?
8 A.  In the middle.
9 Q.  How long was the driveway?
10 A.  I don't know.
11 Q.  You have no memory of it?
12 A.  I never measured it or paid any attention to how long
13    the driveway was, no.
14 Q.  Well, approximately?
15 A.  I couldn't guess.  I have no idea.
16 Q.  Can you picture it in your mind today?
17 A.  No.
18        I don't even remember the address of where this
19    happened.
20 Q.  When you were -- you said you saw Corporal Furman put
21    McClintock in the vehicle; correct?
22 A.  Yes.
23 Q.  Okay.  So, at the time you're watching this, where were
24    you in relation to Furman and McClintock?
25 A.  Behind them.

Page 132

1 Q.  Okay.  So, I would assume, at that time, McClintock is
2    in front of Furman because Furman is putting him in the
3    patrol vehicle?
4 A.  At that point, yes.
5 Q.  Correct?
6 A.  Yes.
7 Q.  Okay.  And you provided a statement that says:
8        "Once at the car, it appeared Corporal
9    Furman pushed McClintock towards the opened back
10    seat, causing McClintock to hit his head on the
11    frame of the car."
12        MS. GORDON:  May I interrupt you for a moment,
13    Melinda?
14        MS. BALIAN:  Sure.
15        MS. GORDON:  You appear to be reading from a
16    document that is the detective's statement --
17        MS. BALIAN:  It is.
18        MS. GORDON:  -- which you have not produced to us,
19    I don't believe.
20        MS. BALIAN:  Well, it's court-ordered to be
21    produced on Monday.
22        MS. GORDON:  Okay.
23        MS. BALIAN:  So, you'll have it.
24        MS. GORDON:  Hang on a minute.  Just a second.
25    Why was it not produced originally?

Page 133

1   MS. BALIAN:  Because I objected to it.
2   MS. GORDON:  On what basis?
3   MS. BALIAN:  Because he wasn't disciplined on it,
4   and the court ordered otherwise.
5   MS. GORDON:  Wow.  You people are a piece of work.
6   MS. BALIAN:  Deb -- okay.
7   MS. GORDON:  No, no, no.
8   You're now using this document to cross-examine a
9   witness after sitting in court and telling a federal
10  judge and my firm that it's "not relevant," but here you
11  are today cross-examining from it.
12  MS. BALIAN:  No, it's not relevant.  I still don't
13  think it is relevant.
14  MS. GORDON:  Well, why is it in your hand?  Why is
15  it in your hand?
16  MS. BALIAN:  I don't think anything that this
17  witness has testified to --
18  MS. GORDON:  You people are out of control --
19  MS. BALIAN:  -- here today is relevant.
20  MS. GORDON:  -- and we're going back to the judge
21  for -- okay.  We're going back to the judge for
22  sanctions.  That is clearly a relevant document that you
23  just never even said you had.  You could have said, "We
24  have it, but we're not producing it."
25  You just blew us off and God knows what else you've

Page 134

1   got that you have never produced to us.  I have --
2   MS. BALIAN:  Okay.
3   MS. GORDON:  I can only -- if you didn't produce
4   that simple little statement when you know the -- hang
5   on.  Now that I'm on a roll on this --
6   MS. BALIAN:  No, I'm not debating you on this.
7   MS. GORDON:  Our client was fired in part because
8   of this incident right in your hand.
9   MS. BALIAN:  No.
10  MS. GORDON:  Oh, yes.  Yes, he was.
11  MS. BALIAN:  He was terminated because he didn't
12  properly discipline Furman.
13  MS. GORDON:  Don't be lecturing me, Melinda, on
14  anything.
15  MS. BALIAN:  I'm not lecturing you.
16  MS. GORDON:  You people hide documents.
17  MS. BALIAN:  I'm responding.
18  MS. GORDON:  You hide documents.  You got caught on
19  it in court, and we're going back for sanctions.
20  MS. BALIAN:  We didn't get caught on anything.
21  MS. GORDON:  Oh.  You weren't standing there when
22  the judge told you what she said the other day?  Because
23  I heard it loud and clear.
24  MS. BALIAN:  We didn't get caught on anything.
25  MS. GORDON:  Yes, you did.  She made it very

Page 135

1   clear --
2   MS. BALIAN:  Okay.
3   MS. GORDON:  -- what she thinks of what you've
4   done --
5   MS. BALIAN:  Can you please --
6   MS. GORDON:  -- and I want -- hang on --
7   MS. BALIAN:  Okay.  I'm not going to debate you on
8   this.
9   MS. GORDON:  I want a copy of that document right
10  now.
11  MS. BALIAN:  No, I'm not giving it to you right
12  now.
13  MS. GORDON:  Okay.  Then the dep is stopping and
14  we're going to court.  I am moving for a protective
15  order.  You're now cross -- you've been ordered to turn
16  over a flipping document, and you're standing here
17  cross-examining on it, and you won't hand it across the
18  table.
19  MS. BALIAN:  You're getting --
20  MS. GORDON:  The dep is done.
21  MS. BALIAN:  You're not -- you can't stop the dep.
22  MS. GORDON:  Well, I'm going to.
23  I'm going to.
24  John, the dep is over.
25  This is bizarre.

