# EXHIBIT R

# In the Matter Of:

# HAYSE vs CITY OF MELVINDALE, ET AL.

# LIEUTENANT MICHAEL L. WELCH, JUNIOR

March 28, 2018

*Prepared for you by*



Bingham Farms/Southfield • Grand Rapids

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                   SOUTHERN DIVISION
4
5   CHAD HAYSE,
        Plaintiff,
6   -vs-                        Case No.: 17-cv-13294
    CITY OF MELVINDALE, a political  Hon. Linda V. Parker
7   Subdivision of the State;   Mag. Elizabeth A. Stafford
    MELVINDALE CITY COUNCIL, a
8   legislative body of the City of
    Melvindale; NICOLE BARNES,
9   WHEELER MARSEE, MICHELLE SAID
    LAND, DAVE CYBULSKI, CARL
10  LOUVET, and STEVEN DENSMORE,
    individuals, sued in their
11  official and personal capacities,
        Defendants.
12  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/
13  DEPONENT:   LIEUTENANT MICHAEL L. WELCH, JUNIOR
14  DATE:       Wednesday, March 28, 2018
15  TIME:       10:04 a.m.
16  LOCATION:   Deborah Gordon Law
17              33 Bloomfield Hills Parkway, Suite 220
18              Bloomfield Hills, Michigan
19
20  REPORTER:   John J. Slatin, RPR, CSR-5180
21              Certified Shorthand Reporter
22
23          (Appearances listed on page 2)
24
25
```

**Page 2**

```
1   APPEARANCES:
2
3       DEBORAH L. GORDON (P27058)
4       ELIZABETH MARZOTTO TAYLOR (P82061)
5       Deborah Gordon Law
6       33 Bloomfield Hills Parkway, Suite 220
7       Bloomfield Hills, Michigan  48304
8       (248) 258-2500
9       dgordon@deborahgordonlaw.com
10      emarzottotaylor@deborahgordonlaw.com
11          Appearing on behalf of the Plaintiff.
12
13      MELINDA BALIAN (P55744)
14      Foley & Mansfield, PLLP
15      130 E. Nine Mile Road
16      Ferndale, Michigan  48220
17      (248) 721-8183
18      mbalian@foleymansfield.com
19          Appearing on behalf of the Defendants.
20
21      ALSO PRESENT:  Chad Hayse
22
23
24
25
```

**Page 3**

```
1                    TABLE OF CONTENTS
2
3   WITNESS                                    PAGE
4
5   LIEUTENANT MICHAEL L. WELCH, JUNIOR
6
7       Examination by Ms. Gordon              4
8       Examination by Ms. Balian              149
9       Re-Examination by Ms. Marzotto Taylor  205
10      Re-Examination by Ms. Balian           217
11      Re-Examination by Ms. Marzotto Taylor  225
12
13  EXHIBITS (Attached):              IDENTIFIED
14
15      Exhibit 1    Letter from City of      119
16                   Melvindale Public Safety
17                   Commission dated 1-11-18
18                   with attachment
19      Exhibit 2    Letter from McDaniel dated  159
20                   9-21-16
21
22
23
24
25
```

**Page 4**

```
1                      Wednesday, March 28, 2018
2                        Bloomfield Hills, Michigan
3                        10:04 a.m.
4                        *   *   *
5          LIEUTENANT MICHAEL L. WELCH, JUNIOR,
6   having been first duly sworn, was examined and testified
7   as follows:
8                        EXAMINATION
9   BY MS. GORDON:
10  Q.  I'll call you "Lieutenant" for the record.
11  A.  Okay.
12  Q.  Hi, Lieutenant.  I'm Deborah Gordon.  We met a few
13      minutes ago this morning.  As you know, I represent Chad
14      Hayse.
15          If you don't understand my questions, if you want
16      me to repeat or rephrase, just let me know; okay?
17  A.  Yes.
18  Q.  If you need something -- you know, a question restated,
19      just want to be sure that you understand what you're
20      being asked and you have a chance to give your answer;
21      okay?
22  A.  Okay.  Yes.
23  Q.  All right.  So, what is your current status
24      employment-wise today?
25  A.  Today, I'm considered an inactive employee.  I was
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 5

1  employed as a lieutenant with the Melvindale Police
2  Department.  We have the option to use accrued sick and
3  vacation time towards our retirement.  I took that
4  option earlier in the year.  January 2nd was the last
5  day that I was on the schedule, and they just pay me
6  every two weeks of my accrued time.
7  Q.  Okay.  And then will there come a time when you're
8      retired?
9  A.  My retirement date is August 30th of this year.
10 Q.  Okay.  So, August 30, '18?
11 A.  Yes.
12 Q.  And then you'll begin drawing your retirement benefits?
13 A.  Yes.
14 Q.  Do you intend to seek other employment at some point, or
15     you're going to be retired from work?
16 A.  I don't have any plans as of yet.
17 Q.  Okay.  When did you become employed by the City of
18     Melvindale?
19 A.  June of 1998.
20 Q.  And when did you first become a police officer?
21 A.  I started with the Wayne County Sheriff's Department in
22     April of 1992.
23 Q.  Okay.  Were you right out of the academy at that time?
24 A.  Well, I hired in originally as a jailer, and then I
25     worked in the jails for about three years, and then the

Page 6

1  sheriff's department put me through their academy.
2  Q.  Okay.  And did you actually -- were you a deputy for the
3      Wayne County Sheriff's Department?
4  A.  Yes.
5  Q.  Okay.  And then when did you move to Melvindale?  '98?
6  A.  To reside there or work there?
7  Q.  To work there.
8  A.  In June of '98 is when I started with Melvindale.
9  Q.  Okay.  And what was your rank when you joined the force?
10 A.  Patrolman.
11 Q.  And who was the chief at that time?
12 A.  John Difatta.
13 Q.  So, what was the next change in rank that you had?
14 A.  2006, I obtained the position in the detective bureau.
15 Q.  What title goes with that?  Detective?
16 A.  Detective, yes.
17 Q.  Okay.  And prior to that, were you a patrol officer?
18 A.  Yes.
19 Q.  Okay.  And who was chief at that time?
20 A.  Rick Cadez.
21 Q.  Spell that last name, if you would.
22 A.  C-a-d-e-z.
23 Q.  Okay.  And how long were you in the detective bureau?
24 A.  2006 through, I believe, the end of 2009.  They had to
25     shuffle some people around, so I went back on the road,

Page 7

1      I think, for most of 2010.
2  Q.  Okay.  And what's the next thing that happened with
3      regard to your duties?
4  A.  I was back on road patrol.
5  Q.  Okay.
6  A.  And then a spot opened back up, I believe, end of 2011,
7      and I returned to the detective bureau.
8  Q.  Who were you reporting to at that time?  Who was your
9      boss?
10 A.  Chad Hayse.
11 Q.  Okay.  And how long then were you in the detective
12     bureau at that point?
13 A.  Got promoted to sergeant -- I believe it was in 2012.
14 Q.  Okay.
15 A.  And then I went back to the road patrol.
16 Q.  As a sergeant?
17 A.  Yes.
18 Q.  Were you on the road as a sergeant?
19 A.  Part of my duties was the road and some of them were the
20     desk, depending on the staffing that day.
21 Q.  Okay.  And how long were you in that position as
22     sergeant?
23 A.  I think I was a sergeant for two, two and a half years
24     maybe.
25 Q.  Then what happened?

Page 8

1  A.  I was promoted to lieutenant.
2  Q.  What was the process to become promoted to lieutenant?
3      Were you recommended?  Was --
4  A.  Well, no.  What -- how it worked out is, normally
5      there's the testing procedure.  But if there's no one
6      eligible to be promoted at that time, depending on where
7      you were at, they would automatically promote that
8      person.
9          So, because of contractual circumstances, I was
10     promoted to lieutenant at that time.
11 Q.  Okay.  And that was in 2012?
12         I'm sorry.  I missed the year.
13         You were promoted to sergeant in 2012, back to road
14     patrol.
15         So, what was the year for lieutenant?
16 A.  Had to have been closer to '14, though.
17     I can't think of it off the top of my head.
18 Q.  Okay.  Fair enough.
19         And were there other lieutenants in the department
20     at that time?
21 A.  Yes.
22 Q.  And who else was a lieutenant at that time?
23 A.  At the time that I was promoted?
24 Q.  Yes.
25 A.  John Bajorek, Don Meador -- that replaced Bill Clemens.

Page 9

```
 1            So, I'm trying to think who the other person was.
 2       It's escaping me at the moment.  If you want to let me
 3       think about it.
 4    Q.  Okay.  Maybe you'll think about it later.  Maybe it will
 5       come to mind.
 6    A.  Okay.
 7    Q.  And you --
 8    A.  Oh, I'm sorry.
 9    Q.  Go ahead.
10    A.  John Allen.
11    Q.  Oh, yeah.  Okay.
12    A.  Right.
13    Q.  So, you held the rank of lieutenant until the time you
14       went out on leave, as you've already described?
15    A.  Yes.
16    Q.  Okay.  What's your educational background?
17    A.  I've got -- I graduated from Huron High School in New
18       Boston, and I achieved a two-year degree from Henry Ford
19       Community College in criminal justice.
20    Q.  Okay.  And you're married?
21    A.  Yes.
22    Q.  How long have you been married?
23    A.  Fifteen years.
24    Q.  Children?
25    A.  Two.
```

Page 10

```
 1    Q.  Okay.  What were the duties when you were a lieutenant?
 2            What were your duties, you and the other
 3       individuals who held that rank?
 4    A.  As a -- as a road lieutenant or as a lieutenant in the
 5       detective bureau?
 6            I started off as a road patrol lieutenant.
 7    Q.  All right.  Let me ask you this.  You've given me the
 8       names of the lieutenants.
 9            Did you each have different assignments?
10    A.  There -- at the time, there were three road patrol
11       lieutenants, one for each shift, and there was a
12       lieutenant in charge of the detective bureau.
13    Q.  Okay.  So, were you a lieutenant in charge of the
14       detective bureau at some point?
15    A.  Just before I left, the last year of my employment.
16    Q.  Okay.  And what did you do in that role?
17    A.  I oversaw the detectives working under me, supervised
18       their cases, did some FOIAs, pretty much anything that
19       needed to be done.  Assist the chief.
20    Q.  How many detectives reported to you?
21    A.  At that time, two.
22    Q.  So, were you involved in investigations --
23    A.  Yes.
24    Q.  -- that were being handled by the department?
25    A.  Yes.
```

Page 11

```
 1    Q.  Okay.  And you were overseeing officers who were doing
 2       the day-to-day work on putting together those
 3       investigations?
 4    A.  That's correct.
 5    Q.  Okay.  And then would you assist in making decisions as
 6       to whether or not the case should be moved to the
 7       prosecutor?
 8    A.  If the detectives needed any insight on the case or
 9       requested anything from me, I would get that to them,
10       yes.
11    Q.  Okay.  And during that time period, did the lieutenants
12       meet with the chief on any kind of a regular basis?
13    A.  Occasionally, we would have staff meetings with the
14       lieutenants, yes.
15    Q.  Okay.  And how did you get along with the other
16       lieutenants at that time?
17    A.  Good.
18    Q.  Okay.  And then at another point in time, you were a
19       lieutenant with regard to road patrol?
20    A.  Yes.
21    Q.  So, tell me your duties there.
22    A.  The road patrol lieutenant worked the front desk.  They
23       handled answering the phones.  They dispatched cars.
24       They monitored the jail.  And they approved reports.
25       They did the scheduling, filled any overtime that was --
```

Page 12

```
 1       needed to be filled.
 2    Q.  Okay.
 3    A.  Released vehicles at the desk, took the initial walk-in
 4       complaints from people coming in.
 5    Q.  Okay.  And you did all that?
 6    A.  Yes.
 7    Q.  And you had officers reporting to you?
 8    A.  Yes.
 9    Q.  As far as you know, up until 2015, had there been any
10       performance problems of any significance with regard to
11       your role at the department?
12    A.  I did have some issues with a couple of officers, yes.
13    Q.  Okay.  Anything that you were disciplined for?
14    A.  That I was disciplined for?
15    Q.  Yes.  Yes.  Anything that you received discipline for?
16    A.  No.
17    Q.  Okay.  So, as of 2015, you had a good record.
18            Would that be fair to say?
19    A.  I had never been even late for work.
20    Q.  Okay.  So, as of 2015, you had an excellent record,
21       then, as far as you were aware, with the department?
22    A.  Yes.
23    Q.  Okay.  Okay.  No disciplines on your record, just to
24       clarify that?
25    A.  I had never been disciplined.
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                        Pages 13—16

Page 13

1        I think Chief Difatta talked to me one time about
2   accidentally damaging a car back in 2000, maybe, but
3   that's the only time I had been brought into the chief's
4   office to talk about anything.
5   Q.   Anybody ever accused you of lying?
6   A.   No.
7   Q.   Did you feel you got along with your fellow officers for
8        the most part?
9   A.   For the most part, yes.
10  Q.   Okay.  What is a citizen complaint as you came to
11       understand it in your role as a lieutenant?
12  A.   The process for a citizen complaint is if someone comes
13       into the station, they would speak with the supervisor
14       on duty.  They're required to fill out a written form.
15       And normally how that works is, the complaint is then
16       forwarded to the chief for the chief to review.
17            If they believe -- if they look into it and they
18       believe it's warranted at the time, it would be turned
19       over to the detective bureau, the lieutenant in the
20       detective bureau, to conduct an investigation.
21  Q.   Did that happen from time to time while you were with
22       the department?
23  A.   Yes.
24  Q.   And there were investigations?
25  A.   Yeah.  There's always something going on.

Page 14

1   Q.   Okay.  And then after the investigation, what would be
2        the next step?
3   A.   The chief would decide whether or not the complaint is
4        credible.  They would probably interview the witness
5        again.  And if the officer did something wrong, then the
6        chief would dole out whatever measures or punishment
7        necessary.
8   Q.   Okay.  Do you remember being involved in any such
9        investigations of citizen complaints?
10  A.   Yes.
11  Q.   Okay.  What do you recall?
12  A.   I dealt with quite -- a couple of instances with Officer
13       Furman and excessive use of force.
14  Q.   These were after citizen complaints had been made to the
15       department and then they worked their way to you?
16  A.   Well, some were citizen complaints and some were
17       complaints by other officers.
18  Q.   Okay.  So, let's start with the citizen complaints.  I
19       want to just get the process of what happens.
20            So, what was -- what's the first thing you remember
21       about Officer Furman and a citizen complaint?
22  A.   I had one citizen complaint where a lady came into the
23       station accusing Officer Furman of throwing her on the
24       ground.
25  Q.   Okay.  Do you remember when that was?

Page 15

1   A.   Probably 2015.
2   Q.   Okay.  And what were the circumstances as best you can
3        recall?
4   A.   I was working the front desk, and I heard Officer Furman
5        call for another car.
6             I believe it was Officer Hinojosa went to respond.
7        Before he got there, he cancelled the backup car.
8   Q.   Furman did?
9   A.   Yes.
10            Apparently what had happened was he pulled this
11       lady over for not having insurance.  He was going to tow
12       the car for same, and the tow truck arrived.  The lady
13       had a young infant in a carrier in the car.  This was on
14       Schaefer Road, near 75.  High traffic area, industrial,
15       right next to a refinery.
16            She told Officer Furman that she had a ride coming,
17       and she didn't want to take her baby out in traffic.
18            He told her to get out of the vehicle immediately.
19       She refused.  And then he drug her out of the car, threw
20       her on the ground and towed the car.
21  Q.   Okay.  And what's -- so this is what you were told --
22       did she come into the station then?
23  A.   Yes.
24  Q.   Okay.
25  A.   She came into the station.  She was very irate, very

Page 16

1        upset.  I told her she needed to fill out a form because
2        that was the procedure that we did, and she refused.
3             I passed this information on to Chad Hayse.  He was
4        able to get a hold of her and get a statement from her.
5   Q.   Do you know why she refused?  Did she explain that?
6   A.   She didn't explain why.  She was highly upset, crying
7        and screaming.
8   Q.   Okay.
9   A.   I couldn't get her to calm down.  She stormed out.
10  Q.   Okay.  So, what's the next thing that was your
11       involvement in that?
12       Chad Hayse got a hold of her, and then what
13       happened?
14  A.   Well, it was just one of several incidents right around
15       that time when we were dealing with him using excessive
16       force.
17            It got to a point where he was being investigated
18       for assaulting another person, and it had been turned
19       over to the state police.  And I don't know if it was
20       that instance or the instance where he tackled a guy in
21       his house that he -- it was determined that he was going
22       to be suspended and taken off until they could figure
23       out what to do with him.
24  Q.   Okay.  So, you've got the one woman.
25            Do you happen to recall whether her name was

**Page 17**

1          Henderson?

2   A.   I just remember she was a short white female.

3   Q.   Okay.

4   A.   I don't remember her name, no.

5   Q.   Okay. And then you said he assaulted another person.

6          What were you referring to there?

7          What's your recollection?

8   A.   There was an incident where a guy was running on foot

9      from officers, that he was possibly a B&E suspect. And

10     Officer Furman slammed his head into the door -- the

11     inside door of a patrol car in front of Lieutenant

12     Allen.

13   Q.   And what was your role in that?

14   A.   I didn't really have much of a role in that because that

15     was -- that was with Lieutenant Allen, since he was

16     present at the time.

17         I know that he insisted that something be done and

18     insisted that turn that over to the state police.

19   Q.   Lieutenant Allen did?

20   A.   Yes.

21   Q.   Did he discuss that with you?

22   A.   I just heard bits and pieces. I wasn't directly

23     involved.

24         I think there was communication between Chad Hayse

25     and John Allen, and they agreed to turn it over to the

**Page 18**

1     State.

2   Q.   Okay. And do you know whether it was turned over to the

3     State?

4   A.   Yes. They interviewed me on it.

5   Q.   Who did?

6   A.   The State.

7   Q.   Do you remember who it was?

8   A.   I don't know her last name. Her first name is Sunshine.

9   Q.   Okay. And she asked you about the circumstances of the

10     event and so on, and what you knew?

11   A.   Yeah.

12   Q.   Do you remember when that was, roughly?

13   A.   I believe it was in 2015 also.

14   Q.   Do you know what became of that?

15   A.   I think they weren't able to get a hold of the guy or

16     they weren't able to find him.

17   Q.   Oh.

18   A.   I think that's why the case never went anywhere.

19   Q.   Okay. In other words, the person who had been slammed

20     into the -- his head had been slammed into the car, the

21     state police, as far as you understood it, were not able

22     to get a hold of him?

23   A.   Right. I don't think the case went anywhere.

24   Q.   Okay. Okay. What else with regard to Furman and this

25     issue of citizen complaints and excessive force?

**Page 19**

1   A.   There was -- there was another issue right around the

2     same time. Officer Ginther, Officer Lane and Officer

3     Furman were dispatched to a house in the city. It was

4     reported that the gentleman in the house was threatening

5     his, I believe, sister with a knife down in the

6     basement.

7         Officers arrived at the scene. They talk him out

8     of the basement. He comes up empty-handed. He does not

9     have a weapon on him. They had him at gunpoint.

10        Officer Lane is the training officer. Officer

11     Ginther is the trainee. Officer Furman was behind them.

12        They were ordering him to the ground, and he was

13     complying. Officer Furman holstered his gun, pushed

14     past Officer Ginther and football tackled the guy and

15     drove his --

16   Q.   What does that mean? Can you explain that to us?

17   A.   Forcibly tackled and knocked him into the ground.

18        The guy was complying with the officer's commands.

19   Q.   Okay. So, what became of that one?

20   A.   Officer Lane and Officer -- Officer Lane approached me

21     about the incident, and I think I spoke to Officer

22     Ginther briefly. I told them that I wanted written

23     statements about the incident, and I forwarded them to

24     Chad Hayse.

25   Q.   You did obtain written statements?

**Page 20**

1   A.   Yes.

2   Q.   Do you remember what year this was?

3   A.   I believe it was in 2015.

4   Q.   Okay. By this time in 2015 --

5   A.   Let me correct it.

6   Q.   Go ahead.

7   A.   It might have been earlier in '16.

8   Q.   Okay. So, by this time, you had observed or became

9     aware of several instances where Furman, it appeared,

10     may have used excessive force.

11        Do I have that right?

12   A.   Yes.

13   Q.   Was that unusual from what you observed of the other

14     officers in the department?

15   A.   Was his use of force more than others?

16   Q.   Different. Yes.

17   A.   Yes.

18   Q.   Okay. When did you first meet Furman?

19   A.   He had been an officer on my shift. I think I was his

20     supervisor as a sergeant for a short time, and he was on

21     day shift as -- when I was a lieutenant for most of the

22     time that I worked the desk.

23   Q.   Okay. And did you -- were you ever at a point when you

24     were friendly with him or had a cordial relationship?

25        I don't know how that works in --

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                 Pages 21–24

Page 21

1  A.  Yeah.  We -- I think we got along pretty well until I
2      had to write him up.
3  Q.  Okay.  And what did you write him up for?
4  A.  Well, I forwarded the information for -- about the
5      excessive use of force to the chief.  So, I think he
6      felt I was responsible for his problems.
7  Q.  And then what happened?
8  A.  Stopped talking to me and, you know, ignoring me and
9      whatnot.
10         So, I think I was the bad guy after that.
11  Q.  Okay.  So, what did you observe about Furman's
12      personality by 2015-16?
13         Describe his personality vis-à-vis his role as a
14      police officer from what you observed in the department.
15  A.  Well, he was difficult to supervise because he would not
16      take responsibility for anything that he did.  His
17      normal response to any criticism was to deflect and to
18      deny.  So, he put good effort into whatever task he was
19      assigned, but he would not accept responsibility if
20      something went wrong.
21  Q.  Did you observe an attitude in him where he believed he
22      was more correct than command?
23  A.  Well, he --
24  Q.  Or justified in what he had done?
25  A.  Well, he always had -- like I had said, he would deflect

Page 22

1      or deny any fault in anything.  It didn't matter what it
2      was.
3         So, you could tell him, "Hey, you messed this up,"
4      and he would grumble and walk away and, you know, he
5      knew better.  So, in some aspects, he was difficult,
6      especially when it came to criticism -- constructive
7      criticism or trying to get him to do something he didn't
8      want to do.
9  Q.  Did he seem to have -- I'll use the word "arrogant" --
10      an arrogant personality, or is there a different way you
11      would describe it?
12  A.  He had issues with talking to people.  People would
13      complain that he was talking down to them.
14  Q.  You mean citizens?
15  A.  Citizens, yeah.
16  Q.  Okay.  And you became aware of that?
17  A.  Yes.
18  Q.  So, did you discuss your concerns about Furman?
19         I mean, you've talked about some complaints you
20      actually had to write up.
21         Did you discuss with the chief or the other
22      lieutenants your concerns about Furman or the chief's
23      concerns about Furman?
24  A.  We have had conversations with the chief and with other
25      lieutenants.

Page 23

1         I think I put an honest effort in to try and coach
2      him and counsel him and try and step back and look at
3      things in a different light, but he didn't want to hear
4      it.
5  Q.  Okay.  Did you have a shift you typically worked?
6  A.  As a lieutenant on the -- as a road lieutenant, I worked
7      day shift, from 8:00 to 4:00.
8  Q.  Who was the city's towing contractor when you joined the
9      City?
10  A.  When I first started, it was Howard's Towing.  Back in
11      '98, it was Howard's Towing.
12  Q.  Okay.  What was the next company that you recall?
13  A.  It was Brothers Four, but they were actually the prior
14      people.  They changed the name of the tow company.  I
15      think they went out of business and came back as
16      Brothers Four.
17  Q.  It was actually Howard's but the new name?
18  A.  Yeah.  Same people.  Same family.
19  Q.  Okay.  What was the next towing company you recall?
20  A.  Gene's Towing.
21  Q.  Okay.  And then Goch comes after Gene's; correct?
22  A.  Yes.
23  Q.  Okay.  So, as I understand it from this case, I don't
24      know if you're aware of this or not, but when Gene's
25      Towing had the contract, they collected money directly

Page 24

1      from the individuals whose cars they towed?
2  A.  Yes.  I was -- I worked the desk at that time.  So, what
3      would happen then with Gene's, when someone would come
4      and get their vehicle out, they would pay the police
5      department for the storage because we maintained the
6      lot, and then the driver of the vehicle or the vehicle
7      owner would have to square up with the Gene's driver in
8      the lot.  And then the Gene's driver would take them to
9      our lot and release their vehicle to them.
10  Q.  Okay.  And do you recall what the fee was for towing at
11      that time?
12  A.  I think it was $100.
13         Well, it started at $60-something, and then I think
14      at the end, while Gene's was still there, I think it was
15      up to $100.
16  Q.  And that's what the driver would pay to Gene's?
17  A.  The vehicle owner would pay Gene's the $100.  And
18      whatever storage had accrued, they would pay us.
19  Q.  Pay the City?
20  A.  Right.
21         So, they would come in.  They would get their
22      vehicle out.  We would give them a receipt, showing that
23      they paid the storage.  And then the tow driver would
24      meet them in the parking lot.  They would show them the
25      receipt that they paid up with us, and then they would

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                 Pages 25—28

Page 25

1    pay their tow bill, and then they would release the
2    vehicle for them.
3    Q.   Okay.  Now, with regard to road patrol officers whom you
4         supervised, what were their day-to-day duties out on the
5         road?
6    A.   They were -- they were on patrol in the neighborhood and
7         the side streets, working traffic, responding to calls
8         for service.
9         Tell me how they were assigned; if they were.
10             So, you've got a shift.  You're there --
11   A.   Well --
12        -- on days.
13   A.   -- oftentimes on dayshift, I've only got two guys on the
14        road.
15   Q.   Okay.
16   A.   So, they're running -- a lot of times they may be
17        running from call to call or, you know, on a traffic
18        stop.  It all depends on how the day plays out.
19   Q.   Well, so give me an example.
20             I've had cases with other police departments where
21        people have a particular geographic area --
22   A.   Right.
23   Q.   -- of town.
24   A.   Well, there's -- technically there's an A zone and a B
25        zone, but I didn't typically enforce A zone, B zone

Page 26

1    because the city is small enough that I don't think it
2    really matters.  It's not like a big town that's
3    20-square miles, where you're going to have three or
4    four guys piled up in one corner of the town.  You can
5    get anywhere the city within 2 or 3 minutes tops.
6    Q.   How big is the city?
7    A.   2.7 square miles.
8    Q.   Okay.  All right.  So, you would have two cars out
9         there?
10   A.   Uh-huh.
11   Q.   And how many calls a day, just a range?
12   A.   It could be anything from five or six calls to 15.
13             It -- you never know what the day is going to play
14        out to be.
15   Q.   So, then what was the process?
16             A call would come in and --
17   A.   A call would come in.  I would take the information.  I
18        would enter it in the computer.  While I was entering in
19        the computer, I would get on the radio and I would
20        dispatch the officers to that call.
21   Q.   Okay.  Would you dispatch one of the officers, both of
22        the officers?
23   A.   It depended on the call.  If it was just a general
24        assistance call or backing the rescue or taking a
25        larceny report or whatnot, I would send one.

Page 27

1    Q.   Okay.
2    A.   It was an assault in progress or a possible felony, any
3         assaultive thing, I would send both officers.
4    Q.   Okay.
5    A.   It depends on the call.
6    Q.   And if the officers were not taking calls and reacting
7         to the calls, what were they to be doing during the day?
8    A.   Patrolling and doing traffic enforcement.
9    Q.   Okay.  And was there a system of keeping track of
10        citations that were issued and that type of thing?
11   A.   Well, the -- early on we had a written log that you
12        would turn in at the end of the month, and there's also
13        a daily that you would turn in every day.
14             When we came into the newer computer system, that
15        kind of eliminated the daily logs because everything was
16        logged on the computer.  So, all your traffic stops, all
17        your calls that you went on, you would be able to review
18        everything the officer did that day or everything that
19        the shift did that day.
20   Q.   And did you review that as a lieutenant or --
21   A.   From time to time, yes.
22   Q.   And your goal was what?  To see what kind of activity
23        was occurring?
24   A.   Yeah.  Productivity.
25             And it was also my job to approve the police

Page 28

1    reports that were written on my shift also.  So, I would
2    review those reports and approve them or send them back
3    for clarification or correction.
4    Q.   Okay.  So, if you don't mind, walk me through a traffic
5         stop.
6             I'm just out on patrol.  I'm an officer.  I see
7         somebody that's speeding.
8             What the protocol?
9    A.   Well, normally what will happen is, the officer will get
10        behind the vehicle and run the plate, double-check to
11        make sure whether or not the vehicle is stolen or not or
12        wanted or the driver is wanted.
13             They would log the location of the stop into the
14        computer.  It would come up on the dispatch CAD screen,
15        and I would know that -- where the officer was and that
16        they were on a traffic stop.
17             Officer would approach the vehicle, make contact
18        with the driver, get their information, decide whether
19        or not they were going to issue a violation and send
20        them on their way, and then they would clear the call in
21        the computer.
22   Q.   Okay.  And what if a warrant for an arrest came up on
23        the computer in the vehicle at the time of the stop?
24   A.   Well, a lot would depend on the warrant itself.
25             Say, for instance, if the person had Detroit

Page 29

1  traffic warrants, they would advise them of them because
2  Detroit won't take them.  They won't accept people with
3  just traffic warrants normally.
4  Q.  Okay.
5  A.  Sometimes it's even a struggle to get them to take
6      someone with a felony.
7  Q.  Okay.
8  A.  If there are warrants, they're supposed to bring them in
9      because that's outstanding warrants for our department.
10 Q.  Okay.
11 A.  If it's another municipality in the area, what the
12     officer would do was send me the warrant over CAD, and I
13     would contact the department to see whether or not they
14     wanted to pick them up or meet on the road someplace to
15     turn them over.
16 Q.  Is that typically what happened then?  They would meet
17     you or you -- they'd pick them up?
18 A.  Or they would come right to the station to pick them up,
19     yes.  That's what they're supposed to do.
20 Q.  So, am I correct that is the protocol for a police
21     officer, if there's an outstanding warrant, to -- I
22     don't know if the person is actually arrested but
23     they're picked up or brought back to the station?
24 A.  Unless there are some extenuating circumstances -- I
25     mean, if you pulled somebody over and they had a

Page 30

1      couple -- they had a warrant for a speeding ticket and
2      they just had surgery or there's obviously something
3      wrong with them that you would not be able to lodge them
4      safely, you know, then you would use your discretion and
5      let them go and advise them of the warrant.
6  Q.  Otherwise it's your duty to take the person into custody
7      or turn them over to another municipality?
8  A.  At least have the person on the desk inquire with the
9      department that holds the warrant to see if they want
10     them.  You should do that.
11 Q.  Okay.  And if it's a Melvindale warrant?
12 A.  Unless there's extenuating circumstances, you should
13     bring them in.
14 Q.  So, that means that if an officer is out on the road and
15     has stopped somebody for a traffic violation, a warrant
16     comes up, as an officer, I would give the driver the
17     citation and then bring the individual into the station?
18 A.  Yeah, bring them in, process them.  We would make
19     arrangements to try and let them call for a bond and
20     then go from there.
21         If it's early in the day, we would probably get
22     them in front of the judge.  If it's later in the day,
23     they would have to wait until the next morning.
24 Q.  Okay.  And then the officer would turn around and go
25     back out on the road?

Page 31

1  A.  Yeah.  It would take the officer maybe 15, 20 minutes to
2      do, because they're turning the person over and just
3      putting them in the jail, and I would monitor them from
4      there.
5  Q.  Did you ever learn whether there was any revenue
6      generated for the City by writing traffic citations for
7      moving violations?
8          In other words, you get a speeding ticket, you go
9      to district court.
10         Is there any money that comes back to the City from
11     that; if you know?
12 A.  If I recall, I believe a third of the cost of the
13     citation comes back to the City.  There's a split
14     between -- the court gets a piece, and we share a court
15     with Allen Park, so they -- it all goes like into a
16     kitty and everyone gets a chunk.  So, a third, third,
17     and a third.
18         That's the way it was explained to me.
19 Q.  Okay.  And up until 2015 -- well, strike that.
20         So, Matthew Furman was a road patrol officer -- is
21     that correct -- during the time you were with the
22     department?
23 A.  Yes.
24 Q.  And he was to take calls and do traffic?
25 A.  Correct.

Page 32

1  Q.  And could the officers decide where they wanted to
2      patrol vis-à-vis traffic?
3  A.  Unless there was -- yes.
4          Unless there was something going on where I needed
5      them to have visual presence in the area, I let them
6      patrol where they wanted.
7  Q.  Okay.  And prior to 2015, what was the procedure from
8      your end as a lieutenant with regard to impounding
9      vehicles by the road patrol?
10 A.  What would happen is the -- the road officer would call
11     on the radio and say they were towing a vehicle for
12     whatever reason.  I would contact the tow company.  The
13     tow company would respond and tow the vehicle.
14         The tow driver would come in, after putting the
15     vehicle in the impound, and give me the keys for the
16     vehicle, and we had a carbon copy slip with the vehicle
17     information on it.  I would keep a copy, and I would
18     give a copy to the driver for their records.
19 Q.  Okay.  And what would be the reasons that a car would be
20     impounded at the scene, as you understood it as a
21     lieutenant?
22 A.  If that person was under arrest, if they had a suspended
23     license, no insurance, you know, a traffic misdemeanor
24     or an arrest for OWI.
25 Q.  Okay.  So, if you had no proof of insurance with you,

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 33

