# EXHIBIT Z

# In the Matter Of:

## HAYSE vs CITY OF MELVINDALE, ET AL.

## LAWRENCE J. COOGAN, ESQUIRE

April 30, 2018

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 1

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF MICHIGAN
3                  SOUTHERN DIVISION
4
5   CHAD HAYSE,
         Plaintiff,
6   -vs-                        Case No.: 17-cv-13294
    CITY OF MELVINDALE, a political Hon. Linda V. Parker
7   Subdivision of the State;     Mag. Elizabeth A. Stafford
    MELVINDALE CITY COUNCIL, a
8   legislative body of the City of
    Melvindale; NICOLE BARNES,
9   WHEELER MARSEE, MICHELLE SAID
    LAND, DAVE CYBULSKI, CARL
10  LOUVET, and STEVEN DENSMORE,
    individuals, sued in their
11  official and personal capacities,
         Defendants.
12  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~/
13  DEPONENT:   LAWRENCE J. COOGAN, ESQUIRE
14  DATE:       Monday, April 30, 2018
15  TIME:       10:15 a.m.
16  LOCATION:   Deborah Gordon Law
17              33 Bloomfield Hills Parkway, Suite 220
18              Bloomfield Hills, Michigan
19
20  REPORTER:   John J. Slatin, RPR, CSR-5180
21              Certified Shorthand Reporter
22
23          (Appearances listed on page 2)
24
25
```

Page 2

```
1   APPEARANCES:
2
3       DEBORAH L. GORDON (P27058)
4       ELIZABETH MARZOTTO TAYLOR (P82061)
5       Deborah Gordon Law
6       33 Bloomfield Hills Parkway, Suite 220
7       Bloomfield Hills, Michigan  48304
8       (248) 258-2500
9       dgordon@deborahgordonlaw.com
10      emarzottotaylor@deborahgordonlaw.com
11          Appearing on behalf of the Plaintiff.
12
13      GREGORY M. MEIHN (P38939)
14      JOHN STEPHEN GILLIAM (P81421)
15      Foley & Mansfield, PLLP
16      130 E. Nine Mile Road
17      Ferndale, Michigan  48220
18      (248) 721-8183
19      gmeihn@foleymansfield.com
20      jgilliam@foleymansfield.com
21          Appearing on behalf of the Defendants.
22
23          (Appearances continued on page 3)
24
25
```

Page 3

```
1   APPEARANCES (Continued):
2
3       PHILIP J. THOMAS (P31298)
4       Philip J. Thomas Attorney at Law
5       18720 Mack Avenue, Suite 240
6       Grosse Pointe Farms, Michigan  48236
7       (313) 821-2600
8       philipjthomas@aol.com
9           Appearing on behalf of The Witness.
10
11      ALSO PRESENT: Chad Hayse
12               Richard Ortiz
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              TABLE OF CONTENTS
2
3   WITNESS                              PAGE
4
5   LAWRENCE J. COOGAN, ESQUIRE
6
7       Examination by Ms. Gordon         5
8
9   EXHIBITS
10  (Original exhibits retained; Copies attached):
11                          IDENTIFIED
12
13      Exhibit 1   E-mail from Striz dated    232
14                  2-23-15
15      Exhibit 2   E-mail from Hayse dated    233
16                  11-21-13
17      Exhibit 3   E-mail from Hayse dated    236
18                  12-3-14
19      Exhibit 4   E-mail from Striz dated    238
20                  3-4-15
21
22
23
24
25
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                     Pages 5–8

Page 5

1                        Monday, April 30, 2018
2                        Bloomfield Hills, Michigan
3                        10:15 a.m.
4                   *   *   *
5           (Parties present as indicated.
6           Mr. Hayse, Ms. Marzotto Taylor
7           and Mr. Meihn are not present.)
8                   *   *   *
9           LAWRENCE J. COOGAN, ESQUIRE,
10      having been first duly sworn, was examined and testified
11      as follows:
12                      EXAMINATION
13  BY MS. GORDON:
14  Q.  Hi, Mr. Coogan.
15  A.  Hi.
16  Q.  What is your -- before we get into all the questions,
17      what is your role in this case filed against the City of
18      Melvindale in your capacity as attorney?
19  A.  I filed appearance on behalf of the City.  I represent
20      the City on this case.
21  Q.  Okay.  So, do you represent the City with regard to all
22      the claims in the case?
23  A.  Yes.  I would have to say yes.
24  Q.  And you realize you're a witness here today?
25  A.  I do.

Page 6

1           And that complicates things.
2   Q.  And you realize you're going to be a witness at trial?
3   A.  I don't know that.
4   Q.  Well, we will be calling you.
5   A.  Okay.
6   Q.  So, now you know.
7           I mean, I think I've made that pretty clear all
8       along.
9           So, you are a witness and representing the City in
10      your role as an attorney?  That's your position here
11      today?
12  A.  Well, it was, yes.
13          I have not been a witness at this point.
14  Q.  Well, you were Noticed for your deposition today, and
15      you know the court has ordered your deposition?
16  A.  Correct.  That's why I'm here.
17  Q.  Okay.  Give me your current job title, if you would.
18  A.  I'm the city attorney, corporation counsel for the City
19      of Melvindale.
20  Q.  And how long have you held the position of corp counsel?
21  A.  I think --
22  Q.  2014?
23  A.  Yeah.  On or about that.
24  Q.  Okay.
25  A.  I don't have a date in front of me, so I don't know for

Page 7

1       sure.
2   Q.  What were you doing prior to being corp counsel?
3   A.  I was a city attorney as it relates to prosecution, the
4       Public Safety Commission, and any litigation that the
5       City was involved in.
6   Q.  Was there a corp counsel?
7   A.  Yes.
8   Q.  Who was that?
9   A.  Corinne Galusky.
10  Q.  Okay.  And what happened to Corinne Galusky?
11  A.  She's no longer there.
12  Q.  What happened?
13  A.  I --
14  Q.  You replaced her?
15  A.  I replaced her, yes.
16          I don't know why she left or --
17  Q.  Did you apply to a posting?
18  A.  No.
19  Q.  Okay.  So, when did you first begin to provide legal
20      services to the City of Melvindale?
21  A.  I -- it's been 11, maybe 12 years ago, I started doing
22      the prosecution.  Mayor Cadez appointed me, and I was
23      confirmed by council.
24  Q.  Appointed you to what?
25  A.  Prosecution, and then subsequently Public Safety

Page 8

1       Commission, and then litigation issues.
2   Q.  All right.  So, you were appointed as prosecution as of
3       when?  What year?
4   A.  I -- it's been about 11 years ago.
5   Q.  Okay.  So, what were you doing in that capacity?
6   A.  As a prosecutor, I was handling the cases in the 24th
7       District Court for the City of Melvindale and sometimes
8       the City of Allen Park, review warrant requests and
9       anything associated with trial with cases in the
10      criminal court.  And then subsequently with civil
11      actions involving the City.
12  Q.  And how many cases did you handle a month or a year on
13      behalf of the City?
14  A.  Oh, I couldn't guess.
15  Q.  Well, what were you getting paid at that time?
16  A.  It was an hourly rate.  But prosecution can be anywhere
17      between 30 cases a day or 60 cases in a day, and
18      sometimes trials are set.
19  Q.  Okay.
20  A.  And so it depended upon how it all worked out.
21  Q.  And what was your hourly rate?
22  A.  I think -- I'm not certain -- around $110, $120.
23  Q.  What percentage of your business was that back at that
24      time?
25  A.  Just doing prosecution?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 9–12

Page 9

1  Q.  Just doing prosecution for the City of Melvindale --
2  A.  And the Safety Commission?
3  Q.  Well, we haven't gotten to that yet.
4        You said first was prosecution and the Safety
5      Commission at the same time, the appointment, or not?
6  A.  Pretty much the same time, as I recall.
7  Q.  Okay.  So, let's roll back.
8        Prior to you being hired to do prosecution for the
9      City of Melvindale, what were you doing?
10 A.  Private practice for a number of years.
11       I also represented other municipalities as
12     prosecutor.
13 Q.  Okay.  When did you become a lawyer?  When were you
14     licensed?
15 A.  1988, I believe.
16       Thirty years.
17 Q.  Okay.  And so you were in private practice.
18       And you remain in private practice; correct?
19 A.  Correct.
20 Q.  All right.  So, what did you do between the time you
21     became a lawyer and the time you were retained or
22     appointed to be handling prosecutions and/or Public
23     Safety Commission for Melvindale?
24       What was the nature of your work?
25 A.  When I first became a lawyer, I was --

Page 10

1  Q.  Not when you first, but -- okay.  I'm sorry.  Go ahead.
2      You do it your way.
3  A.  Assistant city -- I'm just trying to be clear on this.
4        Maybe you can ask me the question again.
5  Q.  No.  Go ahead.
6  A.  I was a prosecutor for the City of River Rouge, when I
7      first started practicing law, as well as had a private
8      practice.
9        I also --
10 Q.  Go ahead.
11 A.  -- helped out with prosecution, when needed, in the City
12     of Lincoln Park and sometimes in Ecorse as well.
13 Q.  Okay.  And for how long did you do that?  Continually?
14 A.  For a number of years.  I don't -- 1988 to probably --
15     five years or so.  Five, six, seven years.
16 Q.  Okay.  And then, other than the municipal work you were
17     handling, were you doing anything else?
18 A.  My private practice.
19 Q.  And what was that?
20 A.  I do criminal.  I do some personal injury.  I do civil
21     litigation, some labor disputes.
22 Q.  What kind of civil --
23 A.  Some wrongful termination cases.
24 Q.  Okay.  What kind of civil litigation?
25 A.  I just explained that to you.

Page 11

1  Q.  Well, you said "personal injury," and then you also said
2      "civil."
3  A.  Just general civil.
4  Q.  Okay.  That's what I'm asking.  Other than --
5  A.  Contractual issues, representing corporations, suing
6      people.
7        There's a number of -- I mean, it's a pretty
8      diverse practice.
9  Q.  So, you didn't have one particular area of specialty
10     other than criminal?
11 A.  Well, I did some domestic, too.  I mean, it was a pretty
12     wide --
13 Q.  Okay.
14 A.  -- practice.
15 Q.  All right.  So, then you began to obtain work from
16     municipalities.
17       Are you from Downriver?
18 A.  Yes.
19 Q.  Okay.  Where did you grow up?
20 A.  First, I grew up initially in Lincoln Park, and then,
21     subsequently, we moved to Melvindale.  So, between
22     Lincoln Park and Melvindale.
23 Q.  Okay.  And where do you live today?
24 A.  I live in Dexter.
25 Q.  Okay.  And where did you go to high school?

Page 12

1  A.  Melvindale High School.
2  Q.  And college?
3  A.  I first went to Henry Ford Community College, received
4      an associate degree in criminal justice, and then I went
5      on to get my bachelor's degree from University of
6      Michigan in business, political science and history, and
7      a doctorate degree at Detroit College of Law, which is
8      now located on Michigan State campus.
9  Q.  A doctorate degree, you said?
10 A.  A doctorate of law, yeah.  Juris doctor --
11 Q.  Doctor of law?
12 A.  Yeah.
13 Q.  Okay.
14       All right.  So, I'm going to go back to when you
15     got hired in at Melvindale.
16       You were handling the prosecutions.  And then what
17     were you doing vis-à-vis Public Safety Commission?  What
18     was your role there?
19 A.  To sit on the Public Safety Commission as their attorney
20     and advise them of any legal issues.
21 Q.  Okay.  And were you replacing somebody in that role?
22 A.  Yes, I did.
23 Q.  Who did you replace?
24 A.  The law firm that had it was Pentiuk and Couvreur.
25       As to which attorney they sent to the Public Safety

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                        Pages 13–16

Page 13

1   Commission, I'm not certain.
2   Q.   Okay.  And what were you getting paid for your work on
3        the Public Safety Commission?
4   A.   Hourly rate.
5   Q.   $110 roughly?
6   A.   (Nods head.)
7        THE REPORTER:  I'm sorry.  Is that --
8   A.   Approximately, yes.
9   BY MS. GORDON:
10  Q.   Okay.
11  A.   I'm not going to quote the exact rate.  I really don't
12       know.  I think it was around $110.
13  Q.   That's fine.
14       So, what's the next thing that happened to you with
15       regard to the City of Melvindale?
16       When were your duties added to?
17  A.   Well, Corinne left, and they appointed me corporation
18       counsel, and I've had it ever since.
19  Q.   And who -- who did you know on the council at the time
20       you were appointed corp counsel?
21  A.   I know all of them.
22  Q.   And how did you know all of them?
23  A.   They're on the city council.
24  Q.   Well, you said you were doing prosecutions, and you're
25       working for the Public Safety Commission.

Page 14

1        So, you haven't yet said how you would know the
2        members of the council.
3   A.   Okay.  I graduated from Melvindale High School and, as
4        such, I've met them -- to even grow up, I knew most of
5        them.
6   Q.   Okay.  So, you've grown up with most of the city council
7        members?
8   A.   Well, they're younger -- a lot younger than me, but they
9        grew up in the town that I grew up in, so I knew them
10       from that.
11  Q.   So, you've had long relationships with most of the city
12       council members?
13  A.   I don't have a relationship with them.  I know them.
14       I never stated I had a relationship.  I know them.
15  Q.   Okay.  Well, if you've known them for a really long
16       time, I presume that's somewhat of a relationship.
17       These are people that knew you enough to select you for
18       this job and who you apparently have had multiple years
19       of being in the community with; correct?
20  A.   I've lived in the community up until I was 40, that's
21       correct.
22  Q.   Well, I'm talking about your relationship with the
23       council members.
24       So, let's go through it.
25       Which council members would you say you've known

Page 15

1        for a long time?
2   A.   I think Carl Louvet because he's the -- he's the
3        son-in-law of a real good friend of mine.
4   Q.   Okay.  Who else?
5   A.   I'm not sure what you mean "a long time."
6        I know them, know who they are.
7   Q.   Okay.  Well, let's --
8   A.   But I don't have a -- it's not like we go out to dinner
9        and --
10  Q.   How long have you known Ms. Barnes?
11  A.   Since she was involved with -- she ran for city council.
12  Q.   Okay.  And how did you get to know her, or did you know
13       her before she ran for city council?
14  A.   Yeah, I don't believe I had met her until she ran for
15       city council.
16  Q.   Okay.  And then how did you meet her?
17  A.   Just through her running for office.
18  Q.   Okay.  And did you -- have you ever given her a campaign
19       contribution?
20  A.   Her personally?
21       I don't believe so, no.
22  Q.   Well, why do you ask it that way?  "Her personally?"
23       Was there some kind a PAC or something?
24  A.   Well, I don't know -- there may have been.  I don't know
25       if she was part of that.

Page 16

1   Q.   Okay.
2   A.   So, I've never given her campaign dollars.
3   Q.   But you've given money to PACs or groups of candidates
4        or slates in the City of Melvindale; correct?
5   A.   Yes, I have.
6   Q.   And you do that each election cycle; is that correct?
7   A.   No.
8   Q.   What do you mean "no"?
9   A.   That's not correct.
10  Q.   Okay.  Is there an election cycle where you have not
11       contributed money to a candidate?
12  A.   Yes.
13  Q.   Okay.  When would that have been?
14  A.   Dozens of elections, I haven't donated to the campaign.
15  Q.   How much money do you typically donate when you do
16       donate in an election year?
17  A.   I don't really recall.
18  Q.   What's the range?
19  A.   You're asking me to speculate.  I wouldn't --
20  Q.   No, I'm not.  I'm asking you what you recall.
21  A.   I would think the campaign --
22  Q.   It's not speculation.  It's your money that you wrote a
23       check --
24  A.   Are you going to allow me to answer the question?
25  Q.   Hang on one second.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                 Pages 17—20

Page 17

1      Do you write checks, or is there some other way you
2    give money?
3 A.  Checks.
4 Q.  Okay.  All right.  Go ahead.
5      I mean, we can go --
6 A.  Yeah.
7 Q.  -- get the checks, but let's take a shot at it here.
8 A.  I think somewhere between $100 and $500 is all that's
9    permitted under the campaign finance law.  So, certainly
10   whatever was provided for in the campaign finance law is
11   what I would have donated, somewhere between there.
12 Q.  Is Nicole Barnes a friend?
13 A.  No.
14 Q.  Do you have her cell phone number in your phone?
15 A.  Yes, I do.
16 Q.  Do you text with her?
17 A.  I have.
18 Q.  How do you typically communicate with her?
19 A.  Most people I communicate with is via phone call.
20 Q.  Well, I didn't ask you most.  I just wanted her.  I
21   wanted to know how you communicate with her typically.
22 A.  Phone call.
23 Q.  Cell phone to cell phone?
24 A.  Could be office phone; could be cell phone.
25 Q.  How many numbers do you have?

Page 18

1 A.  In my phone?
2 Q.  No.
3      How many phone numbers do you have?  You
4    personally?  How many phone numbers are connected
5    with --
6 A.  To my office?
7 Q.  Well, I'm asking you.  I don't know, Mr. Coogan.  I
8    assume you have an office phone.  I assume you have a
9    cell phone.
10     Do you have a landline phone at home?
11 A.  Yes, I do.
12 Q.  Okay.  What other phones do you have?
13 A.  I have my cell phone.  I have my office phone, and I
14   have a home phone.
15 Q.  What's your cell phone?
16 A.  What is it?
17 Q.  What's your number?
18 A.  (734) 368-4927.
19 Q.  How long have you had that number?
20 A.  I don't recall.
21 Q.  A long time?
22 A.  Yeah, it's been a while.
23 Q.  Who is your carrier?
24 A.  Right now?
25     Sprint.

Page 19

1 Q.  Okay.  So, you communicate with Ms. Barnes with which of
2    those numbers?
3      You've already said cell phone.
4      Office phone?
5 A.  Yes.
6 Q.  Okay.  Do you have a number at the City?
7 A.  No.
8 Q.  Okay.  Your office number is your law firm number?
9 A.  Correct.
10 Q.  Okay.  And you said you text with Ms. Barnes?
11 A.  I have.  Not that terribly often.
12 Q.  Okay.  Well, I would like you to retain all texts you
13   currently have on your phone with regard to Ms. Barnes.
14   Certainly anything going back to January 2016.
15     Okay?
16 A.  Yeah.
17     I don't think I have that, but okay.
18 Q.  Why don't you have them?
19 A.  I don't think there's very many texts that I text with
20   her, but --
21 Q.  Okay.  Well, whatever.
22 A.  Whatever is there.
23 Q.  Whatever you have, I'm asking that you retain it because
24   we're going to be requesting it.
25 A.  That's fine.

Page 20

1 Q.  Okay.  When is the last time you talked to Ms. Barnes?
2 A.  At the last council meeting.
3 Q.  When was that?
4 A.  It would be approximately two weeks ago.  I could pull
5    my calendar up if you want me to look and give you the
6    date.
7 Q.  No.
8 A.  The council meetings are on the first and third
9    Wednesday of the month.
10 Q.  You haven't talked to her since her deposition?
11 A.  No, I have not.
12 Q.  You've read her deposition transcript?
13 A.  No, I have not.
14 Q.  You haven't read it?
15 A.  No, I haven't.
16 Q.  Do you have a copy?
17 A.  I don't believe so.
18 Q.  Well, you've been obtaining copies of deposition
19   transcripts, haven't you?
20 A.  Some, not all.
21 Q.  Which ones?  Which ones?
22 A.  I don't know.
23 Q.  Well, let's just pause a moment and let you think about
24   that.
25     Whose dep transcript do you remember obtaining a

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 21–24

Page 21

1    copy of?
2    A.   I know I have Mike Welch's.  I'm not sure if I have
3         Wheeler's.  I think I may have Wheeler's.
4             I don't recall.
5    Q.   Okay.  So, have you been advised of what Ms. Barnes
6         testified to in this office last week?
7    A.   No.
8    Q.   You have no idea?
9    A.   No.  I wasn't here.
10   Q.   I didn't ask you if you were here --
11   A.   I have not read the transcript, I have not been advised,
12        and I have not talked with her.
13   Q.   You don't know what she said about you?
14   A.   I think I was pretty clear about that.
15            I have not been advised, I have not talked with
16        her, and I don't know what she testified.
17   Q.   Okay.  Have you read her original deposition transcript?
18   A.   No, I have not.
19   Q.   Okay.  And you have not talked to her since the last
20        council meeting?
21   A.   That's correct.
22            She tried calling me, and I tried calling her.  We
23        have not talked.
24   Q.   Do you socialize with her at all in any manner?  Lunch?
25        Dinner?  Coffee?

Page 22

1    A.   No.
2    Q.   Social event?
3    A.   I've never had coffee with her.  I had lunch with her
4         the day she testified at the first deposition here.
5         I've seen her at political events involving the City.
6    Q.   Such as what?
7    A.   Meetings that she would attend and I would attend.
8    Q.   Well, is that a political event?  A meeting?
9             What kind of meetings are you talking about?
10   A.   City functions.
11   Q.   Like what?
12   A.   City council meetings.  She's attended some Public
13        Safety Commission meetings.
14   Q.   Do you call those political events?
15            I mean, that's the term --
16   A.   They're City functions.
17   Q.   Okay.  Well, you said "political" --
18   A.   Well, political events, I -- well, don't mischaracterize
19        my statement.  I've seen her at political events
20        involving people running for office.
21   Q.   Okay.  Well --
22   A.   So, that would be political events.
23   Q.   I said --
24   A.   The City events would be the meetings.
25   Q.   Okay.  What political events have you seen her at?

Page 23

1             (Ms. Marzotto Taylor enters the room.)
2    A.   Election.  Campaign election day --
3    BY MS. GORDON:
4    Q.   Okay.
5    A.   -- for various candidates.  Not just her but other
6         people as well.
7    Q.   And how about Ms. Striz?  How long have you known her?
8    A.   Are you referring to Mayor Bazman?
9    Q.   Yeah.
10   A.   I knew her when she first ran for city council.  That's
11        when I met her, when she was running on the Cadez team.
12   Q.   Okay.  And is she a friend?
13   A.   Yeah, I think so.
14   Q.   Do you socialize with her from time to time?
15   A.   We've went to lunch a few times to discuss City issues.
16            So, socialize as relates to City issues.
17   Q.   Any other members of the council that you socialize
18        with?
19   A.   Currently now, no.
20   Q.   Historically?
21   A.   Kelly Hess, the former treasurer, I socialized with her
22        a bit.  But mostly as it relates to like Oktoberfest or
23        the City festivals and Melvindale Days, things of that
24        nature.
25   Q.   Okay.  What percentage of your overall income is your

Page 24

1         remuneration from the City of Melvindale as of January
2         2018?
3    A.   Of course, having a private -- you're talking about as
4         of 2018?
5    Q.   Sure.
6    A.   This year until now?
7    Q.   Sure.
8    A.   Maybe 20 percent.
9    Q.   So, what is your income from Melvindale?
10   A.   I'm on a salary.
11   Q.   What is it?
12   A.   I believe it's $160,000 a year.
13   Q.   And do you receive any other money?
14   A.   From the City?
15   Q.   Yeah.
16            For any other functions whatsoever.
17   A.   Yes, I do.
18   Q.   Okay.
19   A.   I get something for the Downtown Development Authority.
20   Q.   Okay.  What is that?
21   A.   It's an hourly rate.
22   Q.   And what do you make roughly a year on that?
23   A.   I think last year it was approximately $2,500.
24   Q.   Okay.  So, you make roughly -- from your employment with
25        the City roughly $162,500 a year?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 25

1  A.  That would be correct.
2  Q.  And that's what percent of your total reported income?
3  A.  You know, I don't know.  I can't give you the exact
4      percentage.
5  Q.  Well, give me a rough idea.
6  A.  I just can't.
7  Q.  Okay.  Well, I'm going to have to get an answer from you
8      of what -- then give me your total income you reported,
9      if you don't want to give me a percentage, and I'll do
10     the math.
11         What did you -- I mean, Tax Day was, what, last
12     week?  I don't know if you filed or got an extension,
13     but you know what you earned in '18.
14         So, what percentage of your remuneration, your
15     entire income was the money you received from
16     Melvindale?
17  A.  Last year may have been about 40 percent.  That's best
18     guess.
19  Q.  Okay.  So, you're making $3-, $4-, $500,000 a year?
20         Is that what you're telling me?
21  A.  Gross income?
22  Q.  Yeah.
23  A.  I --
24  Q.  No, net to you.  Net to you.
25         I don't know what you mean by "gross."

Page 26

1         I'm not talking about what fees come in before you
2      have to pay bills at your law firm.  I'm talking about
3      reportable income.
4  A.  What's the question again?
5  Q.  Uh-huh.
6         So, what was your reportable income for 2018?
7  A.  I think I knew my gross, but I don't know exactly what
8      my net is.
9  Q.  I don't know what you mean by "gross."  Just what you're
10     reporting as -- what do you mean by "gross"?
11  A.  Total gross proceeds the office received was, I think,
12     around --
13  Q.  Before you mean, you pay salaries and stuff?
14  A.  Correct.
15  Q.  Yeah.  Well, that's not going to be very helpful.
16         You --
17  A.  $150,000, let's just say.
18  Q.  That's net to you that you report?
19  A.  That's my best guess at this point.  I don't have my
20     taxes in front of me.  I don't have the exact --
21  Q.  Okay.  Fair enough.
22         So, you make roughly 50 percent a year your income
23     from the City of Melvindale?
24  A.  No.  I think it's less.
25  Q.  40 to 50?

Page 27

1  A.  That would be a good -- I guess that's a good
2      approximation.
3  Q.  Okay.  And how many hours a week do you work for the
4      City of Melvindale?
5  A.  Anywhere between 15 to 60, depending upon which tasks
6      are being done.
7  Q.  How long is your term -- current term of appointment?
8  A.  Well, like all appointed officials, I serve at the will
9      and pleasure of the mayor and council.
10         So, it would be, I believe, until they remove me or
11     the end of this term.
12         (Mr. Hayse enters the room.)
13  BY MS. GORDON:
14  Q.  Okay.  And at the end of this term, what happens?
15         Do you have to get reappointed?
16  A.  Yes.  Yes.  Yes.
17  Q.  Okay.  So, when is the end of the term?
18  A.  The November -- I think on the '19 -- '19 would be the
19     next election.
20  Q.  Okay.  So, at that point somebody will presumably make a
21     motion --
22  A.  Well, there will be a new mayor appointed or elected and
23     a new council, and they will appoint who they wish.
24  Q.  Right.
25         But you've been appointed how many times now?

Page 28

1  A.  In various capacities?
2  Q.  Sure.  Yeah.
3  A.  At least three.
4  Q.  Okay.  And I guess --
5  A.  In Melvindale.
6  Q.  I presume you intend -- your plan is that you will be
7      reappointed again if all goes well?
8  A.  I would like to see that happen, yes.
9  Q.  And you have no reason to think you will not be
10     reappointed, I assume?
11  A.  Well, I don't know --
12  Q.  Nothing you know of?
13  A.  Yeah.  I don't know who is going to be running for which
14     office and who is going to be elected.
15         So, I would hope I'm in consideration, yes.
16  Q.  Is your performance evaluated by the City?
17  A.  There are no performance review hearings.
18  Q.  Okay.  And give me -- so, you said you originally
19     started out as being a prosecutor and being legal
20     representative for the PSC.
21         What was the next thing that happened with you and
22     the City?
23  A.  I also said -- to reiterate, I was involved in
24     litigation for the City.
25  Q.  Okay.  And what did that involve?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 29

```
1   A.  Any litigation that the City was involved with.
2   Q.  Give me just a -- an example of what that would be.
3   A.  One case that -- off the top of my head would be the
4       lawsuit filed by a management company against the City,
5       JRV versus the City of Melvindale.
6   Q.  Okay.  And did you handle that yourself?
7   A.  Yes.
8   Q.  Do you have the ability to hire outside counsel?
9   A.  If needed.
10  Q.  Have you done that?
11  A.  On occasion.
12  Q.  Okay.  When is the last time that happened?
13  A.  I'm uncertain.  I don't recall.
14          Occasionally, I have conflicts and, as such, people
15      cover things.
16  Q.  And who have you hired or recommended be hired as
17      outside counsel that you --
18  A.  Joe Grenn represents EDC.
19  Q.  I don't know who Joe Grenn is, and I don't know what EDC
20      is.
21  A.  Economic Development Corporation.
22  Q.  Okay.  Did you bring him in to handle something?
23  A.  Actually they were looking for an attorney on EDC, and
24      Corinne Galusky held that position.  And I recommended
25      someone else to do that.
```

Page 30

```
1   Q.  And that was Grenn?
2   A.  Yeah, Joe Grenn.
3   Q.  Spell that, please.
4   A.  G-r-e-n-n.
5   Q.  And how do you know him?
6   A.  I've known him since U of M.
7   Q.  So, he's an old friend -- college friend?
8   A.  His brother worked for me.  Fred Grenn is also an
9       attorney.  Joe's dad was an attorney.  Fred worked for
10      the supreme court for a while.  I've known the family
11      for years.
12  Q.  Did you get any referral fees from him?
13  A.  No.
14  Q.  Never?
15  A.  No.  On City cases, no.
16  Q.  On anything.  On anything.
17  A.  Yeah.  There may have been referrals back and forth on
18      civil litigation.
19  Q.  Okay.  So, he refers you cases periodically?
20  A.  No.  I think I referred him cases.
21  Q.  Okay.  You refer him cases --
22  A.  Yeah, some personal injury or something like that.
23  Q.  -- and then he gives you referral fees?
24  A.  He has, yes.
25  Q.  Okay.  Who else have you used as outside counsel?
```

Page 31

```
1   A.  Well, as you -- you deposed Mr. Guzall.  He was used to
2       moderate, mediate, or facilitate the removal hearing
3       that was set regarding this case, Mr. Hayse.
4   Q.  Okay.  And how do you know Mr. Guzall?
5   A.  I've known him for several years.
6   Q.  How many?
7   A.  Three, four, maybe a little -- he was a prosecutor in
8       the City of Romulus for a while.
9   Q.  So, how do you know him?
10  A.  Well, I've had cases in Romulus.  He was a prosecutor
11      there years ago.  I kind of -- didn't really know him
12      well, but I met him there years ago, probably five or
13      six years ago.
14  Q.  Well, so --
15  A.  I never had discussions with him.  Just prosecuted.  I'm
16      defense attorney, negotiate a plea.
17  Q.  Is he a friend?
18  A.  No.
19  Q.  Do you refer him cases?
20  A.  I may have.
21  Q.  You may have referred him cases?
22  A.  I may have.
23  Q.  Does he refer you cases?
24  A.  One case I can recall right now.
25  Q.  And what is that?
```

Page 32

```
1   A.  It was a domestic case.
2   Q.  Okay.  So, how did you happen to pick him to run this
3       hearing?
4   A.  Well, he was an individual who was very competent in
5       labor law.  He had been involved in representing
6       municipalities.  He had been involved in representing
7       plaintiffs and police officers, firefighters, suing
8       municipalities.  So, I thought someone with his type of
9       background and experience would -- give someone the
10      opportunity to oversee it who had experience in the area
11      on both sides.
12          So, I just thought it made really good sense to
13      pick a real good attorney who had experience on both
14      sides to handle that.  I recommended him to the City.
15  Q.  And have you ever represented anybody in his family?
16  A.  You know the answer to that question is yes.
17  Q.  Okay.  Well, why don't you tell me what the
18      representation is.
19          What's the case?
20  A.  His wife.
21  Q.  And what's the case?
22  A.  Wrongful termination case.
23  Q.  Against who?
24  A.  The City of Romulus.
25  Q.  Okay.  And when did you undertake to represent her?
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                          Pages 33–36

Page 33

1   A.   I don't recall the exact date.
2   Q.   Well, give me a year.
3   A.   I don't recall.  The Complaint was filed.  An attorney
4        left the case, and she asked me to take the case.
5   Q.   When was this?
6   A.   So, I think it could have been sometime -- I'm unclear.
7        I think it was '17.  Sometime in '17.
8   Q.   Are you still representing her?
9   A.   Yes, I am.
10  Q.   The case is ongoing?
11  A.   Yes, it is.
12  Q.   Where is that filed?
13  A.   Last week we were in the U.S. Sixth Circuit Court of
14       Appeals in Cincinnati.
15  Q.   Okay.  So, it was a federal court case?
16  A.   Yes, it is.
17  Q.   And was it a summary judgment dismissal?
18  A.   Yes, it was.
19  Q.   Okay.
20  A.   Some interesting issues.
21  Q.   So, now you've appealed it to the Sixth Circuit?
22  A.   Uh-huh.  Uh-huh.
23       THE REPORTER:  I'm sorry.  Is that "yes"?
24  BY MS. GORDON:
25  Q.   That's a "yes"?

Page 34

1   A.   Yes, that's correct.
2   Q.   And you're representing her on appeal?
3   A.   That is correct.
4   Q.   Okay.  So, was it ever filed in Wayne County?
5   A.   To the best of my knowledge, it's always been a federal
6        case.
7            The Complaint was already filed prior to my
8        involvement.
9   Q.   Okay.  And are you on a contingency or an hourly or
10       what?
11  A.   Contingency.
12  Q.   And did Mr. Guzall -- Ray Guzall refer that case to you?
13       Is that how you got connected up with his spouse?
14  A.   His wife contacted me.  So, I would assume -- well, I've
15       had discussions with her husband.  I don't know how, but
16       she contacted me and asked me to represent her.
17           And then subsequently I talked with both of them.
18  Q.   Okay.  And what's her name?
19  A.   Marianne.
20  Q.   Guzall?
21  A.   Uh-huh.
22       THE REPORTER:  I'm sorry.  Is that "yes"?
23  BY MS. GORDON:
24  Q.   That's a "yes"?
25  A.   Correct.

Page 35

1   Q.   Is -- are there any other lawyers on the case
2        representing her other than yourself?
3   A.   No.
4   Q.   Did you prepare the questions for Guzall to ask at the
5        hearing?
6   A.   No.
7   Q.   No?
8            Who prepared the questions?
9   A.   I don't know.
10  Q.   Well, how much did the City spend on him?
11  A.   I'm unclear as to the dollar amount.  I think it was
12       somewhere at $2,000.  I'm guessing.
13  Q.   All right.  So, what was his hourly rate?
14  A.   I don't know.
15  Q.   Okay.  So, he was there for two days; correct?
16  A.   The hearing was two days.  That's correct.
17  Q.   Right.
18           So, if his fee was $200 an hour, just for his time
19       in the hearing would have been roughly $3,000; correct?
20  A.   I don't know what he made.
21  Q.   Well, I do know what he made.  It was -- his bill was
22       $3,000, roughly.
23  A.   Okay.  Then he made $3,000.
24  Q.   Okay.  So --
25  A.   Okay.

Page 36

1   Q.   I'm trying to --
2   A.   I really don't know.
3   Q.   All right.  Look, Mr. Coogan, you brought the man in,
4        you selected him, you gave him his job duties; is that
5        correct?
6   A.   He asked me in what capacity, and the mayor asked me in
7        what capacity, and he was going to oversee the hearing.
8        Yes.
9   Q.   Okay.  What does "oversee the hearing" mean?
10  A.   To moderate, mediate, facilitate the hearing.
11  Q.   Okay.  Well, he did more than that.  He asked questions
12       of witnesses, didn't he?
13  A.   I think he did.
14  Q.   Okay.  So, how did he know what questions to ask?
15  A.   He was given a copy of the Complaint.
16       That's how he knew what questions to ask?
17  A.   I think it's a good question to ask him.  I don't know
18       how he knew what questions to ask.  He's a labor
19       attorney --
20  Q.   Okay.  Well, I'm asking about -- I'm asking --
21  A.   -- who has done -- excuse me.  I'd like to answer the
22       question.
23  Q.   Go ahead.
24  A.   He's a labor attorney who has represented both
25       municipalities and individuals.  I'm assuming he's

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 37–40

Page 37

1   intelligent enough to come up with his own questions.
2   Q.   Well --
3   A.   So, I don't know how he knew what to ask or what not to
4        ask.
5   Q.   Okay.  Well, did you sit down with him and discuss this
6        case at any time prior to the moment the hearing
7        started?
8   A.   Other than him coming in to mediate and giving him a
9        copy of the Complaint and going over the Complaint a
10       little bit and -- no, didn't have any other --
11  Q.   So, you did sit down with him and go over the Complaint?
12  A.   I didn't sit down with him at all.
13  Q.   You said, "He came in."  I assume he sat down.
14  A.   No.  I sent him a copy of the Complaint.
15  Q.   You said, "We sat down."
16  A.   Well, called me on the phone.  We had no face-to-face on
17       that issue.
18  Q.   Okay.  So, when did you talk on the phone with him?
19  A.   Shortly after the City engaged him.  I sent him a copy
20       of the Complaint.  I sent him a copy of some -- I can't
21       remember.  I can't recall, but --
22  Q.   Well, what else did you send him?
23  A.   Something that pertains to the case.  Probably the
24       City -- the --
25  Q.   The what?

Page 38

1   A.   The City charter or something, perhaps.
2   Q.   What else?
3   A.   I don't recall anything else.  I don't know.
4   Q.   Okay.  So, you talked with him on the phone about the
5        case, though, did you not?
6   A.   For a few minutes, that's correct.
7   Q.   And you told him about what had occurred; correct?
8   A.   I said, "A complaint had been filed.  I'm going to send
9        you a copy of it.  And the hearing is set for this date,
10       and the rules and regulations of the charter are as
11       follows."
12            I think I gave him a copy of the charter.  I may
13       have given him some rules and regs.  I don't recall.  I
14       really don't recall.  I gave him whatever I thought was
15       necessary, for someone who was going to moderate over a
16       hearing, to have in front of him.
17  Q.   Why did you need a moderator?
18  A.   I thought it would be best to have someone who is
19       neutral and --
20  Q.   You think he was neutral?
21  A.   Yeah.  He had no stake in the outcome.
22  Q.   Wait a minute.
23            This was an adversarial process, and you were the
24       adversary to the chief; correct?  You took on the
25       adversarial role?

Page 39

1   A.   No.  The city council person brought forth a complaint
2        and a hearing was held to either substantiate or not
3        substantiate the claims that were brought against the
4        chief.
5   Q.   Right.
6            And you took on the role of being the advocate on
7        behalf of the City.  You called witnesses.  You asked
8        questions, and you objected to things Chad Hayse did.
9        You did all those things just as a lawyer would in a
10       trial.
11            I mean, I see that from the transcript.  That's
12       uncontested; right?
13  A.   Well, he contested it.  Mr. Hayse contested it.
14  Q.   Your role is uncontested, sir.
15            You called witnesses?
16  A.   I did.
17  Q.   You placed objections to what Mr. Hayse was doing.
18            You made argument on behalf of the City or Nicole
19       Barnes', at least, theory of the case.  That's what you
20       did there.
21            I mean, it's -- I don't want to argue with you
22       about it.  You can see from the document.
23            But you took on an adversarial role.  You were not
24       neutral during the proceeding; correct?
25  A.   I represent the City --

Page 40

1   Q.   Right.  Well --
2   A.   -- and the city council.
3   Q.   Okay.  The City hadn't done anything.  There was a
4        complaint filed by one city council member in her sole
5        capacity as a city council member; correct?
6   A.   A complaint was filed by one council member.
7   Q.   By one person?
8   A.   That's correct.
9   Q.   The City had not done anything; correct?
10  A.   The city council person filed the complaint.
11  Q.   Right.
12            But the City had never voted to bring charges
13       against Chad Hayse.  We know that.
14  A.   The city council set a hearing at the request of the
15       complaint that was filed by Nicole Barnes.
16  Q.   Okay.  But the city council never voted on whether --
17       well, they have certain requirements of bringing forward
18       complaints that are made by individuals; correct?
19  A.   Correct.
20  Q.   Okay.  But the city council never voted to bring charges
21       against Chad Hayse.  They -- those were filed by one
22       individual person?
23  A.   It was filed by a city council member.
24  Q.   Yes.  One person; correct?  Nicole Barnes?
25            That's what she's testified to.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 41–44

Page 41

1   A.   That's correct.
2   Q.   Okay.  And at the hearing, you acted on behalf of
3        Ms. Barnes by bringing forth the allegations she had
4        made; correct?
5   A.   I acted in the capacity as city attorney on behalf of
6        the City.
7   Q.   Okay.  Well, what in your duties in writing anywhere
8        gives you the role of bringing forward disciplinary
9        charges based on a Complaint made by a lone individual?
10  A.   I did not bring charges forward.  The city council
11       person brought the charges forward.
12  Q.   Okay.  Well, you wrote the charges, sir.  So, let's
13       start with that.
14            What gives you the authority to --
15  A.   Well --
16  Q.   Hang on.
17            -- to write the charges?
18            What exists in the city charter?
19  A.   I am corporation counsel for the City of Melvindale.  I
20       handle any and all litigation, any and all
21       employee-related --
22  Q.   This wasn't litigation.
23  A.   -- issues.
24            THE REPORTER:  I'm sorry --
25  A.   Contractual negotiations, grievance procedures.

Page 42

1   BY MS. GORDON:
2   Q.   Okay.
3   A.   I do all of it.
4   Q.   But on all of that, you are representing the City itself
5        because the City has taken action, they voted on
6        something, or they are going to have to sign their names
7        to a contract.
8             This was not that situation.
9             So, I want to know what gave you the authority, in
10       writing, to write out the charges on behalf of Nicole
11       Barnes and/or yourself against the police chief when the
12       council had never voted on any such thing?
13            What exists in writing?
14            MR. GILLIAM:  Let me just object.  I think there's
15       an attorney/client privilege issue here based on
16       Ms. Barnes that we're asserting.
17            MS. GORDON:  You've got to be kidding me.
18            Well, Ms. Barnes has waived it up one side and down
19       the other.
20            MR. GILLIAM:  I don't think so.
21            MS. GORDON:  Okay.  I'm not going to argue with
22       you.
23            MR. GILLIAM:  No.  Well, I'm asserting the
24       privilege on behalf of Ms. Barnes.
25            MS. GORDON:  What privilege are you asserting?

Page 43

1            MR. GILLIAM:  Attorney/client privilege.
2            MS. GORDON:  For what?  What question?
3            MR. GILLIAM:  Ms. Barnes approached Mr. Coogan
4   and --
5            MS. GORDON:  Well, that -- you know what?
6            MR. GILLIAM:  And that's the privilege that we're
7   asserting.
8            MS. GORDON:  Okay.  You'll be -- yeah.  Well,
9   you'll be in contempt of court very soon on that one.
10           MR. THOMAS:  Just for the record, if they're
11  asserting a privilege, I'm instructing my client not to
12  answer questions relating what was told to him.  I'm not
13  sure what that question involved.
14           MS. GORDON:  Have you read the court order?
15           MR. THOMAS:  I did.  I have it in front of me --
16           MS. GORDON:  Have you got the transcript?
17           MR. THOMAS:  I do.  Yes, I do.
18           MS. GORDON:  You read the judge's transcript?
19           MR. THOMAS:  I did.
20           MS. GORDON:  Okay.
21           Would you read back my last question, John?
22           THE REPORTER:  Yes, one second, please.
23           MS. GORDON:  It had nothing -- before we go, it had
24  nothing to do with any conversation with Ms. Barnes,
25  just so you all on that side of the table can like stay

Page 44

1   with it.  It had to do with what authority he had to do
2   something; what exists in writing.
3            Go ahead.  Read the question.
4            THE REPORTER:  One second, please.
5            (Record repeated by the reporter.)
6   BY MS. GORDON:
7   Q.   Okay.  What gave you the authority to write out what --
8        you're governed by the charter.
9            (Discussion held off the record.)
10  BY MS. GORDON:
11  Q.   Okay.  Let's talk about the charter.
12           Per the charter, who do you represent?
13  A.   I represent the mayor and city council.
14  Q.   Okay.
15  A.   I represent the Public Safety Commission.
16  Q.   Okay.  As a --
17  A.   I --
18  Q.   Hang on.
19           Who else?
20  A.   DDA.  I represent DDA.
21  Q.   Okay.
22  A.   I represent the Planning Commission, the Zoning
23       Commission.
24  Q.   Okay.  So, here is what the charter says about the
25       corporation counsel.

Page 45

```
 1              MR. THOMAS:  Can I ask what page you're at?
 2              MS. GORDON:  22.
 3   BY MS. GORDON:
 4   Q.   (Reading.)
 5              "Corporation counsel shall superintend
 6         and conduct all of the legal business of the
 7         City."
 8         What is the definition of "legal business"?
 9   A.   You're asking me what the definition of "legal
10        business" is?
11   Q.   Yep.
12   A.   Handle any and all legal needs the City has.
13              That's kind of a self-descript- --
14   Q.   Hang on.
15   A.   I'm not done answering the question.
16              It's kind of a self-descriptive analysis, but I
17        handle any and all legal issues the City has.
18   Q.   Where the City is a party to something or the City is
19        going to take action as a City, or the City is going to
20        negotiate a contract; correct?
21   A.   That would be part of it, yes, not all of it.  And
22        that's your definition, not mine.
23   Q.   Well, I'm just looking at the charter.
24              I mean -- all right.  So, that's what this says.
25              You're going to conduct all legal business of the
```

Page 46

```
 1        City.
 2              You're going to draft ordinances; correct?
 3   A.   I handle all legal matters for the City.  That's
 4        correct.
 5   Q.   Okay.  I'm reading from --
 6   A.   In part and parcel --
 7   Q.   -- the charter.
 8   A.   Part and parcel would be drafting ordinances.
 9   Q.   Okay.  Well, do you know what?  That's not how the
10        charter sets it forth.  So, I'm just going to deal with
11        the charter.
12              It says:
13              "Corporation counsel shall draft all proposed
14        ordinances and approve them as to form."
15         Do you do that?
16         Do you draft proposed ordinances?
17   A.   Yes.
18   Q.   (Reading.)
19              "Corporation counsel shall prepare all
20         leases, deeds, contracts and other documents
21         as may be required by the council or any
22         department."
23         Do you do that?
24   A.   Yes.
25   Q.   (Reading.)
```

Page 47

```
 1              "Corporation counsel shall furnish, upon
 2         request, written opinions upon all subjects
 3         submitted by the council, the mayor, or any
 4         department head."
 5         Is that correct?
 6   A.   If requested, yes.
 7   Q.   And it says:
 8              "Corporation counsel shall have further
 9         powers as shall be prescribed by ordinance."
10         Are there any other ordinances that give you
11        powers?
12   A.   I'm not sure.
13   Q.   Okay.  So, you are allowed to act as legal counsel for
14        the City itself; correct?
15              MR. THOMAS:  Ms. Gordon, could I ask a question
16        before you move on?
17              Has he answered -- now answered that question?
18        Have we gotten around the attorney/client issue?
19              Because as you rephrased the questions, I don't see
20        any issue.
21              MS. GORDON:  Okay.  I didn't rephrase anything, but
22        I'm going to move on.
23              MR. THOMAS:  Well, you re-asked the question, and I
24        think --
25              MS. GORDON:  No, John read it.
```

Page 48

```
 1              MR. THOMAS:  Okay.  He did.
 2              MS. GORDON:  John read what I had asked.
 3              MR. THOMAS:  And are you satisfied that he's
 4        answered it now?
 5              Because I thought that he tried to clarify it
 6        without getting into attorney/client privilege issues.
 7              MS. GORDON:  I really don't understand what you're
 8        saying, Phil, but I'll just keep going, and you'll let
 9        me know if you have a concern --
10              MR. THOMAS:  Okay.  Okay.  That's fine.
11              MS. GORDON:  -- and we'll revisit it.  I'm not sure
12        what your point is.
13   BY MS. GORDON:
14   Q.   So, you are allowed to act on behalf of the City but not
15        on behalf of individual council members; correct?
16   A.   No.
17   Q.   Okay.  Well, where do you have authority to act on
18        behalf of individual council members?
19   A.   If --
20   Q.   Where does that exist?
21   A.   If a council member comes to me for legal advice, I can
22        give them legal advice.
23   Q.   Give me an example.
24   A.   Well, the ordinance or the policy or charter provision
25        that says a council person can file a complaint.  That's
```

Page 49

1    one example.
2    Q.  Okay.  Well, I'm not talking about what the charter says
3        about a council member being able to file a complaint.
4    A.  Well, I --
5    Q.  Hang on.
6            I'm trying to find out what gives you authority to
7        advise individual council members where the activity you
8        are undertaking is not being done on behalf of the City
9        or the council as a whole.
10   A.  When an individual comes to me for legal counsel, asks
11       for help, that gives me the authority.
12   Q.  So, you took it upon yourself to draft a Complaint
13       against the police chief --
14   A.  No.
15   Q.  I'm not done with my question.
16   A.  I just want to state right now.  Part of that question
17       is false.
18   Q.  Okay.  Well, you know, you've had --
19   A.  I didn't take anything upon myself.
20   Q.  Okay.  Well, we'll see what Ms. -- we'll see as the case
21       goes along what you did and what you didn't do.
22           You believe that you can act outside the scope of
23       representing the City itself?
24   A.  I don't believe that.
25   Q.  You don't believe what?

Page 50

1    A.  Acting outside the scope is something that's
2        appropriate.
3    Q.  Okay.
4            THE REPORTER:  I'm sorry.  Something "is" or "is
5        not" appropriate?  Sorry.
6    A.  Acting outside the scope of the City was her -- she
7        asked me a question, if I believe it was appropriate to
8        act outside of the scope of the City, and I said I don't
9        believe that's appropriate.  I'm the attorney for the
10       City.
11   BY MS. GORDON:
12   Q.  Are you aware that the Sixth Circuit has found that it's
13       the full city council that's the client of the City's
14       attorney?
15   A.  I'm aware of an opinion that you're referring to, I
16       believe.
17   Q.  And that communications between the City's attorney and
18       individual council members are not privileged --
19   A.  I don't --
20   Q.  -- because the councilmen are not clients.
21           MR. GILLIAM:  I'll just object --
22   A.  Any time --
23   BY MS. GORDON:
24   Q.  Are you aware of that or not?
25           I'll just ask you that.

Page 51

1    A.  Any time a council --
2            MR. GILLIAM:  Let me just object --
3            THE REPORTER:  I'm sorry.
4            MR. GILLIAM:  Objection on the form.  Seeks a legal
5        conclusion.
6    BY MS. GORDON:
7    Q.  Go ahead.
8            MR. THOMAS:  Could I ask what case you're referring
9        to?  The legal opinion?
10           MS. GORDON:  Reed versus Baxter, Sixth Circuit.
11           MR. THOMAS:  Well, I'm going to raise an objection
12       because I don't believe that that's what that case says.
13       I believe that the magistrate cited one sentence from
14       that opinion in the footnote.
15           MS. GORDON:  Okay.  That's fine.
16           MR. THOMAS:  And she didn't cite the follow-up
17       sentence.
18           MS. GORDON:  Okay.  I just want to know what
19       authority Mr. Coogan believes he has to work with
20       individual council members while being paid for that
21       action by the City.
22   BY MS. GORDON:
23   Q.  I want to know where your authority comes from, in your
24       mind.
25   A.  Any time someone comes to my office and asks for legal

Page 52

1        assistance, I have authority to act on their behalf.
2    Q.  Give me an example.
3    A.  I just did.
4    Q.  Somebody gets a traffic ticket, and you can help a
5        council member.  Council member gets a traffic ticket.
6        They can get legal advice from you?
7    A.  It would depend upon which jurisdiction the ticket was
8        written in.
9    Q.  Well, what if it's written in the City of Melvindale?
10       You can help them with their legal problem?
11   A.  Absolutely not.
12   Q.  Okay.  So --
13   A.  That would be -- as you know, you're a learned counsel.
14       That would be a conflict of interest.  I can't represent
15       the City against a council person.
16   Q.  Okay.  But -- so, you're telling me you would give
17       Ms. Barnes advice about a ticket written in Romulus.
18       You would assist her with her legal problem there.  I
19       guess that's what you're saying.
20   A.  Well, it would depend upon whether or not they came to
21       my office and asked for assistance.
22   Q.  Well --
23   A.  If they came to my office and asked for assistance,
24       anybody, in another jurisdiction, I'm certainly free to
25       take that case if I choose to take it.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                              Pages 53–56

Page 53

1  Q.  Not to take it, but to give her legal advice in your
2      role as counsel for the City of Melvindale.
3  A.  Well, that's not a council issue.  That's a separate
4      issue.
5  Q.  Okay.  I'm going to take an answer to my question.
6          Would you give Ms. Barnes legal advice, in my
7      hypothetical, if she came to the City -- your offices at
8      the City and said, "I need some assistance on figuring
9      out what to do with this traffic ticket.  I want your
10     advice"?
11 A.  If she came to my office to retain me to represent her
12     in another jurisdiction, and I decided to take the case,
13     yes, I would.
14 Q.  Okay.  But you wouldn't do it in your role as counsel
15     for the City of Melvindale?
16 A.  No.
17 Q.  But you were helping her with her Complaint against
18     Chief Hayse in your role as counsel for the City of
19     Melvindale is what you're arguing here?
20 A.  She came to me for --
21         MR. GILLIAM:  Same objection.
22 BY MS. GORDON:
23 Q.  It's just a "yes" or "no."
24 A.  She -- no, it's not --
25 Q.  It's just a "yes" or "no."

Page 54

1  A.  No.
2          She came to me for help with a legal issue pursuant
3      to the charter --
4  Q.  What was --
5  A.  -- as a council person.
6  Q.  What was the legal issue?
7          MR. THOMAS:  I'm going to raise an objection.  At
8      this juncture, I have to assert the attorney/client
9      privilege because he's -- he's asserting the privilege
10     and, if he's not waiving it, I'm going to say that
11     anything that was discussed between him and the
12     councilwoman is privileged, unless he's willing to waive
13     it.
14         MS. GORDON:  Well, you're going to have a real
15     problem because the councilwoman has already testified
16     and the Court has already opined.  I don't know if
17     you -- have you read Nicole Barnes' deposition, Phil?
18         MR. THOMAS:  I have not.  I actually requested it,
19     and I didn't get a copy of it.  I requested it last
20     week.  I've been in this case since Tuesday of last
21     week.
22         MS. GORDON:  Okay.  Well, do you know what?
23         MR. THOMAS:  So, I requested it, and I didn't get
24     it, but, Counsel --
25         MS. GORDON:  Who did you request it of?

Page 55

1          MR. THOMAS:  I requested it of Melinda, from
2      Mr. Meihn's office, and I haven't gotten it yet, but for
3      right now --
4          MS. GORDON:  Well, it was -- she ordered it
5      expedited.
6          MR. THOMAS:  Well, I didn't get a copy of it.
7          MS. GORDON:  Okay.  So, I don't know how you can
8      come here today and start asserting attorney/client
9      privilege without having seen what the so-called client
10     testified to already.
11         MR. THOMAS:  Ms. Gordon --
12         MS. GORDON:  Yeah.
13         MR. THOMAS:  -- the attorney/client privilege is
14     the City's.  He asserted the privilege, and what I'm
15     telling my client is that, since they have asserted the
16     privilege, he can't get into the contents of it.
17         MS. GORDON:  Okay.  This is --
18         MR. THOMAS:  He's -- his office has been in the
19     case for a long time.  I haven't.
20         MS. GORDON:  Okay.  Phil -- okay.  Maybe we'll get
21     the magistrate on the phone today, but you obviously are
22     being obstructive.  You don't seem to follow what your
23     client is saying.
24         What he's saying is that when he worked with
25     Ms. Barnes, he was working with her.

Page 56

1          There was no activity by the City.  The City was
2      not a party to her amended complaint and complaint that
3      she worked with Mr. Coogan on.  They had nothing to do
4      with it.
5          I guess you're not aware of that.
6          MR. THOMAS:  Well, I'll tell you, I've had a
7      conversation with counsel for the City, with his office,
8      and it's their opinion that their reading of the Reed
9      case and the City of Memphis case do not say that a
10     municipal attorney when they're giving advice sought by
11     a city council member that that conversation is not
12     protected by the attorney/client privilege.
13         MS. GORDON:  So, you haven't read it yourself?
14         MR. THOMAS:  The cases, yes, I have read the cases.
15         MR. GILLIAM:  Let me just --
16         MR. THOMAS:  Yes, I have read the cases.  You asked
17     me if I read a transcript from Nicole Barnes, and I said
18     the answer is no.
19         MS. GORDON:  Hang on one second.
20         John, to keep track of my hours, we're going to
21     have to have all this argument and colloquy be timed, if
22     you can do that.
23         THE REPORTER:  One second, please.
24         MR. GILLIAM:  Let me just clarify.
25         THE REPORTER:  One second.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 57–60

Page 57

1      MS. GORDON:  Hang on.  Hang on.  Hang on.
2  Ready?
3      MR. GILLIAM:  My objection is to Ms. Barnes' -- on
4  behalf of Ms. Barnes.  It's her privilege.
5      MS. GORDON:  She's waived it.
6      MR. THOMAS:  She has not waived it.
7      MS. GORDON:  Have you read her dep?
8      MR. GILLIAM:  I've had conversations, and I know
9  she's not waived the privilege.
10     MS. GORDON:  Okay.  She's told -- okay.  I'm not
11 going to argue with you guys.  I'm not going to waste my
12 time.  You run the risk of being found in contempt or
13 whatever else.
14     Just for the record, counsel for the City doesn't
15 even know what Nicole Barnes has said here under oath.
16     MR. GILLIAM:  I object to that.
17     MS. GORDON:  And -- hang on.
18     MR. GILLIAM:  No.  I --
19     MS. GORDON:  You object to what?  You haven't read
20 her dep.
21     MR. GILLIAM:  You don't know what I know or what I
22 don't know.
23     MS. GORDON:  Did you read her dep?  It's very
24 simple.  Either --
25     MR. GILLIAM:  I'm not answering questions.

Page 58

1      MS. GORDON:  You said no, you didn't.
2      MR. GILLIAM:  No, I didn't.  I did not say that.
3      MS. GORDON:  Well, then, if you read it, you know
4  she's waived the privilege, but you're not willing to
5  weigh in on --
6      MR. GILLIAM:  She's not waiving the privilege, and
7  that's our position.
8      MS. GORDON:  I know, because you don't --
9      MR. GILLIAM:  And I'm asserting the privilege on
10 her behalf.
11     MS. GORDON:  Well, that's fine.
12     MR. GILLIAM:  And I'll continue to assert the
13 privilege.
14     And at that juncture, if there's not a question on
15 the table, can we take a short recess.
16 A.  Sounds good.
17     MS. GORDON:  I guess.
18        (Short recess at 11:09 a.m.)
19              *  *  *
20        (Record resumed at 11:18 a.m.)
21 BY MS. GORDON:
22 Q.  Mr. Coogan, have you been involved in any litigation
23    that involves you as a party?
24 A.  Yes, as a matter of fact.
25 Q.  Okay.  What have you been involved in?

Page 59

1  A.  I sued a -- like an oil change place who did a tune-up
2     and dropped a screw down in my motor in my car when I
3     was like 27 years old.
4  Q.  What else?
5  A.  They replaced the motor.
6        I can't recall anything else off the top of my
7     head.  I may have been, but I don't recall anything.
8  Q.  Have you been divorced?
9  A.  Oh, yeah.
10 Q.  How many times?
11 A.  Once.
12 Q.  Were you a party in litigation there?
13 A.  I certainly was.
14 Q.  Okay.  What else?
15 A.  When I was 18, I got a careless driving ticket.
16        That's it.
17 Q.  Have you been sued by anybody?
18 A.  I was.
19 Q.  Okay.  What is --
20 A.  Yeah.  Now that you mention, yeah.  It was dismissed.
21 Q.  Now that I mention it?
22 A.  Yeah.  I just recalled it.
23        Yeah, it was dismissed.
24 Q.  You just recalled it?  What is it you're just recalling?
25 A.  A gentleman sued me, I think, two years ago.

Page 60

1  Q.  And you just happened to forget that?  You went all the
2     way back --
3  A.  The case was dismissed.  So, yeah.
4  Q.  Does that mean you weren't --
5  A.  But, no, it's -- yeah, I remember it now.
6  Q.  Does that mean you weren't sued?
7  A.  When I recalled it, I told you.  I'm trying to refresh
8     my memory.
9  Q.  Oh.
10 A.  I wasn't prepared to talk about --
11 Q.  You weren't prepared to talk about two years ago, but
12    you did go back to age 18.
13 A.  Is there a question?
14 Q.  Yes.
15 A.  Okay.  Go ahead.  What's your question?
16 Q.  The question is, what was the litigation?
17 A.  He tried to sue me for --
18 Q.  Well, did he try or did he sue?
19 A.  Well, it was dismissed because it wasn't filed timely.
20 Q.  Okay.
21 A.  He tried to sue me, yes.
22 Q.  Did he file a lawsuit?
23 A.  Yes, he did file a lawsuit, and it was dismissed.
24 Q.  And what was it about?
25 A.  I represented him in a divorce case.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 61–64

Page 61

1    Q.  That doesn't tell me why he sued you.
2    A.  And --
3    Q.  I'm sorry.
4            What was the nature of the claim?
5            I don't know what the nature of the claim was.
6            Are you saying it was malpractice?
7    A.  Yeah.  He attempted to file a malpractice claim.
8    Q.  Well, did he file -- I mean, you keep saying --
9    A.  He filed it, yes, and it was dismissed because it wasn't
10       filed and served, and we contested service we --
11   Q.  Who represented you?
12   A.  Roger did, in my office.
13   Q.  Roger who?
14   A.  Roger Kaly.
15   Q.  Is he an employee of yours?
16   A.  He works in my office.  He's his own attorney.  I'm my
17       own attorney.  We share office space.
18   Q.  So, he's -- you just share space?
19   A.  Yeah, uh-huh.
20   Q.  Okay.  Do you have any employees?
21   A.  Yes, I do.
22   Q.  Who are your employees?
23            Excuse me.  Let me just get off this litigation.
24            Is there anything else that you have not yet
25       mentioned where you have been a party to a lawsuit?

Page 62

1    A.  Not that I can recall at this time.
2    Q.  Have you ever had any grievances filed against you?
3    A.  I have.
4    Q.  How many?
5    A.  Oh, I don't know.  There's been several.
6    Q.  Okay.  Well, give me a rough idea.
7    A.  Four, maybe five in 30 years.
8    Q.  Okay.  And were you disciplined for any of them?
9    A.  No.
10   Q.  It sounds like you're not sure.
11   A.  No, I -- I wasn't disciplined for anything.
12   Q.  Did you have --
13   A.  You're talking about being suspended from the Bar
14       discipline -- type discipline or --
15   Q.  No, I'm not --
16   A.  No, I don't recall.
17   Q.  Hang on.
18            I'm not talking about being suspended.  I'm talking
19       about any finding on behalf of the Attorney Grievance
20       Commission, any direction to you to do anything, take
21       any steps, any finding of wrongdoing.
22   A.  One was a -- directed me to restructure my fee
23       agreement.
24   Q.  Okay.  Anything else?
25   A.  Not that I can recall at this time.

Page 63

1    Q.  Do you have a responsibility for litigation holds within
2        the City of Melvindale when litigation is filed?
3    A.  My responsibility is all legal issues in the City of
4        Melvindale.
5    Q.  Can you answer my question now?
6    A.  I think I just did.
7    Q.  No, you didn't.
8            I'll just take a "yes" or "no" to litigation holds.
9    A.  We haven't had any.
10   Q.  You've never issued a litigation hold?
11   A.  No.
12   Q.  Okay.  You didn't issue one in this case?
13   A.  We've never --
14   Q.  Hayse versus Melvindale?
15   A.  We've never issued any litigation holds.
16   Q.  Why not?
17   A.  We've never done it.
18   Q.  Well, do you know you have a responsibility to ensure
19       that litigation materials are placed on hold?
20            Are you aware of that?
21   A.  If there's litigation, yes.
22   Q.  Okay.  There was litigation in the Chad Hayse case,
23       wasn't there?
24   A.  There is now, yeah.
25   Q.  Well, there has been since the day it was filed.

Page 64

1            You've never --
2    A.  That would be correct.
3    Q.  You've never issued a litigation hold?
4    A.  No.
5    Q.  You've done -- taken no steps to ensure that evidence to
6        be utilized in this case would be maintained?
7    A.  Well, I certainly indicated that we needed to keep a
8        copy of all the stuff.  We have a copy of the hearing.
9        We had tapes of the hearing.  So, all that stuff was
10       reserved.  And what was introduced at the hearing was
11       preserved, yes.
12   Q.  Okay.  But with regard to all evidence regarding Chad
13       Hayse that would have been subsumed by our lengthy
14       Complaint, you didn't ask that anybody hold onto
15       anything?
16   A.  We already saved everything as it relates to Mr. Hayse.
17       The Complaint, the transcript of the hearing and all the
18       evidence that was introduced as -- that was at the
19       clerk's office.
20   Q.  Well, that's your -- those may be the materials that
21       you're using for your defense -- I really don't know --
22       but that has nothing to do with what my Complaint would
23       involve.
24            So, I guess you've told me what you asked people
25       hang onto.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 65–68

Page 65

1        What about your e-mails with Chad Hayse?  Where are
2    those?
3    A.  They have been produced.
4    Q.  No, they haven't.
5        You've produced a handful.  That's all.
6        Have you --
7    A.  Every e-mail that I have has been produced.
8    Q.  No, it hasn't.
9        Have you personally looked for e-mail?
10   A.  My office staff and I both.
11   Q.  Okay.  Well, tell me what you've done in that regard,
12   you and/or your office staff.
13   A.  Looked for any and all e-mails that would have came from
14   Chad Hayse.
15   Q.  Okay.  And what did you do to find those?
16   A.  I searched my e-mail.
17   Q.  How did you look for them?
18   A.  I looked for them on my e-mail history.
19   Q.  Well, what did you do?  You did a search?
20   A.  Correct.
21   Q.  You're going to have to explain to me what you did, sir,
22   because there's a lot of different ways to --
23   A.  Okay.  We --
24   Q.  Hang on.  I'm still talking.
25       There's a lot of different ways to search out of

Page 66

1    e-mail, and I would like to know what you did to search
2    for e-mail with regard to this case.
3    A.  Any and all e-mails that came from Chad Hayse to me were
4    searched and produced.  That's what I did.
5    Q.  Okay.  And how many e-mails were those, roughly?
6    A.  I don't recall.
7    Q.  And have you deleted any e-mails between you and Chad
8    Hayse?
9    A.  No.
10   Q.  So, all of your e-mail between you and Chad Hayse,
11   dating back to 2015, would be on your computer; is that
12   correct?
13   A.  They've been produced.
14   Q.  They would still be on your computer; is that correct?
15   A.  They should be in my history of my e-mail, yes.
16   Q.  I don't know what you mean by "should be on my history."
17   A.  Well, it's e-mail history, so it should be available.
18   Q.  Okay.  And what about your communications with Nicole
19   Barnes?  Have you produced that?
20       MR. GILLIAM:  Same objection as it pertains to any
21   attorney/client privilege.
22   BY MS. GORDON:
23   Q.  Go ahead.
24       MR. THOMAS:  Excuse me.  I think you could answer
25   that question "yes" or "no" without getting into any

Page 67

1    comment.  So -- content.  So, even though he's saying
2    that they're asserting the privilege with Nicole, I'm
3    telling you, I think you could answer that question
4    without getting into content.  She asked a very specific
5    question.
6    A.  I believe they have been.
7    BY MS. GORDON:
8    Q.  They've been what?
9    A.  Produced.
10   Q.  Your e-mails with Nicole Barnes?
11   A.  I don't have any e-mails.
12   Q.  Texts?
13   A.  There may be some texts.  I --
14   Q.  Have you produced those?
15   A.  I believe so, yeah.
16   Q.  You have no e-mails with Nicole Barnes?
17   A.  No, I don't believe so.
18   Q.  You didn't e-mail her back and forth with regard to
19   these drafts --
20       MR. GILLIAM:  Same objection.
21   BY MS. GORDON:
22   Q.  -- of these complaints you filed?
23       MR. GILLIAM:  Same objection as --
24   BY MS. GORDON:
25   Q.  Were they all exchanged --

Page 68

1        THE REPORTER:  I'm sorry.  "Same objection --"
2    BY MS. GORDON:
3    Q.  -- physically?
4        MR. THOMAS:  Excuse me.  He's raised an objection,
5    and I'm going to tell you that you can answer that "yes"
6    or "no" without getting into content.  You either saved
7    them or have them or you don't.
8    A.  I don't believe there are any e-mails.  I don't recall
9    any e-mails with Nicole Barnes, no.
10   BY MS. GORDON:
11   Q.  Okay.  So, then I'll go on to -- my next question is
12   with regard to this drafting process of drafting back
13   and forth, the two of you, did you exchange them
14   physically?
15       Because there were drafts that went back and forth.
16       So, if you didn't e-mail them --
17   A.  Yeah.
18   Q.  -- were you meeting together?
19   A.  Correct.  We were meeting together.
20   Q.  And how many times would you say you met with Ms. Barnes
21   with regard to the complaints filed against Chad Hayse?
22   A.  I don't recall the number of times, but there were
23   several.
24   Q.  More than ten?
25   A.  No.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                                     Pages 69–72

Page 69

1  Q.  Okay.
2  A.  A handful.
3  Q.  Okay.
4  A.  To the best of my recollection.
5  Q.  And where did you meet with her on this?
6       Where did these meetings take place, or what -- if
7       there's more than one location, what were the locations?
8  A.  Primarily at my office.
9  Q.  Your law firm office?
10 A.  Uh-huh.
11      THE REPORTER:  I'm sorry.  Is that "yes"?
12 BY MS. GORDON:
13 Q.  That's a "yes"?
14 A.  Yes, that's correct.
15 Q.  By the way, do you have an office at the city building
16      or not?
17 A.  No.
18 Q.  Okay.  So, at your law office and where else?
19 A.  I made a trip to her employment.
20 Q.  What is that?  Remind me.
21 A.  Where she worked at.  I made a trip to her employer, and
22      we met in the conference room there one time, I believe.
23 Q.  And the other times were in your office?
24 A.  To the best of my recollection.  That's the best of my
25      recollection.

Page 70

1  Q.  Would this be on your calendar, what your meeting dates
2       were with her?
3  A.  It might be; it might not be.
4  Q.  How did you set up the dates?  Was it by text or by
5       e-mail?
6  A.  Usually she would call.
7  Q.  Did you keep track of your time that you spent with her?
8  A.  No.
9       I should.
10 Q.  We asked earlier about -- or I asked earlier about
11      depositions -- transcripts that you had, and you said
12      you didn't have Ms. Barnes and you hadn't read
13      Ms. Barnes.
14      You said you did have Mike Welch?
15 A.  Yes, I do.
16 Q.  And how did you happen to get that?
17 A.  I requested it.
18 Q.  Because I don't think you were at the dep.
19 A.  I requested it.
20 Q.  And who did you request it from?
21 A.  I think John, the court reporter.
22 Q.  Okay.  Did you request it yourself?
23 A.  Yes.
24 Q.  You placed an expedited order?
25 A.  No.  I don't think I requested a -- I don't recall

Page 71

1       placing an expedited order.
2  Q.  Have you ordered any other depositions?
3  A.  I believe Wheeler Marsee's, to the best of my
4       recollection.
5  Q.  Okay.  And other than that, is Mr. Balian ordering the
6       depositions?
7  A.  Yes.
8  Q.  Okay.  So, why did you --
9  A.  Or Greg.
10 Q.  -- order the Mike Welch dep then?
11 A.  I wanted a copy of it.
12 Q.  How did you happen to decide you wanted a copy?  What
13      caused you to form that opinion?
14 A.  Discussions.
15 Q.  With?
16 A.  Council.
17 Q.  About what?
18      MR. GILLIAM:  Work product.  Objection.
19      MS. GORDON:  Well, I don't -- what is privileged
20      about -- the discussion about ordering a dep transcript?
21      MR. GILLIAM:  Anything in furtherance of defense of
22      this case is protected by our work product and as
23      counsel --
24      MS. GORDON:  Well, you can just say whether you're
25      instructing him not to answer.

Page 72

1       MR. GILLIAM:  I raised my objection.
2       MS. GORDON:  Well, are you instructing him not to
3       answer or just raising an objection?
4       MR. GILLIAM:  Yes.  I'm instructing him not to
5       answer regarding any discussions in defense of this
6       matter.
7  BY MS. GORDON:
8  Q.  Okay.  So, you got the transcript of Mike Welch?
9  A.  Yes.
10      And I think Wheeler Marsee's as well.
11 Q.  And then you handed out the Mike Welch dep transcript to
12      members of the city council; is that right?  You put
13      them in their mailboxes or handed them out?
14 A.  No, I don't -- I don't believe I handed them out to the
15      city council.  No, that's not correct.
16 Q.  Did you put them in their mailboxes?
17 A.  No, I did not.
18 Q.  Okay.  And who did you hand them out -- who did you make
19      copies and hand it out to?
20 A.  The Safety Commission.
21 Q.  Okay.  And why did you do that?
22 A.  Because they wanted a copy.
23 Q.  Why?
24 A.  And I gave it to them.
25 Q.  Did you talk to them about what was in it?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                                      Pages 73—76

Page 73

```
1              Were you the one that -- obviously -- strike that.
2         Let me start again.
3              Obviously, the Public Safety Commission is not a
4    party to this case.  The Public Safety Commission is not
5    sitting in on the deps.
6              Why did the City Public Safety Commission ask for
7    this?
8              MR. GILLIAM: Objection.  Attorney/client
9    privilege.  He's represented he represents the Public
10   Safety Commission.  That's a client of the City.  That's
11   the City, and this is representations.
12   BY MS. GORDON:
13   Q.   Well, were you giving legal advice about this case to
14   the Public Safety Commission, or was this for some other
15   purpose?
16              MR. GILLIAM:  Same objection.
17              MR. THOMAS:  If they're not waiving the -- if
18   they're not waiving the privilege, I have to instruct my
19   client not to answer.
20   BY MS. GORDON:
21   Q.   Okay.  Well, you spoke on the record about this, didn't
22   you, at a public meeting?
23   A.   There was -- may have been some discussion.
24   Q.   Yeah.
25              So, what did you say?  What did you tell the --
```

Page 74

```
1    A.   I don't recall exactly what was said.
2    Q.   Well, give me the gist of it.
3              Because you're the one that raised the issue with
4    the Public Safety Commission, obviously, with regard to
5    something that Officer Welch said -- Lieutenant Welch.
6    You're, then, the one that took it upon yourself to take
7    copies to the Public Safety Commission.
8              And you're the one that then talked about it at a
9    public meeting.
10             So, what was your point?
11             MR. GILLIAM:  Object to form.  Compound.
12   BY MS. GORDON:
13   Q.   Go ahead.
14   A.   I put them on notice that the truth and veracity of a
15   current police officer may have been called into
16   question again.
17   Q.   Okay.  What called it into question again?
18             What did you say?
19   A.   Well, I think I can boil this down pretty succinctly for
20   you, and in trying to --
21   Q.   Excuse me.  Excuse me, Mr. Coogan.  I don't need you to
22   boil down anything.  You're here to answer --
23   A.   Do you want me to answer the question or not?
24   Q.   Excuse me.  You're --
25   A.   I'm asking you, do you want me to answer the question or
```

Page 75

```
1    not?
2    Q.   Stop interrupting me.
3    A.   Do you want me to answer the question --
4    Q.   I'm not --
5    A.   -- or not.
6    Q.   I'm not here to answer questions from you, sir.
7    A.   Okay.  Well, I'm here to answer questions for you.
8              MR. THOMAS:  Hold on.  Let's hear what the question
9    is.
10   A.   I'm trying to.
11   BY MS. GORDON:
12   Q.   I don't need you to boil anything down.  I just want you
13   to answer my questions.
14             I appreciate you're trying to boil it down, but I
15   had a question.
16             MS. GORDON:  Would you read it back, John?
17             THE REPORTER:  Yes, One second, please.
18             (Record repeated by the reporter.)
19   BY MS. GORDON:
20   Q.   What did you say to the Public Safety Commission?
21             MR. THOMAS:  Excuse me.  I want to raise an
22   objection.
23             It's not clear to me whether this occurred at a
24   public meeting or confidentially.
25             And if it occurred confidentially, his objection
```

Page 76

```
1    stands.  If this was at a public meeting, I'm not
2    objecting, Ms. Gordon.
3              MS. GORDON:  Okay.  Good.  That's good.
4    BY MS. GORDON:
5    Q.   What did you say?
6    A.   I don't recall verbatim what statement was made.
7    Q.   What was the gist of it?
8    A.   The truth and veracity of a Melvindale police officer
9    may be called into question again --
10   Q.   Okay.
11   A.   -- upon reviewing his statements.
12   Q.   Okay.  Did you read his statements at the dep?
13   A.   Yes.  In fact, I have.
14   Q.   Okay.  So, what were the statements of truth and
15   veracity that you read that you discussed with the
16   Public Safety Commission --
17   A.   Wonderful.
18             I --
19   Q.   -- that called into question the truth and veracity?
20             What topics?
21   A.   I told them to read the transcript and decide what it is
22   they'd like to do.
23             But you want to know my opinion of what was in the
24   transcript that I felt that dealt with truth and
25   veracity?
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 77

1  Q.  Sure.
2  A.  Is that what you'd like to know?
3  Q.  Sure.
4  A.  Sure.
5          I'd be more than willing to answer that question.
6      Well, Mr. Welch's testimony is he had no idea why
7      he was being brought up for discipline.
8          Mr. Walch(ph), in fact, received a written
9      complaint --
10 Q.  You're saying "Walch(ph)."
11         Is it Welch?
12 A.  It's Mr. Welch.
13 Q.  Okay.  Go ahead.
14 A.  He indicated in his deposition -- I believe that you
15     conducted the deposition -- that he had no idea as to
16     why he was being charged, had no idea when, in fact, he
17     received a written complaint informing him exactly what
18     the reasons were and what he was being charged with.
19         The balance of the content of the conversation is
20     statements he made during a disciplinary hearing that
21     was a closed session, and I'm not at liberty to discuss
22     that.
23 Q.  Okay.  So, you've now said his veracity was called into
24     question "again."
25         What's the first time his veracity was in question?

Page 78

1  A.  Well, when he lied to the mayor and council regarding
2      the statements Chad Hayse made about the mayor being a
3      "bitch," "slut," "whore," and "cunt," and
4      subsequently --
5  Q.  He what?
6  A.  He's told three different versions now.
7  Q.  Okay.  Subsequently he what?
8  A.  Recanted.
9          (Discussion held off the record.)
10 BY MS. GORDON:
11 Q.  Okay.  Is -- what -- so, let's just roll back here and
12     figure out what it is you're saying.
13         You told the Public Safety Commission that you were
14     privy to a deposition statement made by a police
15     officer, and it seemed to be inconsistent with his
16     testimony at a prior hearing.
17 A.  Hearings.  Should have been plural.  Hearings.  There
18     had been a hearing in front of the mayor and council --
19 Q.  I'm not done yet.  I'm not done yet.
20 A.  -- and there had been a hearing in front of the Safety
21     Commission --
22         THE REPORTER:  Excuse me --
23 BY MS. GORDON:
24 Q.  I'm still talking, Mr. Coogan.
25 A.  I see that.

Page 79

1  Q.  (Reading.)
2          "I provided the transcript to this body."
3          Okay?
4          So, I want to know what hearings you're aware of
5      that Lieutenant Welch has ever testified at.
6          So, let's start with the very first hearing.
7  A.  The hearing in front of the mayor and council as relates
8      to Mr. Hayse's discipline.
9  Q.  Okay.
10 A.  And that --
11 Q.  Hang on a second.
12 A.  You asked me a question.
13         Do you want me to answer?
14 Q.  Okay.  You've got to calm down.
15 A.  I am calm.  I'm just trying to --
16         MR. GILLIAM:  Wait.  Wait.  Wait.
17 BY MS. GORDON:
18 Q.  I'm trying to follow --
19 A.  I'm trying to give you the dates and times.
20         It was like August of 2016, 29th and 30th or 28th
21     and 29th of August.
22 Q.  Okay.  So, what did Welch say at the hearing that you
23     felt was -- what are you referring to?  What happened at
24     that hearing that's of relevance?
25 A.  Mr. Welch testified at that hearing that he never heard

Page 80

1      Chad Hayse call the mayor any of those names I just
2      referred to earlier.
3          I hope I don't have to repeat it again.
4  Q.  Okay.  And at the time he said that, had he said
5      something differently previously?
6  A.  Subsequently.
7  Q.  Okay.  So, at the time of the hearing, was he under
8      oath?
9  A.  Yes.
10         To the best of my knowledge, information and
11     belief, they all were put under oath.
12         I don't -- I'd have to read the transcript.
13 Q.  Okay.
14 A.  I'd really have to read the transcript.  That's --
15 Q.  Okay.  And who testified that the chief had said those
16     things?
17 A.  At least three other officers.
18 Q.  Okay.  And who testified the chief hadn't said those
19     things?
20 A.  Mr. Welch.
21 Q.  He's the only one, you think?
22 A.  I'd have to review the transcript.
23 Q.  Okay.  So, did the other officers give dates that these
24     things were said?
25 A.  I'd have to refer to the transcript.  I don't recall if

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 81

1   they gave dates or not.
2   Q.   They didn't.  I mean, that's -- I've looked at the
3        transcript.
4           Do you have any recollection to the contrary?
5   A.   I'd have to look at the transcript.  I don't recall.
6   Q.   Okay.
7   A.   There was two days of testimony, so it's kind of hard
8        to --
9   Q.   Okay.  So, Welch made that comment under oath at the
10       hearing, and then you were upset about it; correct?
11  A.   No.
12  Q.   Well, he was subsequently called in for discipline and
13       that was --
14  A.   By the Safety Commission.
15  Q.   Well, sir, that involved you.  You were involved in
16       bringing him in --
17  A.   No.
18  Q.   -- and placing him --
19  A.   I'm an attorney for the Safety Commission.
20  Q.   Okay.  You know, I got --
21  A.   I didn't bring anybody in.  The Safety Commission does
22       their own.
23  Q.   Well, did the safety -- who raised this with the
24       Safety Commission?
25  A.   Jeff Bolton filed a complaint.

Page 82

1   Q.   Okay.  And that was after he talked to you; correct?
2   A.   I don't know if that was before or after he talked to
3        me.
4   Q.   Okay.  Well, Jeff Bolton wasn't at the hearing in
5        August, was he --
6   A.   Yes.
7   Q.   -- where there was testimony --
8   A.   Yes, he was.
9   Q.   He sat for the whole hearing?
10          No, he did not.
11          Jeff Bolton sat in that hearing?
12  A.   I've already answered that question.
13          Yes.
14  Q.   Okay.  All right.  So, what was he charged with at the
15       Public Safety Commission with regard to allegedly giving
16       false testimony?
17  A.   There's a complaint that sets forth the reasons.
18          Basically his lack of truth and candor.
19  Q.   And why did he have a lack of truth and candor?
20  A.   Because he was impeached and subsequently admitted --
21  Q.   How was he impeached?
22  A.   His own statements.
23  Q.   At the hearing, he was impeached?
24  A.   His own statements.
25  Q.   At the hearing, was he impeached?

Page 83

1   A.   With the Public Safety Commission, he admitted.
2   Q.   Okay.  Was the Public Safety Commission on the record?
3   A.   It was a closed session.
4   Q.   Okay.
5   A.   And it's required to be kept for one year --
6   Q.   Okay.  Wasn't it taped?
7   A.   -- and it wasn't -- I don't recall if the closed session
8        was taped or not, but it would only be required to be
9        kept for one year, and it's well past that
10       unfortunately.
11          But I'm quite certain that --
12  Q.   You're quite certain --
13  A.   -- all members of the Public Safety Commission will
14       remember exactly what Mr. Welch said at the closed
15       session.
16  Q.   Okay.  Well, what do you remember that he said?
17  A.   Are we here for Mr. Welch's case or Mr. Hayse's case?
18  Q.   You're here to answer my questions.
19          What did he say?
20  A.   I just want to be clear.
21  Q.   I'm not making anything clear to you.  You're here as a
22       witness.
23  A.   I don't recall the question.
24          What was the question?
25  Q.   What did he say at the closed session that you are now

Page 84

1        sitting here today saying was false or that was a
2        recantment?
3           I don't know what you're saying.
4   A.   I could paraphrase, but I'm not certain if we're at
5        liberty to discuss what happened in a closed session
6        involving that employee.  That employee specifically
7        requested that the session be closed and, therefore, I
8        don't feel comfortable absent --
9   Q.   Well, he's waived it.
10  A.   Well, I don't feel comfortable --
11  Q.   Okay.
12  A.   -- testifying to what happened in the closed session.
13  Q.   Okay.  Well, you've got a problem with that because
14       you've now accused him to the Public Safety Commission
15       publicly --
16  A.   I didn't accuse him.  I said, "Read the transcript" --
17  Q.   You know, you've got --
18  A.   -- as you said.
19  Q.   You've got to wait and let me get the question out.
20          MR. GILLIAM:  I'd like to just interject, and I
21       would ask you to extend the same courtesy and let him
22       finish his answers, because you've been repeatedly
23       interjecting and cutting him off.  So, I'd just like
24       to state that for the record.
25  BY MS. GORDON:

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 85–88

Page 85

1   Q.   I just read -- I just read into the record what you said
2        at the Public Safety Commission.  You said:
3                "I was privy to a deposition statement
4            made by a police officer, and it seemed to be
5            inconsistent with his testimony at a private(sic)
6            hearing."
7                So, you are now referring to his testimony here in
8        my office that occurred in March of 2018.
9                That's the deposition you're referring to.  And
10       you're saying:
11               "-- it seemed to be inconsistent with his
12           testimony at a prior hearing."
13               What prior hearing were you talking about?
14  A.   It should be "hearings," as in two.  There were two
15       hearings.
16  Q.   Okay.  Well --
17  A.   One was with --
18  Q.   -- let's break it down.
19  A.   Well, I'm breaking it down.
20               One was with the mayor and council at Mr. Hayse's
21       removal hearing --
22  Q.   Hang on.
23  A.   -- when he testified one way.
24  Q.   All right.  And what did he testify that way?
25  A.   I believe that's been asked and answered, but I'll --

Page 86

1   Q.   Okay.  No, you're right.  It has.
2   A.   Yeah.  And I'm not trying to be difficult.
3   Q.   But hang on.
4            MR. GILLIAM:  Let him answer.  He needs to answer.
5   BY MS. GORDON:
6   Q.   Hang on.
7                What he said at the Chad Hayse hearing was the same
8        thing he said here in this room under oath.  Both times
9        they were under oath.
10               Do you think he said something different at the
11       Chad Hayse hearing than he said at his deposition?
12  A.   Yes.
13  Q.   Okay.  And what was different about it?
14  A.   It was a closed session, and I'm not certain I can
15       divulge the content of a closed session.
16  Q.   I'm not asking you about the closed session.  I'm asking
17       you about the Chad Hayse open session, which you're
18       saying is the first hearing.  And you're saying that
19       Welch said something different at that closed hearing --
20       I'm sorry -- open hearing -- than he then said in my
21       office recently.
22               So, what are the differences between the two sworn
23       statements?
24               (Discussion held off the record.)
25  A.   I would have to have both the transcript of the

Page 87

1        deposition as well as a transcript of the hearing to go
2        point by point down what he said that was different.
3   BY MS. GORDON:
4   Q.   Well, you're talking about what he said about the mayor,
5        testifying to what he heard the chief say about the
6        mayor and others?  Is that what you're talking about?
7   A.   Part of it.
8   Q.   What's the other part?
9   A.   His admissions.
10  Q.   Of what?
11           Of what?
12  A.   Of lying.
13  Q.   Okay.  Look, let's try to stick together here.
14               I'm just going off of your deposition testimony.
15               Why don't you take a piece of paper, if you need
16       to, and write down what I'm saying to you so we can stay
17       on the same page.
18               I'm talking about your testimony here today under
19       oath that Welch said something different at hearings.
20               So, let's first count the number of "hearings."
21               MR. GILLIAM:  Let me just state for the record
22       Ms. Gordon has torn off a piece of paper and pushed it
23       toward the deponent and also is using air quotes in a
24       demeaning manner toward the deponent.
25               MS. GORDON:  It's not air quotes.  We're having a

Page 88

1        hard time getting through this.
2   BY MS. GORDON:
3   Q.   The first hearing that Mr. Welch -- Lieutenant Welch was
4        under oath was a open hearing for the Chad Hayse removal
5        that apparently was August 29, 2016.
6                Are we agreed?
7   A.   That was the first hearing he was put under oath and
8        testified.
9   Q.   Okay.  Now, what's the second hearing that he was put
10       under oath and testified that -- because you keep
11       saying -- you keep correcting me --
12  A.   He came --
13  Q.   -- and saying it's "hearings."
14               So, what's the second hearing?
15  A.   I'd like the record to reflect that the tone and
16       demeanor in which counsel is addressing me is
17       inappropriate, and these quotation marks are irritating
18       and inappropriate as well.
19  Q.   Okay.
20  A.   I simply would like to have the person who is deposing
21       me to act in a professional manner just like I'm acting.
22       When she asks me a question, I will answer.
23  Q.   Okay.  Do you know what, Mr. Coogan?  This is being
24       recorded.
25  A.   Thank you.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

1  Q.  And John has the recording --
2  A.  **It's not my first deposition.**
3  Q.  Well -- so, my tone and demeanor --
4  A.  **Is not reflected in the transcript.**
5  Q.  Okay.  My tone is on the recording, and with regard to
6      air quotes, I'm quoting literally -- using it to quote
7      literally your statement to the Public Safety Commission
8      where you literally use the term "air quote, hearing,
9      close air quote."
10         Okay.  It wasn't a casual expression.  You used the
11     word "hearing," and I'm going to continue to use air
12     quotes because a hearing is far different to me, as a
13     lawyer, than other circumstances.
14         So, the first hearing --
15         MR. THOMAS:  I think we should --
16 BY MS. GORDON:
17 Q.  -- hearing --
18         MR. THOMAS:  Look, I just would like the tone to be
19     lowered a little bit.
20         MS. GORDON:  Well, I don't care what you want.
21         MR. THOMAS:  This -- well --
22         MS. GORDON:  I'm moving forward.  So, could you
23     guys just, you know, deal with it like big people and
24     let's move on?
25         MR. GILLIAM:  Let's take a break.

1      MR. THOMAS:  Well, you know, that's a --
2      MS. GORDON:  No, I'm not taking a break.
3      MR. GILLIAM:  We're going to take a break.
4      MS. GORDON:  We're not taking a break.
5      MR. GILLIAM:  Yeah, I need a --
6      MS. GORDON:  You just got -- do you need like --
7      MR. GILLIAM:  Yeah.
8      MS. GORDON:  -- a breath of fresh air to get
9  yourself under.
10     MR. GILLIAM:  I think we need to take -- I think
11 everybody needs to cool down.
12     MS. GORDON:  I don't.  And I'm not -- you people --
13 no, we're not taking a break.
14     Mr. Coogan, I don't know how late you plan to be
15 here today but with counsel taking breaks and running
16 out of the room, it's going to definitely prolong this
17 deposition.
18     MR. GILLIAM:  Well, I --
19     MS. GORDON:  This will be the second break in a
20 half hour you people have asked for, and you don't need
21 a break.  You can deal with this, I promise.
22     Would you read the last question back?
23     MR. GILLIAM:  I think I'm going to take a break.
24     MS. GORDON:  Okay.  You take a break.  I'm moving
25 forward and I'm creating a record.

1  BY MS. GORDON:
2  Q.  Are you getting up, Mr. Coogan?
3  A.  **If he's taking a break, I am.**
4  Q.  Well, how late do you have to be here today?
5  A.  **As late as you'd like.**
6      MS. GORDON:  Okay.
7      MR. THOMAS:  Well --
8  A.  **Whatever you'd like to do.**
9      MR. THOMAS:  -- the court rules say a 7-hour day --
10     MS. GORDON:  Well, this is all carved out, Phil.
11     MR. THOMAS:  Excuse me --
12     MS. GORDON:  Breaks are not part of the 7 hours.
13     MR. THOMAS:  Let's just catch a breath.  I don't
14 know whether -- if you need a break --
15     MR. GILLIAM:  Yeah.
16     MS. GORDON:  You're the only one that needs --
17     MR. THOMAS:  Could we just sit here and wait for
18 him --
19     MS. GORDON:  Of course.
20     MR. THOMAS:  -- if nobody leaves the room other
21 than him?
22     MS. GORDON:  Sure.  Fair enough, Phil.
23     Go to the washroom --
24     MR. GILLIAM:  I'd like to talk to Mr. Coogan, so --
25     MS. GORDON:  Okay.  So, now there's a question

1  pending and you're talking to --
2      MR. GILLIAM:  There's not a question pending.
3      MS. GORDON:  Is there a question pending, John?
4      THE REPORTER:  I could read the record --
5      MR. GILLIAM:  I think there's a long diatribe.
6  There's just --
7      MS. GORDON:  No.  There's a question pending, and
8  you're now --
9      MR. GILLIAM:  What's the question pending?
10     MS. GORDON:  Okay.  Well, it was what do you -- I
11 want the second hearing.
12     I know what the dep is.  I want the second hearing.
13     MR. GILLIAM:  I'll wait to hear the question.
14     THE REPORTER:  One second, please.
15         (Record repeated by the reporter.)
16     MS. GORDON:  Thank you.
17     That was the last question.
18     MR. GILLIAM:  All right.  We'll sit for the
19 question.
20 A.  **This --**
21 BY MS. GORDON:
22 Q.  What's the second hearing?
23 A.  **Was the hearing in front of the Public Safety**
24     **Commission.**
25 Q.  Okay.  What date are we talking about, Larry?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                            Pages 93—96

Page 93

1        I don't know what you're referring to.  Explain it
2   to me.
3   A.   His discipline hearing.  I don't know what the date is
4        either.  I don't have that in front of me.
5   Q.   Okay.
6            MR. GILLIAM:  All right.  Now, I'd like to take a
7        break.  There's no question on the record.
8   A.   Okay.
9            MS. GORDON:  Okay.  We're -- just so you-all know,
10       we're carving this out of our 7 hours whenever we take a
11       break.
12           MR. GILLIAM:  That's fine.
13  A.   Whatever you guys want to do, that's fine.  I'm yours
14       for the day.
15           MS. GORDON:  Fun.
16               (Short recess at 11:48 a.m.)
17                   *   *   *
18           (Record resumed at 11:57 a.m.)
19        (Mr. Meihn is present after the break.)
20           MS. GORDON:  Okay.  Back on the record.
21  BY MS. GORDON:
22  Q.   At the recent Public Safety Commission meeting that
23       occurred on April 10th, you told the Public Safety
24       Commission, on the record in public, that you were privy
25       to a deposition statement by a police officer and it

Page 94

1        seemed to be inconsistent with his testimony at a prior
2        hearing.
3            What testimony were you referring to that was made
4        at this dep that was inconsistent with what had been
5        said at a prior hearing?
6   A.   Other than what I just told you earlier?
7   Q.   I don't know what you told me earlier.
8            So, let's take it from the beginning.
9   A.   Well, I told you that in the dep transcript, he made a
10       statement that he had no idea why he was being
11       disciplined.
12  Q.   Okay.
13  A.   And what I said is that there was a complaint that was
14       put forth by the chairman of the Public Safety
15       Commission, which was served upon Mr. Welch, and he knew
16       darn good and well what he was being disciplined for.
17  Q.   Okay.  Thank you.
18  A.   So, that's one issue, but there's others, too.
19  Q.   Okay.  But that doesn't answer my question, because what
20       you told the Public Safety Commission, Mr. Coogan, is
21       that it was inconsistent with prior testimony, not that
22       it was inconsistent with what happened.  You made the
23       point of saying it was inconsistent with "prior
24       testimony."
25           So, I want to know what the prior testimony is now.

Page 95

1        You've told me about the dep testimony in my
2   office.
3        What's the prior testimony?
4            MR. MEIHN:  And I'm just going to object to the
5        extent that that testimony requires testimony in a
6        closed session meeting.
7            Subject to that, please answer.
8   A.   Well, I'm concerned -- in response to your question, I
9        don't want to have an unfair labor practice filed
10       against me.  If an employee requests to have a hearing
11       done in closed session, I don't think I'm capable of
12       divulging the content of that closed --
13  BY MS. GORDON:
14  Q.   Well, I don't know what you're talking about.  If you're
15       talking about a closed session, let's -- tell me that
16       and --
17  A.   I just did.
18  Q.   -- then we'll take it from there.
19  A.   Yeah.
20  Q.   No, you didn't.  You picked up on your counsel -- so,
21       where was the other testimony?
22  A.   There was testimony given in a closed session.
23  Q.   When?
24  A.   Under Mr. Welch's disciplinary hearing.
25  Q.   Mr. Welch?

Page 96

1   A.   Yeah.
2            And there was testimony in front of the city
3        council.
4   Q.   Hang on.
5            Okay.  Was the testimony in front of the Public
6        Safety Commission under oath?
7   A.   To the best of my information, knowledge and belief,
8        yes.
9   Q.   And who swore him in?
10  A.   I don't recall.
11  Q.   And you believe that there's a record somewhere that he
12       was under oath?
13  A.   Well, I believe a lot of -- what I believe is really
14       not -- there is no record of the hearing because it's
15       been over a year.
16  Q.   Okay.  So --
17  A.   But there's testimony that he gave in front of the
18       commission.
19  Q.   Okay.  So, that -- there's no record of that testimony.
20       Do I have that right?
21  A.   I think there's a record and everybody else who attended
22       the hearing heard.  There was a number of people at the
23       meeting.  I can -- just for the --
24  Q.   So --
25  A.   I want to answer the question, please.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 97–100

Page 97

1  Q.  I didn't --
2  A.  I was there --
3  Q.  -- ask you whether other people heard it.  I want to
4      know what --
5  A.  Roger Kaly --
6          THE REPORTER:  Excuse me --
7  A.  -- was there.
8          MR. THOMAS:  Wait.  He can only pick up one person
9      at a time.
10 A.  The members of the Public Safety Commission were all
11     present.  There was a union attorney.  There was a union
12     representative.
13 BY MS. GORDON:
14 Q.  Mr. Coogan, I'm not asking you who was there, sir.
15 A.  And I believe there was an officer in charge of the
16     union.
17 Q.  Okay.  I had a very specific question which for any
18     lawyer would be extremely clear-cut.
19         Was there a record made of what was said at this
20     Public Safety Commission which you're saying was in a
21     closed session, and which you're saying that Lieutenant
22     Welch said something?
23         Was there a record made?
24         That's just a "yes" or "no."
25 A.  Do you know what?  I don't recall.  I don't recall.

Page 98

1  Q.  Okay.
2  A.  But even if there was one, it's only required under law
3      to keep it for a year, and there was no litigation
4      pending.  So, I don't know.
5  Q.  Okay.  Have you --
6  A.  I don't recall.
7  Q.  -- seen or listened to any record of what Lieutenant
8      Welch said at this Public Safety Commission closed
9      session?
10         Have you ever heard a recording of it?
11 A.  I may have at the time -- shortly thereafter the
12     hearing.
13 Q.  Okay.  Did you --
14 A.  I may have --
15 Q.  -- take any notes at the hearing?
16 A.  I'm certain there was some.  I don't know where they're
17     at this point.
18 Q.  Did you take -- you personally take notes?
19 A.  I believe I did, but I don't know if I still have them
20     any more.  I'd have to look.
21 Q.  When is the last time you would have seen them; if you
22     even took them?
23 A.  Shortly after the hearing.
24 Q.  Okay.
25 A.  It's been about a year and a half.

Page 99

1  Q.  Okay.  And was there anybody transcribing minutes or any
2      record that, you know --
3  A.  Yeah.  And, as I indicated to you, I believe there was a
4      tape at the time, but I don't know if it still exists.
5      I think they use it to do their minutes of the meeting.
6  Q.  Well, are there minutes of closed sessions?
7  A.  There can be, yes.
8  Q.  Well, were there at the Public Safety Commission closed
9      session?
10 A.  I don't know if they have any minutes for that or not.
11 Q.  What do you mean "there can be"?
12 A.  Well, you can take minutes at a closed session.  And
13     they can be divulged if there's a court order that
14     allows you to have them divulged.  But absent that,
15     there can't be.
16 Q.  So, you know of no closed minutes?  Closed meeting --
17 A.  No.  I haven't seen any.  I haven't seen any.
18 Q.  Okay.  All right.  So, when you say that Lieutenant
19     Welch testifies differently at a hearing, you're
20     referring to comments made at a closed session.  You
21     don't know whether or not he was under oath and, as far
22     as you know, there is no record of that meeting.
23         Do I have that right?
24 A.  I don't know if there's a record or not.  That's
25     correct.

Page 100

1  Q.  Nothing you know of?
2  A.  I don't know for sure if there is or -- there may be
3      one, but I haven't --
4  Q.  Nothing you're aware of?
5  A.  I haven't seen it.
6  Q.  Okay.  And what is the discrepancy between what was said
7      at the closed session and at the deposition here in my
8      firm?
9  A.  I'm --
10         MR. MEIHN:  I'm going to object to attorney/client
11     privilege to the extent that there was communications
12     you're asking him to divulge that were done in a closed
13     session.
14         MS. GORDON:  Okay.  Well, I'm not asking him what
15     action was taken by the PSC at a closed session.  I'm
16     asking him why he went back to the PSC and said that
17     there were two different testimonies and what he was
18     referring to.
19         MR. MEIHN:  I understand, but to get to your
20     answer, with all due respect, he has to divulge --
21         MS. GORDON:  Okay.  With all due respect, you're
22     wrong, and I'm going to take an answer.  And you can
23     instruct him not to answer, but I promise you we will be
24     back here.
25 BY MS. GORDON:

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 101-104

Page 101

1  Q.  Go ahead.
2      What were you referring to at the PSC on April
3  10th, 2018 when you said that Welch gave inconsistent
4  testimony?
5  A.  Again, he made statements --
6  Q.  About what?
7  A.  -- in the closed session.
8  Q.  About what?
9  A.  And I do not want to commit an unfair labor practice and
10  subject myself -- I respect that employee's ability to
11  keep that information private.  Mr. Hayse had the same
12  opportunity.  He chose to go public.  Mr. Welch chose to
13  go private.
14  Q.  Okay.  Well, sir --
15  A.  And I want to respect that, and I don't have authority
16  to release the content in my -- I can't release that
17  information.
18  Q.  Okay.
19  A.  I really can't.
20  Q.  Well, do you know what?  You're the one that stood up in
21  front of the public and announced that Lieutenant
22  Welch -- you've got to let me finish.
23  A.  Can I breathe?  Because I was breathing just then.
24  Q.  You're the one that said that Lieutenant Welch gave
25  inconsistent testimony at a prior hearing.

Page 102

1      That's fine.  So, we'll just go to court.  We're
2  make a note of everything we're going back to court on,
3  and I guess you're now worried that you're going to draw
4  an unfair labor practice.  So, maybe you're in a
5  conflict now on that as well, but that's your choice at
6  this time, and I'm quite sure Lieutenant Welch will, in
7  any event, waive whatever alleged privilege there is.
8  A.  Is that a question for me or --
9  Q.  No.
10  A.  -- are you testifying now?
11  Q.  I'm not testifying.
12  A.  Because I'm here to answer questions.  So, if you could
13  ask me questions, I'd like to answer them.
14  Q.  Well, thank you for sharing that, but I'm going to do
15  what I'm going to do.
16  A.  No problem.
17      You're quite welcome.
18  Q.  All right.  Now, you also talked to the Public Safety
19  Commission on April 10th about discipline of Welch, and
20  you talked about that publicly, didn't you?
21  A.  You've read that into the record at least twice.
22      Yes.  There were some statements made.
23  Q.  Okay.  And why did you believe discipline should be
24  considered?
25  A.  I have answered that question.

Page 103

1      Because his statements were inconsistent than what
2  he had previously said.
3  Q.  Okay.  Just so I have --
4  A.  So, his lack of ability to tell the truth is in
5  question, and that's up to them to decide what they want
6  to do with it.  They can do nothing.  They could do
7  something.  It's not up to me.
8  Q.  Okay.  So, it's your position that Lieutenant Welch lied
9  under oath at his deposition?  That's what you believe?
10  A.  Well, yes.
11  Q.  Okay.  And what did he lie --
12  A.  I read it.
13  Q.  Okay.  Well, sir, I didn't ask you what you read.
14      So, why don't you tell me what he lied about.
15  A.  I think I already did one time.  I'll do it again.
16  Q.  Well, if you don't mind, repeat it, please.
17  A.  He said that he had no idea as to why he was
18  disciplined.
19  Q.  Okay.  And you think that's a lie why?
20  A.  Because he was served with a copy of the complaint prior
21  to the hearing, and he knew darn well why he was there
22  being disciplined.
23  Q.  Okay.  What else did he lie about?
24  A.  And he made inconsistent statements.
25  Q.  What were they?

Page 104

1  A.  I'm not going to divulge what he said in the closed
2  session.
3      We keep on going in these ever-increasing
4  concentric circles.
5  Q.  Okay.  So, you went to the Public Safety Commission and
6  just said you thought he lied, but you're not willing
7  today to say what it was, I guess; right?
8  A.  I don't feel comfortable in terms of respecting that
9  employee request for a closed session, and if he wanted
10  to do it publicly, then I would have no problem
11  discussing all those issues.  But he elected to do it
12  privately.
13      It's not my election.  It's the employee's
14  election.
15  Q.  What was he charged with at the hearing?
16  A.  There's a copy of a complaint that he was served.  I
17  don't have it in front of me.
18  Q.  Okay.
19  A.  Truth and veracity was one, I believe.
20      Seems to be a lot of that going around.
21  Q.  I've noticed the same thing.
22      The fact is, you were very upset about Mr. --
23  Lieutenant Welch's testimony at the hearing because he
24  undercut your drive to run the chief out of his job.
25  You were mad about it, weren't you?  And so you got him

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 105–108

Page 105

1  disciplined --
2  A.  So, just -- in order to answer your question, you're
3  asking, I'm mad at Mr. Welch?
4       No, I'm not.
5  Q.  Oh, yeah.
6  A.  No, I'm not.
7  Q.  Okay.
8  A.  Not at all.
9  Q.  All right.  How long have you known Lieutenant Welch?
10 A.  Gosh.  Probably ever since he started working for the
11 City.  I don't recall how long ago that was.
12 Q.  And how did you happen to know him?  Did you just know
13 him from around?
14 A.  Well, just as an officer coming to court and then
15 prosecuting.
16 Q.  Okay.
17 A.  And then subsequently I knew him a little better.
18 Q.  Okay.  And were you there when he got promoted to
19 lieutenant?
20 A.  Was I there?
21 Q.  Yeah.
22       Were you working for the City at that time?
23 A.  I believe so, yeah.
24 Q.  Okay.  And had you ever heard of any citizen complaints
25 coming in against Lieutenant Welch?

Page 106

1  A.  I personally?
2  Q.  Yeah.
3  A.  I may have.
4  Q.  Nothing you can remember here today?
5  A.  Yeah, I don't remember if there's any charges that he
6  was brought up on.  I don't recall any of that.
7  Q.  Okay.  Did you ever socialize with him?
8  A.  We went to a Christmas party for the City.
9  Q.  Uh-huh.
10 A.  And he used to hunt in the hunt club.
11 Q.  What was the hunt club?
12 A.  It was my hunt club.
13 Q.  What's the -- is there a name?
14 A.  Yeah.  Larry's Hunt Club.
15 Q.  Okay.  And who was in it?
16 A.  Me, Mr. Welch -- there's been a lot of people over the
17 years, but he was there for a couple years.
18 Q.  Okay.  So, you went hunting with him multiple times?
19 A.  I didn't go with him hunting.  He was a member of my
20 club.
21 Q.  Well, I don't know what that means.
22       Does that mean you all head out together to hunt,
23 or what does that mean?
24 A.  No.  It's about a 20,000-acre parcel of land we leased.
25 Q.  So, what does that mean?  You all go -- did you --

Page 107

1  A.  We were there at the same time, and we talked and had
2  dinner --
3  Q.  I'll make it simple.
4       Did you ever hunt with him?
5  A.  He was at the camp, but I didn't go in the woods, like
6  walk in the woods with him.  But it was a big acreage.
7  Q.  Did you stay overnight together?
8  A.  Well, there's three homes that we stay in.  So --
9  Q.  Okay.  Did you get along with him?
10 A.  I think so.
11 Q.  Okay.
12 A.  Yeah.
13 Q.  Has he ever been disciplined by the City until you came
14 along with your discipline against the chief?  Up until
15 then, had Welch ever been disciplined for anything?
16 A.  I'm not privy to his file.  I haven't looked at
17 Mr. Welch's file.  I have no idea if he was ever
18 disciplined.
19 Q.  Well, were you ever involved in any discipline with him?
20 Ever hear of any discipline?
21 A.  Other than this one time, I had never been involved in
22 any discipline --
23 Q.  I said prior --
24 A.  -- of Mr. Welch.
25       And I'm answering that question --

Page 108

1  Q.  -- to you coming after the chief, did you ever --
2  A.  I didn't come after the chief.  So, I don't like your
3  characterization.
4  Q.  Okay.  That's fine.
5  A.  I didn't come after anybody.
6  Q.  The record will speak for itself, Mr. Coogan.
7  A.  Thank you.
8  Q.  So, you don't need to worry about that.
9  A.  Thank you.
10 Q.  But up until that time that people went after the chief,
11 you knew of no wrongdoing on the part of Welch; right?
12 A.  I have not reviewed Mr. Welch's file.  That was my
13 statement.  I --
14 Q.  Okay.  I didn't --
15 A.  I -- I have no idea.
16 Q.  I didn't ask if you reviewed his file, because if you
17 reviewed Mark(sic) Furman's file today --
18 A.  Who is Mark Furman?
19 Q.  Matthew Furman.
20       If you reviewed his file today, you probably
21 wouldn't see anything in there either.  But do you know
22 what?  He's been called up quite a few times.  So, I'm
23 going to --
24       MR. MEIHN:  I'm going to object to the use of "Mark
25 Furman" again, for the third deposition that you've made

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 109–112

Page 109

1    that comment and --
2         MS. GORDON:  You'll just have to cope --
3         MR. MEIHN:  Deb, I'm starting to believe that
4    you're doing it intentionally to be a bully, and I would
5    ask you to stop, please, and give deference to the
6    gentleman.
7         MS. GORDON:  Okay.  You live in a parallel
8    universe.
9         MR. THOMAS:  Who is that directed to, Ms. Gordon?
10        MS. GORDON:  Not you.  Not in this case, Phil.
11        We had another case where I would have said
12   something differently.
13        MR. THOMAS:  I'm not sure -- I'm not sure we both
14   weren't in a parallel universe at that time.
15        MS. GORDON:  Well, I came out on the right side of
16   the universe.  You have to admit that one.
17        Sorry.
18   A.   Inside jokes.
19        MS. GORDON:  Yeah.  We had a very odd case
20   together.
21   A.   Just one?
22        MS. GORDON:  Two.
23        MR. THOMAS:  Two.
24        MS. GORDON:  Kandrevas.
25   A.   I don't know anything about that one.

Page 110

1         MS. GORDON:  A judge.
2    A.   I know all about it.
3         MS. GORDON:  All right.  So, what was the last
4    question, John?
5         THE REPORTER:  One second, please.
6         MS. GORDON:  Oh, I know.  I'm sorry, John.
7    BY MS. GORDON:
8    Q.   Leave aside the personnel file.
9         Had you ever heard of any wrongdoing on the part of
10   Lieutenant Welch?
11   A.   I may have heard something, yeah.
12   Q.   Anything you can think of here today?
13   A.   Comments, because he's a big guy.  You know, people
14   saying he was intimidating them.
15   Q.   Who were the people?
16   A.   Just over scuttle.  There was -- I have never been
17   involved in any formal discipline.  He's a big guy, you
18   know.  So, a lot of people --
19   Q.   Well, what does that have to do with wrongdoing?
20        He can't help it if he's a big guy.
21   A.   Well, I mean --
22   Q.   I'm not sure what your point is.
23   A.   There have been people that have made comments that --
24   Q.   Who?
25   A.   Various individuals.

Page 111

1    Q.   Like who?
2    A.   Over the years, there's been a few.  I can't recall
3    the --
4    Q.   What are you talking about?  Citizens?
5    A.   Yeah, citizens.  You asked me if I ever heard any
6    complaints.
7         But I think he's a nice guy.
8    Q.   Comments to you?
9         Had you ever heard about any dishonesty on his
10   part?
11   A.   Other than this case, involving this case?
12   Q.   I said up until the time you and/or whoever did it went
13   after the chief -- up until the time of the chief's
14   hearing, had you ever heard of any dishonesty by Welch?
15        MR. MEIHN:  Object to form.
16   A.   I don't recall.
17   BY MS. GORDON:
18   Q.   Who does the police chief at the City of Melvindale
19   report to?
20   A.   The Public Safety Commission and the mayor and council.
21   Q.   Who runs the police department at the City of
22   Melvindale?
23   A.   Pursuant to the charter, the Safety Commission manages,
24   directs, and supervisors the Public Safety Commission.
25   Q.   What is your job today with the Public Safety

Page 112

1    Commission?
2    A.   I'm the attorney.
3    Q.   What does that mean with regard to the Public Safety
4    Commission?
5    A.   I just -- I sit at their meetings and answer any legal
6    questions they have at the meetings or any issues that
7    come up.
8    Q.   Can you give me an example of what kind of things you
9    might be called upon to do?
10   A.   Well --
11   Q.   I know you're not drafting ordinances.  I know you're
12   not going to criminal court.
13        So, what kind of questions might come up?
14   A.   Well, typically it's employee discipline questions that
15   come up before them, you know, grievances, discipline,
16   trial boards.  Things of that nature.
17   Q.   Okay.  So, tell me what your understanding is of the
18   process, then, based on the fact that you apparently
19   answer legal questions on this.
20        There's a Collective Bargaining Agreement; is that
21   correct?  For police officers?
22   A.   That's correct.
23   Q.   Okay.  And what governs discipline of police officers at
24   the City of Melvindale vis-à-vis the Public Safety
25   Commission?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 113—116

Page 113

```
 1   A.   Well, there's actually two Collective Bargaining
 2        Agreements that govern the police department.
 3   Q.   What are they?
 4   A.   One is for the Command Officers Union and the other one
 5        is the Patrol Officers Union.
 6   Q.   Okay.
 7   A.   Okay.  So, those are different Collective Bargaining
 8        Agreements.
 9   Q.   Okay.  How many arbitrations have you been involved in
10        since you've been counsel for the Public Safety
11        Commission; if any?
12   A.   Zero.
13   Q.   Okay.  So, nothing has actually had to go to
14        arbitration?
15   A.   Correct.
16   Q.   All right.  And how often does the Public Safety
17        Commission receive grievances, in your experience?
18   A.   You know, I'm going to say once or twice a year,
19        perhaps.
20   Q.   Okay.
21   A.   Maybe less; maybe more.
22   Q.   Okay.
23   A.   I don't -- you know, it ebbs and flows.  There's no
24        exact number.
25   Q.   So, under the Public -- strike that.
```

Page 114

```
 1            Under the Police Officers Collective Bargaining
 2        Agreement, what --
 3   A.   Which one?  The patrol?
 4   Q.   The patrol.
 5   A.   Okay.
 6   Q.   Under the patrol, what is the process for discipline?
 7   A.   Well, I'm paraphrasing, not quoting the Collective
 8        Bargaining Agreements.
 9   Q.   Okay.  All right.
10   A.   But basically --
11   Q.   We can pull it out if you need it.
12   A.   That's fine.
13            But there's a step one and the grievance goes to
14        the police chief.
15   Q.   I'm not talking about grievance.  I'm talking
16        pregrievance, discipline, and then I'm going to ask you
17        about grievance.
18            Because grievance would come after discipline;
19        right?  Presumably?  At least hypothetically?
20   A.   Uh-huh.
21   Q.   All right.  So, how does --
22            THE REPORTER:  I'm sorry.  Is that "yes"?
23   A.   Yes, it could come after, depending upon -- it could
24        come prior to any discipline, too.
25   BY MS. GORDON:
```

Page 115

```
 1   Q.   It could be --
 2   A.   Yeah.  I mean, there's a lot of --
 3   Q.   Separate and apart.
 4   A.   Right.  Right.
 5   Q.   Since you've been there, have police officers been
 6        disciplined under the Collective Bargaining Agreement?
 7   A.   Yes.
 8   Q.   Have you had any experience with that?
 9   A.   Yes.
10   Q.   Okay.  So, what is the procedure under the Collective
11        Bargaining Agreement for disciplining officers?
12   A.   It's set forth in the police guidelines -- in the police
13        department guidelines.  Chad Hayse had a copy.  I have a
14        copy.
15   Q.   Isn't it set forth in the Collective Bargaining
16        Agreement itself?
17   A.   The grievance procedure is, but --
18   Q.   No, no, no.  Discipline.
19   A.   Well, I'm trying to answer that.
20   Q.   Okay.
21   A.   The grievance procedure is set forth in the Collective
22        Bargaining Agreement.
23   Q.   Okay.
24   A.   The discipline practices and procedures are put forth in
25        the policy manual.
```

Page 116

```
 1   Q.   Okay.  I have a section here on the Collective
 2        Bargaining Agreement on discipline.  Maybe you --
 3   A.   You're talking about the grievance discipline, their
 4        steps?
 5   Q.   No, no, no, no.  I'm talking about giving discipline.
 6   A.   Okay.  Which Collective Bargaining Agreement are you
 7        referring to?
 8   Q.   I'll show it to you --
 9   A.   I know.
10            Which one is it, though?  Which -- is it the
11        patrolman's or is it the --
12   Q.   Yeah, the patrolman's.
13   A.   All right.  Then it's put there, too, as well.
14   Q.   Okay.  It's Section 8.
15   A.   Okay.
16   Q.   I don't know if you've ever had to use it or give
17        anybody any advice on it, but it says "Article 8,
18        Discipline."
19            And then there is a "Grievance" article, as well.
20   A.   Okay.
21   Q.   And I don't have that marked, but that's in here as
22        well.
23            Okay.  So, I want to go to the grievance procedure
24        on discipline.  The grievance procedure is Article 6.
25            "An employee shall have the right to
```

Page 117

1　　　　present grievances and in accordance --"
2　　　Okay?
3　　　But Article 8 is "Discipline."
4　　　It says:
5　　　　　"All employees shall have the right to be
6　　　represented by the local president, his
7　　　designee, and/or a union representative at all
8　　　disciplinary conferences or procedures except
9　　　that the employer has the right to take
10　　disciplinary action immediately in emergency
11　　situations."
12　　Does that sound familiar?
13　A.　It does sound familiar.  I don't -- I've read that, but
14　　I don't have recall totally on that.
15　Q.　All right.  So, first, let me ask you this:  I know most
16　　of us in this room are already aware of this, but I'd
17　　just like your statement on the record of what is the
18　　Collective Bargaining Agreement.
19　　　This is a mandatory agreement -- do I have that
20　　right -- once it's signed off on between the City and
21　　the patrol officers?
22　A.　It's a labor contract between the municipality and the
23　　union.
24　Q.　Okay.  And you -- it's required that the City follow it,
25　　and it's required that the union follow it.

Page 118

1　　　　Do I have that right?
2　A.　Yes.
3　Q.　Okay.
4　A.　I would --
5　Q.　And if it's not followed, what happens?  If you breach
6　　or the City breaches -- or -- excuse me -- the officers
7　　breach, what's your remedy?
8　A.　Well, if the officers breach it, they could be written
9　　up, and if the City does it, the union could file a
10　　grievance.  I think that's what you're referring to.
11　Q.　Okay.  And so 8.1 says that:
12　　　　"Employees have the right to be represented
13　　by the union at all disciplinary conferences."
14　　　What's a "disciplinary conference"; if you know?
15　A.　The disciplinary conference would be when someone is
16　　accused of doing something in violation of the policies
17　　and procedures.
18　Q.　Okay.
19　A.　They would be brought in front of the chief, or his
20　　designee, and told what the charges were against them,
21　　then have an opportunity to respond to those charges
22　　against them.
23　Q.　Okay.
24　A.　And then the discipline would be imposed or not imposed
25　　based upon the outcome of that discussion.

Page 119

1　Q.　Okay.
2　A.　Those are not done typically with counsel present --
3　　with the city attorney being present.  It would be the
4　　department head or the chief or the designee as relates
5　　to the officers.
6　Q.　I understand.
7　　　But it is required that the union be notified, it
8　　sounds like --
9　A.　Uh-huh.
10　　　THE REPORTER:  I'm sorry --
11　BY MS. GORDON:
12　Q.　-- before such a conference takes place.
13　　　Is that you're understanding?
14　A.　Yes.
15　Q.　All right.  And --
16　A.　Well, not only the union.  Just to follow up, it would
17　　have to be -- the person who is charged would have to be
18　　notified as to what the charges were.
19　Q.　Sure.
20　A.　And then that person would probably notify the union.
21　Q.　Well, this says that the --
22　A.　Suffice to say, the mechanics are set forth in the
23　　agreement.
24　Q.　Fair enough.
25　A.　Yeah.

Page 120

1　Q.　And then after the conference, the employee has an
2　　opportunity to give his side of the story.
3　　　And then who decides whether there will be
4　　discipline given?
5　　　Is that the chief, or is that his designee, or what
6　　is that?
7　A.　Without looking at the exact document you're looking at,
8　　it's the chief and/or his designee, I believe.
9　Q.　Okay.
10　A.　Yeah.  That's at the first step.
11　Q.　And is there a requirement that a reprimand be given
12　　before suspension, or does it depend on the offense and
13　　the discretion of the chief?
14　A.　Just -- I want to make sure I'm clear on that.
15　Q.　Sure.
16　A.　Can you just rephrase that one more time?
17　Q.　Yeah.
18　　　So, now we've got a disciplinary issue.  We've gone
19　　through, very briefly here, what's in Article 8; that
20　　there's a conference.  The union is brought in.
21　　　And does the chief get to decide on his own what
22　　the discipline will be, or is there some kind of a
23　　requirement for a process?
24　A.　Okay.  It would be the chief or his designee again.
25　Q.　Okay.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 121–124

Page 121

1 A.  And typically it would be a step.  You know, usually
2 there's a step discipline that's imposed unless it's
3 catastrophic.
4 Q.  Okay.  That is not included in this contract.
5 Are you aware of that?
6 A.  Well, it may be somewhere else, but not in that
7 particular -- there's usually a step to the --
8 Q.  Okay.
9 A.  I mean, first of all, there's a step procedure.
10 To the best of my recollection, there's oral, and
11 then there's a written.  Then it could be a suspension,
12 depending on -- but the severity could change depending
13 upon what the issue is.
14 Q.  Okay.  And all officers get a copy of the Collective
15 Bargaining Agreement, obviously; correct?
16 A.  I --
17 Q.  They should?
18 A.  They should, yes.
19 As to whether or not they do --
20 Q.  Because it's binding upon them; correct?
21 A.  It would be.  If they're part of the union, they would
22 be bound by that, yes.
23 Q.  And the purpose of the Collective Bargaining Agreement
24 is to set forth terms with respect to rates of pay,
25 wages, hours and other conditions of employment, and to

Page 122

1 promote orderly and peaceful labor relations to the
2 mutual interest of the employer and the employees.
3 Do I have that right?
4 A.  I don't have it in front of me, but it sounds correct.
5 Q.  Okay.  And the employer is recognizing the union as the
6 sole and exclusive bargaining agent; right?
7 A.  That is correct, I believe.  I don't have it in front of
8 me, but that sounds absolutely correct.
9 But now with the new law, employees can opt out of
10 the union.
11 Q.  Right.
12 A.  So, there's a little bit --
13 Q.  Has anybody opted out of the City of Melvindale, patrol
14 officers?
15 A.  Not patrol officers, no, but other unions.
16 Q.  Okay.
17 A.  Which is interesting.
18 Q.  And in the Collective Bargaining Agreement, there's
19 also -- as I think in most of these CBAs, there's a
20 management rights clause; correct?
21 A.  That would be correct.
22 Don't ask me to quote.  I'd have to look at it.
23 Q.  Fair enough.
24 And this says:
25 "The employer retains and reserves onto

Page 123

1 itself the rights, authority and discretion
2 in the proper discharge of their duties and
3 responsibilities to control, supervise and
4 manage the City police department and its
5 employees to determine and administer policy,
6 to operate the department and to direct
7 employees."
8 Correct?
9 A.  I don't have it in front of me, but that sounds correct.
10 Q.  Okay.  So, this Collective Bargaining Agreement is
11 binding upon the City; correct?
12 A.  Well, it actually would be binding on the City as well
13 as the members of that union.  Correct.
14 Q.  Fair enough.
15 A.  And that is the patrolman that we're referring to still?
16 Q.  Yep.
17 A.  Okay.
18 (Discussion held off the record.)
19 BY MS. GORDON:
20 Q.  And then in addition -- let me just get them out here.
21 There is also something in the police department
22 called the "Melvindale Police Department Rules and
23 Regulations"?
24 Are you familiar with those in your role with the
25 PSC or the City?

Page 124

1 A.  I am familiar.  They're quite lengthy, and they've
2 gotten even larger now.
3 Q.  When did they get larger?
4 A.  Chief Allen has --
5 Q.  What's he added?
6 A.  Oh, God.  I can't -- there's been quite a bit.  Quite a
7 few policies and procedures.  I can't quote verbatim all
8 of them.  There's quite a few.
9 Q.  Do you remember anything that he's added?
10 A.  I think -- there several treatises.  So, there's
11 quite a bit.  I read them all.
12 Q.  Well, what -- do you remember anything they're about?
13 A.  Not today.  I'm not going to recall anything today.
14 I don't recall anything right now.
15 Q.  Did you have any input or assist him on that?
16 A.  You know, I would read them and go over with him.  I had
17 a problem with certain sections.  I would discuss that
18 with Chief Allen, and he made revisions, yes, but at
19 this point I'm sitting here, I --
20 Q.  Who is in charge of HR for the police department?
21 The chief?
22 A.  Well, that's an interesting question.
23 The chief has the files of all his employees in his
24 office, presumably under lock.
25 I would think that the chief -- if there's -- HR

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                              Pages 125–128

Page 125

1    relations would probably talk to the city administrator.
2 Q. Are you guessing or --
3 A. No.  I would believe that would be the natural flow.
4    The chief would probably talk with -- depending on what
5    the issue is.  I don't know what the issue is.  I mean,
6    human resources -- it depends on what the issue is.  He
7    would probably handle most of it, the chief, but he
8    would probably seek out the assistance of --
9 Q. But you're not called in?
10 A. Well, I could be at the request of the department head.
11    At their request, I would come in.
12 Q. What department head?
13 A. Well, the chief.  The chief asks me for assistance, I
14    would certainly avail myself to him.
15 Q. Has that occurred?
16 A. Did that occur when?
17 Q. Has that occurred?
18    Have you ever been called in with regard to a human
19    resources issue by the chief of police, let's say within
20    the last three years?
21 A. When you say "human resources," are you referring to
22    write-ups against individuals?
23 Q. Anything involving, you know, the employees and some
24    issue with how the employees are conducting themselves.
25 A. Yeah.  I'd say John Allen has called me.

Page 126

1 Q. Okay.
2 A. I can't -- I don't have recall --
3 Q. Can you recall anything, any issue that you've been
4    called in on?
5 A. Just employee discipline issues, you know.
6 Q. Okay.  Well, who has called you in on employee
7    discipline issues?
8 A. John Allen has.
9 Q. Okay.  And when would that have been?
10 A. Since he's become chief.  I'm not being evasive, but
11    there's been a number of, you know --
12 Q. Okay.  So, tell me what issues he's called you in on.
13 A. Well, for instance, an employee getting charged with an
14    offense in another jurisdiction.
15 Q. What do you mean by "an offense"?  You mean like a
16    crime?
17 A. Well, it could be a crime.  It could be a civil
18    infraction.  It could be -- and how that should be
19    handled and addressed.
20 Q. Okay.  So, what do you go to then for guidance on that?
21    The Collective Bargaining Agreement or --
22 A. I look at the Collective Bargaining Agreement.  I look
23    at the policies, rules and regulations, and procedures.
24 Q. Okay.
25 A. And then ultimately, if it has to go for a trial board,

Page 127

1    it goes in front of the Safety Commission, and they
2    would make a determination.
3 Q. Have there been any trial boards since you've been with
4    the City, in front of the Safety Commission, other than
5    Welch?
6 A. Yes.
7 Q. What else?
8 A. There was another officer.  I can't recall his name
9    right now, unfortunately.
10 Q. How long ago was it?
11 A. I don't want to say the wrong name, so I'm not going
12    to -- it was probably a month and a half ago.
13 Q. What was the issue?
14 A. Probably more like a domestic disturbance with a
15    girlfriend/thing.  I don't have all the details.
16 Q. Was he charged with something criminally?
17 A. I don't know if it was resolved in civil or it was
18    criminal.
19 Q. So, there was actually a full trial board in front of
20    the PSC?
21 A. Yes.
22 Q. What was the result?
23 A. The employee was subjected to discipline.
24 Q. What was the discipline?
25    Some kind of --

Page 128

1 A. A number of days off.
2 Q. Okay.  Any other trial boards you can recall, since
3    you've been with the City, in front of the PSC?
4 A. Yes.  There's been several.
5 Q. Okay.  What else do you recall?
6 A. There was a trial board involving, again, an officer who
7    had a criminal/civil complaint in another jurisdiction.
8    Those are the two within the last year and a half
9    or so.
10 Q. Is that officer still employed?
11 A. Yes.
12 Q. Okay.  What else do you recall?
13 A. He was given discipline.
14 Q. What other trials boards do you recall?
15 A. Those are the two that come to my mind --
16 Q. Okay.
17 A. -- other than Mr. Welch's was a hearing in front of the
18    Safety Commission as well.
19 Q. Okay.  And what about Officer Easton?
20    Has he been in front of the PSC?
21 A. Yes.
22 Q. Was it a trial board?
23 A. Yes.
24 Q. Okay.  So, you didn't mention him.
25 A. Well, I didn't mention any officers names, but I

Page 129

```
1       mentioned the event.
2   Q.  Well, is he one of the examples you gave me?
3   A.  Yes, he's one -- yes.  Yes.
4           I didn't mention any officer names because I don't
5       want to --
6   Q.  That's fair.  Okay.  I just wanted to know.
7           And he was charged -- his incident, I think, was a
8       hit and run.  Does that sound correct?
9           That's already out there in the public.
10  A.  I think the citation was leaving the scene of a personal
11      injury accident.
12  Q.  Okay.  And he is still --
13  A.  And there were some --
14  Q.  Go ahead.
15  A.  There was some ambiguity as to whether or not that took
16      place or not.
17  Q.  Okay.  And he's still with the City?
18  A.  Yes, he is.
19  Q.  Okay.  All right.  So, in addition to the Collective
20      Bargaining Agreement, I have been provided something by
21      the City called Melvindale -- "City of Melvindale Police
22      Policies and Procedures."
23          Are you familiar with that or you're not?
24  A.  I've read it, and I've used it on various occasions, but
25      I have not committed the document to memory.
```

Page 130

```
1   Q.  Well, I understand that.
2           What's the purpose of this as you understand it?
3   A.  Just the guidelines or -- not the guidelines, but the
4       rules and regulations of the department.
5       Interdisciplinary department rules and regulations, I'd
6       think I'd classify it as.
7   Q.  Okay.  And then I've been given something called
8       "Operational Policy of the Melvindale Police
9       Department."
10          Do you know what that is?
11  A.  I think that's a continuation of the rules and
12      regulations of the department.
13  Q.  Okay.
14  A.  Policies, regulations -- rules and regulations of the
15      department.
16  Q.  Okay.
17  A.  And I've read -- I've read them all.  I don't commit
18      them all to memory, though.
19  Q.  Okay.  And they have, as I understand it, going through
20      the rules and regulations, what you're supposed to do as
21      a patrol officer, how you're supposed to conduct
22      yourself, they talk somewhat about discipline and the
23      like; correct?
24  A.  That would be part and parcel what's contained in there,
25      yes.
```

Page 131

```
1   Q.  All right.  Do you know of anything else that exists at
2       the police department other than the Collective
3       Bargaining Agreement, the policies and procedures of the
4       Melvindale Police Department and the operational policy
5       of the Melvindale Police Department that apply
6       specifically to the police department?
7   A.  I don't recall anything else at this time.
8   Q.  Okay.
9   A.  Other than that.  There may be something, but I don't
10      recall.
11  Q.  Okay.  Do you know who is responsible for creating the
12      policies and procedures at the police department that
13      we've been talking about?
14  A.  Yep, I do.
15  Q.  And who is that?
16  A.  It would be -- the chief would create the policies.  He
17      would bring those policies, rules and regulations to the
18      Safety Commission, and they would either approve them or
19      not approve them.  And subsequently they would go to the
20      mayor and council for their ratification as well.
21      That's the step.
22  Q.  Do you have any formal or informal role with the police
23      department itself?
24  A.  Do I have a formal role with them?
25  Q.  Yes.
```

Page 132

```
1           Aside from your role on the Public Safety
2       Commission --
3   A.  Yeah, I --
4   Q.  -- where things may come before the commission.  I grasp
5       that.
6           Other than that -- I'll be more specific.
7           Do you have any reason to meet regularly with the
8       police chief for any purpose?  Is that part of your job?
9   A.  Well, the rules and regulations, we talked about.  If
10      there's discipline stuff, he talked to me.
11          But also I meet with like the detectives regarding
12      warrants and things of that nature.
13  Q.  Okay.  That's with your hat of --
14  A.  Prosecution.
15  Q.  -- prosecutor?
16          Okay.  And I get that.
17  A.  Okay.
18  Q.  And so you're probably pretty involved with them with
19      your prosecutor role, I assume.  They are kind of your
20      client; right?
21  A.  Well --
22  Q.  They are your client.  I mean --
23  A.  I try to dish off all the warrants to Roger.
24  Q.  All right.  Just for the record, we all understand here
25      that Mr. Coogan has a very specific role as prosecutor
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018
Pages 133—136

Page 133

1    for the City of Melvindale and much of that work
2    involves the police department.
3         But aside from that, you're corporation counsel on
4    the civil side?
5  A. Correct.
6  Q. Okay.  So, with regard to corporation counsel hat, do
7    you have any reason to meet with the police department,
8    the chief or any other command officers on any kind of a
9    regular basis?
10        I'm not talking about something comes up and
11   somebody has a question.  But is there any reason for
12   you to interact with the police department?
13 A. On the corporation counsel side, I do as requested.
14   But, again, the prosecution side, domestic disturbance,
15   problems in neighborhoods, things of that nature, the
16   police department bring the people into the conference
17   room and try to resolve issues.
18 Q. Do you have any role with citizen complaints that are
19   filed against any police officer with Melvindale?
20 A. Well, certainly if there's a complaint filed, they would
21   bring that to my attention, yes.
22 Q. Who is "they"?
23 A. The police chief.
24 Q. Well, is that required?
25        I'm not familiar with that in other police

Page 134

1    departments where you have to notify city council.
2  A. I didn't say "they have to," but typically if there's a
3    complaint that is an important issue --
4  Q. Well, are you guessing, or is this something that's --
5  A. No.  If something is -- a complaint is an important
6    issue regarding something in the City, it would be
7    brought to my attention through legal representation.
8  Q. I don't see that in any of the policies and procedures.
9  A. Well, it would be under corporation counsel.  If there's
10   any issues with any department head, that they have any
11   issues, I would address those if they came to me.
12 Q. I'm not following what you're saying.
13        You think any department head has to come to you
14   with any issue he has?
15 A. I didn't say they had to, but usually they would come to
16   me.
17 Q. Okay.  Well, has anybody come to you with citizen
18   complaints from the police department ever, since you've
19   been with the City?
20 A. I would have to say yes.  And I would refer them to the
21   chief to address that first with them and see if they
22   could --
23 Q. So, you don't think the chief knows that he's the one
24   responsible for the citizen complaints?
25 A. No.  I didn't say the chief doesn't know that -- you

Page 135

1    asked me if anybody ever came to me, and I said, yes,
2    they have.
3  Q. Who?
4         Has a chief --
5  A. Well, just --
6  Q. Has a chief ever come to you with a question?
7  A. Perhaps.  I don't recall anything specific right now.
8    But citizens stop in my office all the time and want to
9    talk.
10 Q. Okay.  So, you've actually had citizens who possibly
11   make complaints to you, and then you refer them to the
12   chief?
13 A. That is correct.
14 Q. Okay.  So, what terminations of command officers have
15   occurred since you've been corporation counsel, other
16   than Chad Hayse?
17 A. Well, he's the chief, not a command officer, but --
18 Q. Well, I'm putting him in that category.
19 A. None that I know of, no.
20 Q. Okay.  Have there been any trial boards of command
21   officers or chiefs other than Welch and Hayse since
22   you've been there?
23 A. Yes.  We alluded to this earlier.
24        THE REPORTER:  Excuse me?
25 A. We alluded to the one --

Page 136

1         THE REPORTER:  Thank you.
2  A. -- specific --
3  BY MS. GORDON:
4  Q. I said command officers.
5  A. That's correct.
6  Q. That would be Easton?
7  A. That would be correct.
8  Q. Okay.  Have there been any civil lawsuits filed against
9    the City with regard to actions by police officers since
10   you've been with the City as corp counsel?
11 A. Yes.
12 Q. Okay.  When is -- what's the most recent case you
13   recall?
14 A. I think there's two that I recall.
15        One was against Mr. Furman; another was against --
16   who is the other one against?
17        No.  Just one against Mr. Furman, I think.
18 Q. And what was that about?
19 A. Or maybe two against Mr. Furman.
20 Q. Okay.  What were those about?
21        Excuse me for interrupting --
22 A. One is a federal lawsuit you alluded --
23 Q. I was going to ask you, where are they?
24 A. Yeah.
25        One is a federal lawsuit and --

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                    Pages 137–140

Page 137

1   Q.   Is that McClintock or --
2   A.   Yeah, there you go.
3   Q.   -- somebody else?
4   A.   Yes.
5   Q.   Are you representing the City?
6   A.   I'm involved in it.  I'm not --
7   Q.   Who is representing the City, then, if you're not?
8   A.   I can't tell you at this point.  I can't remember the
9        name.
10  Q.   Well, is it insurance counsel?
11  A.   (Nods head.)
12  Q.   That's a "yes"?
13  A.   Yes.
14            I'm sorry.  Yes.
15  Q.   Okay.  So, that's ongoing.  That's in federal court.
16            Do you understand what the allegations are there?
17  A.   Yes.
18  Q.   What do you understand them to be?
19  A.   Allegations of excessive force.
20  Q.   Okay.  And what was the other one against Officer
21       Furman?
22  A.   Yeah.  It was a -- I don't know if that's in litigation
23       right now or if that's been settled.
24  Q.   Okay.  What was it about?
25  A.   The one you alluded to in your previous depositions.  A

Page 138

1        young lady who said that she was placed outside of her
2        vehicle.
3             I'm not representing the City.  I've not been
4        involved in that.
5   Q.   Was that in city -- state or federal court?
6   A.   To the best of my knowledge, that's in Wayne County
7        Circuit Court.  I'm not 100 percent certain.
8   Q.   Is that excessive force as well?
9   A.   I haven't been involved in that as much, so I really
10       don't --
11  Q.   Don't you track these cases, though, in your role as
12       corp counsel?
13  A.   I try to, but I'm kind of busy right now with some other
14       litigation with the City.
15  Q.   Well, have you been directed by the City to be involved
16       in this litigation, even though you've got insurance
17       counsel?
18  A.   I'm -- yes.
19  Q.   Did that happen on the record in some kind of formal
20       vote by the council?
21  A.   Not to the best of my knowledge, no.
22  Q.   Or is it just that you have chosen to be here?
23  A.   I've been directed to be here.
24  Q.   But that's not in writing anywhere?
25  A.   No.  I've been directed to be here.

Page 139

1   Q.   I asked -- I know.  I said, is it in writing?
2   A.   No, I don't believe it's writing.  No.  It's not been a
3        council resolution.
4   Q.   Well, then, who directed you to be here?
5   A.   The mayor.  The mayor.
6   Q.   Do you report to the mayor or to the council?
7   A.   Both.
8   Q.   So, the mayor can direct you without action by the
9        council?
10  A.   Certainly.
11            We all serve at the will -- all appointed officials
12       serve at the will and pleasure of mayor and council.  If
13       they come to me and ask me to do something, I typically
14       do it, if it's within the legal --
15  Q.   Well, the charter defines what you can do and can't do,
16       doesn't it?  Just like it does with the police chief and
17       just like it does with the mayor?
18  A.   Well, the mayor and council define what I do, too.  I
19       mean, they tell me to do something.  I work for the
20       mayor and council.
21  Q.   Well, they can't go outside the scope of the charter,
22       can they?  They can only stay within the scope of the
23       charter when they direct you what to do; right?
24  A.   That would be correct.
25  Q.   All right.

Page 140

1   A.   I believe that would be correct.
2   Q.   All right.  So, I'm going to go back to the other
3        lawsuit.
4             Who is the plaintiff in that one?
5   A.   I don't know the name.
6   Q.   Well, tell me what the facts are, and I'll be able to
7        figure it out.
8   A.   It was the lady who was put outside her vehicle.
9   Q.   With her children?
10  A.   Yeah.
11            She was placed outside her motor vehicle, and there
12       was an issue that you alluded to, and I don't remember
13       now --
14  Q.   Is that case ongoing?
15  A.   I don't recall if it's been resolved yet or not.
16  Q.   Is that Henderson?
17  A.   That is -- I believe that is correct.  Yeah, that's the
18       name.
19  Q.   And who is the insurance counsel for that?
20  A.   I don't have it in front of me.  I've not worked with
21       that individual.
22            I have --
23  Q.   You don't remember the law firm?
24  A.   -- talked -- I don't remember the law firm.  Sorry.
25       Honestly, I don't.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 141–144

Page 141

```
 1   Q.  So, do you have a role with that lawsuit?
 2   A.  Minimal.
 3   Q.  Okay.
 4   A.  I've had minimal involvement.
 5   Q.  What was your involvement with Chad Hayse during the
 6       time he was chief?  Did you have any reason to interact
 7       with him?
 8   A.  I attempted to.
 9   Q.  Okay.  For what purpose?
10   A.  Prosecution issues.
11   Q.  Okay.  What else other than that?
12   A.  Any and all issues surrounding the police department.
13   Q.  Well, I'm asking you what they are, sir.
14           What -- for what reason would you have interacted
15       with the police chief that you can think of here today,
16       other than prosecutions and other than just the normal
17       routine?
18   A.  Well, Public Safety Commission meetings I attended, and
19       he was there as well.
20   Q.  Okay.
21   A.  So, we had interaction there.
22           Sometimes prior to the meetings, there would be
23       some discussion, not very often, though.  Chad didn't
24       really talk to me very much.
25   Q.  Okay.
```

Page 142

```
 1   A.  I don't think he liked me.
 2   Q.  What makes you think that?
 3   A.  Well, I'll tell you what makes me think that.
 4           There was an issue which I'm sure you're aware of
 5       when we first started -- when he -- he was an interim
 6       police chief, and the co-applicant's position submitted
 7       an application and within a few minutes of Mr. Plemons
 8       submitting his application, Mr. Hayse was calling his
 9       references and verifying his experience and training
10       that were provided for in Mr. Plemons' application.  And
11       I think Mr. Hayse thinks -- well, first of all, I put on
12       the record in front of the mayor and council -- and that
13       is part of the record -- that Mr. Plemons and I have
14       been friends for years, and I really didn't think it
15       would be appropriate for me to be involved in any
16       investigation Mr. Plemons wanted to seek regarding
17       Mr. Hayse's conduct.  So, I withdrew from that and --
18   Q.  What year are we in here?
19   A.  On or about -- probably '14.
20   Q.  All right.  Well, if you don't mind, got anything more?
21   A.  Well, you asked me why I thought he didn't like me.  I
22       think that's the case.  I was just answering your --
23   Q.  I think that was actually 2012, but okay.
24   A.  It may have been.  It may have been.  I'm not certain.
25   Q.  All right.  Is -- have you ever done any -- strike that.
```

Page 143

```
 1           You have no expertise in the Elliott-Larsen Civil
 2       Rights Act.  Am I correct on that?
 3   A.  I have dealt with it.
 4   Q.  In what way?
 5   A.  In litigation.
 6   Q.  What litigation?
 7   A.  Several times over the years.
 8   Q.  Can you just tell me what you're referring to?
 9           Have you --
10   A.  In a labor issue, I think.
11   Q.  Well, labor doesn't involve --
12   A.  Well, I'm trying to --
13   Q.  -- usually, Elliott-Larsen.
14   A.  Well, I've -- I've used it -- I've argued.  I can't
15       recall when I -- but I am familiar with it a little bit.
16           THE REPORTER:  Excuse me?
17   A.  I'm familiar with it a little bit.  I don't recall.
18       Yeah, I mean --
19   BY MS. GORDON:
20   Q.  Okay.  All right.  So, have you ever done any training
21       or asked that any training be done or -- leave you out
22       of it.
23           Has anybody from the City, as far as you know, ever
24       done any training with the police department --
25   A.  Yes.
```

Page 144

```
 1   Q.  Let me finish.
 2   A.  Okay.
 3   Q.  -- with regard to civil rights laws?
 4   A.  We've had -- it's probably been several years.  But,
 5       yes, I've been involved with training at the request of
 6       Officer Bajorek and put on some training for the police
 7       department on various issues.
 8   Q.  But I'm not asking about various issues.  I'm asking
 9       about civil rights.
10           Let me break it down.
11           Have you -- are you aware of any training that's
12       been provided with regard to racial profiling, or do you
13       know of any?
14   A.  Do I -- the question is -- let me understand.
15           Is the question --
16   Q.  Have you been involved with any training, or do you know
17       of any with regard to racial profiling?
18   A.  I believe we dealt with a little bit of that when
19       Mr. Bajorek had me come in and give a presentation to
20       the various members of the police department, both Roger
21       Kaly and I --
22   Q.  Well, do you know anything about --
23           THE REPORTER:  I'm sorry?
24   BY MS. GORDON:
25   Q.  Do you know anything about racial profiling?
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 145–148

Page 145

```
 1   A.   Yeah.  I have a running understanding.  I'm not --
 2   Q.   Well, is it --
 3   A.   -- intimately familiar with this.
 4   Q.   -- a legal running understanding, or is it just what you
 5        pick up out there in general in the news media?
 6   A.   Well, anything --
 7   Q.   Have you ever had any training yourself on it,
 8        professional training?
 9   A.   I have not went to special classes on racial profiling,
10        if that's your question, no.
11   Q.   What percentage of your time as corp counsel is done
12        acting as prosecutor for the City?
13   A.   I can't really give you percentages.  I can tell you
14        more hours.
15   Q.   Okay.  Go ahead.
16   A.   Usually one full day a week, sometimes -- most often a
17        day and a half a week on prosecution issues.  And that
18        includes warrants.
19   Q.   How many days a week are you in court on prosecution
20        issues?
21   A.   Well, that varies.  If we have trial, it can be several
22        days.  Typically it's at least one day.
23   Q.   Okay.  Do you have any employees in your office?
24   A.   Yes.
25   Q.   Who are they?
```

Page 146

```
 1   A.   Well --
 2   Q.   Or what job titles are they?
 3   A.   Legal secretary and secretary.
 4   Q.   Okay.
 5   A.   Yeah.
 6   Q.   Any other attorneys work for you?
 7   A.   Well, there's a number of attorneys who I associate with
 8        that do work with me or --
 9   Q.   Right.  I understand that.
10   A.   Yeah.  So, I mean, Roger is in my office with me.
11   Q.   Right.
12        But nobody else is on your payroll?
13   A.   Payroll.
14        No.
15        At one point, I had up to seven employees working
16        for me, attorneys, and I decided I was working for them.
17        They weren't really working for me.  So --
18   Q.   When was that?
19   A.   Years ago.
20   Q.   Okay.
21   A.   I found myself coming in at 7:00 a.m. and working until
22        9:00 at night, and they would come in at 10:00 and leave
23        at 3:00.  So, I decided keeping people on a payroll
24        wasn't really what I wanted to do any more.
25   Q.   When did you meet Michael Goch or anybody in his family?
```

Page 147

```
 1   A.   I met Mike Goch as relates to his application for the
 2        towing position --
 3   Q.   Had you --
 4   A.   -- at a meeting.
 5   Q.   Had you known him previously?
 6   A.   No.  I have never knew Mike Goch prior to that.
 7   Q.   Okay.  Do you know anybody in his family?
 8   A.   I've met his brother, and his sister-in-law, who has
 9        also came to city council meetings on behalf of the
10        corporation.
11   Q.   What his brother's name?
12   A.   I don't know.  I just call him "Mr. Goch."
13   Q.   Okay.  Have you ever had a meeting with Michael Goch
14        where the two of you were present anywhere?
15   A.   Have I ever met with --
16   Q.   Uh-huh.
17   A.   Yeah, I've met with him.
18   Q.   Okay.  So, how many times, roughly?
19   A.   More initially when he first got the contract and the
20        problems he was having in getting the auctions.  Very
21        infrequently.  I don't really --
22   Q.   How many times have you met with him approximately?
23   A.   How many times have I had a meeting with Mike Goch?
24        Six, seven, eight.  I don't know.
25        I'm really not sure.
```

Page 148

```
 1   Q.   Where have you met with him?
 2   A.   My office.
 3   Q.   Where else?
 4   A.   City hall.
 5   Q.   Where else?
 6   A.   For meetings, it would be my office or city hall.
 7   Q.   Have you ever been at a restaurant with him?
 8   A.   Oh, yeah.  A couple times.
 9   Q.   Okay.  What restaurant?
10   A.   The Broadcast Booth.
11   Q.   Okay.  What else?
12   A.   I don't recall.  Off the top of my head, I don't recall
13        any other.
14   Q.   Was anybody else present for these restaurant meetings
15        or get-togethers?
16   A.   I don't recall.  I've met with him a couple times --
17        several times.  I couldn't tell you.
18   Q.   Has your wife ever met him?
19   A.   One time.
20   Q.   Okay.  Where was that?
21   A.   Where did she meet him at?
22        On one occasion, we were at his house.
23   Q.   And what was that for?
24   A.   Dinner.
25   Q.   Okay.
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 149–152

Page 149

1  A.  His girlfriend, Katie, cooked dinner.
2  Q.  For the four of you or other people there, too?
3  A.  My son -- my oldest -- my only son.  My son, Luke.
4  Q.  What's his name?
5  A.  Luke.
6         Luke was there.
7  Q.  Luke Coogan?
8  A.  Yeah.
9  Q.  How old is he?
10 A.  Seventeen.
11 Q.  Okay.
12 A.  My wife.  I believe it was Katie, Mike and myself.  The
13     five of us.
14 Q.  And Katie is who?
15 A.  His girlfriend, I think.
16        Yeah, it's his girlfriend.
17 Q.  Does she live there?
18 A.  I --
19 Q.  As far as you know?
20 A.  She --
21 Q.  Appears to?
22 A.  Yeah.  I would assume so.  I never really --
23 Q.  Okay.  So, it was the five of you, and they cooked
24     dinner for you guys?
25 A.  Yeah.  Yeah.

Page 150

1  Q.  Okay.  Any other times you've been at his home?
2  A.  No, no, no.
3  Q.  Has he been at your home?
4  A.  No.
5  Q.  Have you been at any club with Mike Goch or anybody in
6      his family?
7  A.  Any club?
8  Q.  Yeah.
9  A.  What do you mean by "club"?  I mean, what do you mean by
10     "club"?
11 Q.  Country club?  Sports club?
12 A.  No.
13 Q.  Athletic club?  Hunting club?
14 A.  No, he was -- I don't think he hunts.
15 Q.  Okay.  Any club?
16 A.  No, I don't -- no, ma'am, I don't think I have.
17 Q.  Has he ever given you a gift basket?
18 A.  No.
19 Q.  Has he ever given you a gift of any kind?
20 A.  No.
21 Q.  Has he ever sent you flowers?
22 A.  No, he has not.
23 Q.  Or your law firm flowers?
24 A.  No, he has not sent me flowers or my law firm.
25 Q.  Have you ever obtained any money of any kind from Mike

Page 151

1      Goch?
2  A.  Absolutely not.
3  Q.  Have you ever purchased a car at auction?
4  A.  Have I?
5         No, I've never --
6  Q.  Anybody in your family?
7  A.  No.
8  Q.  At any Melvindale Police auction, have you ever
9      purchased any vehicle?
10 A.  No, I haven't.
11 Q.  Has anybody ever purchased a vehicle on your behalf?
12 A.  No.
13 Q.  Do you know the employees of Mike Goch?
14 A.  Well, I've seen them come in and out of city hall.  I
15     don't know their names.  I don't really -- I don't
16     really know their names.
17 Q.  What's your daughter's name?
18 A.  Which one?
19 Q.  I don't know.
20        How many do you have?
21 A.  I have three daughters.  They're beautiful daughters.
22 Q.  You just got lucky.
23 A.  Yeah.
24        Amy is my oldest.  She's going to be 30.  Annie is
25     25.  And Abby is 19.

Page 152

1  Q.  You're not aware that one of them has purchased a
2      vehicle at a police auction?
3  A.  My daughters?
4  Q.  Yeah.  One of your daughters.
5  A.  No.  I know they haven't.  They purchased a car from
6      Mark Chevrolet is where they bought their cars from
7      and -- I know the owner, and that's where they bought
8      their cars from.
9  Q.  Have you ever been on Mike Goch's boat?
10 A.  One time.
11 Q.  Okay.  When was that?
12 A.  I don't know.  The same day I had dinner.
13 Q.  What were you doing out there?  Why were you on his boat
14     and had dinner with him?
15 A.  He asked me to come over on the boat and go to dinner.
16 Q.  Well, it sounds like you don't really know him.  You had
17     only met with him a few times.
18        What was the purpose as you understood it?
19 A.  It was just social.
20 Q.  Have you ever been at any sporting event with him?
21 A.  Yes, I have, as a matter of fact.
22 Q.  Okay.  What have you done in that regard?
23 A.  I took him to the Red Wings games this year.  One game.
24 Q.  And you bought the tickets?
25 A.  Yeah.  Yeah.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 153–156

Page 153

1    Q.   And why did you take Mike Goch to the Red Wings game?
2         What was the purpose of that?
3              Is he a friend?
4    A.   He's kind of a social acquaintance.  You know, I've
5         gotten to know him since he's had his contract with the
6         City.
7    Q.   Okay.  Well, how have you gotten to know him since he's
8         had --
9    A.   Well, I told you.  I went to the Red Wings game with him
10        this year.
11   Q.   Okay.  But how is it you got to know him?
12        You don't have any reason to interact with him now
13        that he has the contract; am I correct?
14   A.   Well, initially he had some problems with the contract
15        in that the chief wouldn't allow him to run the
16        auctions.  So, he came to me and said, you know, "My
17        agreement says I'm supposed to run these auctions," and
18        the chief wouldn't allow him to do that.  So, I got to
19        talk to him then, and then intermittently issues have
20        come up or whatever.
21   Q.   Like what?
22   A.   You know --
23   Q.   Like Mike -- Mark Furman and -- the Matthew Furman and
24        the towing?  Has that come up a couple times?
25   A.   Has it come up with me and him?

Page 154

1    Q.   Yeah.
2         You said he's had some issues.
3    A.   Well, it was primarily when he first got the contract.
4         It was kind of rocky at first, and then it kind of
5         smoothed out.
6    Q.   I know, but then I asked you a different question --
7    A.   Okay.  What was that question?  I --
8    Q.   He's discussed Matthew Furman with you a couple times;
9         correct?
10   A.   I don't recall specifically discussing Matt Furman with
11        him.
12   Q.   Well, you remember in general, though, his name coming
13        up; correct?
14   A.   I don't specifically remember talking to him about
15        Mr. Furman.
16        I don't.
17   Q.   Okay.  Are you aware that Furman generates a great deal
18        of money for Goch & Sons?
19        You must be.
20   A.   I'm not -- I'm not certain what money he does.
21   Q.   Well, aren't you --
22   A.   I know that Mr. Furman --
23   Q.   -- familiar with the contract?
24             THE REPORTER:  Excuse me --
25   BY MS. GORDON:

Page 155

1    Q.   Aren't you familiar --
2    A.   I know that Mr. Furman tows vehicles, yes.  I know that
3         Goch & Sons is the tow company.
4              As to the dollar amounts they make or don't make, I
5         don't know.
6    Q.   Well, you get those at the meetings, don't you?
7              MR. MEIHN:  Object to foundation.
8    A.   I haven't seen one of those in a long, long time.
9         Honestly, I haven't.
10   BY MS. GORDON:
11   Q.   Isn't that a regular topic of conversation at meetings?
12             MR. MEIHN:  Objection.  Foundation.
13   BY MS. GORDON:
14   Q.   How much money, revenue, is coming in from towing every
15        month?
16   A.   Not in a long, long time.
17   Q.   Like how long?
18   A.   A year and a half ago maybe.
19   Q.   Okay.  So, why was it a topic at that time?
20   A.   Well, initially, the -- we changed companies because of
21        some issues going on, and no one could produce a
22        contract.  No one had the contract with Gene's Towing,
23        and the mayor came in and said, "How do we have this
24        relationship?  Where is the contract at?"
25             So, then the mayor went out and that's how --

Page 156

1    Q.   I don't need the whole backstory.  I had a very specific
2         question.
3    A.   So, what was it you'd like to know?  What would you like
4         to know?
5              MS. GORDON:  Would you read the question back,
6         John?
7              THE REPORTER:  Yes.  One second, please.
8    A.   I'm not trying to be evasive, I just --
9              MS. GORDON:  That's fine.
10             (Record repeated by the reporter.)
11   A.   Oh, okay.
12   BY MS. GORDON:
13   Q.   Why was towing a topic at city council or Public Safety
14        Commission meetings?
15   A.   Well, I think there was -- it wasn't towing.  It was
16        tickets and towing, and the whole issue.  There was a
17        significant drop, and the chief was asked, "Chief, do
18        you know why the enforcement has dropped so much?"  And
19        he didn't know.
20   Q.   The enforcement or the towing?
21   A.   The enforcement -- well, obviously, enforcement is part
22        of towing.
23             If you pick someone up and give them a citation,
24        you have to tow their vehicle, if you have to tow their
25        vehicle, that's part of the citation.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 157

1          So, both the citations were down and so was towing.
2    Q.   Okay.  Here's my question to you, sir.  Here is how this
3         started:  I asked you, isn't it true that Goch & Sons
4         makes a great deal of money based on Matthew Furman's
5         towing?
6              Can you answer that "yes" or "no"?
7              MR. MEIHN:  I would object -- object to foundation.
8    A.   I don't know.
9    BY MS. GORDON:
10   Q.   Well, aren't you familiar with the contract?
11            Didn't you help negotiate the contract?
12   A.   They're pay-per-tow.  As to how much they're making, I
13        don't know if they're making a lot.
14            Your statement was, did they make a lot of money?
15        I don't --
16   Q.   Did you -- did you help negotiate the contract?
17   A.   Certainly.
18   Q.   Do you know what their towing rates are?
19   A.   Not off the top of my head, but it's in the contract.
20   Q.   Okay.  Do you know how much money the City obtains
21        roughly each month?  Do you get that information at
22        council meetings?
23   A.   I haven't -- as I indicated just earlier, we haven't
24        seen that in about a year and a half or so.
25   Q.   You're not aware this is -- Mike -- Goch & Sons Towing

Page 158

1         makes a presentation at the council meetings?
2    A.   They haven't done that in about a year and a half or so.
3         I haven't seen them there recently -- in a long, long
4         time.
5              Initially they did, but they don't do it any more.
6    Q.   Well, common sense would tell you that Goch & Sons is
7         making significant money off of the towing done in
8         Melvindale; correct?  You know that?
9              MR. MEIHN:  Objection to foundation.
10   BY MS. GORDON:
11   Q.   Correct?
12   A.   No, that's not correct.  I don't know what they're
13        making.  I don't keep track of what Mike Goch's tow
14        company makes per month.  I really don't.  I could care
15        less.
16   Q.   Do you keep -- you could care less?
17   A.   Honestly, yes, I do.  I could care less.  I have a lot
18        of other things to worry about.
19   Q.   Okay.  Well, you're very concerned about the number of
20        tows in the City of Melvindale each month, aren't you?
21   A.   No.
22            MR. MEIHN:  Object to foundation.
23   A.   I would say, you know, from an enforcement, I'd like to
24        keep a busy prosecution.  But, you know, I don't write
25        the tickets.  I have no influence on what tickets are

Page 159

1         written by anybody.
2    BY MS. GORDON:
3    Q.   Well, haven't you stated publicly that the reduction in
4         tows is a reduction in revenue for the City?
5    A.   Any lack of enforcement --
6    Q.   You can just answer "yes" or "no" to my question.
7    A.   Okay.  Any lack of enforcement --
8    Q.   I didn't want you to just opine in general.
9              THE REPORTER:  I'm sorry.
10   BY MS. GORDON:
11   Q.   Did you state publicly in a meeting that a reduction in
12        tows is a reduction in revenue?
13   A.   I don't recall making that exact statement, no, or
14        anything similar.  I don't recall that.
15   Q.   I mean -- and you've expressed that your concern as
16        corporation counsel is that you're in a deficit
17        elimination plan, and you do not want to see a reduction
18        in tows, haven't you?
19   A.   Have I said we're in a deficit elimination plan?  Yes.
20            Do I want to see a reduction in enforcement?  No.
21   Q.   That wasn't my question.
22            MS. GORDON:  Would you read my question back, John?
23   A.   I thought it was two questions.  I tried to answer both.
24   BY MS. GORDON:
25   Q.   Just listen to the question.

Page 160

1    A.   I'm doing my best.
2              (Record repeated by the reporter.)
3    A.   Okay.  Yes, I've said we're in a deficit elimination
4         plan.
5              I'm not certain if I ever said I don't want to see
6         a reduction in tows.  I don't recall making that
7         specific statement, no.
8    BY MS. GORDON:
9    Q.   And you've also talked in meetings that -- of being
10        aware that Furman does 80 percent of the towing;
11        correct?
12   A.   I heard someone make that statement.
13            As to whether or not that's correct, I don't keep
14        track of who tows what --
15   Q.   You're the one that made the statement, sir.
16            Do you remember making the statement?
17   A.   I don't remember making the statement that he does
18        80 percent of the tows, no.
19   Q.   Well, actually --
20   A.   I remember somebody else making that statement.
21   Q.   Actually, you said it, but actually you were low.  He
22        does more than 80 percent of the towing.
23   A.   Okay.  Well, I don't really keep track of his percentage
24        of tows.
25   Q.   Oh, don't you?

Page 161

1    A.   No, I don't.
2    Q.   Well, then how is it you stated it at a public meeting
3         if you don't keep track of it?
4    A.   Somebody might have had to tell me, because it's not
5         like I keep score.
6    Q.   Oh, okay.
7    A.   If I said it at all.  I don't recall.
8              I might have.  It's not really something I keep
9         track of.
10   Q.   And is Mike Goch still getting up in meetings and
11        announcing how many cars were towed each month?
12   A.   I've asked that -- answered that question at least three
13        times, and I'll answer it again.
14   Q.   Go ahead.
15   A.   I don't believe I've seen Mike Goch talk about towing
16        for about a year and a half, to the best of my
17        information, knowledge and belief.
18   Q.   Who else is there from his office that talks about
19        towing?
20   A.   I don't believe anybody has come before the council in
21        the last year and a half or so.
22             I mean initially, when Mike first got the contract,
23        Goch & Sons --
24   Q.   Since this lawsuit was filed, they stopped coming?  Is
25        that about when it happened?

Page 162

1    A.   I didn't say that.
2              When was this filed?
3    Q.   I'm asking you.
4    A.   When was this filed?
5              I'd have to look at that.  I don't know when it was
6         filed.
7    Q.   All right.  So, this is a transcript of a meeting of the
8         Public Safety Commission --
9    A.   Okay.
10   Q.   -- dated 7-12-16.
11             Mr. Goch opens up by saying:
12             "Good evening.  I'm Mike Goch from Goch & Sons
13        Towing.  I just wanted to give a report from
14        last month's total."
15   A.   And what was the date of that?
16   Q.   Hang on.  Hang on.
17             And we have -- this is July 2016.
18   A.   Okay.
19   Q.   And we have monthly reports from Goch at the council
20        meetings, including December -- all through, every
21        month, through December 2017.
22             Do you deny that, that there's been reports given
23        every month at city council meetings about towing
24        through --
25             MR. MEIHN:  Objection to foundation --

Page 163

1    BY MS. GORDON:
2    Q.   -- December 2017?
3              MR. MEIHN:  Sorry.
4              Objection to foundation.
5    A.   Are you saying that something was in the mayor and
6         council's packet?
7    BY MS. GORDON:
8    Q.   I have --
9    A.   I don't recall seeing those, no.
10   Q.   You know what?
11   A.   I don't recall seeing those.
12   Q.   I didn't ask you if you saw anything in the packet.
13   A.   Okay.
14             MS. GORDON:  Would you read the question back,
15        John?
16             THE REPORTER:  Yes.  One second, please.
17             (Record repeated by the reporter.)
18   BY MS. GORDON:
19   Q.   Do you deny that?
20   A.   I have not seen reports for Goch Towing in a long time.
21   Q.   Do you know what?  I --
22   A.   And I don't know.  I've never seen those.
23             So, I'd have to -- I'd have to see --
24   Q.   Mr. Coogan, you're either not listening to the question
25        or you're intentionally prevaricating.  I didn't ask

Page 164

1         you --
2    A.   I'm not prevaricating anything.
3    Q.   Oh, yes, you are.  I never used the words "did you see"?
4         I said "they made reports at meetings."
5              And I said, "Are you denying that?"
6              So, are you?  "Yes" or "no"?  That they got up --
7    A.   I do not recall --
8              THE REPORTER:  Excuse me.
9    BY MS. GORDON:
10   Q.   Hang on.
11             That they get up and make a report?
12   A.   I do not recall them giving a report in front of the
13        mayor and council in quite some time.
14             And if you're saying it happened up through and
15        every month to 2017 --
16   Q.   Yes.
17   A.   -- I don't believe that.  No, I don't believe that's
18        correct.
19   Q.   Okay.  That's fine.
20   A.   I don't believe that's correct.
21   Q.   Then maybe you're lying under oath here today, sir.
22   A.   I don't recall that --
23             MR. THOMAS:  Objection.
24   BY MS. GORDON:
25   Q.   Maybe you just are.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                    Pages 165–168

Page 165

1          MR. THOMAS:  That's argumentative, Ms. Gordon.
2    A.   I don't recall seeing any reports.
3          MR. THOMAS:  Excuse me.  I'm objecting.
4          That's argumentative, and you're harassing the
5    witness with statements like that.
6    BY MS. GORDON:
7    Q.   And do you recall Goch & Sons making reports at Public
8    Safety Commission meetings about the amounts of tows and
9    the amounts of revenue?
10   A.   They had, yes.  I haven't seen that in a long, long
11   time.  In the past they had, though.
12   Q.   And do you recall Mr. Bolton being concerned about the
13   trend of towing going backwards, at a Public Safety
14   Commission meeting, or expressing concern in some other
15   way?
16   A.   I think the Safety Commission was concerned, yes.
17        And the chief was asked, and he didn't know why it
18   was up or down.
19   Q.   So, I have minutes or a transcript from a meeting where
20   Bolton is asking -- or discussing the number of tows and
21   Bolton asks:
22             "How can one officer be the one that does
23        all the towing?"
24        And you say:
25             "I think it was 80 percent."

Page 166

1             Does that sound familiar to you, referring to
2    Furman?
3    A.   We talked about that earlier.
4         I don't recall saying that, but maybe I did, yeah.
5    Q.   Well, it says right here:
6             "I think it was 80 percent."
7         You're not denying that, are you?
8    A.   I don't know what percentage -- if I said it back then,
9    I knew it then.
10        When was that meeting; if you know?
11        But I don't recall --
12   Q.   We already said.  July 2016.
13   A.   Oh.  I don't remember what was said in July 2016 in a
14   meeting.  I'm sorry.
15   Q.   Okay.  So, here is you also speaking at the same meeting
16   saying:
17             "My concern as a corporation counsel is
18        that we're still in a Deficit Elimination Plan.
19        The reduction in tows means reduction in revenue
20        for the City, and since, like I said, we're
21        still in a Deficit Elimination Plan, and that
22        concerns me."
23   A.   Well, if I said it, I said it.
24   Q.   I'm not done yet.
25   A.   Oh, I'm sorry.  I thought it was a question.

Page 167

1    Q.   (Reading.)
2              "I don't think anybody wants the State of
3         Michigan coming in and the effects that would
4         have on our community."
5         Do you remember saying that?
6    A.   No, I don't remember saying it, but if it's in the
7    transcript, I certainly said it.
8         That was 2016.  I don't remember.
9         I don't want to see a reduction in any revenue
10   streams on behalf of the City.
11   Q.   What other sports events have you been with Mike Goch
12   to?
13   A.   None.
14   Q.   Any other ball games of any kind?
15   A.   No.
16   Q.   Do you text with him?
17   A.   Not particularly.
18   Q.   I don't know what "not particularly" means.  It's either
19   kind of a "yes" or a "no" or a "sometimes," I guess.
20   A.   Have I ever gotten a text from him?
21   Q.   Yes.
22   A.   Yes, I have.
23   Q.   Okay.  And what does he text with you about?
24   A.   He bought a boat.
25   Q.   I didn't ask you whether he bought a boat.  I asked what

Page 168

1    the texts were about.
2    A.   I just responded to the question.
3         He texted me about he bought a boat.
4    Q.   Why?
5    A.   I don't know why he bought a boat.
6    Q.   I didn't ask --
7    A.   He was glad he bought a boat.  He was happy he bought a
8    boat or something.
9    Q.   So, he contacted you?
10   A.   He sent a text saying, "I bought a boat."
11   Q.   And when was that?  Recently?
12   A.   Yeah.
13   Q.   This spring?
14   A.   No.  It -- well, it was -- it was a couple days ago.
15        Actually he sent me a picture, so --
16   Q.   Can you pull it up?
17   A.   Yeah.
18   Q.   Let's see.
19   A.   I don't -- it was a picture of like four boats.  I'm not
20   sure which --
21   Q.   Okay.
22   A.   -- one it is.
23   Q.   That's fine.  No problem.
24   A.   I haven't seen the boat.
25        I'm waiting for my phone to start up.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 169–172

Page 169

1  Q.  Okay.
2  A.  Do you want to ask me another question in between or no?
3  Q.  It can't be that long, is it?
4  A.  Well --
5  Q.  What's your model there?
6      How old is that phone?
7  A.  Stop it.  I think it's a 7.
8  Q.  Come on, 7s are pretty fast.
9  A.  Oh, God.  Now I can't find it.
10    Let me see if I can find it.
11    I can't seem to locate it right now.
12  Q.  You must have him in there as a contact.
13    What do you have him under?  "Mike"?
14  A.  I have it under "Mike Goch."  It would be his name.  I
15  put it under his name.
16  Q.  You can search "Mike Goch" on the top of the thing.
17  A.  I'm looking for a boat that he sent me.
18  Q.  Yeah.  I just -- go to "Mike --"
19  A.  Here it is.
20  Q.  Okay.  Are all those texts from Mike Goch that you're
21  looking at?
22  A.  No.  I was looking for -- it's not loading.
23    He sent me a link to click on.  It's a boat.  It's
24  "axopar 28" or something.  I don't even know what it is.
25  Q.  Well, let's just see the text.

Page 170

1  A.  I'm trying to pull it up.
2    I don't have very good service in your place here.
3  Q.  Who is your carrier?
4    There it is.
5  A.  Well, it's not.  That's something else.
6    I'm trying to download, and it's not downloading.
7  Q.  Well who is your carrier?
8  A.  Sprint.
9    So, yeah.  He said he bought a boat.  He sent me a
10  link, and I clicked on the picture.
11  Q.  Okay.  I'm looking for the text, though.
12  A.  Yeah.
13  Q.  I mean you shouldn't need service to pull up texts that
14  are on your phone.
15  A.  No, no.  I -- yeah.
16    I don't have a picture of his boat, though.
17    I sent him:
18      "Send me a picture of your new boat."
19    And he sent me this, and I can't load it.  So --
20  Q.  I'm interested in the text, not the pictures.
21    And they're already on your phone, so they don't
22  really need to load.  I just want to see your text with
23  Goch about that.
24  A.  It says:
25      "Send me a picture of your boat."

Page 171

1      And he sent me a picture of a row boat.
2  Q.  May I -- can I see it?
3  A.  No.  I'm not going to give you my phone.  You can look
4  at it.
5    MR. THOMAS:  Stand over there by her --
6  A.  It was a joke.  Evidently it's not a row boat.
7    MS. GORDON:  Hang on.  I can't read it.
8  A.  Oh, okay.
9    MS. GORDON:  Just hang on a second.
10  A.  Let me get my glasses on, too.
11    I said:
12      "Send me a picture of your new boat."
13    And he sent this one.  It was a row boat.
14  BY MS. GORDON:
15  Q.  What's before that, before the:
16      "Send me a picture of your new boat"?
17  A.  (Reading.)
18      "Sounds good."
19      "Okay."
20  Q.  Scroll back.
21    What's the date of this?
22  A.  This is Friday.
23  Q.  This past Friday?
24  A.  Uh-huh.
25  Q.  All right.  So, roll back to the beginning of last

Page 172

1  Friday's text communications.
2  A.  I'll make you a copy of these texts that we did last
3  Friday.  That' --
4  Q.  I just want to take a look at them while you're here,
5  and then you can get me a copy.
6  A.  Okay.  This is dated --
7  Q.  Because I might have some questions.
8  A.  Yeah, Friday.
9  Q.  Okay.  But what's before that?
10    How many -- how long a string do you have there
11  with Goch?
12  A.  I don't know.
13  Q.  Well, roll back and tell me what the date is on your
14  phone.
15    How far back does it go?
16  A.  I don't know.
17  Q.  Well, why?  It's --
18  A.  April 16th, there's a text.  He had 40,000 pounds of
19  chicken were on the freeway, and he was cleaning it up.
20  Q.  Okay.  I just -- I want to see when you first started
21  texting with Goch.
22  A.  I have some texts from him.
23  Q.  I know.  Just let me know when the first date is.
24  A.  April 15th, this one says.
25  Q.  That's not your first text.  You've been texting with

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 173

1   him for a long time.
2   A.   You're asking me, and I'm telling you.
3        Oh, he actually called me because he was watching a
4   movie on TV, and I was on -- in the movie.  So, he sent
5   me a picture of me in the movie.  He said he couldn't
6   believe it.  He said the guy looked just like me.  It
7   was Christopher Walken and myself, and that's on April
8   15th.
9   Q.   Okay.
10  A.   So, I can give you that.
11  Q.   So, when did you're first start texting with Mike Goch?
12  A.   I don't text very often.  I don't know.  I can't --
13  Q.   I didn't ask you that.
14  A.   I don't know.  I couldn't answer that question.
15  Q.   It's going to be on your phone, Mr. Coogan.  We can all
16       go to our phones and find out when the first text is we
17       receive from somebody.
18  A.   Well, I don't know.
19        I don't know when I first started texting with him.
20  Q.   Okay.  It's on your phone.  Just take a minute and
21       scroll back to the beginning of the chain.
22  A.   I don't know.  There's some texts to Mike Goch.
23  Q.   Okay.  Well, how far back have you gone?  Where are you
24       in the --
25  A.   November '17.

Page 174

1   Q.   Okay.  Keep going.
2   A.   He indicated he wanted to call me about something, and I
3   said:
4        "I'm hunting."
5   Q.   Uh-huh.  What did he want to call you about?
6   A.   He said:
7        "Give me a call back if you're not busy."
8   Q.   What was that about?
9        What did he want to talk about?
10  A.   I don't know.  A FOIA request or something.  I don't
11  know.
12  Q.   What do you mean "a FOIA request"?  From who?
13  A.   I don't -- I don't know.  I don't know.
14  Q.   Did he FOIA something?
15  A.   I don't know.
16  Q.   Well, what's he say?
17  A.   He wanted to talk about a FOIA request.
18  Q.   Okay.
19  A.   I don't know if he was supposed to provide something
20  or --
21  Q.   He's not the government.  He's not providing stuff.
22        Go -- go back further in the chain.
23        Did you start texting with him in 2015?
24  A.   I didn't even have this phone in 2015, so I don't know
25   if I texted him in 2015 or not.

Page 175

1   Q.   When did you get the phone?
2   A.   I don't know.  I've had it for a couple years.
3   Q.   What other texts do you have on there from him that
4   you're seeing?
5   A.   I'm trying to find --
6   Q.   Well, they're in front of you, sir.  So, just, what are
7   you seeing from him?
8        May I take a look at it over your shoulder?
9        I'll come around.
10  A.   Yeah.
11        There's a SMART bus.  I don't know what that was
12  about.
13  Q.   Hang on.  I'm coming over.
14        Okay.  That's September what year?
15  A.   It would be September '17.
16  Q.   Okay.  Scroll back.
17  A.   So, August --
18  Q.   (Reading.)
19        "I have Luke's car.
20        Dougherty is done."
21        "Done like prison?"
22  A.   Yeah.
23  Q.   Scroll back.
24        The other way.
25        Okay.

Page 176

1        "Sorry."
2        Hang on.
3        "Mike, are you up?
4        Can I call you?"
5   A.   Uh-huh.
6   Q.   What's that a picture of?
7   A.   That's a car accident that my son's car was in.
8   Q.   So, why were you calling Goch?
9   A.   Because he had -- he has a yard, and I wanted to buy --
10  see if he had any parts.
11       THE REPORTER:  Excuse me?  Sorry.
12  A.   He has a yard, and I asked to see if I could buy any
13  parts for my son's vehicle.
14  BY MS. GORDON:
15  Q.   Okay.  Keep going back.
16  A.   So, I sent him pictures, like the radiator was busted.
17  Q.   Keep going back.
18        That's June, we're now in.
19        "I sprayed your weeds at your office."
20  A.   Yeah.
21  Q.   What's that?
22  A.   This is what I paid him to fix my son's car.
23  Q.   He said:
24        "I sprayed your weeds --"
25  A.   Yeah.  My weeds are my lot.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 177

1   Q.   Hang on.
2        So, he came out and sprayed your weeds?
3   A.   Uh-huh.
4   Q.   Hang on.
5        THE REPORTER:  I'm sorry.  Is that "yes"?
6   A.   Yes.
7   BY MS. GORDON:
8   Q.   Why did he come out and spray your weeds?
9   A.   He was just being nice, I guess.  I don't know.
10  Q.   Uh-huh.
11       And did you pay him for that?
12  A.   I don't recall paying him for spraying my weeds.
13  Q.   And then it says:
14           "What do I owe you?"
15       For front alignment.
16           "I'm testing it.  I'll let you know."
17  A.   Everything together came to "$1,311."
18       THE REPORTER:  Excuse me?
19  A.   Everything together came to $1,311.88 for the parts and
20       things that he did to fix my son's car.
21  BY MS. GORDON:
22  Q.   Okay.  So, he also spray -- takes care of your
23       landscaping at your office?
24  A.   No, he doesn't landscape my office, no.
25  Q.   Okay.  Why was he spraying your weeds?

Page 178

1   A.   I don't know why.  I didn't ask him.  He did it.
2   Q.   Now he says:
3           "Washing car now."
4        What's that about?
5   A.   That's my son's car.  He took it -- I took it to him and
6        had him fix it.
7   Q.   Okay.  Keep going back.
8           "Chris will paint it Sunday."
9        Keep going back.  That's a car.
10  A.   That's the new parts put on it.
11  Q.   All right.  Keep going back.
12  A.   I think that's it.
13       Looks like May --
14  Q.   Try --
15  A.   It's not -- May 5th, and it must have been when my --
16  Q.   Can I count up how many texts you've got from him --
17  A.   I'll just send you from May 5th forward.  I'll send you
18       what I've got.  There's nothing --
19  Q.   All right.  Well, just -- if you don't mind, just take a
20       second and scroll back down just so I can see what's
21       there.
22  A.   Yeah.  Yeah.  That's fine.
23       MR. THOMAS:  Just let her look over your shoulder.
24  A.   Yeah.  That's fine.
25           There's a ticket here.  I don't know what that's

Page 179

1        about.
2        MR. THOMAS:  Why don't you just start at May 5th
3    and let her go forward.
4        MS. GORDON:  Yeah.
5        MR. THOMAS:  Just scroll back to May 5th and let
6    her go forward.  Let's move things along.
7        MR. MEIHN:  Yeah.
8   A.   Well, I'm showing it to her.  I'm just not comfortable
9        giving her my phone.
10       MR. THOMAS:  She --
11       MS. GORDON:  Here.
12       MR. THOMAS:  No, she's not asking for it.
13       MS. GORDON:  Here, I'm not going to -- here.
14       MR. THOMAS:  She's going to count.
15       MS. GORDON:  I'll just stand right here.
16       All right.  So, we've got May 5th.
17       MR. THOMAS:  Okay.  Go forward.  That's easy.
18       MS. GORDON:  I'll just put on the record, May 11th,
19   May 12th, May -- June 19th, June 21, June 23rd, July --
20   June 23rd, July 20, August 3, August 3, August 4,
21   August 8, August 9, August 9, September 6, September 6,
22   September 8, September 11.
23       And then he writes here on September 11:
24           "Are you getting tickets to prosecute?
25       I'm not getting many tows!  I guess there is

Page 180

1    something about mandatory neighborhood patrols.
2    It's killing me and the City.  I wonder if they
3    realize it?  This month the auction will be
4    smaller (about 20 cars) but the October auction
5    will have 6 cars in it only.  We have been
6    averaging about 30 cars give or take a few.  Who
7    do you think I should bring it up to?"
8    And then you write:
9        "I'm ordering food brother."
10   He says:
11       "Order me chicken sandwiches."
12       "You coming?"
13       "Tried to call you back."
14       "We are here but we have no fucking clue
15   where we are."
16   You say:
17       "We're in the back of the lot near the
18   practice field.  Look for the bus.  It is
19   painted maize and blue."
20  A.  Oh, yeah.  I know what that is.  That refreshed my
21      memory.
22  Q.  What is that?
23  A.  It's a Michigan football became.  I have a tailgate for
24      a Michigan football game.  He came to tailgate.
25  Q.  Okay.  So, then it's -- you say:

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 181–184

Page 181

1    "I just pulled in."
2  This is now October 8.
3    "I will call you in the morning."
4    "I hope you had a good time."
5  He says:
6    "We had a great time.  Thank you for the
7  invite and the great party --"
8    "We had a great time.  Thank you for the
9  invite and the party."
10 You say:
11   "Can you call me?"
12   "I need you to call me."
13   "Are you in town?  Or you hunting?"
14 You say:
15   "Hunting."
16   "I can call you after dark."
17 November 17:
18   "I can't talk right now."
19   "I'm still hunting."
20   "What's up?"
21   "Do you need me to call you?"
22 November 17, he says:
23   "Tomorrow sometime when you're not busy."
24   "Hey, Larry, are corporate tax returns
25 available for release under FOIA?  Like those

Page 182

1    that would be submitted with a bid to a tow
2    for a city.
3        Also if you know, how much of the tax
4    return would be required normally?  Would the
5    first page be sufficient?  I do not like to
6    hand my competitors private information."
7        He continues to ask you --
8  A.  Unless he put in an application somewhere else or
9    something --
10 Q.  He continues to ask you about tax returns.  You say:
11       "I do not believe they are."
12       You're talking to him further about tax advice or
13   whatever it is.
14       He says:
15       "Let's go for a drink."
16       "Today."
17       "At like 2:30 at the Booth."
18       "Do you have time?"
19       "Good."
20       "On my way."
21   November 23rd:
22       "Happy Thanksgiving."
23   Back and forth.
24       "Did I win or lose?"
25 A.  I'm not sure what that's about.

Page 183

1  Q.  December 22nd:
2        "On job.  Let me know where you're going
3    after."
4  He says to you.
5        You go:
6        "Hey, are you going to get here?"
7        "Come on."
8  A.  That might be Christmas party for the City.
9  Q.  (Reading.)
10       "What -- happen to you guys tonight?"
11   He says --
12 A.  That was the Christmas party for the City.
13 Q.  (Reading.)
14       "We were on the way to party."
15   They had a tow.
16       "Happy New Year."
17   He writes on January 1.
18       And then:
19       "What time does the show start?"
20   you say:
21       "7:30."
22   What's that?
23 A.  That is a play that my daughter was in.
24 Q.  So, he went to your daughter's play?
25 A.  Yes, he did go to that play.

Page 184

1        "What is the dress code?"
2    You say:
3        "Whatever you want."
4    He says:
5        "Jeans?"
6    You say:
7        "That's fine.  I am going from work."
8    You say:
9        "We're going to grab a beer."
10       "Today."
11   He says:
12       "Sure."
13 A.  What date was that?  February?
14 Q.  February 16.
15 A.  Okay.
16 Q.  Going to Broadcast.
17       "Yes, sir."
18       "You still going?"
19       "Hello?"
20       "I'm going home to change."
21   April 11, you write:
22       "That was Stacy's daughter's car.  She is
23   with me.  WTF."
24 A.  Oh, yeah.  That was --
25 Q.  (Reading.)

Page 185

1     "We are downtown at court."
2         And then who is the picture of there?
3   A.  That's me.  He's seeing pictures of me in a movie.
4   Q.  Okay.  He writes:
5         "To Kill an Irishman?  You're in the
6     movie."
7     You say:
8         "That's just one of the many movies I
9     have starred."
10        "Looks just like you."
11        Then you guys banter back and forth about your
12    movies.
13  A.  Uh-huh.
14  Q.  That's quite a long text chain.
15        Now I'm on April 16.
16        "Mexican Gardens in 30."
17        You're meeting him for dinner at Mexican Gardens?
18  A.  He never made it.  I --
19  Q.  But that was the idea there?
20  A.  I don't know.  I'd have to -- I don't know.
21  Q.  Then he says:
22        "I'm sorry.  We were flipping a truck
23    back over.  How about tomorrow?"
24    You say:
25        "I will try brother.

Page 186

1         "About(sic) 5ish."
2         And:
3         "Send me a pic of new boat."
4   A.  There you go.
5   Q.  That was a joke he sent you.
6         "First one I'm getting --"
7   A.  And that's -- I tried to load the boats right there.  I
8       couldn't get that to load.
9   Q.  Okay.  Then:
10        "Mike, do you know an Alexandra Carrier?"
11        That's you texting to him.
12        You(sic) say:
13        "No, who is she?"
14        You write:
15        "Chief Allen arrested for drunk driving --"
16  A.  I didn't write that.  That was someone else's Facebook
17      page.
18  Q.  Okay.  So, you sent it, though.
19        "Chief Allen --"
20  A.  No, I didn't send it.  It was sent to me.
21  Q.  Okay.  Fair enough.
22        It was sent to you by Goch?
23  A.  He seen that on Facebook and sent it to me.
24  Q.  (Reading.)
25        "Chief Allen arrested for drunk driving

Page 187

1     fleeing an officer.  And did the same thing
2     recently in Officer Timmy Sassak's Viper
3     being chased by retired officer Gary
4     Bowerman.  Gives no forgiveness to others.
5     And he says:
6         "Pat Easton --"
7   A.  Pat Easton --
8   Q.  (Reading.)
9         "-- posted this on Facebook."
10  A.  Correct.
11  Q.  Did he?  He posted that on Facebook?
12  A.  That's what was on Facebook.  That's what was sent to
13      me.
14  Q.  And then you say -- he says:
15        "Real nice.  Start world war 3."
16        You say:
17        "Check his Facebook now."
18  A.  It's down.
19  Q.  (Reading.)
20        "We can't access his page.  Looks like
21    it's down."
22        "What did he post?"
23        "Or did you --"
24        Okay.  That's all I'm seeing, and that goes
25    through -- let me just get the last date, Mr. Coogan.

Page 188

1         April 17.
2         So, you'll hang on to those?
3   A.  Yeah.
4   Q.  Thank you.
5   A.  No problem.
6   Q.  Did Easton get disciplined for a Facebook post about
7       City business?
8   A.  I don't know if that's City business or not.
9   Q.  Well, isn't he posting about the chief on a Facebook
10      page?  Didn't you --
11  A.  That was forwarded to me, yes.
12  Q.  Did somebody tell him to take it down?
13  A.  I believe so.
14  Q.  Why?
15  A.  I'm not at liberty to discuss.
16  Q.  You can discuss it with Mike Goch?
17  A.  He sent me a picture of that.
18  Q.  Okay.  So, he was told -- Easton was told to take it
19      down.
20        Well, you may not be at liberty to discuss
21    elsewhere, but here you are liberty to discuss because
22    I'm talking about a termination of my client.
23        So, I want to know what happened with regard to
24    Easton.
25  A.  I was sent an e-mail -- or a text, rather -- excuse

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

---

1       me -- by Mr. Goch, who said:
2          Did you see what Easton posted on his
3          Facebook?
4          And he sent me that.
5   Q.  And what was it?
6          I could read --
7   A.  It was -- you just read it.  It was a ticket.
8   Q.  Look, that was a 2-second thing.
9   A.  It was a ticket that John Allen got when he was 19 years
10      old.
11   Q.  Okay.
12   A.  And I think --
13   Q.  And Easton posted that up there?
14   A.  Yes, he did.
15   Q.  What, to embarrass Allen presumably?
16       MR. MEIHN:  Object to foundation.
17   A.  Well, yeah, I -- I can't --
18   BY MS. GORDON:
19   Q.  Was that your takeaway?
20   A.  I can't tell you why he posted it.  I think it was
21      pretty inappropriate to say something like that about
22      the current chief.
23   Q.  It would be embarrassing to the chief?
24   A.  I think it's inappropriate.
25   Q.  Okay.

1   A.  Yeah, and --
2   Q.  So, what happened after you learned of it?
3   A.  I just found out -- just found out about it.
4   Q.  Well, what did you do?
5         You said something happened.
6   A.  At this point --
7   Q.  Was it taken down?  Did you --
8   A.  Yes, it's taken down.
9   Q.  Did you alert somebody, I guess is my question?
10   A.  Did I alert somebody?
11   Q.  Yes.
12   A.  No, I didn't alert anybody.
13   Q.  You didn't call the City and say, "Hey, there's an
14      inappropriate Facebook post up"?
15   A.  Who would I -- no, I didn't alert the City.
16   Q.  Okay.  So, who found out about it and told him to take
17      it down?
18   A.  There is -- counsel, am I at liberty to discuss that?
19       MR. MEIHN:  You want to take a break for a moment
20      and --
21       MS. GORDON:  Well, what's the problem?
22   BY MS. GORDON:
23   Q.  Why don't you tell me what you're concerned about.
24      Maybe I can re-craft the question.
25       MR. MEIHN:  I mean --

1   BY MS. GORDON:
2   Q.  Did somebody tell Easton to take it down?
3       MR. MEIHN:  If you know.
4   A.  Someone did, yeah.  I didn't tell him.
5   BY MS. GORDON:
6   Q.  Somebody from the City?
7   A.  I don't know who.
8   Q.  Well --
9   A.  I don't know who told him to take it down, but --
10   Q.  But you never got involved?
11   A.  -- either it was his attorney --
12   Q.  You never got involved?
13   A.  It might have been his attorney; it might have been
14      someone else.  I don't know.
15   Q.  Whose attorney?
16   A.  Mr. Easton's attorney.
17   Q.  He has his own attorney?
18   A.  Yes.
19   Q.  Why?  I mean, anything you're aware of?
20   A.  Yes.
21   Q.  Was he involved in something with the City where he
22      needs counsel?
23   A.  Yes.
24   Q.  What is that?
25       MR. THOMAS:  If you need to speak to your counsel

1      outside --
2   A.  I think I need to talk to counsel.
3       Mr. Easton has filed a complaint.
4   BY MS. GORDON:
5   Q.  A civil complaint or a City complaint?
6   A.  A civil complaint.
7   Q.  He's filed a lawsuit?
8   A.  Yes.
9   Q.  Well, then it's public record.
10       What does it say?  Where is it filed?
11   A.  Is that federal court?
12       Yes, federal court.
13   Q.  Okay.  All right.  So, he's got a federal case.  There's
14      nothing --
15   A.  Yeah.
16   Q.  -- confidential about it any more.
17   A.  No, no.  I mean, I'm just --
18   Q.  What's his complaint about?
19   A.  It would depend on which complaint you're referring to.
20   Q.  Okay.  How many are there?
21   A.  He's filed a complaint against the City.
22   Q.  More than one?
23   A.  He's filed a workers' comp case.
24   Q.  Okay.
25   A.  He's filed an EEOC case.

Page 193

1  Q.  Okay.
2  A.  And he's filed a complaint with the city clerk's office.
3  Q.  Okay.  What's the lawsuit, the federal lawsuit about?
4      What's the claim there?
5  A.  The claim --
6          MR. MEIHN:  There's no attorney/client privilege.
7  BY MS. GORDON:
8  Q.  Yeah.
9  A.  Okay.  He filed a claim against the City regarding
10     allegedly discriminating against him because he has
11     PTSD, which is baseless, but --
12 Q.  So, that's what the lawsuit is about, or is there
13     any other thing to it?
14 A.  Well, it depends on -- like I said, there's four or five
15     things he's made complaints.
16 Q.  In the civil complaint, I mean.
17 A.  Yeah.
18 Q.  He has other claims as well?
19 A.  There's a couple claims.
20 Q.  Has he been disciplined or discharged for something?  Is
21     that what he alleges in his suit?
22 A.  We alluded to that earlier; the trial board.
23 Q.  But he's still working?
24 A.  Correct.
25 Q.  And how long has he had PTSD according to his complaint?

Page 194

1  A.  I'm not sure of the exact date.  He --
2  Q.  Is this new or is this a long --
3  A.  I can't tell you how long he's had it, or if he has it
4      for certain.
5          MS. GORDON:  All right.  Are you guys planning to
6  take lunch break or no?
7          MR. MEIHN:  No.
8          MS. GORDON:  Okay.  Then I'm going --
9          MR. THOMAS:  We'll just keep going.
10         MS. GORDON:  Okay.  Then I'm going to need about
11 15 minutes.  I've got to take care of something in my
12 office.
13         MR. MEIHN:  Absolutely.
14         (Deposition recessed at 1:28 p.m.)
15                 *   *   *
16
17
18
19
20
21
22
23
24
25

Page 195

1                              Monday, April 30, 2018
2                              Bloomfield Hills, Michigan
3                              2:13 p.m.
4                      *   *   *
5          (Deposition resumed pursuant to
6           its recess; parties present, same
7           as before.  Mr. Meihn is not
8           present.)
9                      *   *   *
10         MS. GORDON:  Back on the record.
11                     *   *   *
12             LAWRENCE J. COOGAN, ESQUIRE,
13     after having been previously duly sworn, was examined
14     and testified further as follows:
15             EXAMINATION (Continued)
16 BY MS. GORDON:
17 Q.  First, let's put on the record that John just got copies
18     or did -- received photos from Mr. Coogan's text
19     messages that he and I had gone through before the
20     break.  The text messages start in May -- I don't
21     remember the exact date -- of 2017?  No.
22 A.  Yes.
23 Q.  Yes.  Yes.
24     And go through now?
25 A.  Yeah.  Until like Saturday.

Page 196

1  Q.  But here is my question to you, Mr. Coogan.
2  A.  Yeah.
3  Q.  There have to be texts prior to May of 2017.
4      Did you get a new phone or what happened?  Or where
5      are those other texts?
6  A.  I'm not aware where -- I gave you everything I have.
7      So, I backed it up and it stopped.  There is no other
8      texts.
9  Q.  But you did text before May of 2017, obviously.  You met
10     the man in '15.
11 A.  You know, I don't know if I did or didn't.  Honestly, I
12     don't know.  I don't recall.  Honestly, I don't recall.
13 Q.  Okay.  Now, with regard to the Complaint and the Amended
14     Formal Complaint for Removal of Chad Hayse, have you
15     ever drafted up such a document before for anybody other
16     than Mr. Hayse?
17 A.  For removal of a police chief?  No.
18 Q.  Removal of anybody.
19 A.  I don't believe so.
20 Q.  Okay.  Now, you were the one that drafted the Amended
21     Formal Complaint; correct?
22 A.  With the input and direction from Nicole Barnes.
23 Q.  Okay.
24     THE REPORTER:  I'm sorry.  "-- from --"
25 A.  Nicole Barnes.

Page 197

1     THE REPORTER:  Thank you.
2         MR. THOMAS:  Don't get into any contents because
3  they've asserted the privilege.
4         MS. GORDON:  Well, it's going to have to be
5  question by question.  I don't think --
6         MR. THOMAS:  That's right.  Agreed.
7         (Discussion held off the record.)
8         MS. GORDON:  All right.  Well, I apologize.  Maybe
9  I left it in my office.  I will be right back.  There's
10 one thing I need to get.
11        (Short recess at 2:15 p.m.)
12        *   *   *
13        (Record resumed at 2:19 p.m.)
14        (Mr. Meihn is present after the break.)
15 BY MS. GORDON:
16 Q.   When did you begin drafting the original complaint with
17      Nicole Barnes?
18      Not the amended, but the original.
19 A.   **I don't recall the exact date.**
20 Q.   Okay.
21 A.   **I really don't.**
22 Q.   Well, how did it come to pass?
23 A.   **The original complaint or the amended complaint?**
24 Q.   The original.
25        MR. MEIHN:  Yeah, I'm going to object to any

Page 198

1  communications that involved communications and opinions
2  that were provided by Mr. Coogan to Ms. Barnes.
3         MS. GORDON:  Okay.  Well, do you know what?  The
4  judge has already ruled on this, and she's already said
5  you guys had a chance to set forth the basis for your
6  privilege, and you did not, and it's right in the
7  transcript and in the court order that we are asking
8  about this.  So, you want to --
9         MR. MEIHN:  That's not true at all.  What the judge
10 said was for us to be very careful about --
11        MS. GORDON:  Okay.  I've --
12        MR. MEIHN:  -- how we --
13        MS. GORDON:  -- made my record.  I'm not going to
14 argue with you.
15        THE REPORTER:  Excuse me.  "-- about how --"
16        MR. MEIHN:  Be very careful.
17        MS. GORDON:  And have you read Nicole Barnes' dep?
18        MR. MEIHN:  I did, and I can cite to page 111,
19 3-17-18 deposition, where the privilege was communicated
20 and you did not object, and --
21        MS. GORDON:  Okay.  I'm not talking about that.
22 I'm just going to go ahead and make my record.  You do
23 the same.
24 BY MS. GORDON:
25 Q.   Okay.

Page 199

1         MR. MEIHN:  You haven't let me finish my record,
2  though.  I'm sorry.
3         So --
4  BY MS. GORDON:
5  Q.   Okay.  Ms. Barnes testified that you drafted the
6       charges.
7         Is she correct?
8         MR. MEIHN:  You have to answer the question.
9  A.   **I assisted her.**
10 BY MS. GORDON:
11 Q.   Okay.  She didn't say that.  She said you drafted them.
12 A.   **Okay.  I attempted to get a hold of Ms. Barnes today to**
13      **see if she's willing to waive her privilege.**
14 Q.   I'm reading testimony, sir, under oath.
15 A.   **And I'm not -- whose testimony?**
16 Q.   Question to Nicole Barnes --
17        MR. THOMAS:  Did you see that transcript?
18 BY MS. GORDON:
19 Q.   (Reading.)
20        "Question:  --"
21 A.   **Uh-uh.**
22 Q.   I'm going to read this to you, and then you can all go
23      ahead and do what you're going to do.
24 A.   **Yeah.**
25 Q.   Okay.

Page 200

1         "Question:  Okay.  So, you said you told
2  Coogan about this, and based on what you said,
3  he drafted --
4         "Answer:  Yeah, because there was some --
5         "Question:  Hang on.
6         Because of what you said, he drafted the
7  charges.  Is that what your testimony is?"
8         "Answer:  Yeah --"
9         MR. MEIHN:  Can you tell me what the transcript
10 date is and the lines, please, so I can find it?
11        MS. GORDON:  It's page 220.
12        MR. MEIHN:  Because what I want to do is help you
13 for a moment, Deb.
14        MS. GORDON:  It's page 220.  Look --
15        MR. THOMAS:  Of which date?
16        MS. GORDON:  There's -- the pages are consecutive.
17 They start at 1 and they go to the end.
18        MR. THOMAS:  Oh, I see.  Okay.  Okay.
19        MS. GORDON:  It's actually the second transcript.
20        But, you know, I'm not going to waste a lot of time
21 with this.  You'll just make your record, and I'm going
22 to go to the court and ask for sanctions and bring
23 Mr. Coogan back here, because he will be answering these
24 questions.
25        MR. MEIHN:  Do you have a copy of the transcripts?

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 201–204

Page 201

1    MS. GORDON:  No, I didn't bring an extra copy in
2  here.
3    MR. MEIHN:  Okay.  Then I'm going to ask you to
4  wait until I can pull it up so I can address this issue
5  in a professional manner with you.
6    MS. GORDON:  Look at 220.
7    MR. MEIHN:  I'm trying to.  I'm not --
8    MS. GORDON:  Keep track of this, John.  This is not
9  going to come out of my time.  Thank you.
10 A.  I'd just like to -- I haven't read the transcript.  I
11   don't know what she said.
12 BY MS. GORDON:
13 Q.  Nobody asked you that.
14 A.  I would like to have her waive it, but she won't.  So, I
15   haven't been able to communicate with her.  I tried.
16   MR. THOMAS:  Why don't you just wait for a
17   question.  Let them pull up the transcript.
18 A.  Certainly.
19   MS. GORDON:  We'll make a record on that.
20   MR. MEIHN:  Okay.  John, can you -- would you be
21   willing to go off the record so I can pull this up?
22   I'm having a difficult time pulling it up.  I don't
23   want to eat into your time also.
24   MS. GORDON:  Off the record at the Defendant's
25   request.

Page 202

1    MR. MEIHN:  Yes.  Thank you.
2    (Discussion held off the record.)
3    MR. MEIHN:  Mr. Coogan, I'm -- we are not asserting
4  the objection to the question that she asked you with
5  regard to drafting the complaint.
6  BY MS. GORDON:
7  Q.  Okay.  Ms. Barnes has testified that she talked to you
8  about Mr. Furman and possibly some other things.
9  And that, after she talked to you, you drafted the
10   complaint; is that correct?
11 A.  I don't know what she testified to, but she talked to me
12   about drafting the complaint for her, and I assisted her
13   in doing that, yes.
14 Q.  Okay.  You did not get permission from the city council
15   to do so; correct?
16   You never went to the council as a whole?
17 A.  I never went to anybody.  She came to me and asked for
18   my legal assistance.
19 Q.  Okay.  And what was she asking you to do?
20 A.  Well --
21 Q.  Did she tell you she wanted Hayse fired?
22 A.  I don't recall her using that language, no.
23 Q.  Well, what did she say?
24 A.  (No verbal response.)
25   (Discussion held off the record.)

Page 203

1  BY MS. GORDON:
2  Q.  Go ahead.
3    MR. THOMAS:  If I'm going to assert the objection,
4  I will do so.
5  So, go ahead and answer the question.  Thank you
6  for pausing.
7  A.  What did she tell me?
8  That's asking me to disclose what was said in the
9  meeting between her and I --
10 BY MS. GORDON:
11 Q.  Okay.  Your attorney is not instructing you not to
12   answer.
13 A.  She had some complaints.
14 Q.  About what?
15 A.  About Mr. Hayes.
16 Q.  What were they?
17 A.  They're contained in the complaint.
18 Q.  Okay.  What do you recall?
19 A.  All the things that are contained in the complaint.
20 Q.  Okay.  And did you ask her any questions, or did she
21   just gave you her complaints?
22 A.  There was a discussion with me on numerous issues.
23   I can't recall exactly every single issue she
24   discussed with me, but --
25 Q.  Okay.  Did she want him fired?

Page 204

1  A.  She wanted to bring it to council to have him removed.
2  Q.  Why?
3  Why a removal?
4  A.  Because she felt he was incompetent and unable to do his
5   job.
6  Q.  Did she tell you he was incompetent?
7  A.  I don't recall the exact content or exact statements
8   made by her, but she felt that he was unable to perform
9   his duties as a police officer.
10 Q.  In what regard?  What duty was not being performed?
11 A.  Disciplining employees the correct way.
12 Q.  Okay.  So, let's take this --
13 A.  He --
14 Q.  Disciplining -- you're talking about Furman now?
15 A.  Yeah.  I could talk about that.  I could talk about --
16 Q.  No, no.  It's not what you're going to talk about.  It's
17   what --
18 A.  That's -- whatever is in the complaint is what we talked
19   about.
20 Q.  Okay.  Okay.  I want to know -- it's not in the
21   complaint that he's incapable of performing his duties
22   or whatever you just said.  That's not in the complaint.
23   So, I want to know what duties he was incapable of
24   performing.
25 A.  Being a police chief.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                          Pages 205–208

Page 205

1   Q.   Okay.  That's not an answer to my question.
2        I said, what duties was he unable to perform?
3   A.   The proper discipline of an employee is one.
4   Q.   Okay.  Was some employee not disciplined?
5   A.   Disparaging the City.
6   Q.   Okay.  Proper discipline?
7   A.   Disparaging the City on the City's website, lying to the
8        mayor and council.
9   Q.   Okay.  Anything else?
10  A.   I'm going to turn this off.
11       Whatever else is contained in the complaint.
12  Q.   Okay.  So, did you say, "Well, let's give him a written
13       warning"?
14  A.   The charter doesn't apply for council giving written
15       warnings.  If --
16  Q.   I'll repeat my question.
17  A.   Okay.
18  Q.   Did you say, "Let's give him a written warning"?
19  A.   I said the charter --
20  Q.   I didn't ask you what the charter said.
21  A.   Okay.  Well, I'm responding to your question.
22       The charter --
23  Q.   So, your answer is "no"?
24  A.   No, my answer is the charter doesn't provide for written
25       discipline by council.  It is removal of appointed

Page 206

1        officials.
2   Q.   And what is the --
3   A.   And that was the mechanism for which the city council
4        had to proceed on.
5   Q.   So, if you inadvertently kick a trash can over, and
6        you're the police chief, the only thing the council can
7        do about it is fire you?  That's the only remedy?
8   A.   I don't know of any remedy for kicking a garbage can
9        over.
10  Q.   Well, let's say you intentionally kick a garbage can
11       over and you're the police chief, and it's a violation
12       of the rule.
13       You're telling me the only remedy is termination?
14       You just got done telling me that.
15  A.   I didn't say anything about kicking the can; you did.
16  Q.   You just said the council can't do anything --
17  A.   I said the council --
18  Q.   You've got to let me finish, Mr. Coogan.
19  A.   Okay.  The council's procedure is --
20  Q.   Stop talking and let me finish.
21  A.   -- set forth in a charter how you remove appointed
22       officials.
23  Q.   You know, I didn't ask you that.  I realize you have a
24       little spiel you want to give here today, but you --
25  A.   I don't have any spiel, actually.

Page 207

1   Q.   Oh, really?  Well, you need to listen to the questions.
2        So, I'm not asking about the charter.  I asked you
3        this:  Is it your position that if a police chief kicks
4        over a garbage can, the only thing you can do about
5        that, either the PSC or the City, is to terminate him?
6   A.   I can only speculate on the garbage can.  I don't know
7        the charge.
8        MR. MEIHN:  I'm going to object to foundation and
9        speculation.
10  BY MS. GORDON:
11  Q.   Okay.  Are you telling me --
12  A.   What I can talk about is lying --
13       THE REPORTER:  I'm sorry.  One at a time, please.
14  A.   What I can talk about is him lying to the mayor and
15       council was the basis -- one of the bases in which he
16       was removed.
17       And that certainly has nothing to do with kicking a
18       garbage can, so I don't know where that came from,
19       but --
20  BY MS. GORDON:
21  Q.   I'm going to tell you where it came from, and then if
22       you can't answer my question, you'll tell me.
23       You just got done telling me the only thing the
24       council can do is remove an appointed official.  That's
25       what you just got done saying here on the record.

Page 208

1        So, my follow-up to that was, then there's no other
2        discipline that can be meted out, to a police chief or
3        any department head or you as an appointee, other than
4        termination.
5        Do I have that right?
6   A.   We serve at the will and pleasure of mayor and council.
7        That's correct.
8   Q.   I didn't ask you that.  I didn't ask you that.
9   A.   No, they can --
10  Q.   In fact, my client doesn't serve at the will and
11       pleasure, sir.
12  A.   He's an appointed official.  I disagree.
13  Q.   He -- excuse me.
14       He's got a -- do you have a Collective Bargaining
15       Agreement contract?
16  A.   With Chad Hayse?
17  Q.   Do you as corporation counsel?
18  A.   No.
19  Q.   Do you have any contract?
20  A.   No.
21  Q.   Okay.  Does Chad Hayse have any contract?
22  A.   No.
23  Q.   Has he ever had a contract?
24  A.   Yeah, when he was part of the Collective
25       Bargaining Agreement --

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018
Pages 209–212

Page 209

1    Q.   Is he a due process employee?
2         Yes, he is, isn't he?
3    A.   He was given due process.
4    Q.   Okay.  He's a due process employee.
5         You're not, are you?
6    A.   He was appointed by the Safety Commission, and he
7         serves the Safety Commission, and he also serves at the
8         will and pleasure of the mayor and council.
9         Is he entitled to due process?
10   A.   He's an appointed official.
11   Q.   You're not going to answer my question, or you just
12        don't know the answer?
13   A.   There's a procedure in place which I can read to you if
14        you --
15   Q.   Which requires due process.
16        Is that true for you?
17        MR. MEIHN:  I am going to object to foundation.
18   BY MS. GORDON:
19   Q.   Is that a true -- is that true for you?
20        MR. MEIHN:  And I'm going to object to
21   foundation --
22   BY MS. GORDON:
23   Q.   Do you get a --
24        MR. MEIHN:  -- of the question as --
25   BY MS. GORDON:

Page 210

1    Q.   -- due process hearing if you're terminated?
2         MR. MEIHN:  Would you please wait for a moment?
3         I'm going to object to the foundation as it relates
4    to the question on Mr. Hayse.  There's been no testimony
5    that he understands or has knowledge of that.  But as to
6    Mr. Coogan, I don't have an objection.
7    A.   What was the question?
8    BY MS. GORDON:
9    Q.   Are you entitled to a due process hearing before you're
10        removed?
11   A.   Under the appointed officials, I believe I would be.
12   Q.   So, then you don't serve at the will and pleasure of?
13   A.   No.  We certainly serve at the will and pleasure.
14        There's just a mechanism in place in which to remove
15        appointed officials.
16   Q.   Okay.  Did you -- why did you not recommend that Nicole
17        Barnes go to the Public Safety Commission since Chad
18        Hayse reports to them?
19        MR. MEIHN:  Object to the foundation.  I don't
20        think he ever said that he didn't recommend it.
21   BY MS. GORDON:
22   Q.   Go ahead.
23   A.   She came in to me and asked what a city council person
24        could do to remove an appointed official.
25        MS. GORDON:  Would you read my question back, John?

Page 211

1         (Record repeated by the reporter.)
2    A.   She came --
3         MR. MEIHN:  Same objection.
4    A.   She came to me asking for legal assistance in how to --
5         how a city council person could remove an appointed
6         official.
7    BY MS. GORDON:
8    Q.   That's not an answer to my question.
9         You knew Chad Hayse reported to the Public Safety
10        Commission, didn't you?  You knew that?
11   A.   Of course he does.
12   Q.   Of course.
13        But you never --
14   A.   He reports to the mayor and council as well.
15   Q.   And you never -- you never -- well, not for his
16        day-to-day duties, he certainly does not, and under any
17        set of circumstances.
18        But in any event, you never said, "Well, why don't
19        we go check with the Public Safety Commission and see
20        what they have to say?"
21        You never did that, did you?
22   A.   She didn't ask me.  She asked me what she could do.
23   Q.   Okay.  Did you know she had a personal relationship with
24        Matthew Furman?
25   A.   No.

Page 212

1    Q.   Do you know that sitting here today?
2    A.   No, I don't.
3         Well, she knows him.  I don't know what her
4         relationship is with him.
5    Q.   Uh-huh.
6         Well, what do you think her relationship with him
7         is?
8    A.   I have no idea.
9    Q.   You have no idea?
10   A.   I have no idea.
11   Q.   You're not aware that they get together socially?
12        Were you aware of that when you wrote up these
13        charges?
14   A.   I have no idea what her relationship is with Mr. Furman.
15   Q.   I didn't ask -- I asked you --
16   A.   I'm not aware of any relationship --
17        MS. GORDON:  Would you read back my question, John?
18   A.   -- with Mr. Furman and Nicole Barnes.
19        So, no, I'm not aware of that.
20   BY MS. GORDON:
21   Q.   Okay.  You're not aware that he's been to her home?
22   A.   I believe she testified the first time when I was here,
23        and she indicated he came to her house one time as a
24        result of a complaint or something, yes.  I'm aware he's
25        been to her home.

Page 213

```
1    Q.   No, she -- were you here for that dep?
2    A.   I think I was.
3    Q.   Then why did you just tell me you're not aware of her
4         relationship and act like, oh, wow, I'm stunned?
5              You sat right here and listened to the woman say
6         he's been to her house socially.  He stops by.  They
7         text, and they've met for drinks.  You sat right here
8         and heard it, yet just this moment you acted like, in
9         fact, your eyes were like back and forth like, what?  I
10        don't know about that.
11             Why did you do that?
12             You heard her testify; correct?
13   A.   I was here for part of her deposition, not the entire --
14   Q.   Did you hear her testify --
15   A.   That he came to her house on -- one time.
16   Q.   You know, I'm talking now.
17             THE REPORTER:  Excuse me.
18   BY MS. GORDON:
19   Q.   You've got to stop talking until the question is
20        complete.
21   A.   Ask your question, and I'll answer it.
22   Q.   I was in the middle of asking my question.
23   A.   I thought I was in the middle of answering it.
24   Q.   No, you weren't.
25             MS. GORDON:  John, read my question.
```

Page 214

```
1              (Record repeated by the reporter.)
2    BY MS. GORDON:
3    Q.   Did you hear her testify about their personal
4         relationship?
5    A.   I don't recall that, no.
6    Q.   And why was she involved in this Matthew Furman issue
7         when she came to you to draft this complaint?
8              What did you understand her -- her big issue was
9         and why she cared?  Was it because of towing dollars?
10        Was it because she liked him?
11             What was the reason that she, for the first time,
12        was parachuting into police matters?  Why?
13   A.   I'm not aware of anybody parachuting into any matters.
14             I know she had a number of concerns --
15   Q.   What were they?
16   A.   -- with Mr. Hayse's conduct.
17   Q.   What were they?  What were they?
18   A.   I think probably the first and foremost was the fact
19        that he lied to council.
20   Q.   Okay.  Well, we'll cover that later.
21   A.   Okay.
22   Q.   That big fat lie.
23   A.   Which one?  How many?
24   Q.   I don't know.  The one you got.  The one that's in your
25        papers, sir.
```

Page 215

```
1    A.   Okay.
2    Q.   So, what were the concerns versus -- with regard to
3         Furman?  What was her concern?
4    A.   That he was laid off while they were getting notices of
5         the charges that were against him.
6    Q.   Okay.  And did you look into that?
7    A.   Yes.
8    Q.   You never did an investigation into any of this, did
9         you?
10   A.   That's not correct.
11   Q.   Okay.  I asked Ms. Barnes if --
12   A.   I --
13   Q.   I asked Mr. Barnes if there was an investigation into
14        any of the matters alleged in your complaint, whether
15        anybody took it upon him or herself to investigate what
16        Ms. Barnes believed prior to a formal charge being
17        brought.
18             She has nothing in writing whatsoever, from you or
19        from her, regarding an investigation.
20             Do you have something?
21   A.   In writing?
22   Q.   Yeah.
23             Of course in writing.
24   A.   No.
25             I had a phone call from the union inquiring to
```

Page 216

```
1         me -- Tom Funke, I believe it was -- that the union
2         wanted to know --
3    Q.   Okay.  I don't want to --
4    A.   -- why Mr. Furman was not working.
5    Q.   Okay.  Do you know what?  You've got to answer only my
6         questions.  You want to just say stuff here to make
7         yourself sound better than you are.  I didn't ask you
8         who called you.
9    A.   Is this ridiculing my personality now?  Is that what
10        you're trying to do?
11   Q.   I'm --
12   A.   Let's ask me a question, and I'll answer it, Counsel.
13   Q.   I'm telling you that your question -- your answer is not
14        designed to answer my question.  It's designed for
15        another purpose, and the purpose is obvious to anybody
16        in this room.  You want to put yourself in a better
17        light.
18             So, when I say to you, "Did you do any
19        investigation?" instead of saying "yes" or "no," you
20        announce that a union guy called you.
21             I didn't ask you who called you.
22   A.   Yes.
23   Q.   I'm still not done with my question.
24   A.   Oh, it's a narrative.
25   Q.   I think you did no investigation that is in writing.
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 217—220

Page 217

1          Am I correct?
2    A.   You're not correct --
3    Q.   Okay.  What is in writing --
4    A.   -- that I didn't do an investigation.
5          You are correct that there's nothing in writing.
6    Q.   Okay.  So, part of your investigation was not to go to
7         Chief Hayse and ask him to respond to these allegations.
8         Do I have that right?
9          You never once went to Chief Hayse?
10   A.   I wrote Mr. Hayse a letter, actually several letters --
11   Q.   What date?
12   A.   -- and asked him -- I don't have the dates in front of
13        me.
14   Q.   Before you drafted the amended complaint?
15   A.   I -- I wrote several letters to him --
16   Q.   Well, then --
17   A.   -- saying --
18   Q.   -- you should have produced them.
19   A.   -- "Chief, tell --"
20        THE REPORTER:  I'm sorry.
21   A.   They're part of the record.  I did produce them.
22   BY MS. GORDON:
23   Q.   What record?
24   A.   Part of the discovery request --
25   Q.   What are the dates of your letters?

Page 218

1         THE REPORTER:  Excuse me.
2    A.   It would have been -- I believe it was July or August.
3         July or August of 2016.
4    BY MS. GORDON:
5    Q.   Yeah.
6          Oh, you wrote him --
7    A.   Two letters, yeah.
8    Q.   And what did they say?
9    A.   "Please indicate to me why Officer Furman is no longer
10        working."  Or "is not working."
11   Q.   Okay.  No, you asked him for a packet of materials.  You
12        said, "Send all your materials."
13         That's what you did, and you got them?
14   A.   The second letter, I think I said that.
15   Q.   Okay.  Did you ever tell the chief, charges -- "There's
16        been a complaint against you, and I'm going to
17        investigate it.  I need to ask you some questions.
18        Let's meet"?
19         No.  You never did that, did you?
20   A.   Chad didn't talk to me.
21   Q.   You know, whether he talked to you or not is really not
22        the issue as a matter of law.  The issue it whether you
23        investigated this and gave him an opportunity to
24        respond.
25         You did not, did you?

Page 219

1    A.   He had an opportunity to respond, yes.
2    Q.   Okay.  Before you brought the charges, he did not have
3         an opportunity --
4    A.   I didn't bring --
5         THE REPORTER:  I'm sorry.
6    BY MS. GORDON:
7    Q.   Mr. Coogan, you cannot keep interrupting me.
8    A.   I do not -- don't mischaracterize the statements then.
9         I did not bring a charge.  The council person
10        brought charges.
11   Q.   Okay.  Well, you drafted them.  And before you drafted
12        them, you never went to talk to Chad Hayse about the
13        concerns that had been brought to your attention.
14         Do I have that right?
15   A.   I wrote -- no, you don't.  You don't have it right.
16   Q.   What day did you go talk to him?
17   A.   I wrote him letters.
18   Q.   Okay.  What letters did you write?
19   A.   The two that I just alluded to earlier, which you have
20        copies of.
21   Q.   Okay.  You never said in either of those letters,
22        "Complaints have been made against you, and I need to
23        ask you questions and get a response."
24         That never happened.  I don't have any letters like
25        that.

Page 220

1         Do you have some letter like that?
2    A.   I'd have to refer to the two letters I wrote.
3    Q.   All right.  We will.
4    A.   Good.
5    Q.   So, you wrote him two letters?
6    A.   Yeah.
7         I've said that three times in the last 5 minutes.
8         Yes, there's two letters that I --
9    Q.   And that's it?  That's what you did?
10   A.   That I can recall off the top of my head, yes.
11   Q.   Okay.  And you never talked to Lieutenant Welch and
12        asked him questions, did you?
13   A.   Regarding what?
14   Q.   The charges against Chad Hayse.
15   A.   No.  I didn't talk to Mike Welch about charges against
16        Mr. Hayse.
17   Q.   Well, wasn't he Furman's lieutenant?
18   A.   He was probably one of them.
19   Q.   Yeah.
20         And he was involved in the discipline.
21         Were you aware of that?
22   A.   I think I came to be aware of that later.
23   Q.   And were you aware that Lieutenant Allen was involved in
24        his discipline -- Furman's discipline?
25   A.   Yes.  He reinstated Mr. Furman.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                    Pages 221–224

Page 221

1  Q.  No.  I said "involved in the discipline," not the
2      reinstatement.
3  A.  Well, part of the discipline is reinstating him.  So --
4  Q.  Okay.  You want to say that here today at your dep.  I
5      don't have time for your personal desire to get your
6      version of events on the table.  I'm just here to get
7      answers.
8          Were you aware that Lieutenant Allen was involved
9      in discipline that was meted out to Furman?
10         It's a "yes" or "no."
11 A.  Yes, I was aware he was involved with the discipline.
12 Q.  And you never went to talk to him to ask what happened;
13     correct?
14 A.  As a matter of fact, I did talk with him.
15 Q.  When?
16 A.  Subsequent to Mr. Hayse being terminated.  He came in my
17     office.
18 Q.  Oh, I'm not interested in that.  I want to --
19 A.  Actually, it was prior to Mr. Hayse's termination, I
20     talked to him.
21 Q.  Okay.
22 A.  I talked to him because we had a grievance hearing
23     scheduled, and I wanted a copy of the write-up.
24 Q.  Okay.  Now you're just talking.
25         Before --

Page 222

1  A.  No, you asked me if I talked to Mr. Allen, and I'm
2      responding to your question --
3  Q.  No, I --
4  A.  -- and you don't like my answer.  Let me finish.
5  Q.  No, I asked you --
6  A.  You asked if I talked to Allen.
7          THE REPORTER:  I'm sorry --
8  A.  The answer to that question is yes.
9  BY MS. GORDON:
10 Q.  Did you talk --
11 A.  I talked to Allen.
12 Q.  -- to Allen before you wrote a complaint --
13 A.  I talked to Allen about the discipline --
14         THE REPORTER:  Excuse me.  I'm sorry.  One at a
15     time, please.
16         MR. THOMAS:  Yeah.  Yeah.
17 A.  I talked to Allen about the discipline --
18         MS. GORDON:  Okay.  You've got to tell your client
19     to just answer the questions I've asked.
20         MR. THOMAS:  I'd like to say something, but -- I
21     have to tell you, Ms. Gordon, I think you're badgering
22     him a little bit.  He's trying.  Maybe he doesn't
23     answer --
24         MS. GORDON:  No, he's not.
25         MR. THOMAS:  Well --

Page 223

1          MS. GORDON:  He's trying to avoid the question,
2      Phil.
3          MR. THOMAS:  Well --
4  BY MS. GORDON:
5  Q.  Here is my question:  Did you talk to Allen prior to
6      issuing the amended complaint against Hayse?
7  A.  Yes.
8  Q.  Okay.  What date?
9  A.  I don't have the dates in front of me.
10 Q.  And what did you ask him about with regard to Furman?
11 A.  I asked him to provide me -- like I asked Mr. Hayse -- a
12     copy of the write-up that is in the file.  We had a
13     grievance hearing, and I needed a copy of what was
14     written up.  And Mr. Allen came in and said, "There is
15     no write-up.  He never was written up."
16 Q.  What is a "write-up"?  Under the contract, what's a
17     "write-up"?
18 A.  It is a statement of charges --
19 Q.  Okay.  Is that required --
20 A.  -- that would be brought.
21 Q.  -- under the contract?
22 A.  It's somewhat ironic that Mr. Hayse is claiming he had
23     no knowledge when he is -- had due process and
24     Mr. Furman did not.
25 Q.  Okay.

Page 224

1  A.  Mr. Furman did not receive a notice of the charges,
2      the --
3          MS. GORDON:  Can you --
4  A.  -- union didn't know.
5          MS. GORDON:  Can you tell him to listen --
6          THE REPORTER:  I'm sorry --
7          MS. GORDON:  Can you tell him to listen to my
8      question?
9          MR. THOMAS:  There's not a question on the table
10     right now.
11         MS. GORDON:  There was a question, actually.
12         MR. THOMAS:  Well, I think we may have lost it
13     somewhere.
14         MS. GORDON:  It was very specific.
15 A.  What was the question?
16         MR. THOMAS:  If you want to have it reread, you
17     could have it reread.
18         MS. GORDON:  It was about whether there's any
19     requirement in the contract.
20         Just listen to the question.
21     (Record repeated by the reporter.)
22 BY MS. GORDON:
23 Q.  In the Collective Bargaining, what is a write-up and
24     is --
25 A.  It is a notice -- I'm sorry.  I'll wait till your

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 225

```
1          question is -- it is a notice that's given to the person
2          who is being charged for the discipline as to what that
3          discipline is.
4              That person is brought in to address those charges
5          with his union rep, and he's afforded an opportunity to
6          respond.
7    Q.   Okay.  That's not -- there's no requirement of a written
8          notice in the contract, is there?
9    A.   There is a notice that's provided to the --
10   Q.   But it's not in writing; correct?
11   A.   Typically, yes.
12   Q.   Okay.  Look, it's either -- a contract is not
13        "typically."  There's language in a contract that has to
14        be followed; correct?
15   A.   Written notice of the charges against the officer -- and
16        he has an opportunity to respond with his union rep --
17   Q.   Okay.  That's --
18   A.   -- prior to the imposition of any discipline, yes.
19   Q.   That's not what the contract says.
20   A.   That's exactly what the contract says.
21   Q.   Okay.  I'm going to read it to you again for the second
22        time during the dep.
23              "All employees shall have the right to
24        be represented by the Local president, his
25        designee and a union representative at all
```

Page 226

```
1          disciplinary conferences except that the
2          employer has the right to take disciplinary
3          action immediately in emergency situations."
4              That says a "disciplinary conference," doesn't it?
5    A.   That's part of it, yes.
6    Q.   Okay.  There's no --
7    A.   There's policies and procedures in the department --
8    Q.   Okay.  You show me --
9    A.   -- in how the City is to discipline employees.
10   Q.   -- where in the contract it says you have to give
11        written notice of the charges.
12   A.   There's policies and procedures --
13   Q.   I -- sir --
14   A.   -- of the City discipline procedure.
15              MS. GORDON:  I'm asking about the Collective
16        Bargaining Agreement, Phil.  He's refusing to answer.
17              MR. THOMAS:  Do you remember the Collective --
18              MS. GORDON:  I've put it in front of him.
19              MR. THOMAS:  If not --
20   A.   Let me take -- I'll read it.
21              MR. THOMAS:  Okay.
22   A.   What provision are you specifically referring to?
23   BY MS. GORDON:
24   Q.   I just turned it to you.  I gave you the page.  It's
25        called "Discipline."
```

Page 227

```
1              There's no requirement in there for anything in
2          writing.  "Yes" or "no"?
3              (Discussion held off the record.)
4    A.   It says:
5              "Further details or documentation of
6          disciplinary action shall be made available
7          to the union."
8    BY MS. GORDON:
9    Q.   I'm talking about notice of the charges against the
10        officer.  It says a conference -- the union rep shall be
11        at the conference; correct?
12   A.   That's what this says.
13   Q.   Okay.
14   A.   Section 8.1 says that.
15   Q.   Right.
16              And that's the Collective Bargaining Agreement that
17        you must follow by law; correct?
18   A.   It's part and parcel of it, yes.
19   Q.   You must follow that by law; am I correct?
20   A.   It's part and parcel of it, yes.
21   Q.   Okay.  And you've not pointed me to anything that says
22        anything in writing must be given to the officer.  Okay.
23              (Discussion held off the record.)
24   BY MS. GORDON:
25   Q.   Okay.  At the time that Barnes came to you about Furman,
```

Page 228

```
1          discipline, were you aware of Officer Furman's track
2          record with regard to citizen complaints?
3    A.   Barnes didn't come to me about Furman's discipline.  She
4          came to me about disciplining Chad Hayse.
5    Q.   Well, one of your counts is the discipline of Furman.
6              We've already covered that here.
7              That's one of your counts, Count 4.  You said she
8          was upset about discipline.
9              MR. MEIHN:  That wasn't your question, Counsel.
10        You said, "When she came to you to complain about
11        Furman."
12              MS. GORDON:  Yeah.
13              MR. MEIHN:  And so he's answering the question.
14   BY MS. GORDON:
15   Q.   Well, she complained to you about Furman, that he was
16        being disciplined improperly, didn't she?
17   A.   No.  She complained to me about Chief Hayse not doing
18        his job.
19   Q.   Well, wasn't one of the things she complained about
20        Matthew Furman's discipline?
21              You've been testifying to that.
22   A.   She came to me about the discipline of Chad Hayse.  She
23        didn't come to me about the discipline to Furman.
24              MS. GORDON:  Oh, God.  Now, we're just going around
25        in circles needlessly.
```

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                Pages 229–232

Page 229

1        I'm saying this for the judge.
2        Now I've asked the same question four times.
3   BY MS. GORDON:
4   Q.   You've already testified to this, but yet you're making
5        me repeat myself over and over again.
6        You've already testified that -- so has Barnes --
7        that she came to you because she was upset about
8        discipline of Matthew Furman.  You've already admitted
9        to it.
10       You're now arguing with me about that?
11  A.   No, I'm not arguing with you, Counsel.  What I'm saying
12       is, she came to me over the discipline of Chad Hayse and
13       she was upset with Chad Hayse not performing his job.
14       And part of the discussion was issues of inappropriate
15       discipline, but that wasn't --
16  Q.   Of who?  Of who?
17  A.   Of Mr. Furman.
18  Q.   Okay.  At the time she came to you with that and you put
19       together a complaint, in detail, about wrongdoing on the
20       part of Chad Hayse with regard to Matthew Furman's
21       discipline, were you aware of Matthew Furman's record of
22       citizen complaints?
23  A.   You know, I don't recall if I was aware of that or not.
24  Q.   Did you know -- did you know --
25  A.   I knew that every officer occasionally gets a complaint,

Page 230

1        so I'd have to say that --
2   Q.   Oh, really?  Oh, really?  Have you looked at that?
3   A.   No, I'm just aware officers sometimes get complaints.
4   Q.   How many complaints has Lieutenant Welch had in his long
5        career?
6   A.   I have not -- as I indicated to you earlier -- it's the
7        second or third time you've asked me this question -- I
8        did not review Mr. Welch's file for discipline.  So, I'm
9        sorry.
10  Q.   Well, I don't think citizen complaints are in the file,
11       sir.
12       But I just wanted to know what --
13  A.   So, I can't -- I'm not qualified to answer.  An opinion?
14       I don't know.
15  Q.   Did you look into citizen complaints of Furman to see
16       whether or not he had been a problem in the department
17       leading up to the discipline?
18  A.   I don't believe anything was provided to me.
19  Q.   Well, did you go looking for anything?
20  A.   Did I go looking for anything?
21  Q.   Yes.  In order to try to put together your case and your
22       complaint --
23  A.   Yes, I did, as a matter of fact.
24       THE REPORTER:  I'm sorry --
25  A.   I asked Mr. Hayse to provide me any and all

Page 231

1        documentation as to why Mr. Furman was being
2        disciplined.  Correct.
3   BY MS. GORDON:
4   Q.   Right.
5   A.   So, I did.
6   Q.   But with regard to Furman's record, did you look to see
7        whether he had been a problem in the department?
8        I think your answer is "no."
9   A.   No, that's not my answer.  But go ahead.
10  Q.   Well, did --
11  A.   I like my answer better.
12       My answer is that I --
13  Q.   I know you do.
14  A.   And it is.
15  Q.   Because you don't want to be honest --
16  A.   I asked Mr. Hayse --
17  Q.   -- and tell the truth.
18       THE REPORTER:  Excuse me --
19  A.   -- if there was any discipline or anything that was
20       related to Furman, please provide it to me.  You can see
21       it in the letter.  So, yeah, I did.
22  BY MS. GORDON:
23  Q.   No, you asked for anything about his discipline of
24       Furman.
25       I'm asking you whether you went to see whether

Page 232

1        Hayse had a history, for example, of citizen complaints
2        against him that ultimately caused the chief to
3        discipline him?
4   A.   I'm not aware of Mr. Hayse having a series of citizen --
5        MR. THOMAS:  I think you might have misspoke,
6        Ms. Gordon.  You said "citizen complaints against
7        Mr. Hayse."  I think you misspoke.
8        MS. GORDON:  Against Furman.  Against Furman.
9   A.   If the chief didn't provide it to me, I did not see it.
10  BY MS. GORDON:
11  Q.   Okay.  Well, you asked the chief only for discipline.
12       But -- okay.  So, let's go through them -- a few of
13       the complaints and just find out whether you knew about
14       this.
15       I'll start with complaints that actually you
16       received via e-mail in the City, and you never produced
17       to us.
18       MS. GORDON:  And I'm going to make a record of
19       this.  I'm going to mark these one by one.
20       (Deposition Exhibit 1 marked
21       for identification.)
22  BY MS. GORDON:
23  Q.   I'm going to hand you -- okay.  Here is from Stacy Striz
24       to Chad Hayse and Jeff Bolton.  It's Exhibit 1.
25       "Good morning, Chief.  Over the weekend

Page 233

1      there were some rumblings of a situation where
2      Officer Furman had to use his TASER on a woman
3      that he had pulled over last week who had a
4      small baby in the back seat.  I would like to
5      see reports, recordings and audios and know
6      how many times the individual had to be
7      TASED.  Please let me know if I can stop by
8      today."
9           Have you ever seen that before?
10  A.  No, I'm not aware of that.
11           (Discussion held off the record.)
12           (Deposition Exhibit 2 marked
13            for identification.)
14  BY MS. GORDON:
15  Q.  Okay.
16  A.  It's -- just for the record, it's Monday, February 23rd,
17      2015, and if I was aware of it, I don't recall that.
18           MR. THOMAS:  Can I take a look at it?
19           MS. GORDON:  Yeah.
20  A.  Sure.  Sorry.
21  BY MS. GORDON:
22  Q.  Do you know why that -- are you responsible for pulling
23      documents in this case to produce to us in response to
24      requests for production of documents?
25  A.  No, I had --

Page 234

1  Q.  Who is responsible at the City for pulling documents?
2  A.  There's a collective group of individuals that had been
3      getting together documents.
4  Q.  Who are they --
5  A.  I got together everything I had.
6           MS. GORDON:  Okay.  Well, I'm telling you, counsel
7      for the City, I've never received any of these e-mails
8      I'm marking, and they're obviously things we've asked to
9      be produced, and I continue to be concerned that
10      documents are being withheld from us.
11           MR. THOMAS:  Could we have a copy of this,
12      Ms. Gordon?
13           MS. GORDON:  Yeah.
14           MR. THOMAS:  Did you make a copy for us?
15           MS. GORDON:  No.  I just pulled these just now
16      myself.  I'll get a copy.  After it's marked, I'll get a
17      copy.
18           MR. THOMAS:  Okay.
19  BY MS. GORDON:
20  Q.  Here is something from Chad Hayse to the mayor of
21      Melvindale, November 21, 2013.
22           "Michelle Hollis.  Her adult daughter was
23            assaulted by a neighbor.  The report was
24            forwarded to Larry Coogan's office for
25            potential charges.  I personally spoke with

Page 235

1      Michelle and advised what her daughter could
2      do to help.  To my knowledge, neither the
3      daughter or Michelle have taken the action
4      that I suggested and neither have come to the
5      police station to make any complaints against
6      the officers.
7           Kassie Weinstein was upset because her
8      adult son's vehicle was towed.  The divorced
9      parents gave the son a vehicle but nobody
10      bothered to transfer the license plates.  The
11      vehicle was towed.  She was upset because the
12      fine sheet from the court was an old one which
13      had the wrong fine amount.  They just want to
14      complain but aren't taking any
15      responsibility --"
16      It's Exhibit 2.
17      Have you seen this before?
18  A.  Now I'll take a look at it.
19      So, this is a November 21st, 2013 letter from Chad
20      Hayse sent --
21           MR. THOMAS:  It's not a letter.  It looks like an
22      e-mail.
23  A.  E-mail communication from Chad Hayse to Stacy Striz.
24  BY MS. GORDON:
25  Q.  Have you ever seen that before?  Were you aware of that?

Page 236

1      Your name is in it.
2  A.  I have no recollection of this.
3  Q.  Okay.  I have another one.
4  A.  It's from 2013, so I'm --
5  Q.  Okay.  You can just set that right down there.
6  A.  -- not sure what to tell you about that one.  I'm
7      sorry.
8           (Deposition Exhibit 3 marked
9            for identification.)
10  BY MS. GORDON:
11  Q.  December 2, 2014, "Subject:  Officer Complaint."  It's
12      "From:  Stacy Striz," "To:  Police Chief."
13           It starts, actually, on December 2nd, 2014 at 9:32.
14           "Good morning.  I received a call on
15            Sunday from a person who was pulled over by
16            Officer Furman on November 21.  He alleged
17            that Officer Furman was swearing at him and
18            yelling at him repeatedly and that it was
19            unwarranted.  Is there a tape we can listen
20            to when a situation like this -- situations
21            like this arise?  I'm just curious."
22           Were you made aware of this citizen complaint about
23      Furman?
24           Did the mayor ever discuss that with you?
25  A.  This is a communication from allegedly Chad Hayse to the

Page 237

1   mayor, dated --
2 Q. It's from the mayor to Chad Hayse.  Look down at the
3   bottom.
4 A. From Chad Hayse to Stacy Striz --
5 Q. Go down to the --
6     THE REPORTER:  Excuse me?
7 A. It's dated --
8 BY MS. GORDON:
9 Q. Go down to the bottom, Mr. Coogan, and see where it
10   starts.
11 A. I'm making a record, too.  It's December 3rd, 2014 at
12   9:02 a.m.
13     And it says, "From:  Stacy Striz."
14     The second part says, "To:  Police Chief."
15 Q. The record has already been made.  I already said that
16   on the record, but go ahead.
17     MR. THOMAS:  Ms. Gordon, can I ask you a question?
18     Did you want him to start at the bottom of it?
19   Would that save time?  Is that really what you were
20   asking him to do?
21     MS. GORDON:  Yeah.  From the mayor.
22     MR. THOMAS:  I think what she wants you to do is
23   start at the bottom --
24 A. Okay.  And.
25     MR. THOMAS:  -- and go up.  That might save a

Page 238

1   minute or two.
2 A. I was not aware of anybody making this accusation.  It
3   was not communicated to me.
4     I don't see it going to the Safety Commission
5   either.  So --
6 BY MS. GORDON:
7 Q. Were you aware -- okay.  You can put that down.
8     (Deposition Exhibit 4 marked
9      for identification.)
10 A. Yeah.  I --
11 BY MS. GORDON:
12 Q. I'm going to hand you Exhibit 4.
13 A. I have -- this is from 2014.
14 Q. Were you aware that in early 2015, Matthew Furman was
15   sent for psychological counseling based on his potential
16   anger problems and inability to use discretion in his
17   job?
18     Did you ever become aware of that?
19 A. I was here --
20 Q. Other than in this case.  Other than in this lawsuit
21   here.
22 A. I was aware that he sent Furman for counseling.
23   "He" being the chief of police.
24 Q. When did you --
25 A. Demanded Mr. Furman to go to counseling.

Page 239

1 Q. When did you become aware of that?
2 A. I'm not certain, but I was aware of that about --
3 Q. Before this lawsuit?
4 A. I believe so.  I --
5 Q. Were you aware that the mayor knew that and told Chad
6   Hayse, "Nice job"?
7 A. I haven't seen any communication to that --
8 Q. Yes, you have.
9 A. Oh, I have?
10 Q. Yeah.
11 A. Okay.
12 Q. Exhibit 4.  Your name is right on it.  Read it --
13 A. So, if my name is --
14 Q. -- top to bottom.
15 A. -- on it, that means I've seen it?
16 Q. These are -- none of these have been produced.
17     Read top to bottom.
18     Does that refresh your recollection?
19 A. Well, it says here -- it doesn't --
20     THE REPORTER:  I'm sorry?
21 BY MS. GORDON:
22 Q. I'm sorry?
23 A. It says "CC:  Larry Coogan."  It doesn't have an e-mail.
24   I don't know how I was cc'd this.
25     Just the fact that the letter says "cc'd" -- that

Page 240

1   doesn't show an e-mail going to me.
2 Q. Okay.
3 A. So, I don't know if I ever got this or not.  So, I
4   don't --
5 Q. You see --
6 A. I don't recall that.
7 Q. You see that Chad sent Furman for counseling.  He
8   reported to the mayor, and she told him "Nice job";
9   correct?
10     You see that?
11 A. I'm looking for the part where it says "Nice job."
12 Q. It's got a little smiley face.
13     MR. THOMAS:  Right there.
14 A. (Reading.)
15     "Thank you for the update.  Nice job."
16 BY MS. GORDON:
17 Q. Okay.  Were you aware of the history of problems Chief
18   Hayse had had with Matthew Furman, beginning at least in
19   2013, with regard to complaints made by citizens?
20     Did you become aware of that at any time?
21 A. I'm sure I did at some point.
22 Q. Okay.  When did you become aware of it?
23 A. I'm sure I did at some point.  If there's complaints
24   against an officer, I'm sure I would hear about it.
25 Q. Well, at the time you had the hearing against Hayse,

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 241–244

Page 241

```
 1      were you aware of a number of years that had gone by
 2      where the chief had had to respond to serious concerns
 3      from citizens about their treatment by Furman along the
 4      lines, for example, of the mayor here knowing of
 5      somebody that was TASED?
 6          Did you know what the chief had had to deal with
 7      for all those years?
 8  A.  I didn't see any write-ups from the chief writing Furman
 9      up.
10  Q.  I didn't ask you that.
11  A.  Well, that's my --
12          MS. GORDON:  Do you want to read back the question,
13      John?
14  A.  My response is --
15  BY MS. GORDON:
16  Q.  Excuse me.
17          All right.  Let's stop right there?
18  A.  I'm trying to respond to your question.
19  Q.  Do you --
20  A.  I don't recall receiving any write-ups from Mr. Hayse --
21  Q.  Okay.  You don't get write-ups every time somebody is
22      written up --
23  A.  Well, typically if somebody grieves it --
24  Q.  Okay.  You've got to left me finish.
25          When the police chief sent Furman for counseling,
```

Page 242

```
 1      you didn't get a copy of that, did you?
 2  A.  I don't know.  I'd have to look at your letter.
 3          Did you say I got a copy of that or not?
 4  Q.  No, you didn't.
 5  A.  Well, then, if you already know the answer to the
 6      question, no, I guess I didn't then.
 7  Q.  I -- you don't get copies of directives that the chief
 8      gives to employees, do you?
 9  A.  I do now, I think, yeah.
10  Q.  Okay.
11  A.  I do now by Mr. Allen.  Pretty much, he gives me --
12  Q.  All right.  Well, I'm not talking about now.
13          I'm talking about between the years of 2013 and
14      2017.
15          It's not that you didn't -- because you just got
16      done saying, "Well, I didn't get any discipline."
17          My point is, it's not your job as city attorney to
18      get copies of every discipline issued around the City,
19      is it?
20  A.  Normally, if there's a problem employee, I hear about
21      it.
22  Q.  Okay.  I didn't ask you that.
23          MS. GORDON:  I'm going to have the question read
24      back, and I'm going to make a record that the witness is
25      intentionally -- this is for my 7 hours for the court --
```

Page 243

```
 1      intentionally refusing to answer questions.
 2          Read the question back, John.
 3          THE REPORTER:  One second.
 4          (Record repeated by the reporter.)
 5  BY MS. GORDON:
 6  Q.  "Yes" or "no"?
 7  A.  My job is to provide legal assistance to everybody in
 8      the City, every department head --
 9          MS. GORDON:  Again, the witness --
10  A.  -- mayor and council.
11          So, yes, my job is to provide legal assistance to
12      anyone.
13          MS. GORDON:  Okay.  Again, this question was
14      nonresponsive.  The witness is intentionally not
15      responding to my question.
16  BY MS. GORDON:
17  Q.  As part of your -- I'm going to ask it again.
18          As part of your job, Mr. Coogan, you do not get
19      copies of every directive to every employee by his boss;
20      correct?  That's not what you get?
21  A.  That's correct.  I don't get copies of every single
22      directive by every employee in the City.
23  Q.  In fact, you don't get copies --
24  A.  By their boss.
25  Q.  -- of discipline unless it goes to grievance, do you?
```

Page 244

```
 1  A.  No, that's not true.
 2  Q.  Okay.  There's nothing -- there's no rule that people
 3      have to send city counsel copies of discipline; correct?
 4  A.  Well, you didn't ask me if there was a rule.  You asked
 5      me if I ever get copies, and I said yes.
 6  Q.  Okay.  Is there a rule that you have to get copies?
 7  A.  I don't believe there's a rule that says any department
 8      has to conform or tell me anything unless --
 9  Q.  Okay.  So, it's up to the department head as to whether
10      the department head wants to copy you in?
11  A.  Yeah.  I would think that's --
12  Q.  Okay.
13  A.  -- that's a fair assessment.
14  Q.  Okay.  And when Chad Hayse, at least, was chief, as far
15      as you know, you were not regularly being copied on what
16      he was doing within his department; correct?
17  A.  Chad wouldn't communicate with me.  That's correct.
18  Q.  Again, the question was evasive -- the answer was
19      evasive.
20  A.  No, you asked me did he communicate with me.
21          I said he was not communicating with me.  That's
22      correct.
23  Q.  I didn't ask you that, sir.  I asked you, did he send
24      you copies of disciplines or directives?
25  A.  When I wrote a letter to him?
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                Pages 245–248

Page 245

1  Q.  No.  Generally speaking, day in, day out, you were not
2      copied, were you?
3  A.  I don't believe so.  I don't recall for certain, though.
4      There may be some correspondence.  I don't recall.  I
5      can't say with absolute --
6  Q.  For example, you didn't know until that e-mail came
7      later, after the counseling, that Furman was being sent
8      for counseling, did you?  You were never told that in
9      advance by the chief?
10 A.  I don't recall.
11 Q.  Okay.
12 A.  I don't think so.
13 Q.  Okay.
14 A.  That's in 2013 or something.  I don't --
15 Q.  Okay.  Now I'm going to hand you complaint against
16     Officer Furman, March 4, 2013, Bates stamp -370 and
17     -371, to Chief Hayse from Sergeant Jones, and the
18     citizen complaint from Daisy Truss.
19 A.  Thank you.
20 Q.  Were you aware of that?
21         MR. THOMAS:  Are you having that marked?
22         MS. GORDON:  No.  I'm just using --
23         MR. THOMAS:  Because we didn't get a copy.
24         MS. GORDON:  -- the Bates numbers, Phil.
25         MR. THOMAS:  Okay.

Page 246

1         MS. GORDON:  I did say on the record what the Bates
2      numbers were.
3      I can get you a copy of whatever you want.
4         MR. THOMAS:  Yeah.  That's all the -- that's the
5      reason I was asking.  So, they have it primarily.
6         MS. GORDON:  Yeah.
7         (Discussion held off the record.)
8  A.  Do you want me to -- do you want me to read the second
9      page of this, Counsel?
10 BY MS. GORDON:
11 Q.  I just wanted to know whether you became -- you were
12     aware of this.
13 A.  I'd have to read --
14 Q.  It doesn't appear you were, but I don't know.
15 A.  I don't -- I could read it and see if it refreshes my
16     memory, but -- if you'd like.
17     Yeah, it -- it looks as though Officer Jones
18     responded to the accusations made by this
19     Mrs. Jones(sic).
20         MR. THOMAS:  I think she wanted to know if you saw
21     it.
22 A.  I did not see it, no.
23 BY MS. GORDON:
24 Q.  Okay.  So, you can see here that Officer Jones concluded
25     the sergeant -- that well, first of all, the

Page 247

1      complainant was upset that she had been stranded on
2      Greenfield after her vehicle had been towed.
3         See that on the second page?
4  A.  It doesn't say that she was stranded.
5  Q.  That's the word on the second page, sir.  6372.
6         "She was now mostly upset that she had
7         been stranded on Greenfield."
8         Do you see it?
9  A.  You're not talking about the first page?
10 Q.  Hang on a second.  Let me see what I gave you there.
11 A.  (Reading.)
12         "-- upset the Officer --"
13 Q.  Why don't you just hand it to me, and I'll point it to
14     you.
15 A.  Yeah.  Sure.  Sure.
16         Oh, it's on the second page of the second document.
17     Okay.  I was looking at the second page.
18 Q.  She was upset that she had been stranded on Greenfield."
19     Do you see that?
20 A.  Yeah.  She was making an accusation.  She was upset that
21     she was stranded, yeah.
22 Q.  Okay.  And then if you skip down to the line that says:
23         "Officer Furman was professional --"
24     Do you see that Sergeant Jones says he:
25         "-- could have been more courteous --"

Page 248

1      considering it was an accident and the location
2      she was at."
3      Do you see that?
4  A.  Yes.
5      And it also says:
6         "I believe that this matter is closed and
7      does not require any further follow-up --"
8         MS. GORDON:  Okay.  Again, the witness is
9      intentionally not responding to the question --
10 A.  I'm reading the document you gave me.
11 BY MS. GORDON:
12 Q.  I didn't ask you to read it out loud.
13 A.  Oh, okay.  I'll read it to myself.
14 Q.  I asked you to answer a question, and instead of
15     answering the question you're adding in things you want
16     to add in because they make you feel better in the
17     moment.
18     Let's go to the third thing on --
19 A.  I'd like the record reflect that counsel is now
20     testifying as to how I feel.  I don't know how she has
21     this clairvoyant ability --
22 Q.  You know, you don't have to say that, Mr. Coogan --
23 A.  -- to tell how I feel or don't feel.
24 Q.  -- because it's already on the record, what I just said.
25 A.  But it's amazing that you can testify to my state of

Page 249

1　　　mind.
2　Q.　Okay. When you stop adding things to your answers that
3　　　have nothing to do with my question, I'll stop --
4　A.　Why don't you ask your --
5　Q.　Okay. Now --
6　A.　-- question, and I'll answer.
7　Q.　-- you're interrupting me.
8　　　　　THE REPORTER: Excuse me --
9　BY MS. GORDON:
10　Q.　Once you stop adding to your answers and delaying this
11　　　deposition on purpose, I will stop pointing out what
12　　　you're doing.
13　A.　Why don't you ask a question, and I'll answer.
14　Q.　I did.
15　A.　Please state it again. I don't recall.
16　Q.　You've already answered it. You just added something
17　　　in.
18　A.　Okay. Go ahead.
19　Q.　Do you see that the sergeant stated that he advised
20　　　Furman not to accuse people of lying when there's a
21　　　possibility they are not?
22　A.　You don't want me to read it out loud? You just want me
23　　　to read it?
24　Q.　No. I said, do you see that?
25　　　　　MR. THOMAS: It's this paragraph.

Page 250

1　A.　Yeah. Yeah. He did accuse her of lying.
2　BY MS. GORDON:
3　Q.　Do you see what his sergeant is telling him, giving him
4　　　correction?
5　　　　　　"I advised not to accuse people of lying --"
6　　　Do you see that?
7　　　　　MR. THOMAS: It's the last --
8　A.　Yeah.
9　　　　　　"I advised not to accuse people of lying
10　　　　　when there is a possibility they are not."
11　BY MS. GORDON:
12　Q.　Okay.
13　A.　Okay. I see it, yeah.
14　Q.　Go to the next paragraph.
15　A.　Sure.
16　Q.　Do you see where Sergeant Jones told Furman:
17　　　　　　"I observed that the accident did occur
18　　　　　on Greenfield and out of courtesy he should
19　　　　　have at least given her a ride to the nearest
20　　　　　location so she didn't have to walk down
21　　　　　Greenfield and Allen Road intersection in the
22　　　　　cold. I spoke with him about this, and he
23　　　　　states he understands"?
24　　　Do you see that?
25　A.　Yeah.

Page 251

1　Q.　Okay. So, are you -- this is in 2013, and we're going
2　　　to keep going, but you're going to see that in 2016,
3　　　Furman was still being counseled for the way he handled
4　　　tows.
5　　　　　All right. Let's go to --
6　A.　Sorry. I thought you were going to hand me another
7　　　document.
8　Q.　Let's go to August 6th, 2013.
9　　　　　This is Bates stamp -373.
10　　　　　And it's got an attachment.
11　A.　Thank you.
12　Q.　And I would like you to observe that this is from Chad
13　　　Hayse to Tiffany Osley, O-s-l-e-y, "Subject: Horrible
14　　　experience with one of your officers."
15　　　　　And Tiffany Osley is saying that she was on her way
16　　　to take her son to urgent care, at the bottom:
17　　　　　　"A police officer stopped me for a broken
18　　　　　windshield. He asked me if I was having
19　　　　　financial trouble. I told him yes."
20　　　　　The problem -- she says:
21　　　　　　"-- the problem was, I had no knowledge
22　　　　　of Detroit suspending my license. The officer
23　　　　　then takes my license, myself and my five
24　　　　　children, including a one-year-old, get out of
25　　　　　the car, and have us wait on the side of the

Page 252

1　　　road. So, I have no form of ID, no
2　　　transportation to get to school and further my
3　　　education or to transport my kids."
4　　　Do you see that?
5　A.　Yes.
6　Q.　Is that appropriate conduct for a police officer?
7　A.　Well, if she's driving without a valid license and she's
8　　　driving without a valid plate on her vehicle, she
9　　　shouldn't be operating on the roads of the City, or
10　　　anybody, in the State of Michigan.
11　Q.　So, you support --
12　A.　I don't know what all the facts and circumstances are.
13　　　I don't know.
14　Q.　Okay. But you see in 2013, here we have a woman
15　　　complaining about the exact same thing that caused Chief
16　　　Hayse to finally direct Furman in 2016 to call into the
17　　　desk before he makes tows?
18　　　　　You see this is now going on in August '13, don't
19　　　you, Mr. Coogan?
20　A.　That --
21　Q.　Citizens are upset; right?
22　A.　This lady is upset --
23　Q.　You see this?
24　A.　-- right here. The number that you just read.
25　Q.　Yeah. Yeah. Exactly.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                          Pages 253—256

Page 253

1   A.   Yeah.  This is dated August 6th of --
2   Q.   Yeah.  Well, I'm showing you the history, sir, that you
3        knew nothing about.
4   A.   Yeah.  She was driving with her license suspended --
5   Q.   Are you just really so dug in, you're going to defend
6        Matthew Furman --
7   A.   I'm not -- I'm reading the ticket he gave --
8   Q.   Do you do any -- do you have any business dealings with
9        Matthew Furman?
10  A.   Business dealings?
11  Q.   Is he a friend of yours?
12  A.   He's an acquaintance.  I see him as a police officer.
13  Q.   Do you socialize with him?
14  A.   I see him as a police officer.
15  Q.   Have you socialized with him ever?
16  A.   Have I socialized with him ever?
17       I think -- I think I may have had a beer with him
18       once or twice.
19  Q.   Okay.  Where would that be?
20  A.   Probably at the Broadcast Booth.
21  Q.   I mean, is that once or twice true, or is it like when
22       you told me you hardly ever texted with Goch, and then
23       we had quite a few texts?
24       I mean, are you guessing or do you know?
25  A.   I think I've had a beer with him maybe once or twice.

Page 254

1        But I don't --
2   Q.   It's been more than that, hasn't it?
3   A.   I -- I don't recall.
4   Q.   It might be?
5   A.   I think twice for sure.
6   Q.   It might be; right?
7        You're under oath here.
8   A.   I don't recall.  I think a couple times I had a beer.
9   Q.   Oh.  Why were you having a beer with him?
10  A.   I have beer with the officers once in a while, different
11       officers.
12  Q.   Okay.  Who else?
13  A.   Quite a few of them, actually.
14  Q.   Well, when is the last time you saw Furman?
15  A.   At -- wait a minute.
16       At this deposition he had here.  And then he
17       stopped by my office because he rode there with me, and
18       he picked up his coat that he had had -- it had been
19       hanging in my office for a couple weeks.
20       So, he was there maybe a week ago.
21  Q.   So, he rode with you to the dep?
22  A.   Yeah.
23  Q.   Uh-huh.
24  A.   Rich and Furman all rode --
25  Q.   And you've had lunch with him, too; is that correct?

Page 255

1   A.   At the dep day, we had lunch together.
2   Q.   You've had lunch with him other times, haven't you?
3   A.   I don't believe so.
4   Q.   You text with him; correct?
5   A.   Not -- no, not really.
6   Q.   Check your phone.
7   A.   All right.  I'll look in my phone.
8        I have to turn it back on again.
9   Q.   I'm going to ask you to retain that phone because we're
10       going to have the court -- we're going to ask the court
11       to have somebody inspect it, do a forensic exam.  So, do
12       not remove anything from that phone, Mr. Coogan, and do
13       not do anything with that phone.
14  A.   I'm still turning it on right now.  So --
15  Q.   Okay.
16  A.   I have some texts from Furman.
17  Q.   Okay.  May I see them, please?
18       I'm going to come around.
19       MR. THOMAS:  I have to make a call.  Can we go off
20       the record while you review those --
21       MS. GORDON:  Sure.
22       MR. THOMAS:  -- or are you going to stay on the
23       record?
24       MS. GORDON:  All right.
25       MR. THOMAS:  I'd like to go off the record.

Page 256

1        MS. GORDON:  All right.  For the record, Mr. Thomas
2   is stepping out but he's --
3        MR. THOMAS:  To make a call.
4        MS. GORDON:  -- going to allow me to go through the
5   phone.
6        MR. THOMAS:  Yes.
7        MS. GORDON:  And then I'll --
8        All right.  Let's go to the top, Mr. Coogan.
9   A.   March 12, 2018.
10  BY MS. GORDON:
11  Q.   Okay.  So, I'm -- if you don't mind, let's just read
12       some of this into the record.
13  A.   Yeah, I can read it to you --
14  Q.   All right.  The green is you?
15       (Mr. Thomas leaves the room.)
16  BY MS. GORDON:
17  Q.   Go ahead.
18  A.   Okay.  It says:
19       "It's still up in the air so I will keep you
20       posted."
21       I don't know what we're referring to.
22       It says:
23       "Okay.  They come off like a bunch of clowns
24       changing dates."
25       I'm assuming they're talking about the date of the

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 257–260

Page 257

1    deposition.
2    Q.   Read the whole thing, please.
3    A.   (Reading.)
4              "Clowns changing dates at the last minute!
5         Unprofessional!"
6    Q.   That's talking about us?
7    A.   I would assume.
8    Q.   Okay.  Go ahead.
9    A.   But I don't know.
10   Q.   That's fine.
11   A.   (Reading.)
12             "That's what I've been dealing with."
13   Q.   Is that from you, the green?
14   A.   I believe so.
15   Q.   And then that's Furman responding to you:
16             "I'd tell them to fuck themselves.  Can't
17        wait to destroy any hopes they have of $$$$."
18        That's from Furman to you, sir?
19   A.   That's correct.
20   Q.   And then you say:
21             "I will keep you posted."
22        Furman:
23             "When are they supposed to let us know by?"
24        Your answer --
25   A.   It should say "Let's plan."  It said:

Page 258

1              "Let plan --"
2    Q.   (Reading.)
3              "Let's plan on meeting at 7:30 at my
4         office unless something changes."
5         Answer:
6              "Okay."
7         March 14, 10:07:
8              "David Robinson lawyer, former DPD cop,
9         sued Hayse for illegal imprisonment and got --"
10        it looks like seven dollar signs --
11             "-- $$$$$$$ from Melvindale."
12   A.   Right.
13   Q.   Okay.  And then he --
14   A.   I guess I could download that.  I don't know what
15        that --
16   Q.   I'll tell you what it is.  It's something from David
17        Robinson.
18   A.   Yeah.  That's --
19   Q.   And then he writes:
20             "The case is Dale Barnes versus Chad Hayse.
21        Case number --"
22        blank --
23             "-- United District Court for the
24        Eastern District of Michigan."
25             "Welch is also named in the lawsuit."

Page 259

1              Keep going.
2         Saturday, March 17th.
3    A.   It's something -- wait a minute.
4    Q.   You write:
5              "Nice."
6    A.   I know -- I read that and said:
7              "Nice."
8         I'm not sure what this says.
9    Q.   It's a legal pleading.
10   A.   Yeah, I know what it is, but --
11   Q.   Look at it.
12   A.   Yeah.  I know.  I'm pulling it up so we can look at it
13        together.
14             Oh, shit.  Where the heck did that go?
15   Q.   Go ahead.
16   A.   It says:
17             "Defendants Hayse and Welch questioned
18        Plaintiff and refused to allow the Plaintiff
19        to leave without making a statement regarding
20        Barse's death."
21        And then it says the complaint number.
22        THE REPORTER:  I'm sorry.  "-- regarding --"
23   A.   B-a-r-s-e-'-s death.
24             "Plaintiff finally alleges that he was
25        only -- only released after being held for

Page 260

1         more than 48 hours after writing a statement
2         of facts directed by the Defendants."
3         Hayse and Welch.
4         So, he's referring to -- he found some lawsuit
5    against Hayse and Welch.
6         MS. GORDON:  Okay.  So, that's -- for the record,
7    that was an attachment.
8    A.   Yeah.
9         MS. GORDON:  Or it was texted.
10   A.   Yeah.
11        I'll give you a copy.  I'll give you a copy of
12        that.
13   BY MS. GORDON:
14   Q.   Okay.  Then you write:
15             "Nice."
16        And then you write:
17             "Call me when you can."
18        And we're now on --
19   A.   Correct.  And that was Tuesday, whatever day it was.
20        And this says:
21             "I heard Welch was at the station --"
22        This came last Tuesday.
23             "-- meeting with Kennaley."
24   Q.   And you went:
25             "?"

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 261–264

Page 261

1  A.   And so there was concerns regarding witness tampering is
2       what my question is, because there's been a lot of that
3       going around.
4              "Welch is at the station with Kennaley."
5       Same thing twice.  They're buddies or something.
6  Q.   Hang on.
7              "Welch was at the --"
8       This is Wednesday:
9              "Welch was at the police station with
10             Kennaley --"
11 A.   Kennaley.
12 Q.   (Reading.)
13             "-- got to be careful.  They are
14             hunting/outdoor buddies."
15 A.   Okay.
16 Q.   What's the next --
17 A.   That's it.  That's all there is.  That's all there is.
18 Q.   Okay.
19             So, obviously --
20 A.   So, there's a few -- few texts.
21 Q.   Well, this --
22 A.   It started March 12th --
23 Q.   But -- but hang on.  Hang on.
24             The March 12th is obviously a continuation of an
25       earlier line of texts because the March 12th text is a

Page 262

1       response to something else that's currently not showing
2       up on your phone.
3              The first text on this phone says:
4              "It's still up in the air so I will keep
5              you posted."
6       So, you obviously texted with Furman before March
7       12th.
8  A.   It was the dates for depositions we were referring to.
9  Q.   Okay.  It doesn't matter.
10 A.   Oh, no --
11 Q.   There was a text before that, and I'm going to have you
12       preserve that phone because we're going to get those
13       texts.
14 A.   I don't care.  That's fine.
15 Q.   Well, it's not a matter of whether you care, but I
16       appreciate your cooperation.
17 A.   That's fine.
18             Well, absolutely.  No problem.
19             (Mr. Thomas enters the room.)
20 A.   Always willing to cooperate.
21 BY MS. GORDON:
22 Q.   Did you tell Furman about the Welch testimony?
23 A.   I don't believe I had a conversation with Furman about
24       the Welch testimony.
25 Q.   Uh-huh.

Page 263

1       How did Furman find out about it?
2  A.   About what?
3  Q.   That you think Welch lied under oath at his deposition?
4  A.   I don't --
5              MR. THOMAS:  If he knows.  Objection.
6  A.   I don't know.
7              MR. THOMAS:  Foundation.
8  BY MS. GORDON:
9  Q.   Well, he sent Nicole Barnes --
10 A.   I don't know how he found out about it.
11 Q.   He sent Nicole Barnes a text about it, saying:
12             "I fucking hate him."
13             You don't know how he -- you didn't call him and
14       tell him?
15 A.   No, I don't believe I had a conversation with him.
16 Q.   Okay.  So, what else do you do socially with Furman?
17             Obviously you keep in touch with him.  He contacts
18       you about the Plaintiff in this case, sending you what
19       he thinks is dirt on the Plaintiff.  He tells you --
20 A.   Yeah, I -- I did -- yeah.
21 Q.   He -- excuse me.
22             He talks about legal counsel:
23             "They can fucking go --"
24       something.
25             So, obviously he has a kind of relationship with

Page 264

1       you where he easily uses profanity.  He talks about the
2       litigation.
3              So, you must have a close relationship with this
4       man.  This isn't just a business relationship.
5  A.   Yeah.  I don't have a real close relationship with him,
6       no.
7  Q.   Oh, really?  People just write you that kind of e-mail,
8       sending you dirt on --
9  A.   Well, we spent the day here in the dep, and he's -- you
10       know, so --
11 Q.   You're not -- you've never been neutral in this
12       matter -- entire matter since day one, have you?
13             You've always been on the side of getting rid of
14       Chief Hayse, no matter what.
15             Fair statement?
16 A.   No, absolutely not.
17 Q.   You've never been neutral?
18 A.   I had -- I had no disagreement with Chad.  I don't
19       really dislike him or likes him.
20 Q.   Yeah.  But you were extremely upset and made -- made
21       your sentiments clear because the towing numbers were
22       down because he disciplined Furman; correct?
23 A.   No, that's not correct.
24 Q.   You were very upset about the numbers being down.  You
25       made it clear publicly.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018
Pages 265–268

Page 265

1  A.  You said was I extremely upset?
2  Q.  Yes, you were.
3  A.  The facts speak for themselves.
4      I was more concerned because you're the chief and
5      you're asked a question, why that was, and he couldn't
6      even answer that question.
7  Q.  Are you -- are you concerned that there's a man --
8  A.  I was concerned about not being able to articulate what
9      the reasons were.
10 Q.  Are you concerned that there's a man that works
11     full-time for the department that does nothing but tow
12     cars all day every day?
13 A.  That who --
14 Q.  That that's what he does for the citizens?
15 A.  Am I concerned?
16 Q.  Yeah.  And he's not out there patrolling or backing up
17     his fellow officers.
18     Was that ever a concern to you?
19     MR. MEIHN:  Objection.  Foundation.
20 BY MS. GORDON:
21 Q.  All he wants to do is tow.
22 A.  I don't know whether he's backing up officers or not.
23 Q.  Well, have you ever --
24 A.  I know that he's writing tickets --
25     THE REPORTER:  I'm sorry --

Page 266

1  A.  -- for people who don't have licenses on their vehicle
2      and don't have licenses to drive in Michigan.
3      It may come as a shock to some people, but you have
4      to have a valid driver's license in order to operate a
5      motor vehicle.
6  BY MS. GORDON:
7  Q.  I didn't ask you that.
8  A.  You have to have a valid plate on your vehicle.
9  Q.  I didn't ask you that.
10 A.  Do I have a problem with him towing vehicles?  No, I
11     don't.
12 Q.  How about ten a day?
13 A.  I don't -- I don't know how many -- if there's ten
14     violations, he writes them up.  I have no problem with
15     that.
16 Q.  Do you know that's all he does?  He sits on Schaefer.
17     He doesn't patrol.  He doesn't patrol the --
18 A.  I don't know that.  No, I don't know that.
19 Q.  After all this --
20 A.  I don't know where he sits.
21 Q.  Okay.  That's good to know.
22 A.  Yeah.
23 Q.  All right.  I've got another one.
24 A.  Sure.
25 Q.  This is -- what date is this one?

Page 267

1      September 2014.  The chief was forced to respond to
2      a woman whose husband was a 20-year police officer and
3      had been treated very poorly by Furman.
4      This is Bates stamp 6387 and 6388.
5      Dawn Harris.  The complaint is:
6      "I wish to complaint against Officer Furman."
7      MR. THOMAS:  Are you going to have these marked
8      also?
9      MS. GORDON:  No.  I'm just reading the Bates
10     numbers in.
11 BY MS. GORDON:
12 Q.  (Reading.)
13     "Nature of complaint:  My aunt was pulled
14     over for a rear light facing -- out.  The
15     officer told her that her DL was suspended.  So,
16     I, Dawn Harris, called my husband that is also a
17     police officer because the officer would not let
18     me drive her car home.  He had her car towed,
19     and he also gave her a ticket for no proof of
20     insurance.  When she tried to give the officer
21     her insurance, he said it took her too long.
22     There was only Deborah Hughes, Dawn Harris and
23     my daughters in the car.  Officer Furman was
24     very rude from the start.  My husband has been
25     a police officer for -- years --"

Page 268

1  A.  "20 years."
2  Q.  "20 years."
3      I don't think we've got --
4  A.  Yeah.  I don't have the rest of it, but that's what she
5      says.
6      (Discussion held off the record.)
7  BY MS. GORDON:
8  Q.  You didn't produce this.  I'll let the City attorneys
9      know that second page was not produced.
10     So, then the chief was forced to write an apology
11     letter on September 18, 2014.
12     "Ms. Harris,
13     On behalf of the men and women of the
14     Melvindale Police Department, I would like
15     to sincerely apologize for Corporal Furman's
16     actions on September 27, 2014.  His actions do
17     not represent the hard work that our officers
18     perform every day.  I will counsel Corporal
19     Furman about using discretion in towing
20     vehicles with a licensed passenger or occupied
21     by children.  Lieutenant Welch called your
22     aunt this morning to apologize and I have
23     dismissed the citation, so she will not go to
24     court.  Please thank your husband for picking
25     you up.  I know how busy he must have been at

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                    Pages 269–272

Page 269

1         work.  If ever I can be of assistance, please
2         don't hesitate to contact me.  I'm sorry your
3         experience was not a good one."
4            You didn't know about that, I guess?
5    A.  No, I didn't know about the chief dismissing that ticket
6         or this event at all.
7    Q.  Oh, you want to criticize Chad Hayse?
8    A.  No.  I didn't know about him dismissing the ticket or --
9    Q.  Is that what you want to do here today now?
10   A.  -- this at all.
11   Q.  Because Furman --
12          MR. THOMAS:  Objection.  Argumentative.
13   BY MS. GORDON:
14   Q.  Because Furman is doing great work here with these
15        citizen complaints, to you; right?
16   A.  I didn't get these citizen complaints.  You asked me
17        that.
18   Q.  Well, now that you see them, what's your thinking on
19        them?
20   A.  I think if people are driving without a license, without
21        insurance, without a proper plate on their vehicle
22        that's required under the laws of the State of Michigan,
23        I think they should be enforced.
24   Q.  I didn't ask you that.  I asked you --
25   A.  Well, you asked what I thought.  I'm telling you.

Page 270

1    Q.  I asked you whether -- did Furman misuse his discretion
2         in any of these instances?
3    A.  And my response is that driving without a license and no
4         insurance and improper plate on the vehicle --
5           MR. THOMAS:  It's a "yes" or "no."
6           Why don't you answer "yes" or "no"?
7    A.  I --
8           MR. THOMAS:  Let's tighten things up.
9    A.  Okay.
10          MR. THOMAS:  Let's tighten things up.
11   A.  Okay.  What was the question?  Is he acting
12        appropriately?
13   BY MS. GORDON:
14   Q.  Did you -- yeah.
15   A.  Yeah, I think so, if they're not complying with the law.
16   Q.  We can see what the jury thinks about that.
17   A.  All right.
18          MR. THOMAS:  Objection to that comment,
19   Ms. Gordon.
20          MS. GORDON:  Okay.  Fair enough.
21   BY MS. GORDON:
22   Q.  All right.  I've got more.
23   A.  Okay.
24   Q.  I've got Ratasha Moore, 1-14-14.
25           "I was pulled over by Officer Furman and

Page 271

1         after the procedure of the stop, he notified
2         he was going to take -- impound my car.  I told
3         him that didn't sound right, 'Let me call
4         somebody.'  He was telling me that I could not
5         operate my vehicle without insurance.  I said,
6         'Okay.  Let me call somebody.'  When I pick up
7         my phone to call someone, Officer Furman
8         snatched my phone from my hands and yelled,
9         'Get out of the car.'  I asked him to give me
10        back my phone to call someone and come get me.
11        I then felt scared.  We argued back and forth
12        about the phone, and he said --"
13          MS. GORDON:  Again, I don't have the second page.
14   I'm letting the City know.
15   A.  This is what she's reading now?
16          MS. MARZOTTO TAYLOR:  Yeah.
17   BY MS. GORDON:
18   Q.  6396.
19           Do you think that's appropriate, too, to pull
20        somebody's phone out of her hand?
21          MR. MEIHN:  And that was the Bates stamp that you
22   just gave?
23          MS. GORDON:  Yep.
24          MR. MEIHN:  Thank you.
25          MS. GORDON:  We're missing second pages on these.

Page 272

1           MR. MEIHN:  Got it.  Thank you.
2            (Discussion held off the record.)
3    A.  Taking the phone out of her hands, probably not good.
4         Giving her a ticket for no insurance, I don't have
5         a problem with that.
6    BY MS. GORDON:
7    Q.  Okay.  So, I'm not going to spend all of our time today
8         going through these one by one.
9    A.  Okay.
10   Q.  But I can tell you that the City refused to turn over
11        any of these complaints, but the court has now ordered
12        that they be turned over.  And so, as of today's date, I
13        have at least -- I believe it's 14 complaints --
14          MS. MARZOTTO TAYLOR:  Total of 20.
15   BY MS. GORDON:
16   Q.  -- 20 on Matthew Furman.
17   A.  Okay.
18   Q.  Okay.  Which is far more than any police officer in the
19        City of Melvindale, I think, has ever had with much
20        longer careers than Matthew Furman.
21           But you didn't know that; correct?
22   A.  No.  I don't have a copy of those.  I've never seen
23        those.
24           And I don't know about other police officers ever
25        getting more write-ups --

Page 273

1  Q.  Well, you can go back and look now if you want to.
2  A.  No, I --
3  Q.  But otherwise you'll have to take my word for it.
4       MR. MEIHN:  Deb, can we have a 2-minute, 3-minute
5  break?
6       (Discussion held off the record.)
7       (Short recess at 3:27 p.m.)
8                * * *
9       (Record resumed at 3:42 p.m.)
10  (Mr. Meihn is not present after the break.)
11       MS. GORDON:  Back on the record.
12       Wanted to say that on the break, Mr. Coogan
13  provided his cell phone to the court reporter, who
14  apparently was able to capture photos of the texts that
15  we had tried to read into the record as best we could
16  earlier with regard to you and Mr. Furman.
17  BY MS. GORDON:
18  Q.  Correct?
19  A.  Correct.  I gave him what I had.
20       (Discussion held off the record.)
21       MS. GORDON:  All right.  Just to correct the
22  record, Mr. Coogan had in his hand his cell phone, and
23  the court reporter was able, at Mr. Coogan's suggestion,
24  to take pictures of it to capture them for the record so
25  we would have them, but Mr. Coogan at all times had

Page 274

1  control of the cell phone.
2       All right.  Back at it.
3  A.  Let's do it.
4  BY MS. GORDON:
5  Q.  I'm going to hand you the amended complaint, Mr. Coogan.
6  I'm going to go to Count 4.  It's on page 16, Bates
7  stamp Hayse 24.
8  A.  Thank you.
9       On page 16, Count 4.
10  Q.  Yes.
11       "Willful misconduct in office by the
12       improper issuance of discipline upon Corporal
13       Matthew Furman."
14       And according to Ms. Barnes, as we've already
15  discussed, in particular -- she did point out this
16  count -- you wrote this.
17       So, I've got some questions for you.
18       Let's go to Number 26.
19  A.  Okay.
20  Q.  You say:
21       "On July 25th, the city attorney, in a
22       letter to Chief Hayse, requested the
23       following."
24       You say:
25       "Please provide my office with copies of

Page 275

1       all documents or writings regarding or
2       concerning the recently alleged misconduct,
3       disciplinary action and work suspension of
4       Police Officer Matthew Furman.
5       Furthermore, please identify all persons
6       in the governmental agencies who have performed
7       any investigation, fact-finding, interviews or
8       any other form of information gathering of
9       Officer Furman's alleged misconduct.  The names
10       and contact information of all persons who are
11       or were involved in the investigation of this
12       matter are also requested, including the
13       identification of the individual who initiated
14       any communication upon the matter and the
15       individual who received that communication."
16       Okay.  What is your point of including this?
17  What's the point being made here that you asked -- other
18  than the -- obviously that you asked for materials?
19       Is there any other point to that?
20  A.  Yeah.  I was basically trying to respond to the union
21  that was wanting to know why Furman was laid off and/or
22  not working.  And I wanted -- and members of the council
23  had asked me, "Why is he not working?  What's going on?"
24       And I said, "I don't know."
25       So, that's why I wrote it, because I did not know.

Page 276

1  Q.  When had he been suspended?  July 5th?
2  A.  I don't recall --
3  Q.  Take a look at your document.
4  A.  Yeah.
5  Q.  Look at Count 4.
6       Doesn't it say July 5th?
7  A.  July 5th.
8  Q.  Was he suspended with pay?
9  A.  He was suspended with pay at that time and then
10  subsequently suspended --
11       MR. THOMAS:  She didn't ask that question.
12  A.  Okay.
13  BY MS. GORDON:
14  Q.  Okay.  All right.  So --
15       MR. THOMAS:  We're going to tighten things up here.
16  BY MS. GORDON:
17  Q.  Here is your letter to the chief that you've just
18  quoted.  It was marked as Exhibit 5 at the Hayes dep.
19  It's Hayse 171.
20       That's your letter; is that correct?
21  A.  That is correct.
22  Q.  Okay.  And you've copied the mayor, the council, the
23  Commission of Public Safety and Ortiz; correct?
24  A.  That is correct.
25  Q.  Okay.  And then you received a response from the chief;

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                          Pages 277—280

Page 277

1    correct?  In response to your letter, he replied?  Did
2    he get --
3  A.  I eventually got a response from the chief.  That is
4    correct.
5        I wrote a second letter, I think, before I got a
6    response, though, or it was a partial response.  I
7    wasn't given information that I had requested.
8  Q.  Okay.  So, let's look at the documents here.
9        I'll hand you Bates 6025 and 6026.  Go to the
10   second page because it starts from the back.
11       On July 5th -- well, your letter was sent at 3:24.
12   Do you see that?  From your assistant.
13       It says on the very bottom of the second -- you're
14   not going to be able to tell from that.  Look at the
15   e-mail.  It was e-mailed to Chad.
16       Go to the second page, Mr. Coogan, and go to the
17   bottom?
18       Do you see that, Vicky, legal assistant, e-mailed
19   Chad Hayse at 3:24?
20  A.  I do.
21  Q.  And she attached your letter which we've just identified
22   a moment ago, requesting documents; correct?
23  A.  Correct.
24  Q.  Okay.  And then within an hour and a half, Chad
25   responded to you, and he wrote:

Page 278

1        "I'll be back in the office on Thursday
2        and will provide the information.  There are
3        two separate matters concerning Corporal
4        Furman, and I assume you want the requested
5        information for both."
6        Do you see that?
7  A.  Yes, I do.
8  Q.  Okay.  So, you responded, then -- go to the first page.
9    You seemed happy with that, and you say:
10       "Yes, thank you."
11       Do you see that on the bottom?
12       MR. THOMAS:  Right there.
13  A.  Yes.  Thank you.
14  BY MS. GORDON:
15  Q.  Okay.  So, you were content to have him give you the
16   stuff when he got back Thursday, the 28th; correct?
17  A.  It appears that way, yes.
18  Q.  Okay.  So, let's go to the next communication.
19       The next communication is from Chad to you, it's
20   10:30 in the morning on the 28th.  He's now returned.
21   And he says:
22       "I have the packet available.  Are you
23       available to meet this afternoon between
24       2:00 p.m. and 3:30?"
25       Do you remember that, Mr. Coogan?

Page 279

1  A.  I see that, yes.
2  Q.  So, that's a good response from him; correct?  He wanted
3    to meet with you and bring over the documents; right?
4  A.  That's what it says.
5  Q.  Okay.  And then you responded:
6        "Yes, I should.  Just give me a call."
7        Do you see that?
8  A.  Yes, I do.
9  Q.  And then the chief said:
10       "Okay.  Thanks."
11       Right?  Correct?
12  A.  It says:
13       "Okay.  Thanks."
14  Q.  All right.  And did you meet with the chief on Thursday
15   afternoon?
16  A.  I did not.
17  Q.  Why?
18       You were not -- you were no longer available?
19  A.  I don't recall what the facts and circumstances were,
20   but we did not meet.
21  Q.  He wanted to meet with you, and you never met with him;
22   is that correct?
23  A.  We did not meet.
24  Q.  But it's not because he wasn't available.  As I
25   understand, it's because you weren't available; is that

Page 280

1    correct?
2  A.  That could be correct.
3  Q.  Okay.
4  A.  I don't --
5  Q.  Okay.  Okay.  Then it wasn't until after he gave you
6    this stuff on July 28 -- he gave you the packet.
7        What was in the packet?  Do you remember?
8  A.  I don't -- I remember bits and pieces of it.
9  Q.  Do you still have it somewhere?
10  A.  I don't recall.  I don't think so.
11  Q.  So, you're not going to be able to produce in this case
12   what the chief sent you on the 28th, even though you're
13   accusing him in your papers that he did not have proper
14   documentation for discipline of Furman?
15       But you can't produce to me what he gave you?
16  A.  No, no.  That's -- okay.  He gave me stuff in an
17   envelope, and I wrote him another letter, and he said he
18   had supplied -- he had given me additional information
19   as to who the contact people were.  So, I got some
20   information on that.  I didn't get everything I asked
21   for.
22  Q.  Okay.  Again, you're being not responsive to the
23   question.
24  A.  No --
25  Q.  We're going to read it back.  Just listen to the

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 281–284

Page 281

1    question.
2          (Record repeated by the reporter.)
3    BY MS. GORDON:
4    Q.   You have no record of what the chief provided to you on
5         July 28th.  Do I have that right?
6    A.   I think we already gave it to you folks.
7    Q.   No.  We've received nothing that was the packet that was
8         given to you, Mr. Coogan.
9              So, where is it?
10   A.   I don't know.  I don't know.
11   Q.   You don't know?
12   A.   No, I don't know.  I thought you already had it.
13   Q.   You fired the man because --
14   A.   I didn't fire anybody.
15   Q.   The City fired the man because he allegedly didn't do
16        the right discipline procedure with Furman.
17             He sends you his stuff in a packet that shows you
18        what he did, but you don't have that?
19   A.   He never disciplined him.  He sent some information to
20        me.  There was no discipline that he took --
21   Q.   You've got to listen to my questions; okay?
22   A.   I'm trying to.  I really am.
23   Q.   Okay.  What does your letter say?
24             Let's go back to your letter.  Let's go back to
25        your letter of July 25th, sir.

Page 282

1         You just are wasting my time.
2              On July 25th, you wrote to the chief, saying:
3                  "Provide me with all copies of documents
4              concerning disciplinary action and work
5              suspension."
6              My client sends you a packet.  You don't have it.
7         And your answer to me at this deposition is, "Well, he
8         was never disciplined."
9              Do you follow what you just got done doing here?
10   A.   Absolutely.  Absolutely.
11   Q.   All right.  You were sent a packet with regard to
12        disciplinary action per your request.
13             You don't have it; is that correct?
14   A.   I didn't say that.  I thought it was already provided.
15   Q.   You don't have to tell me what you said.
16   A.   I thought it was already provided.
17   Q.   Your answer to the question --
18   A.   You're saying you don't have it, so I'll take another
19        look and see if we have it.
20   Q.   Wow.
21   A.   It was an envelope, and I think it was already supplied.
22   Q.   You'll take another look.
23             It wasn't supplied.  And if it was, you can go --
24        since you're the city attorney, you'll be easily able to
25        find the answer to the pleading where you say, "Please

Page 283

1         see attached Bates stamps blank through blank."
2              Okay.  You'll be able to find that.
3              In fact, in court, Ms. Balian said you had advised
4         her you didn't have it.
5    A.   I don't know what she advised you right now.
6    Q.   Are you representing the City in this --
7    A.   I don't know what she --
8    Q.   I thought you were representing the City, and now you're
9         really unclear about what has been produced that is your
10        material.
11             MR. THOMAS:  Objection.  Argumentative.
12   BY MS. GORDON:
13   Q.   And you fired the chief --
14   A.   I didn't fire anybody.
15             MR. THOMAS:  Objection.  Argumentative.
16   BY MS. GORDON:
17   Q.   All right.  I think the record has been made here, and I
18        think the -- your answers speak for themselves, and
19        you're going to say you're going to go back and look.
20             We've already gone to court on this, sir.  To
21        federal court, and if you have it somewhere, you best be
22        producing it.  And if you don't have it, I guess that
23        speaks volumes about what you knew.
24             But it's not a question, so I'll move on.
25             MR. THOMAS:  It's not a question.

Page 284

1    A.   Okay.
2    BY MS. GORDON:
3    Q.   Now, on August 1, after Chad gives you the materials on
4         the 28th, which you can't find, you write him and say:
5                  "Dear Chief Hayse,
6              On July 25th, I wrote a letter to you
7              requesting that you provide me all documents
8              or writings regarding or concerning the
9              alleged misconduct of Officer Furman.  In
10             addition, I requested the names and contact
11             information of all persons in governmental
12             agencies who have performed any investigation.
13             Upon receipt and review of what you
14             provided, there is no contact information,
15             nor did you indicate who made contact."
16             Do you remember that?
17   A.   I -- it's the second letter I wrote, yeah.
18   Q.   Right.
19             Those are the grand total of the two letters you
20        sent to the chief before he was fired; correct?
21   A.   I sent two letters to the chief.
22   Q.   And these are the two that we've just now identified
23        here right now?  The one was --
24   A.   There may have been additional letters on additional
25        subjects, but as it relates to this issue, I think those

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 285–288

Page 285

1    are the two.
2    Q.   Okay.  So, what you're saying on August 1 is, "Okay.  I
3         got your packet.  I got everything on the disciplines."
4    A.   I don't think I said that.
5    Q.   Okay.  Here it is.  You say all that's missing is the
6         contact info.
7              You don't say, "I didn't get the disciplinary
8         paperwork."
9              Correct?
10   A.   The letter speaks for itself.
11   Q.   Thank you.
12             And right away Chad Hayse responds to you.  Right
13        the same very day.  Bates stamp 5897 and 5898.
14   A.   Thank you.
15   Q.   (Reading.)
16                   "I'm sorry for the oversight.  I spoke
17             with Sunshine Ponzetti from MSP.  Her cell
18             number is blank.  She was accompanied by two
19             men from the FBI.  I do not have their
20             information.  The first incident was brought
21             to my attention by Lieutenant John Allen and
22             then by Mr. McClintock by a complaint against
23             an officer form.  I originally contacted the
24             second district captain from MSP.  Her name
25             is Monica Yesh --"

Page 286

1         and so on.
2              So, here is your contact info; correct?
3    A.   There was a contact person's info on here, yes.
4    Q.   So, he's now supplied you with what was missing, which
5         was the contact info; correct?  As of Monday, August 1st
6         at 4:05; right?
7    A.   He gave me a phone number, yes.
8    Q.   Okay.  So, as of Monday, August 1 at 4:05, you had
9         everything you had requested from Chief Hayse; correct?
10   A.   No.
11   Q.   What do you mean "no"?
12             Where is your follow-up e-mail saying, "I still
13        don't have material"?  Where is your letter?
14             You're actually in here saying "no," and you can't
15        even locate the packet?
16   A.   I'm saying "no," yes.
17   Q.   Okay.  Well, what didn't you have, Mr. Coogan?
18   A.   He never wrote Furman up.
19        MS. GORDON:  Okay.  Read -- okay.  This -- okay.
20   Back on the record.
21             I'm now wasting more of my 7 hours, okay, because
22        Mr. Coogan has now made an answer to my question that
23        makes no sense and is not an answer.
24   BY MS. GORDON:
25   Q.   What material did you ask Hayse for that he did not give

Page 287

1         you?
2              List the items.
3              Because there's nothing in writing where you tell
4         him, "You haven't produced things to me."
5              So, what in the world are you talking about?
6    A.   He never wrote Furman up for any violation.
7    Q.   Okay.  Did he give you everything you requested?
8    A.   No.
9    Q.   Okay.  What did he not give you?
10   A.   He never gave me a write-up.
11             If all this information is so important, why didn't
12        he write up the employee and tell him what he was
13        charged with?
14             There was never a write-up.
15        MR. THOMAS:  You've answered the question.
16   BY MS. GORDON:
17   Q.   Okay.  Are you talking about the suspension with pay or
18        without pay or both?
19   A.   Both.
20   Q.   And are you aware that Corporal Furman had a conference
21        and wrote a multiple-page letter response to the
22        allegations against him as given to him by Chief Hayse?
23   A.   I may have been.  I don't recall exactly what that is
24        right now, no.
25   Q.   Well, you never gave it to Nicole Barnes.  We'll cover

Page 288

1         that in a minute, though.
2              I'm going to hand you Bates stamp 6504.
3    A.   Thank you.
4    Q.   Before you look at that, Mr. Coogan, I've got another
5         question for you.
6              After Chief Hayse sent the packet of information on
7         Furman, did you give it to Nicole Barnes?
8    A.   No.
9              I don't recall ever giving it to Nicole Barnes.
10   Q.   Okay.  But it's her complaint, and the complaint is
11        that --
12        MR. THOMAS:  Are you looking for your copy to show
13   him?
14        MS. GORDON:  I am.
15             Thank you.
16   BY MS. GORDON:
17   Q.   And the complaint is that -- she wrote:
18                   "Corporal Furman was never provided with
19             any notice stating the cause, reason or basis
20             for the suspension of his duties -- being
21             either with pay or without."
22             Do you remember that?  That's what he was
23        disciplined for.  For -- excuse me.  That's what you
24        were -- that's one of the allegations against Hayse;
25        that Corporal Furman was never provided with any notice.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 289–292

Page 289

1    Do you recall that you wrote that?
2 **A.   If it's in the complaint I wrote it, yeah.**
3 Q.   Okay.  I'm going to read to you paragraph 29.
4 **A.   Thank you.**
5 Q.   And this is something that you did with Nicole Barnes.
6        "Corporal Furman was never provided with
7        any notice stating the cause, reason or basis
8        for the suspension from his duties as a
9        Melvindale police officer, either with pay or
10       without pay."
11       Okay.  So, that's what you're saying.
12       And now you asked the chief for all of the
13   documents, and I suppose you're looking to see if Furman
14   ever had notice?  Is that what you were looking for?
15       Don't look at the documents in front of you,
16   because --
17 **A.   Well, you handed me to look it --**
18 Q.   -- I need you to focus on my question.
19 **A.   Okay.  That's fine.**
20 Q.   You are alleging that Hayse should be fired because
21   Furman was never provided with any notice stating the
22   cause, reason or basis for the suspension from his
23   duties as a Melvindale police officer.
24       That's what it says.
25 **A.   Okay.**

Page 290

1 Q.   Your letter of July 25th asked Hayse for all of the
2   material he had with regard to the Furman discipline or
3   misconduct; right?
4 **A.   It certainly did.**
5 Q.   And you got a packet of information from him?
6 **A.   I got some information from him.  Correct.**
7 Q.   And you don't know where it is today?
8 **A.   I thought it was --**
9        MR. THOMAS:  Objection.  Repetitive questioning.
10 **A.   Yeah, I thought it --**
11       MR. THOMAS:  Asked and answered.
12 BY MS. GORDON:
13 Q.   All right.  Fair enough.
14       But whatever you did get, you never shared it with
15   Ms. Barnes?
16       That's what you just testified to.
17 **A.   No.  You asked if I gave her a copy, and I said no.**
18 Q.   Did you share your packet with Ms. Barnes?
19 **A.   I don't recall.**
20 Q.   Okay.
21 **A.   I don't recall.**
22 Q.   Did you attach it to the -- I know you didn't, but I'm
23   going to ask you.
24       You never attached -- the packet you got from Chad
25   Hayse outlining the discipline against Furman, you never

Page 291

1   attached it to your table of attachments with regard to
2   the amended complaint to take away Chief Hayse's job?
3   You never attached what you received from Hayse, did
4   you?
5 **A.   Not to the complaint.**
6 Q.   Thank you.
7 **A.   He was never disciplined.  The chief never wrote Furman**
8 **   up.**
9 Q.   Hang on.
10 **A.   That's all I'm trying to tell you.**
11 Q.   Well, you're wrong.
12 **A.   He's never wrote him up.**
13 Q.   You're lying, and we're going to get to that in a
14   minute.
15       MR. GILLIAM:  Whoa, whoa.
16       MR. THOMAS:  Objection.  Objection.
17       MR. GILLIAM:  Object.
18       MR. THOMAS:  Objection.
19 BY MR. THOMAS:
20 Q.   Okay.  You're perjuring yourself.  I'll change it.
21       MS. GORDON:  I'll use his word.  I'll use his word.
22       MR. THOMAS:  It's not a question of --
23       MS. GORDON:  What is it then?
24       MR. THOMAS:  I'm going to raise an objection --
25       MS. GORDON:  Phil, he's not telling the truth.

Page 292

1        MR. THOMAS:  You're being -- well, you want to know
2   something, Deb?  That's something for a jury or a judge
3   to decide, not me, but you're being very argumentative
4   with him.
5        MS. GORDON:  No.  We'll see documents in a minute.
6        MR. THOMAS:  Okay.
7 BY MS. GORDON:
8 Q.   All right.  You never attached the materials that you
9   received from Chad Hayse about Furman to your table of
10   attachments that went with the amended complaint to get
11   the chief fired?  You never handed out to the council
12   everything that had been put in writing against Furman;
13   correct?
14 **A.   I did not attach what the chief gave me.  That's**
15 **   correct.**
16 Q.   And did you ask Furman, "Hey, give me all the documents
17   you have received from the chief with regard to
18   misconduct.  I need to look at them"?
19 **A.   No.**
20 Q.   Okay.
21 **A.   What needs to be said here --**
22 Q.   No, sir.  There's not a question on the table.
23       MR. THOMAS:  There's no question on the table,
24   yeah.
25 BY MS. GORDON:

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 293–296

Page 293

1  Q.  So, I guess you weren't aware that after being told that
2      the charges against him, Furman asserted his Fifth
3      Amendment rights with regard to the July 5th suspension?
4      You didn't know that, or you've just forgotten?
5  A.  I don't recall seeing that.
6  Q.  Okay. Well, it was sent to you in the packet.
7          Furman knew what he was accused of, talked to the
8      union, and he asserted his Fifth Amendment rights.
9          You didn't know that?
10 A.  I don't recall seeing that.
11 Q.  Okay. Well, I'll hand you Bates stamp --
12          MS. ARNOTTO TAYLOR:  He already has it.
13 BY MS. GORDON:
14 Q.  -- 6504.
15 A.  Is this it?
16 Q.  Which is -- do you know where I got that from?  Guess
17     where I got that, Mr. Coogan.  I got that from the City
18     of Melvindale.
19          So, you read that.
20 A.  I don't see anything that indicates where he's charged
21     with something.  He's invoking his Fifth --
22 Q.  Do you see there's --
23 A.  -- and Fourteenth Amendment, but I don't see charges
24     that are pending here.
25 Q.  You know, I didn't ask you that.

Page 294

1  A.  It's a Garrity form.
2  Q.  I didn't ask you that.
3          Do you see that there's a case number?
4  A.  It's a Garrity form.
5  Q.  Do you see there's a case number?
6          Do you see it written in hand?
7          Why don't you read the number into the record?
8  A.  I see something --
9  Q.  Read the number into the record, please.
10 A.  Okay. I see something with a "2016-01932."
11 Q.  Okay.
12 A.  I don't know what that represents.
13 Q.  Okay. Well, you did because you got a packet that
14     you've chosen not to recall it and you chose to hide --
15 A.  This is not saying what he's charged with.
16 Q.  And you chose --
17          MR. THOMAS:  Objection. Argumentative.
18          THE REPORTER:  I'm sorry --
19 BY MS. GORDON:
20 Q.  And you chose to hide it --
21 A.  This is a Garrity form.
22          MR. THOMAS:  Excuse me.  Objection.  Argumentative,
23     Ms. Gordon.
24 BY MS. GORDON:
25 Q.  Okay. Well, a police officer does not have to assert

Page 295

1      his rights under Garrity, does he?  That's a choice;
2      right?  Once he knows what the charges are; correct?
3  A.  A police officer can assert a Garrity.  This doesn't say
4      what he's charged with.
5  Q.  So, do you think Furman asserted his Garrity rights
6      without knowing what he was accused of?
7  A.  I don't know.  I didn't see what he was charged with.
8          There's no write-up.  The chief never wrote him up.
9  Q.  Wow.
10          MR. THOMAS:  Just -- you've answered the question.
11 BY MS. GORDON:
12 Q.  I'm going to hand you Bates stamp 940 through 943, dated
13     7-5-16.
14 A.  Thank you.
15 Q.  Have you ever seen that before?
16          That was in your packet.
17          Have you ever seen it?  Do you see the subject
18     number on the document, sir?
19          Do you see the subject number on the document?
20 A.  Yes, I do.
21 Q.  Okay. You've seen that document before, haven't you,
22     that I just gave you?
23 A.  I don't recall.  I'm reading it right now.
24 Q.  Okay. Well, I got it from the City.
25          No, I take it back.  This is from Chief Hayse.

Page 296

1          (Discussion held off the record.)
2          MS. GORDON:  It's a City document.
3  A.  Well, it's from the police chief.  I don't know if it's
4      a City document or not.
5  BY MS. GORDON:
6  Q.  Okay. You see here that Matthew Furman has written a --
7      one, two, three -- three-page response to the charges
8      against him?
9          Do you see there's three pages there?
10          MR. GILLIAM:  I'm going to just object to
11     foundation.
12 A.  There's actually four pages, what you provided me.
13 BY MS. GORDON:
14 Q.  Okay.
15 A.  Well, three pages and the top of the other one.
16 Q.  Okay. So, let's read the top.  It's to Chief Hayse from
17     Corporal Furman, 7-5-16, "subject:  2016-01932."
18          "It has come to my attention that Richard
19          Crosslin has filed a complaint against me in
20          regards to excessive force during the incident
21          occurring on 7-4-2016."
22          Let's stop right there.
23          So, we now know that, as of July 5th, Corporal
24     Furman had been made aware that a complaint was filed
25     against him for use of excessive force, and that the

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                          Pages 297—300

Page 297

1    incident -- are you listening to me?
2  A. Yes, I'm listening.
3  Q. -- and that the incident occurred on 7-4-16.
4       Do you see that?  That Furman knows that, and he
5    knows the date and he knows the charge.
6       Do you see that?
7  A. I see a letter to Chief Hayse, allegedly from Furman,
8    which is dated 7-5-16, and it has the same
9    correspondence number that you indicated.
10       It's not signed, and I don't know if he sent this
11    or not.  I don't know -- I don't recall ever seeing
12    this.
13  Q. Well, I didn't ask you any of that.
14  A. Okay.  Go ahead.
15  Q. I said, do you see that Furman was aware that
16    Crosslin -- there had been a complaint filed against
17    him, that the complaint was for excessive force and that
18    the incident occurred on 7-4-16?
19       Do you see that?
20  A. I see what you're representing is a letter dated that
21    date, yes, I do.
22  Q. Okay.  Very good.
23       Now, do you see that Furman goes into great detail
24    in the next three pages?
25  A. I have not read that.

Page 298

1  Q. All right.  Well, let's go -- and by the way, I can tell
2    you that Furman has already testified that this is his
3    response to what he was told was his wrongdoing.
4       Go to the third page, please.  And he gets very
5    specific.
6       Go to page 942.
7       MR. THOMAS:  I think she's saying the third page of
8    the document.
9       MS. GORDON:  Yeah.
10  A. Okay.
11  BY MS. GORDON:
12  Q. Where he says:
13       "At no point did I strike, punch, kick,
14       choke, TASER, pepper spray or shoot Crosslin.
15       at no point did I use any excessive or
16       unnecessary force."
17       Do you see that?
18  A. Yes, I do.
19  Q. Okay.  Now, I'm going to go to an e-mail sent to the
20    mayor.  I'm going to hand you Bates stamp 5839 and 5840.
21  A. Should we start from the second page and go forward?
22       MR. THOMAS:  Wait for the question.  She just
23    handed you the document.
24  BY MS. GORDON:
25  Q. No.  In this one, we're going to start on the first

Page 299

1    page.
2  A. Okay.
3  Q. At the top, where the police chief is writing to you,
4    sir, and to Stacy Striz, and he's telling you-all the
5    following at 11:15 a.m.:
6       "I met with a detective from the Michigan
7       State Police on Friday to discuss an allegation
8       of excessive force about Corporal Furman.
9       Today, I received another allegation of
10       excessive force about Corporal Furman.  Furman
11       has been suspended effective today, pending the
12       outcome of both investigations.
13       MSP will be contacted again today and
14       given an update.  He may face criminal charges
15       and potentially termination from his employment.
16       Obviously discussions with corp counsel and others
17       would have to precede that decision."
18       Do you see that?
19  A. I see that.
20  Q. Did you respond to this?
21  A. I don't recall.
22  Q. So, as of July 5th, you knew all the particulars, and
23    you knew that you were going to be in a discussion with
24    Chad Hayse to determine what should happen next.
25       You see that?

Page 300

1  A. I see the letter.
2  Q. Okay.  And then Stacy Striz responds with a few
3    questions, and you're cc'd.
4       "What are the allegations?  What is
5       protocol?  Would Public Safety conduct an
6       investigation?  Is he suspended with or
7       without pay?"
8       Do you see that?
9  A. I certainly do.
10  Q. And then the chief responds on the bottom, doesn't he,
11    at 2:13?
12       And he lays out the process.
13       And it says:
14       "He is suspended with pay to avoid
15       immediate grievance."
16       Do you see that?
17       MR. THOMAS:  (Indicating.)
18  A. (Reading.)
19       "He is suspended with pay to avoid
20       immediate grievance."
21  BY MS. GORDON:
22  Q. Uh-huh.
23       And then you received this from Stacy Striz on the
24    last page she's sending it to you; correct?
25  A. At 3:30, it looks like, yes.

Page 301

1   Q.   Right.
2        Now, on July 5th, you don't jump on this and say,
3   "Well, wait a minute.  Where's the write-up?"
4        You don't write anybody that once you get this
5   e-mail string, do you?
6   A.   I'm sorry.  What was the question?
7   Q.   On July 5th, when you received this e-mail string, being
8   very specific about what the chief is doing, that he's
9   going to sit down with corp counsel, that here is the
10  charges against Furman, here is what he's doing -- he's
11  suspending him without pay -- you don't contact the
12  chief or anybody from the City and say, "Well, wait a
13  minute.  You haven't filled out a form."
14       You don't say that, do you?
15  A.   No.  What it was, was an allegation pursuant to the
16  chief's letter.  It said, "I received an allegation."  I
17  did not --
18  Q.   Mr. Coogan, I asked you a question.
19       I asked you whether -- this says the man is being
20  suspended.
21       You don't then write to anybody and say, "Well,
22  wait a minute.  Where's the form?"
23       You don't do that; correct?
24  A.   I did not respond to that.
25  Q.   Thank you.

Page 302

1   A.   It was an allegation at that time.
2   Q.   Well, there was discipline --
3   A.   He wasn't written up yet.
4   Q.   Okay.  He was suspended, sir.
5   A.   For an allegation of excessive force.  I see that.  I
6   read that.
7   Q.   Okay.  What is a write-up?
8   A.   A write-up is when you tell somebody what they're
9   charged with.  You give them notice.  They come in with
10  the union rep, and they're given an opportunity to
11  respond.
12  Q.   Okay.  Well, go back to the Hayse/Furman letter, where
13  you can see that Furman was already told what he was
14  charged with because he had responded on the 5th.
15       MR. GILLIAM:  Object to foundation.
16  BY MS. GORDON:
17  Q.   Do you see that?
18       We already have covered this, Mr. Coogan, and we
19  already know that Furman was notified of what he did
20  wrong and he wrote a three-page single-spaced letter in
21  response.
22       He's responding to a charge.  And, in fact, he
23  asserted his Fifth Amendment rights.
24       So, Furman was well aware that there was a charge
25  against him and he was being suspended.

Page 303

1        Agreed?
2        MR. GILLIAM:  Same objection.
3   A.   Yeah, I didn't see this, so I don't know whether or not
4   he was aware at the time.
5   BY MS. GORDON:
6   Q.   Well, now you're seeing it.
7        Now that you've --
8   A.   If he wrote it.
9   Q.   Now that you've worked with somebody to ruin somebody's
10  career, you're now seeing it.  Good.  That's great.
11       MR. THOMAS:  Objection to the form of the question,
12  and it's badgering and it's harassing.
13  BY MS. GORDON:
14  Q.   Let me hand you Bates stamp 6507.
15       MR. GILLIAM:  Let the record reflect she's tossing
16  these documents --
17       MS. GORDON:  No, I am not.  I am handing it across
18  the table.
19       MR. GILLIAM:  I don't think that was a hand.  I
20  mean, look, I get that it's getting tense, but let's
21  keep it respectful.
22       MS. GORDON:  It's -- okay.  It's respectful.
23       MR. GILLIAM:  I don't think it was.
24       MS. GORDON:  Tell you what.  You walk over here and
25  stand behind me, and I'll hand you the paper, and you

Page 304

1   can walk around to Larry.  Otherwise, I'm going to slide
2   it across the table.
3        MR. GILLIAM:  I'm just noting it for the record.
4   You've placed some.  That one was tossed.  You tossed
5   one before.  Let's just -- we're asking --
6        MS. GORDON:  Okay.  You're wrong, and I'm not
7   agreeing with you.
8        MR. GILLIAM:  Okay.  That's not --
9   BY MS. GORDON:
10  Q.   Okay.  Do you see that here we have the union and
11  Corporal Furman signing, on 7-5-16, a document that says
12  he asserted his right to remain silent after --
13  A.   It's a Garrity form.  This is a Garrity form.
14  Q.   You know what?  You don't have to tell me what it is.
15  Your job is to listen to the questions.
16       Do you see that he was with his union rep on July
17  5th and signed off on a document?
18  A.   I don't see that he was with his union rep.
19  Q.   Well, look at the bottom --
20  A.   But I see that was signed by --
21  Q.   Look --
22  A.   If I could answer?
23  Q.   Look at the bottom.
24       Who signed this?
25  A.   It was signed by Matthew Furman.

Page 305

1  Q.  And who else?
2  A.  Matthew Furman is the only signature on it.
3        There's printing of Kennaley on it.
4  Q.  That's Kennaley's signature, sir.
5        Who is Kennaley?
6        Is he in the union?
7  A.  He's an officer.
8  Q.  He's the union president.
9        You're not aware of that?
10 A.  He was at the time, I think.
11 Q.  Okay.  Good.  Now we've established that.
12 A.  I think he was.
13 Q.  Okay.  Good.  So, now --
14 A.  I don't know if he was president, but he was certainly
15      an officer.
16 Q.  Okay.  So, now we see -- we have a document that both
17      Furman and his union president signed off on, on the
18      5th, after you say he was not given notice.  We also see
19      that we have a letter from Furman.  We've already
20      covered that.
21        Nicole Barnes has testified she was never given any
22      of this by you.
23        MR. GILLIAM:  Object to the form.
24 BY MS. GORDON:
25 Q.  Okay.  Now, let's go to the suspension with pay,

Page 306

1      Mr. Coogan.
2        Now we have another form filled out, documented,
3      that Furman has been advised and his union rep is with
4      him.  And once again, he's saying:
5            I assert my right to remain silent, but
6        I was ordered to submit information which
7        includes a report, statement or answers to
8        questions.  And in view of possible job
9        forfeiture, I'm going to answer his questions.
10       okay?
11       So, here it is.
12       -516, 7-20.
13       You see, once again, Matthew Furman and his union
14     rep signed this; correct?
15 A.  Well, they're two printed names.  It doesn't look like
16     anybody signed them.  But one is printed "M. Furman."
17     The other one is looks like "B. Nolin."
18 Q.  Wow.  You're really in deep on this.  You're --
19       MR. GILLIAM:  Objection.
20 A.  I'm just telling you what it -- I don't know if it's
21     signed or not.  It looks printed.
22 BY MS. GORDON:
23 Q.  Okay.  You have no -- okay.  That's not for you to say.
24       You see what potentially looks likes signatures on
25     the page?  Do you see that?

Page 307

1  A.  Yes, I do.  I told you.  I just read it into the record.
2  Q.  Okay.  Good.  Good.
3        But you want to sit here and waste my time --
4  A.  One says "M. Furman" and one says --
5  Q.  -- and argue --
6  A.  -- "B. Nolin."
7        THE REPORTER:  I'm sorry.  One at a time.
8  BY MS. GORDON:
9  Q.  But you want to argue with me, hoping against hope
10     somehow, Mr. Coogan, that these aren't really
11     signatures, I guess.  But you know what?  Furman has
12     already identified this.
13 A.  This is a Garrity form again.
14 Q.  I didn't ask you what it was, and I realize you
15     gratuitously want to tell me that.  But it's very clear
16     that there's a case number on here, and that, here,
17     Furman is being ordered to answer questions about an
18     incident that has a number, and then he does answer.
19       And you got this in your packet, sir, but you've
20     managed to lose it, and you never gave it to Nicole
21     Barnes.  Maybe you were trying to help your friend Mike
22     Goch and get the chief fired.
23       MR. THOMAS:  Objection.
24       MR. GILLIAM:  Yeah.
25       MR. THOMAS:  Form of the question.

Page 308

1        MS. GORDON:  Well, I'll change it.
2        MR. THOMAS:  Compound question.
3  A.  Do you know what --
4  BY MS. GORDON:
5  Q.  Were you trying to --
6  A.  I need to have counsel act -- no, I need to say
7      something.
8        You need to act in a professional manner.  Ask me
9      questions, and I'll answer.
10 Q.  Okay.  I'm going to ask --
11 A.  Okay?  So, answer(sic) questions --
12 Q.  I'm going to ask you questions.
13 A.  Don't give editorial comments.  Thank you.
14 Q.  Here is my question.
15       Did you intentionally withhold all of these
16     documents from Nicole Barnes and the entire city council
17     because you were so anxious to make Mike Goch happy and
18     to fire the chief?  Is that what you did?
19 A.  Absolutely not.
20 Q.  Well, then why did Nicole Barnes testify under oath that
21     she knew about none of these documents showing that
22     Furman was on notice and had a chance to respond?
23       Why did she know about none of that when she's the
24     one that signed the amended complaint?  Why?
25       MR. GILLIAM:  Object to foundation.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 309

1  A.   I can't say whether she knew about it or not.  I wasn't
2       here --
3  BY MS. GORDON:
4  Q.   She testified under oath.
5  A.   I don't know why -- what she did.  I don't know.
6            All I can tell you is that Mr. Furman was never --
7  Q.   Don't tell me anything.
8  A.   -- written up by the chief.
9            If all this is true, why didn't the chief write him
10      up?
11 Q.   Okay.  There's nothing in the union contract that --
12      we've already covered this -- requires -- I know you're
13      hanging onto this desperately.
14           There's nothing in the union contract that requires
15      anything other than a conference.  You've already agreed
16      with me on that.  I handed you the contract and you
17      could find nothing.
18       MS. GORDON:  Where is Nicole Barnes' dep?
19       (Discussion held off the record.)
20       MS. GORDON:  There it is.  Thank you very much.
21 BY MS. GORDON:
22 Q.   Okay.  Here is what she says.  Because I'm asking her
23      about all this, and I'm handing her page by page.
24       MR. GILLIAM:  What page are you on?
25       MS. GORDON:  Of Nicole's dep?

Page 310

1        MR. GILLIAM:  Yes.
2        MS. GORDON:  213, 214.
3        MR. GILLIAM:  Thank you.
4  BY MS. GORDON:
5  Q.   Okay.  She says -- she's talking about Chief --
6       then-Lieutenant Allen.
7            "He told it to myself and Larry Coogan,
8       and there was no one else there."
9       Okay.  Now I'm going down to 214.
10           "And Larry was requesting like information
11      regarding the write-up.  Larry had requested
12      that he get the information regarding the
13      write-up, and he had requested it from Chief
14      Hayse, and he was never provided with the
15      information.  And -- and he said he reviewed
16      Furman's --"
17      I'm sorry.  Now I'm talking about Allen.
18      Okay.  Then I asked her:
19           "Question:  Well, where was the information
20      kept?"
21      And she said:
22           "Answer:  I don't know where the
23      information was kept.  I don't know if it was
24      kept in the disciplinary file."
25      Now I'm going to page 218.

Page 311

1        So, I say:
2            "Question:  So, with regard to Count 4,
3       'Willful misconduct in office by improper issuance
4       of discipline,' who wrote that language?
5            "Answer:  That would have been Coogan.
6       "He wrote the wording."
7       Okay.
8            "Question: --"
9       271.
10       MR. THOMAS:  Excuse me.  Are we supposed to follow?
11       MS. GORDON:  No.
12       MR. THOMAS:  Is there a question on the table?
13       MS. GORDON:  I'm sorry.  I'm sorry.  Here's the
14      point I'm making.  Page 271.
15       Good point, Phil.
16 BY MS. GORDON:
17 Q.   (Reading.)
18           "Question:  Have you ever asked
19      Mr. Coogan -- we've been back and forth in
20      federal court about getting documents -- why
21      he didn't provide you with all the documents?
22           "Answer:  I have not, but I definitely will
23      talk to him after today."
24           Why would Ms. Barnes not have known about all these
25      documents that I'm now handing you?

Page 312

1  A.   I don't know.
2  Q.   Okay.  Okay.
3  A.   I don't know why she would or would not know.
4  Q.   Okay.  You had to have done that intentionally,
5       Mr. Coogan; correct?
6        MR. GILLIAM:  Objection.
7        MR. THOMAS:  Objection.  That's argument.
8        MR. GILLIAM:  Asked and answered.  That's
9       argumentative.
10       MS. GORDON:  I'm asking --
11       MR. THOMAS:  No, you didn't -- it wasn't -- you
12      didn't ask it, Ms. Gordon.  You made a statement.
13 BY MS. GORDON:
14 Q.   That was intentional on your part to not give Barnes the
15      stuff, wasn't it?
16       MR. GILLIAM:  Asked and answered.
17 A.   No.
18 BY MS. GORDON:
19 Q.   Was it a mistake or inadvertent?
20 A.   No.  There was never a write-up in the file, and he
21      filed a grievance --
22 Q.   Why didn't --
23 A.   Furman filed a grievance.  It was brought before the
24      Safety Commission.  There wasn't even a write-up in the
25      file, and he was reinstated because he was never written

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                    Pages 313–316

Page 313

1      up for any of this alleged conduct.
2  Q.   Okay.  But --
3  A.   Sorry.
4  Q.   All right.  You are hung up on the term "write-up."
5       Don't talk yet.
6       There's nothing in the contract that requires a
7  write-up, nor did you ever take the position, while you
8  were being cc'd on all of this correspondence, that
9  there was no write-up.
10      And when Chad Hayse sent you this packet of
11 information on July 28, you never wrote back to him and
12 said, "Where's the write-up?"
13      MR. GILLIAM:  Objection as to form.
14 BY MS. GORDON:
15 Q.   You never said a word to him about the write-up.
16      (Discussion held off the record.)
17 BY MS. GORDON:
18 Q.   The amended complaint was August 17th.  By that time,
19 you had asked Chad Hayse for all of his materials.
20      If you were worried about a write-up, in spite of
21 the fact that there were multiple forms filled out, and
22 in spite of the fact that there was lengthy responses
23 from Furman, why didn't you send the chief an e-mail and
24 say, "I don't see a write-up in here"?
25      MR. GILLIAM:  Objection as to form.

Page 314

1  BY MS. GORDON:
2  Q.   Why didn't you do that, Mr. Coogan?
3       MR. GILLIAM:  Form.
4  BY MS. GORDON:
5  Q.   Because you were trying to set him up?
6  A.   Absolutely not.
7  Q.   Well, did you just forget to write him and say, "I don't
8  see a write-up, and I think a write-up is required.
9  Maybe you didn't know --"
10 A.   The union had contacted me --
11 Q.   I'm still talking.
12 A.   Yeah.  Well, I'm trying to answer your question.
13 Q.   No, you're not.
14 A.   Oh, okay.
15 Q.   You're thinking about what to do here.
16      MR. THOMAS:  Objection.  Argumentative.
17      MS. GORDON:  He's not listening.
18      MR. THOMAS:  Objection.  Argumentative.
19      MS. GORDON:  Okay --
20      MR. THOMAS:  Wait.  Let her finish the question.
21 If I have an objection or Rich has an objection, we'll
22 raise it after that.
23      You can answer.
24 A.   Okay.
25 BY MS. GORDON:

Page 315

1  Q.   You don't dispute or deny, sitting here today, that
2  Furman was well aware of the two complaints against him,
3  do you?
4       Because I have multiple-page responses for him.
5       You don't deny that he knew what the charges were,
6  do you?
7  A.   I don't believe he did.
8  Q.   What do you think his responses are about --
9  A.   The union --
10 Q.   Hang on.  You didn't let me --
11 A.   -- had contacted me --
12 Q.   I'm not --
13      THE REPORTER:  Excuse me.
14 A.   I'm going to respond to your question.  Let me finish.
15      The union contacted me and asked him -- "Why he was
16 suspended?  What was he written up for?"
17      I told the union, "I haven't seen a write-up."
18 BY MS. GORDON:
19 Q.   What date --
20 A.   "I see some allegations, is what I see."
21 Q.   Okay.  This is not an answer to my question.
22 A.   It is an answer to your question.
23      I see allegations.
24 Q.   Okay.  There's nothing in the contract that requires a
25 write-up.  I'm not going to keep arguing with you about

Page 316

1  this.  At some point I'm going to ask the judge to issue
2  an order on this.
3       In the meantime, I'm sick of hearing you say
4  "There's not a write-up."
5       My question is different.
6       Matthew Furman responded in detail to allegations
7  against him.
8       You've seen that; right?
9  A.   You showed us some documents today, yes.
10 Q.   Okay.  And you've seen that he asserted his Fifth
11 Amendment rights?
12      MR. GILLIAM:  Asked and answered.
13 A.   I see that he asserted his Garrity privilege, yes.
14 BY MS. GORDON:
15 Q.   Now I'm going to hand you Bates stamp 6517 through
16 65- -- oh, by the way.
17      Who called you from the union?
18 A.   I already said that.  I'll tell you again.
19      It was Mr. Funke, Tom Funke.
20 Q.   What date?
21 A.   He called me several times during this --
22 Q.   What dates?
23 A.   -- procedure.
24 Q.   What dates?
25 A.   It would have been right after Mr. Furman was suspended

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 317–320

Page 317

1       with pay and then subsequent to -- and then subsequent
2       to Mr. Furman being suspended without pay.
3    Q. Okay.  So, did you immediately contact the chief and
4       say, "Hey, the union guy was just in here --"
5    A. I wrote a letter to the chief.
6    Q. Do you know what?  You can't keep interrupting me.
7          Did you ever tell the chief, "The union guy was in
8       here and wants to know what the allegations are"?
9    A. Yes.
10   Q. Okay.  Where is that?
11   A. Phone conversation with the chief.
12   Q. Okay.  What date?
13   A. As soon as the union contacted me.
14   Q. What date?
15   A. I can't give you the exact date, but I would guess it's
16      after the 5th of July and prior to --
17   Q. Okay.  What did you say?  What did you say?
18   A. "The union is calling me, wanting to know why Mr. Furman
19      is suspended."
20         (Discussion held off the record.)
21   BY MS. GORDON:
22   Q. Okay.  What did he say?
23   A. I said I didn't know.
24   Q. What did he say?
25   A. He told me there was an internal and external

Page 318

1       investigation.
2    Q. Okay.  That's proper, isn't it?
3    A. I -- I don't know if that's proper or not.  So --
4    Q. Well, go to the union --
5    A. -- then I asked --
6    Q. Go to the Collective Bargaining Agreement, and you'll
7       see an investigation is required before you bring
8       charges.
9          Do you still have the Collective Bargaining
10      Agreement there?
11   A. I never had it.  You had a copy of it.
12   Q. Well, I handed it to you.
13         Are you aware that the Collective Bargaining
14      Agreement requires an investigation?
15   A. Yes.
16   Q. Are you aware that part of the investigation is to ask
17      the officer who is allegedly engaged in misconduct to
18      respond?  Are you aware that that's part of the --
19   A. I --
20   Q. Hang on.
21         Are you aware that that's part of the
22      investigation?
23         Are you aware of that?
24   A. Can I talk now or --
25   Q. Yeah.

Page 319

1    A. Yes.
2    Q. Okay.  And are you aware that Furman participated in the
3       investigation and responded to the alleged misconduct?
4    A. I'm aware of what you provided me today.
5          (Discussion held off the record.)
6    BY MS. GORDON:
7    Q. Okay.  Okay.  Bates stamp -- back to 6517 through 6519.
8    A. Thank you.
9    Q. You've seen that before.  It was in the packet sent to
10      you by Chad Hayse.
11         This is a response from Corporal Furman with regard
12      to a -- now a second matter in the same month, this time
13      involving Robert Michael McClintock.
14         Do you see this?
15         He says:
16            "I've been ordered to write an account of
17         the incident from the time I first saw McClintock
18         until he was brought to MEPD.  I have been
19         advised by my union representative, Detective
20         Nolin that, per Lieutenant Allen, I can be
21         terminated if I do not provide a written
22         statement."
23         Do you see that?
24   A. I see that.
25   Q. All right.  Now we go through here and he, in great

Page 320

1       detail, says what happened with Mr. McClintock.
2          Do you understand that this is his statement?
3    A. Well, it says "From:  Corporal Furman" on the top.
4    Q. Okay.  This is the same Mr. McClintock that has now sued
5       the City; is that correct?
6    A. That would be correct, I believe.  To the best of my
7       knowledge, that would be correct.
8    Q. And this is the same Mr. McClintock for whom Chief Allen
9       pulled discipline -- any discipline at all?  Furman has
10      received no discipline for all of this; correct?
11         Do I have that right?
12   A. That is correct.
13   Q. Okay.
14   A. He was never written up.
15   Q. In fact -- show me where he has to be written up by law
16      before he can be disciplined.
17         Where does that exist?
18   A. There was a write-up form in Mr. Furman's file that the
19      City operates under.  It was never filled out, and there
20      was -- the grievance was -- he was reinstated.
21   Q. Does that trump the Collective Bargaining Agreement?
22   A. The discipline procedure of the City, I believe, does.
23         The discipline procedure of the City is what is
24      followed in all discipline forms.
25   Q. Okay.  You know darn well the discipline procedure has

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Page 321

1    zero legal impact.  That's not a mandatory document by
2    law.  That's a document that the City may throw out the
3    next day.
4         You know that, don't you, Mr. Coogan?
5         That's not a legal document.  That's a City
6    document --
7    A.   I believe it was an executive order --
8    Q.   It doesn't matter.  It --
9    A.   -- of the City.
10        Well, that's your opinion, not mine.
11   Q.   Well, excuse me.
12        Executive orders can be withdrawn at any time,
13   can't they?
14   A.   It was in effect at the time.
15   Q.   Okay.
16   A.   It's still in effect now.
17   Q.   But the union contract is in force and effect until it
18   expires whether the City wants it to be or not; correct?
19   A.   Contracts expire upon the expiration date.  That's
20   correct.
21   Q.   So, then, the executive order is in contrast to the
22   Collective Bargaining Agreement.  Is that what you are
23   telling me here?
24   A.   No.  I didn't tell you that.
25   Q.   Well, the Collective Bargaining Agreement does not

Page 322

1    require anything in writing.
2    A.   The executive order is how you discipline employees,
3    written from the mayor to department heads on how to
4    properly discipline employees.
5    Q.   Okay.  So, why didn't you just tell the chief, "Hey,
6    you've got to put this in writing.  I see what you're
7    doing here.  I see Furman has done some weird stuff --"
8    A.   Well --
9    Q.   You've got to stop and let me finish.
10        "I see you -- I see you want to try to get Furman
11   under control, Chief.  You know what?  Just fill out the
12   form, and we're all good"?  Why didn't you do that?
13        MR. GILLIAM:  Object to the form.
14   A.   Well -- okay.
15   BY MS. GORDON:
16   Q.   Because you wanted to get him.  That's why?
17        MR. GILLIAM:  Objection.
18        MR. THOMAS:  Objection to that statement.
19        MR. GILLIAM:  Objection.
20        MR. THOMAS:  You didn't even allow --
21        MS. GORDON:  I'll withdraw the question.
22        He has no answers for any of this.
23   A.   I have an answer to that question, and I'm going to tell
24   you the answer --
25   BY MS. GORDON:

Page 323

1    Q.   No.  I'm not listening.
2         MR. THOMAS:  I'll object to that as being
3    argumentative and badgering.
4    BY MS. GORDON:
5    Q.   I'm going to hand you Bates stamp 65- --
6    A.   You don't want my answer to that question?
7    Q.   I don't really want anything from you, Mr. Coogan.  I'm
8    forced to --
9    A.   Then why am I here today?
10   Q.   Because I'm forced to try -- to attempt to get the truth
11   from you --
12   A.   It's always --
13   Q.   -- which is not going to be possible.
14        MR. THOMAS:  Objection to that statement.
15        MS. GORDON:  I'm sorry.
16        MR. THOMAS:  That's harassment, and it's
17   argumentative, Ms. Gordon.
18        MS. GORDON:  Oh, is it?  Okay.  Look, Phil, I take
19   your point.  You -- I have to sit here, day after day,
20   and listen to people from the City of Melvindale come in
21   here and full-on lie, and it gets tiresome --
22        MR. THOMAS:  I don't know if that's --
23        MS. GORDON:  I know, but it gets really tiresome.
24        MR. THOMAS:  -- true or not, Ms. Gordon, but --
25        MS. GORDON:  And it's all run by this man right

Page 324

1    here.
2         MR. THOMAS:  I can tell you I don't know if that's
3    true or not, but the only thing I want to do --
4         MS. GORDON:  Well I do, because I have the
5    transcripts.
6         MR. THOMAS:  -- is just move the deposition.
7         MS. GORDON:  Okay.  All right.
8         MR. THOMAS:  Let's just not make statements.
9    Questions and answers.
10   BY MS. GORDON:
11   Q.   Let's look at 6516.
12        MR. THOMAS:  Questions and answers.
13   BY MS. GORDON:
14   Q.   Let's look at 6516 --
15        MR. GILLIAM:  And I'll just object to that
16   characterization of the testimony.
17   BY MS. GORDON:
18   Q.   Let's look at 6516.
19        Here we've got another form signed off on by the
20   union and by Furman.
21        Do you see that?
22   A.   It's the same form you gave me a few moments ago.
23   Q.   Okay.
24   A.   Just for the record, it's the same one you just gave me.
25   Q.   All right.  I hear you.

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 325–328

Page 325

1          So, I'm going to go back to my question.
2          Why didn't you tell Hayse -- if you were really
3    concerned that no form had been filled out, why didn't
4    you just contact him and say, "You may have missed this,
5    but you need to fill out a form"?
6  A.  I didn't know that he failed to do it, and Mr. Hayse is
7    aware of those forms because he's filled them out in the
8    past and has complied with it in the past.
9  Q.  Okay --
10 A.  So, other employees were disciplined using the same
11   forms by Mr. Hayse.
12 Q.  Okay.  But --
13 A.  So, I didn't feel like it was incumbent upon me to tell
14   him, "Hey, go back to your same form and discipline your
15   employee."
16 Q.  But isn't the point of the form to let the employee know
17   what he did wrong?  Isn't that the whole point?
18 A.  Correct.
19 Q.  Okay.
20 A.  And there was no write-up in the file.
21 Q.  Okay.  And you don't doubt that Furman knew what he had
22   done wrong because we know he responded in detail?
23 A.  There was no write-up in the file.
24 Q.  Okay.
25 A.  I'm sorry.

Page 326

1  Q.  Was he told verbally what he did wrong?
2  A.  I have no idea.
3  Q.  Okay.  Have you checked every single employee in the
4    City who has been disciplined to see if a form was
5    filled out?
6  A.  When requested to do so, yes.
7  Q.  Well, as of today's date have --
8  A.  If it involves a termination or suspension, yes.
9  Q.  Okay.  Well, that form doesn't apply to a termination or
10   suspension.  It applies to everything, doesn't it?
11 A.  Employee discipline.
12 Q.  Okay.  Does the Collective Bargaining Agreement require
13   progressive discipline?
14 A.  I think I've already testified to that earlier, but I'll
15   rephrase it or say it again for you.
16        It does provide for a step procedure, but certain
17   instances are enough to terminate someone if they rise
18   to that level.
19 Q.  Okay.  So, if I'm in the union -- if I'm a patrol
20   officer and I'm in the patrol officers' union, and I get
21   suspended, can I file a grievance because I didn't get a
22   written warning first?
23 A.  Depending on what the issue is.
24        You can always file a grievance, yeah.  Anybody
25   can always file a grievance.  I'm speculating, but

Page 327

1    anybody --
2  Q.  Hang on.
3  A.  -- can always file a grievance.
4  Q.  Hang on.  Hang on.
5        MR. GILLIAM:  Let him -- please, let him finish his
6    answer.
7  BY MS. GORDON:
8  Q.  Is an employee, per the contract -- is it in the
9    contract that an employee has the right to get a written
10   warning before he gets discipline?  Is that in the
11   contract?
12 A.  It depends upon the level of the offense the employee
13   does.
14 Q.  No, it doesn't.
15 A.  Under certain situations, yes.
16 Q.  You think that's in the contract, the Collective
17   Bargaining Agreement?
18 A.  I think there's a step procedure.  If there's something
19   that is extremely egregious, they can be terminated.
20 Q.  Okay.  Well, I will hand you the contract.  It's Bates
21   stamp 1245 through 1272, and you show me where there's
22   progressive discipline in the Collective Bargaining
23   Agreement.
24        MR. THOMAS:  Just for the record --
25        MR. GILLIAM:  I just want --

Page 328

1        MR. THOMAS:  Just for the record, a document that
2    is approximately 28 pages has been handed to my client.
3        So, take a look at it --
4        MS. GORDON:  He's very familiar with it, Phil.
5        MR. THOMAS:  -- or any portion of it that you want
6    to.
7        MS. GORDON:  He's very familiar with it, and it has
8    a Table of Contents.
9  BY MS. GORDON:
10 Q.  This is a contract that you collectively bargained for;
11   correct?
12        You're at the table, Mr. Coogan, are you?
13 A.  I negotiated the last contract.  Some of the terms and
14   conditions therein were changed; some were not.
15 Q.  Okay.  Fair to say you're familiar with the Collective
16   Bargaining Agreement or not?
17 A.  Not intimately, but I certainly --
18 Q.  Okay.  Well, go find me where you're entitled to
19   progressive discipline.
20        MR. GILLIAM:  And I'll just object.  I believe this
21   whole line of questioning was asked and answered
22   earlier.
23        MR. THOMAS:  I'll join that objection.
24 A.  It talks about the grievance procedure, Article 6.
25 BY MS. GORDON:

Page 329

1   Q.   Okay.  Mr. Coogan, don't talk out loud.  Don't -- I
2        mean, just wait for the --
3   A.   Well, you want me to just read this document then?
4   Q.   I want you to find the part where you say the contract
5        requires progressive discipline.
6             Until you find it, please don't talk on the record.
7             MR. THOMAS:  Just for the record, I think that --
8        I'm going to object.  I think you've misstated his last
9        answer.
10            MS. GORDON:  Okay.
11            MR. THOMAS:  Take a look at the document.
12  A.   Okay.  It says exactly what I said.  Have a right to be
13       disciplined and, in certain steps, an employer has a
14       right to disciplinary action.
15  BY MS. GORDON:
16  Q.   Hang on.  Hang on.  Hang on.
17  A.   Immediate action as necessary, emergency action
18       situations.
19  Q.   Okay.  Hang on.
20            Where are you in the document?
21  A.   I'm on 8.1, under "Discipline."
22  Q.   Yeah.  Read it out loud.
23  A.   (Reading.)
24            "All employees so have a right to be
25            represented by a Local president, his designee,

Page 330

1            and/or a union representative at all
2            disciplinary conferences or procedures except
3            that an employer has the right to take
4            disciplinary action immediately in emergency
5            situations."
6        And I think that's what I said.
7            MS. GORDON:  Okay.  John, would you please read
8        back my last question where I asked the witness to take
9        a look at the Collective Bargaining Agreement.  It had
10       to do with progressive discipline.
11           So, just let's all wait while John looks.
12           THE REPORTER:  One second, please.
13           (Record repeated by the reporter.)
14  BY MS. GORDON:
15  Q.   Okay.  The part you just read, Mr. Coogan, does not
16       require progressive discipline.  So, you have not found
17       anything.
18           Do I have that right?
19  A.   Well, it says if the employee receives subsequent
20       reprimand for a similar offense within two years --
21           THE REPORTER:  Excuse me?
22  A.   It talks about subsequent reprimand.
23  BY MS. GORDON:
24  Q.   All right.  Get your answer together before you start
25       talking out loud.  Just read it through, and then let us

Page 331

1        know when you're ready.
2   A.   It doesn't speak directly to step.  It talks about
3        additional disciplines.
4   Q.   Okay.  So, the executive order does require progressive
5        discipline.
6            Are you aware of that?
7   A.   I believe that's correct.
8   Q.   Okay.  But the police department does not have to give
9        progressive discipline; correct?
10  A.   Well, it depends on the nature of the --
11  Q.   Under the contract, there's no requirement that they go
12       through progressive steps.
13           We've just looked for that in the contract, and
14       you've not been able to find it.
15           Correct?
16           MR. THOMAS:  Objection.  Repetitive questioning.
17       Asked and answered multiple times today.
18  BY MS. GORDON:
19  Q.   Okay.  So, my point is, sir, that the executive order
20       contains a requirement that the police department does
21       not follow; correct?
22  A.   I'd have to review the executive order.  I'm not -- I
23       don't feel comfortable telling you exactly what the
24       executive order says without having it in front of me.
25           (Discussion held off the record.)

Page 332

1   A.   I don't want to speculate.
2            MR. THOMAS:  There's no -- there's no question on
3        the record.
4            (Discussion held off the record.)
5            MS. GORDON:  We've got it.  We've just got a lot of
6        stuff here.
7            (Discussion held off the record.)
8   BY MS. GORDON:
9   Q.   Okay.  I'm going to hand you Executive Order 05-01.
10       It's Bates stamp 10 through 18, and I'm going to direct
11       you to Bates stamp 11, "C.  Disciplinary Steps."
12           And do you see that says:
13            "If not otherwise set forth in the
14            applicable Collective Bargaining Agreement,
15            work rule or departmental policy, or unless
16            otherwise circumscribed, the collective
17            discipline requirements are verbal warning,
18            written reprimand, suspension and
19            termination."
20           Do you see that?
21  A.   Yes, I do.
22  Q.   So, this document states that look to the Collective
23       Bargaining Agreement; correct?  For -- with regard to
24       what they require.  But if it's not addressed in the
25       Collective Bargaining Agreement, you should follow these

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                  Pages 333–336

Page 333

1    progressive steps; right?
2  A.  Correct.
3  Q.  Okay.  But you know the police department does not -- is
4      not required to give a verbal warning, written warning,
5      and suspension before termination?  You know that?
6      You've been around a long time; right?
7  A.  Well, it depends on the nature and extent of what the
8      issue is.
9  Q.  Okay.  There's no requirement that you follow steps in
10     the Collective Bargaining Agreement.  We've already
11     covered that.
12         Now, let's go down to "Guidelines and Imposing
13     Discipline."
14         Do you see E on that same page number:
15             "1.  Follow any applicable rules and
16                 regulations, policies or Collective
17                 Bargaining Agreements"?
18         Do you see that?
19  A.  Yes, I do.
20  Q.  Okay.  Did Chad Hayse follow the Collective Bargaining
21      Agreement here, as far as you can tell, from what I've
22      showed you today?
23  A.  He may have.
24  Q.  Okay.
25  A.  I don't know for certain.

Page 334

1  Q.  Well, it appears he did.
2         Would you agree with that from what you've looked
3      at?
4         You have no reason to say otherwise; fair enough?
5  A.  There was no write-up in Mr. Furman's file regarding
6      this issue.
7  Q.  That's not required in the Collective Bargaining -- I'm
8      not on that.  I'm on the Collective Bargaining
9      Agreement, sir.  You've --
10  A.  I thought we were looking at the executive order.
11  Q.  I know.
12         The executive order says:
13             "Follow all(sic) --"
14  A.  Discipline procedures.
15  Q.  Hang on.  Hang on.  Just listen.
16  A.  I am.
17  Q.  The executive order says:
18             "Follow any applicable rules, regulations,
19         policies or Collective Bargaining Agreements."
20         Do you see that?
21         I'm on E.
22  A.  Yes, I do.  I see that.
23  Q.  Okay.  And as far as -- you have no reason here today to
24      tell me Chad did not follow the Collective Bargaining
25      Agreement with Furman; right?

Page 335

1         MR. GILLIAM:  Object to foundation.
2  BY MS. GORDON:
3  Q.  Nothing you can come up with here today?
4  A.  Other than the fact he didn't write him up and stick
5      anything in Mr. Furman's file.
6         MS. GORDON:  Okay.  Now, I'm going to have to go
7      back, Phil, because I'm going to have to re-cover this
8      now.
9  BY MS. GORDON:
10  Q.  The Collective Bargaining Agreement does not require
11      that he write him up and stick it in his file.
12         I thought we had already agreed with that.
13         Mr. Coogan, the Collective Bargaining Agreement
14      does not require a written notice.
15         Do you -- we've covered this five times today.
16         MR. THOMAS:  Are you making my objection for me?
17         MS. GORDON:  Yes.  But he keeps saying it.  He
18      keeps suggesting that that's required by the Collective
19      Bargaining Agreement, and we've -- would you agree,
20      Phil, that -- I mean, if it's established, it's
21      established.
22         MR. THOMAS:  No, I don't, but you don't --
23         MS. GORDON:  But the witness keeps saying it.
24         MR. THOMAS:  But you don't want me to give a
25      narrative.  But under C, "Disciplinary Steps," Deb, it

Page 336

1      specifically said "if not otherwise set forth in the
2      applicable --"
3         MS. GORDON:  I've already covered that.  I'm fully
4      aware of that.
5         MR. THOMAS:  But it said that step should be
6      followed.  I think that's what he's trying to
7      articulate.
8         MS. GORDON:  Unless it's -- unless it's -- I'm not
9      on that right now.
10  BY MS. GORDON:
11  Q.  The Collective Bargaining Agreement does not include a
12      written notice; correct?
13         MR. THOMAS:  You've already read it, and you've
14      said "no."  You said "no."
15  A.  Yeah.
16         MS. GORDON:  Okay.  All right.
17         MR. THOMAS:  So, we're there.
18  BY MS. GORDON:
19  Q.  So, now I'm on E.
20         So, you're supposed to follow the Collective
21      Bargaining Agreement.  Chad Hayse followed the
22      Collective Bargaining Agreement.
23         Now, Number 2 is, you're supposed to discipline
24      promptly on suspected violations; true?  That's what
25      that says?

Page 337

1    A.    That's what the guidelines and imposing discipline say.
2    Q.    Did Chad do that?
3          If you don't know, you don't know.
4    A.    I don't know.
5    Q.    Okay.  Let's go to 3.
6          "Obtain all facts."
7          Are you aware that he did an investigation and
8          received information from other officers?
9    A.    I believe that he did.
10         I don't have a copy of that in front of me.
11         (Discussion held off the record.)
12   BY MS. GORDON:
13   Q.    Okay.  And then he's supposed to provide the appointee
14         with notice of the charges; correct?
15   A.    That's correct.
16   Q.    Okay.
17   A.    And proposed discipline.
18   Q.    Right.
19         And he did.  I mean, we've already seen
20         documents --
21   A.    I don't know.
22   Q.    -- where it point-blank says, "You're facing
23         termination."
24         But I'm not going to argue with you about it.
25         (Discussion held off the record.)

Page 338

1          MR. THOMAS:  If you want to see the document again,
2          you can ask her.  I don't have a note on it.  He does.
3          (Discussion held off the record.)
4    BY MS. GORDON:
5    Q.    Okay.  Now, let's go to look at the investigation that
6          Chad Hayse did into the McClintock matter.
7          Are you aware that he requested, Mr. Coogan, a
8          statement from Corporal Hinojosa on June 16, 2016, to
9          get his input into what occurred?
10   A.    That he requested a statement from Officer Hinojosa?
11   Q.    Yes.
12   A.    I don't know if I was aware of that or not.
13   Q.    As part of his investigation.
14         I'll hand you 6548 produced to me by the City.
15         MR. THOMAS:  Is that the City or the police
16         department?
17   A.    It's the police department.  It says --
18         MR. THOMAS:  Oh, yeah.
19   A.    Yeah, the Melvindale Police Department is not --
20   BY MS. GORDON:
21   Q.    Produced by the City.  They're the Defendant.
22         Do you see that Hinojosa handed in a statement to
23         the chief?
24   A.    It says from Hinojosa to --
25   Q.    Okay.

Page 339

1    A.    -- Allen.
2    Q.    Okay.  So, you see the chief is looking into this
3          McClintock situation; right?
4    A.    Well, it's addressed to Allen.  So, it looks --
5    Q.    Fair enough.
6    A.    -- like Allen maybe looked into it.
7    Q.    Fair enough.
8    A.    I don't know.  Maybe the chief --
9    Q.    All right.  Here is one from Chief Hayse from Nolin --
10         Detective Nolin, who was also at the scene.
11         (Discussion held off the record.)
12   BY MS. GORDON:
13   Q.    Okay.  You've seen that before, haven't you?
14   A.    I may have.
15   Q.    Okay.
16   A.    I may have seen.
17         MR. THOMAS:  Deb -- Ms. Gordon, I don't think you
18         identified that for the record by Bates stamp or date or
19         anything yet.
20   A.    Well, I can do that if you want.
21         MR. THOMAS:  Well, just --
22   BY MS. GORDON:
23   Q.    All right.  What's the Bates stamp?
24         What's the Bates stamp?
25         MR. THOMAS:  Just give her the Bates stamp and

Page 340

1          we'll all --
2    A.    006547.
3    BY MS. GORDON:
4    Q.    Okay.  Now, I'm going to hand you Bates stamp 6563,
5          where the chief has obtained a statement from Lieutenant
6          Allen --
7          MR. THOMAS:  See it?
8          MR. GILLIAM:  (Shakes head.)
9    BY MS. GORDON:
10   Q.    -- about the McClintock/Furman situation.
11         Do you see that he's written a statement to the
12         chief in June?
13   A.    It's from Allen to the chief.
14         Yes, I see that.
15   Q.    I'm sorry.  Okay.
16   A.    Yeah.
17         "Subject:  Corporal Furman."
18   Q.    Do you see in the second paragraph that Lieutenant Allen
19         says:
20         "There I observed Corporal Furman forcibly
21         placing the man into the rear of the patrol car.
22         I heard a thud sound and also witnessed the
23         man's head, above the hair line and towards the
24         top, hit the portion of the rear door of the
25         patrol car while he was being placed back

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 341–344

Page 341

1     there"?
2         Do you see that?
3  A.  Yes, I do.  I see it right there.  Second paragraph.
4  Q.  Then he says:
5             "At the station, I informed Lieutenant
6         Welch of this and asked him if the prisoner had
7         any injuries.
8             Lieutenant Welch stated he was told he
9         didn't have any reported injuries.
10            I printed out McClintock's booking photo
11        and jail medical screening report and have it
12        attached.  It should be noted that the booking
13        photo is from 2015 because no new photo was
14        taken."
15        Isn't that a concern to you, as the city attorney,
16    that what Furman did is, he attached an old booking
17    photo --
18 A.  I don't know that it's -- it's true.
19 Q.  Okay.  Let me finish.  Let me -- well, look at what your
20    current chief says:
21            "It should be noted that the booking photo
22        is from 2015 --"
23        Look at the bottom.
24 A.  I see that, yeah.
25 Q.  Okay.  So, you've got a lieutenant that's pointing this

Page 342

1     out because no new photo was taken.
2         So, here we have a head injury to McClintock, which
3     the City has now been sued for, and we have your Officer
4     Furman not taking a new photo.
5  A.  My Officer Furman?
6  Q.  The City's.  I'm using the royal "you."
7         Okay?
8         So, that's what we've got here.
9         Is that not a concern to you, sir, as city
10    attorney, that it looks like Furman -- at least from a
11    plaintiff's point of view in a lawsuit -- could say, "He
12    was covering up my injury"?
13        MR. GILLIAM:  Object as to form and foundation.
14 A.  I'm sorry.  What was the question you asked me?
15 BY MS. GORDON:
16 Q.  Isn't it a concern to you, that Lieutenant Allen is
17    pointing out, that Furman did not take a new picture of
18    McClintock but rather used a 2015 photo?
19 A.  I don't know if he did or didn't take a picture.  I
20    don't know who is responsible for -- I really don't know
21    the procedure, so I don't know -- if he was supposed to
22    take one and he didn't, that would be a problem, yes.
23 Q.  Okay.
24 A.  I don't know that he's supposed to take one.
25 Q.  Again --

Page 343

1  A.  I'm not familiar -- I don't know that.
2  Q.  All right.
3  A.  I don't know.
4  Q.  Well, when you book somebody, are you supposed to -- I
5     thought you were supposed to take a photo automatically
6     when you book somebody?
7  A.  I don't know what the procedure was, if they have a
8     photo, if they use the same one or not.  I don't know.
9     I'm not -- I don't really do much booking procedure
10    stuff.  I've not addressed that issue.  That would kind
11    of make sense, but --
12 Q.  And Nolin also said in his report -- do you have
13    Detective Nolin's statement there?
14        I think you do.
15 A.  Yes, you gave it to me.
16 Q.  Okay.  He says:
17            "Once at the car, it appeared --"
18        I'm in the second paragraph --
19            " -- it appeared Corporal Furman pushed
20        McClintock towards the open back seat, causing
21        McClintock to hit his head on the frame of the
22        car."
23            MR. THOMAS:  Objection.  Repetitive --
24 BY MS. GORDON:
25 Q.  Do you see that?

Page 344

1         MR. THOMAS:  Objection.  Repetitive question.
2  A.  Yes, it says --
3         MR. THOMAS:  You read that earlier.
4  BY MS. GORDON:
5  Q.  Isn't that a concern to you?
6         Now you've got two police officers putting in
7     writing that they have seen Furman use -- these are my
8     words, not theirs -- excessive force.
9         Isn't that a concern to you as city attorney?
10 A.  It says "it appeared" Corporal Furman pushed him in the
11    car.
12        I see that, yes.
13        And if he did, that would concern me, yeah.
14 Q.  And you now know, if you didn't at the time, that this
15    is information that was coming to Chief Hayse back in
16    June, while he was still investigating Furman.
17        You see that; right?
18 A.  I've seen the letters you provided me here today, yes.
19 Q.  Yeah.
20        I want to ask you a question.
21 A.  Okay.
22 Q.  That was needless.  Sorry about that.
23        You have a name in your phone that I saw earlier
24    today with regard to Alexa --
25            (Discussion held off the record.)

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018

Pages 345–348

Page 345

BY MS. GORDON:
1
2   Q.   Alexandra Carrier.
3   A.   Yeah, it's --
4   Q.   Why is that in your phone?
5   A.   There was somebody that was subpoenaed for a deposition
6        in this case, and I don't know who that individual is.
7        I never heard of that person.
8   Q.   Okay.
9   A.   To the best of my knowledge, I don't know who that
10       person is.
11           So, I don't know.  I don't know who that person is.
12  Q.   Did you find out?
13  A.   No.  I have no idea.  I have no idea who that person is.
14           Everybody else has been subpoenaed.  I pretty much
15       know who they are.
16  Q.   Hang on one second, please.
17           (Discussion held off the record.)
18           MR. THOMAS:  Ms. Gordon, it's almost 5:00.  Can I
19       ask what time you're planning on going today?
20           MS. GORDON:  Yeah, you can.  Give me just one
21       second.
22           (Discussion held off the record.)
23           MS. GORDON:  Give me just a second, Phil.
24           (Discussion held off the record.)
25  BY MS. GORDON:

Page 346

1   Q.   Are you aware that on -- I guess you're aware that on
2        July 28, the chief notified you, the mayor and Bolton
3        that he was suspending Furman without pay effective
4        immediately, and that he was going to meet with you in
5        the afternoon to discuss termination?
6   A.   I do recall seeing that chief sent me a letter after he
7        suspended Furman without pay.
8   Q.   And you never met with him, did you?
9   A.   I did not meet with him, no.
10  Q.   Why not?
11  A.   I don't know.
12  Q.   He wanted to meet with you --
13  A.   I don't know why.
14  Q.   -- to discuss this.  Okay.
15  A.   I really don't know why.
16           MS. GORDON:  Okay.  All right.
17  A.   It never took place.
18           MS. GORDON:  All right.  Phil, I'm not going to
19       finish today, so let's go ahead and break.
20           (Discussion held off the record.)
21           MS. GORDON:  It's too late today to finish.
22  A.   Are you sure?
23           MS. GORDON:  It's been a -- you know, it's been a
24       long day.  We never really took a lunch hour and --
25  A.   That's up to you.  I don't care if we --

Page 347

1           MS. GORDON:  Yeah, I know.  We're going to
2        reschedule.
3   A.   But I need some flexibility.  I've got a heck of a
4        schedule coming up over the next two weeks.  So --
5           MS. GORDON:  What's good for you?
6           MR. THOMAS:  Do you want to throw out some dates?
7           MS. GORDON:  It's just two hours.
8   A.   Yeah.  Yeah.
9           MS. GORDON:  I mean, we can squeeze it in in the
10       morning or late in the day.
11  A.   That's fine.
12           MR. THOMAS:  Everybody got their calendar --
13  BY MS. GORDON:
14  Q.   One more question for you, Mr. Coogan, while Phil is
15       looking.
16  A.   Sure.  Certainly.
17           What's up?
18  Q.   Are you paying for your private -- your attorney that's
19       here for you?
20  A.   He's being paid to be here today.  I --
21  Q.   By you or the City?
22  A.   At this point, I don't know.  Perhaps the City,
23       hopefully, or the insurance company maybe.  I don't
24       know.
25           MR. THOMAS:  Well, you should tell her -- you

Page 348

1        should tell her -- I don't know that that --
2   A.   The city, I think.  Yeah.
3           MR. THOMAS:  He signed my retainer agreement.
4        That's all I can tell you.
5   A.   I would hope.
6           MS. GORDON:  The witness --
7           MR. THOMAS:  Whether he's going to get coverage or
8        not, he could say he hopes.
9           MS. GORDON:  Fair enough.  Okay.
10           MR. THOMAS:  I don't really know that you're
11       entitled to that without a court order, but I don't want
12       to fight over it.
13           MS. GORDON:  Okay.  I appreciate it.
14  A.   Yeah.
15           (Deposition adjourned at 4:57 p.m.)
16                   *  *  *
17
18
19
20
21
22
23
24
25

COOGAN, ESQUIRE, LAWRENCE J.
04/30/2018                                                                    Pages 349

Page 349

1   STATE OF MICHIGAN )

2   COUNTY OF OAKLAND )

3              CERTIFICATE OF NOTARY PUBLIC

4      I do hereby certify that the witness, whose

5   attached testimony was taken in the above matter, was

6   first duly sworn to tell the truth; the testimony

7   contained herein was reduced to writing in the presence

8   of the witness by means of stenography; afterwards

9   transcribed; and is a true and complete transcript of

10  the testimony given.

11     I further certify that I am not connected by blood

12  or marriage with any of the parties; their attorneys or

13  agents; and that I am not interested, directly or

14  indirectly, in the matter of controversy.

15     In witness whereof, I have hereunto set my hand

16  this day at Highland, Michigan, County of Oakland, State

17  of Michigan on Friday, May 4, 2018.

18

19

20  _____

21     John J. Slatin, RPR, CSR-5180

22     Certified Shorthand Reporter

23     Notary Public, Oakland County, Michigan

24     My commission expires:  July 25, 2023

25