UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WELCH,

     Plaintiff,

vs.

CITY OF MELVINDALE, *a political Subdivision of the State;* MELVINDALE PUBLIC SAFETY COMMISSION, *a political advisory body of the City of Melvindale;* JEFFERY BOLTON, KEVIN MCISAAC, MARTHA MCDANIEL, PATRICIA HALL, JOSEPH ALVARADO, *and* LAWRENCE COOGAN, *individuals, sued in their official and personal capacities,*

     Defendants.

Case No:  18-cv-11450
Hon. Laurie J. Michelson
Mag. Mona K. Majzoub

---

| |
|---|
| **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

---

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500/Fax (248) 258-7881
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

**PLUNKETT COONEY**
Audrey J. Forbush (P41744)
Attorney for Defendants, City of Melvindale, Melvindale Public Safety Comm., Bolton, McIsaac, McDaniel, Hall & Alvarado
Plaza One Financial Center
111 E. Court Street- Suite 1B
Flint, Michigan 48502
(810) 342-7014/Fax (810) 232-3159
aforbush@plunkettcooney.com

**JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C.**
Carlito H. Young (P61863)
Laura B. Brown (P79742)
Attorneys for Lawrence Coogan, Only
27555 Executive Drive, Suite 250
Farmington Hills, Michigan 48331
(248) 489-4100/Fax (248) 489-1726
cyoung@jrsjlaw.com
lbrown@jrsjlaw.com

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii-vii

I.      INTRODUCTION .............................................................................................1

II.     FACTUAL BACKGROUND...............................................................................1

        Defendants' Actions Against Plaintiff were Linked to the Drive to Eliminate the City's
        Debt with Impound Revenues ......................................................................1

        Plaintiff Assists in Disciplining Matthew Furman..........................................2

        Plaintiff Testifies at Sham Proceeding Designed to Terminate Chief Hayse.................6

        Defendants Retaliate Against Welch for Testifying in Support of Hayse .........................7

        Defendants Further Retaliate Against Plaintiff for his Testimony in a Federal Civil
        Lawsuit .....................................................................................................15

        Role of the Public Safety Commission and City Attorney...................................20

III.    LAW AND ARGUMENT ..................................................................................22

        A.      Standard of Review ....................................................................22

        B.      The PSC is a Legal Entity, and Plaintiff's Official Capacity Claims are Proper ...............23

        C.      42 USC § 1983 – First Amendment Retaliation ...........................24

                1.      Both Plaintiff's August 2016 and March 2018 Testimony were
                        Protected Speech ...................................................24

        Defendants cannot show Plaintiff misspoke ...................................................24

        Plaintiff Spoke as a Citizen ..........................................................................26

        Plaintiff Spoke on Matters of Public Concern.................................................27

                2.      Plaintiff Suffered A Sufficiently Adverse Action.....................28

i

3.    Evidence of Causation is Uncontested – Defendants' Actions Against Plaintiff were Based on his Protected Speech ......................................................30

D.    42 USC § 1985(2) – Conspiracy to Interfere with the Administration of Justice in Federal Courts ...........................................................................................................31

E.    42 USC § 1983 – Fourteenth Amendment Procedural Due Process...........................37

1.    Defendants deprived Plaintiff of his Protected Liberty and Property Interests...............................................................................................................38

2.    Defendants Denied Plaintiff a True Due Process Hearing..................................40

a.    Plaintiff did not Receive Proper Notice .....................................................40

b.    Plaintiff's Trial Board was a Sham .............................................................41

3.    Plaintiff's Procedural Due Process Claim is Not Barred because he Did Not Request a Name Clearing Hearing..................................................................43

F.    Defendants are not Entitled to Immunity against Plaintiff's Constitutional Claims ..........44

1.    Decisions by Defendants Create Liability for the City ...........................................44

2.    Individual Defendants are not Entitled to Qualified Immunity...............................45

G.    Defamation.............................................................................................................................46

H.    Tortious Interference with an Advantageous Business Relationship or Expectancy........................................................................................................................48

I.    Defendant Coogan is Not Entitled to Immunity Against Plaintiff's State Law Claims  ...............................................................................................................................49

IV.    CONCLUSION ......................................................................................................................50

CERTIFICATE OF SERVICE ......................................................................................................51

ii

## INDEX OF AUTHORITIES

Cases                                                                                    Page

*Bd. of Regents of State Colleges v. Roth,*
   408 U.S. 564 (1972) ............................................................................... 39

*Bishop v. Wood,*
   426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d 684 (U.S. 1976) .................. 39, 41

*Briner v. City of Ontario,*
   2010 WL 3982755, at *14 (N.D. Ohio Oct. 7, 2010) ........................................ 32

*Brown v. City of Detroit,*
   259 F. Supp. 2d 611 (E.D. Mich. 2003) ......................................................... 39

*Brown v. City of Niota, Tenn.,*
   214 F.3d 718 (6th Cir. 2000) ...................................................................... 43

*Brunn v. City of Cleveland,*
   526 F.Supp. 564 (D.C.Ohio, 1981) .............................................................. 38

*Califano v. Yamasaki,*
   442 U.S. 682, 686, 99 S.Ct. 2545, 2550, 61 L.Ed.2d 176 (1979) ...................... 42

*Carter v. W. Reserve Psychiatric Habilitation Ctr.,*
   767 F.2d 270 (6th Cir. 1985) ...................................................................... 43

*Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1,*
   131 F.3d 564 (6th Cir. 1997) ................................................................... 27, 28

*Chilingirian v. Boris,*
   882 F.2d 200 (6th Cir. 1989) ...................................................................... 38

*Christian v. Belcher,*
   888 F.2d 410 (6th Cir.1989) ...................................................................... 39

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985)........................................................................... 37, 38, 41

*Connaughton v. Harte Hanks Commc'ns, Inc.,*

842 F.2d 825 (6th Cir. 1988) ...................................................................... 47

*Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro,*
477 F.3d 807 (6th Cir. 2007) ...................................................................... 29

*Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.,*
921 F.2d 1343 (6th Cir. 1991) ................................................................... 22

*DiLuzio v. Vill. of Yorkville, Ohio,*
796 F.3d 604 (6th Cir. 2015) ................................................................. 31, 32

*Duchesne v. Williams,*
849 F.2d 1004 (6th Cir. 1988) ................................................................... 42

*Ely v. Dearborn Heights Sch. Dist. No. 7,*
150 F. Supp. 3d 842 (E.D. Mich. 2015) ................................................. 26, 29

First Amendment. *Ely v. Dearborn Heights Sch. Dist. No. 7,*
150 F. Supp. 3d 842 (E.D. Mich. 2015 ....................................................... 26

*Frank v. Relin,*
1 F.3d 1317 (2nd Cir. 1993) ...................................................................... 45

*Fritz v. Charter Twp.,*
592 F.3d 718 (6th Cir. 2010) ...................................................................... 29

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ................................................................................... 28

*Hafer v. Melo*,
502 U.S. 21 (1991) ..................................................................................... 45

*Haji v. Columbus City Schools,*
No. 12–3520, 621 Fed.Appx. 309, 313, 2015 WL 4385280, at *4
(6th Cir. July 16, 2015) .............................................................................. 29

*Handy-Clay v. City of Memphis, Tenn.,*
695 F.3d 531 (6th Cir. 2012) ...................................................................... 27

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.,*
268 Mich. App. 83 (2005) .......................................................................... 48

iv

*Henderson v. City of Flint,*
No. CV 16-11648, 2017 WL 3412095, at *6 (E.D. Mich. Aug. 9, 2017) ........................... 24

*Hoover v. Radabaugh,*
307 F.3d 460 (6th Cir. 2002) ......................................................................................... 30

*Hughes v. Region VII Area Agency on Aging,*
542 F.3d 169 (6th Cir. 2008) ......................................................................................... 30

*Jackson v. City of Cleveland,*
No. 17-3840, 2019 WL 1397484, at *15 (6th Cir. Mar. 28, 2019) .................................. 32

*Jett v. Dallas Independent School Dist.,*
491 U.S. 701 (1989).......................................................................................................... 44

*Joelson v. United States,*
86 F.3d 1413 (6th Cir. 1996) ...................................................................................... 38, 39

*Johnson v. Hills & Dales General Hosp.,*
40 F.3d 837 (6th Cir.1994) ............................................................................................. 32

*Jones v. City of Youngstown,*
980 F.Supp. 908 (N.D.Ohio 1997)................................................................................... 32

*Kendricks v. Rehfield,*
270 Mich. App. 679 (Mich. App., 2006) ......................................................................... 50

*Kreuzer v. Brown,*
128 F.3d 359 (6th Cir.1997) ........................................................................................... 24

*Lane v. Franks,*
134 S. Ct. 2369 (2014).............................................................................................. 26, 28

*Leary v. Daeschner,*
228 F.3d 729 (6th Cir. 2000) ...................................................................................... 24, 37

*McMurphy v. City of Flushing,*
802 F.2d 191 (6th Cir. 1986) ......................................................................................... 28

*Miller v. City of Canton,*

319 F. App'x 411 (6th Cir. 2009) ............................................................... 31

*Monell v. Dep't of Soc. Servs. of City of New York,*
  436 U.S. 658 (1978) ............................................................... 23, 44

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977) ............................................................... 24

*Pembaur v. City of Cincinnati,*
  475 U.S. 469 (1986) ............................................................... 44

*Perry v. McGinnis,*
  209 F.3d 597 (6th Cir 2000) ............................................................... 22

*Pickering v. Board of Educ. of Township High Sch. Dist.*
  *205,* 391 U.S. 563 (1968) ............................................................... 28, 30

*Quinn v. Shirey,*
  293 F.3d 315 (6th Cir. 2002) ............................................................... 43

*Radu v. Herndon & Herndon Investigations, Inc.,*
  302 Mich. App. 363 N.W.2d 720 (2013) ............................................................... 49

*Rankin v. City of Highland Park,*
  2015 WL 773734 (Mich. App.), 6 (Mich.App., 2015) ............................................................... 50

*Rodgers v. Banks,*
  344 F.3d 587 (6th Cir.2003) ............................................................... 30

*Silberstein v. City of Dayton,*
  440 F.3d 306 (6th Cir. 2006) ............................................................... 45

*Smith v. Anonymous Joint Enter.,*
  487 Mich. 102, 117, 793 N.W.2d 533 (2010) ............................................................... 47

*Smith v. Michigan Dep't of Corr.,*
  765 F. Supp. 2d 973 (E.D. Mich. 2011) ............................................................... 42

*Thaddeus–X v. Blatter,*
  175 F.3d 378 (6th Cir.1999) ............................................................... 28, 29

*Veres v. Monroe Cty.,*
    364 F. Supp. 1327 (E.D. Mich. 1973) ............................................................... 23

*Wagner v. City of Memphis,*
    971 F.Supp. 308 (W.D.Tenn. 1997) ................................................................. 42

*Weisbarth v. Geauga Park Dist,*
    99 F.3d 538 (6th Cir. 2007) ............................................................................. 27

*Whittington v. Milby,*
    928 F.2d 188 (6th Cir. 1991) ........................................................................... 24

**Other Authorities**
42 USC § 1985(2) ........................................................................................... 31
42 USC § 1983 .......................................................................................... 24, 37
Fed. R. Civ. P. 56(C) ...................................................................................... 22

## I.    INTRODUCTION

Plaintiff Michael Welch served as a Melvindale police officer for 20 years, exhibiting "peerless performance...marked by unsurpassed efficiency and excellence." Dkt. # ¶ 1; **A**, Jones Dep. 46:15-18; **B**, Kennaley Dep. 10:18-11:13; **C**, Bolton Dep. 180:13-6; **D**, Commendation. However, when Plaintiff opposed the rogue and unlawful behavior of his subordinate, Melvindale Police Corporal Matthew Furman (who single-handedly generated tens-of-thousands of dollars in revenue for the City) and refused to go along with the City's witch hunt against the only other command officer who stood against Furman—former Melvindale Police Chief Chad Hayse—they decided to end his career. Defendants do not like Plaintiff's testimony, so they publically and falsely condemned Plaintiff as a "perjurer," and sought to terminate him and decimate his retirement benefits twice over.

