UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WELCH,

      Plaintiff,

v.

CITY OF MELVINDALE, a political
subdivision of the State; MELVINDALE
PUBLIC SAFETY COMMISSION, a
political advisory body of the City of
Melvindale; JEFFERY BOLTON, KEVIN
MCISAAC, MARTHA MCDANIEL,
PATRICIA HALL, and LAWRENCE
COOGAN, individuals,
sued in their official and personal
capacities,

      Defendants.

Case No. 18-cv-11450
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [38, 39]**

---

Plaintiff Michael Welch served as a police officer in Melvindale, Michigan, for over

20 years. In 2016 Welch gave sworn testimony in support of Melvindale Police Chief Chad

Hayse during Hayse's termination hearing. Welch was accused of lying during his testimony

and charged with disciplinary violations, which resulted in a negotiated settlement of a 30-day

suspension without pay. In 2018 Welch gave a deposition in Hayse's civil lawsuit and was

again accused of lying by the city attorney and the Melvindale Public Safety Commission (the

"Commission").

Welch brought this lawsuit alleging that his employer—the City of Melvindale ("the

City")—members of the Commission, and City Attorney Lawrence Coogan conspired and

retaliated against him for his testimony in support of Hayse. Welch also claims that he was denied due process leading up to his 2016 suspension. Welch separately brings state-law claims of defamation and tortious interference against Coogan.

The Defendants now seek summary judgment on all claims. Welch opposes the motions and the Court heard oral argument on November 22, 2019. For the reasons that follow, the Court grants in part and denies in part the Defendants' motions. Welch's claim of First Amendment retaliation relating to his 2016 suspension and his defamation claim will proceed to trial. Welch's other claims are dismissed.

## I.

When, as here, defendants seek summary judgment, the Court presents the facts in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Welch began working at the Melvindale Police Department in 1998. (ECF No. 24, PageID.1089.) Welch worked his way up through the ranks and became a lieutenant in 2014. (*Id.*) The terms, benefits, and conditions of Welch's employment are governed by a collective bargaining agreement (CBA) between the City and the police union. (ECF No. 42-45, PageID.5544.)

Welch alleges that his troubles at work began around 2015 when he tried to rein in the behavior of a subordinate, Melvindale Police Corporal Matthew Furman. (ECF No. 42, PageID.3470.) After Furman received dozens of citizen complaints alleging improper enforcement of the traffic code, verbal and physical abuse, and racial profiling, Welch and Chief Hayse decided Furman's behavior needed to be addressed. (*Id.* at PageID.3470.) In July 2016, Chief Hayse made it known that he planned to terminate Furman. (*Id.* at PageID.3472.)

In August 2016, disciplinary proceedings were initiated against Chief Hayse for a number of issues, including improperly disciplining Furman, interfering with the city's towing contract, and publicly making derogatory remarks about city officials. (ECF No. 38, PageID.1227; ECF No. 38-2, PageID.1306–1308; 1398–1399; ECF No. 38-3, PageID.1503.) Welch alleges that the City Council wanted to terminate Hayse to protect Furman. Welch believes Furman "single-handedly generated tens-of-thousands of dollars in revenue for the City" by having large numbers of cars towed and so the City Council had reason to protect him. (ECF No. 42, PageID.3468.)

The City Council held a termination hearing for Chief Hayse on August 29 and 30, 2016. (*See* ECF No. 38-2; ECF No. 38-3.) Hayse called Welch as a witness in support of his contention that the City's allegations of misconduct against him were false and that he had not publicly made derogatory comments about city officials or the city's contracted towing company, Goch & Sons Towing. (ECF No. 42, PageID.3473.)

Under oath, Welch testified as follows:

Q (By Hayse): Lieutenant, have you ever heard me make disparaging remarks regarding any public official, appointed official, or Michael Goch from Goch & Son's Towing?

A (Welch): No direct. We've had personal conversations in regards to the way the tow contract had been warranted, but no personal attacks in front of anybody else in personal conversation, yes.

Q: Never heard me come up to the front desk and make any sort of announcement or disparaging remark about not towing vehicles because Goch & Son's was our tow provider as of June of 2015?

A: Absolutely not. In fact, you had offered an incentive to officers to tow cars.

(ECF No. 42-23, PageID.4663.) On cross-examination, Welch further testified:

Q: Okay. And did—in this personal conversation that you say you had with the chief in regards to Goch & Son's, did he say any derogatory things about Goch & Son's?

A: No.

Q: Okay. So what other officers have testified in regards to negative comments as to Goch & Son's being made by the chief of police, you're saying you have not heard those comment[s], correct?

A: No, I have not.

Q: You haven't heard that comment from any other officers.

A: From any other officers—

Q: Yeah.

A: —or from Chief Hayse?

Q: Have any other officers told you that Chief Hayse made those statements?

A: No, they have not.

(ECF No. 42-23, PageID.4664.)

Defendants argue that testimony by other witnesses directly contradicted Welch's testimony. Two officers testified that Hayse had referred to the mayor using derogatory terms such as "bitch" and had called both the mayor and the city attorney corrupt. (ECF No. 38-3, PageID.1508–1510, 1514.) One of the officers further testified that Welch made similar comments. (*Id.* at PageID.1515.)

At the end of the second day of the hearing, one of the council members noted the discrepancy, stating that "Lieutenant Welch testified yesterday that he's never heard [Hayse] say anything derogatory, and I'm thinking that today's testimony says otherwise." (ECF No. 42-23, PageID.4692.)

On September 7, 2016 the chairman of the Commission, Jeffrey Bolton, signed a document entitled "Complaint for Suspension, Demotion and/or Termination of Michael Welch." (ECF No. 38-4, PageID.1548.) In his deposition, Bolton stated that he did not initiate

4

the idea of disciplining Welch, but that he could not remember who did. (ECF No. 42-41, PageID.5377.) Bolton also testified that city attorney Coogan was the person who drafted the complaint, and Bolton simply signed it. (ECF No. 42-4, PageID.3697.) The complaint states the reasons for discipline included "lying to Mayor and City Council at a public hearing on or about 8/29/2016." (ECF No. 38-4, PageID.1548.) Other reasons included "making unprofessional comments in the presence of subordinates," "violation of Melvindale Police Department Rules and Regulations," and "Violation of Operating Policy of the Melvindale Police Department." (*Id.*)

Welch testified that when he received the complaint he contacted his union representatives and then prepared his own written statement. (ECF No. 38-5, PageID.1596, 1606.) Welch was not given an opportunity to review his testimony from the Hayse hearing before his trial board hearing on the complaint in front of the Commission. (ECF No. 38-5, PageID.1605.)

Before the hearing, Welch's union representatives suggested he seek a suspension to save himself from potential termination. Because Chief Hayse had just been terminated by the Commission, Welch believed that the Commission also intended to terminate him. (*Id.* at PageID.1616–1617.) Welch believed that the Commission intended to fire him no matter what he said at his trial board hearing. (ECF No. 42-18, PageID.4512.)

The trial board hearing was scheduled for September 13, 2016. Defendants Jeffrey Bolton, Kevin McIsaac, Martha McDaniel, and Patricia Hall were members of the Commission at this time. There was one additional Commission member who is not a party to this lawsuit.

Union representatives and a union attorney were present at the hearing with Welch. (ECF No. 38-5, PageID.1612.) At the beginning of the hearing, Canfield, one of the union

representatives, suggested the situation could be resolved with a suspension. (ECF No. 38-5, PageID.1614.) At this point, at least two members of the Commission called for Welch to be terminated. (*Id*. at PageID.1617.) The union representatives and members of the Commission negotiated for about 20 minutes. The Commission offered a 30-day suspension if Welch agreed not to file a union grievance and to testify truthfully at any upcoming depositions. (*Id*. at PageID.1622.) The union representatives suggested Welch accept the offer, and he did. (*Id.*) Welch asserts that he only accepted the suspension "to not mess up my pension and not be able to keep a roof over my kids' heads." (ECF No. 42-18, PageID.4512.)