Page 136

1   MS. BALIAN:  Okay.  You want this document, fine.
2   MS. GORDON:  Yeah, I do.  Yeah, I do.
3   MS. BALIAN:  No, but you're not going to interrupt
4   this part of my deposition.
5   MS. GORDON:  How dare you come in here and
6   cross-examine on a document the court has ordered you to
7   produce and don't give it to me.
8   MS. BALIAN:  The court ordered me to produce it on
9   Monday.
10  MS. GORDON:  Where is the date --
11  MS. MARZOTTO TAYLOR:  I'm sorry?
12  MS. GORDON:  Where is the date for Monday that it
13  has to be produced --
14  MS. MARZOTTO TAYLOR:  I never saw a date.
15  MS. BALIAN:  It's April 26(sic).  It's in the
16  order.
17  MS. GORDON:  Okay.  Well, how dare you.  I'd like
18  the document now.
19  MS. BALIAN:  I'm sorry.  It's April 23rd --
20  MS. GORDON:  I'd like the document.
21  MS. BALIAN:  You will get the document.  I'll give
22  you the --
23  MS. GORDON:  Right now.  Right now, while you're
24  standing here with it in your hand.
25  MS. BALIAN:  No.  I'm going to have him answer my

Page 137

1   question.
2         MS. GORDON:  No.  You're giving me the document --
3         MS. BALIAN:  No, you can't -- I have --
4         MS. GORDON:  -- before we go forward.
5         MS. BALIAN:  I have a question pending that I would
6   like --
7         MS. GORDON:  Well, we'll get the court on the
8   phone.  These are documents I should have had months
9   ago, Melinda.
10        MS. BALIAN:  No, they're not.  I objected to them.
11        MS. GORDON:  Excuse me.  Did the court -- hang on.
12  Did the court overrule your objection and order that we
13  get them?
14        MS. BALIAN:  The court ordered that the documents
15  will be produced on Monday, Deb.
16        MS. GORDON:  Melinda, you --
17        MS. BALIAN:  I will provide this document to you,
18  but the court ordered --
19        MS. GORDON:  No, you're not -- you're not
20  cross-examining a witness on a document I don't have in
21  front of me.  That's not going to happen.  And the fact
22  that you think that the judge didn't just tell you we
23  should have had that from day one means you don't
24  understand law.
25        MS. BALIAN:  No.  The court ordered me to produce

Page 138

1   these on Monday.
2         MS. GORDON:  Having --
3         MS. BALIAN:  I will provide this to you --
4         THE REPORTER:  I'm sorry --
5         MS. GORDON:  Having ordered that you should have
6   produced them originally.
7         You don't grasp that the judge's whole order --
8         MS. BALIAN:  However --
9         MS. GORDON:  -- is because you made a mistake
10  and/or were dishonest?
11        MS. BALIAN:  Okay.  You can believe whatever you
12  want to believe --
13        MS. GORDON:  It's not what I believe --
14        MS. BALIAN:  You'll have the --
15        MS. GORDON:  It's the judge's order.
16        Just hand me the document or we're not going --
17  I'll get the judge on the phone.
18        MS. BALIAN:  I don't care if you call the judge.  I
19  really don't.
20        MS. GORDON:  You're not going to hand me the
21  document?
22        MS. BALIAN:  I told you I would provide you the
23  document, but I want an answer from -- there is a
24  question pending.
25        MS. GORDON:  What's the question pending?

Page 139

1         MS. BALIAN:  If you could read it, John?
2         MS. GORDON:  No, he's not going to answer --
3         MS. BALIAN:  Well, he -- you asked for the
4   question.
5         MS. GORDON:  Okay.  I may want to interpose an
6   objection --
7         MS. BALIAN:  Okay.  That's fine.
8         MS. GORDON:  -- Melinda.
9         MS. BALIAN:  Let him read back the question, Deb.
10        MS. GORDON:  No.  I -- is there a reason you're not
11  going to hand me the document right now?
12        MS. BALIAN:  I would like the question read back --
13        MS. GORDON:  Why?
14        MS. BALIAN:  So, you can place your objection if
15  you want to place an objection.
16        MS. GORDON:  I can't place it if you're misreading
17  the document and I don't have the document.  I can't do
18  that.
19        Is there a reason you're not handing me the
20  document?
21        MS. BALIAN:  Oh.  So, you can read the document?
22  Fine.
23        MS. GORDON:  Thank you.
24        MS. BALIAN:  But I want the question read back.
25        MS. MARZOTTO TAYLOR:  It's a different document.