```
1         was that an automatic tow or --
2   A.    Well, no proof of insurance is a civil infraction.
3   Q.    Right.
4   A.    You would have to determine that they did not have
5         insurance at all.
6   Q.    Okay.  And could you do that from your vehicle?
7   A.    Well, if they presented -- say they presented a proof of
8         insurance to you and it was expired, you could call the
9         insurance company.  They normally have a 1-800 number to
10        verify whether they had coverage.
11  Q.    And did the officers typically do that?
12  A.    Yes.
13  Q.    Okay.  And prior to the beginning of 2015, what was your
14        observation with regard to approximately how many cars
15        were being impounded on any given shift or any given
16        week, however you can think about it?
17  A.    Prior to 2015?
18  Q.    Right.  Prior to Goch & Sons.
19  A.    I mean, it all depended.  There could be five or six
20        cars towed in a shift, or there could be none.  It all
21        depends on what's going on out there.  If someone is out
22        there actively enforcing traffic, there would be more
23        vehicles towed.  If the officers were tied up on cases
24        and in the station doing paperwork and arrests, then
25        maybe none.
```

Page 34

```
1   Q.    Okay.
2             MS. GORDON:  Hang on one second, please.
3             (Discussion held off the record.)
4   BY MS. GORDON:
5   Q.    So, Goch & Sons took the contract over in 2015 for
6         towing.  I presume you're aware of that.  Maybe you
7         don't recall the exact date.
8   A.    It was June, maybe.
9   Q.    Okay.
10  A.    Okay.
11  Q.    Did you know of Goch & Sons?
12  A.    Yes, I knew of them.
13  Q.    How did you know of them?
14  A.    Because he had come -- he had been brought into the
15        station by Pat Easton.
16  Q.    And who had been brought into the station?
17  A.    Mike Goch.
18  Q.    Okay.  And what was that for?
19  A.    Introducing him to the guys.
20  Q.    Was this prior to the contract --
21  A.    Yes.
22  Q.    -- being signed?
23  A.    Yes, it was.
24  Q.    Was Easton a friend of Goch's, or how did it happen that
25        they were in the station?
```

Page 35

```
1   A.    He said that Mike Goch was his friend, and he was a
2         really good guy.
3   Q.    Okay.  And at that time, did you know Goch had a towing
4         company?
5   A.    Yes.  He introduced him as --
6   Q.    In that way?
7   A.    -- in that capacity, yes.
8   Q.    Okay.  And any other way that you knew of Goch other
9         than Easton bringing him into the station prior to the
10        contract being entered into?
11  A.    I had seen him at a concert -- at a -- I don't know
12        if -- I don't know if he had the contract yet.
13           I had seen him at an AC/DC concert with Pat Easton.
14        I don't know if it was June of 2015 yet or whether that
15        was later.  But I had seen them in public together,
16        yeah.
17  Q.    Okay.  Did he develop some relationships with -- that
18        you ever observed with some city politicians or
19        officials, anything like that?
20  A.    It seemed -- it seemed fairly apparent that he was
21        friends with the city politicians.  At one of the
22        auctions after he got the contract, I observed Katie
23        Pope, who is Mike Goch's girlfriend, approach Dave
24        Cybulski and Wheeler Marsee and tell her -- tell them
25        that they missed them at -- that they missed them at the
```

Page 36

```
1         bar the night before and gave them hugs.
2             So, I would assume they had a personal
3         relationship, yes.
4   Q.    Meaning there had been a group at the bar the night
5         before but those two had --
6   A.    I believe it was after a council meeting.
7             MS. BALIAN:  Objection as to what that meant.
8   BY MS. GORDON:
9   Q.    Okay.  So, the way you took it was "some of us were
10        there, and we missed you last night"?
11  A.    Right.  It appeared to me that they had a personal
12        relationship.
13  Q.    Okay.  Did you ever discuss Goch & Sons with the city
14        manager Ortiz?
15  A.    Yes.
16  Q.    What was that discussion or discussions about?
17  A.    We had -- at one time, I remember we had had a
18        conversation -- it was myself, Rich Ortiz and Chad Hayse
19        in the chief's office, and it was before the time that
20        the contract was awarded to Goch & Sons.  Chad had done
21        an investigation of both companies and went through our
22        computer system and printed out all the complaints of
23        the incidents that we had had with each company.
24            Not too long prior to them getting the contract, we
25        had arrested one of their drivers for assaulting someone
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                    Pages 37–40

Page 37

1  in our city.
2  Q.  A Goch driver?
3  A.  Yes.
4  Q.  Okay.
5  A.  And we had spoke to Rich about the incidents that we had
6      had.
7  Q.  Rich Ortiz?
8  A.  Rich Ortiz.
9          And over the years we had had some negative
10     dealings with that tow company.  Our motor carrier
11     officer had towed numerous vehicles that they
12     were towing, scrap cars, that they weren't licensed to
13     do, and whatnot.
14         So, we had had a little bit of a history with that
15     company.
16         And Chad tried to put forth an -- objective reasons
17     why we should or should not take the -- go with that tow
18     company.
19 Q.  To Ortiz?
20 A.  Yes.
21 Q.  Okay.
22 A.  And I remember Rich saying that he thought that Mike was
23     a good guy, that he had known him since high school, and
24     he wasn't really concerned about it.
25 Q.  Okay.  Was there ever any discussion after it -- with Ortiz

Page 38

1  after Goch came onboard with regard to -- I mean, it's
2  already been established in this case what the towing
3  numbers were and what the revenue was that the City was
4  making, and we have documents that show $20,000 a month
5  was coming just to the City, sometimes more.
6      Did Ortiz ever discuss with you guys possibly
7  getting a raise if the towing numbers were up?
8  A.  He made the statement at the front desk before, while
9      both the supervisors in patrol were in contract
10     negotiations that, "If you guys keep up the tickets and
11     the tows, I can probably justify a raise to the city
12     council for you guys."
13 Q.  Were you aware, after Goch & Sons came in, of the
14     difference in the cost schedule for tows?
15 A.  Well, they changed it.  They added on release fees and
16     whatnot.  The cost for someone getting their vehicle
17     towed went up substantially.
18 Q.  Okay.  And that was paid by the driver, obviously;
19     correct?
20 A.  Yes.
21 Q.  And then did you realize that there was going to be a
22     portion of that towing charge that would be revenue sent
23     back to the City?
24 A.  The -- yes.
25         I don't exactly know how it worked, but the

Page 39

1  vehicles that were towed, the City got a portion of it
2  and the tow company got a portion of it.
3          And when vehicles were auctioned off, the tow
4  company got a percentage of the proceeds of the auction
5  also.
6  Q.  That was different than previously?
7  A.  Right.
8          And then we were on the hook for paying for the tow
9  of the vehicle auctioned, regardless of what the cost
10 was.
11         I think at one time, we had a lady commit suicide
12 by driving her vehicle into the Rouge River, and the tow
13 company hit us for like $1,500 fee to pull it out, and I
14 thing we got $150 for it at auction.
15 Q.  That was Goch?
16 A.  Yeah.  We lost a lot of money on that one.
17 Q.  Okay.
18 A.  So --
19 Q.  Were you aware of the amount of revenue that the City
20 was generating from the Goch tows?
21 A.  I didn't know the numbers, but -- I mean the exact money
22 number, but I knew it was substantial because of the
23 number of vehicles towed on a daily basis.
24 Q.  Were you aware that Goch was making very significant
25 amounts of money every month on tows out of Melvindale?

Page 40

1  A.  Just by the -- I don't know how much, but just by the
2  number of vehicles towed and released every month that
3  it would be substantial.  There was a lot of money being
4  made.
5  Q.  And did you ever form the opinion that either the city
6  council or Mr. Ortiz wanted tows and -- a lot of tows in
7  order to generate revenue?
8  A.  Well, it was cash money coming in every month.
9          The City was under scrutiny from the State
10 Treasury.
11 Q.  Deficit Elimination Plan?
12 A.  Yeah.  They were in a Deficit Elimination Plan, and they
13 were reporting on a regular basis, having to go up to
14 Lansing.
15         I would submit paperwork from the auction, and they
16 would take it to the auditors, and the auditors would
17 work it in in the city budget, from what I understand,
18 and then present it to the State.
19 Q.  Okay.  And that was different than pre-Goch?
20 A.  I don't know what they did before.  I just know that
21 Rich had asked me on several occasions for the numbers
22 from the auctions, and that they were using them to give
23 to the auditors.
24 Q.  Okay.  So, this was different as of 2015?  The City was
25 now actually generating revenue based on tows --

Page 41

1    MS. BALIAN:  Objection.  Lack of foundation.
2    BY MS. GORDON:
3    Q.  -- that went to the City coffers; is that correct?
4        MS. BALIAN:  Objection.  Lack of foundation.
5    A.  Well --
6    BY MS. GORDON:
7    Q.  Separate and apart from the auctions that you described
8        earlier?
9    A.  Okay.  Well, they're -- prior to Goch & Sons, we
10       received money from storage, and they -- we would get
11       money from the auctions.
12   Q.  But post-Goch & Sons, you were getting revenue from
13       every single impound or tow?
14   A.  Well, the amount collected from the drivers went up
15       because they added more fees.  So, the cost of getting
16       your vehicle out increased with Goch & Sons versus
17       Gene's.
18   Q.  What would they add in as fees?
19   A.  Like a $35 release fee, and I believe the tow cost more.
20       There was a release fee that was added and some other
21       fees, too.
22           I think average, if you got it out that day, I
23       think it was $255 -- $255, where it was significantly
24       less before.
25   Q.  Okay.  Were you aware that Officer Furman had a personal

Page 42

1        relationship of some type with Mike Goch?
2    A.  I had heard other people talking, but I did not witness
3        it myself.
4    Q.  Were you aware that he had been to his home and been on
5        his boat?
6    A.  I -- no, I did not know that.
7    Q.  Okay.  Did you ever attend a Goch Christmas party?
8    A.  No, I did not.
9    Q.  Were you ever invited to a Goch Christmas party?
10   A.  Not that I know of, no.
11   Q.  Okay.  So, we've heard in this case about -- excuse me
12       one second.
13           I'll just show you some documents.  I don't know if
14       you're familiar with them or not, but these have been
15       used in this case and produced.
16           This is Hayse Bates stamp 478.  It says the Goch &
17       Sons Towing Melvindale revenue statistics 9-1-15 through
18       9-30-15, so that's a 30-day period.
19   A.  Okay.
20   Q.  Does that refresh your recollection with regard to the
21       costs?
22           MS. BALIAN:  I'm just going to object as to
23       foundation.  I don't know if he's ever seen this.
24   A.  I -- I don't know if I've seen this particular document
25       before, but I've seen a similar document before in the

Page 43

1        city council packet.
2    BY MS. GORDON:
3    Q.  Okay.  And you see obviously on the bottom that there's
4        a revenue figure directly to the city which would be, in
5        this case, $19,280.75 --
6    A.  Right.
7    Q.  -- for one month; correct?
8    A.  Correct.
9           I did not witness it, but I was told that the tow
10       company would present this in the city council meetings.
11   Q.  Okay.  And do you know who presented it from Goch?
12   A.  Mike Goch.
13   Q.  Okay.
14   A.  And would critique that, you know, tows were up or tows
15       were down for the month.
16   Q.  Okay.  Did you typically attend city council meetings?
17   A.  No.
18   Q.  So, I don't know if you have any idea what percentage of
19       the tows of the revenue went to the City as compared to
20       Goch, but with regard to the document I just handed you,
21       does that indicate to you how much money Goch would have
22       received for Melvindale tows?
23   A.  Well, in the form here it says, "City of Melvindale
24       revenue generated."
25           So, I would assume they're saying that's what the

Page 44

1        City made.
2    Q.  That's correct.
3    A.  Okay.
4    Q.  So, do you know the multiplier of what that would mean
5        Goch would have received?
6    A.  I don't know -- I don't know what they would have made
7        out of that for the month, no.
8    Q.  Okay.  So, I'll hand you Bates 476, which is a December
9        revenue statement from Goch & Sons Towing, December 1,
10       '15 through December 31, and this has gone up over the
11       one I've got in front of you by about $10,000.
12           Do you know why that would be?
13           That's a $29,000-plus month of December.
14   A.  I could only conclude that more vehicles were towed that
15       month.
16           I don't know.
17   Q.  Do you know why that many more vehicles would be towed
18       in December?
19           It looks like 99 vehicles were towed that month.
20           Do you see that?
21   A.  Yes.
22           Someone was towing a lot of vehicles that month, is
23       what it would tell me, or more than one officer.  I
24       don't know.
25   Q.  Okay.  I'll take that back.

Page 45

1    Did you have any interaction with Mike Goch
2    yourself?
3    A.   I would see him at the auctions, and there were a couple
4    times where we were having issues with what the clerical
5    staff were trying to charge drivers.  I had met with him
6    a couple times in person to try and iron it out.
7    Q.   What was that about?
8    A.   There was a whole thing about charging drivers for a
9    dolly fee.  It was basically for a service that they
10   didn't do, and he justified that if he had a different
11   truck, he would have had to have done it, so he thought
12   he could charge it.
13   Q.   Even though he didn't have it?
14   A.   Even though he did not perform the service.
15        And so we discussed it a couple times.  Chad Hayse
16   dealt with him on numerous occasions about it.  It was a
17   big blow up with the city council.  And then they kind
18   of dropped it.
19   Q.   What do you mean by "big blow up"?  What were they
20   concerned about?
21   A.   Well, the City wanted to make sure that they got a piece
22   of it, and they were kind of defending Mike Goch.
23        And it was for something that wasn't in their
24   contract, and they had -- Katie Pope had come in, and we
25   have it posted up at the front window for people coming

Page 46

1    in, the fees.  And she came in with her own fee list
2    with it added into it.
3        Well, it's not in their contract, so that was taken
4    down, and the actual fee list from the actual contract
5    was photocopied and put in its place.  And then after
6    that, we didn't have that issue any more.
7    Q.   Did you form the opinion, after Goch & Sons came
8    onboard, that the city council was very supportive of
9    them and happy to receive this revenue?
10        MS. BALIAN:  Objection.  Lack of Foundation.
11   BY MS. GORDON:
12   Q.   Go ahead.
13        MS. BALIAN:  He didn't attend the city council
14   meetings.
15   BY MS. GORDON:
16   Q.   Go ahead.
17   A.   I would assume because of the financial status of the
18   City, they were happy with the revenue generated.
19   Q.   Did you know any of the city council members?
20   A.   I knew Wheeler Marsee as an acquaintance, you could say.
21   He would come into the station occasionally and speak
22   with us to see how we were doing and whatnot.
23   The other members of the city council, I did not
24   know.
25   Q.   Did you hear that Nicole Barnes had some type of a

Page 47

1    relationship or friendship with Matthew Furman?
2    A.   I knew they were friends.
3    Q.   Was that known, or was that something --
4    A.   He -- yeah.  He -- he would stop by while he was working
5    and visit with him.
6    Q.   How did you know that?
7    A.   Because he said so.  He said, "I stopped by -- I was by
8    and talked to Nicole Barnes," and whatnot.  I knew they
9    were friends.
10        And he was -- Nicole Barnes is good friends with
11   Pat Easton, too.
12   Q.   Okay.  Were you aware that Nicole Barnes went out to
13   have a drink or a beer or something at a couple of
14   different local bars with Furman from time to time?
15   A.   No.
16        (Discussion held off the record.)
17   BY MS. GORDON:
18   Q.   I'm going to hand you Bates Hayse 2227.
19        Do you recall this memo coming out from Chad Hayse
20   to All Officers?  It's dated June 2nd, 2015.
21   A.   Yes.
22   It's "Re --"
23   A.   I remember it, yes.
24   Q.   "-- Rules and Regulations," and it says:
25        "As a reminder, Section 23, Professional

Page 48

1    Conduct and Responsibilities of the Rules and
2    Regulations prohibits acceptance of gifts,
3    gratuities, fees, loans, et cetera.  Any
4    officer violating this Section will be
5    disciplined up to termination and may face
6    criminal charges."
7    Were you aware of why this was needed to be sent
8    out in June of 2015?
9    A.   I believe it was in regards to issues with the tow
10   company wanting to do things and give things to the
11   department.
12        I believe at one time that Katie Pope, from Goch &
13   Sons, approached us and wanted to hold a barbecue at the
14   department for the officers.  They would come in and
15   bring muffins, pastries, drinks and whatnot.
16   Q.   Am I correct that the number of tows done by Melvindale
17   police officers had a direct impact on the amount of
18   money made by Goch & Sons?
19   A.   The more vehicles that the officers towed, the more
20   money that Goch & Sons made.
21   Q.   Okay.  So, we've got some data from towing, and we see
22   that the number of tows during the first six months of
23   2015 was 368.
24        And then Goch & Sons took over, from Gene's, and
25   right after that, for the second half of the year, there

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 49–52

Page 49

1    were 1,137 tows in a six-month time period.

2         Is that something you would have been cognizant of

3    at the time?

4  **A.  Yes.  I was doing the paperwork.**

5  Q.  Okay.  What happened, from your point of view as a

6    lieutenant?

7  **A.  Furman had said that his goal was to tow 1,000 cars that**

8  **year.  And there are days that he would tow 10 cars in a**

9  **shift.**

10  Q.  Okay.  This was different after Goch & Sons came in?

11  **A.  He had towed quite a few cars before.**

12  Q.  Right.

13  **A.  But it went up substantially after the Goch & Sons came**

14  **in.**

15  Q.  Okay.  All right.  So, let's compare the amount of cars

16    Furman was towing in a day while you were supervising to

17    the other -- there was one other officer on his shift?

18  **A.  There would be one other officer.  Depending on**

19  **scheduling, there might be a third, depending on**

20  **officer's days off and whatnot.**

21  Q.  Okay.  So, what percentage of those 1,137 tows, in the

22    second half of 2015, would you estimate would have been

23    from Mark(sic) Furman as compared to all other officers?

24  **A.  My guess would be 75 percent.**

25  Q.  Okay.  So, in order to do eight or ten tows a day, how

Page 50

1    much -- what percentage of your shift was this taking

2    up?

3  **A.  It was taking up most of his shift.**

4  **    And I was getting complaints that, you know, the**

5  **other officers were taking all the report calls while he**

6  **was towing cars.**

7  Q.  So, you needed somebody to go out on a dispatch.  He was

8    towing, so the other officer would have to pick up all

9    the calls?  Is that what you're saying?

10  **A.  Right.  I would catch flack from the other officers that**

11  **he was working with.**

12  Q.  Did you ever discuss this with Furman about the tows?

13  **A.  Yes.  I told him before.  I said, "Listen, if it's just**

14  **the two of you out there, I can't have you tied up**

15  **towing cars all day.  If I've got a third guy and we're**

16  **not super busy, that's fine."**

17  **    There was an instance where he was working a**

18  **traffic detail, and we had an armed robbery.**

19  **    In the middle of the armed robbery, he called out**

20  **for a tow truck.**

21  Q.  What was that about?

22  **A.  He had to tow a car, though we had somebody just commit**

23  **an armed robbery.**

24  Q.  I see.

25  **A.  His response should have been, help the other officers**

Page 51

1  **that are -- stop your traffic detail and help the other**

2  **officers.**

3  **    It's a very serious situation.**

4  **    But he wanted to tow the car instead.**

5  Q.  Okay.  So, why would he -- I mean, I get that people

6    may, you know, have -- enjoy doing certain things.  Some

7    people might like traffic.  Some people might like

8    dispatch, whatever.

9        What was the -- I'll use the word --

10    "obsession" with Furman and the tows as far as you could

11    discern?

12  **A.  I don't know.  He bragged about it.  He talked about it.**

13  **He kept a ledger in the inside of his locker where he**

14  **would log everything at the end of the day.  He liked**

15  **the attention.  He would tell anybody that would listen.**

16  Q.  And the attention was generated because his tows were

17    generating so much money and revenue for Goch and for

18    the City; is that -- do I have right?

19        MS. BALIAN:  Objection.  Calls for speculation.

20  BY MS. GORDON:

21  Q.  Is that correct?

22  **A.  I assume he liked the attention that he was getting.**

23  Q.  Okay.  But when you make a tow, you're literally

24    generating money for Goch & Sons and for the City;

25    correct?

Page 52

1  **A.  Yes, that's true.**

2  Q.  But when you go out on an armed robbery run, you are not

3    generating money?

4  **A.  Well, no.  This was an officer safety issue.**

5  **    He was not assigned to the road that day.  He was**

6  **working a traffic detail.**

7  **    A call for an armed robbery came out.  If you're**

8  **working a detail which isn't important -- it's an**

9  **overtime detail --**

10  Q.  Right.

11  **A.  -- and something serious like that happens, it's an**

12  **officer safety issue.  You're supposed to stop what**

13  **you're doing and assist the responding officers.**

14  Q.  No, I get that.

15  **A.  He chose not to because towing the car was more**

16  **important than helping his fellow officers with an armed**

17  **gunman.**

18  Q.  Okay.  I get that.

19        But the point I'm asking you about is, am I correct

20    that, when he towed a car, there would be money

21    generated from that tow to Goch and to the City, as

22    compared to him taking a dispatch run on a possible --

23    not your armed robbery, but just a normal dispatch run?

24    You're not generating revenue?

25  **A.  No.  Most --**

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 53–56

Page 53

1    MS. BALIAN:  Objection.  The testimony wasn't that
2    he was dispatched.
3 BY MS. GORDON:
4 Q.  Go ahead.  I'm saying hypothetically.
5 A.  Most often you're responding to the situation and taking
6    report.
7 Q.  And even if you stop somebody for speeding, I mean,
8    there might be a little revenue from the speeding
9    citation, but you're not generating money for Goch &
10   Sons when you issue a speeding ticket; correct?
11 A.  No.  Only when you tow a vehicle.
12 Q.  Okay.  So, did you wonder why it was that Furman was so
13   obsessed with doing these tows that were generating
14   money?
15 A.  I don't know the reason why he was so obsessed with it.
16 Q.  There --
17 A.  I know he liked to brag about it.  He liked to talk
18   about it and, you know, tell everybody how he was
19   making -- he was going to -- making all this money for
20   the City, and he's going out there to get us raises and
21   whatnot.
22 Q.  Were you aware that he was not calling dispatch --
23   strike that.
24       You've described a situation where if you stop a
25   vehicle, you would know about it, a lieutenant back at

Page 54

1    the station would know about it.  And then you would be
2    contacted with regard to getting the tow to dispatch the
3    tow truck; correct?
4 A.  Right.
5 Q.  Were you aware that Furman bypassed that step of
6    contacting the desk?
7 A.  Well, if he was going to tow a vehicle, he would have
8    to -- I was normally the one that called the tow
9    company.  And if he were to tow a vehicle, then the tow
10   driver would come into the station for the paperwork, so
11   I don't know how that would work.
12 Q.  Well, he testified that he, on his cell phone, would
13   contact --
14       (Discussion held off the record.)
15 BY MS. GORDON:
16 Q.  -- Briscoe directly --
17 A.  Oh, all right.  Just --
18 Q.  Just on his own, he would make the contact.
19 A.  Okay.  Just recently, within the last year or so, the
20   procedure did change a little bit.  Sometimes I will
21   call or sometimes he will call a tow driver because now
22   the officer is filling out the tow slip in the car and
23   handing the tow slip directly to the driver, but the
24   driver would still come into the station and turn over
25   the keys.

Page 55

1    So, they eliminated a step, and that was just
2    within the -- like the last year, I believe.
3       So, occasionally, he did call, but I did know that
4    he -- when he was on a traffic stop, I did know he was
5    on a traffic stop because he would log in the computer.
6 Q.  Right.
7 A.  But he just took it upon -- they changed the procedure a
8    little bit recently, and, depending on how busy we were,
9    sometimes he would contact the tow driver directly
10   because the tow driver was in town.
11      In fact, if Furman was working traffic, the tow
12   driver would pretty much follow him around.
13 Q.  Right.
14 A.  Because the tow driver got a commission for each tow
15   that he made, too.
16   I see.
17      Okay.  Did you ever form -- you've already touched
18   on this a bit.
19      Did you form the opinion that by doing all these
20   tows, other road patrol duties that should have been
21   handled may be left undone in some way?
22 A.  Well, you're not getting the patrol coverage in the city
23   that you normally would.  If you've got a guy that's
24   sitting on Schaefer Highway all day, he's not in the
25   neighborhoods making a visual presence or keeping an eye

Page 56

1    on the houses while people are at work.  And I did, on
2    several occasions, tell him to get on the side streets.
3 Q.  Did he do it, or did you get a response?
4 A.  He would do it for a little while, and then get back out
5    there and start towing cars again.
6 Q.  Did you have the ability to tell him, "Look, you know,
7    you've got to be doing other stuff," or did you feel
8    constrained to do that or explain that?
9 A.  Well, there were numerous times I tried to coach him and
10   give him advice and whatnot, and times I would try and
11   teach him -- try and tell him he needed to use
12   discretion in a lot of things that he did and whatnot.
13   And most of the time he just -- he acted like he knew
14   better and didn't want to hear it.
15 Q.  Do you recall Councilwoman Nicole Barnes contacting
16   Chief Hayse with Officer Furman's request that the chief
17   assign Furman to traffic 100 percent of the time?  Does
18   that ring a bell?
19 A.  I had heard something that he was speaking to Nicole
20   Barnes about wanting to try and negotiate his own
21   contract, and the patrol -- he was a member of the
22   patrol union board, and they kicked him off.
23 Q.  What's --
24 A.  He was the treasurer, and they voted him out because of
25   it.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                        Pages 57—60

Page 57

1  Q.  Okay.  So, explain that.
2       What's the patrol officer's board?
3  A.  Well, they have -- it's a union position.
4  Q.  Okay.
5  A.  And you have POAM for the patrolmen, and that is the
6      main -- the main representation and then each department
7      has their own reps in the department.
8       So, they would have a sergeant at arms, a
9      president, vice president and treasurer.
10      At that time, Matt Furman was the treasurer for the
11      patrol union.  And after all that stuff happened, the
12      patrol union voted him off the board.
13  Q.  And why was that as far as you could tell?
14  A.  Because he was trying to circumvent their own contract.
15  Q.  By getting his own contract?
16  A.  Correct.
17  Q.  Do you recall Nicole Barnes facilitating or trying to
18      facilitate a grant on behalf of Goch & Sons for the
19      purchase of a new computer for a patrol car?  Were you
20      aware of that?
21  A.  I don't know if directly.
22      I know that there were a couple instances where
23      Goch was trying to do things for the department.  I
24      don't know if that was under the lines of a grant.  I'm
25      not sure.