## II.    FACTUAL BACKGROUND

### Defendants' Actions Against Plaintiff were Linked to the Drive to Eliminate the City's Debt with Impound Revenues

By November 2011, the City of Melvindale was in severe debt, and was placed under a deficit elimination plan ("DEP") overseen by Michigan's Department of the Treasury. **E**, Bazman Dep., 103:16-25. By 2015, the DEP was a "huge" issue for the City, and Defendants were eager to avoid being placed under an Emergency Manager by the State. **F**, Barnes Dep., 13:17-20; 16:23-17:4; **G**, July 12, 2016 PSC Mtg. at 54:2-12. Although the City was near the end of the five-year DEP, it was still in debt, and therefore sought to expand its revenue streams. In May 2015, the City awarded its towing contract to Goch &

1

Sons Towing because "Goch would generate the most revenue for the City." **E**, Bazman Dep. 132:3-5. Goch's proposal permitted the City to keep at least 15% of every towing fee. creating "an immediate stream of cash flow for the City." **H**, Goch Contract, Proposal and Fees. Goch described its fee schedule as "easily defendable" and promised the City would "experience an instant stream of income." *Id* at 2-3. In practice, Goch imposed a laundry-list of costly fees on citizens, like charges for "hook and drop," dolly use, "excessive winching," "vehicle release," and "personal property retrieval." *Id.*

The City's impound-related income grew over the course of the Goch contract's term.

| YEAR | ANNUAL IMPOUND REVENUE (Ex. I) |
|------|--------------------------------|
| 2014 | $165,276 (Gene's Towing) |
| 2015 | $182,000 (Gene's Towing / Goch & Son's Towing) |
| 2016 | $208,460 (Goch & Son's Towing) |
| 2017 | $186,538 (Goch & Son's Towing) |

Once Goch took over, the number of impounds more than tripled—the City impounded 1137 vehicles during the latter half of 2015. **AS**, 2015 Impounds. Goch and his agents briefed the PSC on how much money the City made from impounds and auctions. **G**, July 12, 2016 PSC Mtg. at 49:7-50:18. During the first six months of 2016, Melvindale took in **$190,792.00**. **K**, 2016 Revenue.

### Plaintiff Assists in Disciplining Matthew Furman

Melvindale Police Officer Matthew Furman almost single-handedly brought in the tens-of-thousands of dollars Melvindale generated each month in impound revenue. Furman

2

sometimes impounded up to twelve cars in a single day. **AT**, Furman Tow Volume; **L**, Furman Dep. at 148:14-8, 107:1-7. Furman improperly seized vehicles based on unreliable information regarding drivers' insurance coverage in defiance of his superiors' orders. **M**, Nolin Dep. 117: 5-24; 99:13-21; **L**, Furman Dep., 325:7-326:6. He even declined to execute Melvindale warrants and warrants issued by nearby municipalities in his haste to get to the next tow. *Id.* at 111:11-116:2; **N**, Detrich Aff. at ¶ 15-16. Furman boasted to his coworker, Detective Brandon Nolin that two City Council members and the City Administrator told him that, "he needed to keep towing cars in order to make the City money because we had a deficit." **M**, Nolin Dep. 118:9-15.

In 2015 and 2016, Plaintiff and, then-Police Chief Chad Hayse, had no choice but to address Furman's behavior. Furman received dozens of citizen complaints alleging that he improperly enforced the traffic code, inflicted verbal and physical abuse on citizens and prisoners, and displayed racial biases and poor decision-making capabilities[1]. **N**, Detrich Aff. at ¶ 9-12; 21-7; **B**, Kennaley Dep. 146:24-147:8. In 2015, Plaintiff directed him to seek psychological evaluation, and, if necessary, treatment with the City's medical consultants. **L**, Furman Dep. at 66:10-17; **O**, Hayse Dep. at 153: 4-7.

In February 2016, Welch received a citizen complaint from a woman whose vehicle had been impounded by Furman. Through his investigation, Plaintiff substantiated that

---

[1] Plaintiff has not attached the actual citizen complaints to this brief because they are extremely voluminous. Plaintiff is prepared to provide copies of these documents if the Court wishes to review them.

Furman improperly stopped her, inappropriately escalated the encounter, and falsely arrested the woman by removing her from her vehicle using a wrist lock and placing her in handcuffs, merely to impound her vehicle. **P**, Wielichowski Investigation at 3-4. Furman placed the woman and her two infant children in physical jeopardy by onto a busy street and having them transported without proper child restraints. *Id.* Welch reported to the Chief that Furman had no explanation for his actions, that he had been counseled multiple times without improvement, and as a result Welch "could not trust Furman to do the right thing."

On the basis of Plaintiff's investigation, Hayse suspended Furman for three days. *Id.* at 4; **Q**, Welch Dep. 71:1-72:11. The suspension infuriated Furman, who promptly restricted himself to only impounding abandoned vehicles as an act of retaliation. **M**, Nolin Dep. at 29:23-30:17; 32:13-23; **B**, Kennaley Dep. 98:14-20. The City immediately experienced an appreciable decrease in revenue. **R**, May-July 2016 Revenue Summaries.

On June 16, 2016, Furman arrested a suspected burglar, McClintock. As Furman placed the compliant McClintock into his patrol car, he shoved McClintock's head into the doorframe, splitting it open. **M**, Nolin Dep., 129:24-130:12; 41:15-25; **S**, McClintock Investigation at 19. Furman denied McClintock medical attention, and told Welch McClintock was unharmed. *Id.* at 10, 11, 15, 19. Furman suspiciously declined to take a new booking photograph of McClintock, claiming that the camera was broken. *Id.* at 10-12. Nolin and then-Lieutenant John Allen both observed Furman's excessive force against McClintock. *Id.*

at. 7, 16-18. They interviewed McClintock, photographed his injuries, and provided all the information to the Chief. *Id.* at 7, 13-4, 16-18.

On July 4, 2016, Furman was assisting Officers Lane and Ginther in arresting Robert Crosslin. Crosslin was on his knees ready to be handcuffed when Furman violently attacked him. **T,** Crosslin Investigation at 6-7.  Officers Lane and Ginther immediately reported this incident to Welch, who directed them to submit written statements to the Chief. *Id.* at 6-8; **Q,** Welch Dep. at 19:1-24. After concluding the McClintock investigation and receiving Furman's version of the events a few weeks later, Hayse and Welch determined further disciplinary action was needed. *Id.* at 15; **U,** Suspension Correspondence. Significantly, Hayse made it known that he planned to terminate Furman—without drastic action by Defendants, the City would lose the revenue Furman generated for good. **S,** McClintock Investigation at 24; **L,** Furman Dep. 280:9-24; **M,** Nolin Dep. 157:20-158:4.

During the July 12 2016 PSC meeting, Goch reported that towing had decreased dramatically, "down a couple hundred thousand if this continues to the end of the year." **G,** July 12, 2016 PSC Mtg. at 54: 20-23. Coogan's concern was revenue. *Id.* at 54:2-12. He insinuated that unless towing increased, the state would place Melvindale under an emergency manager. *Id.* McIsaac stated that regardless of Furman's conduct, "all I know is these numbers are way down and I don't think it can continue." *Id.* at 57:22-58:22. Bolton, PSC Chair, admitted, "it seems kind of repulsive …but unfortunately that's [sic] we've relied on that revenue." *Id.* at 107:2-7.

**Plaintiff Testifies at Sham Proceeding Designed to Terminate Chief Hayse**

Defendants and other officials could not countenance Welch and Hayse's investigation into and discipline of Furman, which resulted in Furman being unable to impound vehicles for a period of time. To protect Furman from the recommended termination, in late July or early August 2016, the City Council unanimously agreed to terminate the Chief. **F**, Barnes Dep., 129:3-131:24. The City Council unanimously voted to ratify this earlier decision to terminate Hayse after a two-day sham termination proceeding held on August 29 and 30, 2016. *Id.* at 129:3-131:24. On August 29, 2016, Hayse called Welch as a witness in support of his contention that Defendants' allegations of misconduct were false. Plaintiff testified, in pertinent part that:

> Q (By Hayse): Lieutenant, **have you ever heard me make disparaging remarks regarding any public official, appointed official, or Michael Goch** from Goch & Son's Towing?
>
> A: No direct. **We've had personal conversations in regards to the way the tow contract had been warranted**, but no personal attacks in front of anybody else **in personal conversation, yes**.
>
> Q: Never heard me come up to the front desk and make any sort of announcement or disparaging remark about not towing vehicles because Goch & Son's was our tow provider as of June of 2015?
>
> A: Absolutely not. In fact, you had offered an incentive to officers to tow cars. **T**, Aug. 29, 2016 Proceeding 145: 5-17.
> ************************************************************
>
> Q (By Guzall): Okay. And did—in this personal conversation that you say you had with the chief **in regards to Goch & Son's**, did he say any derogatory things **with Goch & Son's**?

A: **No.**

At the end of the second day of the termination proceeding against Hayse, Larry Coogan, City Attorney and legal advisor to the Public Safety Commission, and City Council President Nicole Barnes attempted to re-call Welch to the stand.

**Mr. Coogan**: Well, <u>I was going to ask one more I intended to cover</u>.

**Official Guzall**: We've covered—

**Councilwoman Barnes**: Is Lieutenant Welch here?...Well, I just—my reasoning is because <u>I believe that Lieutenant Welch testified yesterday that he's never heard him say anything derogatory, and I'm thinking that today's testimony says otherwise</u>. **V**, Aug. 30, 2016 Term. Proceeding at 79:21-81:5.

The wheels were already in motion to terminate Welch along with Hayse.