After accepting the offer, Welch read a written statement to the Commission. Welch said that during his testimony in Hayse's hearing, he "felt like a deer in headlights and blanked out on most of the questions" (ECF No 38-6, PageID.1691) and that he could not remember most of the questions or the answers that he had given. He further explained that Chief Hayse had said negative things to him about Mike Goch and the mayor. He said that "Hayse would vent to me at times." (*Id.*) He said these conversations happened in Hayse's office or at the front desk where Welch worked. Welch finally stated: "I had no intent to lie to or to deceive the City Council. Any misstatements were due to the stress of the situation where I blanked during questioning." (*Id.* at 1692.)

To this day, Welch asserts that he never lied under oath and that his written statement to the Commission did not recant or contradict any of his prior sworn testimony. (ECF No. 42-18, PageID.4512.)

Welch served his 30-day suspension and returned to work in October 2016. (*Id.* at PageID.1628.) Welch states that "in light of the immense pressure and scrutiny on him because of his support for Hayse" (ECF No. 42, PageID.3480), he opted for early retirement. (ECF No.

38-5, PageID.1628–1629.) He submitted his notice of retirement in December 2017 and went on inactive status on January 18, 2018. (*Id.*) The official date of his retirement (after using up all of his accrued leave time) was August 31, 2018. (*Id.*)

In March 2018 Welch was subpoenaed to testify in civil litigation filed by Hayse against the City. (*Id.* at PageID.1569.)

Regarding the use of derogatory terms, Welch testified in his deposition as follows:

Q: Did you ever call the mayor a "bitch," "whore," "slut," or "cunt" in the presence of other officers in the department?

A: No, I did not.

Q: Did of you ever hear Chad Hayse call the mayor a "bitch," "whore," "slut," [or] "cunt" in the presence of other officers in the department?

A: No, not in the presence—he had never said anything about anyone else disparaging in front of the other officers.

(ECF No. 42-18, PageID.4498.)

After the deposition, city attorney Coogan met with Lieutenants Daniel Jones and Robert Kennaley on an unrelated matter. During the meeting, Coogan told Jones and Kennaley that he wanted to give them a "heads up" that Welch had "lied again and the [Commission] is going to investigate." (ECF No. 42-3, PageID.3580.)

On April 10, 2018, the Commission met. Coogan raised with the Commission the allegation that Welch had made a statement in his deposition that was "inconsistent with his testimony at a prior hearing." (ECF No. 42-35, PageID.5117.) Coogan provided the deposition transcript to the Commission. (*Id.*) McDaniel and Bolton, two members of the Commission, testified that when Coogan told them Welch had lied in his deposition they had wanted to discipline Welch. (ECF No. 42-26, PageID.4743; ECF No. 42-41, PageID.5385.)

At a May 8, 2018, public meeting, the Commission adopted a resolution "to set a trial board date and draft a complaint against Lt. Michael Welch regarding his truthfulness and v[e]racity during his testimony in front of the Public Safety Commission in closed session and compare it to his testimony during his recent deposition." (ECF No. 42-39, PageID.5280.) Bolton and McDaniel testified in this case that they were uncertain whether Welch lied in his deposition. (ECF No. 42-41, PageID.5392; ECF No. 42-26, PageID.4741.) Hall stated that after reading the deposition transcript she did not believe Welch had lied. (ECF No. 42-28, PageID.4857.) Hall is the only Commission member that voted against the May 8th resolution. (ECF No. 42-39, PageID.5280.)

In June 2018, in response to a motion for a preliminary injunction by Welch, the Defendants entered into a stipulated order agreeing not to issue disciplinary complaints, charges, or further notices of trial board hearings against Welch. (ECF No. 17.) And at its June 12, 2018 meeting, the Commission withdrew its May 8th resolution regarding disciplinary action against Welch. (ECF No. 42, PageID.3487.) Welch retired in August 2018 with full benefits. (ECF No. 38-5, PageID.1636–1637.)

Following the close of discovery in this case, Defendants City of Melvindale, Melvindale Public Safety Commission, Bolton, McIsaac, McDaniel, and Hall, and Defendant Coogan each filed a motion for summary judgment asking the Court to dismiss all counts against them.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is material only if its resolution will affect the outcome of the lawsuit."

*Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And "a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

## III.

Welch brings a number of claims against the City of Melvindale; the Melvindale Public Safety Commission; and Bolton, McIsaac, McDaniel, Hall, and Coogan in their official and personal capacities. The Court will first address Defendants' summary judgment arguments related to party liability in Section III, then the federal-law claims in Section IV, and finally the state-law claims brought solely against Defendant Coogan in Section V.

Defendants raise three arguments about the proper parties to this suit and the liability of those parties. Defendants first argue that the Commission is not a proper party capable of being sued. Defendants next argue that the claims against individuals in their official capacities are duplicative of claims against the City. Finally, the City argues that it should not be held liable for the actions of its employees under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Court will take each argument in turn.

## A.

Welch names as a defendant the Melvindale Public Safety Commission, "a political advisory body of the City of Melvindale." (ECF No. 24, PageID.1087.) In the summary-judgment briefing, the parties disagreed over whether the Commission is a legal entity capable of being sued. During oral argument, the parties stipulated to a voluntary dismissal without

prejudice of the claims against the Commission. So the Commission is no longer a party to this case.

## B.

Defendants Bolton, McIsaac, McDaniel, and Hall argue that the claims against them in their official capacities should be dismissed as duplicative of Welch's claims against the City of Melvindale. The Court agrees.

Indeed, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 68 (1989)). "As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit 'imposes liability on the entity that he represents.'" *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (quoting *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)). Courts in the Sixth Circuit routinely dismiss duplicative official-capacity claims. *See, e.g.*, *Doe v. Claiborne Cty.*, 103 F.3d 495, 509 (6th Cir. 1996); *Cavanaugh v. McBride*, 33 F. Supp. 3d 840, 848–49 (E.D. Mich. 2014); *Andrews v. Wayne Cty.*, No. 17-11684, 2018 WL 774150, at *6 (E.D. Mich. Feb. 8, 2018).

Bolton, McIsaac, McDaniel, and Hall, as members of the Commission, are officials of the City. Although the members of the Commission are not paid, they are appointed by the mayor or city council pursuant to the City Charter. (ECF No. 39-5, PageID.2367, 2384.) The City of Melvindale has clearly received notice of this suit since it is also a named party. Thus, all claims brought against Bolton, McIsaac, McDaniel, and Hall in their official capacities are duplicative of the claims against the City of Melvindale. Accordingly, the Court dismisses the claims against these individuals in their official capacities.

Although Defendant Coogan did not make this argument in his summary-judgment motion, for purposes of judicial economy and efficiency, the official capacity claims against him will also be dismissed for the same reason.

## C.

Defendant City of Melvindale argues that it cannot be held liable for any of the alleged actions of its employees under *Monell*.

Both sides agree that municipal liability under 42 U.S.C. § 1983 is governed by *Monell*. That case established that a municipality may not be sued under a respondeat superior theory for an injury inflicted solely by its employees or agents. *See* 436 U.S. at 694. A municipality can only be held liable under § 1983 for its own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Thus, "liability will attach only where the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 694). "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

Here, Welch argues that the Public Safety Commission is an authorized decisionmaker for the City concerning suspension and discipline of police officers. The City disagrees. They argue that "the Public Safety Commission is not the final word on the policies for the police department, or even itself." (ECF No. 38, PageID.1243.) Both parties cite to the same chapter of the Melvindale City Charter but draw opposite conclusions from the language.