Page 140

1         MS. GORDON:  Well, what is this?
2         MS. BALIAN:  No, it's not a different document,
3   Elizabeth.
4         MS. MARZOTTO TAYLOR:  You're reading off that
5   document.  This is a different document.
6         MS. BALIAN:  No, it's not.
7         MS. MARZOTTO TAYLOR:  So, there are now two
8   documents.
9         MS. GORDON:  What's that one over there?
10        So, I now have in front of me date 6-16-2016 to
11  Chief Hayse from Detective Nolin.
12        You now have another document that's never been
13  produced.
14        What is that that you're now using?
15        I'm going to be re-deposing your witnesses,
16  Melinda.  You people are out of control.
17        MS. MARZOTTO TAYLOR:  That's a new one entirely.
18        MS. BALIAN:  That is what I read from, Elizabeth.
19        MS. GORDON:  Well, you've got a stack of stuff
20  right there.
21        MS. MARZOTTO TAYLOR:  No, it was not.  You were
22  reading off --
23        MS. BALIAN:  I was reading off of that.  It's
24  quoted in the paragraph.
25        Why don't you look at it before you talk about

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 141–144

Page 141

1    something you don't know?
2            MS. MARZOTTO TAYLOR:  Melinda --
3            MS. GORDON:  Okay.  We see --
4            MS. MARZOTTO TAYLOR:  I've been watching you this
5    whole time, Melinda.  I can see what you're reading off
6    of.
7            MS. BALIAN:  Okay.
8            MS. GORDON:  No, no.  This is our document --
9            MS. BALIAN:  Excuse me.  No, it's not.  That is my
10   original.
11           MS. GORDON:  Okay.  You don't have to grab things
12   like a child --
13           MS. BALIAN:  I just want to clarify what your
14   associate thinks she knows.
15           MS. GORDON:  You just snatched that out of my hand.
16           MS. BALIAN:  What I quoted from --
17   A.  Am I allowed to use the rest room?
18           MS. GORDON:  Go ahead and take a break.
19           MS. BALIAN:  No, there's a question pending.
20           MS. GORDON:  Well, that's fine.  He's allowed to go
21   to the bathroom in the midst of your failing to produce
22   documents.
23           MS. BALIAN:  No.
24           MS. GORDON:  Go ahead, Detective.
25           MS. BALIAN:  No.  There is a question pending.

Page 142

1            MS. GORDON:  Well, too bad, Melinda.  I mean,
2    you're not producing documents.  We're way off the trail
3    of the question by now.  I'm not talking to him on the
4    break.
5            So, go ahead.
6            (The Witness leaves the room.)
7            MS. BALIAN:  It said:
8            "Once at the car, it appeared Corporal Furman
9    pushed McClintock towards the open back seat."
10           MS. GORDON:  Okay.  I'm going in for sanctions.
11           MS. BALIAN:  Well, okay.  Good.
12           MS. GORDON:  And you heard what the judge said to
13   you.
14           MS. BALIAN:  Yes.
15           MS. GORDON:  Do we have that transcript?
16           MS. MARZOTTO TAYLOR:  Yeah.  Want me to get it?
17           MS. GORDON:  No.
18           MS. BALIAN:  Why don't you pull the order that has
19   the date in it?  That would be helpful.
20           MS. GORDON:  Okay.  Melinda, you seem to grasp
21   that -- what the court said was that we should have had
22   these documents a long time ago, not on the 23rd.  And
23   now you have the gall to come in here and not hand me
24   stuff.  You're -- I see exactly how you operate and your
25   firm.

Page 143

1            MS. BALIAN:  I am complying with the court order.
2            MS. GORDON:  No, you're not.  The judge never
3    anticipated that between the date she ruled and the
4    23rd, you would be using and withholding documents from
5    me.
6            MS. BALIAN:  I wasn't withholding anything.
7            MS. GORDON:  She never anticipated that.  That is
8    for darn sure.
9            MS. BALIAN:  Okay.  So --
10           MS. GORDON:  So, if I would have said to her --
11           MS. BALIAN:  Maybe you shouldn't have scheduled any
12   depositions --
13           MS. GORDON:  No, no --
14           THE REPORTER:  I'm sorry.  One at a time.
15           MS. BALIAN:  -- between that time frame, Deb.
16           MS. GORDON:  If I would have said to the judge,
17   "Your Honor, Ms. Balian is going to refuse to turn over
18   documents and then use them at depositions and not hand
19   them to me between the day you just put this on the
20   record and the 23rd," what do you think she would have
21   said?  "That's fine.  She can withhold documents and
22   then cross-examine on them"?
23           MS. BALIAN:  Deb, you've continued to schedule
24   depositions.
25           MS. GORDON:  Okay.  I was entitled to.

Page 144

1            MS. BALIAN:  Maybe you shouldn't have scheduled
2    any.
3            MS. GORDON:  Maybe you shouldn't have violated the
4    court rules.
5            MS. BALIAN:  I didn't violate anything.
6            MS. GORDON:  The judge almost sanctioned you.  You
7    came that close.
8            MS. BALIAN:  She did not almost sanction me.
9            MS. MARZOTTO TAYLOR:  She did, indeed.
10           MS. GORDON:  Okay.  Okay.  You know, I'm not going
11   to argue with you and your alternate reality.
12           The court will speak for itself, and we'll see what
13   they do.
14           MS. BALIAN:  Okay.
15           MS. GORDON:  I'm not going to sit here and argue
16   with you about you didn't violate anything or the court
17   didn't almost sanction you.  You must live in a parallel
18   world.
19           MS. BALIAN:  Okay.
20           MS. GORDON:  And I see how you operate.
21           MS. BALIAN:  Okay.
22           MS. GORDON:  It's been made extremely clear.
23           MS. BALIAN:  Okay.
24           MS. GORDON:  I mean, I thought it was bad enough
25   after the court made clear to you that you had violated