Page 58

1  Q.  What do you mean by "do things for the department"?
2  A.  Help them obtain equipment and whatnot.
3  Q.  What documentation had to be filled out at the time of a
4      tow?
5       We've got something in this case called "tow tags."
6  A.  Uh-huh.
7  Q.  What's that?
8  A.  For the desk officer?
9  Q.  Whatever the paperwork is that's generated either by the
10      officer or the desk officer.
11  A.  All right.  Well, what -- there is a document that is
12      our tow slip.  It has spots to fill in all the vehicle
13      information, the make, year, the make, the VIN, the
14      color.  There's a little graph of a vehicle on the tow
15      slip to mark any damage -- preexisting damage or list
16      any property that was in the tow slip.
17      And the person that filled out the tow slip would
18      normally -- the desk officer would sign their name to
19      it, and then the officer that towed the vehicle would
20      sign it also.  Or they would -- or the desk officer
21      would put that officer's name as the towing officer on
22      it.
23  Q.  Did you typically see those when you were working your
24      shift?
25  A.  That was part of my responsibilities as the desk

Page 59

1      lieutenant.
2  Q.  Did you see the tow tags that Furman filled out?
3  A.  Yes.
4  Q.  Okay.
5  A.  Well, normally I filled them out.  The portion about
6      damage or property, he would come in, because -- I
7      didn't physically see the vehicle, so he would fill in
8      that section.
9       But as far as the vehicle identification, all the
10      identifiers for the vehicle, the location and whatnot, I
11      would fill out that, and then he would come in and fill
12      out the vehicle search section or damage section and
13      then the tow tag would be filed.
14  Q.  He testified that -- I was asking him about people who
15      he stopped where there were warrants and he didn't
16      arrest them, even if they were Melvindale, and he said
17      he would just tell people, you know, "You've got an
18      arrest warrant out," and sometimes we could see that was
19      written on the bottom of the tow tag by him.
20  A.  Right.
21  Q.  He said that was his writing.
22      Were you aware of that?
23      MS. BALIAN:  Objection.  That wasn't his testimony.
24      But go ahead and answer.
25      MS. GORDON:  I'm paraphrasing.

Page 60

1  BY MS. GORDON:
2  Q.  Go ahead.
3  A.  I would -- after he would come in to fill out the slip
4      and after the vehicle was towed and the person was
5      already gone, there were times that he did write on
6      there that the person had Melvindale warrants or Allen
7      Park warrants or whatnot.
8  Q.  Okay.  But you're saying that really he should have
9      arrested them at the scene?
10  A.  Unless there were extenuating circumstances, especially
11      a Melvindale warrant.
12      MS. GORDON:  Okay.  I'm just going to take like a
13      3-minute break, run down hall.
14      (Short recess at 11:10 a.m.)
15              *   *   *
16      (Record resumed at 11:17 a.m.)
17  BY MS. GORDON:
18  Q.  Okay.  You mentioned earlier, Lieutenant, some
19      discipline with regard to Officer Furman.  I've got a
20      few questions a little more specifically about that.
21      We have some paperwork on the discipline as well,
22      and I can see that on February 28, 2016, Furman towed a
23      woman named Cecilia -- I've got her as Cecilia W.  I
24      think it was Wielichowski or something to that effect
25      and that she had a newborn and that the weather was

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 61–64

Page 61

1    inclement.
2       Is that the incident you mentioned earlier?
3    A.  I believe so, yes.
4    Q.  Okay.  And --
5       (Discussion held off the record.)
6    BY MS. GORDON:
7    Q.  Okay.  So, I've got some paperwork.  I'll start with the
8       investigation paperwork.  It's from Chad Hayse -- I'm
9       sorry.  Yeah.
10      From Chad Hayse.  It's with regard to a Furman
11      investigation.  I'm going to hand you this document.
12      It's Bates stamp 1440 and 1441.
13      I don't know whether you've seen that before or
14      not.  Take a second and look at it.
15      MS. GORDON:  (Producing document.)
16      MS. BALIAN:  Thank you.
17   A.  I believe I'm familiar with some of the circumstances
18      but I do not think that I saw this document.
19   BY MS. GORDON:
20   Q.  Do you remember Furman being suspended in April for
21      three days?
22   A.  I don't remember if he actually got the time off or if
23      they took it -- he was able to forfeit the time out of
24      his bank.  I don't remember.
25   Q.  He was later.  He was later.  That is correct.

Page 62

1    A.  Okay.  I think those are the circumstances I remember,
2       but I --
3    Q.  Okay.
4    A.  -- as far as him being off.
5       But I thought he had just lost time.
6    Q.  Okay.  So, if you go to the bottom of this first page,
7       it says:
8           "The driver came to the police station
9       and complained to Lieutenant Welch that you
10      had assaulted her in front of her children."
11      Is that what you were talking about earlier,
12      Lieutenant?
13   A.  No.  I was --
14   Q.  Somebody coming to the station, or is this somebody
15      different?
16   A.  I'm trying to remember if this is the same -- is this
17      the -- is this the incident on Schaefer Highway?
18   Q.  Well, yes.
19   A.  Or is this something else?
20   Q.  The stop was conducted on Schaefer.
21   A.  Okay.  Then this was probably -- and what was the name
22      of the person?
23   Q.  This document shows her as "Cecilia."
24   A.  That sounds like maybe that might be the name of the
25      person, and then they're talking about --

Page 63

1    Q.  And Corporal Hinojosa was --
2    A.  Right.  Dispatched to the call.
3       So, this would be the incident, yes.
4    Q.  Okay.  On the second page, it says:
5           "You arrested the driver and failed to
6       follow the listed rules and regulations as
7       adopted by the Public Safety Commission,
8       Section 2, Number 4, Handcuff; Number 5, Search
9       the Prisoner; and 6, Transport Prisoner to
10      Police Station."
11      Do you see that?
12   A.  Yes.
13   Q.  Do you recall being aware of Furman not having done
14      these things?
15   A.  Yes.  This is the woman that came into the station and
16      stated that Officer Furman had thrown her on the ground
17      and she had her child with her, and she was waiting for
18      someone to pick her up.
19   Q.  Okay.  If you go back to the first page, the third
20      paragraph talks about:
21           "Lieutenant Welch and other supervisors
22      have Advised you in the past about towing
23      vehicles with sick, elderly or children in
24      the vehicle."
25   A.  Yes.

Page 64

1    Q.  And it says:
2           "On February 28, you towed a vehicle after
3       removing children.  The driver was on her cell
4       phone.  You ordered her from the vehicle several
5       times and forcibly removed her by using a
6       transport wrist lock and secured both of her
7       wrists behind her back while forcing her over
8       the hood of the vehicle.  You placed the driver
9       under arrest.  You failed to report the arrest
10      to your supervisor, Lieutenant Welch.  You did
11      not process the prisoner, but instead released
12      her with a citation for no insurance.
13          In my opinion, it was not necessary to
14      remove the woman from the vehicle instead of
15      allowing her to complete her telephone call."
16      I'll turn right there.
17      Is this paragraph accurate that you and other
18      supervisors had advised Furman in the past about towing
19      vehicles with sick, elderly or children?
20   A.  Yes.
21   Q.  Okay.  And is it correct with regard to he -- Furman
22      failed to report the arrest to his supervisor?
23   A.  Well, he -- the issue was there he used force against
24      the citizen.
25   Q.  Uh-huh.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                                     Pages 65–68

Page 65

1    A.    Any time that you use force, the circumstances -- to
2          properly use force, the circumstances have to be
3          appropriate to use that force.  And if they're to that
4          level where you have to use physical force against
5          someone, they better be under arrest.  You just can't
6          put your hands on people in the street and play catch
7          and release.  If that person did something to the level
8          that required you to use physical force against them,
9          then you need to bring them to jail.
10   Q.    What is a transport wrist lock?
11   A.    There is a -- it's a technique where you basically take
12         control of the person's arm, and you're able to use
13         leverage or pain compliance to get them to come out or
14         do what you want them to do.
15   Q.    Did you become aware that this discipline was being
16         issued to Furman at some point?
17   A.    Well, yeah.  I did -- I did hear that he had lost some
18         time later on.
19   Q.    Okay.
20   A.    But other than advising Chad Hayse about the situation,
21         he took -- he took the situation and handled it from
22         there.  And then I believe I heard later on that Furman
23         had lost a couple days in regards to the situation.
24   Q.    Okay.  As you understood it, was part of the goal of the
25         memo to Furman, even though he didn't actually end up

Page 66

1          using days, to advise him to use better judgment and to
2          listen to --
3    A.    Of which memo?
4    Q.    The one I just -- that you've got in front of you.
5    A.    This one?
6    Q.    Yeah.
7                MS. BALIAN:  Objection.  Lack of foundation.
8    BY MS. GORDON:
9    Q.    Do you view that as a memo that is giving, you know,
10         counseling to Furman, as well as discipline, which he
11         didn't end up having to lose time for?
12               MS. BALIAN:  Objection.  Lack of foundation and
13         calls for speculation.
14   A.    Well, this document would be advising Matt Furman as
15         this -- for the circumstances of why he was being
16         disciplined, and the circumstances around it and telling
17         that officers -- supervisors have made multiple efforts
18         to get him to use better discretion.
19   BY MS. GORDON:
20   Q.    Do you agree that that memo dated April 25th, 2016,
21         Bates stamp 1440, produced to us by the City, would have
22         been an appropriate thing for the chief to give Furman
23         under these circumstances?
24   A.    Yes.
25   Q.    Let me hand you Bates stamp produced by the City 1448 to

Page 67

1    A.    Lieutenant Welch from Corporal -- no.  I'm sorry.
2                (Discussion held off the record.)
3    BY MS. GORDON:
4    Q.    Okay.  So, now I've got a document dated 3-1-2016.  This
5          is a different event where apparently Chief Hayse had
6          requested that Furman explain himself.  And it starts
7          with -- I'm going to give you a different Bates number.
8          It starts with 1454.  It's a memo to you from Corporal
9          Hinojosa.
10   A.    Yes, I remember this document.
11   Q.    Okay.  All right.  And here is Bates stamp 1448 to
12         Lieutenant Welch from Corporal Furman, 3-1-16.
13               Take a look at that and just refresh your
14         recollection.
15   A.    Yeah, I remember this document.
16   Q.    So, was Furman asked to give you an explanation?
17   A.    I requested that Furman give me a letter about what
18         happened on that traffic stop after the lady had come in
19         to complain.
20               And then, because Corporal Hinojosa was also
21         dispatched to that call, I requested that he document
22         what happened also.
23   Q.    If you don't mind, take a look at this document.  I'm
24         just going to ask you your reaction to what -- how
25         Furman explained himself as his commanding officer.

Page 68

1    A.    After reading his statement, I would come to the
2          conclusion that there would be a better way to handle
3          this.  You could probably let the lady calm down a
4          little bit and give her an opportunity to get out of her
5          vehicle and not use physical force.  This -- it wasn't
6          handled properly.
7    Q.    Okay.
8    A.    And if she -- he had already called for Corporal
9          Hinojosa to respond to the situation.  Oftentimes if a
10         citizen is angry with an officer, if someone else comes
11         to the location, you can normally get them to cooperate
12         because they're not mad at the other officer.
13               (Discussion held off the record.)
14   BY MS. GORDON:
15   Q.    Okay.  So, here I have a memo to Furman from Chad Hayse
16         with regard to two requests.
17   A.    Yeah.  I'm familiar with that document.  I spoke with
18         him about it before it was issued.
19   Q.    You spoke to --
20   A.    Chad Hayse about it.
21   Q.    Okay.  And what did you discuss?
22   A.    I thought it was a good idea.
23   Q.    Explain.
24   A.    He refused to use any common sense.  He was out there
25         working like a robot.  I mean, every traffic stop, every

Page 69

1    encounter with a citizen, I think you should weigh the
2    circumstances, and some situations have some compassion
3    for the people that you're dealing with.  It didn't
4    matter to him what their circumstances were.  He was
5    putting old ladies out on the street, people that had
6    just had surgery, people with kids.  You can't be a
7    robot out there.  You have to use discretion.  And the
8    purpose of this letter was to make him stop and think
9    about what he was doing instead of working like a robot.
10   Stop, think about what you're doing, and if you've got
11   to call in and explain yourself, then you should be able
12   to justify what you're doing, because he wouldn't
13   listen.
14   Q.   Okay.  And with regard to driver gender and age, number
15        of occupants and ages, the reason for the tow, what was
16        that about?
17             What was --
18   A.   That was to get him to consider the circumstances
19        surrounding his traffic stop and to use some judgment
20        and some common sense.  Just because you can tow the car
21        doesn't always mean you should.
22             It was an attempt to get him to think about what
23        he's doing and not just worry about getting a stat.
24   Q.   So, the City -- I'm paraphrasing the City's position in
25        this case, but I've sat through a lot of depositions and

Page 70

1    what people like Nicole Barnes and the mayor say is this
2    would have caused Furman to have to discriminate against
3    people on the basis of gender, "race" -- I heard the
4    word "race" used in here -- and age.
5         So, what is your takeaway on that?
6    A.   That's not accurate.  That's not the intent of this
7         letter, and that's not what he was told.
8              You can take and spin it any way you want, but it
9         is an attempt to get him to use discretion, which he
10        refused to do.
11   Q.   So, he says, "Well, I was the only one that had to call
12        in."
13   A.   Because he was the one not using discretion.  He was
14        the one getting all the complaints, and he was the one
15        that was assaulting people.
16   Q.   Was this memo designed, from what you could tell, to try
17        to protect the department in some way from complaints,
18        lawsuits and the like?
19   A.   Yes.  This was for the best interests of the department
20        and for his career.
21   Q.   And how would gender and age come into play with regard
22        to calling in?
23   A.   Putting --
24   Q.   I know you did have one older woman.  I don't know if
25        that's what triggered this or not --

Page 71

1    A.   Well, there were multiple situations where he was
2         putting people out on the street that he shouldn't.
3              So, if you made him stop and think about what he
4         was doing before he did it, because if he knew he had to
5         let us know and there's a chance we might tell him no,
6         then maybe he would make the right decision on the
7         street before calling the station to let us know.  That
8         was the purpose of it.
9    Q.   What about gender and age?
10   A.   He --
11   Q.   You're talking about --
12   A.   There had better be a darn good reason why you're
13        putting a 70-some-year-old lady, frail old lady on the
14        street miles from her home.  A real good reason.
15   Q.   And how about children?  Same thing?
16   A.   Yes.
17   Q.   Number of occupants, what is that going to?  What are
18        you trying to avoid there?
19   A.   Well, that would probably tie into having a car load of
20        kids.
21             My years on the road, there were many times in just
22        a simple traffic stop or driving on suspended, based
23        upon who was in the vehicle, the circumstances
24        surrounding it, I let them drive away.
25   Q.   And why would you do that?

Page 72

1    A.   Because it was the right thing to do.
2    Q.   For their safety?  For their well-being?  Because they
3         weren't a threat?  What?
4    A.   Yeah.  So, you've got a mother that's got three kids in
5         the car that has an unpaid speeding ticket, so has a
6         failure to comply with judgment and suspension out of
7         30 -- out of the Detroit court, 36th District Court, for
8         example.
9              So, you're going to put a mother and children out
10        on the street over something like that?
11             It's wrong.
12   Q.   Okay.  Did you hear of any pushback from Furman about
13        this memo that was issued on April 26th?  Did you get a
14        reaction from him or anybody else?
15   A.   I don't recall him saying -- I kind of got the
16        impression that he didn't like it, but I don't think he
17        stated anything specifically to me about it.
18   Q.   Okay.  Did he start calling, if you remember, or no?
19   A.   I -- yeah, I recall him calling in.
20   Q.   Do you remember him being denied tows and being told,
21        "Hey, no, don't tow"?  Do you remember that happening?
22   A.   Not that I can remember off the top of my head.
23   Q.   Okay.
24   A.   Which would probably indicate that it was working.
25   Q.   Okay.  Okay.  Then Furman was suspended without pay on

Page 73

1          July 5th, 2016.
2      I'm sorry.  With pay originally, and then I think
3      it was later changed.
4          This involves an individual named Richard Crosslin.
5  A.  Okay.  Is Crosslin the guy that he tackled?
6      MS. BALIAN:  You can't ask questions.
7  BY MS. GORDON:
8  Q.  I'm going to let you look at this.
9  A.  Okay.
10 Q.  And then we'll see if I can refresh your recollection.
11     This is to Hayse from Furman.  It's Bates stamp 940
12 through 943?
13     MS. BALIAN:  Can I just see -- I'm sorry.
14 A.  Go ahead.
15     Yeah.  That is the incident that I'm speaking of.
16 BY MS. GORDON:
17 Q.  That is the incident.
18     Were you aware of a suspension over this?
19 A.  Yes.
20 Q.  Okay.  Did you discuss that with the chief?
21 A.  Yes, I did.
22 Q.  Okay.  Tell me what you discussed.
23 A.  Well, at that time, he was under investigation from the
24     state police for another assaultive incident.  This one
25     happened.  This is the incident that I spoke of earlier

Page 74

1      that Officer Lane and Officer Ginther responded to, and
2      they brought their concerns to me about it.
3  Q.  What did they say?
4  A.  They said what he did was wrong.  It was unnecessary
5      force used against that person that they were compliant.
6      That he was compliant.  I'm sorry.
7  Q.  Okay.  So, this is now the third one you've had in -- I
8      think since April 2016.
9      Does that sound correct?
10 A.  Approximately, yeah.
11 Q.  Okay.  So, you had a concern about what to do about
12     him --
13 A.  Yes.
14 Q.  -- with regard to --
15 A.  I -- I expressed to Chad Hayse that this situation has
16     gotten out of control, and it's something that needed to
17     be addressed.
18 Q.  And did the chief agree?
19 A.  Yes.
20 Q.  Did you become aware that Furman was then suspended --
21     or not suspended, but at least put off work with pay?
22 A.  Yes.
23 Q.  Was there an investigation; if you recall?
24 A.  I did not have a hand in the investigation.  I'm not
25     sure what transpired in regards to this incident.

Page 75

1          I took the initial statements from the officers
2      that were there with him and turned them over to the
3      chief.
4  Q.  You see from the exhibit that I just handed you, Hayse
5      940, Corporal Furman responded in writing to Chief Hayse
6      about what he had been -- a complaint that had been
7      filed against him; correct?  At the very top?
8  A.  Correct.
9          I believe what this is, is Chief Hayse addressed
10     the matter to him and advised Corporal Furman to respond
11     in writing his account of the incident.
12 Q.  Okay.  And then here is the other one.
13         This is -- I think you've discussed this briefly
14     before that the state police investigated.  I'll hand
15     you Hayse 928.  It's a series of e-mails.  I don't know
16     if you've seen these before or not.
17 A.  No.  No, I have not.
18 Q.  Who is Brandon Nolin, if you look at the very bottom of
19     the page?
20 A.  He's an officer with Melvindale.
21 Q.  Okay.  So, have you ever seen this write-up from Brandon
22     Nolin, which is attached?
23         If you go on to the next page, he's writing to
24     Sunshine Ponzetti about what occurred.
25 A.  I've never seen this document, no.

Page 76

1  Q.  Okay.  It does reference Lieutenant Allen.
2          Were you aware that Lieutenant Allen observed the
3      events with this particular individual whose head was
4      bounced against the car or whatever the verbiage is that
5      goes with that?
6  A.  Yes.  Yes.  He was present.
7          The -- Brandon Nolin -- Lieutenant Allen, at the
8      time, was in charge of the detective bureau.  Brandon
9      Nolin was assigned to the detective bureau.  When they
10     called out that they were in a foot chase, the
11     detectives responded from the station to assist.
12 Q.  Did you hear any -- did you get any pushback or hear of
13     any pushback about Furman -- either from Furman or
14     anybody else involved with the City of Melvindale with
15     regard to these disciplines or counselings that he was
16     receiving?
17     MS. BALIAN:  On what?
18     MS. GORDON:  On the counselings or disciplines
19 Furman was receiving.
20     MS. BALIAN:  For this?
21     MS. GORDON:  No.  Any of these that we've covered.
22 A.  I don't recall any -- from City officials or anything?
23     I don't --
24 BY MS. GORDON:
25 Q.  Any -- well, from Furman or from any city council

Page 77

1    members that expressed displeasure or anybody else?
2  A.  I -- I did not have contact with any city council
3      members or really anyone from the City in regards to
4      this, no.
5          (Discussion held off the record.)
6  BY MS. GORDON:
7  Q.  Okay.  Did you become aware that there was a request for
8      Furman, as part of his discipline or counseling, to
9      obtain a psychological evaluation by the city
10     psychologist?
11         MS. BALIAN:  Objection.  Misstates facts not in
12     evidence.
13 BY MS. GORDON:
14 Q.  Go ahead.
15 A.  I believe that he was sent to see Dr. Clark.  I think it
16     was something that Chad Hayse did to try and figure
17     things out.
18 Q.  Okay.  Who did you understand Dr. Clark was at the time?
19 A.  Dr. Clark is the -- and still is the police department
20     psychologist used for our hiring process or whatever
21     that we may need.
22 Q.  Okay.  So, he is somebody that is paid by the City to
23     evaluate officers or potential officers when necessary?
24 A.  Right.  Or if involved in a critical situation, you
25     know, for counseling and whatnot.  He's who we use.

Page 78

1  Q.  Okay.  And does that happen from time to time that
2      officers need counseling?
3  A.  Yes.
4  Q.  Okay.  And is it possible for a supervisor to recommend
5      them for counseling?
6  A.  A supervisor would probably speak to the chief about it,
7      and the chief would do so.
8  Q.  Do you understand that the chief has the ability to have
9      an officer be evaluated or go for counseling as part of
10     a discipline or something else?
11 A.  I've seen it happen where officers have been in
12     situations and that the chief has requested that they
13     speak with the psychologist, yes.
14         I've seen it a couple times during my career there.
15 Q.  What's the purpose of that as you understand it?
16 A.  Probably to help that officer, to see if they have some
17     underlying issue that needs help.
18         We had a situation where Chief Difatta had an
19     officer see Dr. Clark about his drinking problem.
20 Q.  Okay.  Have you ever seen any reports from Dr. Clark --
21 A.  No.
22 Q.  -- with regard to officers?
23         Were you aware that Lawrence Jackson was hired by
24     the City of Melvindale to do an analysis of why towing
25     was down?

Page 79

1  A.  I had heard that the city council had approved funds to
2      do so, but I don't know who Lawrence Jackson is.
3  Q.  Did you know he was interviewing officers?
4  A.  No, I did not.
5  Q.  Were you aware that towing -- strike that.
6          Did you ever hear Furman say he was not going to do
7      towing?
8  A.  When Matt Furman would get complaints -- citizen
9      complaints or he was being disciplined, he would state
10     that he wasn't going to "because if I don't tow
11     anything, I don't have contact with the public, then I
12     can't get in trouble."  So --
13 Q.  So, how did you view that position on his part?
14 A.  Well, the logic is pretty silly, but if you just were
15     doing your job, then you wouldn't get in trouble.  If
16     you were using discretion, you wouldn't get complaints.
17         I take that back.  You will always get some
18     complaints because you're telling people what they don't
19     want to hear and doing things that they don't want to
20     do, but they're very infrequent if you handle yourself
21     and you treat people with respect.
22 Q.  When did you first meet Larry Coogan?
23 A.  I met Larry Coogan when he started working for the City
24     as the one of the corporate counsel.
25 Q.  Did you work with him from time to time?

Page 80

1  A.  In the detective bureau occasionally I would deal with
2      him at court if we had a City case, a hearing.
3  Q.  Any other times later or toward the end of your career
4      when you dealt with him?
5  A.  He oversaw a disciplinary hearing that I undertook.
6  Q.  Okay.  Were you aware -- well, I'll hand you Hayse
7      Exhibit 172.
8          It's a letter to Chief Chad Hayse from Lawrence
9      Coogan with a copy to mayor and council and Ortiz and
10     Public Safety, stating:
11             "On July 25th, I wrote a letter to you
12         requesting you provide me all documents or
13         writings regarding or concerning the alleged
14         misconduct of Officer Furman.  In addition, I
15         requested the names and contact information
16         of all persons and governmental agencies who
17         have performed any investigation."
18         So, you see he's asking the chief for all
19     information regarding any alleged misconduct of Furman;
20     correct?
21 A.  Yes.
22 Q.  Okay.  Were you aware of this previously?
23 A.  I think I had heard that he requested.
24         I've never seen the document, but I think I heard
25     Chad Hayse say that he requested it.

Page 81

1  Q.   Okay.  Do you know of any reason why the counsel for the
2       City would be requesting from the chief all alleged
3       misconduct -- documents relating to all alleged
4       misconduct of Officer Furman based on your years with
5       the City?
6  A.   I've never seen this before.  Never seen it happen.
7  Q.   Do you -- sitting here today, can you -- I mean, we all
8       know what happened.  We all know that the end of the
9       story is all Furman's discipline was removed.
10 A.   Yes.
11 Q.   Made null and void.
12      Do you have any idea why Lawrence Coogan would be
13      trying to obtain information about Furman's proposed or
14      alleged misconduct?
15 A.   I don't know.  I heard rumblings.  And I don't have
16      names, but I did hear people saying stuff to the effect
17      that Furman was in contact with Coogan who was giving
18      him legal advice.
19 Q.   And who was responsible for discipline of members of the
20      police department?
21 A.   The police chief is responsible for doing the
22      investigation, and then, if it rises to the level of
23      suspension, termination, demotion, he is supposed to
24      turn that over to the Safety Commission who would then
25      have a hearing to determine his punishment.

Page 82

1  Q.   Okay.
2  A.   If it was a minor situation where he might get a day off
3       or a couple days off, the chief would be able to do that
4       arbitrarily.  But a major incident goes to the Safety
5       Commission.
6  Q.   Were you aware that the mayor and members of city
7       council were also asking questions about why Furman was
8       being disciplined and looking into it?
9  A.   I'm sorry.  Could you restate your question?
10 Q.   Okay.  I will -- I'll rephrase it.
11      Did there come a time when you became aware that
12      the city council was upset about Furman being criticized
13      or disciplined?
14      MS. BALIAN:  Objection.  States facts not in
15      evidence.
16 A.   I did not hear anything from -- about the city
17      politicians in regards to Furman.  Not that I know of.
18 BY MS. GORDON:
19 Q.   Do you know of anything Chief Hayse did improperly or
20      incorrectly with regard to any of his counseling or
21      discipline of Furman based on your years with the
22      department?
23 A.   The only thing that ever came to light -- and I don't
24      know if -- whatever happened -- was that when Furman was
25      suspended, Chad Hayse had -- was on his way out of town

Page 83

1       for the weekend.  Furman was advised to contact Chief
2       Hayse when he got back into town, I believe on Monday.
3       He was going out of town for a conference.
4       It was alleged -- and I don't know if it was
5       true -- that he never received a written reason why he
6       was being suspended.  I don't know if that's true or
7       not.
8  Q.   Which suspension was that?
9  A.   When he was suspended the second time with pay after the
10      Crosslin incident.
11 Q.   Was he told verbally?
12 A.   He was told verbally, yes.  John Allen was -- I was
13      present in the room, in the chief's office, and he was
14      told he was being suspended.  I don't remember exactly
15      the verbiage that John Allen gave, but I remember
16      advising Furman to get a hold of the chief Monday
17      morning when he gets back into work.
18 Q.   Okay.  So, let's say hypothetically that he should have
19      been advised in writing.
20      I presume that could be corrected if it had not
21      occurred by, at a later time, giving -- you know,
22      holding off on his suspension and, at a later time,
23      giving him something in writing?
24 A.   Well, ideally, from -- looking at it from a union
25      standpoint, they should have been -- the person should

Page 84

1       have been advised in writing.  But that would be
2       something that that officer might contest later on down
3       the line in a grievance procedure.
4  Q.   Okay.  All right.  Leave aside that procedural issue
5       that you've raised.
6       With regard to substance of what Hayse was trying
7       to accomplish with regard to counseling and discipline
8       of Furman, was he acting appropriately based on your
9       experience with the department?
10 A.   Was the chief acting properly based on the circumstances
11      at that time?
12 Q.   Yes.
13 A.   Yes.
14      (Discussion held off the record.)
15 BY MS. GORDON:
16 Q.   Okay.  Did you know that one of the charges against the
17      chief and the complaint against him to fire him was
18      called "willful misconduct in office by improper
19      issuance of discipline upon Corporal Matthew Furman" and
20      that that was a so-called "terminable offense"?
21 A.   I'm -- I didn't -- I'm not aware of every specific
22      charge that he was charged with.
23      I knew they had made an issue, but I didn't know
24      what the term was or whatnot.
25 Q.   Uh-huh.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                    Pages 85–88

Page 85

1        Did you ever see the Amended Formal Complaint
2   lodged against the chief by Nicole Barnes and the city
3   council?  You know, the packet of wrongdoing by Chief
4   Hayse?
5  **A.   No.**
6  Q.   Okay.  Back to Lawrence Johnson -- Jackson, who was
7   hired by the city council and apparently knows Lawrence
8   Coogan.  That's how he came to be retained for this job.
9        He was given the job of determining the reason for
10  the fluctuation in towing activity by the Melvindale
11  Police Department.
12        Were you aware that somebody had been hired to
13  provide a report on that?
14 **A.   Yes.**
15 Q.   Okay.  How did you become aware of that?
16 **A.   I believe I heard people talking about it after**
17 **attending the city council meeting.  I was not present**
18 **at that meeting.**
19 Q.   Okay.  As a lieutenant in the department, who was
20 managing road patrol officers and towing, were you ever
21 contacted by Lawrence Jackson to -- for him to obtain
22 information from you with regard to this issue of why
23 there was a fluctuation in towing activity?
24 **A.   I've never met the gentleman.**
25 Q.   Were you aware he did meet with certain selected

Page 86

1  officers in order to generate a report for Lawrence
2  Coogan and the council?
3 **A.   No, I was not aware.**
4        **If the gentleman wanted the tow stats, I could have**
5 **printed them off on the computer for him in about**
6 **5 minutes.**
7        **Every vehicle that is towed is logged in the system**
8 **with -- coinciding with the report, the officer that**
9 **towed the vehicle, the time, the location.  I could have**
10 **given him ten years of data.  He never asked me for it.**
11 Q.   Okay.  I'll hand you his "Policy Review."  It's -- it
12 begins with City Bates stamp 1273.
13     MS. GORDON:  I think I've got another one, Melinda.
14     MS. BALIAN:  Thank you.
15 BY MS. GORDON:
16 Q.   Have you ever seen that?
17 **A.   I've never seen this, no.**
18 Q.   Okay.  So, let's go to the first page, under
19 "Methodology."  The paragraph says:
20       "Several different factors can affect the
21     number of vehicles impounded and towed within
22     the City.  Outside factors include reduced
23     traffic, reduction in the number of illegally
24     driven vehicles, environment conditions and
25     other factors which are impossible to quantify.