### Defendants Retaliate Against Welch for Testifying in Support of Hayse

Plaintiff's truthful testimony—that although he had heard Hayse criticize the Mayor and Michael Goch in private, he never heard Hayse do so in front of their subordinates—did not fit into the City's plan to fire Hayse. Defendants took immediate steps to retaliate. On September 7, 2016—mere days after his August 29 testimony, Coogan unilaterally drafted and served him with a one-page, "Complaint for Suspension, Demotion, and/or Termination of Michael Welch." Bolton signed the document, but later vehemently denied the charges were his idea. **AN,** Bolton Dep., 109:1-21. It is uncontested that the other members of the PSC had no input on bringing or drafting these charges. According to Bolton, Coogan wrote the charges, and merely asked for his signature as a formality. *Id.* at 198: 12-20. Unsurprisingly, Bolton could not initially explain the substance of the allegations—

7

particularly, what actual evidence there was indicating Plaintiff's guilt[2]. Coogan unequivocally acted beyond his authority as City Attorney to invent and execute the idea of disciplining Welch for his truthful testimony, and usurped the authority of the Chief of Police and PSC to draft and finalize the charges against Welch with Bolton's signature as a mere formality. Despite the fact that Bolton and the PSC knew Welch was innocent, and grasped Coogan's ultimate, unlawful aim, they allowed him to proceed, in an abuse of their own authority.

In pertinent part, the charges accused Plaintiff of "lying to Mayor and City Council at a public hearing on 8/29/2016." However, the document gave absolutely no indication of what specific "lie" Plaintiff had told, despite the fact that the entire two-day proceeding had been recorded and transcribed. W, Sept. 2016 Complaint Against Plaintiff.

Plaintiff was convinced that he would be fired. Out of sheer desperation, he resolved to do whatever he could to stay employed and retain his pay and retirement benefits. Q, Welch Dep. 144:23-146:11; AQ, Welch Dep. 60:2-11. The day before his trial board, Plaintiff met with the Mayor, and asked her to tell him what his supposed "lie" had been. Plaintiff also requested to examine the transcript of the August 29, 2016 proceeding. The Mayor falsely told Plaintiff that when asked whether Hayse had ever said anything negative about the Mayor or Goch, he had replied no. Q, Welch Dep.136:6-137:22; At Coogan's direction,

---

[2] C, Bolton Dep. 204:11-21; 205:11-207:22; 208:6-209:3; 214:5-14; 215:14-17; 217:23-218:21; 219:1-220:13.

the Mayor refused to let Plaintiff see a copy of his testimony before his trial board. *Id.;* **AQ,** Welch Dep. at 52:20-53:8; 55:15-23.

Before the trial board began, Plaintiff wrote a statement addressing Defendants' allegations. Plaintiff reiterated that, in a few private conversations with Plaintiff, Hayse said negative things about the Mayor and Michael Goch. **X,** Welch Statement. Welch's statement flatly denied the remainder of the charges. The statement, which Plaintiff read before the PSC at his trial board is completely consistent with his August 29, 2016 testimony, where he recalled that in private conversations, Hayse criticized the Mayor and Michael Goch. *Id.;* **V,** Aug. 29, 2016 Proceeding 145: 5-17; 149:21—150:16.

It is undisputed that during the September 2016 trial board, Welch was never advised of what "lie" he allegedly told under oath at Hayse's termination proceeding. There was no lie, and Defendants' accounts of what lie Plaintiff allegedly told have varied wildly over time, as illustrated by the following chart:

| Name | Alleged Lie | Source |
|------|-------------|--------|
| Bolton | "he never heard the—Chief Hayse use derogatory terms towards the mayor and council." | **C,** Bolton Dep. 174:8-11. |
| | "who was gathered at the police desk, who was—the incidence that the chief made disparaging remarks, who was present." | **AN,** Bolton Dep., 93:17-21. |
| | Hayse had never made derogatory statements about Goch & Sons | **Defs. Brief (Dkt 38)** at 2. |
| McDaniel | Hayse had not come up to | **Y,** McDaniel Dep. at 30:22- |

9

| | the front desk and made any sort of announcements or disparaging remarks about not towing | 31:3 |
|---|---|---|
| | Hayse [had not] made remarks about the mayor and Goch & Son's | Y, McDaniel Dep. at 33:1-10 |
| | (*Q: What indicated Welch lied?*) "Nothing," (*Q: How did he lie?*) "I don't know." | Y, McDaniel Dep. at 40:13-41:1; 41:13-42:3; 61:12-14 |
| | Hayse had never made derogatory statements about Goch & Sons | **Defs. Brief (Dkt 38)** at 2. |
| McIsaac | "He said he didn't hear—the officer didn't hear Hayse or—and he didn't make any statements in front of other officers. It was just in private…he only heard Chad Hayse speak in private conversations—about Goch & Son's towing and the Mayor." | **Z, McIsaac** Dep. at 28:6-22 |
| | Hayse had never made derogatory statements about Goch & Sons | **Defs. Brief (Dkt 38)** at 2. |
| Hall | "Nothing," "I didn't think he lied." | **AA**, Hall Dep. at 95:1-16; 97:11-13; 97:22-98:5; 102:20-21 |
| | Hayse had never made derogatory statements about Goch & Sons | **Defs. Brief (Dkt 38)** at 2. |
| Coogan | Welch never heard Chad Hayse call the mayor any names | **AD**, Coogan Dep. at 79:25-80:2 |
| | Welch never heard Hayse make derogatory comments about the mayor and Goch & Son's in front of subordinates | **Defs. Brief (39)** at 2 |

10

| | or at the police desk | |
|---|---|---|

Not only does each individual Defendant's understanding of Plaintiff's alleged lie depend on the day, and sometimes the hour, **but as of the filing of Defendants' Motions for Summary Judgment, there is no consensus between the Defendants as to what lie Plaintiff allegedly told that led to his trial board**. The City, PSC, Bolton, McIsaac, McDaniel, and Hall claim that the alleged lie was that Welch testified that Hayse had never made derogatory statements about Goch & Sons towing company. Defs. Brief (Dkt 38) at 2. Coogan claims Welch allegedly lied that he never heard Hayse make derogatory comments about the mayor and Goch & Son's in front of subordinates or at the police desk. Defs. Brief (Dkt # 39) at 2. Coogan drafted the charges with one allegation in mind, and Bolton signed them believing that Plaintiff was being trial boarded for something else entirely. **Thus, it is impossible that Defendants provided Plaintiff adequate notice of the charges against him—to this day, they do not even agree on the substance of the charges**.

Notably, the PSC members conceded that during Welch's September 2016 trial board, Welch never admitted to lying, or stated that he had lied under oath at his disciplinary trial board in front of the PSC. **Y,** McDaniel Dep. 67:18-19; **Z,** McIsaac Dep., 126:23-127:2; **AA,** Hall Dep. 112:8-17. Other witnesses at the trial board, including Plaintiff and his union and legal representatives corroborated this fact. **AB,** Canfield Dep., 41:1-11; **Q,** Welch Dep. 146:12-147:15; **AL,** Kulesza Dep. at 36:13-15; 59:10-14.

On the basis of the statement Welch read aloud, Defendants "mitigated" the proposed termination to a 30-day suspension without pay. According to Hall, even though it was clear Welch had done and admitted to doing nothing wrong, there was "no choice" but to vote in favor of a suspension, because otherwise, the Ortiz, McDaniel, McIsaac, and Bolton would fire him. **AA,** Hall Dep., 104:12-18; 118:15-24. Hall repeatedly testified that Welch never lied under oath in 2016. *Id.* at 95:8-16; 102:20-21; 115:8-11; 116:4-9. McDaniel agreed that although she did not know Welch had lied, she immediately called for Welch's termination, and eventually voted in favor of suspending him in September 2016. **Y,** McDaniel Dep., at 61:12-14. Bolton similarly admitted that, aside from the sheer fact that the recollections of other officers differed from Welch's, at the time he voted to suspend Welch, he had no evidence that Welch lied under oath. **AN,** Bolton Dep., 93:7-10.

Notably, during the trial board proceeding, Coogan made a show of extracting Plaintiff's promise that he would, "render truthful testimony if called upon to do so, regarding former Police Chief Chad Hayse and statements he admitted he heard the former Chief make." **AC,** Sept. 13, 2016 PSC Minutes at 3; **AB,** Canfield Dep., 47:25-48:10. According to Canfield, Coogan told Welch, "You will cooperate." *Id.* at 48:3-6. This statement made it clear that the charges had been nothing more than means to ensure he would later testify in line with the City's position regarding Hayse's termination. *Id.* at 49:17-23. Defendants' unabashedly punished Plaintiff to ensure that his future testimony would support their version of events, and exonerate them of any wrongdoing. In light of the immense pressure

and scrutiny on him because of his support for Hayse, in January 2018, Plaintiff opted for an early retirement date of August 31, 2018.

According to Defendants' own Trial Board Rules and Procedures, Plaintiff's 2016 trial board was an utter sham—it is uncontested that although the Rules and Procedures mandate the following actions, none of them were taken in Welch's case:

- Respondents have 10 days after service of charges to answer charges in writing;
- Decisions of the trial board shall be based on the preponderance of the evidence presented at the hearing;
- A written transcript of all testimony and proceedings shall be prepared and preserved by the trial board;
- If the trial board sustains the charges, a written order/opinion shall enter stating its findings and determining the appropriate extent and scope of discipline. **AE**, PSC Trial Board Rules and Procedures, 2-4.

Coogan never gave the Rules and Procedures to the PSC prior to Welch's trial board, or even advised them that such rules existed. Instead, Coogan privately instructed the PSC on how he decided to conduct the proceeding. **Y**, McDaniel Dep., 18:1-9. Coogan again acted outside his authority as the City Attorney in determining that the PSC would operate outside the well-established rules and procedures for conducting trial boards Plaintiff's case. Coogan had no authority under the Charter to unilaterally dispense with these rules of due process. **AI**, Coogan Dep. at 69:7-8; 98:24-101:8; 103:12-104:16; 151:9-13; 152:15-23; 156: 2-8.

It is undisputed that no record exists of the closed-session of the PSC in which Plaintiff's disciplinary trial board was convened. In fact, the PSC's secretary admitted to Hall that either Coogan or the city clerk instructed her not to record the trial board session. **AA**,

Hall Dep., 121:13-122:1. McIsaac was the only PSC member to take notes during the trial board—it is undisputed that his notes contain no reference to any alleged "admission" that Welch either lied or misspoke under oath, further highlighting the fact that such an admission never took place.

Plaintiff was not only publically accused, but wrongly found guilty of lying under oath by the PSC in 2016. It is uncontested that the City never mounted any evidence in support of its position at the September 2016 trial board. **AA**, Hall Dep., 127:11-15; **Y**, McDaniel Dep., 57:24-58:4. None of the PSC members bothered to review any testimony from the August 2016 Hayse termination proceeding before making their decision—despite the fact that the two-day event had been recorded and transcribed. **AN**, Bolton Dep., 93:7-10; **Y**, McDaniel Dep., 55:16-21; 59:24-60:6; **AA**, Hall Dep., 101:21-24; **Z**, McIsaac Dep., 161:8-10; 22-25.

Instead, Defendants allegedly decided to suspend Plaintiff based on their recollections of the word of Patrick Easton, who Defendants all now admit cannot be trusted to tell the truth; and Matthew Furman, who admitted that he was under threat of termination because of Hayse and Welch's investigations under oath at the August 2016 termination proceeding. Notably, Furman never testified that Welch was present when Hayse allegedly called the mayor and city council members names, but said only that he believed Welch and Kennaley hypothetically "*would have been there*," at the times these statements were made.