Although the Commission was the body that put in place Welch's suspension, this does not, in and of itself, create municipal liability. That an official (or official body) "has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986) (plurality). Such authority can be granted to an official "directly by a legislative enactment or may be delegated by an official who possesses such authority." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988) (citing *Pembaur*, 475 U.S. at 483 (plurality).) Most notably, a policymaker is the final authority if his "decisions are final and unreviewable and not constrained by the official policies of superior officials." *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

The courts have frequently used the line between decisionmakers that are beholden to other bodies or superiors and decisionmakers whose decisions are unreviewable to determine municipal liability. In *Praprotnik*, the Supreme Court noted that "[a]ssuming that applicable law does not make the decisions of the Commission reviewable by the Mayor and Aldermen, or vice versa, one would have to conclude that policy decisions made either by the Mayor and Aldermen or by the Commission would be attributable to the city itself." 485 U.S. at 126. In *Arendale v. City of Memphis*, the court found that the city could be held liable for the final

disciplinary decisions of the police chief: "As neither the Memphis Charter nor the Memphis City Code provide for further review of Plaintiff's suspension, Chief Wright had final policy making authority with respect to Plaintiff's disciplinary charge." 519 F.3d 587, 602 (6th Cir. 2008) (internal citations omitted). On the other hand, the Sixth Circuit has found that when an official's decision is reviewable, either by a body like a Civil Service Commission or by a supervisor, the official's actions alone cannot create liability. *See Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994) (holding that employee disciplinary actions were not explicitly reviewable by Civil Service Commission); *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (finding that the Chief of Police did not make final policy because he was subordinate to Director of Public Safety who had not delegated authority).

To determine whether the Commission has final authority to make municipal policy, the Court must look to state law. *Praprotnik*, 485 U.S. at 125. "This includes 'state and local positive law,' such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano* 988 F.2d at 655 (6th Cir. 1993) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, (1989); *Mandel*, 888 F.2d at 793). "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett*, 491 U.S. at 737.

The source of state law in this case is the Melvindale City Charter and other city rules and procedures. The City Charter authorizes the Commission to "perform all the duties pertaining to the government, management, maintenance and direction of the Police and Fire Departments . . . including all appointments to such forces." (ECF No. 39-5, PageID.2384.) Welch argues this inherently includes final policymaking authority over discipline, demotion,

and discharge of members of the police department. (ECF No. 42, PageID.3512.) Other parts of the City Charter support Welch's view. For example, although the Charter tasks the city administrator with providing "direction and oversight on all personnel issues," the charter adds, "except personnel issues involving the Police Department and Fire Department." (ECF No. 39-5, PageID.2377.) Also, while "rules and regulations" of the Commission must be approved by the mayor and city council to become effective (*id.* at PageID.2387), the same does not appear to be true for trial board decisions. The Trial Board Rules and Procedures give the Commission the power to convene a trial board to "determine whether a violation of the Melvindale Police . . . Rules and Regulations has occurred" and "what disciplinary action is ordered." (ECF No. 42-32, PageID.5062.) Further, "any Respondent may be disciplined, removed or discharged, suspended without pay, and/or deprived of privileges by the Public Safety Commission acting as a Trial Board." (*Id.* at PageID.5063.) Rather than requiring approval by the mayor or city council, the Rules allow for an "immediate right of appeal to the Wayne County Circuit Court or the Respondent may file a grievance as provided for" by the CBA. (*Id.* at PageID.5065.) Although the City Charter and Trial Board Rules and Procedures are not explicit on this point, nothing in the record suggests that the Commission's disciplinary decisions require approval of the city council or the mayor.

Thus, as Melvindale governing documents establish that the Commission is the final policymaker for decisions regarding police discipline, the City of Melvindale would be liable for the Commission's discipline of Welch if an underlying constitutional violation is established.

## IV.

Welch makes three claims under federal law against all defendants. Count I alleges that the City and the individual defendants violated the First Amendment by retaliating against him for his speech. Count II alleges that the Defendants conspired to deter Welch from testifying freely and truthfully as a witness, in violation of 42 U.S.C. § 1985(2). Count III alleges that the Defendants deprived him of protected liberty and property interests without due process, in violation of the 14th Amendment.

### A.

The Court starts with Welch's First Amendment claim. Welch asserts that Defendants retaliated against him because of his public sworn testimony during Hayse's termination hearing and in a deposition for Hayse's civil suit.

To establish a prima facie case of First Amendment retaliation, a public employee must show "(1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights." *Boulton v. Swanson*, 795 F.3d 526, 530–31 (6th Cir. 2015) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000)).

### 1.

A public employee engaged in constitutionally protected activity if "the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Whether speech is a matter of public concern is a legal question. *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

Defendants' first say that Welch's speech was not protected because it was false. It is true that "false statements that are knowingly or recklessly made" are exempt from constitutional protection. *Williams v. Kentucky*, 24 F.3d 1526, 1535 (6th Cir. 1994). Thus, a plaintiff is not entitled to First Amendment protection for perjury or other knowingly false statements. *United States v. Alvarez*, 567 U.S. 709, 720–21 (2012) (perjury not protected); *Williams*, 24 F.3d at 1535 ("[T]he *Pickering* Court declined to extend protection to false statements that are knowingly or recklessly made.") But whether Welch knowingly lied is the central dispute of this case. The parties have differing interpretations as to whether Welch testified that Hayse never made any disparaging remarks about public officials or Goch towing, or that Hayse did make such remarks but he made them privately to Welch, and not publicly. And they further dispute whether either version is truthful. Thus, at this point, it cannot be said there is no genuine dispute of a material fact on this issue.

Defendants next argue that Welch's testimony at Hayse's hearing was "within [the] confines of his own duties as a police officer" (ECF No. 38, PageID.1240) and thus he was speaking as a public employee and not a private citizen.

Defendants are correct that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

But Defendants ignore the critical finding in *Lane v. Franks* that "[s]worn testimony in judicial proceedings is a quintessential example of citizen speech for the simple reason that anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." 573 U.S. 228, 239 (2014). Welch had that same obligation at the termination hearing.

And even though Welch regularly testified at hearings as part of his job as a police officer, "any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth. That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee." *Id.* Thus, Welch's speech at both Hayse's termination hearing and the deposition in 2018 was made as a citizen.

Lastly, Defendants argue that even if Welch spoke as a citizen, his speech was still not protected because he did not speak on a matter of public concern.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48; *see also Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017) (factors to consider include speech's impetus, setting, audience, and general subject matter). Broadly, a matter of public concern includes "any matter of political, social, or other concern to the community." *Id.* at 146. Issues of corruption and mismanagement by public employees have been consistently considered a matter of public concern. *See, e.g.*, *Handy-Clay v. City of Memphis*, 695 F.3d 531, 544 (6th Cir. 2012); *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997).

Welch characterizes his speech as "about the unlawful behaviors of a Melvindale police officer and other City officials." (ECF No. 42, PageID.3495.) The City disagrees and characterizes the speech as "answer[ing] questions concerning day-to-day operations and whether Hayse had made any disparaging comments." (ECF No. 38, PageID.1241.) It is true that the questions Welch answered were principally about his observations of Hayse. But given the summary judgment record, Welch's speech can be seen in the context of both the discipline

and removal of a police chief as well as accusations of corruption and conspiracy, all of which are matters of concern to the public at large. Welch was asked about allegedly inappropriate statements Hayse made regarding city officials and city towing contracts. Welch asserts that these and other accusations against Hayse were made as part of a larger conspiracy to oust Hayse from his position as police chief.

So the Court finds that during his testimony in 2016 and 2018 Welch spoke as a citizen on a matter of public concern. Whether Welch's speech was false and thus not protected by the First Amendment is a question of fact for the jury.

Once it is established that an employee spoke as a citizen on a matter of public concern, the Court must take the final step of balancing the interests of the employee and "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Lane v. Franks*, 573 U.S. 228, 231 (2014) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Because Welch has alleged facts, which if found to be true, establish his speech was constitutionally protected, the burden shifts to the Defendants "to proffer legitimate grounds for the allegedly retaliatory action at issue." *Handy-Clay*, 695 F.3d at 544 (internal citations omitted). The Defendants have offered no such justification for their actions. So the Defendants cannot prevail on the balancing issue.