Page 145

1  court rules and all of this should have been turned over
2  and that your objections were utterly misplaced and
3  outside the scope of the rule.  After she said all that,
4  the court made clear what she observed and what we had
5  observed.  This is now taking it to yet another step of
6  continuing to hide stuff.  And the fact that you didn't
7  turn that over -- I'm repeating myself now -- is a
8  pathetic joke.  That's as basic as it gets.
9        That's right.
10       MS. BALIAN:  Okay.  Are you done, or do you want to
11  say more?
12       MS. GORDON:  I'm not answering you, Melinda.  I
13  have no --
14       MS. BALIAN:  Okay.
15       MS. GORDON:  -- reason to answer you whether I'm
16  done.
17       MS. BALIAN:  Okay.
18       Everything that the court is requesting is being
19  produced pursuant to the court order.
20       (The Witness enters the room.)
21       MS. GORDON:  Okay.  I object to going forward with
22  the deposition unless I'm handed the documents that I
23  was entitled --
24       MS. BALIAN:  You will be --
25       MS. GORDON:  Okay.  You just interrupted me.

Page 146

1        MS. BALIAN:  Sorry.  Go ahead.
2        MS. GORDON:  I was putting an objection on the
3  record.
4        MS. BALIAN:  Okay.
5        MS. GORDON:  I object to going forward with the
6  deposition when counsel for the Defendants is sitting
7  across the table from me with documents in her hand,
8  which should have been produced months ago, and that,
9  according to the federal court, they interposed improper
10  objections to them and improperly withheld them.  And
11  now, after the judge has ordered and -- from the bench
12  and issued a written order that we get these documents,
13  Defendants are using them to cross-examine this witness
14  without giving them to us.
15       And it looks like there's a stack of documents
16  there that we've never received.
17       MS. BALIAN:  Okay.  And in response the court
18  ordered that the documents will be produced on April
19  23rd.  I didn't schedule this deposition.  You did.
20       Any documents --
21       MS. GORDON:  Well, I didn't know you were hiding
22  stuff.
23       MS. BALIAN:  Any -- I'm not hiding anything.
24       MS. GORDON:  You've hid stuff --
25       MS. BALIAN:  The court ordered them produced on

Page 147

1  April 23rd.  I objected.
2        MS. GORDON:  Okay.  Melinda, she ordered --
3        MS. BALIAN:  I will proceed with the questioning --
4        THE REPORTER:  I'm sorry.  One at a time.
5        MS. GORDON:  She ordered that --
6        MS. BALIAN:  I'm just -- Deb, if you could let me
7  respond?
8        MS. GORDON:  No --
9        MS. BALIAN:  Any documents I referenced, you can
10  happily reference them in any follow-up questioning.
11       MS. GORDON:  Okay.  Melinda, the court ordered that
12  because you had hidden documents from us.
13       MS. BALIAN:  Okay.
14       MS. GORDON:  You don't grasp that?  Because
15  you operate --
16       MS. BALIAN:  It's called an objection.  It's not
17  hiding.
18       MS. GORDON:  -- in my opinion, in a very dishonest
19  way.
20       MS. BALIAN:  Okay.
21       MS. GORDON:  As do your clients, obviously.
22       MS. BALIAN:  If you could read that last question
23  that I had, John, I would appreciate it, prior to all
24  the back and forth.
25       MS. GORDON:  Are you going to give me a copy of

Page 148

1  that or not?
2        MS. BALIAN:  Any document I reference, you're happy
3  to use with any follow-up questions you have.
4        MS. GORDON:  Okay.  Then I'm leaving.  I'm not
5  going to sit here while you have documents I'm entitled
6  to and have you ask questions -- I'm still talking,
7  Melinda.
8        I'm not going to be in a dep where you have
9  withheld documents intentionally.  The court has ordered
10  them, and then you're not allowing me to have them while
11  you do your cross.
12       John, the dep is over.
13       MS. BALIAN:  Okay.  I just said --
14       MS. GORDON:  No, no.
15       MS. BALIAN:  -- you will have these documents for
16  your follow-up questions.
17       MS. GORDON:  I don't -- no, I want them now, as
18  you're asking the witness.  He's under --
19       MS. BALIAN:  I'm -- you just had it in your hand.
20       MS. GORDON:  Okay.  Melinda, goodbye.  The dep is
21  ending.
22       MS. BALIAN:  Okay.  So, I want to make sure.  So,
23  your objection and your walking out is because you are
24  not make copies of these prior?
25       MS. GORDON:  Okay.  I've made this incredibly

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                          Pages 149–152

1    clear, the fact --
2         MS. BALIAN:  Okay.
3         MS. GORDON:  Okay.  Now you're interrupting me
4    again.
5         MS. BALIAN:  No.  Go make your four copies.
6         MS. GORDON:  Do you have other documents there with
7    regard to this witness?
8         MS. BALIAN:  I do have other documents that I'm not
9    using.
10        MS. GORDON:  That you're producing on the 23rd?
11        MS. BALIAN:  Correct.
12        MS. GORDON:  That have anything to do with this
13   witness?
14        MS. BALIAN:  No.
15        MS. GORDON:  Okay.
16        Sorry.
17   A.   That's okay.
18        (Discussion held off the record.)
19        (Record repeated by the reporter.)
20   BY MS. BALIAN:
21   Q.   Okay.  So, you're behind them.  Corporal Furman is in
22   front of you.
23        So, if you're behind Corporal Furman, how did it
24   appear that he pushed him?
25   A.   Once at the car, the way that, I guess, everything