Page 87

1        The factors within the control of the City
2     and police department include police staffing,
3     policy, procedures, and possibly other internal
4     factors.  The focus of this review was limited
5     to those variables which can be controlled by
6     the City."
7        So, I'll stop right there and ask you if you know
8  what variables can be controlled by the City with regard
9  to the number of tows.
10 **A.   The variables that can be controlled by the City?**
11 Q.   That's what he's saying.  He wanted to look at that.
12 **A.   Well, the number of vehicles towed depends on the number**
13 **of traffic stops made and the officer's discretion**
14 **whether or not to tow a car.  They can tow one car in a**
15 **day; they can tow zero; they can tow ten.  It matters --**
16 **it varies from day-to-day.**
17 Q.   Okay.  The next paragraph says:
18     "Interviews were conducted with members of
19     the city administration and the police department.
20     Information regarding Goch & Sons Towing was
21     solicited from members of the patrol division."
22        Again, you've already said you weren't interviewed;
23  correct?
24 **A.   Correct.**
25 Q.   Did you hear of anybody that was interviewed?

Page 88

1 **A.   No.**
2 Q.   How many officers are there at Melvindale, or were there
3  at this time, 2016, roughly?
4 **A.   Maybe 25 from top to bottom.**
5 Q.   So, the next paragraph says:
6     "During these interviews, all officers
7     requested anonymity."
8        Do you see that?
9 **A.   Yes.**
10 Q.   (Reading.)
11     "The one exception was Corporal Matthew
12     Furman.  He agreed to be identified."
13        Okay.  So, now let's look and see what he says he
14  did, on the next page.
15        He says:
16     "Four members of the patrol division were
17     asked to interview, one declined."
18        So, one of those was Furman.
19        Do you have any idea why Mr. Jackson would pick
20  four officers out of the 24 to interview?
21 **A.   I have no idea, and I don't know why he would pick those**
22 **ones.**
23 Q.   Okay.
24 **A.   We don't even know who they are.**
25 Q.   Okay.  Okay.  Let's go down to "Interview Content."

**WELCH, JUNIOR, LIEUTENANT MICHAEL L.**
03/28/2018
Pages 89–92

Page 89

1      Number one, you see your name appears there?
2  A.  (No verbal response.)
3  Q.  (Reading.)
4           "All officers stated that Chad Hayse and
5      Lieutenant Welch 'hate' Mike Goch and his
6      company.  All relayed experiences where the
7      chief and lieutenant ordered officers to not
8      make that 'fucking Goch' more money."
9           See that?
10  A.  Yes.
11  Q.  Okay.  Obviously, you've already covered this, but I
12      want to make the record.
13           You were never asked about this by Lawrence
14      Jackson; correct?  He never got your input --
15  A.  Never.
16  Q.  -- on what you thought about Mike Goch, whether you
17      hated Mike Goch or anything else?
18  A.  I don't know who this gentleman is.
19  Q.  Okay.  Do you have any idea who from the department
20      would have said that you hated Mike Goch and that you
21      ordered officers to not make that "fucking Goch" more
22      money?  Do you have any idea who would have said that?
23      Anybody you can think of?
24  A.  My guess would either be Matt Furman or Patrick Easton.
25  Q.  What was with Easton?  Who --

Page 90

1  A.  Patrick Easton is good friends with Mike Goch.
2  Q.  And what is Patrick Easton like as an officer?
3  A.  Troubled.
4  Q.  What do you mean by that?
5  A.  He's gotten in a lot of trouble.
6  Q.  Like what?
7  A.  Demotion, suspension.  He's --
8  Q.  For what kind of things?
9  A.  He just had a trial board just recently.  He was demoted
10      from sergeant to the lowest ranking patrolman.
11  Q.  Why was that?
12  A.  Because of his charges in a hit and run and his conduct
13      within the department.
14  Q.  Did you ever work with him?
15  A.  I worked with him for years.
16  Q.  What did you observe about his conduct that would make
17      you think he was troubled?
18           Any examples?
19  A.  I believe he was normally dishonest, and he did not have
20      a good work ethic.
21  Q.  Okay.  You go to the next page, page 3, paragraph 6:
22           "All interviewees related hearing Chief
23      Hayse and Lieutenant Mike Welch disparaging city
24      administrators, including the city council, the
25      city attorney as 'being on the take.'  They also

Page 91

1      witness them calling the mayor a 'bitch,' 'whore,'
2      'slut' and 'cunt' in the presence of other
3      officers."
4           Now, as you well know, Lieutenant, this of course
5      comes up at the Chad Hayse disciplinary hearing, right,
6      where officers come to the stand and testify to that.
7           So, I'm showing you this.  This is where this
8      originally appeared.
9           Do you know who would have said this about you
10      and/or Chief Hayse?
11  A.  I would probably assume it would be Patrick Easton or
12      Matt Furman.
13           I was not in the hearing.  We were all sequestered.
14      So --
15  Q.  Okay.
16  A.  I don't know for sure.  I don't know who would say that.
17      That's my guess.
18  Q.  So, they're saying, whoever these interviewees are,
19      again, you were not asked about these statements by
20      Lawrence Jackson; correct?
21  A.  Correct.
22  Q.  Okay.  Had you learned previously that you were being
23      accused of calling -- or strike that -- disparaging city
24      administrators as being on the take?
25  A.  I was not aware of -- that I was being investigated

Page 92

1      until Chad Hayse's hearing when they started asking me
2      questions directly about me.
3  Q.  Okay.  And what is your response to whether or not you
4      disparaged city administrators, including the city
5      council and the city attorney -- I guess that would be
6      Coogan -- as being on the take?
7  A.  I don't know where someone would have came up with that.
8  Q.  Was there talk -- was there talk around the city of Goch
9      & Sons giving money or gifts to people in Melvindale in
10      order to retain business and get tows?
11  A.  Well, there were situations where they were trying to
12      bring stuff in to the station for the officers, and Chad
13      Hayse said that we weren't going to do that and not to
14      accept gifts from them.
15  Q.  Okay.  Did you ever call the mayor a "bitch," "whore,"
16      "slut" or "cunt" in the presence of other officers in
17      the department?
18  A.  No, I did not.
19  Q.  Did you ever hear Chad Hayse call the mayor a
20      "bitch," "whore," "slut," "cunt" in the presence of
21      other officers in the department?
22  A.  No, not in the presence -- he had never said anything
23      about anyone else disparaging in front of other
24      officers.
25  Q.  Let's go to 7.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018
Pages 93—96

Page 93

1         "All people interviewed mentioned the
2     background checks done by Chief Hayse on
3     Goch & Sons Towing during the contract bid
4     process.  They felt this proved Chief Hayse
5     doesn't like Mike Goch since 'he didn't do
6     that for the old tow company.'"
7  A.  That's incorrect because he did.  He did all his
8     information -- he did all his background checks and all
9     his investigation on both companies, and he presented
10    that, I'm told, to the city council to review, and they
11    wouldn't even look at it.
12  Q.  Would it be an appropriate thing for the police
13    department to do a background check on a contractor who
14    is going to be working with the police department?
15  A.  It's very appropriate.
16  Q.  Okay.  Go to Number 9.
17        "One interviewee complained that '4 or
18     5 times' Lieutenant Welch skipped over the
19     officers' names and assigned the overtime to
20     himself."
21        Who would be saying that?
22  A.  That would be Pat Easton.  He would complain that I
23    wouldn't give him overtime that I was entitled to.
24  Q.  And what's the response to that?
25        What's your response?

Page 94

1  A.  My response is that it's not true, and I have never
2    worked a minute of overtime that I was not contractually
3    entitled to.
4  Q.  Do you know what -- if this is Easton, do you know what
5    he's talking about when he says he was skipped over?
6  A.  No.  Just knowing him for 20 years, it sounds like him.
7        I don't know for sure if that is who that is, but
8    if it was me working the overtime, then he's the only
9    other one the overtime can go to, because he's also a
10    supervisor.
11  Q.  I see.
12  A.  So, I wouldn't be skipping over patrolmen.  It would be
13    allegedly skipping over him.
14  Q.  I see.
15        He never filed a grievance, obviously, about that;
16    correct?
17  A.  No.
18  Q.  Nobody ever put anything in writing as far as you're
19    aware about you skipping over people so you could take
20    overtime yourself?
21  A.  Not that I am aware of, no.
22  Q.  Number 10 says:
23        "All interviewees stated that some fellow
24     officers feared doing something to receive
25     negative treatment similar to Corporal Furman."

Page 95

1        So, let's talk about the officers in general from
2    your knowledge in the department.
3        You were there from the time Furman arrived;
4    correct?
5  A.  Correct.
6  Q.  Okay.  So, how did the other officers, from what you
7    observed, view Furman by 2015?
8  A.  I think a lot of the officers -- I mean, for the most
9    part -- I think for the most part everyone got along
10    until all this stuff started coming to a head, and it
11    caused kind of a rift in the department.  I think we
12    pretty much had a decent working relationship, a pretty
13    good working environment.  Everyone seemed to get along.
14    We were able to joke around with each other back and
15    forth.
16        Once all this stuff with Chad Hayse started
17    underway, it caused a lot of tension in the department
18    and caused a lot of division, and it was mainly Matt
19    Furman and Pat Easton and everyone else.  So, they kind
20    of became their own island.
21  Q.  So, those -- it was them and then it was everybody else?
22    Is that what you're saying?
23  A.  That's what it appeared to be, yes.  A lot of people
24    separated themselves or just kind of stopped talking to
25    those two.

Page 96

1  Q.  Do you know anything about "Snowgate"?
2        Were you involved in that?
3  A.  That was the situation where we had a snow emergency,
4    and they were supposed to go out and write tickets for
5    vehicles that had not been moved off the roadway after a
6    given -- a certain amount of time and proper warning.
7        And Officer Furman took it upon himself to write on
8    the ticket, "Per the mayor."
9  Q.  Meaning what?
10  A.  That -- he was -- he was implying that it was under
11    orders from the mayor to write those people the parking
12    tickets.
13  Q.  I see.  So, that the recipient of the ticket would see
14    "per orders of the mayor"?
15  A.  Yeah.  Probably because he didn't want to do it, so --
16  Q.  Okay.  Number 14 says:
17        "Mike Goch said he has tried hard to
18     establish good relations with the MPD."
19        So, obviously he was interviewed.
20        "-- but he thinks that Hayse, Welch and
21     Officer Dietrich don't like him."
22        Do you know what that would be about?
23  A.  Well, I -- originally when the contract first started, I
24    questioned some of the fees that he was charging, and I
25    spoke to him in person about it and expressed to him

Page 97

1    that I -- that some of the stuff I didn't feel was right
2    or appropriate, and that we were charging people more
3    than we should.
4         I was under the impression we hashed everything out
5    and had -- really didn't have any problems with him
6    since.
7  Q.  Okay.
8  A.  He had always been polite and shook my hand every time I
9    saw him, and -- "How are you doing?" and whatnot.
10 Q.  Okay.
11 A.  So, I believe after we had a couple conversations, we
12   had a pretty decent professional relationship.
13 Q.  Okay.  Let's go to the next page.
14        You're going to see "Conclusion Number 1" from
15   Lawrence Jackson.
16        And he says at the top of the page:
17            "After reviewing the documents and speaking
18        to officers --"
19   we don't know who they are other than Furman --
20            "-- and civilians --"
21   I don't know who that would be --
22            "-- involved, it seems the recent change
23   can be traced to two factors.
24   Then he has "Fewer Impounded Vehicles."
25        And if you'll read down a couple paragraphs -- take

Page 98

1    your time -- it talks about the absence of Corporal
2    Furman on the day shift was an obvious contributor.
3        It says:
4            "He was absent due to various circumstances
5        August, September and October, and that he
6        accounts for 79 percent of the impounds each
7        month."
8        Take your time.
9  A.  Okay.
10        Well, this report just confirms that -- my
11   statement earlier that said when he got in trouble he
12   would stop pulling people over, and he would just tow
13   abandoned, unoccupied vehicles.  So, he thought he could
14   stay out of trouble if he didn't have contact with
15   people.  Those were his words.
16        So, if he wasn't making as many traffic stops
17   because he was trying to avoid citizen complaints, then
18   that month there may be less.
19 Q.  Obviously, an officer can avoid citizen complaints and
20   also do his job; is that correct?
21 A.  Sure.
22 Q.  By conducting himself properly?
23 A.  Yes.  Yes.
24        Using some discretion and some compassion and some
25   common sense.

Page 99

1  Q.  But you see -- go ahead.
2  A.  You could definitely lower the number of complaints that
3    you receive.
4  Q.  But you can see here that Furman definitely got the
5    attention of the city council because they actually
6    hired somebody to do a written report on why impounds
7    were down and to point out that it's because Furman
8    wasn't doing as many tows.
9  A.  His -- are tows down for the year?  For the month?  For
10   the week?
11 Q.  Well, they're down for the time that he apparently was
12   having his petulant moment.
13 A.  Well, okay.
14 Q.  But you'll see here that what happened is that the
15   result of that was not to tell, by whoever commissioned
16   this, Furman to get back out there and do his job.  It
17   was to come down on the chief.
18 A.  If you're out there doing your job, and you're using
19   discretion and common sense and being polite to people,
20   the number of complaints you receive will be minimal.
21        If you don't know how to talk to people and you
22   treat people like crap and you don't use discretion, you
23   will get a lot of complaints.
24        There are many ways to handle any situation.
25 Q.  All right.  Let's go to the next page, which is Bates

Page 100

1    1277.
2        "Conclusion Number 2," your name comes up again.
3            "Conclusion Number 2:  A vocal campaign
4        of negative comments and actions was reported
5        by all officers."
6        So, again, this is apparently three officers we're
7    talking about here.  Four were requested to be
8    interviewed and three were interviewed, one of whom was
9    Furman.
10        It says:
11            "Even Mr. Goch had heard some of the
12        stories regarding the rejection of his food
13        and flower donations."
14        What do you make of that?
15        Did you know -- was this part of the --
16 A.  Well, Mike Goch knew, through his girlfriend, Katie
17   Pope, who worked for the tow company, that we did not
18   want to receive items from the company.  He knew that,
19   but they sent them anyways.  And I was told that if they
20   brought them after being told not to, to throw them in
21   the garbage, and I did.
22 Q.  Okay.  Then it says:
23            "The anger and verbal directions from
24        Chief Hayse and Lieutenant Welch are
25        communicated very effectively.  The message

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 101–104

Page 101

1     is, do not do anything to help Mike Goch in
2     Melvindale."
3         And this goes to you throwing out the baskets, I
4     guess.
5         But do you have a response to that?
6         Since you were never asked at the time, I'm going
7     to ask you today.
8         What is your response to the anger and verbal
9     directions?
10 A. **I am unaware of this.  And I -- like I had mentioned**
11     **before, I had had a couple conversations with him at the**
12     **beginning of the contract in regards to fees assessed to**
13     **drivers, and I was under the impression we hashed that**
14     **out.  I do not have a problem with Mike Goch.  I never**
15     **had a problem with Mike Goch.**
16 Q. And what's the downside to taking gifts?
17         I mean, why is the City -- why is any public person
18     not supposed to take gifts?
19 A. **Well, what is expected in return?**
20 Q. Yeah.
21         This author continues on the topic of the food in
22     that paragraph, saying:
23         "Such messages have a great impact on
24     officers when delivered by someone with the
25     power over your schedule, overtime, promotion

Page 102

1     and even your employment.  When you see your
2     boss throwing out Christmas --"
3     I'm sorry --
4     "-- Christmas flowers and trays of muffins
5     and cursing the sender, you get the message."
6     Were you trying to send a message?
7 A. **I know.  It's silly.**
8 Q. Okay.  Okay.  Let's flip over to page 1278.  Let's go
9     down to the bottom under "Lieutenant."
10     "A lieutenant calling the mayor a 'bitch,'
11     'whore,' 'cunt,' 'slut' in front of
12     subordinates -- would seem to conflict with
13     this section."
14     Talking about obedience and so on.
15     Again, nobody asked you about that; correct?
16 A. **No.**
17 Q. Okay.  And then if you'll go over to something that
18     looks like this, Lieutenant.  This is "Appendix A,
19     Towing Time Line," beginning with the Goch & Son
20     contract.
21         And apparently it shows that tows are down when
22     Furman is either away or there's a -- something else
23     going on with Furman.  I'm not sure.
24         Do you understand what this shows, like May, June
25     and July?

Page 103

1 A. **It's -- it is the monthly totals of tows, and he's**
2     **trying to show correlation between what's going on with**
3     **Officer Furman and the number of tows per month.**
4 Q. So, there's nothing in this report analyzing Furman's
5     alleged misconduct.  So, the report is geared toward why
6     tows are down.  And, obviously, the author finds that
7     tows are down because of Furman either not doing as many
8     tows or being disciplined.
9         Were you, as a lieutenant, ever given, by Coogan or
10     anybody else, the results of this to get your input or
11     to have a discussion with you about the results?
12 A. **No.**
13 Q. So, nobody came to you and said, "Look, Lieutenant,
14     we've got this report.  We want these tows.  Get off
15     Furman's back.  Let him be Furman," anything like that?
16 A. **No.**
17 Q. "We don't care if he's using excessive force.  We want
18     him to do the tows"?
19 A. **No one ever said anything to me about it.**
20 Q. But what did happen is that then Chad Hayse was brought
21     up on charges; correct?  Shortly after this?
22 A. **Yeah.  Yes.**
23 Q. Having read part of the policy review by Lawrence
24     Jackson and having gone through the hearing, what
25     conclusion do you reach as a long-time officer with the

Page 104

1     City of Melvindale about what Lawrence Coogan and the
2     city council were trying to do here?
3         MS. BALIAN:  Objection.  Calls for speculation.
4     Lack of foundation.
5 BY MS. GORDON:
6 Q. Go ahead.
7 A. **It would appear to me that the City was going after Chad**
8     **Hayse for disciplining Matt Furman.**
9 Q. Why?
10 A. **Because Matt Furman made the City a lot of money.**
11         (Discussion held off the record.)
12 BY MS. GORDON:
13 Q. Is there a social media policy that you are aware of at
14     the City with regard to what you could post or not post
15     anywhere?
16 A. **I think there may be something, but I don't remember the**
17     **guidelines of what is stated.**
18 Q. Okay.  I want to go back to this Lawrence Jackson report
19     to Recommendation Number 4, page 1278.
20         This is under honesty and integrity.
21         Okay.  This report says under Recommendation 4,
22     about the fourth paragraph down:
23         "First, the reports that the chief denied
24     any involvement in either problem.  Then he is
25     reported to have recanted and admitted

Page 105

1       responsibility in both cases."
2       I assume you don't know who is reporting this; is
3  that correct?
4  A.  **No. I'm unaware of any reports regarding either**
5     **situation.**
6  Q.  Were you aware of the chief ever taking bribes?
7  A.  **No.**
8  Q.  Okay. So, you were suspended shortly after you gave
9     testimony at the Chad Hayse hearing; is that correct?
10  A.  **Yes.**
11  Q.  Did you testify more than once or one time?
12  A.  **One time.**
13       (Discussion held off the record.)
14  BY MS. GORDON:
15  Q.  Do you remember roughly how long you testified for?
16  A.  **Might have been 15, 20 minutes long.**
17  Q.  Okay. So, you were questioned by Chad Hayse.
18     Do you remember?
19  A.  **He attempted to ask me questions.**
20  Q.  Okay. What do you mean by that?
21  A.  **Well, oftentimes when he would start asking me a**
22     **question, I was told not to answer.**
23  Q.  By?
24  A.  **Or talked over.**
25     **By corporate counsel.**

Page 106

1  Q.  Okay. Do you remember "Official" -- somebody referred
2     to here as "Official Guzall," G-u-z-a-l-l, being
3     present?
4  A.  **There was a guy sitting up there with the city council.**
5     **I had no idea who he was.**
6  Q.  Okay. So, you were subsequently accused -- at least
7     this is what I've been told in this room by people from
8     the City under oath -- of being a liar --
9  A.  **Yes.**
10  Q.  -- based on what you said at this meeting.
11  A.  **Yes.**
12  Q.  That came to your attention, too, I assume; correct?
13  A.  **Yes.**
14  Q.  Because you were disciplined; correct?
15  A.  **Correct.**
16  Q.  You were disciplined -- I'll put it in my words.
17     You were disciplined for coming in and saying
18     things that did not comport with the city council's view
19     of wanting to get rid of Chad Hayse?
20     In other words, they were --
21  A.  **I was -- I attempted to testify in support of Chad**
22     **Hayse, yes.**
23  Q.  Okay. Did you feel you were retaliated against for
24     offering such testimony after you did so?
25  A.  **Yes. And I believe that I was retaliated against**

Page 107

1     **because I was the one that wrote up Officer Furman,**
2     **which directly corresponds with the reason why they went**
3     **after Chad Hayse.**
4  Q.  Okay. So, I'm going to just go over with you your
5     questions and answers. I think Elizabeth went to get
6     another copy of this document, but here is the first
7     question from Chad Hayse:
8     "Question: Lieutenant Welch, have you ever
9     heard me tell yourself or any other officer under
10     your command not to tow cars?
11     "Answer: --"
12     MS. BALIAN: What page are you on, Deb?
13     MS. GORDON: Yep. This is page 144.
14  BY MS. GORDON:
15  Q.  (Reading.)
16     "Answer: No, I have not."
17     Okay. So, I'll stop right there.
18  A.  **That is accurate.**
19  Q.  Okay. Next:
20     "Question: Okay. And has anybody in your
21     command, be it a sergeant, corporal or officer
22     on your shift, ever come to you and said that I
23     advised them not to tow cars?
24     Answer: They have not."
25     Is that correct?

Page 108

1  A.  **That is correct.**
2  Q.  Page 145:
3     "Question: Lieutenant, have you ever heard
4     me make disparaging remarks regarding any public
5     official, appointed official, or Michael Goch
6     from Goch & Sons Towing?
7     "Answer: Not direct.
8     We've had personal conversations in regard
9     to the way the tow contract had been warranted
10     but no personal attacks in front of anybody
11     else. In personal conversation, yes."
12     Is that a correct statement?
13  A.  **That is correct.**
14  Q.  (Reading.)
15     "Question: Never heard me come up to the
16     front desk and make any sort of announcement or
17     disparaging remark about not towing vehicles
18     because Goch & Sons was our tow provider as of
19     June 2015?"
20     "Answer: Absolutely not. In fact, you
21     had offered an incentive to officers to tow
22     cars."
23     Is that correct?
24  A.  **That is correct.**
25  Q.  What was the incentive you were referring to?

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 109–112

Page 109

1   A.   I approached Chad Hayse with an idea. We have a traffic
2       detail. While an officer is working, the officers are
3       required to produce. We can't pay them to just be out
4       driving around. Their minimum level of activity is two
5       moving violations per hour.
6          I got -- I brought the idea to Chad that we would
7       let the officers consider towing a vehicle part of their
8       stat, which would encourage people to tow more cars.
9   Q.   Okay.
10          "Question: --"
11       Also on page 145 of the transcript, and I should
12       give the date. October 26, 2017.
13          "Question: Okay. Since I became chief --
14       interim chief in 2012 and named permanent chief
15       in June of 2012, would you say we've towed more
16       cars or fewer cars since that time per year?"
17       Your answer:
18          "Answer: We've probably went from around
19       200 cars to year -- a year to well over 1,000."
20       Is that a --
21   A.   Yes.
22   Q.   -- correct statement?
23       Okay. Page 146.
24          "Question: And the number of vehicles
25       towed, is there -- is there any result of the

Page 110

1       number of vehicles towed with the amount of
2       work that you do as a lieutenant at the desk?
3          "Answer: Working on the desk when someone
4       is towing eight or ten cars during the course
5       of my day increases my workload dramatically."
6       Is that a correct statement?
7   A.   Yes.
8   Q.   (Reading.)
9          "Question: Okay. And as a result of
10       more cars being towed, does that also mean
11       there are more cars at the car auction?
12          "Answer: Yes."
13       Is that a correct statement?
14   A.   Yes.
15   Q.   Okay.
16          "Question: Have you had any conversations
17       with Corporal Furman regarding the number --"
18       excuse me --
19          "-- regarding the manner in which he tows
20       vehicles?
21          "Answer: Numerous conversations with
22       Corporal Furman."
23       Is that a correct statement?
24   A.   Yes.
25   Q.   Question from Chief Hayse:

Page 111

1          "Question: And did he -- has he listened
2       to your suggestions, or did he continue in the
3       way he --"
4       Objection from Mr. Coogan:
5          "MR. COOGAN: Okay. This is not about
6       Corporal Furman. Ask you to move on, sir.
7       not relevant."
8          "OFFICER GUZALL: We're not here to discuss
9       Corporal Furman's issues. We're here to discuss
10       the issues of -- alleged against you, sir, so
11       you can keep to those issues within the
12       complaint so we can move on, that would be great.
13          "CHIEF HAYSE: All right."
14       Question from Chief Hayse:
15          "Question: Have you read a memorandum --"
16       strike that.
17       So, you never got to answer the question with
18       regard to the conversations you had had with Furman;
19       correct?
20   A.   I believe so. I --
21   Q.   You've lost the train here?
22       So, the question --
23   A.   Well, yeah. No, did --
24       MS. BALIAN: I'll just say the document speaks for
25       itself. We don't have to go over question, answer,

Page 112

1       question, answer, question, answer.
2   BY MS. GORDON:
3   Q.   Go ahead.
4   A.   Yeah. I would assume that the document is correct. I
5       don't remember the exact verbiage.
6   BY MS. GORDON:
7   Q.   Okay. So, next question is:
8          "Question: Have you read a memorandum put
9       out on April 26th? It's labeled as Plaintiff's
10       Exhibit 4. Have you seen that document?"
11          "Answer: Yes, I have. It was posted at
12       the desk.
13          "Question: Did you have an opportunity to
14       discuss the history of that document with me,
15       with myself?
16          "Answer: I believe I spoke with you before
17       I put -- you put it out.
18          "Question: What was the basic synopsis of
19       the discussion that we had? Not necessarily
20       what's in the document but what we discussed
21       back --
22          "Answer: Well, what we had discussed was
23       an effort to try to get to have this officer
24       change the way that he does things and use
25       better discretion."