Like Easton, Furman did not testify about any specific instances, dates, or occurrences. **V**, Aug. 29 Term. Proceeding, 72:5-11.

Later on, Furman appeared to retract his testimony that both Hayse and Welch made derogatory statements about Michael Goch, stating, "It's just Chief Hayse." *Id.* at 86:12-15. Kennaley also merely speculated as to who was probably around when the alleged comments were made, stating that "It was during the dayshift, so I think Lieutenant Allen was there—or not Allen, Lieutenant Welch...This was conversation amongst everybody that was in there." He said only that he believed Welch "would have been" present for Hayse's comments. **V**, Aug. 30 Term. Proceeding, 69:3-12. <u>Moreover, Defendants completely disregarded the objective facts that Hayse, Welch, and officers Detrich, and Meador all denied that they observed Hayse make derogatory statements about the mayor and Goch in front of subordinate officers</u>. **V**, Aug. 29 Term. Proceeding, 100-1; 145; 149; Aug. 30 Term. Proceeding, 18; 32-3; 81-3.

Defendants have attempted to ruin the career of a life-long public servant with an unimpeachable record for honesty and efficacy over nothing more than their pretextual personal opinions that he gave allegedly false testimony. Defendants clearly disciplined Plaintiff because his testimony was unfavorable to Defendants' position in the Hayse matter.

### Defendants Further Retaliate Against Plaintiff for his Testimony in a Federal Civil Lawsuit

On March 28, 2018, counsel for Hayse took the subpoenaed deposition of Plaintiff. Q, Welch Dep. Plaintiff's truthful testimony was uncontrovertibly favorable to Hayse. In pertinent part, Plaintiff testified that:

- Furman did not apply common sense and discretion on the job. Despite counseling by Plaintiff, Chief Hayse, and numerous other supervisors, Furman's bad behavior and poor judgment persisted. *Id.* at 21-23; 55-6.
- Furman's obsession with towing caused manpower and safety issues for the Department. *Id.* at 50-2.
- Plaintiff's investigation substantiated that Furman used excessive force against a citizen in February 2016. *Id.* at 14-16; 60-9.
- Furman impounded cars with elderly, frail, sick, and infant passengers when, under the totality of the circumstances, he should not have left those passengers without transportation. *Id.* at 71.
- Plaintiff's investigation substantiated that Furman used excessive force against Richard Crosslin in June 2016. *Id.* at 19-20; 73-75.
- Furman obtained legal advice directly from Coogan regarding his 2016 suspensions. *Id.* at 81.
- Plaintiff and Chief Hayse communicated to City officials that the Melvindale Police Department had negative dealings with Goch & Son's in the past; and that Goch was charging citizens for services he did not perform, but their concerns were ignored. *Id.* at 37; 45-6.
- The City Administrator stated that if the Melvindale Police ensured impounding revenues remained high, he could justify raises for the officers in their ongoing contract negotiations. *Id.* at 38.
- Neither Plaintiff nor Chad Hayse called the Mayor names in front of subordinate officers. *Id.* at 92.
- Hayse was fired because he disciplined Furman, who generated significant revenue for the City. *Id.* at 104.
- Plaintiff's own discipline was not conducted pursuant to the Department's rules and regulations. Coogan falsely explained that he and the Public Safety Commission investigated the allegations of wrongdoing against Plaintiff because Allen was only an interim Chief. However, during that time Allen investigated and disciplined two other officers. *Id.* at 123.
- After seeing what happened to Hayse, Plaintiff was confident that Defendants had also predetermined to fire him. As a result, Plaintiff decided to try to persuade the PSC to suspend rather than terminate him. *Id.* at 133.

- Three of the five Commissioners openly called for Plaintiff's termination. *Id.* at 135.
- The Mayor and Coogan withheld information from Plaintiff that he could have used to exonerate himself, namely the transcript and/or audio recording of the August 29 and 30, 2016 hearing. *Id.* at 136-7.
- Plaintiff never lied or admitted to lying under oath during any official proceeding. *Id.* at 146-7; 207-9.
- Plaintiff's investigations of Furman's misconduct in spring and summer 2016 directly led to his own September 2016 trial board and suspension. *Id.* at 216.

This testimony, again favorable to the Chief, infuriated Defendants.

On or about April 9, 2018, Coogan requested that Lieutenants Daniel Jones and Robert Kennaley, both subpoenaed witnesses in the Hayse case, meet with him in his office. **AF,** Welch Aff. ¶ 22.  Coogan had Plaintiff's March 2018 deposition transcript with him when he told Jones and Kennaley that Plaintiff had perjured himself. He even offered to let them read it. *Id.;* **A,** Jones Dep. 43:12-44:6; **B,** Kennaley Dep. 76:12-77:15. With Jones and Kennaley in his office, Coogan placed a telephone call on speakerphone to Chester Kulesza, the Police Officer's Labor Council Field Representative for the Melvindale Police Supervisors' Association. **AF,** Welch Aff. ¶ 23; **AG,** Kulesza Aff. ¶ 5; **A,** Jones Dep. 43:12-44:6; **B,** Kennaley Dep. 76:12-77:15.

Coogan told Kulesza that Plaintiff lied during his deposition. Coogan explained that he originally thought Plaintiff's testimony would be favorable to the City, but was upset to find that the opposite was true. **AG,** Kulesza Aff. ¶ 6, 8.  In a brazen effort to intimidate Plaintiff, Jones, and Kennaley, Coogan explained the PSC was contemplating disciplinary charges against Plaintiff for his unfavorable federal court testimony. **AF,** Welch Aff. ¶ 24-25;

17

AG, Kulesza Aff. ¶ 7-9. Coogan attempted to telegraph a message to Plaintiff, Jones, and Kennaley—if they dared to testify unfavorably for the City, they too would be harshly penalized. **AF**, Welch Aff. ¶ 27; **AG**, Kulesza Aff. ¶ 10; **B**, Kennaley Dep. 172:8-16.

Immediately prior to their April 10, 2018 meeting, Coogan provided the PSC copies of Plaintiff's deposition transcript, and advised them that they should bring disciplinary charges against Plaintiff for <u>lying during his federal court testimony. Coogan advised the PSC to terminate Welch</u>. **AH,** April 10, 2018 PSC Meeting 34: 8-14; 35:7-14; **C**, Bolton Dep. 171:10-172:11; 173:1-4; **AD**, Coogan Dep. 70:10-72:24; **AI**, Coogan Dep. at 163:7-13; **AA**, Hall Dep., 130:4-7; 136:19-21. In Coogan's deposition in the Hayse matter, he knowingly and falsely testified that the only reason he gave the PSC copies of Plaintiff's deposition transcript was <u>because they specifically asked him for copies</u>. **AD**, Coogan Dep. at 72:18-24. However, in his later deposition in the Welch case, he admitted that this was a lie—the PSC was unaware of Welch had even been deposed until Coogan took it upon himself to inform them. **AI**, Coogan Dep. at 163:7-13.

The PSC members immediately determined that Welch was guilty of the wrongdoing Coogan accused him of. McDaniel testified that after receiving Welch's deposition transcript from Coogan, she immediately decided that Welch should be disciplined for the testimony. **Y,** McDaniel Dep., 90:5:-8. Bolton also admitted that when Coogan presented him with Welch's transcript and told him that Welch had "lied," he "wanted him disciplined." **AN,** Bolton Dep., 143:24-5.

During the April 10, 2018 meeting, Coogan reiterated his false information and advice about Plaintiff. **AH,** April 10, 2018 PSC Meeting 2:14-20. Adamant that Plaintiff receive discipline, the PSC decided to draft a complaint for disciplinary action, and set a date for his trial board at their next meeting, on May 8, 2018. *Id.* 34: 20-35:3, 17-20; 36:24-37:12-16; 38:4-8, 24-25; 39:1-25. Jones, also a witness in the Hayse case, was present at the April 10, 2018 PSC meeting. **AF,** Welch Aff. ¶ 25. Jones privately telephoned Plaintiff on April 11, 2018, and told Plaintiff that he feared Coogan and the PSC would "come after" him next. *Id.* ¶ 27. On April 25, 2018, in another clear act of retaliation, Mayor Stacy Bazman issued a memorandum to the Melvindale Police Department not only banning Welch and Hayse from the police station, but also banning the rest of the officers from contact with them. Bazman Memo. Bazman issued this directive to the department without so much as notifying the Police Chief, John Allen. **AJ,** Allen Dep., 41:2-12; 19-21. Lieutenant Jones, one of the Command Officer's Union leaders, reached out to the Union's field representative with his concerns that Welch, then still an employee and Union member, would be unable to obtain representation. **AL,** Kulesza Dep., 54:1-13; 55:11-23.

At his May 14, 2018 deposition in the Chad Hayse case, Bolton knowingly and falsely testified that "no action had been taken" by the PSC against Plaintiff at the May 8, 2018 meeting, and McIsaac was merely "thinking about submitting charges" against Plaintiff. **C,** Bolton Dep. 190:23-191:3. To the contrary, on May 15, 2018, the PSC advised Plaintiff that on May 8, 2018 (6 days before Bolton's deposition) it publically and officially

resolved to draft disciplinary charges against Plaintiff and set a date for his trial board for lying under oath. **AL,** May 2018 PSC Letter. Bolton's reticence to admit the PSC's actions against Welch makes it highly likely that he knew their actions were improperly retaliatory. Again, Defendants failed to provide any indication of what "lie" he allegedly told under oath at his March 28, 2018 deposition. The PSC's resolution merely states:

> "Moved by McIsaac, and supported by McDaniel, to set a trial board date and draft a complaint against Lt. Michael Welch regarding his truthfulness and voracity [*sic*] during his testimony in front of the Public Safety Commission in closed session and compare it to his testimony during his recent deposition in the Chad Hayse lawsuit against the City." *See id.*

During their depositions, Bolton, McDaniel, Hall, and McIsaac all confirmed under oath that there was no lie in Welch's 2018 deposition transcript. **AN,** Bolton Dep., 171:14-172:16; **Y,** McDaniel Dep., 83:1-85:10; **AA,** Hall Dep., 137:5-8; **Z,** McIsaac Dep., 123:1-20.

Plaintiff filed a motion for a preliminary injunction restraining Defendants from further acts of retaliation on June 1, 2018. *See* Dkt. # 10. Defendants entered into a stipulated Order agreeing not to issue disciplinary complaints, charges, or further notices of trial board hearings against Welch prior to June 26, 2018. *See* Dkt. # 17. At the PSC's meeting on June 12, 2018, it withdrew its May 8, 2018 resolution to proceed with disciplinary action against Welch. He officially retired on August 31, 2018.

### Role of the Public Safety Commission and City Attorney

Chapter 20 of the Melvindale City Charter establishes the PSC. **AM,** City Charter at 33. The five members of this government agency are appointed to their positions by the

Mayor. However, Chapter 33 § 22 clarifies that the PSC members are **not** appointed under Chapter 7, § 10, and accordingly do not hold their positions at the will of the Mayor and Council. *Id.* at 68. Chapter 20 § 5 states that the PSC alone possesses and shall exercise fully all the powers, and perform all the duties pertaining to the government, management, maintenance, and direction" of the Police Department. *Id.* at 33.