## 2.

The second element of a First Amendment retaliation claim, whether the defendants took an adverse action against Welch which caused him to suffer an injury, is more complicated. An adverse action is defined as "any action that would deter a person of ordinary firmness from exercising protected conduct." *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583–84 (6th Cir. 2012) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th

Cir. 2010)). The adverse action element also includes an inherent requirement of causation. *See Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010) (discussing the causation requirement). Welch must show that the actions of the Defendants were both the cause-in-fact and proximate cause of Welch's injuries. *Id.*

**a.**

Because Welch alleges separate retaliatory action in both 2016 and 2018, the court will address these incidents separately.

Start with 2016. The parties do not dispute that Welch's 30-day unpaid suspension in 2016 was an adverse action which harmed him. *See, e.g.*, *Arnold v. City of Columbus*, 515 F. App'x 524, 532 (6th Cir. 2013) (finding that 40-hour suspension was an adverse action). But keeping in mind the causation requirement, for the claim against the Commission members and Coogan to survive, Welch must show that these defendants were legally responsible for Welch being threatened with termination and suspended.

Coogan disputes that he took any adverse action that caused Welch harm. Coogan argues that he did not have any authority to make decisions regarding Welch's employment and simply offered legal advice to the Commission in both 2016 and 2018. (ECF No. 39, PageID.1953.) Coogan relies on *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) to argue there is a strong presumption that state actors have properly discharged their official duties. But this reliance is misplaced. The presumption in *Gardenhire* pertains to selective enforcement claims alleging invidious discrimination under § 1983. *Id.*

The fact that Coogan was not a voting member of the Commission and did not otherwise have authority to make employment decisions about Welch is not dispositive here. "An influential recommender can be liable under § 1983 without being the final

decisionmaker, if the recommendations are shown to be sufficiently influential." *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (6th Cir. 1999). The question is whether Coogan's actions, including bringing Welch's testimony to the attention of the trial board and drafting the complaint against him, were a but-for and proximate cause of Welch's injury.

Cause-in-fact, otherwise known as but-for causation, "requires [the court] to imagine whether the harm would have occurred if the defendant had behaved other than it did." *Powers*, 501 F.3d at 608. According to Welch, Coogan unilaterally drafted the complaint against Welch and had the chair of the Commission, Bolton, sign only as a formality, while "other members of the Commission had no input on bringing or drafting these charges." (ECF No. 42, PageID.3474.)

Coogan testified that the decision to convene a trial board was made "by the Safety Commission, Jeff Bolton, and discussion with other Safety Commission individuals" and that Coogan drafted the charges against Welch "at the direction of Jeff Bolton." (ECF No. 39-4, PageID.2266) But Bolton disputes that he directed the start of the disciplinary process against Welch. Although Bolton does not remember who came up with the idea to pursue charges against Welch, he testified, "I didn't come up with this and drive the bus myself." (ECF No. 42-41, PageID.5377.) Additionally, Bolton testified that it was the decision of Coogan, rather than Bolton or the Commission, to subpoena witnesses. (*Id.* at PageID.5394.)

Further, there is conflicting testimony about Welch requesting a transcript of his testimony from the Hayse hearing. Welch testified that he and his union representatives met with the mayor the day before his trial board hearing and asked to see the transcript. (ECF No. 42-18, PageID.4509). Welch further testified that the mayor said she would call Coogan and ask him to share the transcript with Welch, but that the next day Welch's union representatives

were told that Welch would not be able to review the transcript. (*Id.* at 4510.) On the other hand, Coogan asserts that Welch never requested the hearing transcript. (ECF No. 39-4, PageID.2289.)

These disputes create a question of fact whether Coogan's actions were a but-for cause of Welch's discipline.

If Welch can establish but-for cause, he must also establish that Coogan's actions were a proximate cause of his injury. The Sixth Circuit describes proximate cause as being about the appropriate scope of responsibility. *See Powers*, 501 F.3d at 609. So the Court must ask "whether it was reasonably foreseeable that the complained of harm would befall [Welch] as a result of the defendant's conduct." *Id.* "Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Id.*; *see also Paige*, 614 F.3d at 281; *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012) (providing that causation "includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else"). If it is true that Coogan was the moving force behind bringing disciplinary charges against Welch, that he unilaterally drafted charges against Welch, or that he denied Welch access to a transcript of his testimony, it is foreseeable that these actions would lead to termination or discipline of Welch. Indeed, the complaint drafted by Coogan was entitled "Complaint for Suspension, Demotion, and/or Termination of Michael Welch". (ECF No. 39-6, PageID.2422.)

As for the defendant Commission members, causation is apparent. The members of the Commission convened and presided over the trial board hearing on September 13, 2016, and voted to suspend Welch for 30 days, as negotiated by his union representatives and Coogan. (ECF No. 42-30, PageID.4914.) Since the Commission is the body charged with discipline of

police officers (ECF No. 42-32, PageID.5063), but for a vote by the Commission approving the suspension, Welch would not have been disciplined. And it is certainly foreseeable that Welch would be harmed by a 30-day suspension without pay.

The Court finds that the members of the Commission took the adverse action of suspending Welch, which resulted in actual harm to Welch. Whether Coogan took an adverse action in 2016 which was the but-for cause of injury to Welch is a question of fact left to the jury.

**b.**

Turning to 2018, both the City and Coogan argue that Welch did not suffer any adverse consequences.

To establish a First Amendment retaliation claim, Welch must show not only that a sufficiently adverse action was taken against him, but also that the action resulted in actual injury to him. *See Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005). Whether an action is sufficient to deter a person of ordinary firmness is generally a question of fact, but the claim is "properly dismissed as a matter of law" if the "alleged adverse action is 'inconsequential,' resulting in nothing more than a 'de minimis injury.'" *Wurzelbacher*, 675 F.3d at 584 (citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)). This threshold is not meant to be exacting and "is intended to weed out only inconsequential actions." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999).

In the employment context, typical examples of adverse action include termination, demotion, suspension, and failure to promote. *See id.* Additionally, "[d]efamatory statements motivated in part by a person's exercise of their First Amendment rights can be, but are not always, legally sufficient standing alone for a claim of adverse action under the framework of

this Circuit." *Fritz*, 592 F.3d at 726. The Sixth Circuit also recognizes that "in some cases injury based on embarrassment, humiliation, and emotional distress is sufficient to be actionable under § 1983." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (internal citations omitted).

Welch argues that the adverse actions taken against him in 2018 were: (1) Coogan reporting to the Commission and other police officers that he believed Welch had lied during his deposition, and (2) the "threat of serious discipline" created by the May 8, 2018 resolution by the Commission "to set a trial board date and draft a complaint against" him because the Commission believed he may not have been truthful in a 2018 deposition. (ECF No. 42-39, PageID.5280.)

Given the low threshold, these actions are sufficient to create a question of fact whether they constitute adverse action. Welch cites one non-binding Sixth Circuit case in which the Court held a recommendation of termination to be an adverse action. *Haji v. Columbus City Schs.*, 621 F. App'x. 309, 313 (6th Cir. 2015). He also cites a District Court case in which two letters of reprimand were sufficient adverse action. *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 853 (E.D. Mich. 2015). Although these cases are not precisely analogous, the Court finds that Coogan's allegedly defamatory statements and the Commission's resolution are not so inconsequential that no reasonable jury could find adverse action. *See Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002).

But there is still the question of whether Welch can demonstrate actual harm resulting from these allegedly adverse actions. *See Wurzelbacher*, 675 F.3d at 584 (finding allegations of harm insufficient to state a claim because adverse action resulted in no consequences for plaintiff and where only allegation of injury was emotional); *Mezibov*, 411 F.3d at 722 (finding

"any harm to [plaintiff] as a result of [defendant's] speech is too minimal to be constitutionally cognizable").