1    played out, if you will -- I was directly behind the
2    car, if you will.  So, Corporal Furman and
3    Mr. McClintock were actually facing parallel to me.  So,
4    I actually had a view of Corporal Furman behind
5    Mr. McClintock as he pushed him into the vehicle.
6    Q.   Where was the car parked?
7    A.   Down the street, roughly three or four houses down from
8    where the arrest was made.
9    Q.   Three to four houses down.  Okay.
10        So, did you hear any discussion between McClintock
11   and Furman?
12   A.   At the car?
13   Q.   Yeah.
14   A.   No.
15   Q.   Where was -- where was Hinojosa at this time?
16   A.   I don't know where he was.
17   Q.   Was he standing by you?
18        MS. GORDON:  What do you think?  They all --
19   they're all lying, Melissa(sic)?  So, you're sitting
20   here cross-examining --
21        MS. BALIAN:  My name is Melinda.
22        MS. GORDON:  I'm sorry.
23        MS. BALIAN:  Just let me get my questioning done.
24   Thank you.
25        MS. GORDON:  Melinda, I apologize.  I mean --

1         MS. BALIAN:  If you have an objection --
2         MS. GORDON:  -- my objection --
3         MS. BALIAN:  -- place your objection.
4         MS. GORDON:  -- is that this is all in writing and
5    you are sitting here cross-examining a subpoenaed
6    witness as if to say he's lying and Allen --
7         MS. BALIAN:  I'm not at all.  I'm just asking some
8    questions.
9         gentleman, what's the point?
10        MS. BALIAN:  If you have an objection, place it.
11        MS. GORDON:  It's irrelevant.
12        MS. BALIAN:  Okay.  Thanks.
13   A.   I don't know.
14   BY MS. BALIAN:
15   Q.   You don't know where he was?
16   A.   He wasn't in my view.
17   Q.   Okay.  Did McClintock have blood on his body at the time
18        that he was arrested?
19   A.   I didn't see any.
20   Q.   Do you know if -- do you recall Furman putting on
21        protective gloves at the time he arrested him?
22   A.   I don't remember if he did or not.
23   Q.   At what point did you arrive on scene?
24   A.   I believe at -- the time of my arrival was basically as
25        the officer -- Officer Furman and Officer Hinojosa had

1    caught up to Mr. McClintock in the backyard of -- again,
2    I don't remember the address, but of that house.
3    Q.   Did you have discussions with the other citizens that
4    were there?
5    A.   I had a brief discussion with one citizen at the scene,
6    yes.
7    Q.   Who was that?  Do you recall?
8    A.   I believe it was the homeowners' son, but I can't be
9    certain of that.
10   Q.   Was he one of the individuals that was going after
11   McClintock?
12   A.   Yes.
13   Q.   Okay.  And there were, from my understanding, several
14   individuals that were going after him in sort of an
15   assaultive nature?
16   A.   No.
17   Q.   No?
18   A.   It was -- the brief discussion I had was with that
19   gentleman, and he stated he was the only one going after
20   Mr. McClintock in an assaultive nature.
21   Q.   Have you reviewed all the reports on this matter?
22        MS. GORDON:  What reports?  The ones you are
23   holding in your hand?
24   BY MS. BALIAN:
25   Q.   You can answer the question.

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 153–156

Page 153

```
1            MS. GORDON:  I would like a description of what
2     reports you're talking about so the witness can answer
3     the question.
4            Unless you know what she means.
5  A.  No.  Actually, that was going to be my question as to
6     which reports you're referring to.
7  BY MS. BALIAN:
8  Q.  Have you reviewed any of the reports in this case?
9  A.  Yes.
10           MS. GORDON:  How does he know what the reports are?
11           What reports?
12 BY MS. BALIAN:
13 Q.  What reports have you reviewed?
14 A.  Mine to Chief Hayse and Officer Furman's actual police
15    report from the incident.
16 Q.  Okay.
17 A.  But that was not recently.
18           Excuse me.  I need to add, I also, obviously,
19    reviewed my own report to -- that was given to the
20    Michigan State Police when they interviewed me in the
21    station.
22 Q.  Speaking of that report to the Michigan State Police,
23    you had indicated that you didn't know whatever happened
24    with that; right?
25 A.  Correct.
```

Page 154

```
1  Q.  Did Chief Allen ever tell you that in March 2017, he was
2     contacted by the Michigan State Police and informed the
3     case was denied?
4  A.  No.
5  Q.  That it was closed?
6  A.  No.  That's the first time I'm seeing anything of this.
7  Q.  You had testified about citizen complaints and that you
8     believe that Furman has more citizen complaints of other
9     officers.
10 A.  Yes.
11 Q.  Do you know, of any of those citizen complaints, how
12    many have been verified?
13 A.  I don't know.
14 Q.  Have any citizens made a complaint against you?
15 A.  Yes.  Yes.
16 Q.  Is it fair to say that many citizen complaints that come
17    in are not necessarily accurate?
18 A.  Yes.
19           MS. BALIAN:  Where's the Hayse Bates stamp 928
20    through 930?
21           MS. GORDON:  I don't know.
22           MS. BALIAN:  Well, it was referenced during the
23    deposition --
24           MS. GORDON:  I'm sorry.  You know --
25           MS. BALIAN:  -- in the middle.
```