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                      Pages 113—116

Page 113

1          Is that a correct answer on your part?
2   A.   Yes.
3   Q.   I'll hand you the deposition transcript, Lieutenant.
4        Okay.  So, now --
5   A.   Where are we here?
6   Q.   We're on page 147, where you say:
7            "Answer:  Well, what we had discussed was
8        an effort to try to get to have this officer
9        change the way he does things and use better
10       discretion."
11       Is that a correct statement by you?
12  A.   Yes.
13  Q.   Okay.  And was that document the one we referred to
14       earlier in this deposition, instructing Officer Furman
15       to contact the desk before he called for a tow?
16  A.   Yes, that is the document.
17  Q.   Okay.  Then we go down to 148, and Mr. Coogan is
18       questioning you.  And he says:
19           "Question:  I'll cut to the chase.  You're
20       familiar with the Constitution of the United
21       States?"
22       You say:
23           "Answer:  Absolutely."
24       And then he asks you:
25           "Question:  You understand -- can you

Page 114

1        enforce laws based upon age and gender?"
2        And you say:
3            "Answer:  Laws based on gender?"
4        And you say you would not do so.
5        Do you see that on there?
6        MS. BALIAN:  Where are you?
7        MS. GORDON:  On page 148.
8   A.   Number -- line 10?
9   BY MS. GORDON:
10  Q.   Line 18.
11  A.   18.
12       Okay.
13  Q.   Do you recall --
14       MS. BALIAN:  On page 148?
15       MS. GORDON:  Right.
16  A.   All right.  I'm not sure if we're looking at the same
17       thing here.
18       You said line 18 on page 148?
19  BY MS. GORDON:
20  Q.   Yeah.
21       You said you would not do so, that you would not
22       enforce a --
23  A.   -- law based on age and gender.
24  Q.   -- on age and gender.
25       And you said you would not do so?

Page 115

1   A.   No.
2   Q.   Okay.  And then you went on to try to explain.
3        If you'll read the next several lines?
4        Do you see that?
5   A.   Yes.
6   Q.   And you were told you can't answer that question?
7   A.   Yes, I recall -- I recall that part of the conversation.
8   Q.   All right.  Now, let's go to page 149, where you are now
9        asked on the bottom of 149, line 23.  This is by
10       Official Guzall.
11           "Question:  Okay.  And did -- in this
12       personal conversation that you say you had with
13       the chief in regards to Goch & Sons, did he say
14       any derogatory things about Goch & Sons?"
15       Your answer was:
16           "Answer:  No."
17       Is that a correct statement?
18  A.   What is -- define "derogatory."
19  Q.   Okay.  At the time you said this, you believed your
20       answer was correct?
21  A.   At the time, yes.
22  Q.   Okay.
23  A.   I don't -- you could say "he's wearing a silly hat
24       today" and you can consider that derogatory.  I don't
25       know what he meant.

Page 116

1   Q.   Okay.  On the next page, 150, the question is:
2            "Question:  Okay.  So, what other officers
3        have testified in regards to negative comments
4        as to Goch & Sons being made by the chief of
5        police, you're saying you have not heard those
6        comments; correct?"
7        Your answer:
8            "Answer:  I have not heard those comments,
9        no, sir."
10       Did you know what was being referred to there?
11  A.   What other officers have testified with regard to
12       negative comments -- I'm not exactly sure what he's
13       talking about.
14  Q.   Okay.  And you say:
15           "Answer:  I have not heard those comments,
16       no, sir."
17  A.   He's asking me if I'm aware of other officers testifying
18       in regards to negative comments.
19       I wasn't in the hearing so I don't know what anyone
20       else said.
21       So, no, I haven't heard those comments because I
22       was not present in the room.
23  Q.   Okay.  Then there's a question to you:
24           "Question:  So, Chief Hayse has not often
25       ordered officers to not make that, quote,

Page 117

```
1              unquote, 'fucking Goch' any more money'?  You
2         haven't heard that from --"
3              And you say:
4                   "Answer:  No, I have not."
5    A.   That is correct.
6    Q.   (Reading.)
7                   "Question:  You haven't heard that
8         comment from any other officers?
9                   "Answer:  From any other officers --
10                  "Question:  Yeah.
11                  "Answer:  -- or from Chad Hayse?
12                  "Question:  Have any other officers told
13        you that Chief Hayse made those statements?"
14             And you said:
15                  "Answer:  No, they have not."
16             Was that a true statement?
17   A.   Yes.
18   Q.   Okay.  Were you -- that's all I can see of your answers
19        from this day in -- at the hearing.
20             I guess there's one more from Councilman Louvet on
21        page 151 -- I'm sorry.  I missed this -- where he says:
22                  "Question:  Lieutenant Welch?"
23             You say:
24                  "Answer:  Yes, sir.
25                  "Question:  You testified that not only the
```

Page 118

```
1         chief never told anybody not to tow, but he gave
2         him incentives.  And councilman just asked the
3         question of the chief, and he said no.  So, could
4         you elaborate on the incentives --
5                   "Answer:  Towing the vehicles --"
6         You say:
7                   "Answer:  Yes, sir.  Towing the vehicles
8         while working traffic enforcement is you're
9         allowed to consider that part of your stats.
10                  "Question:  Okay.
11                  "Answer:  So, I guess you can't encourage
12        people to tow and discourage them at the same
13        time I guess is my point."
14             Is that a correct statement by you?
15   A.   Yes.
16   Q.   Okay.  So, are you aware that you have been accused of
17        lying under oath at that hearing?
18   A.   Yes.
19   Q.   What did you become aware of in that regard?
20   A.   Well, I was accused by the Safety Commission and
21        corporate counsel of lying in my testimony.
22             I really didn't know what they were talking about,
23        and I stand by what I testified to.
24   Q.   What did they tell you?
25   A.   Well, they --
```

Page 119

```
1    Q.   Strike that.
2             When did they tell you this?
3    A.   I didn't find out about it until the -- these
4         accusations until they served me with the paperwork for
5         a trial board.
6    Q.   This is obviously your first trial board?
7    A.   First time I had ever been in trouble.
8    Q.   You brought some documents with you today per my
9         subpoena; is that correct?
10   A.   Yes.  Some documents were requested, and I brought them
11        with me.
12   Q.   Do you have them with you?
13   A.   I have some -- the originals, yes.
14             MS. GORDON:  Yeah, okay.  I'm going to mark a copy
15        I have as Exhibit 1 and ask you if this is what you
16        brought.
17             (Deposition Exhibit 1 marked
18             for identification.)
19   BY MS. GORDON:
20   Q.   It's three pages.
21   A.   It would be four pages total.
22   Q.   Four pages.  Thank you.
23   A.   Yes.  Those are the documents --
24   Q.   The first page is dated January 11, 2018.  It's a
25        letter.
```