Chapter 20 § 6 provides that the PSC shall appoint and govern the position of the Chief of Police. *Id.* at 34. It is undisputed that it is the role of the Chief to organize and administer discipline to the ranks of the Police Department. It is uncontested that Plaintiff's case is the only one in which the PSC arranged a trial board without the Chief's input or recommendation. In all other cases, the PSC had no involvement other than to sit in judgment at the trial board. In every other case resulting in a trial board, neither the PSC nor Coogan decided or recommended that charges be brought, drafted or gave input on charges, or organized the trial board. **AI**, Coogan Dep. at 42: 6-22; 44:24-45:4; 46:22-47:5, 15-22. In Plaintiff's case, Chief Allen was not even consulted by Coogan or the PSC. **AJ**, Allen Dep. at 13:23-14:3; 29:4-7. The fact that Coogan and PSC usurped the Chief's customary role in Plaintiff's case alone strongly suggests improper motive.

Chapter 15 § 3 describes the duties of the City's attorney as conducting the "legal business of the City;" drafting "ordinances, leases, deeds, contracts, written opinions, and other documents **as may be required** by the Council or by any department;" and sets forth that the City's attorney may have further duties as prescribed by ordinance. **AM**, City

Charter at 27. According to longtime PSC member Hall, Coogan's role as legal advisor to the PSC is to "give us advice or—to the Safety Commission **when requested**…" for example "interpret parts of the charter…" **AA,** Hall Dep. at 40:3-6; 14-15. According to McDaniel, "If we have a question, we go through him as to how we should approach [it],…he will advise us on how to proceed with it. **Y,** McDaniel Dep. 20:4-9, 17-19. For example, McDaniel explained that Coogan might advise on what the established procedure was for erecting a street sign. *Id.* at 20:12-13. It is undisputed that Coogan was neither requested nor required to draft 2016 charges against Welch, nor to instruct the PSC to attempt to terminate Welch a second time on the basis of his false assertion that Welch had "perjured" himself during his 2018 deposition. Coogan acted far beyond the bounds of his authority under the Charter when he took these actions against Plaintiff.

## III.    LAW AND ARGUMENT

### A.    Standard of Review

This Court may grant summary judgment only if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C). In considering a summary judgment motion, the facts "must be viewed in the light most favorable to the party opposing the motion." *Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.*, 921 F.2d 1343, 1349 (6th Cir. 1991). "Summary judgment is generally not well suited for cases where motive and intent are at issue and in which one party is in control of the proof." *Perry v. McGinnis*, 209 F.3d 597, 600 (6th Cir 2000).

B.     The PSC is a Legal Entity, and Plaintiff's Official Capacity Claims are Proper

Plaintiff's state law tort claims are not lodged against the PSC, but rather against Defendant Coogan alone. Moreover, as set forth in the City Charter, the PSC is not a municipal department, but rather a legal local governing body with powers and authorities separate from those of the City's other governing bodies. **AM,** City Charter at 33, 68.

The PSC and its members are indeed susceptible to being sued under federal law, particularly under § 1983 and § 1985. The Sixth Circuit held it would be anomalous to hold that Congress intended the word "persons" in § 1983 to carry a different meaning than the word "persons" in § 1985. *Veres v. Monroe Cty.*, 364 F. Supp. 1327, 1330 (E.D. Mich. 1973), *aff'd sub nom. Veres v. Cty. of Monroe*, 542 F.2d 1177 (6th Cir. 1976). In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that local governing bodies and local officials sued in their official capacities can be sued directly under § 1983 for monetary, declaratory, and injunctive relief in situations where, as here, the action that is alleged to be unconstitutional implements or executes a decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy. 436 U.S. 658, 690-91 (1978). "Our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in the official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name." While a state official, sued in his official capacity for monetary relief, is not a "person" within the meaning of § 1983, here Plaintiff seeks

23

declaratory, injunctive, and other forms of relief. *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991). The PSC and its members are susceptible to suit under § 1983 and § 1985.

### C.      42 USC § 1983 – First Amendment Retaliation

In order to prove that Plaintiff was retaliated against for exercising his First Amendment rights, he must show that: (1) he engaged in constitutionally protected conduct; (2) he suffered adverse action sufficient to deter person of ordinary firmness from engaging in such conduct; and (3) the adverse action he suffered was motivated at least in part by Plaintiff's protected conduct. *Henderson v. City of Flint*, No. CV 16-11648, 2017 WL 3412095, at *6 (E.D. Mich. Aug. 9, 2017). If Plaintiff meets his initial burden, the burden then shifts to Defendants to show by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. *Id.* (citing *Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### 1.      Both Plaintiff's August 2016 and March 2018 Testimony were Protected Speech

The question of whether Plaintiff engaged in protected conduct is a question of law. *Conn*, 586 F. Supp. 2d at 859; *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000).

### Defendants cannot Show Plaintiff Misspoke

There is no evidence that Plaintiff's testimony in August 2016 or March 2018 was false. Plaintiff testified in August 2016 that he heard Hayse make negative comments about the Mayor and Michael Goch in private conversation with himself. **W**, Aug. 29, 2016

Proceeding 145: 5-17. It is undisputed that the only evidence of what transpired during the trial board are the memories and subjective opinions of the attendees, who have a direct interest in silencing Plaintiff. **AD**, Coogan Dep. at 99:11-100:5; **C**, Bolton Dep. at 181:23-182:8. Plaintiff's September 2016 written statement was entirely consistent with his earlier testimony. He reiterated that Hayse had on occasion said negative things about the Mayor and Michael Goch in private conversations with Plaintiff. It is undisputed that at the time Plaintiff wrote the statement, he had not been provided with a copy of his testimony to review.

Accordingly, Plaintiff's written statement says only that *if he made any misstatement,* it was unintentional. **X**, Welch Statement. <u>Plaintiff, the PSC members, and other witnesses to the trial board agree that Plaintiff never admitted to lying under oath at or outside the trial board</u>[3]. **Q**, Welch Dep 146:12-147:15; **AK**, Kulesza Dep. at 36:13-15; 59:10-14; **Y**, McDaniel Dep. 67:18-19; **Z**, McIsaac Dep., 126:23-127:2; **AA**, Hall Dep. 112:8-17. **AB**, Canfield Dep., 41:1-11. Moreover, Defendants' utter lack of consensus on what aspect of Plaintiff's testimony was false is fatal to their argument that Plaintiff's speech lacks constitutional protection. *Supra*, 13-14.

The topic of the speech, not its veracity, determines whether a public employee is entitled to First Amendment protection. First Amendment protection might not be available if the employer can actually show that the public employee knowingly or recklessly made false

---

[3] Defendants' Briefs abandon their earlier position that Welch lied under oath at his March 2018 deposition. Dkt. # 38 at 13; Dkt. # 39 at 10.

statements, but a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment. *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 851 (E.D. Mich. 2015), *aff'd*, 655 F. App'x 495 (6th Cir. 2016). Defendants proffered no evidence that Plaintiff's alleged "misstatements" were anything but unintentional. Moreover, as set forth above, the record shows Plaintiff never lied or misspoke in August 2016 March 2018. Plaintiff's speech was clearly protected by the First Amendment, and Defendants had no viable interest in silencing that speech.

Plaintiff Spoke as a Citizen

A public employee's sworn testimony outside the scope of his ordinary job duties is protected First Amendment speech, even when his testimony relates to his public employment or concerns information learned during that employment. *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014). The "critical question" involved in determining whether an individual has engaged in protected speech as a private citizen is whether the speech at issue is itself ordinarily within the scope of the employee's duties, <u>not</u> whether it merely concerns those duties. *Mayhew*, 856 F.3d at 464. Speech is not transformed into employee—rather than citizen—speech merely because it concerns information acquired by virtue of the speaker's public employment. *Mayhew*, 856 F.3d at 463. Both in August 2016 and March 2018, Plaintiff testified <u>about</u> things he heard and observed at work. The actual speech at issue—his subpoenaed testimony on both occasions—was not within the scope of his duties.

Plaintiff's ordinary job duties did not require him to testify at the August 2016 termination proceeding, or at Plaintiff's March 28, 2018 deposition. Plaintiff was under subpoena in both instances. There is no evidence that Plaintiff was on official Melvindale Police duty when he testified at the August 29 proceeding. Plaintiff was undisputedly in an inactive, non-duty status in March 2018. Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen because a sworn witness bears an obligation to the court and society at large to be truthful that is independent of any duties they owe their employer in connection with giving that testimony. *Lane*, 134 S. Ct. at 2379 (2014). *Weisbarth v. Geauga Park Dist.* is not instructive here. At her employer's behest Weisbarth had a "ride-along" conversation with an investigator her employer hired to conduct a departmental evaluation. 499 F.3d 538, 544 (6th Cir. 2007). Weisbarth, unlike Plaintiff, was not subpoenaed to give sworn testimony under penalty of perjury before the court and society at large. *See Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 542 (6th Cir. 2012). Plaintiff did not speak in the course of his ordinary job duties.

## Plaintiff Spoke on Matters of Public Concern

Matters of public concern are those that may be "fairly characterize[d] ... as relating to any matter of political, social, or other *concern to the community.*" *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1,* 131 F.3d 564, 574 (6th Cir. 1997) (internal quotation marks omitted). The First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. *See Connick,* 461 U.S.

at 145, 149, 103; *Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 571–72 (1968). "The core value of the Free Speech Clause of the First Amendment" is "[t]he public interest in having free and unhindered debate on matters of public importance." *Pickering,* 391 U.S. at 573. This core value demands that "[public employees] be able to speak out freely on ... questions [of public concern] without fear of retaliat[ion]." *Id.* at 572. *Chappel,* 131 F.3d at 574.

Plaintiff's testimony about the unlawful behaviors of a Melvindale police officer and other City officials was obviously a matter of significant public concern. *Garcetti v. Ceballos,* 547 U.S. 410, 425 (2006) ("exposing governmental inefficiency and misconduct" is a matter of considerable public significance"); *Lane,* 134 S. Ct. at 2380. The public is deeply concerned with how a police department is operated. *McMurphy v. City of Flushing,* 802 F.2d 191, 196 (6th Cir. 1986). Plaintiff's speech concerned not only the clash between his and Hayse's attempts to reign in Furman and the administration's desire for revenue, but also how the government wrongfully prevailed in this conflict. His speech unquestionably comprised matters of significant public concern.

## 2. Plaintiff Suffered A Sufficiently Adverse Action

Defendants' actions would clearly deter a person of ordinary firmness from continuing to engage in the conduct. Since there is no justification for harassing individuals who exercise their constitutional rights, any resultant impact on free speech need not be great in order to be actionable. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir. 1999). A

plaintiff "need not show [that she was] actually deterred from exercising [her] right to free speech." *Ctr. for Bio–Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007). Requiring a showing of "adverse" action "is intended to weed out only **inconsequential** actions, and **is not** a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X,* 175 F.3d at 398 (emphasis added). A credible threat to the nature and existence of ongoing employment is of a similar character to the other recognized forms of adverse action, such as termination or refusal to hire. *Fritz v. Charter Twp.*, 592 F.3d 718, 724, 728 (6th Cir. 2010); *see also Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 853 (E.D. Mich. 2015), *aff'd*, 655 F. App'x 495 (6th Cir. 2016).