After Welch filed this lawsuit, the Commission agreed in June 2018 to rescind its May 8th resolution and remove it from the public record. (ECF No. 42, PageID.3487.) The Commission never drafted a complaint and took no further action against Welch. (*See* ECF No. 38-5, PageID.1636.) Welch retired as planned a few months later with full benefits. (*Id.* at PageID.1636–1637.)

Welch does not dispute these facts but insists he suffered reputational harm and was deprived of his ability to continue to work as a police officer. In his declaration, Welch opines that the actions of the Commission and Coogan "have had a hugely detrimental impact on my reputation and good standing in the community" and "have harmed [my] ability to pursue employment as a police or security officer." (ECF No. 42-48, PageID.5719.) But Welch does not provide any factual support for these high-level allegations. He does not identify anyone who thought less of him as a result of Coogan's statement or the resolution and does not identify anyone or any place that refused to hire him as a result of these statements. Indeed, he does not even identify any police officer employment he pursued. Further, his counsel confirmed at the summary-judgment hearing that he was offered, but had turned down, a job in private security.

Welch's assertions are equivalent to the "generalized statements about the effect on [plaintiff's] character and reputation" in *Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999). *See also Mezibov*, 411 F.3d at 722 (rejecting plaintiff's retaliation claim in which he "alleges no specific harm—only a generalized harm to his character and reputation"). Thus,

without more specifics, the Court "cannot say that this meets the constitutional threshold required for [his] claim of First Amendment retaliation to proceed." *Mattox*, 183 F.3d at 523.

Because Welch has failed to make any showing of concrete harm, he cannot make out a prima facie case of First Amendment retaliation as a result of the 2018 alleged adverse actions by the Commission and Coogan.

**3.**

The final element of a First Amendment retaliation claim is that the adverse action was motivated at least in part by Welch's protected speech. The question is "whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). Here, both parties agree that the 2016 trial board hearing to investigate Welch was convened as a result of Welch's testimony at Hayse's termination hearing. The dispute is over whether the actions were a legitimate response to an officer lying under oath or a means of retaliating against an officer for supporting the beleaguered chief. That is a question of material fact that will be left for the jury.

**4.**

The individual defendants also claim they are entitled to qualified immunity for this first amendment retaliation claim.

"Qualified immunity shields government officials from standing trial for civil liability in their performance of discretionary functions, unless their actions violate clearly established rights." *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, No. 17-2445, 2019 WL 6766998, at *7 (6th Cir. Dec. 12, 2019) (citing *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019)). To overcome a qualified immunity defense, a plaintiff must show (1) "a constitutional

violation (2) that was clearly established." *Hudson v. City of Highland Park*, Michigan, No. 19-1036, 2019 WL 6223750, at *2 (6th Cir. Nov. 22, 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 227 (2009)).

It is clearly established in the Sixth Circuit "that employers may not retaliate against employees based on their protected speech." *Id*. So the only question is whether Welch can establish a constitutional violation.

As discussed above, the Court finds that a reasonable jury could find a violation of Welch's First Amendment rights. "Qualified immunity is a question of law, but where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Bazzi v. City of Dearborn*, 658 F.3d 598, 606 (6th Cir. 2011) (internal quotation marks omitted) (quoting *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010)). Thus, the Defendants are not entitled to qualified immunity on Welch's First Amendment retaliation claim.

**B.**

In Count II, Welch alleges that Defendants conspired to deter him from testifying freely, fully, and truthfully as a witness in Hayse's federal lawsuit.

Welch brings his conspiracy claim under 42 U.S.C. § 1985(2). That provision prohibits any two or more people from conspiring to deter a party or witness from attending or testifying "freely, fully, and truthfully" in court, or injuring that person because of his or her attendance or testimony. Section 1985(3) creates a cause of action for such a conspiracy. To succeed on his claim, Welch must show that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive [Welch] of [his] constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*,

753 F.3d 606, 622 (6th Cir. 2014) (internal quotation marks omitted) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). Although a plaintiff is not required to prove an express agreement amongst the conspirators, he must prove there was a meeting of the minds or some other link between the alleged conspirators. *Robertson*, 753 F.3d at 622; *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008).

Defendants first argue that Welch's § 1985 claim is barred by the intracorporate conspiracy doctrine. The doctrine states that "if all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019) (internal citations omitted). So, members of the same entity cannot conspire with one another and a municipality or corporation also cannot conspire with its own agents or employees. *Id.* at 819; *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 841 (6th Cir. 1994) (citing *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991)). But the Sixth Circuit recognizes an exception when employees act outside the scope of their employment. *Jackson*, 925 F.3d at 819; *Johnson*, 40 F.3d at 841.

The parties agree that all individual defendants are employees of the same entity—the City of Melvindale—and thus § 1985 cannot be violated unless the individual defendants were acting outside the scope of their employment.

Welch concedes that the City Charter gives the Commission the authority to discipline, demote, or discharge members of the police department through trial board proceedings. (ECF No. 42, PageID.3512; *see also* ECF No. 38-10, PageID.1899.) And the Charter also states that Coogan, as city attorney (a.k.a. "Corporation Counsel") has the power to "superintend and conduct all of the legal business of the City and its various departments." (ECF No. 38-10,

PageID.1893.) So the actions by Coogan to advise the Commission, draft the complaint, and administer the trial board hearing were squarely within his duties to conduct the legal business of the City. And the same is true of the Commission members when they executed the trial board process and voted to suspend Welch.

"Even improper actions fall within the scope of employment where they are connected with the employer's business." *Saad v. City of Dearborn Heights*, No. 11-10103, 2012 WL 72244, at *3 (E.D. Mich. Jan. 10, 2012); *see also Barrow v. City of Hillview, Kentucky*, 775 F. App'x 801, 807 (6th Cir. 2019) (holding that even if plaintiff's allegations of bias were true, complaints by defendants were within scope of employment because they "were made during the course of their working hours, the remarks were connected to the business of the hospital, and they were forwarded to the proper managerial authorities"). For actions taken inside the workplace to be considered outside the scope of employment, Welch must show that the Defendants' actions were actually "private acts done by persons who happen to work at the same place." *Johnson*, 40 F.3d at 840.

Welch argues that the Defendants' actions should be considered private acts because they "abused their authority and used their authority as a cover for unlawful activity, for malicious, self-serving reasons." (ECF No. 42, PageID.3500.)

In the case of Coogan, Welch argues that he "unilaterally drafted charges, issued subpoenas, and staged a sham trial board . . . staged press coverage . . . and demanded that [Welch] 'cooperate.'" (ECF No. 42, PageID.3500.) Looking past the exaggerated rhetoric used in Welch's brief, the Court finds that none of these actions are beyond the broad authority given to the Melvindale city attorney to "superintend" the legal matters of the city. Welch also alleged at the summary-judgment hearing that Coogan had a personal vendetta against him

because Coogan was friends with Furman, the officer who supposedly generated enormous amounts of money for the City by having cars towed on a regular basis, and who Welch had frequently disciplined. But Welch offers no record evidence to support this bare assertion.

As for the members of the Commission, the evidence of malicious, self-serving intent that Welch points to includes that the Commission brought charges against him without the involvement of the chief of police and that the Commission members called for his termination without reviewing his testimony. (ECF No. 42, PageID.3501.)

It is true that Coogan testified that the police chief would typically be involved in the trial board process. (ECF No. 42-36, PageID.5163–5164.) But, as Welch concedes, under the City Charter, the Commission has full authority to convene trial boards and discipline police officers. (ECF No. 42, PageID.3512; *see also* ECF No. 38-10, PageID.1899.) So the decision of the Commission to convene the trial board cannot be considered evidence of wrongdoing or malicious intent.

As for Welch's contention that the Commission members called for his termination without reviewing a transcript of his testimony, Welch's claim is misleading. Although it is true that the members did not have a transcript when they agreed to draft a complaint against Welch in 2016, all of the members had been present during Welch's testimony at Hayse's hearing, according to Bolton. (*See* ECF No. 42-41, PageID.5373.) So it was reasonable for the Commission members to form an initial opinion about Welch's truthfulness and a possible punishment based on their own personal observations. And it follows that it is not evidence of malice that members of the Commission stated their belief that Welch should be terminated before his trial board hearing was held.