Page 155

```
1            MS. GORDON:  You know, all the documents I'm using
2     today are pretty much -- what is the -- what is it?
3            MS. BALIAN:  The e-mail, Sunshine Ponzetti, I
4     believe.
5            MS. GORDON:  From this officer?
6            MS. BALIAN:  Yes.
7            MS. GORDON:  Okay.  You know, I would think you
8     would bring that with you since it's Officer Nolin's
9     document.
10           MS. BALIAN:  Are you refusing to give it to me?
11           MS. GORDON:  Melinda, it may be back on my desk.
12    If you want to take a break, I'll look for it.
13           MS. BALIAN:  Sure.  We'll take a break.
14           (Short recess at 1:24 p.m.)
15                    *   *   *
16           (Record resumed at 1:27 p.m.)
17 BY MS. BALIAN:
18 Q.  I'm showing you again what has been marked as Hayse 928
19    through 930.
20           When you were testifying to this earlier, you
21    testified, "We reached out to MSP regarding McClintock."
22 A.  Correct.
23 Q.  Who is "we"?
24 A.  I don't -- I'm not sure if I made that clear earlier or
25    not.
```

Page 156

```
1            I'm not sure specifically.  I just meant "we" as in
2     the department of Melvindale.  I don't know who it was
3     specifically.
4  Q.  Well, clearly you did because you e-mailed.
5            Do you know of anybody else?
6  A.  You're mixing up two different time frames there.
7            What I was referring to when I said "We reached out
8     to MSP," that was in reference to when Mr. McClintock
9     had returned to Melvindale for his court appearance.
10 Q.  Okay.
11 A.  And -- versus this e-mail was actually when this was
12    requested from me by Sunshine.
13 Q.  Okay.  So, when you say, "We reached out to MSP when
14    McClintock was back," who was "we"?
15 A.  Again, I -- I don't know the specific person.  It was
16    somebody from the department of Melvindale.  I don't
17    remember who it was.
18 Q.  Was that person asked to?  Do you know?
19 A.  I don't know.
20 Q.  Then how do you know that person did?
21 A.  They told me.
22           I -- I just don't remember who it was.
23 Q.  Now, what position do you have with the union?
24 A.  Currently I'm our vice president.
25 Q.  What position did you have in July of 2016?
```

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                                    Pages 157–160

Page 157

1   A.   I would have been our secretary then.
2   Q.   When you say "our," what is "our"?
3   A.   For the union, the patrol union.
4   Q.   The patrol union.
5        Okay.  And is that the PO- --
6   A.   POAM.
7   Q.   POAM.  Okay.
8        So, when an officer is suspended with pay, what
9        procedures have to be followed?
10  A.   I don't know.  I don't know the disciplinary procedures
11       that the command staff has to follow.
12  Q.   Okay.  And I believe Lieutenant Welch testified that he
13       informed Furman that he was suspended with pay.
14       Were you present then?
15  A.   Yes.
16       It was myself, Lieutenant Welch and Lieutenant
17       Allen.
18  Q.   Okay.  And where did that take place?
19  A.   In Chief Hayse's office.
20  Q.   Okay.  And you indicate -- is this where you're claiming
21       that you provided an envelope of some sort with a letter
22       inside of it?
23  A.   No.
24  Q.   Okay.  When was that?
25  A.   That was after Chief Hayse had concluded his

Page 158

1        investigation into the McClintock incident and changed
2        Officer Furman's suspension from with pay to without pay
3        and was informing Officer Furman that he was going to be
4        seeking his termination.
5   Q.   Okay.  Well, I also thought that Welch said that he
6        informed Furman that it was being changed to without
7        pay.
8   A.   I wasn't here for that deposition.  I would have no idea
9        what Lieutenant --
10  Q.   Were you present when Welch informed Furman that it was
11       being changed to without pay?
12  A.   No.
13  Q.   Okay.  And where -- I'm sorry.
14       Where did it take place that you're saying you
15       informed Furman that it was being changed to without
16       pay?
17  A.   The first -- initial of me informing him, I guess, was
18       through -- via text within -- probably within an hour.
19       Myself and Detective Thompson met Officer Furman.  It
20       was at a -- kind of like a park and ride in Melvindale.
21       It was just an empty parking lot some people will
22       carpool out of.  It's basically at the corner of Allen
23       Road and Outer Drive.
24  Q.   Why did you meet him there rather than someplace else?
25  A.   That's where Officer Furman asked me to meet him.

Page 159

1   Q.   Okay.  So, you texted him.
2        What did you text him?
3        Do you still have it?
4   A.   Oh, no.
5   Q.   Okay.  What did you text him?
6   A.   I don't remember exactly, but it would have to have -- I
7        would assume be along the lines of just informing him
8        that his suspension was being changed to without pay and
9        that Chief Hayse was going to be seeking his
10       termination, and that I had an envelope to give him;
11       that I needed to meet up with him.
12  Q.   And who gave you this envelope?
13  A.   Chief Hayse.
14       (Discussion held off the record.)
15  BY MS. BALIAN:
16  Q.   Was it a thick envelope or a thin envelope?
17  A.   I don't recall.  It seemed thicker than one sheet of
18       paper.
19  Q.   What role did Kennaley have with the union?
20  A.   If he was still in our union, at that time, he would
21       have been our union president.
22  Q.   Okay.
23  A.   I can't recall when he got promoted.
24  Q.   And you were aware that Furman filed a grievance
25       regarding his suspension; correct?