Page 120

```
1              MS. BALIAN:  Do you have a copy?
2              MS. GORDON:  Yeah, that's your copy.
3              MS. BALIAN:  Yeah.
4              MS. GORDON:  Okay.
5    BY MS. GORDON:
6    Q.   The second is a "Complaint for Suspension, Demotion
7         and/or Termination of Michael Welch," and the third is
8         apparently a statement.
9              Have you got your originals there?
10   A.   I'll pull them back out.
11   Q.   So, there has been testimony in this case, Lieutenant,
12        on multiple occasions that you retracted or recanted all
13        of your -- all of your testimony at that hearing, and
14        that you cannot be believed because you went under oath
15        and you lied.
16             That's been the testimony in this case from
17        multiple people, including Furman.
18   A.   Okay.
19   Q.   And Barnes.
20             And I believe Striz said that as well.
21             So, I'd like to find out from you of what happened
22        in that regard.
23             After the hearing, when you testified the way I
24        just read it into the record, in October, what was the
25        next thing that you heard about the hearing?
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 121

1         Did you hear that the chief -- I assume you heard,
2   obviously, that he was terminated?
3   A.  Chad had texted me the night that he was terminated and
4   he advised me that the City was coming after me next.
5   Q.  Okay.  And were you surprised he was terminated?
6   A.  No.  I -- regardless of what he said or did, I was
7   confident they were going to fire me.
8   Q.  And why did you think they were going to fire you
9   regardless of what he said or did?
10  A.  Just based upon my observations in the hearing that he
11  wasn't going to get a fair shake.
12  Q.  Okay.  Did anybody speak to you about your testimony
13  before you went in there?  Did you get with -- did
14  Coogan want to know from you what you were going to
15  testify to?
16  A.  I did not speak with Larry Coogan before the hearing.
17  Q.  So, you were then suspended -- I mean, the termination
18  proceeding was --
19        (Discussion held off the record.)
20  BY MS. GORDON:
21  Q.  Okay.  I -- you know, the date I read into the record, I
22  think, was the date the transcript was typed.  I think
23  the hearing was actually August 29, 2016.  So, I
24  misspoke earlier.  The transcript is dated October.
25        So, August 29th was the termination proceeding.

Page 122

1   That's when Chad Hayse was terminated.
2         And then shortly thereafter, you learned he was
3   gone and that you would be next.
4         What's the next thing that you heard?
5         Were you feeling uncomfortable around the station?
6   Did anybody tell you they thought you were a liar?
7         What happened?
8   A.  No one said anything directly, but I could feel there
9   was definitely a lot of tension because of his
10  termination in the station.  Things were pretty turned
11  up on end, I guess you could say.  I didn't know for
12  sure until Larry Coogan came into the station and served
13  me with papers.
14  Q.  Okay.  And when was that?
15  A.  Probably close to corresponding with the date on the
16  form.  It was early September.
17  Q.  Okay.  And what did Larry Coogan say to you?
18  A.  He passed it through the window and told me to call him
19  if I had any questions.
20  Q.  And is page 2 of Exhibit 1 that document that he gave
21  you?
22  A.  Yes.
23  Q.  Had there been -- before you were handed this Complaint
24  for Suspension, Demotion and/or Termination, am I
25  correct that there had never been an investigation done

Page 123

1   that you were aware of?
2   A.  The department rules and regulations state that the
3   chief of police shall conduct an investigation of any
4   complaints.  And therefore after conducting that
5   investigation, they are to submit their findings to the
6   Public Safety Commission.
7         That never happened.  In my hearing, it was asked
8   why that procedure was not followed.  Mr. Coogan's
9   statement was it was of his opinion that Interim Chief
10  John Allen did not count because he was an interim
11  chief, and they decided to conduct their own
12  investigation.
13        However, during that time of John Allen being
14  interim chief, he investigated and disciplined two other
15  officers.
16  Q.  Who were they?
17  A.  It would be Zach Blunden and Robert McCoy.
18  Q.  Okay.  And who -- so, when Larry Coogan said, "So, they
19  did the investigation," do you know who he was referring
20  to?
21  A.  I heard from other officers that Jason Ortiz had been
22  into the station, interviewing officers.
23  Q.  Do you know who he interviewed?
24  A.  I -- I believe John Ginther and maybe Rhman Hamayun,
25  people that weren't even on my shift.  They were

Page 124

1   afternoon-shift people.
2   Q.  You know, we covered a little bit earlier today with
3   regard to Mark Furman's discipline where Furman was
4   asked to respond in writing by Hayse --
5   A.  Yes.
6   Q.  -- to the allegations against him.
7         Do you recall what I'm talking about --
8   A.  Well, when --
9   Q.  -- that Furman was given a chance to respond to the
10  concerns that the chief had raised?
11  A.  Right.
12        Whenever -- whenever there's an issue, there's a
13  complaint or someone is being accused of something, they
14  are -- the officer is requested to respond in writing to
15  the allegations.
16  Q.  That never happened with you?
17  A.  No.
18  Q.  Okay.  All right.  So, let's go through the document.
19  Let's look at the Complaint.
20        So, here is what Mr. -- I don't know if Coogan
21  wrote this up, but Bolton signed it.  It says:
22        "The reason for discipline is including,
23  but not limited to, the following:
24        1.  Making unprofessional comments in the
25        presence of subordinates and others

Page 125

1              that:
2                A.   The owner of Goch & Sons Towing
3                     Company is a crook."
4           Okay.  So, you had already been questioned about
5     that at the hearing under oath; correct?  From whatever
6     I read into the record?
7  A.  Yes.
8  Q.  Okay.
9           MS. BALIAN:  Do you have a copy or not?  You said,
10    "just a minute."
11          MS. GORDON:  Oh.  I thought I handed one over
12    there.
13 A.  You gave one to me.
14          MS. BALIAN:  You did.  You marked one as an exhibit
15    and gave it to him.
16          MS. GORDON:  Okay.  Do you have your original
17    handy?
18          If you don't, I'll get a copy.
19 A.  The original of my paperwork?
20          MS. GORDON:  What you brought today.  Yeah.
21 A.  Yes, I have the original.
22          MS. GORDON:  Okay.  So, where is the copy then?
23          Right there, Melinda.  Right there.  You can look
24    at the exhibit, and the witness has his own copy.
25          MS. BALIAN:  I just want to mark it up because I'm

Page 126

1     going to question him on it, so I want to be able to
2     make notes on it.  So --
3           MS. GORDON:  Okay.  Then I'll trade with you.
4           MS. BALIAN:  Okay.  Thanks.
5           MS. GORDON:  Uh-huh.
6           (Discussion held off the record.)
7           MS. GORDON:  Okay.  Does that have my notes on it?
8     I don't think I took any notes on that.
9           Is that highlighted?
10          MS. BALIAN:  "What about fees --"
11          MS. GORDON:  Right here.  All right.  We'll get you
12    a copy.  I'll just sit for a second.
13          Did you need a water or anything?
14 A.  I could use a restroom.
15          MS. GORDON:  Yeah, let's take a restroom break
16    while we get a copy.
17          (Short recess at 12:50 p.m.)
18                    *    *    *
19          (Record resumed at 1:02 p.m.)
20 BY MS. GORDON:
21 Q.  Okay.  Let's go to the document, which is Exhibit 1.
22          So, here we are.  It's the reasons for your
23    discipline.  It's dated the 7th of September.  And the
24    first one is -- the first reason is you were apparently:
25               "1. Making unprofessional comments in the

Page 127

1     presence of subordinates and others that:
2                A.   The owner of Goch & Sons Towing
3                     Company is a crook."
4           So, I'll stop there.
5           Did you make that comment in the presence of
6     subordinates and others?
7  A.  The only statements I ever made about the tow company is
8     that I believe that we were not charging people the
9     money that we should or we were charging them too much.
10          I took issue with that.
11 Q.  Okay.
12 A.  Mike Goch, as a person, I didn't really know him, and
13    I -- at that point, I -- I had nothing to base
14    anything -- any type of statement like that on.  I had
15    no real issue with him.
16          I had issue with the amount of money that we were
17    charging people, and I had run into issues with the
18    ladies in the office and wanting to tack on fees and
19    stuff.  And I had a few conversations with his
20    employees, and, you know, refused to collect some money
21    that I didn't feel was proper.
22 Q.  Okay.  (B), did you ever say the mayor of -- did you
23    ever say in the presence of subordinates and others that
24    "The mayor of Melvindale is taking bribes"?
25 A.  No.

Page 128

1  Q.  C -- 1(C), did you ever say in the presence of
2     subordinates and others that the city council and the
3     city attorney are "on the take"?
4  A.  No.
5  Q.  (D), did you ever make "vulgar, sexist comments about
6     the mayor and others" in the presence of subordinates
7     and others?
8  A.  No.
9           The mayor has always actually been very nice to me.
10 Q.  Let's go to Number 2.
11          This is -- Number 2 says the following:
12               "2.  Lying to mayor and city council at a
13               public hearing on or about 8-29-2016."
14          Did anybody tell you what your lies allegedly were?
15 A.  No.  No one told me what they were.
16 Q.  And this is the testimony that we've just covered a
17    little while ago in this deposition.  We just went
18    through the transcript?
19 A.  Yes.
20 Q.  Okay.
21               "3.  Violation of Melvindale Police
22               Department rules and regulations,
23               Section 5-Lieutenant."
24          Do you know what that is referring to?
25 A.  I would assume that these sections listed are

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                     Pages 129–132

Page 129

1   referencing the allegations in 1 and 2.
2   Q.  What do you mean?
3   A.  That -- that this -- this section in the rules and
4       regulations has to do with professional conduct and
5       responsibilities, and they are tying this back to the
6       allegations in Number 1 and Number 2.
7   Q.  Okay.
8            "4.  Violation of operating policy of
9             the Melvindale Police Department:
10            On equal  protection of the law."
11           Did anybody tell you what that was referring to?
12  A.  No.
13  Q.  Did you ever violate anybody's equal protection of the
14      law that you were aware of?
15  A.  No.
16  Q.  Did you ever instruct anybody else to do so?
17  A.  No.
18  Q.  Okay.  The next one is on loyalty.
19           Did anybody ever tell you what your lack of loyalty
20      was?
21  A.  No.
22  Q.  Next, on "Management of the Department," were you ever
23      given any specifics of how you violated operating policy
24      of the Melvindale Police Department with regard to
25      management of the department?

Page 130

1   A.  No.
2   Q.  You've already testified you were never written up in
3       any way.
4            Is that correct?
5   A.  Correct.
6   Q.  And that would include for management of the department;
7       correct?
8   A.  Correct.
9   Q.  And you've worked for many other chiefs other than Chad
10      Hayse; is that correct?
11  A.  A sheriff with my prior job with Wayne County Sheriff's
12      Department, John Difatta and Rick Cadez.  So, yeah.
13  Q.  Okay.  And then the next says:
14           "4.  Violation of operating policy of the
15            Melvindale Police Department:
16            On the responsibilities of supervision."
17           Did anybody ever tell you what that was involving?
18  A.  No.
19  Q.  Were you ever told you were not acting properly as a
20      supervisor?
21  A.  No.
22  Q.  Did anybody ever complain about you as a supervisor
23      other than perhaps Mark(sic) Furman?
24  A.  Not to my knowledge, no.
25  Q.  Next says:

Page 131

1            "On the impounding of violators'
2             vehicles."
3            That you somehow -- this goes back to "4.
4       Violation of operating policy."
5            So, what would you have violated on operating
6       policy with regard to the impounding of violators'
7       vehicles?
8   A.  I have no idea.
9   Q.  You don't know what that's talking about?
10  A.  No.
11  Q.  Go down to the next paragraph.
12           Did you ever form the opinion or belief that you
13      had undermined morale and functionality of the
14      department?
15  A.  No.
16  Q.  Did anybody ever tell you that?
17  A.  No.
18  Q.  Did you get along well with the officers that reported
19      to you, generally speaking?
20  A.  I believe so, yes.
21  Q.  Okay.  Let's go to the last sentence, which is pretty
22      instructive, at least with regard to my point of view.
23           "Further, such comments may have caused
24            some of the officers to be leery of towing
25            vehicles for fear of reprimand by ranking

Page 132

1       officers."
2            Do you agree that goes directly to the fact that
3       the City wanted Matthew Furman to continue to tow as
4       many vehicles as possible, no matter what his conduct
5       was?
6   A.  Well --
7            MS. BALIAN:  Objection.  Calls for speculation.
8       Lack of foundation.
9   BY MS. GORDON:
10  Q.  Go ahead.
11  A.  It would imply that they were worried about the total
12      number department-wide.
13           I'd also like to comment that when we talked about
14      the incentive to write -- to tow vehicles, oftentimes
15      when Matt Furman was in on his days off, and he would
16      come in and work traffic, I would also let him leave
17      early.  So, oftentimes, he would come in and put in for
18      eight hours when he may have only worked six.
19           So, there was a whole lot of incentive for him.
20      And to say that I was trying to dissuade people from
21      towing cars is completely false.
22  Q.  You just wanted it to be done in a manner --
23  A.  Instead -- I just -- I wanted him to do his job, but I
24      wanted him to do it right.
25  Q.  Okay.  Now, this statement says that your comments may

Page 133

1    have caused some of the officers to be leery of towing
2    for fear of reprimand.
3         Did anybody ever tell you that they were leery of
4    towing vehicles, leaving aside Furman?
5    A.  No.
6    Q.  Did any other officer ever really even talk about the
7    towing of vehicles?
8         I mean, was this a topic of conversation with
9    anybody?
10   A.  Towing of vehicles was only an issue for Officer Furman,
11   not any other officer in the department.
12   Q.  Okay.  Let's go to the next page.
13        Tell us what the -- it's a page and a half.  It's
14   typed up.
15        What is this, Lieutenant?
16   A.  When -- on the date of -- after consulting with the
17   union attorney, my union rep, I come to the conclusion
18   that, after seeing what happened to Chad Hayse, that
19   irregardless of what I did or allegedly did, that they
20   were going to fire me and let me fight for my job back.
21   I was very confident of that.
22        I decided that we would try and get them to suspend
23   me so I could save my job and my pension.  I was about
24   less than two years from retirement.
25        If I were to not leave on time, if I were to be

Page 134

1    terminated, I would have to wait another nine and a half
2    years to draw my pension, 59 and a half versus 50.
3    Q.  And you thought they were serious about termination?
4    A.  Oh, absolutely.  Yeah.  I was convinced they were going to
5    fire me.
6         So, we went into the hearing, and we offered to
7    make a deal.  I prepared a statement, that we have here,
8    in response to the allegations against me.  I read this
9    to the city council and the city attorney.  They asked
10   me some more follow-up questions that kind of correspond
11   with this document here that they talked to anonymous
12   people.
13   Q.  And by "this document here," you're referring to the
14   Jackson report?
15   A.  Yes.
16   Q.  Lawrence Jackson?
17   A.  Yes.  There are quite a few things listed in that
18   document that they referenced in my disciplinary
19   hearing, and I did address those with the safety
20   commissioners.
21   Q.  Okay.  You said those were not true?
22   A.  That what --
23   Q.  The things you were accused of?
24   A.  The -- no, they're not true.
25        So, I addressed these allegations against me, and

Page 135

1    they agreed.  I gave them the offer of 30 days'
2    suspension, and I would not grieve the suspension.  They
3    went back and forth a couple times.  Two of them were
4    openly calling for my dismissal, two of the five.  Come
5    to find out later, there were actually three, and my
6    assumptions were correct.
7    Q.  Who were they?
8    A.  Well, the two that I know of that said it in front of me
9    that they wanted me terminated was Martha McDaniels and
10   Jason Ortiz.
11        I don't know who the third person was.  But Patty
12   Hall, who also sits on the Safety Commission, told me
13   after the hearing while we were going in and out of
14   chambers that there was a third person that was opting
15   for me to be terminated.  So, my assumptions were
16   correct.
17   Q.  Did you have an idea on why these three people wanted
18   you terminated?
19        Was it that they believed this write-up, or was it
20   for some other reason?
21   A.  I don't know.
22        I know Martha McDaniels is a very close friend of
23   Pat Easton, so probably whatever Pat Easton said, she'd
24   probably buy.
25        And I know that oftentimes the city council and the

Page 136

1    safety commissioners go back on -- make their decisions
2    upon what the city attorney says.
3    Q.  And Coogan was in favor of you being terminated as far
4    as you were aware?
5    A.  Yes.
6    Q.  Okay.  Now, with regard to your statement, here you had
7    been accused of lying under oath at a hearing; right?
8    A.  Correct.
9    Q.  Okay.  You did not have a transcript, as I believe you
10   have said.
11   A.  I wasn't allowed to see the transcript.
12   Q.  Was there a transcript?
13   A.  Well, there was a recording of Chad Hayse's hearing.
14   Q.  Okay.  So, when you're now writing your comments, you
15   are relying on what you are being told by the mayor
16   about what you said at the hearing.  Do I have that
17   right?
18   A.  Correct.  I had spoke with the mayor the day before my
19   hearing, and she -- Dan Jones and Don Meador were
20   present.  They're the other union guys.
21   Q.  Okay.
22   A.  She said in that meeting that she believed that this was
23   stupid and this needed to end, and she wanted to resolve
24   the matter.
25        She had stepped out for a little while and said she

Page 137

1    was going to call Larry Coogan, and she wanted me to
2    have the ability to go over the recording, and if there
3    were any discrepancies for me to correct them.
4        The next day rolls around, and I believe -- I don't
5    know who contacted -- I think it was Don Meador got a
6    call that they changed their mind and me having the
7    ability to review the hearing is off and the
8    disciplinary hearing was on for that day.
9    Q.  So, you are -- let me understand this.
10       You were accused of lying to the mayor and city
11   council at a public hearing on 8-29-16, and you were
12   never given the opportunity to listen to what were the
13   alleged lies?
14   A.  That is correct.
15   Q.  So, when you wrote this statement, you had not had a
16   chance to actually look to see or listen to hear whether
17   you had ever said anything incorrect?
18   A.  When I made this statement, I wasn't really sure --
19   completely sure what they were talking about.
20       When I went into that hearing, there were parts
21   that I was nervous, and I don't remember everything.
22   Q.  Sure.
23   A.  Reading this transcript over again refreshed my memory
24   about a few things.  But bits and pieces of it, when I
25   realized that the City was coming after me also, I

Page 138

1    became very nervous.
2    Q.  Okay.
3    A.  And while people were talking to me and asking me
4    questions, I'm thinking in my mind whether I should be
5    answering them or wait until I have a union rep or a
6    union attorney present.
7    Q.  Okay.
8    A.  So, my mind was running in a hundred different
9    directions all at once.
10   Q.  You mean, when you were being asked questions at the
11   public hearing?
12   A.  Yes.
13   Q.  Yeah.
14       All right.  Let's look at what they say you said
15   and let's look at per your statement.
16       In the third paragraph, you say:
17       "I learned later in a discussion with the
18       mayor last night that I was asked if Chief Hayse
19       had ever said anything negative about Mike Goch
20       and the mayor."
21       I'll stop right there.
22       So, you were meeting with the mayor.  You're trying
23   to figure out what it is you supposedly lied about, and
24   she says something like, "Well, you were asked if Chief
25   Hayse ever said anything negative about Goch and the

Page 139

1    mayor."
2    A.  Yes.
3    Q.  Okay.  So, let's go to your transcript and see what you
4    were asked.
5        Do you have page 145 there?
6    A.  Yes.
7    Q.  Okay.  On page 145, you're asked:
8        "Question:  Lieutenant, have you ever heard
9        me make disparaging remarks regarding any public
10       official, appointed official or Mike Goch from
11       Goch & Sons Towing?"
12       You said:
13       "Answer:  No direct.  We've had personal
14       conversations in regards to the way the tow
15       contract has been warranted, but no personal
16       attacks in front of anybody else."
17       Do you see that?
18   A.  Uh-huh.  Yes.
19   Q.  Okay.  And you said -- told me earlier that was true;
20   correct?
21   A.  Correct.
22   Q.  Okay.  So, let's go back to what you said in Exhibit 1.
23       You said:
24       "The answer to that question is yes.
25       Hayse would vent to me at times.  I knew he

Page 140

1    did not have a good relationship with the
2    mayor and did not like Mike Goch.  He spoke to
3    me in his office and sometimes at the front desk
4    while I was working.  I do not recall the exact
5    words he said about them, but I knew he did not
6    like them."
7    Okay?
8    A.  Yes.
9    Q.  So, let's stop right there.
10       Do you agree that what you said under oath at the
11   hearing is, in fact, accurate in that you explained that
12   you have had personal conversations with the chief but
13   no personal attacks in front of anybody?
14   A.  That matches up pretty good, I believe.
15   Q.  Okay.  And then the next statement in your Exhibit 1 is:
16       "I admit I have said negative things about
17       Mike Goch.  I do not remember the words stated.
18       I believe that any comments that I made were in
19       regard to fees charged and not about Mike Goch's
20       character.  I also think they may have been
21       largely influenced by the comments of Chad Hayse
22       and not from personal knowledge.  I believe I
23       have a decent professional relationship with
24       him."
25       So, let's go back to what you're admitting you

Page 141

1   said.  You say -- you admit you said negative things
2   about Goch.
3        Let me find it.
4        Okay.  I don't even know that you were asked
5   whether you had made personal statements, but if you
6   did, you've already said what you said on the record was
7   accurate; correct?
8   A.  In regard to questioning for the -- from the transcript?
9   Q.  Yeah.
10  A.  Yes.
11  Q.  Okay.  Next paragraph:
12       "In regard to Mayor Striz and the allegation
13  of her taking bribes --"
14       Do you know what that's referring to?
15  A.  Yes.  There was a situation where Ellis Slaughter, who
16  is our motor carrier officer, brought it to my --
17       THE REPORTER:  I'm sorry?
18  A.  Ellis Slaughter, S-l-a-u-g-h-t-e-r.
19       He's our motor carrier officer.
20  BY MS. GORDON:
21  Q.  Okay.
22  A.  He brought to my attention at the front desk that he
23  attended a Red Wings game.  At the game were a bunch a
24  guys from the City's DPW.  He found out at that game
25  that these block of hockey tickets were a gift from Mike

Page 142

1   Goch to the mayor.  I was kind of concerned about that.
2   This was going through a contract bidding process at the
3   time, and didn't think it was really appropriate.
4        I had spoke to Corrine Galusky who, at the time,
5   was the other corporate counsel attorney.  She told me
6   she was concerned about it, and she asked me if I would
7   speak to the mayor about it, and I agreed.
8        And on December 24th of that year, she had come in
9   in the morning.  We sat in the chief's conference room,
10  and I talked to her about the situation.  I expressed my
11  concern because I was concerned for the -- I was
12  considering the welfare of the City.  It was nothing
13  against her personally but I thought that I should let
14  her know that people were talking about it.
15       In that meeting, we talked about several different
16  things, and she also told me at that time that Pat
17  Easton was politicking for the chief's job.  She told me
18  that she had been approaching politician -- he had been
19  approaching politicians about being the chief, and she
20  stated that he had also made copies of the city charter
21  with the specifications, the requirements for chief, and
22  placed it in his -- in her mailbox.
23  Q.  Okay.  And that goes with -- the Complaint for
24  Suspension and Demotion and Termination against you,
25  that goes to Number 1, saying the mayor of Melvindale is

Page 143

1   taking bribes?  That was your explaining the background
2   to that?
3   A.  Yes.  Yes.
4        I never accused her.  In fact, apparently from what
5   I hear, she thought I was mean, but I don't think I
6   could have been nicer to her.
7   Q.  Okay.  And the next one, you're apparently explaining,
8   again, from Number 1, that the city council and the city
9   attorney are on the take, and you say:
10       "In regard to the allegation that the city
11  council and city attorney are on the take, I do
12  not come into contact with members of the city
13  council on a regular basis."
14  A.  I -- some of them I don't even -- wouldn't even know
15  them if I saw them today.
16  Q.  Okay.  And so you denied saying anything negative about
17  the city council?
18  A.  No.  I had -- I have nothing to say bad about them.  I
19  don't know them.  I don't attend council meetings.
20  Q.  Okay.  And then you talk about towing because you were
21  also accused of that.  That's on the last page.
22       You say, "I've never tried to prevent anyone from
23  towing," which is same thing you said at the
24  hearing.
25  A.  Correct.

Page 144

1   Q.  You say:
2        "I have, however, had issues with Corporal
3   Furman with putting elderly people and mothers
4   with young children out on the street."
5   I'll stop right there.
6        From my review of the transcript, you were cut off
7   from talking about the issues you had had with Corporal
8   Furman at that hearing; correct?
9   A.  I --
10  Q.  I guess the document will speak for itself.
11  A.  Yeah.
12  Q.  Okay.
13  A.  I'm assuming so.  I don't remember.
14  Q.  Okay.  So, here you're explaining that; correct?
15  A.  Yes.
16  Q.  And you say you're looking out for the best interests of
17  the department, the City, and the citizens?
18  A.  Yes.
19  Q.  Okay.  So, this is your response.
20       Now, let me ask you this:  You cut the deal on the
21  30-day suspension?
22  A.  Correct.
23  Q.  Do you -- at the end of all this, did you have any idea
24  that you actually ever did anything wrong that you
25  should have gotten a 30-day suspension for?

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 145–148

Page 145

1    A.    No.  I knew that it didn't matter.  It -- it didn't
2          matter whether I had done anything wrong or not; that
3          they were going to fire me and they were going to make
4          me fight for my job back.
5                So, it was a decision that I made to throw myself
6          on the sword there and just take it to not mess up my
7          pension and not be able to keep a roof over my kids'
8          heads.
9    Q.    And they were going to -- and they were -- you were sure
10         they were going to terminate you because of what you
11         said at the hearing and because of your disciplining
12         Furman or counseling, whatever you did?
13   A.    Well, I had a pretty good idea, based upon the way that
14         Chad Hayse was treated.  I -- I was confident that they
15         were going to do the exact same thing to me as they did
16         to Chad.  I was convinced of it.
17   Q.    Which is what, in your opinion?
18   A.    Terminate him.
19   Q.    But -- okay.  So, it's not necessarily wrong to
20         terminate somebody if there's good cause.
21               So, when you say there were going to do the same
22         thing --
23   A.    Right.  I believe that they were going to terminate me.
24               These people -- they don't -- if they terminate
25         somebody, it's nothing -- no skin off their back.  They

Page 146

1          go home and go to bed.
2                These are appointed positions.  If they make the
3          wrong decision, there's no recourse.  So, therefore, I'm
4          out of a job.  I can't feed my kids.  I've got to wait
5          nine and a half years to get my pension.
6    Q.    Okay.  All right.  So, you explained all of this.  I can
7          see that from your statements, you covered pretty much
8          all of their things and you offered up an explanation,
9          but you're saying that you agreed to take the 30 days just to
10         ensure your future?
11   A.    That would be accurate, yes.
12   Q.    Okay.  Now, I have been told multiple times in this case
13         that you're a liar; that you recanted; that you admitted
14         you were a liar.
15   A.    Where?
16   Q.    At the Public Safety Commission; that you admitted that.
17               Is any of that true?
18   A.    No.  I read this statement that I prepared, and I was
19         asked several random questions regarding this document.
20   Q.    That's the Lawrence Jackson report?
21   A.    The Lawrence Jackson document, and that was it.  I was
22         told when to come back to work, and I walked out the
23         door.
24   Q.    Did you ever say, "I'm recanting anything I said under
25         oath"?

Page 147

1    A.    No.
2    Q.    Did you ever say, "I lied under oath"?
3    A.    No.
4    Q.    Did you ever say, "I said stuff that's not true" or
5          "that's false"?
6    A.    No.  I read this document.
7    Q.    Okay.
8    A.    I read this document.  They asked a couple unrelated
9          questions about taking overtime and about towing cars,
10         and we talked about Matt Furman for about 15 minutes.
11   Q.    Do you know why it is people like the president of the
12         council and the mayor are walking around saying that
13         you're a liar and you recanted everything you said at
14         the public hearing and are saying that under oath?
15   A.    I did -- I did not do that.
16   Q.    Do you know why they're walking around saying that?
17   A.    I have no idea.
18               Why did they say that I accused the mayor of
19         being -- taking bribes?
20               That never happened.  It's a good story, but it
21         never happened.
22               The truth of the matter is what we just talked
23         about, and I spoke to her in regards to that situation,
24         for the best interests of the City.
25   Q.    So, it sounds like you're saying here you believe that

Page 148

1    the City had a predetermined decision to terminate
2    Furman(sic); is that correct?
3    A.    That the City had what now?
4    Q.    A -- predisposed.
5          They were predisposed before this hearing ever
6          occurred to get rid of Hayse?
7          I said "Furman."
8          MS. BALIAN:  Objection.  Calls for --
9    BY MS. GORDON:
10   Q.    Their minds were made up to get rid of the chief?
11         MS. BALIAN:  Calls for speculation.  Objection.
12   A.    Well, conversation that I had with Chad, he was
13         confident they were going to fire him.  That's -- those
14         were his words.
15   BY MS. GORDON:
16   Q.    And then you thought after you testified, they were
17         going to fire you no matter what the truth was?
18   A.    Yes.  I don't think it mattered.
19   Q.    There's a form that's been talked about in this case
20         that police officers are supposed to get before they're
21         disciplined, a form that is supposed to be filled out
22         within the police department.
23         Did you ever receive such a form setting forth
24         reasons from the police department?
25   A.    No.  I never received anything after I walked out of the

Page 149

1    meeting.  No paperwork indicating what my punishment
2    was, what the -- nothing.
3        MS. GORDON:  Okay.  That's all I have for you.
4        MS. BALIAN:  Can I just have like 10 or 15 minutes,
5    please, and then I'll do my questioning.
6        MS. GORDON:  Okay.
7            (Short recess at 1:30 p.m.)
8                *   *   *
9            (Record resumed at 1:56 p.m.)
10        (Ms. Gordon is not present after the break.)
11                *   *   *
12                EXAMINATION
13   BY MS. BALIAN:
14   Q.  I have a copy of the transcript as well, but I don't
15   think my pages are lining up with the copy of the
16   transcript that Deb provided you.  So, I'll just read
17   some of the testimony and you can say whether you recall
18   testifying to that or not.
19       Do you recall being asked by Chief Hayse at his
20   removal hearing whether -- the question was:
21            "Question:  You never heard me come up to
22        the front desk and make any sort of announcement,
23        disparaging remark about not towing vehicles
24        because Goch & Sons was our tow provider as of
25        June --"

Page 150

1        Your response:
2            "Answer:  Absolutely not."
3        Do you remember that?
4    A.  The question is whether I heard Chad Hayse make a
5    statement at the front desk stating not to tow cars.
6        MS. MARZOTTO TAYLOR: It's on page 145 if that
7    helps.
8        MS. BALIAN:  Is it?
9    A.  Okay.
10       MS. MARZOTTO TAYLOR:  It's 145.  I think the
11   question starts at line 14, that you're asking about.
12   A.  Okay.  The question --
13   BY MS. BALIAN:
14   Q.  (Reading.)
15            "Question:  Never heard me come up to the
16        front desk and make any sort of announcement,
17        disparaging remark about not towing vehicles
18        because Goch & Sons was our tow provider as
19        of June of --"
20   A.  Okay.
21   Q.  And then --
22   A.  "2015."  Okay.
23   Q.  You see that?
24   A.  Yes.
25   Q.  And your response:

Page 151

1            "Answer:  Absolutely not."
2    A.  That I never heard him make a statement of that sort?
3    Q.  Correct.
4    A.  Yes.
5    Q.  Okay.  And then on --
6        MS. BALIAN:  You said that was on what page,
7    Elizabeth?
8        MS. MARZOTTO TAYLOR:  That's 145 of our copy.  So,
9    145, line 14.
10   BY MS. BALIAN:
11   Q.  Okay.  So, if you want to turn to page probably 149.
12           By -- questioning by Mr. Guzall, it says:
13            "Question:  Okay.  In this personal
14        conversation that you say you had with the
15        chief in regards to Goch & Sons, did he say any
16        derogatory things about Goch & Sons?"
17   A.  I'm --
18       MS. MARZOTTO TAYLOR:  149, on to 150.
19   BY MS. BALIAN:
20   Q.  Right here.
21   A.  Yes.  I'm -- I got it.
22           In which conversation?  I --
23   Q.  Because you testified earlier you had personal
24   conversations with the chief.
25   A.  Yes, I did.  I did have personal conversations with the

Page 152

1    chief.
2    Q.  And what's your response?
3    A.  It says that I said "No."
4    Q.  Okay.
5    A.  Okay.
6    Q.  And then the following question is:
7            "Question:  So, what other officers have
8        testified to in regards to negative comments
9        about Goch & Sons being made by the chief of
10       police, you are saying you have not heard
11       those comments; correct?"
12           And your response:
13            "Answer:  I have not heard those comments."
14       Correct?
15   A.  The question was other officers testified in regards --
16   is -- in regards from other officers?
17   Q.  The question is:
18            "Question:  So, what other officers have
19       testified to in regards to negative comments
20       about Goch & Sons being made by the chief of
21       police, you are saying you have not heard
22       those comments; correct?"
23   A.  I would --
24   Q.  And your response was:
25            "Answer:  I have not heard those comments."

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 153–156

Page 153

1      Correct?
2    A.   I would interpret that question and answer as he was
3         asking me about comments from other officers, that other
4         officers have testified.
5              I don't know what the other officers testified to.
6    Q.   Well, your response was you didn't hear those comments?
7    A.   Because I wasn't there to hear their testifying.
8    Q.   So, if we go to the response that you submitted to --
9         well, it's Exhibit 1 here today, the response to your
10        Complaint for Suspension, Demotion and/or Termination of
11        Michael Welch.  In the third paragraph down, it says:
12             "I learned later in discussion with the
13             mayor last night that I was asked if Chief
14             Hayse had ever said anything negative about
15             Mike Goch and the mayor.  The answer to that
16             question is yes."
17             That differs from your testimony from the removal
18        hearing, correct, in which you responded, no, that you
19        had never heard Chief Hayse say anything derogatory
20        about Goch & Sons?
21   A.   Which question is that?
22   Q.   It was at the bottom of 149.
23             "Question:  Okay.  And did -- in this
24             personal conversation that you say you had with
25             the chief in regards to Goch & Sons, did he say

Page 154

1              any derogatory things about Goch & Sons?"
2              Your answer:
3              "Answer:  No."
4    A.   Okay.
5    Q.   So, you changed your testimony; correct?  You changed
6         your response to that?
7    A.   My response and my statement is different than what's on
8         the transcript, yes.
9    Q.   Okay.  So, he did make derogatory statements about Goch
10        & Sons?
11   A.   In private, yes.
12   Q.   Well, apparently according to your statement here, he
13        also made them at the front desk?
14   A.   No one else was around at that time.
15   Q.   Okay.  Do you know for certain that nobody overheard
16        what those statements were at the front desk?
17             Did you question each one of the officers?
18   A.   How would I know to question them?
19   Q.   I'm sorry?
20   A.   How would I know to question them?  About what?
21   Q.   I'm asking you if you did.
22   A.   Did I question every officer in the department whether
23        they heard Chad Hayse say something?
24   Q.   Yes.
25   A.   No.

Page 155

1    Q.   Okay.  So, what were the derogatory statements that the
2         chief said about Goch & Sons?
3    A.   He said he didn't like the way that he was -- that he
4         was handling the business.  He thought he was being --
5         he was overcharging citizens.
6    Q.   Did he say that Mike Goch was a crook?
7    A.   I don't recall him saying that.
8    Q.   So, he could have?
9    A.   He could have said anything.
10   Q.   Could he have said that?
11   A.   Can he say those words?
12             It's possible he could say those words.
13             I don't recall him ever saying that, no.
14   Q.   Okay.  What do you recall him saying other than he
15        didn't like how he was charging the citizens?
16             And it's not just Melvindale citizens.
17   A.   The conversations -- no, I was talking about the public
18        in general.
19   Q.   Okay.
20   A.   The conversations we had about Mike Goch were the
21        charging people for services they didn't receive, about
22        having to go back and forth with the city council about
23        this tow dolly service that they had.
24             He did not get along with Mike Goch, and he said he
25        didn't like him.

Page 156

1              So, it's wide open of what "negative" means.
2    Q.   Well, if we go back prior to Goch receiving the
3         contract, why didn't he want Goch to receive the
4         contract?
5              You didn't -- none of this had happened with --
6    A.   I don't --
7    Q.   Just let me get my question out.
8    A.   I'm sorry.
9    Q.   None of this had happened with the dolly yet.
10   A.   Okay.
11   Q.   So, why didn't he want Goch to receive the contract to
12        begin with?
13   A.   I don't know why he didn't want to.  That's -- you would
14        have to pose the question to Chad Hayse.
15   Q.   But you agree he was against Goch receiving the
16        contract?
17   A.   Based upon his investigation, based upon the incidents
18        that have happened with the tow company in relation to
19        the department, it wasn't his first choice.
20   Q.   The incidents?
21   A.   We've arrested their drivers before, and we've had to
22        tow their tow trucks before for violating the law.
23   Q.   Has anybody at Gene's Towing ever been arrested?
24   A.   By us?
25   Q.   I'm not asking by you.

Page 157

1  A.  I don't know about by anyone but our personal
2      experience.
3  Q.  Okay. So, somebody at Gene's also could have been
4      arrested.
5          Does it matter if they were arrested by another
6      municipality?
7  A.  It may. But we're going upon our personal experience
8      with the company. And at that time, it was not
9      favorable.
10 Q.  The background check that you say the chief completed,
11     do you have personal knowledge about whether any of the
12     city council members actually received this written
13     background check?
14         Because they've all testified they never received
15     it.
16 A.  Chad Hayse said he brought it into the city council
17     chambers. I was not present.
18 Q.  Okay. So, based upon what Chad told you?
19 A.  Correct.
20 Q.  In terms of why -- the reasoning behind the suspension,
21     do you agree that it was specifically regarding the
22     false testimony that you provided at the removal hearing
23     regarding statements that you admitted that you heard
24     former Chief Hayse make?
25 A.  Can you rephrase that, please, for me?

Page 158

1          MS. BALIAN:  Can you read the statement back,
2      please?
3          THE REPORTER:  Yes.
4          MS. BALIAN:  Question back, rather.
5          (Record repeated by the reporter.)
6  A.  Now there's one question in -- in the whole deposition
7      where I said "no" when I should have said "yes."
8          I don't know if that -- it wasn't intentional.
9          My intention was never to lie to anybody about
10     anything.
11 BY MS. BALIAN:
12 Q.  But that was incorrect testimony; correct?
13 A.  I said "no" instead of "yes" on that question, in my
14     questioning. Yes, I did.
15 Q.  So, it was incorrect testimony?
16 A.  That would be incorrect, yes.
17 Q.  Okay. Now why don't you answer the question that I
18     posed to you?
19 A.  Okay. Can you repeat it to me again?
20         (Record repeated by the reporter.)
21 A.  Well, they can -- that was an allegation that was made
22     against me. And did I say "no" instead of "yes"? I did
23     say "no" instead of "yes." I didn't even know until
24     now. I've never seen the transcript. I don't know.
25 BY MS. BALIAN:

Page 159

1  Q.  Did you FOIA the transcript of the removal hearing?
2  A.  No.
3  Q.  Why?
4  A.  I don't know.
5  Q.  I mean, you made a big issue of it here today.
6          Why didn't you just FOIA it?
7  A.  Because I did not.
8          MS. BALIAN:  Can I have this marked, please?
9          (Deposition Exhibit 2 marked
10         for identification.)
11 BY MS. BALIAN:
12 Q.  I'm showing you this September -- dated September 21st,
13     2016, which are the minutes of the September 13th, 2016
14     Public Safety Commission.
15         Was that the date of your trial board; if you
16     recall?
17 A.  It was in September sometime.
18 Q.  Okay. The top of the second page indicates:
19         "Moved by Bolton and supported by Hall
20     to suspend Lieutenant Michael Welch for 30 days
21     without pay. In addition, the Melvindale Police
22     Supervisor's Association has agreed not to file
23     any and all grievances regarding Lieutenant
24     Welch's suspension and discipline.
25         Lieutenant Welch will render truthful

Page 160

1      testimony if called upon to do so regarding
2      former police chief Chad Hayse and statements he
3      admitted he heard the former chief make.
4          Upon notice of Lieutenant Welch's retirement,
5      the disciplinary action regarding this issue will
6      be removed from his personnel file."
7      Is that the agreement --
8  A.  Yes.
9  Q.  -- you made?
10         Going on in your complaint, you indicate that Ellis
11     Slaughter informed you in December of 2014 that the
12     mayor had accepted hockey tickets from Mike Goch.
13         Did Ellis Slaughter tell you how he became aware of
14     this?
15 A.  He attended the game and found out that -- where they
16     came from.
17         He was told by the people at the game.
18 Q.  The mayor wasn't there; correct?
19 A.  No.
20 Q.  Who was there?
21 A.  Ellis Slaughter and members of the city DPW.
22         (Discussion held off the record.)
23 BY MS. BALIAN:
24 Q.  And you chose to contact the mayor on Christmas Eve?
25 A.  No.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 161

1    I spoke to Corrine Galusky, and Corinne Galusky
2    asked me if I would speak to the mayor, and Corrine
3    Galusky contacted the mayor, and she came in the next
4    day.
5  Q.  Why didn't you turn this over to the detective bureau or
6    the Michigan State police?
7  A.  Should I have?
8  Q.  Well, you're not a detective; right?
9  A.  I would not investigate something in my department like
10    that anyways.
11  Q.  That's why I'm asking you.
12  A.  Okay.  I brought it --
13  Q.  You know the policies and procedures; right?
14  A.  I brought it -- I brought it to her attention that I had
15    heard about it, and I was looking out for the best
16    interests of the City.
17  Q.  Okay.
18  A.  Okay.
19  Q.  And you believed it was appropriate for you to
20    investigate it?
21  A.  No, I didn't investigate it.
22  Q.  How were you not investigating it when you had the mayor
23    come into the station and asked her questions?
24    That's not investigating it?
25  A.  What questions --

Page 162

1  Q.  What do you call that?
2  A.  What questions did I ask her?
3  Q.  Did you ask -- did you have the mayor come into the
4    station?  Isn't that what it says in your statement
5    here?
6  A.  I did not request the mayor to come into the station.
7    Corrine Galusky contacted the mayor and spoke with
8    her about it, and she came in unannounced.  I didn't
9    even know she was coming.  She showed up at the front
10    desk.
11  Q.  Do you recall telling the mayor that she was going to be
12    sent to prison for corruption?
13  A.  I never said that.
14  Q.  Did you record this?
15  A.  No.
16  Q.  Was she in an interrogation room?
17  A.  No.
18  Q.  Where was she?
19  A.  We were sitting in the chief's conference room.
20  Q.  Did the chief have knowledge of this meeting?
21  A.  Yes.
22  Q.  How so?
23  A.  I told him.
24  Q.  Did you accuse the mayor of receiving a Rolex?
25  A.  No.

Page 163

1  Q.  Did you create a report of this meeting?
2  A.  No.
3  Q.  Why?
4  A.  I didn't think I needed to.
5  Q.  Why?
6  A.  Why would I?
7  Q.  Well, you believed there was wrongdoing.  You're a
8    police officer.
9  A.  I didn't -- I didn't know for sure.  I had heard someone
10    say something, and so I wanted to bring it to her
11    attention.  And I left it at that.
12  Q.  So, you didn't put anything in writing after this?
13  A.  No.
14  Q.  Did you contact Corrine Galusky?
15    MS. MARZOTTO TAYLOR:  When?
16  BY MS. BALIAN:
17  Q.  After the meeting?
18  A.  She worked right down the hall.
19  Q.  Okay.
20  A.  And she spoke with me about it, yes.
21  Q.  Okay.  And what did you tell her?
22  A.  What did I tell her?
23  Q.  Yeah.
24  A.  She -- well, she told me -- she came back and said,
25    "Yeah, the mayor said that you guys met."

Page 164

1    And I said, "Okay."
2    And she said, "Well, for some reason, the mayor
3    thought that you were being mean to her."
4    I said, "Well, I was nice as could be.  I don't
5    know why she would think that."
6    And that was the end of it.
7    I spoke with her because I didn't want there to be
8    any improprieties or make the City look bad.  I was
9    concerned about that.  I wasn't trying to get someone
10    arrested or -- didn't accuse anybody of anything.  I
11    just brought it to her attention that I had heard about
12    it and let her know that it's probably -- if it's going
13    on, it's probably not a good idea because people could
14    draw conclusions from it, and there could be problems.
15    And I was trying to look out for the best interests of
16    the City.
17  Q.  So, it's never been your opinion that the mayor was
18    taking any bribes of any kind?
19  A.  I have no evidence of anything happening like that.
20  Q.  I asked if it's ever been your opinion.
21  A.  No.
22  Q.  And then you say:
23    "I know that the mayor and Mike Goch are
24    friends --"
25    How do you know that?

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 165–168

Page 165

1  A.   Because they attend concerts together, and they go out
2       together.
3  Q.   When did they become friends?
4  A.   I don't know.
5  Q.   Did you hear they went to high school together?
6  A.   No.
7  Q.   Okay.  So, you don't know when they met?
8  A.   I have no idea.
9  Q.   And you say:
10          "I don't ever recall making any vulgar or
11          sexist comments about the mayor or anyone else."
12          You don't recall, but you could have, because
13       anything is possible?
14  A.   The mayor has always been very nice to me.  I have had
15       no reason to ever say anything bad about her.
16          MS. BALIAN:  Can you repeat my question, please?
17          THE REPORTER:  Yes.
18          (Record repeated by the reporter.)
19          MS. MARZOTTO TAYLOR:  Calls for speculation.
20  BY MS. BALIAN:
21  Q.   You can answer the question.
22  A.   I never said anything bad about the mayor.
23          Is it possible for anyone to speak any word?  It's
24       possible, but I'm denying ever saying anything vulgar
25       about the mayor.

Page 166

1  Q.   Did Chad Hayse ever say anything vulgar about the mayor?
2          MS. MARZOTTO TAYLOR:  Asked and answered.
3  BY MS. BALIAN:
4  Q.   You can answer it.
5  A.   Vulgar in what way?  What do you consider vulgar?
6  Q.   Did he call her a "cunt"?
7  A.   No.
8  Q.   Did he call her a "bitch"?
9  A.   There was one incident where the mayor wanted to fire
10       him for not giving her a police radio, and he said
11       something to the effect, in his office, about "she's
12       being a bitch about this."
13  Q.   Did he call her a "slut"?
14  A.   No.
15  Q.   Did he call her any other names?
16  A.   Not they I can remember now.
17  Q.   But he could have?
18          MS. MARZOTTO TAYLOR:  Calls for speculation.
19  BY MS. BALIAN:
20  Q.   Is that true?  Could have?
21  A.   Anything is possible.  I don't know.  I'm telling you
22       what I know.
23  Q.   That's all I want to know is what you know.  I don't
24       want you to speculate.
25  A.   Okay.

Page 167

1  Q.   Did you ever hear Chief Hayse or former chief Hayse say
2       anything about any city council members being on the
3       take?
4  A.   No.
5  Q.   What about Larry Coogan being on the take?
6  A.   No.
7  Q.   The mayor being on the take?
8          MS. MARZOTTO TAYLOR:  Asked and answered.
9  A.   No.
10  BY MS. BALIAN:
11  Q.   Did you hear Chief Hayse, or did he tell you that he did
12       not want officers making Goch money?
13  A.   I never heard him say that, no.
14  Q.   And close to your last statement here in your response
15       to the complaint, you talk about how you contacted John
16       Allen.
17          Do you remember telling John Allen how you messed
18       up at the removal hearing?
19  A.   I assumed that I messed up.  I didn't know.  I wasn't
20       sure, and I explained to him that I was really nervous
21       during the hearing.  And from the response I was getting
22       that I had said something crazy, and I didn't know what
23       it was.
24  Q.   Did you admit to John Allen that you perjured yourself?
25  A.   No.

Page 168

1  Q.   Did you meet with Chad Hayse prior to his removal
2       hearing?
3  A.   Not that I can remember, no.
4  Q.   Do you know anyone that's been questioned in the Gasper
5       Fiore investigation?
6          MS. MARZOTTO TAYLOR:  Relevance.
7  A.   Gasper Fiore?
8  BY MS. BALIAN:
9  Q.   Investigation for bribery?
10  A.   I don't -- I'm not really familiar with the case.
11  Q.   I didn't ask you if you were familiar with the case.  I
12       just asked if you know anyone that's been questioned in
13       it.
14  A.   Do I know anyone?
15  Q.   Uh-huh.
16  A.   I don't know who has been questioned in that case.
17  Q.   So, you don't know anyone that's been questioned in it?
18          MS. MARZOTTO TAYLOR:  Asked and answered.
19  A.   I'm not familiar with the case.  I have no idea.
20  BY MS. BALIAN:
21  Q.   The Lawrence Jackson investigation, was today the first
22       time you've seen that document?
23  A.   Yes.
24          MS. MARZOTTO TAYLOR:  I'm going to need those
25       documents back at the end of the day.  Those are our

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 169–172

Page 169

```
 1    documents.
 2         MS. BALIAN:  These were the copies that Deb gave
 3    me.  She gave me this one.
 4         MS. MARZOTTO TAYLOR:  Yeah.  We gave you the copies
 5    of the exhibit, but other than the exhibit, I'm going to
 6    need everything else back at the end of the day.
 7         MS. BALIAN:  Okay.  That's fine.
 8         MS. MARZOTTO TAYLOR:  Great.
 9         MS. BALIAN:  This is mine.
10         MS. MARZOTTO TAYLOR:  Yeah.  Yeah.
11    BY MS. BALIAN:
12    Q.   You should have this in front of you.  It's the March
13         1st, 2016 memo to you from Corporal Furman.
14              I don't know --
15         MS. MARZOTTO TAYLOR:  Okay.
16         MS. BALIAN:  It might be here.
17              Here it is.
18         MS. MARZOTTO TAYLOR:  Great.
19    BY MS. BALIAN:
20    Q.   So, did you request this from him?
21    A.   Yes.
22    Q.   Okay.  And was that at the direction of Chad Hayse?
23    A.   No.
24              That was my request to him.
25    Q.   And that was because the female came into the station?
```

Page 170

```
 1    A.   Yes.
 2              I was unaware that there was really a situation
 3         that happened on the street, didn't really know what
 4         happened until the lady came in hysterical and
 5         complaining.
 6              So, then I requested him to do a letter about the
 7         incident.
 8    Q.   Okay.  So, in this memo, he advises you in the first
 9         paragraph that he's on patrol.  He's unable to make out
10         the lettering on the license plate.  And in addition,
11         the Secretary of State showed that there was no
12         insurance on file for the vehicle; correct?
13    A.   Let's see.
14              Yeah, it does say that he was unable to see the
15         plate, but he was able to run it, though.
16              But, yes, that's what it says.
17    Q.   Okay.  He said he had observed a cover over the license
18         plate which was dirty and reflected a large amount of
19         sunlight making it difficult for him to see clearly;
20         correct?
21    A.   Okay.
22    Q.   Correct?
23         MS. MARZOTTO TAYLOR:  The document speaks for
24         itself.
25    A.   Yes.  Right here, yes.
```

Page 171

```
 1    BY MS. BALIAN:
 2    Q.   And if you go on to page 2, in the second -- well, the
 3         first full paragraph, Ms. Wielichowski actually
 4         confirmed that the vehicle was not insured to Furman;
 5         correct?
 6    A.   Yes.  Yep.
 7    Q.   And then at the bottom of that paragraph, Furman informs
 8         you that when he ran her through LEIN, it showed she had
 9         a warrant out of Detroit; correct?
10    A.   Yes.
11    Q.   Okay.  Furman then goes on to advise you in the next
12         paragraph that he informed Ms. Wielichowski that he was
13         going to be issuing her a ticket for no insurance and
14         give her a verbal warning on the license plate cover;
15         correct?
16    A.   Yes.
17    Q.   In the next paragraph, Furman advises you that he told
18         Ms. Wielichowski that vehicles with no insurance are
19         generally impounded.  He asked her if she had someone
20         available to pick her up; correct?
21    A.   "I decided to impound her vehicle.  She had a ride
22         available --" yeah, she -- asked if she had someone
23         available to pick her up, yes.
24    Q.   Okay.  And she stated that she did have somebody already
25         on the way?
```

Page 172

```
 1    A.   Yes.
 2    Q.   Okay.  And at that point he decided to impound the
 3         vehicle because she had a ride available; correct?
 4    A.   Yep.
 5    Q.   Okay.  And then he indicates the weather conditions were
 6         warm and sunny with no rain or snow; correct?
 7    A.   Yes.
 8    Q.   And then he indicates to you that he advised
 9         Ms. Wielichowski that she and her passengers will need
10         to exit the vehicle and wait in the rear seat of his
11         patrol car for their ride; correct?
12    A.   Correct.
13    Q.   Okay.
14         MS. MARZOTTO TAYLOR:  The document speaks for
15         itself.
16              Are we coming to a question?
17         MS. BALIAN:  I've got lots of questions.
18         MS. MARZOTTO TAYLOR:  Well, you know, so far we're
19         just reading this document, which --
20         MS. BALIAN:  Yep, just like you did.  Thanks.
21    BY MS. BALIAN:
22    Q.   Okay.  And then it goes on to say that Officer Furman
23         informed Wielichowski that he would give her a ride to
24         White Castle and was also willing to transport her to
25         any other destination of her choice in Melvindale city
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 173