In *Haji v. Columbus City Schools*, No. 12–3520, 621 Fed.Appx. 309, 313, 2015 WL 4385280, at *4 (6th Cir. July 16, 2015) the Sixth Circuit held that a recommendation of termination was sufficiently adverse under First Amendment Retaliation standard. In *Ely v. Dearborn Heights Sch. Dist. No. 7,* this Court found that two letters of reprimand, one warning plaintiff that she could be fired, were sufficiently adverse actions for the purposes of stating a First Amendment Retaliation claim. *See Ely*, 150 F. Supp. 3d at 853. Defendants in this case went much further. They not only suspended Plaintiff for his 2016 testimony, but publically denounced him as a perjurer in their September 13, 2016 and May 8, 2018 resolutions and at the April 10, 2018 public meeting of the PSC. **AC**, Sept. 13, 2016 PSC Minutes at 3; **AL**, May 2018 PSC Letter. Coogan gave an interview to a local newspaper implying Plaintiff had been suspended for lying under oath. **AO**, Welch Suspension Article.

Coogan told Plaintiff's union representatives and colleagues that he was a perjurer, and faced disciplinary action, up to and including termination. Defendants suspended Plaintiff for 30 days without pay in September 2016 and again resolved to take grave disciplinary action against him, up to and including his termination, which threatened to decimate his retirement benefits. Due to the negative attention and scrutiny that resulted from Defendants' unlawful actions against him, Plaintiff elected to use his accumulated leave rather than returning to work in 2017-2018. **AU**, Welch Declaration. Disciplinary actions of this nature are sufficient to meet the standard for adverse consequences. *Conn*, 586 F. Supp. 2d at 861; *see also Pickering*, 391 U.S. at 574-5. Defendants' actions destroyed the reputation for honor and efficacy Plaintiff created over the last 20 years, and with it his standing in the community and hopes for future employment in law enforcement.

### 3. Evidence of Causation is Uncontested—Defendants' Actions Against Plaintiff were Based on his Protected Speech

"An act taken in retaliation for the exercise of a constitutionally protected right is actionable even if the action would have been proper if taken for a different reason." *Hoover v. Radabaugh*, 307 F.3d 460, 467 (6th Cir. 2002). The Court's role is to determine if protected speech was "a substantial or motivating factor" in the adverse action; speech need not be the only factor. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008) (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)) (emphasis added). "Put differently, a plaintiff satisfies the motivation element by showing that the adverse action 'was

motivated <u>at least in part</u>' by the protected speech." *Miller v. City of Canton*, 319 F. App'x 411, 419 (6th Cir. 2009) (emphasis added).

Neither the City, PSC, nor any individual Defendant disputes the element of causation is present in this case, that Defendants' actions against Plaintiff (1) were motivated by his protected conduct; or that they (2) would not have been the same absent Plaintiff's protected conduct. Dkt. # 38:13-16; Dkt. # 39 8-10. If Plaintiff had not given this testimony, or if its substance had been different, Defendants would not have taken action against him.

### D.   42 USC § 1985(2) – Conspiracy to Interfere with the Administration of Justice in Federal Courts

Defendants City of Melvindale, PSC, and Bolton, McIsaac, McDaniel, and Hall argue only that Plaintiff's claim under §1985 is barred by the intracorporate conspiracy doctrine, which goes to the requirement that two or more persons be engaged in a conspiracy. These Defendants do not contest that there are questions of material fact regarding any of the other elements necessary to prove a claim under this statute. (Dkt. # 38 at 8-9). They accordingly waive all such arguments.

The intracorporate conspiracy doctrine is not applicable because Coogan and the PSC acted outside the scope of their duties when they twice conspired with the PSC to punish and/or terminate Plaintiff to remove the threat he posed to the City's towing revenue, and secure his cooperation against Hayse. *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 616 (6th Cir. 2015). Under the intracorporate conspiracy doctrine, "members of the same

31

legal entity cannot conspire *with one another* as long as their alleged acts were within the scope of their employment." However, the Sixth Circuit recognizes an applicable exception to the doctrine where defendants act outside the scope of their employment. *Jackson v. City of Cleveland*, No. 17-3840, 2019 WL 1397484, at *15 (6th Cir. Mar. 28, 2019). This exception distinguishes between collaborative acts done in pursuit of an employer's legitimate business and private acts done by individuals who merely happen to work at the same place. *Johnson v. Hills & Dales General Hosp.,* 40 F.3d 837, 839 (6th Cir. 1994); *Briner v. City of Ontario*, 2010 WL 3982755, at *14 (N.D. Ohio Oct. 7, 2010*), on reconsideration,* 2011 WL 866464 (N.D. Ohio Mar. 9, 2011). In *Briner,* the Court declined to apply the doctrine when city officials' comments about plaintiff indicated their governmental actions against her were motivated by personal considerations, including what the court described a "vendetta" against plaintiff. *Briner,* 2010 WL 3982755, at *15, n. 17, N.D. Ohio Oct. 7, 2010), *on reconsideration,* 2011 WL 866464 (N.D. Ohio Mar. 9, 2011). In *DiLuzio v. Vill. of Yorkville, Ohio,* the doctrine did not apply to plaintiff's claim that the mayor and other officials conspired to wrongfully divest him of his property. 796 F.3d at 616. The mayor was not entitled to the protection of the doctrine because of evidence that he had self-serving and/or malicious intent in taking mayoral action to have a building demolished. Evidence of the mayor's bad intent removed his actions from the scope of his employment, even though the actions could only have been completed under his mayoral authority. *Id.* at 615. Finally, in *Jones v. City of Youngstown,* 980 F.Supp. 908 (N.D.Ohio 1997) the court declined to

apply the doctrine because there was a question of fact as to whether defendants used zoning enforcement as cover for an illegal drug search. Evidence of the officials' wrongful actions precluded a finding that they acted within the scope of their employment.

These cases counsel that application of the doctrine is inappropriate here. There is ample evidence that Defendants acted outside the scope of their authority, abused their authority, and used their authority as a cover for unlawful activity, for malicious, self-serving reasons that had nothing to do with the City's legitimate aims.

Coogan was instrumental in terminating former police chief Chad Hayse. **F**, Barnes Dep. at 129:3-131:24. Based on his fervent demands that Plaintiff "testify truthfully in the future" about Hayse, he knew litigation would likely result. **AB**, Canfield Dep., 47:25-48:10; 48:3-6. With his professional reputation and potentially his own position on the line, Coogan had a significant personal interest in making sure the City prevailed against Hayse's eventual challenge. Coogan immediately took action to secure Plaintiff's future cooperation with the City, and quite literally acted beyond the scope of his authority as the PSC's legal advisor. Without so much as a request for advice from the PSC, he unilaterally drafted charges, issued subpoenas, and staged a sham trial board dispensing with procedural rules, staged press coverage of Plaintiff's suspension, and demanded that he "cooperate" with the City against Hayse[4].

---

[4] **AN**, Bolton Dep., 109:1-21; 179:11-180:6; **Z**, McDaniel Dep., 18:1-9; 57:11-18; **AI**, Coogan Dep. at 69:7-8; 98:24-101:8; 103:12-104:16; 151:9-20; 152:15-23; 156: 2-8; **AA**, Hall Dep.

For their part, the PSC members abused and acted outside their authority for malicious and self-serving reasons by blithely going along with Coogan's plan. Plaintiff has adduced plentiful evidence of the PSC's malicious intent. It is undisputed that Plaintiff's case is the only one where the PSC acted without the involvement of and a recommendation for discipline from the chief. **AI**, Coogan Dep. at 42: 6-22; 44:24-45:4; 46:22-47:5, 15-22. Even more damning, the PSC members admitted to ruthlessly calling for Plaintiff's termination, and suspending him without pay for an entire month, knowing there was no proof that Plaintiff engaged in any wrongdoing. The PSC never reviewed the record of Plaintiff's testimony before suspending him without pay, because it did not matter to them whether Plaintiff had lied. His testimony was damaging, and he had to be punished. **Y**, McDaniel Dep., at 61:12-14; **AN**, Bolton Dep., 93:7-10; **AA**, Hall Dep., 104:12-18; 118:15-24; at 95:8-16; 102:20-21; 115:8-11; 116:4-9. **Y**, McDaniel Dep., 55:16-21; 59:24-60:6. The PSC members' abuse of their authority for malicious and wrongful reasons also took their actions against Plaintiff in September 2016 outside the scope of their employment.

Again, in 2018, Coogan unilaterally took it upon himself to initiate disciplinary action and public recrimination against Welch for his truthful testimony. **AI**, Coogan Dep. at 163:7-13. Coogan again acted unprompted to provide the PSC with Welch's testimony, concoct false accusations of perjury, and initiate discussion that triggered voting on the matter at the PSC's April 10, 2018 and May 8, 2018 meetings. **AH**, April 10, 2018 PSC Meeting 34: 8-14;

---

40:3-6; 14-15; 106:15-25; **AC**, Canfield Dep., 47:25-48:10; 48:3-6; **AM**, City Charter at 27; **AO**, Welch Suspension Article.

35:7-14; **C**, Bolton Dep. 171:10-172:11; 173:1-4; **AD**, Coogan Dep. 70:10-72:24; **AI**, Coogan Dep. at 163:7-13; **AA**, Hall Dep., 130:4-7; 136:19-21. Coogan even took it upon himself to attempt to intimate other witnesses prior to their depositions, and admitted to Plaintiff's union representative that he was upset that Plaintiff's testimony jeopardized the City's position in the Hayse case. **A**, Jones Dep. 43:12-44:6; **B**, Kennaley Dep. 76:12-77:15, 172:8-16; **AF**, Welch Aff. ¶ 23, 27; **AG**, Kulesza Aff. ¶ ¶ 5-8, 10.

Again, the PSC went along with Coogan's plan to retaliate against and punish Plaintiff. McIsaac drafted a second set of charges against Plaintiff using Coogan's 2016 charges as a template, and the other members called for discipline and dismissal despite again knowing there was no proof of any wrongdoing[5]. This strongly indicates that they did so with malicious, self-serving intent, to support Coogan's scheme to punish Plaintiff for jeopardizing the City's position in the Hayse case. Because there are questions of fact as to whether Coogan's and the PSC's actions against Plaintiff were performed within the scope of their employment, summary judgment must be denied as to his §1985 claim.

Coogan also falsely asserts that Plaintiff's claim fails because all Coogan did was "provide legal guidance," after "questions arose regarding Plaintiff's truthfulness" in 2016 and 2018. There is copious evidence, including his own testimony, that Coogan unilaterally raised the issue of Plaintiff's truthfulness under oath on both occasions.

---

[5] **Y**, McDaniel Dep., 83:1-85:10; 90:5:-8; **AN**, Bolton Dep., 143:24-5; 171:14-172:16; **AH**, April 10, 2018 PSC Meeting 2:14-20; 34: 20-35:3, 17-20; 36:24-37:12-16; 38:4-8, 24-25; 39:1-25; **AA**, Hall Dep., 137:5-8; **AA**, McIsaac Dep., 23:2-14; 123:1-20.