Welch cites three cases in support of his claim that Defendants acted outside the scope of their employment. In *Briner v. City of Ontario*, the district court denied summary judgment because there was evidence that the defendant had a vendetta against the plaintiff, which, if believed by the jury, would bring the defendant's actions outside the scope of employment. No. 1:07CV129, 2010 WL 3982755, at *15 (N.D. Ohio Oct. 7, 2010). In another case, the Sixth Circuit held that the intracorporate conspiracy doctrine did not apply because the plaintiff had evidence supporting his theory that the defendants acted in bad faith and abused their authority for personal gain, which would fall outside the scope of their employment. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 615–16 (6th Cir. 2015). In the final case Welch cites, a district court denied summary judgment on the issue of conspiracy because the testimony indicated that the defendants may have used housing code violations as a pretext to illegally search plaintiffs' homes. *Jones v. City of Youngstown*, 980 F. Supp. 908, 913 (N.D. Ohio 1997). That, obviously, was not within the scope of their employment. These cases are distinguishable because Welch points to no evidence to support his claim of malicious intent or a personal vendetta of the Defendants.

Welch has not alleged sufficient facts to create a genuine question of material fact regarding the scope of employment exception. The Court find that the intracorporate conspiracy doctrine bars Welch's conspiracy claim.

## C.

Welch argues that the Defendants deprived him of property and liberty interests without due process of law under the 14th Amendment. Defendants argue that Welch cannot establish a prima facie claim of deprivation of procedural due process.

The first step in the due process analysis is to determine whether Welch has a protected interest that entitles him to due process. If Welch has such an interest, the second step is to determine what process is due. *Leary v. Daeschner*, 228 F.3d 729, 742 (6th Cir. 2000).

**1.**

Welch first argues that he was deprived of his protected liberty interest in his good name, reputation, honor and integrity, and opportunity to pursue a career as a police officer.

Good name, reputation and honor, and integrity are recognized liberty interests protected by due process. *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002); *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989). But "[t]o establish the violation of a protected liberty interest, a plaintiff must show more than injury to his reputation; he must allege the 'loss of a governmental right, benefit or entitlement' without due process of law." *Jackson v. Heh*, 215 F.3d 1326 (Table), 2000 WL 761807 at *6 (6th Cir. 2000) (quoting *Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993)); *see also Paul v. Davis*, 424 U.S. 693, 711 (1976); *Quinn*, 293 F.3d at 319.

Among the elements that Welch must show to establish he was deprived of a liberty interest is that "stigmatizing comments were made in conjunction with the plaintiff's termination." *Crosby v. Univ. of Ky.*, 863 F.3d 545, 555 (6th Cir. 2017); *Quinn*, 293 F.3d at 320. Welch's claim fails on this element because he was not terminated from his job. Welch argues that termination is not required to show a deprivation of his protected property and liberty interests. This is true of property interests, but the Sixth Circuit makes clear that termination is the required first element for a showing of a deprivation of a liberty interest. *See Crosby*, 863 F.3d at 555; *Quinn*, 293 F.3d at 320; *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 410 (6th Cir. 1997).

And even if Welch could overcome that hurdle, his claim would fail as a matter of law because he never requested a name-clearing hearing. When a liberty interest in reputation is at stake, "it is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Quinn*, 293 F.3d at 320 (citing *Brown v. City of Niota, Tenn.*, 214 F.3d 718, 723 (6th Cir. 2000)). And, the Sixth Circuit is clear that "a plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Id.* at 323.

Welch also claims he was separately deprived of his liberty interest in pursuing his chosen profession. The liberty interests protected under the 14th Amendment include "being free to move about, live, and practice [a] profession without the burden of an unjustified label of infamy." *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996) (internal citations omitted).

In the employment context, "a plaintiff must demonstrate stigmatizing governmental action which so negatively affects his or her reputation that it effectively forecloses the opportunity to practice a chosen profession." *Id.* "A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir. 1994) (quoting *Chilingirian*, 882 F.2d at 205–06 n.8).

Welch has failed to establish that he was so stigmatized by the statements of the Defendants that he was foreclosed from obtaining other employment opportunities. *See Joelson*, 86 F.3d at 1421. Welch voluntarily retired from his job with full retirement benefits. (ECF No. 38-5, PageID.1562.) He has neither pleaded any facts nor presented any evidence, beyond bare assertions, that he has attempted to find other employment and has been blocked

from any opportunities. In fact, during the summary-judgment hearing, Welch disclosed that he was offered and turned down a job in private security.

## 2.

Welch also claims he had a protected property interest in his position as a police lieutenant.

Whether an employee has a property interest in his continued employment is "defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Brown*, 214 F.3d at 720. "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Ludwig*, 123 F.3d at 409 (internal citations omitted).

Welch, as a police lieutenant, was a public employee of the City and covered by the police union's collective bargaining agreement, which states that "no employee shall be discharged or otherwise disciplined, except for just cause." (ECF No. 42-45, PageID.5547.) So Welch had a constitutionally protected property interest in continued employment absent good cause for termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539 (1985).

Welch argues that his 30-day suspension without pay is a sufficiently significant deprivation of his property rights to trigger due process protections. The Court agrees. *See Knoblauch v. City of Warren*, 268 F. Supp. 2d 775, 779 (E.D. Mich. 2003) ("Disciplinary suspensions without pay are a protected property interest under the Fourteenth Amendment."); *see also Goss v. Lopez*, 419 U.S. 565, 576 (1975) (holding, in the education context, a 10-day suspension from school is not de minimis); *Gillard v. Norris*, 857 F.2d 1095, 1099 (6th Cir. 1988) (finding a three-day disciplinary suspension "arguably more severe" than the 10-day

school suspension in *Goss*); *Boals v. Gray*, 775 F.2d 686, 689 (6th Cir. 1985) (holding that a five-day suspension of a state employee was not a de minimis deprivation).

### 3.

Once Welch establishes he had a property interest in his job as police lieutenant, the next questions are: What process was due, and was Welch afforded such process by the City?

The essential requirements of due process are notice and an opportunity to respond. *Loudermill*, 470 U.S. at 546. But "due process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The Supreme Court has held that a state has "no constitutional obligation" to provide a pre-suspension hearing in all circumstances. *Id.* at 930, 933. This is particularly true when the state actor provides a "sufficiently prompt post-suspension hearing." *Id.* at 935.

Here, Welch does not argue that the process provided for in the Commission's Trial Board Rules and Procedures is constitutionally inadequate. Instead, he argues that he was not afforded the full process outlined in the Rules and that the process he did receive was tainted.

Welch first claims that he did not receive proper notice of the charges against him because the charging document accused him of lying but did not identify the alleged lie. This argument is unconvincing. The charging document gave Welch clear notice that he was accused of lying during the Hayse investigation; the complaint lists one reason for discipline as "lying to Mayor and City Council at a public hearing on or about 08/29/2016." (*See* ECF No. 39-6, PageID.2422.) In addition, Welch was given the opportunity to meet with a union attorney and to prepare a written statement before the trial board hearing. The Commission did not need to identify the precise statement they believed was a lie, or allow Welch to review a

transcript of his prior testimony, in order to comply with the notice requirements under the Due Process Clause. It is sufficient that Welch was told the general charges against him with sufficient time to be able to prepare for the hearing. *See Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399 (6th Cir. 1992) ("Due process did not require township trustees to inform police officer of the precise nature of meeting to consider charges against him, where officer had at the least the sense of the charges and availed himself of the opportunity to respond in writing to the allegations."); *see also Cremeans v. City of Roseville*, 861 F.2d 878, 884 (6th Cir. 1988) (finding that an officer received due process where he was given 26 hours' notice of a hearing to consider him for involuntary medical disability retirement, he viewed the evidence relied on by the board during the hearing, and he was given an opportunity to present his side).