Page 160

1   A.   Yes.
2   Q.   Okay.  And I believe you testified that and then all of
3        a sudden something happened and he got his backpay back,
4        but the union was never notified of that?
5   A.   Correct.
6   Q.   Were you aware that Kennaley was in discussions with
7        Chief Hayse about this and entered into this?
8   A.   For the record, that looks like Chief Allen, not Chief
9        Hayse.
10       I'm sorry.  Chief Allen, yes.
11  A.   But, no, I was unaware of that.
12  Q.   Well, this occurred after Chief Hayse was removed.
13       MS. GORDON:  There's no date on this document.
14       Do you have a date, Melinda?
15       MS. BALIAN:  The document speaks for itself.  I
16       can't --
17       MS. GORDON:  It doesn't speak, and that's why we're
18       all sitting here perplexed and you're asking the witness
19       about -- you're giving him, you know, hints as to
20       what --
21       MS. BALIAN:  I'm just asking him if he was aware of
22       this.
23  A.   No.
24       MS. GORDON:  I think he already answered, but okay.
25  BY MS. BALIAN:

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Page 161

1  Q.  But Kennaley was the president of POAM; is that correct?
2  A.  With no date on that document, I don't know if he was
3      still the president or not at that time.
4  Q.  Okay.  When did he stop being president?
5  A.  When he was promoted to sergeant.
6  Q.  Which was when?
7  A.  As I stated, I don't remember when he was promoted.
8  Q.  But at some time he was president of POAM?
9      MS. GORDON:  That's been already covered by you
10     twice, I think.
11 BY MS. BALIAN:
12 Q.  At approximately what time was he promoted to sergeant?
13 A.  I don't know.
14 Q.  What is step one of the grievance procedure?
15 A.  The officer -- the person who is being disciplined
16     informs the union president that he wants to file -- he
17     or she wants to file a grievance, and the union
18     president informs the chief of that.
19 Q.  And what is step two?
20 A.  I don't know.  I've never gone through a grievance
21     process, whether it be for myself or in defense of
22     another officer.  I haven't gone through it.
23 Q.  As part of the union, wouldn't -- as having a position
24     in the union, wouldn't you know this?
25 A.  No.  If I did, I would have told you.

Page 162

1  Q.  Why were you in charge of letting Furman know these
2      things?
3  A.  I believe for two reasons:  One, because I was on the
4      union board, and, two, Officer Furman and I were
5      friends, so I think it was a bit more personal and
6      respectful to Officer Furman that I could tell him a bit
7      easier than maybe somebody from the command staff who
8      wasn't friends with him.
9  Q.  What is step three?
10 A.  I don't know.
11 Q.  You provided testimony that you spoke up at this -- I
12     think you called it a workshop where this -- where the
13     Lawrence Jackson investigation was being discussed
14     because you said, "It's sounding dangerously close to a
15     quota."
16     Did you record that meeting at all?
17 A.  No.
18 Q.  Do you know if anybody did?
19 A.  I believe they're recorded, but I'm not 100 percent on
20     that.
21 Q.  Well, workshops are generally not recorded, if this
22     actually was a workshop.
23 A.  Okay.
24     MS. GORDON:  Is that a question, or are you just
25     commenting?

Page 163

1      MS. BALIAN:  Well, if you want to let me get it
2      out.
3  BY MS. BALIAN:
4  Q.  So, do you know if it actually was a workshop, per se?
5  A.  Yes.
6  Q.  Okay.  Are you aware that workshops are generally posted
7      on the Melvindale Police Department website?
8  A.  No.
9  Q.  Was the meeting called to order?
10 A.  I don't recall.
11 Q.  Have you reviewed Furman's personnel file?
12 A.  No.
13     The only person that can do that is Furman and
14     probably the chief or the Safety Commission.
15 Q.  Have you ever had a discussion with city council to
16     determine the full duties of corporation counsel?
17 A.  No.
18 Q.  Do you know the first date that Furman was suspended in
19     July with pay?
20 A.  No.
21 Q.  You said there was an officer at the police department
22     that was upset because Lawrence Jackson had his personal
23     cell phone number.
24     Who was that?
25 A.  I believe that was Officer Blunden.

Page 164

1  Q.  Blunden?
2  A.  Yes.
3  Q.  Were you aware that Welch testified at his deposition
4      that he has heard Hayse refer to the mayor as a "bitch"?
5  A.  No.
6  Q.  Would that surprise you?
7  A.  Yes.
8  Q.  You've provided testimony about some reasons why you
9      believe officers testified the way they did at the
10     removal hearing.
11     Easton never told you he provided false testimony
12     at the removal hearing, did he?
13 A.  No.
14 Q.  As a police officer, you don't have authority to enter
15     into a contract on behalf of the City, do you?
16 A.  No.
17 Q.  You testified that you and another officer razzed Furman
18     about texting Nicole Barnes.
19     Who was the other officer?
20 A.  To clarify, I said that we razzed him about his
21     relationship with her, not about him texting her.
22     And that other -- Lash -- Officer Lash.
23 Q.  What relationship is that?
24 A.  Their relationship with each other.
25 Q.  Which is what?