1    limits; correct?
2  A.  Uh-huh.
3        THE REPORTER:  I'm sorry.  Is that "yes"?
4  BY MS. BALIAN:
5  Q.  You have to say "yes" or "no."
6  A.  Yes.
7        I'm sorry.
8  Q.  Okay.  And then at that time, Goch Towing arrived.  He
9      informed you of that; correct?
10 A.  Yes.
11 Q.  Okay.  And then we go to the next paragraph.  And Furman
12     tells you at this time, Wielichowski says, "No, I'm not
13     getting out of the vehicle"; correct?
14 A.  Yes.
15 Q.  Okay.  And Furman says that he told Ms. Wielichowski at
16     least four or five times to exit the vehicle; correct?
17 A.  Correct.
18 Q.  Going on to the next page, Furman informs you
19     Ms. Wielichowski repeatedly refused to get out of the
20     vehicle; correct?
21 A.  Yes.
22        MS. MARZOTTO TAYLOR:  The document speaks for
23     itself.
24 BY MS. BALIAN:
25 Q.  And then he again told her that she needed to exit the

Page 174

1      vehicle and they needed to wait for their ride in the
2      back seat of his patrol vehicle, and they would be taken
3      to White Castle; correct?
4        MS. MARZOTTO TAYLOR:  The document speaks for
5      itself.
6  BY MS. BALIAN:
7  Q.  At the top paragraph?
8  A.  Yes.
9  Q.  And he explains the reason he wanted to do this was, he
10     wanted to remove the vehicle from the roadway in a
11     timely manner and he still needed to conduct an
12     inventory search; correct?
13 A.  Yes.
14 Q.  Okay.  He explains to you, in his memo, that she
15     continued to refuse to exit the vehicle, and at this
16     point he became more stern and loudly and clearly
17     advised her that if she does not exit the vehicle, he
18     would be forced to physically remove her from it;
19     correct?
20 A.  Yes.
21 Q.  Okay.  And at that point is when he used the transport
22     wrist lock, secured both of her wrists behind her back
23     and placed her -- I'm sorry -- used the transport wrist
24     lock to remove her from the vehicle and then secured
25     both of her wrists behind her back and advised her that

Page 175

1      she can either go to jail, or she can do as she was
2      originally told, get her kids and things and have a seat
3      in the rear of his vehicle; correct?
4        MS. MARZOTTO TAYLOR:  The document speaks for
5      itself.
6  A.  Yes.
7  BY MS. BALIAN:
8  Q.  Okay.  So, at this point, he still offered her the
9      choice of getting in the rear of his vehicle when, in
10     fact, he could have arrested her for being a disorderly
11     person for refusing to obey his directions or arrested
12     her for hindering and obstructing a police officer;
13     correct?
14 A.  At the point that the situation escalated that he had to
15     use physical force against the citizen, he should have
16     arrested her.
17 Q.  Okay.
18 A.  Not let her go.
19 Q.  But he chose not to.  He used his discretion; correct?
20 A.  That's different.
21 Q.  Okay.
22 A.  You use physical force against somebody -- once you use
23     physical force against somebody, that situation is
24     escalated to the point where that person has to be
25     arrested.  If you use physical force against somebody

Page 176

1      and you don't arrest them, you're wrong.
2  Q.  Well, in your opinion?
3  A.  I could probably pull hundreds of police officers that
4      would agree with me.
5  Q.  Okay.  Well, he chose not to arrest her.
6  A.  And his decision was incorrect.
7  Q.  Okay.  In your opinion?
8  A.  Well --
9  Q.  Correct?
10 A.  It was my opinion.
11 Q.  You would have arrested her, you're saying?
12 A.  Because it was the right thing to do, yes.
13 Q.  Okay.  So, you would have arrested her because she
14     refused to remove herself from the vehicle?
15 A.  If I had to use physical force --
16 Q.  Can you just answer my question, please?
17        You would have arrested her in this situation?
18 A.  Could I have arrested her?
19 Q.  Would you have arrested her?
20 A.  No.  No.  I would have let Corporal Hinojosa finish
21     responding to the situation, and I would have had
22     Corporal Hinojosa speak to her to try and calm her down
23     to get her out of the vehicle, or I would have waited
24     5 more minutes for the person that was picking her up
25     that was coming up Fort Street.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                                                    Pages 177–180

Page 177

1    Q.   Well, you just said he was wrong for not arresting her.
2    A.   **If he had to use physical force against her, if that**
3         **situation escalated to the point that he had to put his**
4         **hands on that person, he should have arrested her and**
5         **not let her go.**
6    Q.   Okay.  Okay.  Instead he used his discretion, allowed
7         her to go, and she was driven to White Castle; correct?
8    A.   **I believe so.**
9    Q.   Okay.  And at no point in this memo to you does Furman
10        indicate that she was placed on the ground at all;
11        correct?
12   A.   **That was the statement of the person.**
13   Q.   Correct.
14            So, Furman does not indicate she was on the ground
15        at all; correct?
16   A.   **Yes.**
17   Q.   So, he used his discretion in not arresting her.  She
18        was transported to the White Castle, and he was
19        suspended but allowed to take vacation days because he
20        chose to impound the vehicle.
21            Is that correct?
22   A.   **No, that's not correct.  He --**
23   Q.   Was he suspended?
24   A.   **Yes.  He lost days because he improperly used force.**
25   Q.   Because he improperly used force.

Page 178

1            And at the very same time that he allegedly
2        improperly used force, the --
3            MS. BALIAN:  Can I have the rest of those?
4        Where are the rest of the --
5            MS. MARZOTTO TAYLOR:  What are you looking for?
6            MS. BALIAN:  All of the documents that were
7        referenced during the deposition that are not out in the
8        middle now.
9            MS. MARZOTTO TAYLOR:  Do you have anything specific
10       in mind?
11           MS. BALIAN:  Can you just put them out here so that
12       I can cross-examine the witness on them, please?
13           MS. MARZOTTO TAYLOR:  So, Melinda, they're our
14       documents.  So, if you want to see something specific,
15       you can let me know and I'll pull it for you.
16           MS. BALIAN:  I don't have the Bates numbers in
17       front of me, so --
18           MS. MARZOTTO TAYLOR:  What document are you
19       referring to?
20           MS. BALIAN:  The memo.
21           MS. MARZOTTO TAYLOR:  Okay.  It's right here.
22           MS. BALIAN:  But I have all of them that I'm going
23       to question him on.
24           MS. MARZOTTO TAYLOR:  Okay.
25           MS. BALIAN:  So, if you could just put them out in

Page 179

1        the middle?
2            MS. MARZOTTO TAYLOR:  They're right here.
3    BY MS. BALIAN:
4    Q.   So, on what day was Furman --
5            MS. BALIAN:  Again, I don't have the dates in front
6        of me, so -- the date that he was suspended.
7            MS. MARZOTTO TAYLOR:  Okay.
8            MS. BALIAN:  This will go a lot faster, Elizabeth,
9        if you could just not hold the documents back.
10   BY MS. BALIAN:
11   Q.   So, it looks like Officer Furman was suspended on April
12       25th -- is that correct -- according to the memo?
13   A.   **I'll have to look at it.**
14            **The date on this document is April 25th, 2016.**
15   Q.   And on April 26th of 2016, the day after the memo is
16       issued --
17   A.   **The date on that is April 26th, yes.**
18           MS. BALIAN:  This wasn't the one that was
19       referenced.  The one that was referenced in this dep was
20       to All Staff.
21           MS. MARZOTTO TAYLOR:  That was what was in the
22       middle.  That's what we had out.  I don't see another
23       one.
24   BY MS. BALIAN:
25   Q.   So, Matthew Furman is informed that:

Page 180

1            "Effective immediately, when you request a
2        tow truck, you will notify the desk officer via
3        radio the conditions which merit towing the
4        vehicle, including driver gender, age, number
5        of occupants and their ages, the reason for
6        the tow, et cetera."
7        Correct?
8    A.   **Yes, that's what says.**
9    Q.   And you weren't there at the scene with Corporal Furman
10       to witness any of this; correct?
11   A.   **No.  I was working the desk that day.**
12   Q.   Were there regular staff meetings held with the police
13       officers?
14   A.   **We'd have one probably every several months.**
15   Q.   What is "several"?  "Every several months"?
16   A.   **Depending on when the chief scheduled one.  Three**
17       **months, five months.  I don't know the exact dates, no.**
18   Q.   So, it was irregular?
19   A.   **Yeah.  Depending on what was going on.  If something**
20       **needed to be addressed, one would probably be scheduled.**
21           MS. BALIAN:  Can I have the memo regarding the
22       other incident of alleged excessive force?
23           MS. MARZOTTO TAYLOR:  Sure.
24           There.  This is my work copy.  There you go.
25           MS. BALIAN:  And the e-mail.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                        Pages 181–184

Page 181

1           Thank you.
2    BY MS. BALIAN:
3    Q.  So, regarding the incident with the -- I can't remember
4        the -- the person's name, who was alleging that Furman
5        pushed his head into the car door, you didn't play any
6        role in that was your testimony; correct?
7    A.  That was -- McClintock, I believe, was the guy's name.
8    Q.  And you didn't play any role in that?
9    A.  No.  That was Lieutenant Allen.
10   Q.  Okay.
11           MS. BALIAN:  By the way, Lieutenant Allen indicated
12       he was subpoenaed today.
13           He's a chief of police.  You can go through me for
14       that.  You don't need to subpoena him, but he's out of
15       state.  He will not be here for the date that you
16       subpoenaed him, and he's out of state for a few months.
17           MS. MARZOTTO TAYLOR:  We can work on dates later.
18           MS. BALIAN:  Okay.  But he won't be back, so just
19       go through me, like I've asked several times.  Check
20       with me on dates.
21           MS. MARZOTTO TAYLOR:  We can talk about scheduling
22       later, Melinda.
23           MS. BALIAN:  Okay.  Well, you don't seem to listen
24       to me, which is why I'm putting it on the record.
25           MS. MARZOTTO TAYLOR:  Okay.

Page 182

1    BY MS. BALIAN:
2    Q.  There was testimony or maybe questioning that these
3        incidents were turned over to the Michigan State Police
4        for investigation.
5           Do you have any knowledge about whether the state
6        police found any wrongdoing on behalf of Furman?
7    A.  No direct knowledge, no.
8    Q.  And with regard to this incident involving Richard
9        Crosslin, was Corporal Furman the first officer on
10       scene?
11   A.  I don't know.
12   Q.  Okay.  But you weren't there?
13   A.  No.  I was working the desk.
14   Q.  Okay.  Well, did Corporal Furman indicate to you -- or
15       maybe he didn't indicate anything to you.
16           Did you have anything to do with --
17   A.  I don't know if I spoke to Corporal Furman about the
18       incident.  I was approached by Officer Landin in regards
19       to the situation, and I asked her to give me a letter in
20       regards to the situation, which I forwarded to Chief
21       Hayse.
22           I would assume Chief Hayse, since it's to him,
23       requested that Furman do the letter.
24   Q.  Okay.  So, Chief Hayse asked you to get information from
25       the other two officers on the scene?

Page 183

1    A.  No.  No, he didn't.  I requested those officers to give
2        me a letter about what happened.
3    Q.  Why?
4    A.  Because I'm the supervisor.  I had them give me a
5        letter.
6    Q.  Do you ask that of all situations?
7    A.  They expressed their concerns to me about what happened,
8        and depending on the situation, yes.
9    Q.  Okay.  Did you speak with Corporal Furman about it?
10   A.  I don't remember if I spoke with him that day about it.
11           I don't remember having a conversation about the
12       incident.  I took statements, and I turned them over to
13       the chief is what I can recall.
14   Q.  Do you ever recall Corporal Furman indicating to you
15       whether he was unaware of whether the individual still
16       had the knife on his person when he arrived?
17   A.  I don't think I had discussion with Corporal Furman
18       about the incident.
19   Q.  Okay.  When did you -- I believe you testified you --
20       let's see here.
21           You're an inactive employee.
22           What was the date that you became an inactive
23       employee?
24   A.  January 2nd of this year.
25   Q.  Okay.  So, 1-2 of '18?

Page 184

1    A.  Yes.
2    Q.  Okay.  So, between when Chad Hayse was terminated in
3        August of 2016 and January of 2018, has Furman had any
4        disciplinary issues?
5    A.  Not to my knowledge.
6    Q.  Do you believe John Allen to be an honest person?
7    A.  Yes.
8    Q.  Do you believe he's a good chief?
9    A.  Yes.
10   Q.  Did Furman ever receive any commendations due to his
11       work?
12   A.  I don't recall anything off the top of my head, no.
13   Q.  So, you don't know?
14   A.  I don't know.
15   Q.  What period of time were you the road lieutenant?
16   A.  From the time of my promotion to lieutenant, which is
17       2013, until 1st of January of '17.  In January of 2017,
18       I went to the detective bureau.
19   Q.  And what shift did you work --
20   A.  Dayshift.
21   Q.  -- from 2013 to January of 2017?
22   A.  Dayshift.
23   Q.  And what hours is that?
24   A.  When I was the road lieutenant, it was 8:00 till 4:00.
25           As the lieutenant in the detective bureau, it was

Page 185

1     from 8:30 until 4:30.
2  Q.  Okay.  What days of the week?
3  A.  In the detective bureau, it was Monday through Friday.
4        The road varied because we picked days off with the
5     sergeant.
6        Oftentimes, I was off either Friday/Saturday or
7     Sunday/Monday, depending on the agreement with the road
8     sergeant.
9  Q.  When you were first promoted to lieutenant, did you have
10    to test?
11  A.  I did not test for lieutenant, no.
12  Q.  Why?
13  A.  Because there is a provision in our contract that states
14    if no one else is able -- is eligible to test, then the
15    senior sergeant would be promoted so they don't have to
16    test against themselves.
17  Q.  So, it was strictly based on seniority?
18  A.  In those circumstances, yes, because there was no one
19    else available to test.
20  Q.  And you testified that, you know, generally how many
21    calls a day did you receive, and you said, you know,
22    generally about 15 calls a day, but was that just on
23    your shift that you were testifying about?
24  A.  Yeah.  It varies.  There could be a bunch of ordinance
25    complaints.  No two days are normally the same.

Page 186

1  Q.  But you don't know what took place on other people's
2    shifts; right?
3  A.  Unless someone told me about it or I read the reports,
4    no.
5  Q.  Okay.  How often did you read other people's reports of
6    what occurred?
7  A.  I would browse the reports occasionally because I was
8    responsible for approving the reports.
9        So, sometimes there would be leftover reports from
10    the prior shift, and I would approve them.  So, I would
11    come across reports from other shifts.
12  Q.  If there was an assaultive call, say a domestic violence
13    or just an assault and battery or something worse like a
14    felony, was it procedure to send two officers?
15  A.  Yes.
16        And if there happens to be a third officer on the
17    road, we would send them also.
18  Q.  You said it was explained to you that when tickets are
19    written, some of the money is provided to the police
20    department from the court.
21        Who told you that?
22  A.  I believe it's common knowledge.  The way that it goes
23    is ticket revenue -- we share a court at 24th District
24    Court with the City of Allen Park.  The tickets all go
25    into like a kitty, like an account.  The State gets a

Page 187

1    third, the court gets a third and we get -- I mean,
2    yeah -- the court gets a third, we get a third and Allen
3    Park gets a third.  That's how they divvy them up.
4  Q.  Is it equal?
5  A.  It depends on what department is writing more tickets
6    would make it equal.  Sometimes their tickets may slow
7    down, and they would probably receive some of our
8    revenue.  It could go either way.
9  Q.  So, you don't know the proportions?
10        MS. MARZOTTO TAYLOR:  Asked and answered.
11  A.  I just know it was a third, a third and a third.  I
12    don't know the monetary amount that was involved.  That
13    wasn't part of my job.  I had no idea.
14  BY MS. BALIAN:
15  Q.  Did you know that from 2014 to 2015 there were 2,000
16    fewer tickets written by the officers?
17  A.  No.
18        MS. MARZOTTO TAYLOR:  Assumes facts not in
19    evidence.  Lack of foundation.
20        MS. BALIAN:  I just asked him if he knew.
21  BY MS. BALIAN:
22  Q.  You review the reports; right?
23  A.  I review my shift's reports and correct them, and
24    occasionally spill over reports from the prior shift,
25    I'll review and correct them.

Page 188

1     I don't normally make a practice of following
2    everyone's ticket stats.  So, that statistic I did not
3    know.  That would be something more for the chief.
4  Q.  You had testified at the removal hearing that you
5    believed tows had increased by over -- or impounds had
6    increased, I think, over a thousand.
7        Did you know that from 2014 to 2015 tows decreased
8    by over a thousand?
9        MS. MARZOTTO TAYLOR:  Can you point us to the
10    testimony?
11  A.  I'm not familiar with what you're talking about, ma'am.
12  BY MS. BALIAN:
13  Q.  I'm just asking if you realize that.
14  A.  I don't know what the tow stats are.  I was never
15    concerned with it.
16        MS. MARZOTTO TAYLOR:  I think that mischaracterizes
17    his testimony at the hearing.
18  BY MS. BALIAN:
19  Q.  The question to you:
20        "Question:  Since I became chief -- interim
21    chief in 2012 and named permanent chief in January
22    of 2012, would you say we have towed more cars or
23    fewer cars since that time per year?
24        "Answer:  We probably went from around 200
25    cars a year to well over a thousand."

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 189

1    Is that your testimony?
2  A.  Uh-huh.  Yes.
3  Q.  Okay.  So, you had no knowledge that tows had decreased
4      by over a thousand from one year to the next?
5  A.  They decreased from 2012?
6         I believe the question was, was asking me the
7      numbers in 2012.
8  Q.  I said from 2014 to 2015 tows decreased by over a
9      thousand.
10 A.  I didn't know that.
11 Q.  Do you have any explanation for that?
12        MS. MARZOTTO TAYLOR:  Calls for speculation.
13     Assumes facts not in evidence.
14 A.  The -- want me to respond?
15        MS. MARZOTTO TAYLOR:  You have to answer her
16     questions.
17 A.  Okay.
18        The way I interpret the question posed --
19 BY MS. BALIAN:
20 Q.  That -- that's not what I'm asking.
21 A.  Well, no, I --
22 Q.  My question was, do you have any explanation for why
23     tows decreased by over a thousand from 2014 to 2015?
24 A.  I have no idea.
25 Q.  Who determines if the police officers get a raise?

Page 190

1  A.  With their labor contract.
2  Q.  Okay.  And so who -- who determines that?  Who approves
3      that?
4  A.  I'm sorry.  Who approves what?
5  Q.  Who approves the labor contract?
6  A.  Who approves it?
7  Q.  Yeah.
8  A.  The city council approves the contract.
9  Q.  Is Rich Ortiz on the city council?
10 A.  No.
11 Q.  Are you aware that Furman has a personal relationship
12     with Paul Ott, Junior?
13 A.  Yes.
14 Q.  They're close friends; right?
15 A.  From what I understand they're friends, yes.
16 Q.  And where does Paul Ott, Junior, work?
17 A.  For Gene's Towing.
18 Q.  You testified that there was a blow-up with city council
19     with Goch & Sons about the use of a dolly?
20 A.  Yes.
21 Q.  Because they wanted to use a dolly but it wasn't in the
22     contract.
23        Do I have that correct?
24 A.  There was an issue -- there are two types of tow trucks.
25     There's a light tow truck, which is a traditional truck

Page 191

1      that has a boom on the back that lifts up the car, and
2      then you have a flatbed truck where you winch the
3      vehicle up onto the flat bed of the truck.
4         The contention was -- normally the drivers would
5      respond with a flatbed truck.  They have more of them.
6      They're more practical.  They can tow more stuff with
7      them.
8         The contention was that if they responded with a
9      flatbed truck, and the vehicle, had it been a light-duty
10     truck, would have warranted tow dollies, whether it be
11     an all-wheel drive or four-wheel drive truck, even
12     though they came with the right vehicle to begin with to
13     tow it, they felt that they should be able to charge the
14     extra fee with the truck they didn't drive.
15        So, they were wanting to be paid for services that
16     they did not render.
17 Q.  Okay.  When was that?
18 A.  It was shortly after they approved their contract.
19 Q.  So, shortly after June of 2015?
20 A.  Yes.
21 Q.  Okay.  And apparently -- I'm guessing from your
22     testimony -- city council did not side in favor of
23     Goch & Sons because it was not in the contract; correct?
24 A.  I don't know what happened in the city council.  I just
25     know that the ladies in the office --

Page 192

1  Q.  The ladies in what office?
2  A.  The ladies that answer the phone at Goch & Sons --
3  Q.  Okay.
4  A.  So, when you call for release and they would give you
5      the amount of money due, because they set the fees, they
6      stopped asking for it.
7         So, I would assume that somehow, somewhere along
8      the line, they resolved that issue because they stopped
9      tacking that fee on.
10 Q.  Okay.  Have there ever been any businesses, whether in
11     Melvindale or outside of Melvindale, that have dropped
12     off food or other things for the police department?
13 A.  There have been occasions where maybe a party store
14     would drop off some pizza or some chicken or something.
15 Q.  Was it thrown in the garbage?
16 A.  I don't know.
17 Q.  Did you ever see anybody eating it?
18 A.  I have seen people eating food, yes.
19 Q.  Eating the food that was dropped off by the party store?
20 A.  Yes.
21 Q.  Okay.  So, why wasn't that thrown in the garbage like
22     the food that was dropped off by Goch & Sons?
23 A.  I don't know.
24 Q.  Was Furman ever disciplined for doing too much traffic
25     control?

Page 193

1   A.   No.
2   Q.   You had testified about him towing a vehicle during an
3        armed robbery that was going on.
4             Was he specifically dispatched to the armed
5        robbery?
6   A.   No.
7   Q.   Was he disciplined for not responding to the armed
8        robbery?
9   A.   Not to my knowledge.
10            He was spoke to -- he was talked to about it, but I
11       don't believe he was disciplined.
12  Q.   What is his title now?  Sergeant or lieutenant?
13  A.   I think he got promoted to sergeant after I left.
14  Q.   There's no law against towing vehicles with children in
15       the vehicle; correct?
16  A.   No.
17  Q.   And there's no law against towing vehicles of elderly
18       persons; correct?
19  A.   No.
20  Q.   And you understand that you can't discriminate against
21       people in enforcing laws; correct?
22  A.   You should not discriminate against people, period.
23       Correct.
24  Q.   And you understand that you can't base a determination
25       on whether to tow a person's vehicle based upon their

Page 194

1        age and gender; correct?
2   A.   Well, I believe that common sense and the totality of
3        circumstances should come into play, and an officer
4        needs to use discretion on whether or not they tow that
5        vehicle is what I believe.
6             MS. BALIAN:  Can you repeat my question, please,
7        John?
8             (Record repeated by the reporter.)
9   A.   That's correct.
10            MS. BALIAN:  Where is the April 26th memo?  Is it
11       still here?
12            MS. MARZOTTO TAYLOR:  It should be.
13            MS. BALIAN:  Maybe it's still here.
14  BY MS. BALIAN:
15  Q.   You testified, referring to Bates stamp document 1442,
16       which is the April 26th, 2016 memo to Corporal Furman,
17       that this was to get him to use common sense.
18            Is that correct?
19  A.   To use common sense and discretion.
20  Q.   Correct me if I'm wrong, but the memo indicates that
21       Furman is to contact the desk officer via radio the
22       conditions which merit towing the vehicle, including
23       driver gender, age, number of occupants, their ages,
24       et cetera, and the supervisor will determine if the tow
25       truck will be dispatched; correct?

Page 195

1   A.   Yes.
2   Q.   So, it was then up to the supervisor to make that
3        determination?  It was no longer up to Furman?
4   A.   Well, I believe the intent was to get him to stop and
5        think about what he was doing, and if he was doing the
6        right thing, then he wouldn't have to worry about it,
7        and the car would be towed.
8             MS. BALIAN:  Can you repeat my question, John?
9             (Record repeated by the reporter.)
10  A.   Yes.
11  BY MS. BALIAN:
12  Q.   Other than Furman, when Chad Hayse was chief, did you
13       ever see him refer anyone to Dr. Clark for a psych
14       evaluation?
15  A.   Maybe Dave Taft -- David Taft, but I can't be for sure.
16  Q.   You were asked questions about this letter dated August
17       1st to Chad Hayse from Lawrence Coogan saying:
18            "Dear, Chief Hayse:
19            On July 25th, 2016, I wrote a letter to
20       you, requesting that you provide  me all
21       documents or writings regarding or concerning
22       the alleged misconduct of Officer Furman.  In
23       addition, I requested the names and contact
24       information of all persons and governmental
25       agencies who have performed any investigation

Page 196

1        and the names and contact information of all
2        persons who are or were involved in the
3        investigation of this matter.
4             Upon receipt and review of what you've
5        provided my office, there is no contact
6        information listed of any other outside
7        agencies, nor did you indicate who made contact
8        or initiated any communication regarding this
9        matter.
10            Please provide the requested information
11       forthwith."
12            As of August 1st of 2016, do you know if Officer
13       Furman had complained or lodged a complaint that he was
14       being denied due process because he had not been
15       informed in writing of why he had been suspended without
16       pay?
17  A.   I'm unaware of any complaints lodged by Officer Furman.
18  Q.   So, you don't know?
19  A.   No.
20  Q.   And you testified that you and John Allen met with
21       Furman about his suspension; correct?
22  A.   The day that he was suspended, he was called into the
23       chief's office.  I was present.  John Allen was present.
24       And I believe -- it might have been John Thompson, who
25       was his union steward.

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 197

```
 1   Q.   And was that the suspension with pay or without pay?
 2   A.   With pay.
 3   Q.   You said "with pay"?
 4   A.   Yes.
 5   Q.   What did you tell him?
 6        MS. MARZOTTO TAYLOR:  Asked and answered.
 7   A.   I -- I believe Lieutenant Allen was doing most of the
 8        talking.  I was in the room.  I remember telling him to
 9        get in contact with Chad Hayse on Monday.  That's all I
10        remember about it.
11   BY MS. BALIAN:
12   Q.   Did you have any further contact with Furman about the
13        suspension?
14   A.   This suspension in particular?
15        No.
16   Q.   What about when it became without pay?
17   A.   He was suspended.  He wasn't in the station.  I had no
18        contact with him.
19   Q.   Okay.  Furman lodged a complaint with you regarding
20        then-Lieutenant Easton sometime prior to 2016; correct?
21   A.   Furman lodged a complaint with me regarding Sergeant
22        Easton?
23   Q.   Yes.
24   A.   Yes.
25   Q.   Do you recall what he was complaining about?
```

Page 198

```
 1   A.   He was complaining that Sergeant Easton was telling him
 2        not to tow cars, and that he was trying to give him busy
 3        work to stop him from doing traffic enforcement.
 4   Q.   Was it busy work, or that he was sending him on every
 5        complaint that came in?
 6   A.   I believe one of the complaints that he had was that
 7        Easton told him to visit every business in the city.
 8   Q.   Do you recall Furman complaining that he had been sent
 9        alone on an assault complaint that came in, and it was a
10        safety issue for him?
11   A.   I don't remember all the wording of his complaint.  It
12        was a few years ago.
13   Q.   Do you remember Furman complaining about that?
14        MS. MARZOTTO TAYLOR:  Asked and answered.
15   A.   Not at the moment, no, I don't.
16   BY MS. BALIAN:
17   Q.   Did you do anything with Furman's complaint when it came
18        in?
19   A.   I advised Chad Hayse.
20   Q.   Do you know if anything was done?
21   A.   I don't know the status of it, no.
22   Q.   Did you investigate "Snowgate"?
23   A.   No.  I was not involved in it at all.
24        MS. BALIAN:  Do you have the Larry Jackson
25        document?
```

Page 199

```
 1        MS. MARZOTTO TAYLOR:  Sure.
 2        This one is for you.
 3        There you go.
 4   BY MS. BALIAN:
 5   Q.   Do you recall your testimony that typically after
 6        Furman -- after corrective action would be taken against
 7        Furman regarding how he treated people during stops or
 8        the towing, that he would slow down his towing?  And
 9        then Ms. Gordon's comments to you that, "Well, during
10        his petulant moments, like in July, his towing went down
11        to 40," and she was referring to this right here, July,
12        where the tows went down to 40.
13   A.   Okay.
14   Q.   Furman wasn't working at all in the month of July,
15        correct, because he was suspended?
16   A.   I don't -- I'm not sure of the days that he went off and
17        when he came back.  I don't know exact dates.
18   Q.   Well, if the documents indicate that that's when he was
19        suspended, you don't have any reason to refute that, do
20        you?
21   A.   If it says there were 40, I have no reason to doubt it.
22   Q.   I'm talking about the days of his suspension.
23        If the documents indicate he was suspended
24        starting on July 5th of 2016 --
25   A.   Okay.
```

Page 200

```
 1   Q.   -- and he was not reinstated until August, you don't
 2        have any reason to refute that, do you?
 3   A.   No.
 4   Q.   Were you ever an administrator for the Melvindale Police
 5        Department Facebook page?
 6   A.   I had access to it, yes.
 7   Q.   Okay.  So, you could make posts on it?
 8   A.   I could, yes.
 9   Q.   Would you agree that, according to the rules and
10        regulations of the police department, you were not
11        permitted to post political opinions on the Melvindale
12        Police Department website page?
13   A.   I do not recall what the exact wording of the policy is,
14        but I would assume it would be frowned upon.
15   Q.   During your testimony, you've referenced -- you asked
16        how long -- strike that.
17        You were questioned about your suspension.  You
18        testified that you felt retaliated against for
19        testifying and for writing up Officer Furman.
20        What write-up of Officer Furman?
21   A.   The incidents with the excessive force which caused him
22        to be suspended, which, in turn, caused the drop in
23        revenue for the City.
24   Q.   What write-up are you talking about?
25   A.   I was involved with the Wielichowski incident and --
```

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018                                                                Pages 201–204

Page 201

1   Q.   Wielichowski --
2   A.   -- with Crosslin.
3        Yes.
4   Q.   Okay.
5   A.   Those happened on my shift while I was present.
6   Q.   You wrote him up regarding Crosslin?
7   A.   I was a supervisor on duty that day.  And, yes, that
8        paperwork did start with me when I had the other
9        officers do letters on that.
10  Q.   Okay.  But how did you write up Furman?
11       You testified that you wrote him up.
12  A.   I was a supervisor on duty.
13       Those officers brought those issues to my
14       attention.
15       I informed them to do letters on that, which, in
16       turn, caused him to be suspended.
17  Q.   Okay.  But did you write him up?
18  A.   Did I produce a document?  No.  That normally doesn't
19       always happen.
20  Q.   Okay.  So, you didn't write up Officer Furman in July of
21       2016?
22  A.   Did I generate the documents?  No.  I put them -- put
23       the situation into motion.
24  Q.   Did Chad Hayse ever do evaluations on the officers?
25       Annual evaluations of any kind?