Coogan's claim that the record is devoid of evidence of animus between Plaintiff and Coogan prior to the 2016 trial board is also plainly false. Coogan initiated Plaintiff's discipline and threatened further discipline on the basis of knowingly false perjury charges. Moreover, there is ample evidence that when Coogan learned Welch and Hayse attempted to hold Furman accountable for his misconduct (which Coogan and the PSC knew would decrease towing revenues), Coogan initiated a sham investigation into Welch and Hayse designed to generate fodder for their terminations. Coogan hired Lawrence Jackson (an acquaintance of his legal secretary) to "investigate" Plaintiff and Hayse.   At Coogan's explicit direction, Jackson interviewed only Furman and Easton. **AP**, Jackson Dep. 36:1-18; 40:5-15; 164: 4-14; 164:23-165:19; 168:3-8; 98:17-21; 144:12-23. Jackson later admitted that it appeared he had unwittingly propagated falsehoods. *Id.* at 195:25-196:5. Coogan's animus against Welch is well-documented.

Lastly, Coogan's argument that Plaintiff's claim is inviable because he admitted to lying under oath is contradicted by the overwhelming weight of evidence adduced in this case. Virtually every attendee of the 2016 trial board testified Welch never admitted to lying. **Y**, McDaniel Dep. 67:18-19; **Z**, McIsaac Dep., 126:23-127:2; **AA**, Hall Dep. 112:8-17; **AB**, Canfield Dep., 41:1-11; **Q**, Welch Dep. 146:12-147:15; **AK**, Kulesza Dep. at 36:13-15; 59:10-14. The only reason Plaintiff accepted the 30 day suspension was because he was convinced that he would be immediately terminated if he did not. **Q**, Welch Dep, 144:23-145:8; **AQ**, Welch Dep, 60:2-12. According to Hall, Plaintiff's convictions were correct. **AA**,

Hall Dep., 104:12-18; 118:15-24. Summary Judgment must be denied. Plaintiff has adduced ample evidence that in support of the City's scheme to rekindle towing revenue, and in order to silence Plaintiff and punish him for testifying unfavorably for the City, Coogan and the PSC retaliated against him for his truthful sworn testimony.

### E.     42 USC § 1983 - Fourteenth Amendment Procedural Due Process

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that certain substantive rights–life, liberty, and property–cannot be deprived except pursuant to constitutionally adequate procedures. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  An individual should be given the opportunity for a hearing before he is deprived of his property interest.   *Loudermill*, 470 U.S. at 542 (quotation marks and citation omitted). When considering claims for the violation of due process rights, the court undertakes a two-step analysis: first, to determine whether the plaintiff has a property or liberty interest entitled to due process protection, and second, to determine "what process is due." *Leary v. Daeschner*, 228 F.3d 729, 741-742 (6th Cir. 2000).

### 1.     Defendants Deprived Plaintiff of his Protected Liberty and Property Interests.

Defendants do not dispute that Plaintiff had a protected liberty interest in his position as a police lieutenant, and his reputation for honesty; or that he had a protected property interest in his ability to continue in his profession unmolested by sham disciplinary action. Rather, Defendants argue that they did not cause an actionable deprivation of these interests.

Plaintiff need not show that his employment was terminated to establish a deprivation of his protected property and liberty interests in his position. The Sixth Circuit has characterized suspensions of two to three days as *de minimis* deprivations. Courts in this circuit have found that a week-long suspension was sufficient to trigger due process protections. *Brunn v. City of Cleveland*, 526 F.Supp. 564, 566 (D.C.Ohio, 1981). In the educational context, due process protections are triggered by suspensions of 10 days in length or more. Here, Plaintiff was suspended for an entire month without pay. Moreover, the plain language of the collective bargaining agreement establishes Plaintiff's right to due process before being suspended without pay. **AR,** CBA at 8. Plaintiff's 30-day suspension without pay was therefore sufficient to implicate his protected liberty interest in his employment. *Ludwig v. Board of Trustees of Ferris State University*, 123 F.3d 404, 409 (C.A.6 (Mich.),1997). Plaintiff indeed experienced an actionable deprivation of his liberty and property interests in his employment.

Furthermore, Defendants also deprived Plaintiff of his protected liberty interest in his ability to continue in his profession, by falsely accusing him of and suspending him for perjury. Defendants' allegations go far beyond assertions that Plaintiff was merely incompetent. *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996). *Chilingirian v. Boris*, 882 F.2d 200, 204 (6th Cir. 1989). To establish a deprivation of a protected liberty interest in the employment context, Plaintiff must demonstrate stigmatizing governmental action which so negatively affects his reputation that it effectively forecloses the opportunity

to practice a chosen profession. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573-4 (1972). He must also allege that the stigmatizing information was publicly disclosed. *Christian v. Belcher,* 888 F.2d 410, 416 (6th Cir. 1989).

As set forth above, there is copious documentary evidence and testimony proving that Defendants publically made false, stigmatizing statements about Plaintiff, despite the fact that he did not lie under oath in August 2016. The transcript of his 2016 testimony confirms this objective fact. Defendants admitted that they had no direct evidence Plaintiff lied. Defendants were obviously motivated by a desire to curtail Plaintiff's exercise and receipt of his constitutionally protected rights—they never would have prevailed in disciplining Plaintiff if they explained the real reasons they wanted to punish him. *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d 684 (U.S. 1976).

Defendants' decision to suspend Plaintiff for lying under oath was so stigmatizing that it foreclosed his opportunity to obtain employment as a police officer. *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996); *see also Brown v. City of Detroit*, 259 F. Supp. 2d 611, 621 (E.D. Mich. 2003). Honesty and integrity are fundamental job requirements in the law enforcement and public safety sector. *Joelson*, 86 F.3d at 1420 (6th Cir. 1996). Defendants falsely alleged that Plaintiff was dishonest, dishonorable, and that he twice lied under oath. Unlike in *Joelson*, where the employer's mildly worded letter was held to have made plaintiff less attractive to other employers, when Defendants twice accused and

suspended Plaintiff on the basis of these false allegations, his job prospects in the law enforcement and security industry were effectively destroyed. **AU**, Welch Declaration

Defendants voluntarily and publically disclosed their stigmatizing conclusions about Plaintiff's character. As set forth above, in 2016, Defendants placed information in the public record (both the minutes of the PSC and the local newspaper) strongly signaling Plaintiff had been disciplined for lying under oath. Furthermore, in 2018, Defendants publically lambasted Plaintiff's character for honesty and truthfulness in the public record at their April 2018 meeting, memorialized their accusations in the minutes of the April and May 2018 meetings, and disseminated them to Plaintiff's union representative and two close colleagues. There can be no doubt that Defendants publically and voluntarily disclosed their false and stigmatizing conclusions that Plaintiff was a serial perjurer. Defendants' actions actionably implicated Plaintiff's protected liberty interest in his employment.

2.    Defendants Denied Plaintiff a True Due Process Hearing.

Public employees are entitled to a meaningful pre-termination hearing including oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Loudermill*, 470 U.S. at 546.

a.    Plaintiff did not Receive Proper Notice.

First and foremost, because Defendants' charges against Plaintiff were obviously false, Plaintiff did not receive notice of the true reasons why they sought his termination. Defendants never would have prevailed in suspending Plaintiff if they explained their real

motivations for doing so. *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d 684 (U.S. 1976).

The charges against Plaintiff are also deficient. They allege that Plaintiff lied under oath, but do not bother to explain what the alleged lie was. Defendants did not permit Plaintiff to review his 2016 testimony before the trial board, even though the record was readily available. <u>To this day, Defendants are unable to agree on what Plaintiff allegedly lied about.</u> Not only did Defendants' versions of the "lie" vary throughout the course of their depositions, but, the City, PSC, and Commissioners' brief sets forth a different alleged lie than Coogan's. The individual who wrote the charges had one alleged lie in mind, and the officials voted to suspend Plaintiff on the basis of a different alleged lie. If Defendants do not have consensus amongst themselves about what Plaintiff's wrongdoing was it is impossible that they could give him adequate notice of the charges against him. Moreover, the charges summarized Defendants' false conclusions alone, and did not set forth any actual evidence of wrongdoing. It is frankly impossible that Defendants could have set forth their evidence against Plaintiff because as set forth above, they admitted they had none. Plaintiff did not receive adequate notice.

### b.    Plaintiff's Trial Board was a Sham.

Defendants' sham trial board did not substantively satisfy "the root requirement" of the Due Process Clause, "that an individual be given an opportunity for a hearing <u>before</u> he is deprived of his constitutionally protected interests." *Cleveland Bd. of Educ.*, 470 U.S. 532

at 542. Defendants admitted that they predetermined to take disciplinary action against Plaintiff. Hall confirmed this fact—she voted in favor of suspension, because otherwise, Plaintiff's termination was a foregone conclusion. *See Califano v. Yamasaki,* 442 U.S. 682, 686, 99 S.Ct. 2545, 2550, 61 L.Ed.2d 176 (1979) (holding that the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the decision to terminate is made). Plaintiff's suspension was a sham designed to effectuate Defendants' predetermined decision to punish him for interrupting towing revenues and compromising their proceedings against Hayse. *Smith v. Michigan Dep't of Corr.,* 765 F. Supp. 2d 973, 982–83 (E.D. Mich. 2011). A "sham" proceeding—where the outcome is predetermined— does not meet the Constitutional requirements of a pre-termination hearing, nor does such a hearing afford due process under the Fourteenth Amendment. *See Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988); *see also Wagner v. City of Memphis,* 971 F.Supp. 308, 318–19 (W.D.Tenn. 1997) (sham proceedings "eviscerate the protection afforded to municipal employees under the Due Process Clause of the Fourteenth Amendment").

Moreover, it is uncontested that the City dispensed with its typical process for trial boards in Plaintiff's case. Plaintiff was not given the requisite 10 days to respond, the City mounted no evidence in support of its case against Plaintiff, no record was made of the proceeding, and no written order or opinion issued, although the PSC members testified that their charges against Plaintiff were sustained. Defendants' gross deviations from their

established procedures strongly indicate their motives and intent to deprive him of a fair opportunity to be heard.

### 3. Plaintiff's Procedural Due Process Claim is Not Barred because he Did Not Request a Name Clearing Hearing

Contrary to Defendants' assertions, a public employee relying on denial of a <u>property</u> interest in continued employment in support of his due process claim does not need to request a "name hearing clearing." *Quinn v. Shirey*, 293 F3d 315 (6th Cir. 2002). Neither is the aspect of Plaintiff's procedural due process claim regarding his liberty interest barred. The required extent of post-deprivation procedures is inextricably intertwined with the scope of pre-deprivation procedures. *Loudermill*, 470 U.S. at 547. Where an aggrieved employee receives only a perfunctory or no pre-deprivation opportunity to clear his name, <u>then</u> due process requires a more meaningful post-termination proceeding. In the line of cases Defendant Coogan cited, the aggrieved employee received no pre-termination *Loudermill* proceeding whatsoever. *Brown v. City of Niota, Tenn.*, 214 F.3d 718, 719-20 (6th Cir. 2000); *Quinn v. Shirey*, 293 F.3d 315, 318 (6th Cir. 2002). Due process requires <u>at least one opportunity</u> for such a hearing. *Carter v. W. Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 274 (6th Cir. 1985). There is no case law requiring Plaintiff to subject himself to a second, post-deprivation hearing to preserve his liberty interest when he already submitted to a sham hearing and barely escaped with his livelihood and pension intact. Plaintiff took the suspension and agreed not to grieve the discipline because he was convinced if he did not, he would be fired and be unable to provide for his family; at the time he doubted there

was any recourse to hold Defendants' accountable. **Q,** Welch Dep. 144:23-147:25.
Moreover, in this case, the outcome of the pre-termination proceeding was preordained,
nullifying any possibility that a post-termination proceeding could serve its Constitutional
purpose.