Although Welch was given an opportunity to argue his case before a trial board, he claims this hearing was insufficient to meet due process requirements because it was a sham. The Court is not convinced. As examples of a sham hearing, Welch cites *Wagner v. City of Memphis*, 971 F. Supp. 308, 318–19 (W.D. Tenn. 1997), and *Bettio v. Village of Northfield*, 775 F. Supp. 1545 (N.D. Ohio 1991), cases where the courts found that the outcome of a hearing was predetermined regardless of the evidence presented. But Welch has not provided enough evidence of such predetermination to create a genuine issue of material fact.

Welch argues that the Commission's "gross deviations from their established procedures" is evidence that Defendants intended to deprive Welch of due process. (ECF No. 42, PageID.3509–3510.) It is true that Welch's trial board occurred six, rather than 10, days after he received notice of the charges against him. (*See* ECF No. 38-4, PageID.1548; ECF No. 38-5, PageID.1609.) But it is not clear that this is even a violation of internal procedure, which states only that an employee's answer to the charges must be filed within 10 days but

does not provide for a specific timeline for the trial board hearing. (ECF No. 42-32, PageID.5063.) Even if this was a technical violation of internal procedure, it does not mean there was a violation of constitutional due process. Welch had enough time to consult with union representatives and prepare a written statement. He also had the option to request a postponement, which he did not do. (*See* ECF No. 42-32, PageID.5063.) And there is nothing in the record to suggest he or any union representative complained about the timeframe.

Welch also contends that the City violated procedures by not presenting any evidence, not issuing a written opinion, and not making a record of the proceeding. (ECF No. 42, PageID.3509.) None of these arguments support a constitutional deprivation. First, the Commission did not present any evidence because Welch and his representatives began the hearing by immediately asking for a settlement, rather than having each side present its case. Second, it is logical that there was no written opinion because the parties agreed to a settlement and thus there was no official determination made by the Commission. The agreement was memorialized in the Commission minutes from September 13, 2016. (ECF No. 38-7, PageID.1695.)

As for the lack of transcript, it is true that the Trial Board Rules and Procedures state that a transcript of trial board proceedings will be made available if a respondent requests it. (ECF No. 42-32, PageID.5063–5064.) And it appears that no record exists from Welch's scheduled trial board hearing date. (ECF No. 42-28, PageID.4853.) That said, the absence of a transcript does not demonstrate any procedural impropriety. It again makes sense that there is no record—because the trial board hearing never happened. Instead, Welch explained, before the hearing could start, his union representatives offered a settlement and the union attorney and Coogan then negotiated the settlement in another room. (ECF No. 39-2,

PageID.2037, 2044.) After a settlement was reached and Welch read his written statement aloud, members of the Commission did ask him "some unrelated questions." (*Id.* at PageID.2043–2044.) It seems that the failure to make a record of this questioning was a technical violation of the rules and procedures. And Welch has not alleged that anything unfair or untoward happened during the meeting. Thus, the fact that the questions asked of him after he had accepted a settlement were not recorded as required by internal procedure does not mean Welch was deprived of due process.

Welch does not cite to any other record evidence to support his assertion that the trial board was a sham or that the outcome was predetermined. In fact, multiple members of the Commission testified that they had no plans to terminate Welch at the trial board hearing. (*See* ECF No. 42-41, PageID.5375; ECF No. 42-28, PageID.4848.) Hall did testify that multiple members of the Commission stated during the trial board hearing that they wanted to terminate Welch. (ECF No. 42-28, PageID.4848.) But the fact that these members, who had been present for Welch's testimony at the Hayse hearing (ECF No. 42-41, PageID.5373), stated their opinion during the trial board does not mean that they had wrongfully predetermined the outcome before considering the evidence. Viewed as a whole, Welch's allegations do not create a genuine fact issue on this issue.

And even if a pre-deprivation hearing is tainted, "the Constitution does not require a neutral and impartial decisionmaker" in the pre-deprivation stage. *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004); *see also Stillings v. Franklin Twp. Bd. of Trustees*, 985 F.2d 561, *2 n.5 (6th Cir. 1993) (citing *Duchesne v. Williams*, 849 F.2d 1004, 1008 (6th Cir. 1988) (en banc)). "It is the post-termination proceeding where bias and corruption are ferreted out." *Farhat*, 370 F.3d at 597.

Here, the Trial Board Rules and Procedures provide for two post-deprivation procedures. An employee can contest a decision of a trial board through an immediate right of appeal to the Wayne County Circuit Court or through the union's grievance procedure. (ECF No. 42-32, PageID.5065.)

Welch failed to take advantage of these procedures. *See id.* at 596 ("[W]here the employee refuses to participate or chooses not to participate in the post-termination proceedings, then the employee has waived his procedural due process claim."). Welch claims he did this because he believed the outcome of the hearing was predetermined against him and he decided to take a settlement rather than risk losing all of his retirement benefits. (*See* ECF No. 38-5, PageID.1609.) But beyond Welch's bare allegations, there is little evidence to support this. Even if the settlement foreclosed the grievance procedure (ECF No. 38-7, PageID.1695), it appears that Welch still had the Circuit Court appeal option available to him, which he did not pursue. Instead, after serving his 30-day suspension, Welch returned to work and was able to retire soon after with full retirement benefits. (ECF No. 38-5, PageID.1562.)

Welch was given notice of the disciplinary charges against him, union representation at and before the trial board hearing, time to prepare and present a written statement, and an opportunity to be heard at a trial board hearing. Additionally, Welch had at least one available avenue to pursue post-deprivation relief, which he failed to take. This process is more than sufficient to meet the requirements of the Due Process Clause. Thus, Welch's claim that his right to procedural due process was violated fails as a matter of law and the Defendants are entitled to summary judgment on this count.

## V.

Welch raises two state-law claims solely against Coogan in his individual capacity: defamation and tortious interference with an advantageous business relationship or expectancy. Coogan responds that he is protected by immunity under the Michigan Governmental Tort Liability Act (GTLA). In the alternative, Coogan asserts that Welch cannot establish a prima facie claim of either defamation or tortious interference.

### A.

Coogan first argues that Welch cannot maintain a claim against him for either defamation or tortious interference because Coogan is immune under the GTLA. M.C.L. § 691.1401 *et seq.* The GTLA states that governmental employees are immune from tort liability when they are engaged in government functions. *Id.* at § 691.1407(1).

But the GTLA has a carve-out: the law only covers torts for which Michigan courts awarded immunity before July 7, 1986, the date the GTLA was enacted. *Nicklas v. Koelling*, No. 248870, 2004 WL 2808904, at *2 (Mich. Ct. App. Dec. 7, 2004); *see also Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008). Because defamation and tortious interference claims were not barred by governmental immunity before 1986, immunity under the GTLA does not apply. *Nicklas*, 2004 WL 2808904, at *2 (citing *Tocco v. Piersante*, 245 N.W.2d 356, 365 (Mich. Ct. App. 1976); *Randall v. Delta Charter Twp.*, 328 N.W.2d 562, 565 (Mich. Ct. App. 1982)).

Thus, Coogan is not shielded from liability by the GTLA for either state-law claim.

### B.

Welch argues that Coogan committed defamation per se by publicly stating that Welch had perjured himself in 2016 and 2018.

Under Michigan law, there is a one-year statute of limitations for defamation claims. M.C.L. § 600.5805(1). The statute of limitations begins to run from the time the defamatory statement is made. *Mitan v. Campbell*, 706 N.W.2d 420, 422 (Mich. 2005). Welch conceded at the summary judgment hearing that his 2016 claim is time-barred. But Welch also argues that Coogan defamed him in 2018 by publicly claiming that Welch perjured himself during his deposition for the Hayse litigation. For the 2018 claim, Coogan argues that Welch cannot establish a prima facie case of defamation against him as a matter of law.