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018

Pages 165–168

Page 165

1    A.    I don't know.  He wouldn't tell me.
2    Q.    Okay.  So, you don't know if they have a relationship;
3          correct?
4    A.    Well, I know that they have some sort of relationship,
5          yes.
6    Q.    Which is what?
7    A.    My answer again is I don't know.
8    Q.    Okay.  So, you saw him texting her?
9    A.    Correct.
10   Q.    Okay.  Did you attend the removal hearing of Chief
11         Hayse?
12   A.    No.  It was a closed hearing.  I was subpoenaed, so I
13         wasn't allowed in.
14   Q.    Okay.  And you didn't testify; correct?
15   A.    Correct.
16   Q.    And you weren't involved in disciplining officer -- let
17         me put it this way:  You weren't involved in the
18         discipline of Officer Furman at all in July of 2016;
19         correct?  Other than informing --
20   A.    As in the decision, you mean?
21   Q.    Yes.
22   A.    That's correct, yes.
23   Q.    Was the only role you played in relaying it to him?
24   A.    I was there as his union representation.  However, at
25         the initial, I guess, meeting, if you will, when Officer

Page 166

1          Furman was suspended with pay, he -- there was no steps
2          to be taken at that time.  So, after that point, yes,
3          the steps were taken through our union president, not
4          me.
5    Q.    Okay.  So, was that the only meeting you were at, was
6          the initial one?
7    A.    As far as I'm aware, that's the only meeting that was
8          held.
9                So, yes.
10   Q.    And what took place at that meeting?
11   A.    He was suspended with pay.
12   Q.    What discussion was had at all?
13   A.    That was the discussion.
14               He was -- had already been made aware prior by me
15         that he was under investigation for that incident, and
16         also from our union president, which was Kennaley at
17         that time.  And so he was aware that the investigation
18         was going on.
19               So, at the meeting, all that was -- all that
20         happened was, he was made aware that he was, at that
21         time, suspended with pay and to turn over his firearm
22         and badge until further notice.
23   Q.    Okay.  Who else was present at that meeting?
24   A.    Myself, Lieutenant Welch, Furman and Lieutenant Allen.
25   Q.    Okay.  And that's the only meeting you were at involving

Page 167

1          this discipline --
2    A.    Correct.
3    Q.    -- other than when you went to the park and ride --
4          MS. GORDON:  I think we've covered this so many
5          times, Melinda.
6          MS. BALIAN:  Okay.
7    BY MS. BALIAN:
8    Q.    -- and informed him of the suspension without pay?
9    A.    Yes.
10   Q.    Okay.  You were asked a question about whether you were
11         aware that Hayse had contacted Coogan regarding this
12         discipline, and I believe you testified that you were
13         aware of that.
14   A.    Yes.
15   Q.    How were you aware of that?
16   A.    Chief Hayse told me.
17   Q.    So, just by hearsay from Chief Hayse?
18   A.    Yes.
19   Q.    Did you witness it?
20   A.    No.
21         MS. BALIAN:  I don't have any further questions at
22         this point.
23         MS. GORDON:  I just have one follow-up.
24                  *   *   *
25                  RE-EXAMINATION

Page 168

1    BY MS. GORDON:
2    Q.    With regard to those texts that you saw with Barnes and
3          Furman --
4    A.    Okay.
5    Q.    -- what was the nature of them?
6    A.    The ones that he would let me see were friendly, kind of
7          flirtatious.
8                After that, he covered his phone so I couldn't see
9          the rest of it.  So, I don't know how it ended.
10   Q.    Okay.  Okay.  So, nothing else that you recall seeing,
11         other than what you've just described?
12   A.    Correct.
13         MS. GORDON:  Okay.  Thank you.
14         (Deposition concluded at 1:49 p.m.)
15                  *   *   *

NOLIN, DETECTIVE CORPORAL BRANDON
04/20/2018                                                              Pages 169

1   STATE OF MICHIGAN )

2   COUNTY OF OAKLAND )

3              CERTIFICATE OF NOTARY PUBLIC

4       I do hereby certify that the witness, whose

5   attached testimony was taken in the above matter, was

6   first duly sworn to tell the truth; the testimony

7   contained herein was reduced to writing in the presence

8   of the witness by means of stenography; afterwards

9   transcribed; and is a true and complete transcript of

10  the testimony given.

11      I further certify that I am not connected by blood

12  or marriage with any of the parties; their attorneys or

13  agents; and that I am not interested, directly or

14  indirectly, in the matter of controversy.

15      In witness whereof, I have hereunto set my hand

16  this day at Highland, Michigan, County of Oakland, State

17  of Michigan on Monday, April 23, 2018.

18

19

20

21      John J. Slatin, RPR, CSR-5180

22      Certified Shorthand Reporter

23      Notary Public, Oakland County, Michigan

24      My commission expires:  July 25, 2023

25