Page 202

1   A.   I'm not sure if we did them annually.
2        I know while Rick Cadez was chief, we did annual
3        evaluations for a couple years, and then they stopped.
4        I don't recall them taking place with Chad Hayse.
5   Q.   Who is Jason Ortiz?
6   A.   Jason Ortiz used to sit on the Safety Commission.
7   Q.   For what time period?
8   A.   I don't --
9   Q.   You said he "used to sit."
10       When did he --
11  A.   He -- I think he left maybe seven, eight months ago.  I
12       heard he moved.  I don't know the dates.
13  Q.   Was he on the Public Safety Commission at the time you
14       were suspended?
15  A.   Yes.
16  Q.   You were represented by an attorney for your trial
17       board; is that correct?
18  A.   Yes.
19  Q.   And was that a personal attorney or the union attorney?
20  A.   Union attorney.
21  Q.   And who was that?
22  A.   First name is Brennan.
23       I don't remember his last name.
24  Q.   Brennan?
25  A.   Brennan.  B-r-e-n-n-a-n, I believe, it's spelled.

Page 203

1        I don't remember his last name.  He's the POLC
2        attorney.
3   Q.   Larry Coogan didn't have a vote regarding Chad Hayse's
4        termination, did he; if you know?
5   A.   I don't believe so, no.
6   Q.   And he didn't have any vote regarding terminating you or
7        suspending you; correct?
8   A.   No.
9   Q.   Did Chad Hayse ever tell you that the mayor was having a
10       romantic relationship with Mike Goch?
11  A.   No, he did not.
12  Q.   You were asked questions about whether city council had
13       a predetermined decision to remove Chad Hayse at the
14       removal hearing.
15       Did you have any discussions with any of the city
16       council members whether they had a predetermined
17       decision to remove Chad Hayse prior to the removal
18       hearing?
19  A.   No.  I spoke to no one on the city council.
20  Q.   Do you have any knowledge of Chad Hayse embezzling money
21       from the City?
22  A.   No.
23  Q.   Do you have any knowledge of Chad Hayse meeting with
24       Gasper Fiore?
25  A.   No.

Page 204

1   Q.   Has he ever been into the station?
2   A.   I think he attended one of our auctions before and
3        bought a couple cars years ago.  I met him once at that
4        one auction, but that's the only time I've ever seen
5        him.
6   Q.   Have you ever been to Paul Ott's property up north?
7   A.   Yes, on accident.  We've got a family cottage in
8        Houghton Lake, and come to find out we were driving
9        around Lake James, which is right next door to Houghton
10       Lake.  My wife and I were looking at cottages.  And when
11       we were driving around the lake, I saw a Goch & Sons tow
12       truck -- not a tow truck, but it's a super duty with a
13       Goch -- Gene's Towing -- I'm sorry.
14  Q.   Yeah, you said "Goch & Sons."
15  A.   -- emblem.  Yeah.  A Gene's Towing emblem on the door,
16       and I slowed down, and I saw it was Paul in his garage.
17       And I stopped and said "hello" for about 5 minutes, and
18       I continued on my way.
19  Q.   Do you know if Chad Hayse has ever been up to Paul Ott's
20       property?
21  A.   No.
22       MS. BALIAN:  I don't have any other questions at
23       this point.
24       MS. MARZOTTO TAYLOR:  Okay.  So, I need about
25       5 minutes.

Page 205

1     (Short recess at 3:26 p.m.)
2           *   *   *
3     (Record resumed at 3:41 p.m.)
4           *   *   *
5     RE-EXAMINATION
6   BY MS. MARZOTTO TAYLOR:
7   Q.  So, I'm going to take you back to your testimony on
8       August 29th, and the letter that you wrote to the Public
9       Safety Commission in September of 2016.
10          So, why don't we just get those pages out and go
11      through them.
12          Okay.  So, you've already testified today that at
13      the time you wrote this letter, which is, you know, the
14      letter in Exhibit 1, you had not seen or read or heard
15      back your testimony on August 29th?
16  A.  That is correct.
17  Q.  Okay.  Okay.  So, I'm going to direct your attention to
18      page 145 of our version of your testimony.
19          Okay.  So, specifically, line 7:
20          "Question:  Lieutenant, have you ever heard
21      me make disparaging remarks regarding any public
22      official, appointed official or Mike Goch from
23      Goch & Sons Towing?"
24          Your answer starts at line 10:
25          "Answer:  We've had personal conversation

Page 206

1       in regards to the way the tow contract has been
2       warranted but no personal attacks in front of
3       anybody else.  In personal conversation, yes."
4   A.  Yes, that's what that says.
5   Q.  Okay.  So, moving forward to pages 149 and 150, a
6       question about the personal conversations that you
7       referenced at 145 comes up again; in this personal
8       conversation that you had, did you say derogatory
9       things?
10          You had already stated or admitted under oath that
11      you had conversations with Chad that were critical of
12      Mike Goch and Goch & Sons; isn't that correct?
13  A.  That is correct, yes.
14  Q.  Okay.  So, you also note -- okay.  So, we're still on
15      page 149, starts at line 23:
16          "Question:  And did -- in this personal
17      conversation that you say you had with the
18      chief in regards to Goch & Sons, did he say
19      any derogatory things about Goch & Sons?"
20          Okay.  Turning then to the letter that you wrote to
21      the Public Safety Commission without having had the
22      chance to read your testimony or hear it back in context
23      or in any completeness, you state that you were asked --
24      well, the mayor tells you -- the mayor is trying to
25      isolate the lie you allegedly told and the mayor says to

Page 207

1       you:
2           "I was asked if Chief Hayse had ever said
3       anything negative about Mike Goch.  The answer
4       to that question is yes."
5           Isn't it true that you had already admitted on
6       page 145 that there were negative things that were said
7       about -- between you and Chief Hayse about Mike Goch?
8   A.  Yes, in private.
9   Q.  And you had already admitted that.  That was your sworn
10      testimony?
11  A.  Yes.
12  Q.  Okay.  Now I want to draw your attention to the -- to
13      the wording, to the language that was used in these two
14      statements.
15          The mayor says that you were asked if Chief Hayse
16      had ever said anything negative about Mike Goch.
17          Okay.  Dictionary definition of "Negative":  "Not
18      desirable or optimistic."
19          Isn't it true that, on page 145, you testified
20      under oath that you and Chief Hayse had had private
21      conversations just between the two of you where you
22      discussed information or your opinions or beliefs about
23      the contract that were not desirable or optimistic?
24  A.  That is true.
25  Q.  Okay.  Dictionary definition of "Derogatory":  "Showing

Page 208

1       a disrespectful attitude, disparaging, demeaning."
2           In those personal conversations that are referenced
3       on page 145 and page 149, did Chad Hayse ever say
4       anything that was disrespectful, disparaging or
5       demeaning about Mike Goch or Goch & Sons Towing?
6   A.  I believe that most of the conversation that we had in
7       regards to Mike Goch was trying to iron out our
8       differences of opinion with the contract and the fees
9       that we were charging people that we didn't believe that
10      we should.
11  Q.  Is your opinion or is Chad Hayse's opinion or your
12      opinion about the -- the fee schedule and whether or not
13      that's an appropriate fee schedule, is it disrespectful,
14      disparaging or demeaning to air those kinds of
15      critiques?
16  A.  I wouldn't think so.
17          It's an opinion.
18  Q.  Okay.
19  A.  It's a feeling about something.
20  Q.  Okay.  Is it disrespectful to question the fee schedule
21      of a city contractor?
22  A.  No.
23  Q.  Okay.  And does -- does what you said on page 149, where
24      this personal conversation is referenced, does that not
25      track back to page 145 where you stated "we've had

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Page 209

1  personal conversations*?
2  **A.  That did reiterate that we did have personal**
3  **conversations in regard to Goch & Sons.**
4  Q.  The question on page 149 is made with specific reference
5  to the personal conversation or conversations that were
6  referenced in 145?
7  **A.  I would assume that that's what that person is asking me**
8  **about, about the question I had just been asked prior,**
9  **yes.**
10  Q.  So, you admitted under oath that Chad said things that
11  he -- that Chad stated to you in private that he found
12  that there were things that were not desirable or
13  optimistic about the fee schedule?
14  **A.  That's --**
15  Q.  You admitted that under oath?
16  **A.  That's correct.**
17  Q.  Is there a lie here, Lieutenant Welch?
18  **A.  I don't believe so.  Because, I mean, I misstated "no"**
19  **instead of "yes" in one instance, and a couple questions**
20  **earlier I state what happened.  And then before, even**
21  **seeing a record of my testimony, I stated it again in my**
22  **written statement.**
23  Q.  So, do you feel that your testimony -- across the board,
24  your testimony on August 29th is consistent with the
25  picture that you are giving to the Public Safety

Page 210

1  Commission --
2  **A.  Yes.**
3  Q.  -- later in September?
4  **A.  Yes.**
5       I never saw this document, and I don't -- I wasn't
6  able to review it.  I didn't see it, and I wrote this
7  out of what I remembered from my testimony and my
8  opinion and my feelings about the allegations that were
9  made against me.
10  Q.  Do you believe that you were untruthful at any time?
11  **A.  No.  It was never my intent to be untruthful about**
12  **anything.**
13  Q.  Okay.  Okay.  So, going back in time, then, to April of
14  2016, okay, the Cecilia Wielichowski -- somebody help me
15  out here -- incident.
16  **A.  Yeah.  I'm familiar with it.**
17  Q.  Okay.  Okay.
18       Okay.  So, here is Chad Hayse's write-up, and that
19  is Bates -- produced by the City, 1440.  And here is,
20  then-Corporal Furman's explanation of his perspective
21  about what happened, 1448, also produced by the City.
22       Okay.  So, you got some questions about this from
23  opposing counsel.
24       As a long-serving police lieutenant and a command
25  officer, what did Matthew Furman do wrong on February

Page 211

1  28th?
2  **A.  Once the incident escalated to the point where he saw**
3  **the need to use physical force, once he effected that**
4  **force, that person should have been arrested.**
5  Q.  Do you believe that Furman was justified in putting his
6  hands on that woman that day?
7  **A.  No.**
8       MS. BALIAN:  Objection.  Calls for speculation.  He
9  wasn't there.
10  **A.  I don't believe that he should have put his hands on**
11  **her, no.  I believe it could have been resolved other**
12  **ways.**
13  BY MS. MARZOTTO TAYLOR:
14  Q.  Okay.  And then we are going to look at the April 26th
15  memo, which I think you might have in front of you
16  already.
17  **A.  The one from Chad Hayse?**
18  Q.  Yeah.
19       So, this is the memo.
20  **A.  Oh, okay.  All right.**
21  Q.  Okay.  Can I just see that real quickly?
22  **A.  Sure.**
23  Q.  This is produced by the City, 1442.
24       Having been involved with the -- with the
25  background on this issue, as you were, how would this

Page 212

1  memo help Furman develop and apply what you called
2  "common sense" on an everyday basis?
3  **A.  The intent of the letter was to get him to stop and**
4  **think about what he was doing before he did it and not**
5  **be a robot and just randomly just do things.**
6       **I wanted to try and teach him to use some**
7  **discretion and -- you know, and I think I stated before,**
8  **just because you can, doesn't always mean you should.**
9       **I've counseled him repeatedly on use of discretion,**
10  **and he normally did not listen or he would kind of**
11  **comply for a little while and then go off and do**
12  **whatever he wanted.**
13  Q.  Okay.  And as Counsel pointed out, that memo states that
14  the supervisor, whoever is, you know, on duty at the
15  time, that supervisor is going to be deciding to make
16  the tow.
17  **A.  Right.**
18  Q.  How would talking through those steps with that
19  supervisor and observing that supervisor's
20  decision-making process, how would that help Matt
21  Furman?
22  **A.  If Matt Furman knew that he had to run it by the**
23  **supervisor, it would cause him to stop and think for a**
24  **couple minutes, and then maybe decide whether or not he**
25  **should do what he was going to do to begin with.**

WELCH, JUNIOR, LIEUTENANT MICHAEL L.
03/28/2018

Pages 213–216

Page 213

1        So, if he was towing a vehicle that shouldn't have
2    been towed and he knew it, he probably wouldn't contact
3    the supervisor and ask to do it.
4  Q.  Because he wouldn't be able to justify it to the
5    supervisor?  Is that what you mean?
6  A.  Yes.
7  Q.  Okay.
8  A.  So, it was an effort to try and get him to think while
9    he was working about what is the right thing to do and
10   what is the best thing to do.
11 Q.  And you thought this teaming aspect would get him there?
12 A.  This was an attempt to help him, not hurt him.
13 Q.  Okay.  Did Richard Ortiz have a role to play in the
14   contract negotiation process?
15 A.  Rich Ortiz is the guy that controls the money.  He's the
16   city administrator.  And probably he would have some
17   influence in recommending whether or not the City would
18   be able to afford certain provisions in a contract,
19   whether it be wages, benefits or whatnot.  He would have
20   that knowledge, and he would give his advice to the city
21   council on whether or not whatever contract proposal was
22   a good idea or not.
23 Q.  So, to go back to your testimony, you said that Ortiz's
24   comment was something to the effect of, "If you keep the
25   towing and ticket numbers up, I can justify a raise to

Page 214

1    council"?
2  A.  He -- yeah.  He said, "I may be able to justify getting
3    you guys a raise."
4  Q.  And so putting that comment together with what you just
5    told us that you understand about his role, you
6    understood that if the towing and ticket revenues were
7    up, he could more easily say to the City, "Yes, we can
8    afford to pay the police officers more."
9        Is that what you understood?
10 A.  Yes.
11       And at that time, I don't believe I had a raise for
12   about ten years, and he would be the one to tell the
13   city council whether or not we could afford to give any
14   raises out.
15 Q.  And do you believe that the city council acted upon his
16   guidance --
17       MS. BALIAN:  Objection.
18 BY MS. MARZOTTO TAYLOR:
19 Q.  -- as a subject-matter expert?
20       MS. BALIAN:  Objection.  Lack of foundation.
21 BY MS. MARZOTTO TAYLOR:
22 Q.  To your understanding?
23 A.  Well, from what I understand, he has direct knowledge of
24   the City's finances, so he would be able to give his
25   opinion on whether or not we could afford it.

Page 215

1  Q.  Okay.  You were asked some questions about -- and you
2    gave some testimony that a party store -- a local party
3    store gave some food to the police department.
4        Was that party store a City contractor at the time
5    when they gave you the food -- the police department the
6    food?
7  A.  No.
8  Q.  Okay.
9  A.  No.  There's a party store called Tomboys in town.
10   Occasionally, they will send pizza.
11       THE REPORTER:  I'm sorry.  "-- called --"
12 A.  Tomboys, T-o-m-b-o-y-s.
13       Occasionally they will send a couple pizzas or some
14   fried chicken over for the guys to eat.
15 BY MS. MARZOTTO:
16 Q.  Does Tomboys giving that kind of donation to the police
17   department have the same implications as a municipal
18   contractor whose financial fate is directly tied with
19   the police department's productivity giving a gift?
20       Do those two circumstances have the same
21   implications, ethical implications, to you?
22 A.  You would think that if -- if that person giving you
23   that had a direct financial benefit, that the situation
24   would be a little bit different than just a store in the
25   neighborhood, you know, bringing us something over on a

Page 216

1    holiday or something like that.
2        It's -- there's a lot more involved.
3  Q.  So, there were different ethical considerations involved
4    in Goch giving a sizeable donation or food --
5        MS. BALIAN:  Objection.  There's been no testimony
6    about a sizeable donation.
7  BY MS. MARZOTTO TAYLOR:
8  Q.  -- to the police department than, you know, the party
9    store across the street giving you guys some fried
10   chicken?
11       Those are two very different circumstances with
12   different ethical considerations involved?
13 A.  Yeah.  I think the circumstances are a little bit
14   different.
15 Q.  Let's see here.
16       Do you believe that your -- and I'll use your
17   words -- "putting things in motion" to discipline
18   Matthew Furman on various occasions in 2016 led to your
19   trial board and ultimate suspension?
20 A.  It had a large influence upon it, yes.
21 Q.  Okay.  And what was that influence?
22       Why would your putting things in motion to
23   discipline Furman lead to you being -- lead to the call
24   for your termination?
25 A.  Well, if Matt Furman is suspended, he's not out towing

Page 217

1 cars, and he's not making revenue for the City. And if
2 I was one of the causes of that to happen, then I
3 believe that's why the City came after me.
4 Q. Okay. You were asked a question about why you didn't
5 FOIA the transcript of your testimony in between
6 receiving the notification of your trial board and the
7 trial board actually taking place.
8 Is your chain of command responsible under your
9 contract for giving you notice of specifically why
10 you're going to be disciplined?
11 It that an obligation that your chain of command
12 has?
13 A. That they would tell me why we were disciplined?
14 Q. That they would tell you why you were about to be
15 disciplined.
16 Is it your responsibility to figure out why you're
17 being disciplined, or is that the City's responsibility
18 to tell you?
19 A. It would be the City's responsibility to tell me. It's
20 not mine.
21 MS. MARZOTTO TAYLOR: Okay. I think I have no more
22 questions.
23 MS. BALIAN: Okay. I have questions.
24 * * *
25 RE-EXAMINATION

Page 218

1 BY MS. BALIAN:
2 Q. Can you pull out Exhibit 1, please?
3 I think it's in here.
4 Can you turn to the page right after that?
5 You just said it was the City's responsibility to
6 inform you of why you're being disciplined; correct?
7 A. Yes.
8 Q. Okay. The top paragraph right here, the last line says:
9 "The reason for discipline is including,
10 but not limited to, the following:"
11 And it lists those; correct?
12 A. Yes. That's the document that they served me.
13 Q. Okay. And it's signed by Jeff Bolton; correct?
14 A. Yes.
15 Q. And he's the chairman of the Public Safety Commission?
16 A. Yes.
17 Q. And it's dated September 7th of 2016; correct?
18 A. Yes.
19 Q. And that's a week before your trial board; correct?
20 A. Yes.
21 Q. So, they informed you of the reasons for your
22 discipline; correct?
23 A. Yes.
24 Q. Okay. And you testified just now that you believe the
25 reason for your discipline was because you put things in

Page 219

1 motion relative to the discipline of Matt Furman.
2 Why is it you believe that rather than what's
3 listed in this document, considering there's three
4 officers that testified at the Hayse removal hearing
5 that they heard you and Chad Hayse testify about telling
6 officers not to tow vehicles, calling the mayor names,
7 et cetera?
8 A. If they said that, I believe they're being untruthful.
9 Q. Okay. That wasn't my question.
10 MS. BALIAN: Can you repeat my question please,
11 John?
12 THE REPORTER: Yes. One second, please.
13 (Record repeated by the reporter.)
14 A. I believe we've already touched on that, and I stated
15 earlier that myself or Chad Hayse has never told anyone
16 not to tow vehicles. And that any discussions that we
17 ever had were in private and not in front of other
18 people for them to hear.
19 BY MS. BALIAN:
20 Q. I understand that's your testimony.
21 There were three officers that testified
22 contradictory to that.
23 So, my question to you is, you're saying that's not
24 why I was suspended or why they're coming after me. The
25 real reason is because of my suspension or putting

Page 220

1 things in motion of Matt Furman.
2 So, my question to you is, considering there was
3 contradictory testimony to what you testified to by
4 three officers at the Hayse removal hearing, what
5 evidence do you have that the reason that they came
6 after you was because you put in motion this Matt Furman
7 discipline?
8 A. That's what I believe.
9 Q. Okay. Do you believe that if officers -- three officers
10 testified contradictory to you at the Chad Hayse removal
11 hearing that you and Hayse told officers not to impound
12 vehicles, that the City has to consider that and look
13 into it?
14 MS. MARZOTTO TAYLOR: Speculation. Form. Lack of
15 foundation.
16 A. I guess they could look at it, but I know it's not true.
17 BY MS. BALIAN:
18 Q. And if there was also testimony from officers that you
19 and Chad Hayse referred to the mayor in disparaging
20 terms, that the City needs to look into it?
21 MS. MARZOTTO TAYLOR: Lack of foundation.
22 BY MS. BALIAN:
23 Q. You can answer.
24 A. I guess they can look into it, but it's not true.
25 Q. Okay. And if they determined that there was testimony

Page 221

1    given by you at the removal hearing that is
2    contradictory to what you put in your response to this,
3    that's certainly relevant and important to the City;
4    correct?
5         MS. MARZOTTO TAYLOR:  Speculation.  Lack of
6    foundation.
7    BY MS. BALIAN:
8    Q.  Whether it was intentional or not intentional?
9    A.  I would think so.  They can look at it, but I know what
10   I know.  I know what the truth is.
11   Q.  Who supervises the police officers?
12   A.  The -- which -- there's the chief, then there's the
13   lieutenants that oversee a shift, and there's a sergeant
14   on each shift that works on the road with the road
15   patrol officers.
16   Q.  And who oversees the police department?
17   A.  Safety Commission.
18   Q.  Okay.  So, Rich Ortiz doesn't have anything to do with
19   any of that, does he?
20        MS. MARZOTTO TAYLOR:  Form.
21   A.  No.
22        MS. MARZOTTO TAYLOR:  Any of what?
23        MS. BALIAN:  Okay.
24        MS. MARZOTTO TAYLOR:  Any of what?
25        MS. BALIAN:  Supervising the police officers or

Page 222

1    overseeing the police department.
2         MS. MARZOTTO TAYLOR:  Okay.
3         MS. BALIAN:  Did you not understand my questions?
4         MS. MARZOTTO TAYLOR:  I didn't.
5         MS. BALIAN:  Okay.  He seemed to, and that's really
6    all I care about.
7    BY MS. BALIAN:
8    Q.  So, when you say that he probably could influence
9    regarding raises, so Rich Ortiz has a responsibility to
10   the city council to report the finances of the City; is
11   that fair?
12   A.  Yes.
13   Q.  Okay.  And you don't have any evidence whatsoever that
14   he influenced city council regarding giving raises or no
15   raises whatsoever of the police officers; correct?
16   A.  No.  I just remember the statement that he had made at
17   the front desk.
18   Q.  What time did you arrive here to the office of Deb
19   Gordon this morning?
20   A.  About 9:30.
21   Q.  Who did you talk to once you got here?
22   A.  I spoke briefly with Deb Gordon and Liz.
23   Q.  What did you talk about?
24   A.  We talked about the documents that I brought.
25   Q.  Did you bring any other documents with you other than

Page 223

1    what's marked as Exhibit 1?
2    A.  The letter for the deposition, a copy of the subpoena,
3    and there's a check for mileage.
4    Q.  Do you have any other documents relative to the
5    Complaint for your Suspension, Demotion and/or
6    Termination that you have?
7    A.  No.  This is everything that I brought with me.
8         They made copies of the items that were entered
9    into evidence.
10   Q.  Okay.  Have you talked to anyone else about your
11   testimony here today?
12   A.  I spoke with Chad Hayse on a break.
13   Q.  And what did you talk about?
14   A.  We talked about the -- how everything was coming along.
15   Q.  And what did you say?
16   A.  It seemed like it was going okay.
17   Q.  Did you review any documents prior to testifying today?
18   A.  I reviewed the documents that were entered into evidence
19   today.  I looked at them last night.
20   Q.  By "the documents that were entered into evidence," do
21   you mean Exhibit 1?
22   A.  Yes.  I looked at those documents yesterday before I
23   went to bed.
24   Q.  Okay.  Didn't review anything else?
25   A.  No.

Page 224

1    Q.  Have you consistently been in contact with Chad Hayse
2    since his removal?
3    A.  We talk or text occasionally.
4         We met up for -- at Andiamo's in Dearborn before
5    Christmas, and Chad and our wives I -- Chad and our
6    wives went to Greenfield Village for the holiday nights.
7         That was the last time I had seen him.
8    Q.  So, it's fair to say you're personal friends with Chad?
9    A.  Yes, we are friends.
10   Q.  How long have you had a personal friendship with him?
11   A.  Twenty years.
12   Q.  Is it also fair to say you did not want him to be
13   terminated?
14   A.  No, I did not want him to be terminated.
15   Q.  Were you under oath at the time of your trial board?
16   A.  I do not believe so, no.
17   Q.  You weren't sworn in?
18   A.  No.
19   Q.  Witnesses were called; correct?
20   A.  No.
21   Q.  John Allen wasn't called as a witness?
22   A.  I'm sorry.  He came in briefly, but no one else
23   testified in that matter.
24   Q.  So, there was testimony taken?
25   A.  Yes.  John Allen came in for a couple minutes.

Page 225

1   Q.   And you don't believe they were sworn in?
2   A.   No, I don't believe so.
3             I believe Mr. Coogan said that this was going to be
4        an informal hearing at the beginning.
5   Q.   And did you provide testimony?
6   A.   I read this form, and I answered questions that were
7        posed to me by the Safety Commission.
8   Q.   Okay.  Did you record it?
9   A.   No.
10            MS. BALIAN:  I don't have any other questions.
11            MS. MARZOTTO TAYLOR:  Okay.  Just a couple
12       follow-ups.
13                        *   *   *
14                     RE-EXAMINATION
15  BY MS. MARZOTTO TAYLOR:
16  Q.   Turning your attention back to Exhibit 1 -- the pages
17       have gotten out of order, so --
18  A.   I've got it right here.
19  Q.   Can you flip it?
20  A.   Okay.
21  Q.   So, page 2 of Exhibit 1.
22            On page 2 of Exhibit 1, you are accused in
23       paragraph 2 of:
24            "Lying to Mayor and City Council at a
25            public hearing --"

Page 226

1             Does this document tell you what that lie was?
2   A.   No.
3   Q.   Okay.  And there was some testimony just now about three
4        individuals who gave testimony at the August 29th and
5        30th termination proceeding, and their -- the testimony
6        of those three individuals was contradictory to your
7        own.
8             Were you ever told why the Public Safety
9        Commission, Lawrence Coogan, various other city
10       officials found those three individuals more credible
11       than yourself?
12  A.   No.  I -- I don't know why they considered them more
13       credible.
14  Q.   Okay.  So, your trial board in September 2016, you said
15       earlier that there was someone there from the City who
16       was taking notes.
17            Was that trial board recorded by the Public Safety
18       Commission?  Was there an audio recording made of that?
19  A.   I don't believe, because after the hearing was over,
20       then it was open to the public and they went back on
21       the record.
22  Q.   Okay.  So, to clarify, this was a closed session of a
23       previously scheduled Public Safety Commission meeting?
24  A.   No.  This was a special -- this was at the end of a
25       Safety Commission meeting, and it was closed to the

Page 227

1        public.
2   Q.   So, they went into closed session and then went back on
3        the record?
4   A.   Yes.
5             MS. MARZOTTO TAYLOR:  Okay.  That's it.
6             MS. BALIAN:  No more.
7             (Deposition concluded at 4:15 p.m.)
8                        *   *   *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 228

1   STATE OF MICHIGAN )
2   COUNTY OF OAKLAND )
3             CERTIFICATE OF NOTARY PUBLIC
4        I do hereby certify that the witness, whose
5   attached testimony was taken in the above matter, was
6   first duly sworn to tell the truth; the testimony
7   contained herein was reduced to writing in the presence
8   of the witness by means of stenography; afterwards
9   transcribed; and is a true and complete transcript of
10  the testimony given.
11       I further certify that I am not connected by blood
12  or marriage with any of the parties; their attorneys or
13  agents; and that I am not interested, directly or
14  indirectly, in the matter of controversy.
15       In witness whereof, I have hereunto set my hand
16  this day at Highland, Michigan, County of Oakland, State
17  of Michigan on Friday, March 30, 2018.
18
19
20
21  John J. Slatin, RPR, CSR-5180
22  Certified Shorthand Reporter
23  Notary Public, Oakland County, Michigan
24  My commission expires:  July 25, 2023
25