## F.   Defendants are not entitled to immunity against Plaintiff's Constitutional claims.

### 1.   Decisions by Defendants Create Liability for the City

A governmental agency is liable under 42 U.S.C. § 1983 for the acts of its agents, if
those acts represent the entity's official "policy or custom."  *Monell v. Dep't Social Servs.*, 436
U.S. 658 (1978).  A "policy or custom" may be made up of any "acts or edicts [that] may fairly
be said to represent official policy." *Id.* at 694.  The "custom and policy" requirement can
indeed be met in the context of a single and isolated decision by an individual actor:

> If the decision to adopt [a] particular course of action is properly made by that
> government's authorized decision makers, it surely represents an act of official
> government "policy" as that term is commonly understood.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). The acts of authorized decision
makers for a public entity concerning the action alleged to have caused the particular
constitutional violation at issue are attributable to the entity.  *Jett v. Dallas Independent School
Dist.*, 491 U.S. 701, 737 (1989). It is undisputed that the PSC is an authorized decision maker
for the City concerning the actions Plaintiff alleges to have violated his constitutional rights—
his suspension and proposed further discipline. Chapter 20 § 5 states that the PSC alone
possesses and shall exercise fully all the powers, and perform all the duties pertaining to

the government, management, maintenance, and direction" of the Police Department. *Id.* at 33. It is undisputed that this authority gives the PSC the ability to discipline, demote, or discharge members of the police department, and to conduct trial board proceedings, which in this case led to the deprivation of Plaintiff's constitutional rights. Accordingly, governmental immunity does not attach.

## 2. Individual Defendants are not Entitled to Qualified Immunity

The qualified immunity defense is unavailable in actions against local government officials in their *official* capacity. *Hafer v. Melo*, 502 U.S. 21, (1991); *Frank v. Relin*, 1 F.3d 1317 (2nd Cir. 1993). Government officials are entitled to qualified immunity in their individual capacities if their conduct does not violate clearly established federal, statutory, or constitutional rights of which a reasonable official would have known. A reasonably competent public official is presumed to know the law governing his or her conduct. *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006). As set forth above, Plaintiff has established the violation of his constitutional right to due process and free speech. There is no evidence that Defendants did not understand Plaintiff was entitled to free speech, proper notice, or a fair due process hearing. The second prong of the analysis is satisfied by evidence that the employee's rights are "generally understood." *Silberstein*, 440 F.3d at 317. Plaintiff's constitutional rights to due process and free speech were clearly established, and immunity does not attach. Defendants' arguments that qualified immunity applies to Plaintiff's claims because they he (1) acted reasonably; and (2) Coogan did not

improperly influence the PSC to take action against Plaintiff are flatly contradicted by the record. There is ample evidence that Coogan and the PSC acted unreasonably. They admitted there was no proof Welch lied under oath, and that he never admitted he had done so. There is also sufficient proof that Coogan asserted improper influence over the PSC in 2016 and 2018. *Supra* at 6-22. Defendants cannot claim qualified immunity.

G.    Defamation

Plaintiff has raised a question of material fact as to whether Coogan defamed Plaintiff. Not only were Coogan's statements about Plaintiff's "perjury" objectively false, it is uncontested that the entire reason Coogan published these lies was to harm Plaintiff's trade and profession by getting him fired or disciplined. Plaintiff's employment record of discipline for lying under oath will deter future law enforcement and security sector employers from dealing with him. **AU**, Welch Declaration. Honesty and integrity under oath are indispensable job requirements in Plaintiff's industry.

Coogan published materially false statements about Plaintiff—that he lied under oath in 2018—with knowledge of the falsity of these statements and with reckless disregard of their truth or falsity. Coogan deliberately mischaracterized Welch's statements in his 2018 deposition as "lies," in an intentional effort to destroy Plaintiff's employment and reputation before he could do further harm to the City's and Coogan's position in the Hayse matter.

Coogan is a licensed attorney, and Plaintiff accordingly credits him with knowledge of how to read a deposition transcript and what constitutes a lie under oath. Coogan claimed to

have read Welch's 2018 deposition transcript. **AD**, Coogan Dep. 103:8-12. He asserted that in Welch's deposition, Welch denied receiving the City's 2016 charges. This is false—Welch said the opposite. **Q**, Welch Dep 218:2-12. Taking Coogan at his word that he read the transcript compels a finding that he intentionally misrepresented Welch's testimony. Coogan also claimed Welch lied under oath in 2018 because Welch denied that he had lied in 2016. **AD**, Coogan Dep. 103:8-25; **AI**, Coogan Dep. 163:20-164:15; 193:22-25. Welch did not lie under oath in 2016. Virtually every attendee of the 2016 trial board conceded that Welch never admitted to lying under oath at his 2016 trial board. **Y**, McDaniel Dep. 67:18-19; **Z**, McIsaac Dep., 126:23-127:2; **AA**, Hall Dep. 112:8-17; **AB**, Canfield Dep., 41:1-11; **Q**, , Welch Dep. 146:12-147:15; **AK**, Kulesza Dep. at 36:13-15; 59:10-14. *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 841 (6th Cir. 1988), *aff'd sub nom* ("avalanche of denials by knowledgeable individuals" compelled finding that accusation was defamatory). Coogan pointed the PSC to specific pages in Welch's 2018 deposition that he claimed contained Welch's perjury. **Y**, McDaniel Dep. at 75:2-13; **AA**, Hall Dep. 133:17-18. Coogan spoon-fed the PSC snippets of Welch's testimony in order to give the false impression that he had lied under oath. Coogan deliberately misrepresented this aspect of Plaintiff's 2018 testimony to discipline and humiliate him further. Coogan's actions are more than sufficient to constitute "reckless disregard for the truth." *Smith v. Anonymous Joint Enter.*, 487 Mich. 102, 117, 793 N.W.2d 533, 542 (2010) (actual malice standard met where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports).

Coogan made multiple oral public statements in 2018 characterizing Plaintiff as a perjurer. **C**, Bolton Dep., 171:14-172:16; **Y**, McDaniel Dep., 83:1-85:10; **AA**, Hall Dep., 137:5-8; McIsaac Dep., 123:1-20. Moreover, in Michigan, what Coogan accused Plaintiff of doing is a felony crime of moral turpitude punishable by imprisonment for not more than 15 years under MCL 750.423. MCL 750.423. Plaintiff adduced sufficient evidence to raise a question of material fact as to whether Coogan engaged in negligence per se. *Lakin v. Rund*, 318 Mich. App. 127, 144–45, 896 N.W.2d 76, 85 (2016).

### H.   Tortious Interference with an Advantageous Business Relationship or Expectancy

Plaintiff also raised a question of material fact as to his count of tortious interference by setting forth facts in satisfaction of each element. *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich.App. 83, 89-90 (2005). Plaintiff's satisfaction of the first two elements are uncontested by Defendants. Defendant's argument that Plaintiff cannot show Coogan improperly and intentionally interfered with Plaintiff's business relationship with the City is meritless.

There is ample evidence that Coogan falsely accused Welch of perjury on multiple occasions in an attempt to retaliate against and intimidate him because his 2016 and 2018 testimony was unfavorable for the City. Furthermore, Coogan continued to actively campaign for Plaintiff to be further disciplined—this time terminated—on the basis of further false allegations of perjury. *Supra* at 6-22. Coogan made these objectively false allegations

to the PSC, which is undisputedly charged with governing the affairs of the Melvindale Police Department, including the terms and conditions of Plaintiff's employment.

Defendant's argument that Plaintiff cannot show he was adversely impacted by Coogan's intentional conduct is similarly unsupported by the record. Coogan's demonstrably false accusations of perjury directly led to Plaintiff being suspended for 30 days without pay, and tainted his employment record such that future law enforcement and security employers will not seriously consider Plaintiff as a candidate. **AU**, Welch Declaration. Plaintiff suffered economic losses. Summary judgment should be denied on this claim.

## I. Defendant Coogan is Not Entitled to Immunity Against Plaintiff's State Law Claims

Because Plaintiff pleaded claims of intentional torts, Defendant Coogan was required by MCL 691.1407(3) to establish entitlement to governmental immunity pursuant to *Ross. Odom v. Wayne County*, 482 Mich. 459, 480, 482, (Mich. 2008). He failed to meet this burden.

As set forth above, Coogan's unilateral actions to draft the 2016 charges and initiate the disciplinary process in 2018 were beyond the scope of his authority under the Charter. A governmental employee does not act in 'good faith' if the employee acts 'maliciously or with a wanton or reckless disregard of the rights of another.' *Radu v. Herndon & Herndon Investigations, Inc.*, 302 Mich.App. 363, 386, 838 N.W.2d 720 (2013), quoting *Odom*, 482 Mich. at 474, 760 N.W.2d 217. To establish willful and wanton misconduct there must be intent to harm or "such indifference to whether harm will result as to be the equivalent of a

willingness that it does." *Id.* at 760. As set forth above, Plaintiff has adduced significant evidence that Coogan acted in bad faith, maliciously, and with the intent to harm Plaintiff's employment. Even absent this intent, the fact that Coogan, an attorney, unilaterally drafted disciplinary charges against Plaintiff for lying under oath in 2016 without being asked to, and without consulting the readily available record of Plaintiff's testimony demonstrates his indifference to whether harm would result to Plaintiff from his actions. The record is sufficient to establish gross negligence, destroying the availability of immunity for negligent tortious action by Coogan. MCL 691.1407(2); MCL 691.1407(2)(c); *Kendricks v. Rehfield*, 270 Mich.App. 679, 682, (Mich.App., 2006).

Coogan's actions were discretionary. They required his personal deliberation, decision, and judgment. In 2016, Coogan unilaterally drafted charges against Plaintiff and took complete control of the trial board process. Coogan admitted he unilaterally took it upon himself to hand out copies of Plaintiff's deposition transcript in 2018, and the record shows he initiated the private and public discussions that led to Plaintiff being publically accused of perjury a second time. Coogan cited to no evidence in the record—because none exists— showing that his actions against Plaintiff were merely obedience to orders or the performance of duties in which he had little or no choice. *Rankin v. City of Highland Park*, 2015 WL 773734 (Mich.App.), 6 (Mich.App., 2015).

IV.   CONCLUSION

Because numerous, genuine disputed issues of material fact exist in this case, summary judgment is improper. For all the reasons set forth herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motions for Summary Judgment and allow this matter to proceed to trial on the merits.

Dated: April 15, 2019

Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2019, I electronically filed the foregoing document and Exhibits with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

Deborah L. Gordon (P27058)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500