Under Michigan law, a claim for defamation has four elements: the defendant (1) made a false and defamatory statement about the plaintiff, (2) published the statement to a third party, (3) was at least negligent in publishing the statement, and (4) the statement is either defamatory per se, or the publication caused special harm. *Colista v Thomas*, 616 N.W.2d 249, 254 (Mich. Ct. App. 2000); *Mitan*, 706 N.W.2d at 421.

Coogan first argues that he did not make a false statement about Welch because Welch did perjure himself and admitted it. Truth is a defense to an allegation of defamation. *Lawrence v. Burdi*, 886 N.W.2d 748, 755 (Mich. Ct. App. 2016). But viewing the evidence in the light most favorable to Welch, a reasonable jury could find that Welch did not perjure himself and never admitted to such. And it is undisputed that Coogan told other people, including multiple police lieutenants, the union representative, and the members of the Commission, that Welch had lied in his deposition. Welch also made a statement to a local newspaper about Welch being suspended (although the article did not explicitly state that Welch was accused of perjury). So there is a genuine dispute over falsity.

The fact that Coogan talked to multiple people and gave an interview to a newspaper is also sufficient to meet the publication requirement of defamation. *Colista*, 616 N.W.2d at 254.

And if Coogan's statement about Welch was false, it is also a question of fact whether Coogan was at least negligent in publishing the statement. Welch has pointed to sufficient facts to create a genuine dispute on that question.

Finally, Coogan argues that even if Welch can show the other elements, he cannot show either that the defamation was per se or that it caused special harm. Under Michigan law, words charging the commission of certain crimes, including crimes involving moral turpitude or which subject the plaintiff to "infamous punishment," are defamatory per se. *Lakin v. Rund*, 896 N.W.2d 76, 81 (Mich. Ct. App. 2016). Perjury is considered both a crime involving moral turpitude and a crime of "infamous punishment." *Id.* at 82, 84. Coogan notes that the Commission only brought disciplinary charges against Welch for the alleged perjury, and there was never a criminal action against him. (ECF No. 39, PageID.1967.) This is irrelevant. It does not matter that Welch was never actually charged with a crime, only that the statements made by Welch implied that he committed a crime. *See* M.C.L. 600.2911(1); *Hope-Jackson v. Washington*, 877 N.W.2d 736, 746 (Mich. Ct. App. 2015).

Because there is a genuine dispute over whether Coogan falsely accused Welch of perjury, Coogan's motion for summary judgment on this claim fails.

## C.

Finally, Welch alleges that Coogan wrongfully interfered with Welch's business relationship or expectancy.[1] Welch argues that Coogan intentionally interfered with his employment in both 2016 and 2018 by accusing him of perjury and helping to facilitate charges

---

[1] At the summary judgment hearing, Welch clarified that his claim is for tortious interference with a business relationship or expectancy and not tortious interference with a contract.

against him by the Commission. Welch claims this interference led to his 30-day suspension in 2016 and harm to his professional reputation and goodwill.

Coogan asserts that he did not interfere with Welch's business relationship with the City.

Under Michigan law, the elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy, (2) defendant had knowledge of the relationship or expectancy, (3) defendant intentionally interfered by inducing or causing a breach or termination of the relationship or expectancy, (4) resultant damage to the plaintiff. *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (internal citations omitted).

Assuming, for the sake of efficiency, that Welch can establish the first two elements, his claim stumbles on the third and fourth elements.

The third element of this claim requires that Welch prove either "the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Erickson's Flooring & Supply Co. v. Tembec, Inc.*, 212 F. App'x 558, 565–66 (6th Cir. 2007) (quoting *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984)). "The interference must be both intentional and improper." *Weitting v. McFeeters*, 304 N.W.2d 525, 529 (Mich. Ct. App. 1981).

Most of the actions Coogan is accused of—reporting suspected wrongdoing to the Commission, drafting the complaint, administering the trial board, etc.—cannot be considered per se wrongful as they are tasks related to legal business of the City within the scope of Coogan's employment as city attorney. It is possible that a false accusation of perjury could

be considered wrongful per se, but "where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Erickson's Flooring*, 212 F. App'x at 566. Although the central question of fact of this case is whether Welch lied under oath, Coogan asserts that he honestly believed Welch had committed perjury and reported this to the Commission as part of his job as the city attorney. Welch does not offer sufficient evidence to refute this statement or to establish that Coogan's actions were not motivated by legitimate business reasons.

If Welch cannot establish that Coogan's actions were per se wrongful, Welch must show that Coogan acted with malice and without justification. Welch does not specifically allege malice in either his amended complaint or his motion for summary judgment. The Sixth Circuit requires that "the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 716 (6th Cir. 2018).

Even if Welch can show a per se wrongful or malicious act, the third element of tortious interference also requires the plaintiff to establish specific intent to interfere with a business relationship. *See Auburn Sales*, 898 F.3d at 718. But there is no evidence beyond Welch's bare assertions that Coogan acted with the purpose or desire to interfere with Welch's business relationship with the City. *Id.* (finding that establishing intent to counterfeit is not sufficient to prove tortious interference without demonstrating intent to interfere with a business relationship); *Erickson's Flooring*, 212 F. App'x. at 566 ("To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the . . . defendant that corroborate the improper motive of the interference." (internal quotation omitted)).

So, the evidence does not create a genuine issue of material fact as to whether Coogan tortiously interfered with Welch's contract, business relationship, or business expectancy.

This is also true based on the damage element.

Welch argues that in 2018 Coogan "threatened and advocated for [Welch's] suspension, demotion, and/or termination, which will result in the loss of his retirement benefits." (ECF No. 24, PageID.1108.) But after this lawsuit was filed, the Commission dropped the disciplinary charges against Welch and rescinded the relevant resolution. (ECF No. 42, PageID.3487.) Welch retired as planned with full benefits. (ECF No. 38-5, PageID.1562.) Thus, there was no resultant damage to Welch's employment relationship with the City.

Welch also claims that Coogan's 2018 actions "tainted his employment record such that future law enforcement and security employers will not seriously consider [Welch] as a candidate." (ECF No. 42, PageID.3516.) Welch cannot establish a valid business expectancy for speculative future employment because the record fails to identify an expectancy with any other specific employer. *Cedroni Ass'n*, 802 N.W.2d at 687 (internal citations omitted) ("A valid business expectancy is one in which there exists a reasonable likelihood or probability that the expectancy will come to fruition; mere wishful thinking is not sufficient to support a claim.") Moreover, the only record support for the proposition that Welch's employment prospects were harmed is his own declaration. (*See* ECF No. 42-48, PageID.5719.) But Welch's affidavit only contains his personal supposition about his job prospects. It contains no objective facts about Welch's attempts to find other employment or any negative impact on his reputation or employment prospects. In fact, during argument at the summary judgment hearing, Welch admitted that he has been offered another job and turned it down. Again, while

the court recognizes the position was as a security guard, there is no record evidence that Welch sought and was refused employment as a police officer. Welch's speculative assertion about harm to his reputation is insufficient to support a finding of resultant damage for the 2018 allegations.

## VI.

For all of these reasons, Defendants are entitled to summary judgment and dismissal of (1) the official capacity claims against Bolton, McIsaac, McDaniel, Hall, and Coogan; (2) the claim of First Amendment retaliation for actions taken in 2018; (3) the claim of conspiracy under § 1985; (4) the procedural due process claim for both liberty and property interests; and (5) the state-law claim of tortious interference with a business relationship or expectancy.

Because there are genuine disputes over material facts, the following claims remain for trial: (1) the claim of First Amendment retaliation against the City of Melvindale as well as Bolton, McIsaac, McDaniel, Hall, and Coogan in their individual capacities for actions leading to Welch's 2016 suspension; and (2) the state-law claim of defamation against Coogan in his individual capacity.

Accordingly, the Court GRANTS IN PART and DENIES IN PART the Defendants' motions for summary judgment. (ECF No. 38; ECF No. 39.)

SO ORDERED.

Dated: December 20, 2019

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE